<pre>
1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA
2
   ------------------------------------------------------------
3                                 )
   United States of America,      )   File No. 18CR149
4                                 )        (SRN/DTS)
            Plaintiff,            )
5                                 )
   vs.                            )   Minneapolis, Minnesota
6                                 )   September 10, 2018
   Norris Deshon Andrews,         )   10:34 A.M.
7                                 )
            Defendant.            )
8  ------------------------------------------------------------
9
       BEFORE THE HONORABLE MAGISTRATE JUDGE DAVID T. SCHULTZ
10                 UNITED STATES DISTRICT COURT
                      (MOTIONS HEARING)
11
   APPEARANCES
12   For the Plaintiff:          United States Attorney's Office
                                 JEFFREY PAULSEN, AUSA
13                               300 South Fourth Street
                                 Suite 600
14                               Minneapolis, MN 55415

15   For the Defendant:          Office of the Federal Defender
                                 REYNALDO ALIGADA, JR., ESQ.
16                               300 South Fourth Street
                                 Suite 107
17                               Minneapolis, MN 55415

18   Court Reporter:             KRISTINE MOUSSEAU, CRR-RPR
                                 1005 U.S. Courthouse
19                               300 South Fourth Street
                                 Minneapolis, MN 55415
20

21

22
       Proceedings recorded by mechanical stenography;
23   transcript produced by computer.

24

25
</pre>

```
1                                              10:34 A.M.

2

3                        (In open court.)

4              THE COURT:  Good morning, everyone.  Please be

5      seated.

6              All right.  Good morning.  We are on the record

7      in the matter of the United States versus Norris Deshon

8      Andrews, Criminal Number 18-149.

9              Will counsel for the government note your

10     appearance for the record?

11             MR. PAULSEN:  Good morning.  Jeff Paulsen for the

12     United States.

13             THE COURT:  Good morning, Mr. Paulsen.

14             And for the defendant?

15             MR. ALIGADA:  Good morning, Your Honor.  Reggie

16     Aligada on behalf of Mr. Andrews, who is present before the

17     Court.

18             THE COURT:  Good morning, Mr. Aligada and

19     Mr. Andrews.

20             All right.  We have a number of motions on the

21     schedule.  As to the nondispositive motions, is there any

22     further argument, Mr. Paulsen?

23             MR. PAULSEN:  No.  I set it out in my response.

24     I don't think we have any outstanding controversies at this

25     time.
```

1          THE COURT:  Okay.  Mr. Aligada, are you in

2     agreement with that?

3          MR. ALIGADA:  I'm not, Your Honor.  There are a

4     couple issues that I want to raise --

5          THE COURT:  Okay.

6          MR. ALIGADA:  -- with regard to the

7     nondispositive discovery motions.  In docket 26 in

8     paragraph 4 on page 2, I requested copies of body worn

9     camera video that is, that was produced in the

10    investigation of this case.

11         Mr. Paulsen has informed me that he views that, I

12    believe that he views that to be *Jencks* or otherwise not

13    within the scope of Rule 16.  My perspective is that body

14    worn camera by police officers goes to issues that are

15    front and center here in the pretrial motions hearing,

16    namely the nature of the investigation and what led to

17    investigative decisions on the way to the traffic stop that

18    is at issue in the seizure of the gun.

19         I understand that Mr. Paulsen disagrees with me,

20    but I want to make that record, and there is one other

21    procedural issue that I want to raise as to discovery

22    whenever the Court sees fit.  It's not related directly to

23    a motion.

24         THE COURT:  Okay.  Let me ask you this first:

25    With respect to this aspect of docket number 26, do you

1    need or want further briefing on that issue?

2                 MR. ALIGADA:  Yes.

3                 THE COURT:  Okay.

4                 Mr. Paulsen, do you have a need for further

5    comment this morning?

6                 MR. PAULSEN:  Well, so there are two categories

7    of body worn cameras.  If Mr. Andrews is pictured on a body

8    worn camera such as when he is arrested, then I gave that.

9                 If he's not pictured and officers are just going

10   about investigating the crime scene and interviewing

11   witnesses, some of whom are scared to death for their

12   lives, then I have not given those because it's not Rule

13   16.  It's *Jencks*.

14                So I'm happy to brief it, but that's the reason

15   for my distinction.

16                THE COURT:  Understood.

17                Mr. Aligada, how much time do you need to brief

18   this issue, then?  Does Mr. Paulsen's comment and

19   distinction make a difference to you?

20                MR. ALIGADA:  It does not, Your Honor, and I

21   would like to brief it.  I guess I would tie it to whatever

22   briefing would potentially be due after this evidentiary

23   hearing, Your Honor.  I could include that in the same

24   memorandum.

25                THE COURT:  Okay.  Very well.  We will address

1    that at the end of the evidentiary hearing.

2              MR. ALIGADA:  Okay.

3              THE COURT:  What is the other issue?

4              MR. ALIGADA:  The other procedural issue, Your

5    Honor, is just, I guess what it comes down to is, I want to

6    reserve the right to potentially reopen this motions

7    hearing as to the evidentiary portion of things.  I'm not

8    asking for a continuance today, and I just want to make

9    sure that the Court is aware of why that is the case.

10             It may be that I don't do it, but if I need to do

11   it, I want to be clear about why and certainly can put this

12   in writing.  This case, the process of discovery has

13   happened more slowly and more toward the end of this

14   hearing than I would have liked.

15             In addition to the memorandum or the motion

16   itself, a few weeks back I had asked Mr. Paulsen for

17   specific things as it regards to overall discovery but this

18   motions hearing as well.  This past Friday at 4:30, between

19   4:30 and five o'clock, I received squad car camera video

20   that relates to the traffic stop that is at issue in this

21   case.

22             I don't believe that it is all of the squad car

23   video and particularly the vehicle behind the actual

24   vehicle that is stopped in this case.  I'm not sure whether

25   I have the squad car video of that, and so I don't know if

1    it would be relevant.  I don't know what is in it until I

2    have it, and so that information was disclosed quite late

3    in the process.

4              And I spent the weekend working through it.  I

5    had it delivered to Mr. Andrews over the weekend, but I'm

6    still not confident that I know everything that I need to

7    know to proceed with this hearing today.  There are two

8    other issues that were relevant.  I think what will come up

9    today is cell phone tracking and cell phone call detail

10   reports.

11             The initial disclosure gave a little bit of that

12   information, and I asked for more of it.  That came last

13   week as well, and I can't remember whether that was

14   Wednesday of last week or Thursday of last week.  I'm not

15   trying to belabor why, but if I do need to come back to

16   request to reopen the motion, that is why, Your Honor.

17             THE COURT:  Okay.  And you're not, and you're

18   comfortable proceeding this morning regardless?

19             MR. ALIGADA:  Yes, Your Honor.

20             THE COURT:  Okay.  Well, we will cross that

21   bridge when we get to it.  Okay.  All right.  Thank you.

22             Anything further on the nondispositive motions,

23   Mr. Paulsen?

24             MR. PAULSEN:  No, Your Honor.

25             THE COURT:  Okay.  As to those, let me just put

1     on the record the following:

2            Docket number 24, the motion for Rule 404

3     evidence is granted to the extent that it is Rule 404

4     evidence and not intrinsic to the offense charged.

5            Docket number 25, the request for *Brady* and

6     related material, is granted.

7            Docket number 26, the motion for discovery is

8     granted with the exception of the issue that Mr. Aligada

9     brought up this morning regarding body worn cameras.  That

10    issue is reserved and not ruled on.

11           With respect to docket number 27, the interview

12    of the informant or informants, that is granted in the

13    scope suggested by the government.

14           Number 28, the request for disclosure of early

15    Jencks Act material, will be denied as moot based on the

16    representation of the government that it will voluntarily

17    produce such information.

18           I believe, Mr. Paulsen, you said two weeks before

19    trial or a week before trial?

20           MR. PAULSEN:  Well, on *Jencks*, it's three

21    business days before trial.  404(b) was two weeks before.

22           THE COURT:  Okay.  Thank you.

23           As to docket 29, the rough notes, that will be

24    granted as to preservation of the notes, but no production

25    of those notes is ordered at this time.  Okay?  All right.

1          Have I covered all the nondispositives from your

2     perspective, Mr. Paulsen?

3          MR. PAULSEN:  Yes, Your Honor.

4          THE COURT:  And yours, Mr. Aligada?

5          MR. ALIGADA:  Yes, Your Honor.

6          THE COURT:  Okay.  So let's proceed to the

7     dispositive motions.

8          Mr. Paulsen, are you ready?

9          MR. PAULSEN:  Yes.  The government will have two

10    witnesses.  They're sequestered.  The case agent is also in

11    the back, David Voth.  The first witness is Sergeant Kelly

12    O'Rourke, the Minneapolis Police Department.

13          THE COURT:  Sergeant, if you would come on up.

14    Raise your right hand, please.

15                    **(Witness sworn.)**

16          THE WITNESS:  Yes, sir, I do.

17          THE COURT:  Please be seated.  State your full

18    name for the record and spell your last name, please.

19          THE WITNESS:  Kelly James O'Rourke, O apostrophe

20    R-o-u-r-k-e.

21          THE COURT:  Go ahead.

22

23

24

25

**KELLY O'ROURKE,**

1
2    after having been first duly sworn, was examined and

3    testified as follows:

4                        **DIRECT EXAMINATION**

5    BY MR. PAULSEN:

6    Q.  Sergeant O'Rourke, who do you work for?

7    A.  Minneapolis Police Department.

8    Q.  How long have you been a Minneapolis Police Department

9    officer?

10   A.  21 years.

11   Q.  You have been a sergeant for the last 16?

12   A.  Yes.

13   Q.  At the time of this offense, what division or component

14   were you working for?

15   A.  I worked for the violent crimes division investigating

16   shootings.

17   Q.  So turn your attention to May 15th of 2018.  Were you

18   working that day?

19   A.  Yes.  At some point, I was.

20   Q.  Well, I guess to be more specific, did you get

21   information about a shooting that had just occurred?

22   A.  I did.  I got called by my lieutenant and asked to come

23   in and start investigating a shooting.

24   Q.  All right.  This is what we're going to be talking

25   about today.  What time of day did that shooting take

1    place?

2    A.  Approximately 4:45.

3    Q.  In the afternoon?

4    A.  Yeah.

5    Q.  And where did it occur?

6    A.  1711 Plymouth, I believe.

7    Q.  Is that in North Minneapolis?

8    A.  Yes.

9    Q.  Just tell us a little bit about what you learned from

10   talking to other officers about who the victims were, what

11   happened, what witnesses, eyewitnesses, said to the

12   officers who responded.

13   A.  I was told upon arrival there was video of the incident

14   of good quality.  I was told that there was an argument and

15   that there was a male seen shooting another male, and then

16   shortly thereafter, a second male fell down, and then that

17   male fled in a blue older model Tahoe with no plates, no

18   front plates.

19   Q.  And did you -- was one of the things you did to

20   investigate this view that video, the surveillance video?

21   A.  I did.

22   Q.  And having personally viewed it, how would you describe

23   its quality?

24   A.  The quality was good.

25              MR. PAULSEN:  Your Honor, I'm going to offer

1    Government's Exhibit 1 at this time which is, it says it's

2    the cropped video of the shooting.

3    BY MR. PAULSEN:

4    Q.  Could you explain what we mean by "cropped video"?

5    A.  I'm not entirely sure.  The crime lab would have

6    handled that.  So I'm not sure exactly what cropped -- I'm

7    assuming it's to capture the time frame within the

8    shooting --

9    Q.  All right.

10   A.  -- and the fleeing.

11   Q.  Okay.  If I represent to you that it also looks like

12   it's been condensed so that it focuses on the shooters as

13   opposed to the whole panorama, would you accept that?

14           MR. ALIGADA:  Objection.  Leading and foundation.

15           THE COURT:  Overruled.

16           THE WITNESS:  Yes.

17           MR. PAULSEN:  Okay.  I'm going to offer Exhibit 1

18   with the understanding that it looks to me like it has been

19   shrunk down or blown up, I guess, from the original.

20           THE COURT:  Mr. Aligada, any objection?

21           MR. ALIGADA:  I object.  Lack of foundation.

22           THE COURT:  Overruled.  It will be received.

23   BY MR. PAULSEN:

24   Q.  And I showed you Exhibit 2, a couple of still frame

25   photos from that video.  Are you familiar with those?

1    A.  That's correct.

2    Q.  Do those fairly and accurately represent what's

3    depicted on the video?

4    A.  That's correct.

5              MR. PAULSEN:  I offer 2.

6              MR. ALIGADA:  Same objection, Your Honor.

7              THE COURT:  Same ruling.  Overruled.  It will be

8    received.

9    BY MR. PAULSEN:

10   Q.  I'm going to put these on the Elmo or --

11             THE COURT:  Please.

12   BY MR. PAULSEN:

13   Q.  Okay.  Can you orient us here?  Who is the suspect in

14   this photo?

15   A.  From left to right, he would be the third person in the

16   photo.  From right to left, he would be the second person

17   in the photo.

18   Q.  All right.  And the vehicle behind him, is that the

19   vehicle that you described before?

20   A.  That's correct.

21   Q.  And it turns out to be a blue Tahoe with no license

22   plates?

23   A.  That's correct.

24   Q.  In addition to viewing the video, did you get

25   information from some other eyewitnesses about the identity

1    of the suspect shooter?

2    A.  Yes.

3    Q.  And that came through officers on the scene who were

4    interviewing the witnesses?

5    A.  That's correct.

6    Q.  And what did you learn?

7    A.  I learned that the shooter was named N O and that some

8    of those witnesses physically showed a picture of N O.

9    Then another witness explained that his full name was

10   Norris Andrews and that one of the witnesses had learned

11   that this was a disagreement and that he was committed to

12   shooting.

13   Q.  And the witness who gave the full name Norris Andrews,

14   I think it was witness 6, did that person also give

15   Andrews' phone number?

16   A.  That's correct.

17   Q.  And do you remember that phone number?

18   A.  I don't remember it off the top of my head.

19   Q.  We'll get to it in a second when we get to another

20   exhibit.  So armed with the information that witnesses were

21   saying was Norris Andrews, did you do anything to compare

22   the person you saw in the shooting video to Norris Andrews?

23   A.  I did.  I looked up in the HennRAP or MRAP basically

24   the jail photos.  I took a picture off of that, and I

25   compared it to the photos in the videos.

1    Q.  And what was your conclusion?

2    A.  It was, it was the same person.

3    Q.  Were you fairly confident that it was Norris Andrews?

4    A.  Yes.

5    Q.  So now you had a name and the phone number.  What did

6    you do with respect to that phone number?

7    A.  I continued to do more research on the phone number,

8    and upon doing so, I found that there was some subscriber

9    information that came up with the last name of Andrews.

10   Q.  Okay.  So the phone was subscribed to someone with the

11   last name of Andrews?

12   A.  That's correct.

13   Q.  Different first name, though?

14   A.  In this particular general search, you don't get a last

15   name --

16   Q.  Okay.  And so what did you do with respect --

17   A.  Not a first name.

18   Q.  What did you do with respect to that phone, then?

19   A.  Well, as I continued to get information from officers,

20   I also learned that there was a shots fired call in the

21   similar area about an hour before this, and at that scene

22   were similar shell casings.  Basically what I mean by

23   "similar" is they were both nine millimeter shell casings.

24          In that case, a blue Chevy Tahoe with no plates

25   was described as a potential suspect vehicle.

1    Q.  And that shooting an hour earlier from this one, was

2    that in this same general area?

3    A.  Yes.

4    Q.  Okay.

5    A.  So based on the knowledge of what the witnesses had

6    said, the fact that there was a shots fired call an hour

7    before this, there was an actual shooting on video that I

8    witnessed, I wrote an exigent order to T-Mobile to obtain

9    realtime locations.

10   Q.  For that phone?

11   A.  Yes.

12   Q.  And is that what is contained in Government's

13   Exhibit 3?

14   A.  Yes.

15             MR. PAULSEN:  Offer 3.

16             MR. ALIGADA:  No objection, Your Honor.

17             THE COURT:  3 will be received.

18   BY MR. PAULSEN:

19   Q.  And is this the phone number in question here

20   (indicating)?

21   A.  That's correct.

22   Q.  Can you read it into the record, please?

23   A.  (651) 502-5142.

24   Q.  These exigent orders, if people aren't familiar with

25   them, have you used these in the past in these types of

1      investigations?

2      A.  I have.

3      Q.  What's the standard for getting an exigent order like

4      this?

5      A.  There needs to be a threat to public safety.

6      Q.  And so you can do this on your own.  You don't have to

7      go to a judge to get it signed off on ahead of time?

8      A.  That's correct.

9      Q.  That's for a limited period of time, isn't it?

10     A.  Yes.

11     Q.  Do you remember how long it is?

12     A.  24 hours.

13     Q.  And it hasn't been challenged, but is there a statute

14     that authorizes this?

15     A.  There is.

16     Q.  It looks like you do have to memorialize your reasons

17     for the exigency, and did you do that in this document that

18     you submitted to the phone company?

19     A.  I did.

20     Q.  And that's what we're seeing on page 2?

21     A.  That's correct.

22     Q.  There is -- wait a second.  In the middle it talks

23     about the identified suspect -- that would be Norris

24     Andrews -- has an extensive criminal history involving

25     weapons and narcotics.

1          Had you researched his criminal history after you

2    ID'd him on the video?

3    A.  I had.

4    Q.  It also goes on to say, and this is why I brought up

5    the cropped part about the video.  The egregious part is

6    that after shooting one of the victims multiple times, the

7    suspect got back out of his vehicle and made another

8    attempt to finish him off, shooting at him a few more

9    times.

10          On the uncropped video, do you see that happen?

11    A.  Yes.

12    Q.  Okay.  And if it's not on the cropped video, that may

13    be because somebody blew it up just to cover the initial

14    shooting?

15    A.  Correct.

16    Q.  Okay.  By the way, in this incident that was captured

17    on the surveillance video, was there another person with

18    Mr. Andrews?

19    A.  There was.

20    Q.  And did witnesses identify that person?

21    A.  Yes.

22    Q.  And who did that turn out to be?

23    A.  Montrel Tyson.

24    Q.  Montrel Tyson?

25    A.  Yes.

1    Q.  Okay.  And after the shooting, I think we have

2    established that Mr. Andrews got in the blue Tahoe and

3    drove away?

4    A.  Correct.

5    Q.  What happened to Montrel Tyson?

6    A.  I don't recall.  I believe he ran off.

7    Q.  All right.  Had he arrived in the blue Tahoe with

8    Mr. Andrews?

9    A.  Yes.

10   Q.  Okay.  You may have covered this, but just in case, did

11   you run a records check on a blue Tahoe?

12   A.  No, because I did not have enough information on it,

13   but what I did do is ran a search on our internal database

14   and came up with a case number that referenced the Tahoe

15   and an owner.

16   Q.  Okay.  And was that a recent case?

17   A.  Yes.

18   Q.  And what did you learn about the ownership of the blue

19   Tahoe from that report?

20   A.  That it belonged to Norris Andrews' baby's mother.

21   Q.  And did you know that before Mr. Andrews was arrested

22   that night?

23   A.  Yes.

24   Q.  Was there one other piece of information relayed to you

25   about, having to do with where Andrews and Tyson went right

1    after the shooting, like some girlfriend's?

2    A.  Tyson went to a girlfriend's house and told her exactly

3    what happened.

4    Q.  How do you know that?

5    A.  Because there was a police report written by officers

6    on-scene, and they relayed this information to me.

7    Q.  All right.  Is this something you knew before

8    Mr. Andrews gets arrested later that night?

9    A.  That's correct.

10   Q.  I misspoke.  It was only Tyson that ran to the

11   girlfriend's house?

12   A.  Yes.

13   Q.  And some officers went over there and interviewed the

14   girlfriend?

15   A.  Yes.

16   Q.  And what did you learn as a result of that interview?

17   A.  The girl stated that Tyson called Andrews from her cell

18   phone, and it's one of the people that provided us with the

19   cell phone number.

20   Q.  Okay.  Did the girlfriend provide any information about

21   the shooting itself?

22   A.  She said that there was a disagreement.  Whether it was

23   about money or drugs I don't remember for sure, but that

24   they were, Andrews was agitated and was committed to

25   shooting the person that owed him.

1   Q.  And this is something the girlfriend knew from talking

2   to her boyfriend, Montrel Tyson?

3   A.  That's correct.

4   Q.  And then she said that Tyson called Andrews while Tyson

5   was at her place?

6   A.  Correct.

7   Q.  And did the officers who went out to check the story

8   look at her phone to confirm that?

9   A.  Yes.

10  Q.  And that same number was in the phone, the (651)

11  502-5142?

12  A.  That's correct.

13  Q.  Okay.  Now I want to jump ahead several hours to the

14  time that Mr. Andrews gets arrested.  You applied for this

15  ping order, and what do you actually get back from the

16  phone department when you are pinging a phone?

17  A.  I get e-mails every 15 minutes with just a longitude

18  and a latitude and an error ratio.  For example, in this

19  case it was 9 to 21 meters.

20  Q.  Okay.  And you get these every 15 minutes or so?

21  A.  That's correct.

22  Q.  Through the e-mails, can you track the movement of the

23  phone?

24  A.  That's correct.

25  Q.  Did there come a time when the phone seemed to be

1    stationary at a particular location?

2    A.  Yes.

3    Q.  About what time of day is this?

4    A.  10:16 p.m. through about 11:41 p.m., approximately.

5    Q.  And once you determined that the phone was stationary,

6    did you make note of the location?

7    A.  I did.

8    Q.  And where was the phone stationary?

9    A.  Boy, I would have to look at my notes.  I believe it

10   was 2810 Girard.

11   Q.  I'm looking through your report to make sure we get it

12   right here.  Okay.  2810 Girard, and within what error rate

13   according to the text that you got?

14   A.  I got anywhere from 9 meters to 21 meters.

15   Q.  All right.  So did you notify other officers of the

16   location where you believed Norris Andrews might be at some

17   point?

18   A.  I did.

19   Q.  About what time of the evening or night was that?

20   A.  About 11:30 p.m.

21   Q.  What did you tell them?

22   A.  I told them I was getting consistent hits at 2810

23   Girard, and I asked them to go up there and see if they

24   could look for the suspect vehicle and/or Andrews himself.

25   Q.  At that point, you still thought he might be using the

```
 1    blue Tahoe?

 2    A.  That's correct.

 3    Q.  And who did you relay this information to?

 4    A.  Officer Schroeder and Sergeant Pucely.

 5    Q.  We're going to be hearing from Sergeant Pucely next

 6    about the actual arrest, but let me cover some other things

 7    with you while you're up here.  Well, does it turn out that

 8    he is arrested in the blue Tahoe or in some other vehicle?

 9    A.  He was in another vehicle.

10    Q.  And what type of vehicle was that?

11    A.  It was another Tahoe or Yukon, full-sized SUV.

12    Q.  And this Yukon, did you eventually determine -- well,

13    let me ask you this:  Was he the driver or the passenger of

14    the Yukon?

15    A.  He was a backseat passenger.

16    Q.  Mr. Andrews was?

17    A.  Correct.

18    Q.  Okay.  The driver turned out to be a female?

19    A.  That's correct.

20    Q.  What was her name?

21    A.  I do not remember her name off the top of my head.

22    Q.  Would you know it if you heard it.

23    A.  Yes.

24    Q.  Was it Dominique Smith?

25    A.  Yes.
```

1          MR. ALIGADA:  Objection.  Leading.

2          THE COURT:  Overruled.

3    BY MR. PAULSEN:

4    Q.  Dominique Smith sound right?

5    A.  Yes.

6    Q.  All right.  And did you do some further investigation

7    to find out whose vehicle it actually was?

8    A.  I did.

9    Q.  Whose was it?

10   A.  It belonged to her father.

11   Q.  You talked to him personally about that?

12   A.  I did.

13   Q.  Did she have consent of the father to be using the

14   vehicle?

15   A.  She did.

16   Q.  Did Mr. Andrews have any consent to be in possession of

17   the vehicle?

18   A.  No.

19   Q.  Did you ever find the blue Tahoe that Mr. Andrews --

20   that was depicted in the surveillance video?

21   A.  I did.

22   Q.  How did you find that?

23   A.  During -- after all three parties were brought down to

24   my office to be interviewed --

25   Q.  Okay.  Well, let's make clear we know which three

1     parties you're talking about.  When the Yukon is pulled

2     over, Dominique Smith is driving?

3     A.  Yep.

4     Q.  And Norris Andrews was the backseat passenger?

5     A.  Correct.

6     Q.  And was there a third person?

7     A.  Montrel Tyson.

8     Q.  The same Montrel Tyson we have been talking about?

9     A.  Correct.

10    Q.  He was the front seat passenger?

11    A.  Correct.

12    Q.  So you had all three of them brought to the station to

13    be questioned?

14    A.  Correct.

15    Q.  Let's focus on Dominique Smith.  This was late at

16    night, I assume, like after midnight?

17    A.  Yeah.

18    Q.  Okay.  What did Dominique Smith tell you about what was

19    going on that night?

20    A.  She told me that she had no idea what was going on.

21    She had received a call from the boys asking her to come

22    pick them up in the area of like 26th and James,

23    approximately, and then she was late.  So she got another

24    call to come to 2810 Girard.

25              After I had completed all my interviews, my

1    assessment of Smith is she was being pretty

2    straightforward, and I thought there was only one reason

3    they would go to 26th and James would be to logically drop

4    off the vehicle.

5              So I asked squads to go out there and check the

6    area, and that's where they did find the vehicle.

7    Q.  At 26th and James?

8    A.  Yes.

9    Q.  They found the blue Tahoe?

10   A.  Yes.

11   Q.  Okay.  And did you eventually get a search warrant to

12   search that blue Tahoe?

13   A.  I did.

14   Q.  Was this the application for the search warrant,

15   Government's Exhibit 7?

16   A.  Yes.  That's correct.

17   Q.  Can you see it?

18   A.  I've seen it.

19                        **(Counsel confer.)**

20             MR. PAULSEN:  Apparently I gave copies of all

21   these exhibits, I thought, to Mr. Aligada, but apparently

22   that one was not in his package.

23             Mr. Aligada is saying that he didn't get this

24   before, but I don't know if that's an objection to its

25   receipt or not.

1              THE COURT:  Are you offering it?

2              MR. PAULSEN:  I'm offering it.

3              MR. ALIGADA:  Yes, I object to it.  I do not

4    believe I got this document.

5              MR. PAULSEN:  Well -- yeah.  It's fine.  It may

6    be moot because up until now there has been no motion to

7    suppress the contents of the Tahoe.  So I was going to put

8    it in out of an abundance of caution, but it really doesn't

9    go to any motion that has been filed at this point.

10             MR. ALIGADA:  I didn't know about it before

11   Mr. Paulsen tried to elicit testimony.

12             THE COURT:  Let's take a pause for a second.  I

13   certainly don't want to do this twice, and I don't want to

14   delay this unnecessarily, but is this indicating that we

15   really should re-think this, or do you want to proceed?

16             MR. ALIGADA:  Can I speak with my client, Your

17   Honor?

18             THE COURT:  Sure.

19             **(Counsel confers with defendant.)**

20             MR. ALIGADA:  Thank you, Your Honor.  I had a

21   chance to speak with Mr. Andrews.  I want to make sure that

22   I include him in any decision about a potential delay in

23   the hearing.

24             THE COURT:  Sure.

25             MR. ALIGADA:  To the extent that the Court would

1    allow us to delay the hearing, Mr. Andrews is wondering

2    whether that means a couple of days, whether it means a few

3    months.  That matters to his decision.

4            THE COURT:  Sure.  Well, I don't have my calendar

5    in front of me.

6            MR. ALIGADA:  Understood.

7            THE COURT:  I believe my schedule is open on

8    Thursday and for Friday.

9            Mr. Paulsen, do you know your schedule?

10           MR. PAULSEN:  I have a three o'clock motions

11   hearing in Minneapolis on Thursday and nothing on Friday.

12           THE COURT:  Let's hang on a second.

13           MR. PAULSEN:  I propose we get as far as we can

14   today.  The second witness is brief and doesn't have

15   anything to do with those controversies.

16           MR. ALIGADA:  Well, squad video matters because

17   the squad video I'm trying to find is the squad video from

18   the next witness's vehicle, and I will just represent I'm

19   totally free on Thursday and all through the day on

20   Thursday if Mr. Paulsen has an afternoon hearing.

21           THE COURT:  I'm waiting for what I just told my

22   clerk was my Blackberry.  I don't know where that came

23   from.  I'm waiting for my phone.

24                         **(Off-the-record.)**

25

1           THE COURT:  All right.  As I look at my calendar,

2    assuming that my phone is up-to-date, I am wide open on

3    Thursday and Friday.

4           Mr. Paulsen, I understand the inconvenience I'm

5    about to impose on the government, but I do think it's

6    prudent to defer this.  What is your preference, and are

7    your witnesses available Thursday morning?

8           **(Counsel confers with witnesses.)**

9           THE WITNESS:  I think we are good.

10           THE COURT:  Okay.  He's good.

11           MR. PAULSEN:  I guess -- yeah.  I guess I would

12    propose the Thursday morning but --

13           MR. ALIGADA:  That's fine.

14           THE COURT:  All right.  Why don't we plan

15    Thursday morning at 10:00 a.m.?  I apologize if we're going

16    to redo some of this or we're going to delay this, but I

17    think that's the better course in light of where we are

18    right now.

19           Okay?

20           MR. PAULSEN:  Sure.

21           THE COURT:  Okay.  Thursday morning, 10:00 a.m.

22    we will reconvene.

23           Thank you, Officer.  I appreciate it.  The Court

24    is in recess.

25           THE CLERK:  All rise.

1          **(Court was adjourned.)**

2

3                    *          *          *

4          I, Kristine Mousseau, certify that the foregoing

5    is a correct transcript from the record of proceedings in

6    the above-entitled matter.

7

8

9

10   Certified by:  s/  Kristine Mousseau, CRR-RPR
                          Kristine Mousseau, CRR-RPR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **I N D E X**

2     KELLY O'ROURKE                                    PAGE

3          Direct Examination by Mr. Paulsen             9

4

5

      GOVERNMENT'S EXHIBITS                             REC'D
6
          1                                             11
7         2                                             12
          3                                             15
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25