UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 18CR149 (SRN/DTS-1) |
| Plaintiff, | ) | |
| vs. | ) | Minneapolis, Minnesota |
| | ) | September 19, 2018 |
| Norris Deshon Andrews, | ) | Courtroom 9W |
| | ) | 3:08 p.m. |
| Defendant. | ) | |

---

BEFORE THE HONORABLE DAVID T. SCHULTZ
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
**(MOTIONS HEARING)**

APPEARANCES

For the Plaintiff: Assistant U.S. Attorney
JEFF PAULSEN, AUSA
300 South Fourth Street
Suite 600
Minneapolis, Minnesota 55415

For the Defendant as Standby Counsel: Assistant Federal Defender
REGGIE ALIGADA
300 South Fourth Street
Minneapolis, MN 55415

Court Reporter: MARIA V. WEINBECK, RMR-FCRR
1005 U.S. Courthouse
300 South Fourth Street
Minneapolis, Minnesota 55415

Proceedings recorded by mechanical stenography; transcript produced by computer.

**P R O C E E D I N G S**

**IN OPEN COURT**

**(3:08 p.m.)**

THE COURT: Good afternoon. Please be seated.

All right. We're on the record in the matter of the United States versus Norris Deshon Andrews, Criminal File Number 18-149. Counsel for the government, if you would note your appearance for the record, please?

MR. PAULSEN: Good afternoon. Jeff Paulsen for the United States.

THE COURT: Good afternoon, Mr. Paulsen. Mr. Aligada?

MR. ALIGADA: Good afternoon, Your Honor. Reggie Aligada on behalf of Norris Andrews, who is present in court.

THE COURT: Good afternoon. So you were saying, Mr. Paulsen?

MR. PAULSEN: We've resolved the discovery issues. It turned out that the missing squad video was on the same disk as the other squad video the whole time. You just had to scroll down to find it, so we both found it, and I think we're ready to resume.

THE COURT: So we're good on that. All right.

MR. PAULSEN: The government would recall Sergeant Kelly O'Rourke.

MR. ALIGADA: Your Honor, may I just be heard on one issue?

THE COURT: Sure. Hang on a second, Sergeant. Go ahead.

MR. ALIGADA: Your Honor, in sitting in the courtroom today with Mr. Andrews, he's indicated to me that he would like to speak to the Court. I don't know what the subject is, but I have learned that when a defendant wants to speak, I should at least let the Court know that that's his intention.

THE COURT: Okay. Mr. Andrews, does it relate to the subject of the suppression motions?

THE DEFENDANT: Yes.

THE COURT: It's up to you, Mr. Aligada. I'll hear Mr. Andrews, if you wish.

MR. ALIGADA: Okay, Your Honor. I can't stand in the way of him wanting to talk to the Court.

THE COURT: Okay, fair enough.

MR. ALIGADA: At the podium or?

THE COURT: Actually, you know, you can stay at the table. Just make sure that the microphone is on.

THE DEFENDANT: Okay. Norris Andrews. There is still discovery issues. And there is still discovery objectives, I mean objections that I have. Outside of what my counsel was talking about. We ain't -- I ain't seeing

eye-to-eye with what he's doing. So if the courts would allow, I would like to appoint myself as my counsel for today. I mean with him as standby counsel, so I can know like the legal formalities. You know, I'm not blind. I don't know how to proceed with the court hearings because I've been studying stuff, and I have all my proper paperwork and things.

Plus if the Court would allow, I would like to enter another motion. I have reason that this motion is late, which is part of the objective, the objections that I have about the discovery issues.

THE COURT: Okay, let me interrupt you for a second, Mr. Andrews. As regards -- make sure you and I are on the same page. As regards to the motion to suppress certain evidence.

THE DEFENDANT: Yes.

THE COURT: Is it your desire to have Mr. Aligada continue to represent you on those motions? Because here's where we are, right? Some of the motions, some of the various motion have been ruled on. You, at least as I understand it, are telling me that there are some discovery requests that you want to be heard on and then there is this issue that we're dealing with today in terms of witnesses about the suppression motion. So.

THE DEFENDANT: It's all in the same, the same

witnesses, these detectives, and the Sergeant O'Reilly (sic), these are the same people, and obviously the prosecutor with the discovery issues. And they'll be the same ones that I would be using or calling to impeach about the discovery issues, so it wouldn't be the latest or nothing.

But I would definitely be wanting to, because I don't feel my counsel is effective and ready for this meeting as he need to be to impeach them, so I will be doing the -- I would like to be doing the questioning myself if the Court could see, you know. And I know my rights. I know I will be waiving letting him talk or whatever, and, okay, I'm not blind to that.

But, as I said, I have grounds to think that I want to put on the record today because this is a motions hearing, and it's a very huge conflict of interest, and I feel like my counsel is working with the other side. So with that being said, I would like to proceed today.

THE COURT: Okay. Let me say a couple of things. Number one, you are more than entitled to your view of Mr. Aligada, but I'm just going to tell you I can't imagine a circumstance in which he is not fully prepared for this.

THE DEFENDANT: He's not.

THE COURT: And is more, well, you're entitled to that view. I'm just going to say as a matter on the record

that I believe Mr. Aligada is fully prepared and will do an excellent job. That notwithstanding, if there's a conflict of interest, Mr. Aligada, perhaps you can enlighten me a little bit.

MR. ALIGADA: Your Honor, I don't believe that we're at a point where I would say the relationship is irretrievably broken. That certainly could happen going forward. I think the issue before the Court though is, I think that what Mr. Andrews is saying is that he would like to represent himself with me as standby counsel for today's hearing. So to be fair, to make sure the issue that he's raising is before the Court, I think that's the issue. And, again, if the Court would ask would I be willing to serve as standby counsel? The answer is yes.

THE COURT: Okay. And I appreciate that, and I understand the request.

THE DEFENDANT: That's not all, Your Honor. I still have issues that I would like to bring forward and put on the record, and they all can be readily proven and the prosecutor has the same paperwork I have because it came from him about without having no new hearings about the merits of it. It can all be readily proven right here today, once I give you this motion, if you'll accept it, you know, and we could move forward with this motions hearing.

THE COURT: Yeah, I think what we should do, first

of all, Mr. Paulsen, does the government need or want to be heard on any of this?

MR. PAULSEN: Well, I mean we're getting into the area of a *Faretta* waiver, and he is entitled to represent himself, but only if he can make a valid waiver. What I hear him saying is if he wants to kind of have it both ways and have Mr. Aligada help him but also introduce his own evidence or make his own statements, and I have no objection to that. He can take the stand and testify at a motions hearing like anybody else, but it's subject to cross-examination.

Or if he's got some written statement that he wants to submit to augment the record, normally, clients are not allowed to do that when they have their own lawyer, but I'll waive that objection just to accommodate his interests here. But I think it's not in his interest to proceed pro se even with a standby counsel. It's very perilous. He doesn't have a law degree, as far as I know, and probably is not well educated in the rules of evidence and the other rules, and so I would strongly counsel against that.

In response to his concern that Mr. Aligada and I are in collusion against him, that's not true. We're both doing our jobs the best we can.

THE DEFENDANT: As I stated before, I have concrete evidence that's readily available. We wouldn't

have to continue this meeting. It wouldn't take long to show these things as we go along with the same said motions hearing with the same officers, except for I'm just going to be adding one more motion that I would like to have placed on the record and we discussed with the same officers and the same prosecution about issues.

THE COURT: I understand. What I'm trying to get to -- well, what I'm trying to get to is on the motion to suppress, I would agree with Mr. Paulsen that it is really not in your interest not to be represented by Mr. Aligada, but what I'm also hearing you and Mr. Aligada say is that you wish to represent yourself for all purposes of today's hearing with Mr. Aligada as standby counsel. Am I hearing that correctly?

THE DEFENDANT: Correct.

THE COURT: All right. Well, I'll tell you quite honestly, I've never encountered this. I haven't been on the bench that long. I'm blessed with a little bit of knowledge, which may make me dangerous. So let me ask you this, Mr. Andrews, you understand, first of all, that you have the right to be represented by counsel, correct?

THE DEFENDANT: Yes.

THE COURT: You understand that counsel has been appointed to represent you, correct?

THE DEFENDANT: Correct.

THE COURT: You understand as a practical matter that if there has been and call it an irretrievable breakdown relationship between you and your lawyer, that the Court will allow you to be represented by a different lawyer though it's not going to be a lawyer of your choosing. It will be somebody the Court appoints, do you understand that?

THE DEFENDANT: Correct, and at the end of the hearing that's very well what may happen after I put my next motions in.

THE COURT: Okay. And you understand that if I let you go forward representing yourself in today's hearing, that you are -- you don't have a law degree, correct?

THE DEFENDANT: No, I don't.

THE COURT: Okay. And you understand that there's a lot at stake in this hearing?

THE DEFENDANT: Yes, I do.

THE COURT: Okay. Listen, gentlemen, as far as I understand it, Mr. Andrews has the right to represent himself here today. Mr. Aligada, are you willing to stay here and be as standby counsel and advise him as you deem fit and as he sees fit to ask you?

MR. ALIGADA: Yes, Your Honor.

THE COURT: All right. I am going to find that for purposes of today's hearing, Mr. Andrews has made a knowing, intelligent and voluntary waiver of his right to be

represented by Mr. Aligada and that he is choosing to represent himself.

A couple of ground rules. Number one, we're going to finish with the suppression motion, so Sergeant O'Reilly --

MR. PAULSEN: O'Rourke.

THE COURT: O'Rourke, rather, is going to testify, and you'll be allowed to cross examine him from there. Okay? If you need to approach, I'm going to ask that you do that through the person of Mr. Aligada, if there are any exhibits or anything you need to have the Court see or the witness look at.

In addition, I believe Mr. Paulsen has a second witness who will be called, and you'll be entitled to cross examine him or her as well. And then, Mr. Andrews, on the question of the suppression motion, do you intend to call witnesses of your own or put yourself on the stand?

THE DEFENDANT: Yes. I'll be calling them two, and I guess the other one is going to have to be subpoenaed probably at a later date, but.

THE COURT: All right. I think we'll cross that bridge when we get to it. Following the submission or at least the cessation of the testimony, you have some other discovery motion you wish to present, and I will allow you to do that at that time. Does that make sense?

THE DEFENDANT: Yes.

THE COURT: Okay. Mr. Paulsen?

MR. PAULSEN: I actually do have a third witness who wasn't in the country last time, but he's back now, and he's on my witness list, so Officer Shorter will probably testify as well just briefly, but I'll recall Sergeant Kelly O'Rourke at this time.

THE COURT: Thank you. Sergeant O'Rourke, come on up.

Witness KELLY JAMES O'ROURKE sworn upon his oath and testified as follows:

Please be seated. State your full name for the record and spell your last name.

THE WITNESS: Kelly James O'Rourke, O-apostrophe-R-O-U-R-K-E.

**DIRECT EXAMINATION**

BY MR. PAULSEN:

Q. Sergeant O'Rourke, when we left off last time, we were just about to get into the search of the blue Tahoe, and I was just about to introduce a search warrant. We're going to pick up there in a second, but just to go back to one previous subject. You testified before about getting e-mails, location alerts from the phone company as you were doing the emergency thing on Mr. Andrews' phone?

A. That's correct.

Q. All right. And just to add to the record, we printed off one of those e-mails that you received, and I showed you this Government Exhibit 9. Is that one of the e-mails?

A. That's correct.

MR. PAULSEN: And I offer 9 at this time, Your Honor.

THE COURT: Mr. Andrews, any objection to the Court's receipt of Exhibit 9?

THE DEFENDANT: Yes. I object. I would like to have it suppressed being that this didn't exist until the 12th, and I just received this less than a week ago.

THE COURT: All right. For purposes of this hearing, it will be received, and the objection is overruled.

BY MR. PAULSEN:

Q. So this one you received on May 15, 2018, at what time of day?

A. It was in the 2300 hour.

Q. If I told you that it says 11:41 p.m., does that sound about right?

A. That sounds correct.

Q. And according to the text of the e-mail that's telling you where the phone was located at that same time, it says 9:41 Pacific Daylight time, but that would be 11:41 Central Daylight time?

A. That's correct.
Q. And then it had a link and e-mail to a Google maps site?
A. That's correct.
Q. And we printed out the map from the imbedded, whatever you call that, website, and that's the map that was entered in the e-mail?
A. That's correct.
Q. Now, we're getting back to where we left off. You talked about how you located the blue Tahoe that was used in the shooting incident somewhere in North Minneapolis, and then you were about to say that you obtained a search warrant for the search of that blue Tahoe?
A. That's correct.
Q. And is that what is contained in Government's Exhibit 7?
A. That's correct.
MR. PAULSEN: I offer Government Exhibit 7.
THE COURT: Mr. Andrews, any objection to the receipt of Exhibit 7, which is the warrant for the search of the blue Tahoe?
THE DEFENDANT: Yes, once again, I would just like to state for the record that I object, and I would ask that it be suppressed being that it was late discovery under 16 and 12 Rules of Evidence of the Court. We received this on the 12th of this month.
THE COURT: All right. Whether or not the search

will ultimately be suppressed is of course the point of today's hearing, so that one is overruled as premature. With respect to the production late in discovery, that is overruled. Go ahead, Mr. Paulsen. Exhibit 7 is received.

BY MR. PAULSEN:

Q. And when, according to the receipt of the inventory return, that was executed on July 13, 2018. Does that sound right?

A. That's correct.

Q. Can you summarize what types of evidence were seized from the blue Tahoe?

A. Multiple forms of identification in Andrews name indicating ownership of the car.

Q. And they also took DNA swabs from inside the vehicle?

A. That's correct.

MR. PAULSEN: And I don't think I introduced Government Exhibit 5 last time. If I could approach.

THE COURT: Yes.

Q. Government Exhibit 5, do you recognize these two photos?

A. I do.

Q. And who are they photos of?

A. Norris Andrews.

Q. When were they taken?

A. Directly after my in-custody interview.

Q. And for our purposes, are the photos relevant to a fact

finder deciding whether the clothing he is wearing appears to be the same clothing that's depicted in Government Exhibit 2, which are the still frame photos from the shooting incident itself?

A. Yes.

MR. PAULSEN: Offer Government Exhibit 5.

THE COURT: Any objection, Mr. Andrews?

THE DEFENDANT: Yes. Once again, I reinstate my same objection that it was under late discovery, no chance to suppress this or write up a motion for it. So, yes, I would ask that it don't be allowed in.

THE COURT: That objection is overruled.

BY MR. PAULSEN:

Q. As part of this investigation, did you interview the two victims? People who got shot?

A. I did.

Q. And one of them is a man named Blanton?

A. That's correct.

Q. Which one is he? Where was his wound?

A. His wound was in the chest.

Q. And we're going to be talking about a photo spread that you showed him in a minute, so I want to set the groundwork for that. When did you interview Mr. Blanton?

A. It was approximately three days after the incident.

Q. Was he in the hospital?

A. He was.
Q. What was his physical condition?
A. He was sitting up right and alert.
Q. And did he seem to be coherent?
A. Yes.
Q. Tracked your questions and gave appropriate answers?
A. Yes.
Q. Can you -- did you talk to him about whether he got a good look at the person who shot him?
A. I did.
Q. What did he say about that?
A. He could identify who shot him.
Q. Did he give a description of the person at all before you showed him the photo spread?
A. Did I?
Q. Did he give you a description?
A. He did, yes.
Q. What did he say?
A. He described him as long dreads or braids, just long hair, glasses.
Q. And at that point, did you return to the office to prepare a photo spread?
A. I did.
Q. And then you came back to the hospital to see if you could pick anybody out of the photo spread?

A. That's correct.
Q. And the photo spread is Government Exhibit 6?
A. Yes.
MR. PAULSEN: Offer Government Exhibit 6.
THE DEFENDANT: Objection.
THE COURT: Grounds?
THE DEFENDANT: Two grounds. One, once again, it was late discovery. Two, it's overly suggestive. The defendant in these pictures is all highlighted where everybody else is shaded in.
THE COURT: The objection -- may I see the exhibit, Mr. Paulsen?
THE DEFENDANT: The background of the pictures, Your Honor, and the face and the height of everybody else compared to the defendant. The person six, you can't even see he's so blacked out and just look at the background of everybody else's picture. I would say this photo of mine was overly suggestive.
THE COURT: For purposes of this hearing, the exhibit is admitted. You preserve that argument for a motion to suppress the identification.
THE DEFENDANT: I just wanted that on the record.
THE COURT: Exhibit 6 is received.
MR. PAULSEN: Just as an aside, Your Honor, by my silence, I'm not agreeing necessarily that all of these

things were untimely discovery.

THE COURT: Understood.

MR. PAULSEN: The search warrant, I can see there was a problem there, but on these other things, I don't think there was any untimeliness.

BY MR. PAULSEN:

Q. So when you returned to the hospital to meet with Mr. Blanton, was it the same day?

A. That's correct.

Q. What if any instructions did you give him before showing him the photo spread?

A. I read him the standard set of instructions indicating that, you know, the person may or may not be in this photo, take as much time as you'd like, understand that the clothing, facial hair, et cetera, may be different. I instructed him to look at the photos one at a time and in a manner that I cannot see them.

Q. And did he comply with those directions?

A. He did.

Q. So the part about in the manner that you could not see them, what is that designed to guard against?

A. It's to guard against any insinuation or indication of identification one way or another.

Q. So you can't see what he's looking at so you can't react to any particular picture?

A. That's correct.
Q. And was he able to pick anybody out of the six person photo spread?
A. He was.
Q. Who did he pick out?
A. Norris Andrews.
Q. And what level of certainty did he tell you he had?
A. He was certain.
Q. So did you have him put his name and date on the photo?
A. I did.
Q. And for the record, that was photo number four?
A. Correct.
Q. And then, finally, did there come a time when you obtained a Court Order for a DNA sample from Mr. Andrews?
A. That's correct.
Q. And is that what we have in Government Exhibit 8?
A. Correct.
MR. PAULSEN: I offer Government Exhibit 8.
THE COURT: Any objection, Mr. Andrews?
THE DEFENDANT: Yes, Your Honor, that's not the search warrant that was served upon me. That's not an original, plus it was once again late discovery, so there was no chance to suppress it, but that's I object to the grounds that this is not the search warrant that was served upon me or the one the Judge signed. This is a, I don't

know, a copy made by Paulsen.

THE COURT: Okay. As to the grounds that it's not the original, the motion or the objection is overruled. As to the grounds that it was late discovery, the objection is overruled. Any issues as to suppression of the evidence resulting from the search warrant are obviously preserved. We're dealing with that now. Exhibit 8 is received.

BY MR. PAULSEN:

Q. Pursuant to this Court Order, which was dated -- the date seems to be obscure on here, but at any rate, when did you execute this order?

A. I don't recall the specific date. I believe it's in my report.

Q. Here's the date on the file stamp copy, May 17th of 2018. And if I show you your report, would that refresh your recollection on the date?

A. It would.

MR. PAULSEN: May I approach?

THE COURT: You may.

A. 5-29-2018.

Q. So that's the day you got a cheek swab from Mr. Andrews?

A. That's correct.

MR. PAULSEN: No further questions.

THE COURT: Thank you, Mr. Paulsen. All right. Mr. Andrews, do you wish to question Sergeant O'Rourke?

THE DEFENDANT: Oh, yes.

THE COURT: Okay. Can you make sure that you speak into your microphone and that it's turned on, please?

**CROSS EXAMINATION**

BY THE DEFENDANT:

Q. Sergeant O'Rourke, I would like to take you to the night that you say you used, you located the suspect in this case. Are you familiar with that night?

A. Yes.

Q. And can you state again for my own sake in the record how did you say you went about locating the suspect?

A. In the exigent order?

Q. Yes. The way that you went about locating him? How did you get the location of the suspect?

A. I drafted an exigent order to the phone company.

Q. And that would be T-Mobile Metro PTS?

A. I believe that's correct.

MR. ALIGADA: May I approach, Your Honor, on behalf of Mr. Andrews?

THE COURT: You may.

Q. My standby counsel is bringing you a piece of paper. Is that safe to say that that's it?

A. This is it.

THE COURT: Is this in the record already as a marked exhibit?

MR. PAULSEN: It's Government Exhibit 3, Your Honor. It was received at the last hearing.

THE COURT: Thank you.

BY MR. ANDREWS:

Q. And on the back of that same said piece of paper, is that the supplement you wrote to that exigent -- however you pronounce it -- your emergency extinguished?

A. That's correct.

Q. And everything in that you stand by as being true and correct?

A. That's correct.

Q. Okay. Well, first, I would like to take you back to -- can you tell me the date of the shooting incident, you said you was assigned to this case, May 15th, am I correct?

A. That's correct.

Q. And where did this shooting take place?

A. 1711 Plymouth.

Q. 1711 Plymouth. The paper that you have that you sent the exigent supplement to T-Mobile, can you tell me the address that you said that the shooting took place on there?

A. 1711 Fremont.

Q. But you just testified to the fact that you said everything in that statement that you sent to T-Mobile was in fact true, and you stood by it; am I correct?

A. That's correct.

Q. So if you're saying the shooting happened on 1711 Plymouth Avenue, correct? Or did it happen on 1711 Fremont? I'm confused here.
A. 1711 Plymouth.
Q. So that statement would be in fact false. You lied in that statement, am I correct?
A. That is not correct.
Q. Well, can you please clarify for the Court why is it two separate addresses?
A. Fremont was a typo.
Q. Fremont was a typo?
A. That's correct.
Q. So in a true signed statement that you made, and I just asked you again in court under oath, and you just had a chance to read that statement, was that a true and accurate statement that you wrote to T-Mobile?
A. Yes, it's a true and accurate statement, with a typo in there on Fremont.
Q. A typo?
A. That's correct.
Q. Okay. Well, I would like to take you back to May 15th. Did you not receive a supplement message from one of your officers about another shooting prior in the day that you said the suspect in this situation was listed as being involved in?

A. I don't understand your question.
Q. Could you read your -- in your T-Mobile thing, you told him about a second shooting, did you not? That you said the suspect in fact was involved in?
A. I don't believe your statement is accurate.
Q. You didn't mention two separate shootings in that statement?
A. I did mention two different shootings, that's correct.
Q. You mentioned one that happened hours earlier than the shooting that you was in question trying to get the exigent over, right?
COURT REPORTER: I'm sorry, repeat that again?
THE DEFENDANT: I don't know to correctly say the word extinguish? How do you?
THE COURT: Exigent.
THE DEFENDANT: Exigent.
BY THE DEFENDANT:
Q. Exigent emergency ping from T-Mobile Metro PTS? You did mention another shooting, did you not, other than the one on 1117 Plymouth/Fremont?
A. That's correct.
Q. And where did that shooting take place?
A. I would have to look at the report to tell you exactly where it took place.
Q. Could you tell me what it says on your T-Mobile thing

that you just testified to the Court that's accurate and a true statement?
A. 23rd and Fremont with a case number 18156610.
Q. You said 23rd and Fremont?
A. That's correct.
Q. And you received that information by what means?
A. Police call records.
Q. Police call records. Would that be a record by Officer Scott Kermington?
A. No, it would be a 911 call.
Q. You say what?
A. It would be a 911 call.
Q. But who answered it?
A. I don't know.
Q. I would like to have something brought up to you buy my counsel again.
MR. ALIGADA: May I approach, Your Honor?
THE COURT: You may.
Q. Do you recognize the document that I just had placed in front of you?
A. Yes, it's a police report.
Q. It's a supplement report from one of your officers, am I correct, that was involved in this case on the 15th?
A. That's correct.
Q. And in the eighth paragraph or sentence down from the

top.

THE COURT: Before you do that, is this in evidence? And if not, you have to offer it.

THE DEFENDANT: Oh, yes, I would like to offer it into evidence.

THE COURT: Let's see if it is.

MR. PAULSEN: It's not in evidence, but I have no objection to him offering it, and I have my copy here which is marked up. I'll submit a clean copy if that's all right, at the end of the hearing.

THE COURT: Okay. Proceed. Go ahead.

BY THE DEFENDANT:

Q. In the second paragraph to the last, can you please read that paragraph for me?

A. "I was on an earlier call in regards to shots fired at 25th and Girard Avenue North at approximately 1520 hours. The caller/witness later told us the description of the shooting vehicle was a dark Chevy Tahoe without any plates. The caller/witness told us that the driver shooter was a large black male, dark skin, long braided hair. He stated the passenger was a black male with shorter dreads and a goatee. The officers aired the information, recovered spent casings from the location. Case number 156610."

Q. Is that safe to say that that's the first shooting that you mentioned in your T-Mobile emergency extension?

A. That's correct.
Q. Once again, I would like to draw your attention to your T-Mobile one. Can you please again for the Court and myself and the record, tell me what you testified earlier and that you testified as a true accurate statement to T-Mobile that the shooting was at on your supplement to the exigent ping?
A. I'm not sure what your question is.
Q. The address that you listed for the shooting, the first one on your supplement for the exigent ping?
A. The area of 23rd and Fremont.
Q. 23rd and Fremont. And can you tell me the address that your officers stated that the shots was fired at with the same case number. And I quote, 156610, which is the case you're referencing to in that exigent ping, am I correct?
A. What question are you asking?
Q. I'm asking is it the same case? Is this, is 156610 the same shooting case that you put in your supplement for your exigent ping with T-Mobile Metro PTS?
A. That's correct.
Q. So in the supplement that you have by this officer, did not you just say that the shots were fired at 25th and Girard Avenue North?
A. I did not say that, no.
Q. Didn't you just read that statement off that paper?
A. I did read that statement.

Q. Is that not where you got your information about the shooting that you said was involved that you put in your first beginning part of your exigent pen, which is 156610?
A. No, that's not where I got my information.
Q. So you have another source that told you another shooting with the same case number was on 23rd and Fremont?
A. My source said that there was a shooting in the area of 23rd and Fremont prior to the shooting with the same description.
Q. But this is your case. You were the investigator in this case, am I correct?
A. That's correct.
Q. So you reviewed all of these statements and reports as they came in, am I correct?
A. As they came in, yes, that's correct.
Q. So you would have seen this report then, am I correct?
A. Not prior to writing that exigent order, no.
Q. So you didn't in fact investigate this case and look into the case of CCN156610? Am I correct?
A. What's your question?
Q. Did you look into that case before you decided to write your supplement to the exigent pen and put 23rd and Fremont?
A. I did.
Q. And in that case, 156610 was listed the shooting was where?

A. The area of 23rd and Fremont.
Q. And you tested and you stand by that, you testified to that that you looked this case up CCN number 156610, and they told you that the shooting was in the area of 23rd and Fremont?
A. The CCN is correct on this, and the shots were in the area of 23rd and Fremont. That's what I'm testifying to, yes.
Q. So the author Scott -- I mean the officer in your case, which is 18156712, which is the case of the shooting, am I correct?
A. I don't know what you just asked.
Q. The case of the shooting, the shooting that happened on May 15th at approximately 4:42 p.m. that you was assigned to was the case number for that case CCN MP18156712?
A. That's correct.
Q. So Officer Scott Kermington was the officer on that case, am I correct?
A. That's correct.
Q. And the document that I just gave you is a supplement for that officer, am I correct?
A. That's correct.
Q. And in that officer's statement, he said that he in fact was at the shooting, that he arrived and was aware of the shooting that happened on the 15th of May on 1711 Plymouth

Avenue North, am I correct?
A. What's your question?
Q. Was the Officer Scott Kermington at the shooting that happened on May 15th on 2711 Plymouth? Was he involved in that call?
A. Yes, he was.
Q. And this officer was looking at some surveillance video and was made aware of the situation that happened on May 15th at 1711 Plymouth, am I correct?
A. I can't speak for that officer.
Q. But that is his statement that you have in front of you, am I correct?
A. That's correct.
Q. And that officer said that he was there at the scene of that crime, right, and watched the video footage of that crime, right?
A. Yes, he viewed the video.
Q. And after he viewed that video, he thought about or should I say remembered a call that he was on earlier, am I correct, second paragraph from the bottom?
A. I can't speak to what he thought about.
Q. Okay. Well, we'll cut to the red tape. Did this officer report the case number CCN156610?
A. No, he did not report that case number.
Q. No, no, not report it. Did he document that crime? Did

he write the report for that case?
A. I don't know.
Q. Was he the officer on the scene of that crime?
A. I wouldn't know that.
Q. So in reading this statement, and I'll read it this time. "I was on an earlier call in regards to shots fired at 25th and Fremont, I mean on Girard Avenue North at approximately 1520 hours, the caller/witness later called, later told us that the description of the shooting vehicle was a dark blue Chevy Tahoe with no license plates. The caller witness told us that the driver/shooter was a large black male, dark skin, long braided hair, and he stated that the passenger was a black male with shorter dreads and a goatee. Officers aired this information and received several spent casings from that location."
Am I correct that that officer reported that with a CCN number of 156610?
A. That's correct.
Q. And that's the same shooting that you referred to in your supplement exigent pen; is that right?
A. Yes, that's correct.
Q. So it's safe to say that someone is lying here? Someone is not telling the truth here?
MR. PAULSEN: I'm going to object, Your Honor.
THE COURT: Grounds?

MR. PAULSEN: It is not, this is an improper argument of question 25th and the Girard is in the area of 23rd and Fremont. It would be about two to three blocks away. There is no question of lying here.

THE COURT: Understood. Mr. Andrews, maybe you could rephrase that question just a little bit. Okay?

THE DEFENDANT: Okay. I think the record is pretty clear of what happened here.

THE COURT: I think you can make that point in argument.

THE DEFENDANT: Yes.

THE COURT: I think your point is --

THE DEFENDANT: Proven.

THE COURT: -- clear in the record.

THE DEFENDANT: Okay. Moving on.

BY THE DEFENDANT:

Q. Do you remember, do you know a special agent David Volk?

A. I do.

Q. On June 6th, did Special Agent Volk contact you in regards to locating the suspect Norris Andrews in your shooting case, CCN18157612?

A. I don't know what you're referring to.

Q. Did you have a phone conversation or did you in some capacity talk to sergeant, I mean Special Agent Volk about how you located the suspect in your case?

A. I don't recall if I had a phone conversation regarding that.
Q. Did you have any conversation with him on June 6th about that in locating the suspect?
A. I've had conversations with Agent Volk. I couldn't tell you what date they were.
Q. Okay, I would like to have my counsel approach. And, ,yes, I would like to be entering this into evidence too. It's David Volk, investigational report, Report Number 5.
MR. PAULSEN: I'm sorry, did he offer that as an exhibit?
THE COURT: He did.
MR. PAULSEN: I was reading it while he did that.
THE COURT: We need to have mark this.
(Defendant's Exhibit 1 marked for identification)
THE COURT: For the record, Mr. Andrews, the Court has marked the Voss report number 5 that has been handed to, -- Voth rather, report number 5, that has been handed to the witness as Defendant's Exhibit 1.
Maria, Defendant's Exhibit 1 has been offered and received. Is there a question pending?
BY THE DEFENDANT:
Q. Does that document refresh your recollection? Do you recall having that conversation either in person or over the phone on June 6th with Agent Volk?

A. I believe the document to be accurate.
Q. And on June 8th, did you provide said evidence from that conversation to Volk as to how you located the suspect? And I quote you gave officers that information that they was able to go and apprehend the suspect?
MR. PAULSEN: I'm afraid I don't even understand that question, Your Honor. What evidence are you?
THE COURT: Please rephrase it.
BY THE DEFENDANT:
Q. In that conversation, you mentioned to Officer Volk that you had a T-Mobile, you used a T-Mobile exigent ping to apprehend or get the location of the suspect, am I correct?
THE COURT: Go ahead and answer.
THE WITNESS: That's correct.
BY THE DEFENDANT:
Q. You used an exigent ping on circumstances involving immediate danger by death or serious injury to a person, am I correct?
A. That's correct.
Q. And on the 8th of June, you provided Sergeant Volk with some forms pertaining to how you did that, am I correct?
A. That's correct.
Q. With the target in the information was surrounded, I mean, was based on the target number of (651)502-5142?
A. That's correct.

Q. And this is the number that you believed belonged to Mr. Andrews, am I correct?
A. That's correct.
Q. Exhibit 3 is I would like to -- I'm going to have my counsel bring something up to you. Exhibit 3 is already entered into evidence. Now, I would like to enter four following pages that go with Exhibit 3 to the witness on the stand. And I also would like to add the other three pages front and back into evidence.
MR. PAULSEN: Well, just to be clear, these additional pages, which I produced in discovery, don't really go with Exhibit 3. Exhibit 3 is a free standing document requesting an exigent ping. All of these proposed additions appear to be some data that was obtained as a result of executing that order. So I think they should probably be a separate exhibit, maybe Defense Exhibit 2, and then I have no objection with that understanding.
THE DEFENDANT: No problem. Hold on wait. I want it all entered at the same time since he put it in those terms, that makes it easier. I would like to enter five pages into evidence. They're going to be numbered, date stamped at the bottom 83 through 90, to the witness on the stand.
MR. PAULSEN: All right. Now, I see that his proposed exhibit has the exigent form along with several

pages of data that were obtained pursuant to that order. Let's accommodate him and make that Exhibit 2.

THE COURT: Very well.

(Defense Exhibit 2 marked for identification)

THE COURT: Exhibit 2 is received.

BY THE DEFENDANT:

Q. Those documents that I just handed you, is it not a true fact that those are the documents that you gave following the conversation with Sergeant Volk on June 8th in regards to the information that you sent to officers on how you located the suspect on May 15th from your exigent T-Mobile Metro PTS phone ping?

THE COURT: Do you understand the question?

THE WITNESS: No.

BY THE DEFENDANT:

Q. Is that not the information that you provided to Sergeant Volk on June 8th after the conversation you all had on June 6th in regards to how you located the suspect?

A. I couldn't tell you if this is the exact document I gave him on June 6th.

Q. No, June 8th?

A. June 8th, same answer.

Q. Well, if you looked at the bottom of that page, they're Bates stamped.

MR. PAULSEN: Well, Your Honor, I don't --

THE DEFENDANT: And all of these are Bates stamped through the government Jeff Paulsen and the special agent David Volk in this hearing and matter in the order that they was received after report number 5, which is attachments.

THE COURT: I don't think the witness, I understand your question, Mr. Andrews. I don't believe the witness has the foundation to answer that because --

THE DEFENDANT: Ah, well, can you give them back? No, no, he can keep that. Can you give him back Defendant Exhibit Number 1?

THE COURT: Do you have Defendant's Exhibit Number?

THE WITNESS: Yes.

THE COURT: Okay.

BY THE DEFENDANT:

Q. Again, I would like to point out that at the bottom, it's Bates stamped page 82, but I want to take you to a sentence in here. On June 8th, 2018, Sergeant O'Rourke provided Special Agent Volk with the following attached form, I mean the following form, see attached. Sergeant O'Rourke also provided Special Agent Volk with the results from the T-Mobile for the target number of 6515142. This information allows Sergeant O'Rourke to provide the suspect location to other officers, Minneapolis police officers on May 15th. Do you have that document that states that?

A. No, this doesn't state that I gave him anything on that day.

Q. No, on June 8th.

A. I am testifying that there is nothing in here that says I gave him this on June 8th.

Q. So that's not -- so you're testifying that that in fact are not the attached forms? This, what, Defendant's Exhibit Number 2 that you gave to Special Agent Volk on June 8th in regards to how you located the suspect?

A. Like I said, there is nothing on these pages that identify what date I gave him and what, and if this is what I actually gave him.

Q. Okay. Well, just for the record, and defendant's discovery number one, by Special Agent Volk, report number 5, it do say that, "On June 8th, Sergeant O'Rourke provided the following attached forms, see attached. And Sergeant O'Rourke provided Special Agent Volk with the results from the T-Mobile target number (651)502-5142. This information allows Sergeant O'Rourke to provide the suspect location to other officers, Minneapolis police officers on May 15th." Do you have that document?

A. I don't know.

Q. Do you have Defendant's Exhibit Number 1?

MR. PAULSEN: Your Honor, I'm going to stipulate that that's what Number 1 says, but my objection at this

point is to relevance. This is weeks after the arrest, and it's got something to do with providing documents that I needed in discovery to the case agent probably at my request, and I don't see how it's relevant to whether his arrest was lawful.

THE DEFENDANT: Oh, it's relevant. It's going to go to show the fact that they lied about the way that they did it, the way that it happened. It didn't happen the way you said it happened. I'm feeling to impeach him if he stop ducking the answer and just answer truthfully.

THE COURT: Well, I think I will sustain the objection. The documents are in evidence. So go ahead --

BY THE DEFENDANT:

Q. Okay, moving on. Exhibit Number 2 that you have over there, is that not the exigent ping that you put in, the circumstances and the supplement in the T-Mobile results that you got and provided to the government, rather Special Agent Volk or the prosecutor? That is the information that you provided to the state, I mean the government, is it not?

MR. PAULSEN: I think we've covered this, Your Honor.

THE DEFENDANT: We didn't know.

MR. PAULSEN: He's not sure exactly what he turned over. We can probably recreate it at a break, but I don't really see what it has to do with the validity of his

arrest.

THE DEFENDANT: It is. The question is very simple. It's them not the documents that T-Mobile sent you? Is that not the response to your exigent ping?

THE COURT: Let's do this. Answer that question: Are the attachments to Exhibit 2 the documents that T-Mobile sent you as a result of the exigent ping?

THE WITNESS: There are no identifiers in what I've been given to answer that question properly.

THE COURT: Okay.

THE DEFENDANT: Okay. Well, just for the record --

THE COURT: I think the government has offered to provide that information in discovery, but they can't do it as they're sitting here right now. So if you want that information, if it's important at this moment, we can take a short recess.

THE DEFENDANT: I already have it. I already have it.

THE COURT: Okay. Keep going.

BY THE DEFENDANT:

Q. Well, on the last page of that, which is showing roughly an hour of what can you tell me what time? I mean not the last page, the first page. Let's see, page 88, I would like to draw, first page 88, do you have that up there?

A. I do have page 88? Yes.
Q. There's the date in the first column. Can you tell me the date that's listed for all those phone calls?
A. 5-15-2018.
Q. That's the date of the shooting, am I correct?
A. That's correct.
Q. This is also would be the following evening of the shooting of the same day, am I correct? Just to ask is the 15th the same day that you would have received your T-Mobile ping?
A. What's your question?
THE COURT: He's asking if those entries are after the shooting but on the same day, I believe; is that correct, Mr. Andrews?
THE DEFENDANT: Correct.
THE WITNESS: This is a document that I received after the shooting, yes.
BY THE DEFENDANT:
Q. And the time frame, roughly, if I'm not correct, all of those calls that's on page 88 is reflected through the 11 o'clock hour on the evening of May 15th, am I not correct?
A. No, you're not correct. This document is in UTC.
Q. It's what?
A. This document is in UTC.
Q. But this is the document that you offered into evidence

to Agent Volk to the way that you apprehended the suspect, so this is the time frame because you said that you just testified yourself that you received the information at 11 o'clock at night, 11:30 or what did you say 11:40 at night, 11:42 you received the ping that gave you the location, am I correct?

A. What's your question?

Q. On May 15th, earlier in your testimony, you testified to the fact that, and I'll quote: "You received a ping from T-Mobile or response from T-Mobile there in the 11 o'clock hour, roughly 11:40ish?"

A. Yes, I testified to that.

Q. This evidence that's offered that Sergeant Volk put in that stems between 88 through 90 is the results that you gave him of your T-Mobile exigent ping and that puts this only time frame that you turned over to the prosecutor and the prosecutor turned over to us through sergeant, I mean through Special Agent Volk report of your attachments as to how you located the suspect between the hours of 11 o'clock. It's just showing all the hour of 11 o'clock, am I correct?

MR. PAULSEN: Your Honor, I think Mr. Andrews is confused.

THE DEFENDANT: No, I'm not.

MR. PAULSEN: These records that came in later are in UTC, Universal --

THE DEFENDANT: Objection, Your Honor. I didn't ask the prosecutor to --

THE COURT: Hold on. I understand your point. What's your question? Let's start there.

THE DEFENDANT: The question is I'm not going to beat around the bush. The question is going to show relevance that the officer is feeling to be impeached again about lying about how he received information, what information he received, and then I'm going to go back and show you how he tried to just enter some new documents to cover up his lies because they just caught in.

THE COURT: Is your question when did he receive these documents?

THE DEFENDANT: No. The question is what hour? Just the hour on this document. That's all you entered, like I say this Bates stamp, this whole Bates stamp thing is all an attachment, all in a sequence from the government Mr. Paulsen and Special Agent Volk's information on how they located the suspect, how did they prove their case?

This is the stuff that was given to the defense a month ago, roughly. Well, two months now. This is all that was given. The new T-Mobile stuff with the full unredacted and all the number and the whole 20, 48 hours was just given after I had to have him file for subpoena, and we got it. So up until that time this 11 o'clock hour was all that was

saying on how they located the suspect, which is what he just testified to. So I'm feeling to impeach him with another lie.

THE COURT: Let's do this. We're going to take a brief recess. Officer, would you step down and go back to the conference room for a second?

(Witness O'Rourke steps out of courtroom.)

(In open court.)

THE COURT: All right. Any concerns that the witness would be somehow tainted by further argument have been alleviated, the witness is not in the courtroom. I'm struggling to understand, and I'm trying to understand your point.

THE DEFENDANT: Okay, listen. I want to say something else to Your Honor, one second here. Looking for an e-mail. Just give me one second. The e-mail from me to you that he gave me this document.

MR. ALIGADA: Okay.

THE DEFENDANT: I have it printed out because I was going to enter it into evidence anyway. Your Honor, I'm going to explain it to you while we search for the document.

THE COURT: Please do.

THE DEFENDANT: Okay. The government as part of our discovery from the Magistrate Judge who did our arraignment hearing that told them they had to turn over

discovery under Rule 12 or 16.

THE COURT: Right, they gave you what's attached as Exhibit 2.

THE DEFENDANT: Correct. And it went from 1 to 117, which is Bates stamped at the bottom of the page.

THE COURT: Right.

THE DEFENDANT: Which all goes in sequence. Now, if you look at Document 1 from the defense and then go to Document 2 from the defense, you will see that all of those go together and that is the attached that he provided to Special Agent Volk as to how he located the suspect.

THE COURT: Well, the problem with that, I understand your point. You may well be right, but this witness is unable to confirm that that is in fact what was provided to Special Agent Volk.

THE DEFENDANT: I just want it on the record because at the end once I put this other document in, then you're going to understand why and how that this all becomes relevant, but I would like to enter that into evidence though.

THE COURT: Right.

THE DEFENDANT: Well, you see it. I'm just going to just have him just I guess testify to the fact that the Bates stamp keep on going.

THE COURT: You do not need that in testimony.

It's in the record by virtue of the documents themselves, and they are in sequence. It is a reasonable inference that you're making that these are attached to this or were the documents provided to Special Agent Volk, but he can't testify to that because he's already said, "I don't know." And that's what you got to live with. He says, "I don't know."

THE DEFENDANT: Okay, well, the record is going to show he's lying, so it doesn't matter.

THE COURT: Okay. Well, where are you going with this lying?

THE DEFENDANT: I'm going to pull his other little e-mail thing that he just popped up with that is saying that he got a private e-mail sent to his real time location sent to his cell phone. I have that document too. I'm going to enter that into evidence, but it didn't exist, nowhere, not a shred of that was in none of this paperwork. It was just offered to us on, well, given to us on September 10th, which is the day of our pretrial hearing. I mean our motions hearing. And once again, late evidence, but that's going to go to the fact of what I was saying about the conflict of interest thing, I'm going to be wrapping this into that, but I would like to put this on the record to impeach him about his lies because if you had a real time location, you would have gave that to the Sergeant Volk instead of an hour long

showing the fact that that's what they were going to use as their evidence in chief because we requested it. That's what they gave us. They said they were going to use it as evidence in chief to show the 11 o'clock hour and how they located the suspect. Because if you go back to page, I want to say 90 of that that you got Bates stamped, it lists the address from the cell tour of 2912 Fremont, which is roughly a block away from where I got -- the officer was out there surveilling the area and just pulled his car over, and that's what he used as his reference as to how he located the suspect.

But further I was going to impeach him because if you look at page 85, right? T-Mobile never responded to his exigent ping to May 16th, which means that him giving us this as evidence in chief to say that he gave this to officers, and this is what he used to have officers come to that location to watch and get the suspect would make it a lie because unless T-Mobile responded to him at 12:01 in the morning, and the officer, I'm pretty sure he's here, Joe Pedro, whatever his name is back here, he's going to testify that that's what time he got information from Sergeant O'Rourke, which was 11:30ish, and O'Rourke just testified that he got the information at 11:40, but T-Mobile didn't respond until the 16th, and this is what they gave to Special Agent Volk as his evidence in chief. So they lied,

which means somehow, some way one of them went to the Grand Jury and lied, which is what my other motion is going to come in behind about how they lied and how they got their information, which is all just lies, and they're padding lies on lies to try to make up their probable cause as they're going along.

THE COURT: Okay. I will bring Officer O'Rourke back in. I would ask if you can to ask your questions a little more directly than you've been doing. Okay, try and get right to it. All right. Thank you.

THE DEFENDANT: I don't know what he just told the dude, but he is feeling to tell him something out there, man. I don't believe he should be just sitting in here with this testimony. He's another one who is going to testify.

THE COURT: He understands that he's sequestered with respect to telling the witness.

THE DEFENDANT: But Jeff Paulsen just told him something, and he is high tailing his way out the door now.

THE COURT: He told him to get the witness, correct?

MR. PAULSEN: Yes, Your Honor.

THE COURT: Is the witness coming?

THE WITNESS: No, Your Honor.

THE COURT: Go ask the witness to come in and speak no other words to him, please.

THE COURT: Sergeant O'Rourke, you're still under oath, you understand that?

THE WITNESS: Yes, sir.

THE COURT: All right. You can go ahead, Mr. Andrews.

BY THE DEFENDANT:

Q. Okay. I would like to draw you back just one more time to the statement that you made earlier as to can you tell us the time and date that T-Mobile provided you with the location of the suspect? Or should I say responded to your exigent ping emergency circumstances?

A. What's your question?

Q. What time and date did T-Mobile get back to you and alert you to where the suspect was located? What time did they respond to your request for the exigent ping?

A. They responded to me on 5-15, 2018, throughout the whole evening.

Q. Throughout the whole evening being what? What was the first time they responded to you roughly?

A. I don't recall.

Q. Was it nine o'clock, ten o'clock, six o'clock in the afternoon?

A. It was in the evening.

Q. Before or after the shooting?

A. After the shooting.

Q. Was it before or after the suspect was arrested on May 16th?
A. Both.
Q. So you responded after the suspect was arrested too?
A. That's correct.
Q. And you don't know what the first time that they responded to you?
A. It's been turned over.
Q. Huh?
A. I said I don't recall specifically. It's been turned over.
Q. Oh, okay. Well, I would like to refresh your recollection. I'm feeling to have another exhibit brought up there to you.
THE COURT: Do we need to have that marked? Does that need to be marked?
MR. ALIGADA: Do you want to put that into evidence?
THE DEFENDANT: Yes, that one is going into evidence too.
Defense Exhibit 3 marked for identification.
BY THE DEFENDANT:
Q. The document that you have in front of you, is that not your supplement 33, Sergeant Kelly O'Rourke?
A. This is my supplement, yes.

Q. And is everything in this supplement true and accurate to your knowledge?
A. Yes.
Q. So you stand by this statement?
A. Yes.
Q. I'm going to ask you once again to read that statement and then I'm going to ask you that question again.
A. I can save the Court time and my answer is going to be the same.
Q. Okay. So you stand by that statement. Okay, well --
THE COURT: You need to move the admission of 3. If you want him to read anything out loud, if you want anything from the content of it on the record, it has to be admitted. Do you wish to have the document admitted?
THE DEFENDANT: Yes, I wish to have supplement 33 of Sergeant O'Rourke admitted into evidence.
MR. PAULSEN: No objection.
THE COURT: It's received. Go ahead.
THE WITNESS: "On 5-15-2018, I was contacted by Lieutenant May and was assigned Minneapolis case number --
MR. PAULSEN: Hold on, I don't think he asked you a question.
THE COURT: There is no question pending.
THE DEFENDANT: I didn't ask him to read it.
THE COURT: Yes.

BY THE DEFENDANT:

Q. I would like to draw your attention to your sixth paragraph down, "at approximately," that's what it starts out. Can you please read that for the record?

A. "At approximately 2336 hours, I received information that Andrews was in the area of 2810 Girard Avenue North. I contacted Sergeants Pucely and Peltz along with Officer Schroeder and advised them of Andrews location. All three were aware of the suspect description."

Q. Is it safe to say that at that time that's the information that you received from T-Mobile?

A. That's correct.

Q. So the time is going to be entered into evidence as 11:36 or 2336 hours, am I correct?

A. I'm not sure what the question is.

Q. Is that the time that you said that T-Mobile contacted you 11:36 p.m. on May 5, 2018?

A. Like I said, they had been contacting me all night throughout those hours.

Q. In this document, is that the time you said that you received the information that Mr. Andrews was on 2810 Girard Avenue North?

A. "At approximately, 2336 hours, I received information that Andrews was in the area of 2810 Girard Avenue North." That's what I received.

Q. Okay. Now, I would like to draw you to Defense Exhibit Number 2, page 85. Well, it's Bates stamp 85 at the bottom.
A. Okay.
Q. Do you have that in front of you?
A. Page 85?
Q. Yes. Do you have it?
A. Yes.
Q. Is that the response to your exigent ping that T-Mobile provided to you, from the exigent ping that you wrote to them on May 18, 2018?
A. This is not what you're referring to, if that's what you're asking me.
Q. No. Is this the request submission response to your emergency exigent ping that you wrote on May 15, 2018?
MR. PAULSEN: Your Honor, I can clear this up and save a lot of time.
THE DEFENDANT: No, I would like the witness to answer.
THE COURT: Do you understand the question?
THE WITNESS: Yeah, sort of.
THE COURT: Tell me if I've got it wrong. You're asking if page 85 of Exhibit 2 shows the response that you received from T-Mobile in response to the exigent ping, right?
THE DEFENDANT: Correct.

THE WITNESS: What I have in here in Exhibit 2 appears to be part of a document that was sent to me as a reflection of the immediate pings I was receiving the evening of the shooting.

BY THE DEFENDANT:

Q. I'm going to act like you didn't put that little extra immediately in there, but anyway, the sentence that it says right here, it says that this was provided on May 16th. Am I correct?

A. What are you talking about?

Q. On the paper you got. On the paper?

THE COURT: Hold on everybody, hold on. Sorry. Mr. Paulsen, go ahead.

MR. PAULSEN: The document, those hard copies were submitted pursuant to the exigent request and apparently received on May 16th, but he asked in the exigent request not only for the call detail records, which is what that is. He also asked for real time location, and we already talked about --

THE DEFENDANT: Hey, excuse me, excuse me, excuse me --

COURT REPORTER: I'm sorry, please don't over each other.

THE DEFENDANT: But I object, he's leading the witness and trying to go away from the direction that I'm

going. The direction that I'm going, and I don't care if the witness is in here, is goes to show the evidence that the prosecutor Jeffrey Paulsen himself and the Sergeant O'Rourke put into this case on how they received information to get the suspect, and I needed to go on the record.

So without being interrupted by Mr. Paulsen again, because at some point I'm going to need, he's going to end up doing some explaining too, once this other motion go in, but if you please could object --

THE COURT: Hold on, hold on. My courtroom, okay? Let's be clear. I will tell everyone who talks when and what they say. Now, there is some confusion about what this document is, and I understand that. And I understand the point you're trying to make, and you're entitled to make it. But I think the point you're trying to make in part is a result of the two of you talking past each other, and I think Mr. Paulsen was trying to make that clear, so.

THE DEFENDANT: No, Mr. Paulsen was trying to put on the record the lies that they entered. This document was entered in response, like I said, to the arraignment hearing where the Judge told them that they had to give over discovery under Rule 12, 16 and 26.

THE COURT: Right.

THE DEFENDANT: Of discovery rules, and we even put a motion in under Bradley and inspection and evidence

favorable to the defendant, multiple different avenues requesting their evidence in chief that they was going to use at trial, and this is the way that they say that they used, this is the sequence that they say they used to give this location.

THE COURT: You're referring when you say "this document," you're referring to Defense Exhibit 2.

THE DEFENDANT: Yes.

THE COURT: Which is a document that contains information about the ping responses that were given by T-Mobile on May 15th.

THE DEFENDANT: On May 15th. And nowhere in that response or nothing was this mysterious e-mail that was just given to us after May, I mean after September 10th in this. It wasn't mentioned in this real time location. It wasn't a shred of evidence about this. There was no mention of this until now after I have my lawyer subpoena, which I also have here that I'm going to be entering into evidence the T-Mobile full records, which are going to show that I was somewhere else at the said time of the offense using the same time frames that they use to say that I was at this location and that's how he gave officers the information to be on 28th and Girard because that's going to show that he's going to get on the stand and lie too.

THE COURT: If your point is that the information,

the e-mail is not contained in the documents that describe what was received by Sergeant O'Rourke, ask that directly.

THE DEFENDANT: Okay.

BY THE DEFENDANT:

Q. Okay. Sergeant O'Rourke, at any time during this case -- okay, better question. When did you become aware that T-Mobile has sent you a real time alert to the suspect's location?

A. Shortly after I wrote the exigent order the night of the shoot, 5-15-2018.

Q. So that would be May 15th. When you submitted your evidence in this case to the state's court, when did you ever, any documentation mention this real time location? Can you point me to a shred of evidence in any document? Can you tell me any supplement reports you or any officer that you know of that was involved in this case wrote anything about this report because I have my state case in front of me too, so I will easily be able to pull it up and make reference to it.

A. Well, I can go with your Defendant's Exhibit 3 at approximately 2336 hours, I received information that Andrews was in the area of 2810 Girard Avenue North, supplement number 23 of my state submitted case, case number 18156172.

Q. Okay. Now, in support, since you brought that

supplement up, in support of that statement that you made, can you tell me was said documents in evidence did you give to the investigator for the government, which is Special Agent Volk, that in turn would have gave to Jeff Paulsen to give to the defense? Did you give any information? Did you give any documentation or anywhere submitted an e-mail or anything to either the agent, Special Agent Volk or Jeff Paulsen of the government?
A. I have turned over everything that was requested of me pursuant to this case.
Q. So in response to this case, did you tell Agent Volk, Special Agent Volk about this real time location?
A. I'm sure at some point I had a conversation with Agent Volk about the exigent ping orders and the real time location, yes.
Q. So the information when he called you on June 6th in regards to this exigent ping before the indictment was even made and you all was investigating in putting a case together, what information did you submit to him in regards to the location on how you located the suspect on May 15th?
A. I don't recall exactly what I gave him. I can tell you that to this point I've given him everything that's been asked.
Q. Okay. Moving along, the record will reflect that this document is fictitious. It didn't exist. It was just

offered, and it will be argued and explained in due time. So I'll move along.

Okay. Now, since you have your supplement report up there, which is exhibit, I believe, 3, Exhibit 3, I would like to at this time I would like to have you read the fourth paragraph from Exhibit 3 of your document, of your supplement 33, Sergeant O'Rourke.

A. "At this time, I was provided the name Norris Deshon Andrews, date of birth 12-8-1984 as the shooter based on eyewitness accounts of the incident. Upon doing some research, I learned Andrews child's mother Tanita Shaw is the owner of a 2002 blue Tahoe with 21-day temporary sticker, Minneapolis, CCN18045880. This information is consistent with what I viewed on the video. In addition, as I continued to review incoming police reports I learned that Andrews was using T-Mobile cell phone, (651)502-5142. I learned the cell phone listed to a party, I learned the cell phone listed to a party with the last name Andrews."

Q. Okay. Now, I would like to draw your attention just briefly to the question of the last part of that sentence, how did you become aware that the last name of the party to that cell phone was Andrews?

A. A public Google search.

Q. A public Google search gave that you information?

A. That's correct.

Q. Moving along. Also, I would like to point you to another question that you say you did some research, and upon your research, you found that this vehicle, this 2001 Tahoe, 2002 Chevy Tahoe was the defendant's child's mother Tanita E. Shaw, am I correct?
A. That's correct.
Q. What research did you do to come up with that conclusion?
A. I read case number 18045880.
Q. And that case is what?
A. I don't recall.
Q. You don't recall? You don't recall what that case is?
A. Is that a question?
Q. Yes.
A. No.
Q. So if I was to pull up case 18, it's going to somehow say that this blue Tahoe, which is the one that you're referencing to the one that was involved in the shooting on May 15, 2018, am I correct?
A. What's your question?
Q. It's going to say that this vehicle was registered to a Tanita E. Shaw?
A. I don't know if it will say it's registered. No, I don't know. It will show a relationship.
Q. A relationship to what?

A. An association.
Q. What? What is the association relationship? You can't have a relationship with a vehicle, so she's going to have a relationship with an individual or a vehicle. Could you please explain?
A. This case number will show an association with Tanita E. Shaw.
Q. What does that have to do with the said vehicle in question? The vehicle from the 2015 shooting on May 15th?
A. It draws a connection to you, sir.
Q. In what way? You said that this vehicle was registered Tanita E. Shaw, am I correct?
A. That's correct. I -- that's correct.
Q. So when you ran the VIN number to this vehicle, in fact, did that vehicle come back listed to a Linda Bell?
A. I did not run the VIN numbers.
Q. You didn't run the VIN numbers on this?
A. No.
Q. After your officers went and had this vehicle in custody, you didn't run the VIN numbers on this vehicle after you had it towed for assault?
A. No.
Q. Hmmm, that's interesting. I would like the record to reflect that once again I would like to impeach this officer, one, you said you did your research, right? And

this is a true and accurate statement, right? Is not the said vehicle in question a 2001 blue Chevy Tahoe?
A. What's your question?
Q. Is not the vehicle in question that was involved in your shooting a blue 2001 Chevrolet Tahoe?
A. I don't know what the exact year is. I didn't run it.
Q. Oh, you didn't run it, okay. Can you give me his -- you know what, I got it.
THE COURT: While you're looking for something, Mr. Andrews, let me ask the marshals, what time do you need to depart?
THE MARSHAL: Sherburne County usually picks up at about 1630, 4:30. Typically, that's the time they're here, but they'll have to wait until whatever time you're done with the hearing.
THE COURT: Well, Mr. Andrews, how much more do you have for this particular witness?
THE DEFENDANT: Oh, man, his, I mean how much time are we working with? That's going to be a better question because the way he dances in circles, and, you know.
THE COURT: Hold on. If you have only a few more minutes with this particular witness, then we'll finish and go through the cross-examination. But I'm sensing that you intend to go for a while, and I can't hold these gentlemen up nor the rest of what Sherburne County needs to transport

people for several hours, so that's why I'm asking how much time do you have for this witness?

THE DEFENDANT: If we can just fly through it and got straight answers, probably about 15 maybe 20 minutes if that.

THE COURT: All right. Let's go off the record for a second.

(Discussion held off the record.)

THE COURT: Okay. Let's go back on.

MR. PAULSEN: Can I have Mr. Volk excuse the other two witnesses that are waiting?

THE COURT: Yes, you may. You may proceed, Mr. Andrews.

BY THE DEFENDANT:

Q. Well, back on the record on reference to the alleged said vehicle, do you have Government Exhibit Number 7 in front of you, Sergeant O'Rourke?

A. I do not.

Q. My counsel will bring it up. The document that you have in front of you, the application for the search warrant for the alleged vehicle, the vehicle that was in your shooting for May 15th?

A. That's correct.

Q. Could you please state for the Court and for myself what year that vehicle is in your search warrant?

A. In my search warrant, it is described as a presumed blue Chevy Tahoe displaying no plates with VIN 1 George, Nora, Everett, King, 1-3 Tom 5, 1 John, 117426.
Q. And that vehicle is a what, what year?
A. That's not for me to determine.
Q. What year, make and model did you apply for your search warrant of the vehicle?
A. I didn't apply for it under a year, make and model.
Q. What's the description of the vehicle?
MR. PAULSEN: Asked and answered. He just read it into the record, Your Honor.
THE DEFENDANT: No, in his affidavit, I asked him was the description that he asked for his car? I mean of the vehicle that he wanted to have searched?
THE COURT: In your affidavit.
THE DEFENDANT: In your affidavit, in your application, what did you ask the Courts?
THE COURT: Hold on. Okay.
THE DEFENDANT: Page 3 of 5.
THE WITNESS: There is nowhere in my affidavit that I specify that I am asking to search a specific year number of a car.
BY THE DEFENDANT:
Q. Oh. In your application, you didn't put on page 2 of 5, "Your affiant, Sergeant O'Rourke, licensed peace officer for

19 years, currently employed with the Minneapolis police, currently assigned to the Minneapolis Police Department as a bodily crime detective in capacity has reviewed the Minneapolis report, interviewed witnesses and conducted an investigation of his own substantially the following."

Is that not a statement that you wrote in your application on page 2 of 5?

A. Yes, that's a statement I made in there.

Q. And what follows the supplement or paragraphs that follow? Do you not in paragraph 1, 2, 3, make reference to a vehicle?

A. I do make reference to a vehicle, yes.

Q. And what's the vehicle that you make reference to?

A. A 2002 blue Tahoe with a 21-day temporary sticker in Minneapolis, CCN18045880.

Q. Is that the same vehicle that you're asking the Court to allow you to search that will, that you believe will likely produce evidence that will assist in your investigation?

A. Yes, it is.

THE DEFENDANT: I would like to introduce three pictures into evidence. My counsel will be bringing them up. I'll be introducing them as 4, I believe. These are photograph pictures that was also late discovery that we received on the 12th of September from the government Jeffrey Paulsen, in regards to the search that Sergeant

O'Rourke and his officers did of the said vehicle that was towed on May 16th from the shooting that was on May 15th at 4:42 p.m.

MR. PAULSEN: I don't accept that statement, but I'll deal with it later, Your Honor.

THE COURT: Understood. Do you have any objection to the use or admission?

MR. PAULSEN: I don't have any objection to the photos.

THE COURT: Thank you. Exhibit 4 is received. Defense Exhibit 4 is received.

BY THE DEFENDANT:

Q. The photos of the vehicle that you have, that's the vehicle that you had towed. Those are the pictures of the vehicle that you asked the Court to have searched and them are the pictures that your officers took of the vehicle in connection with that search, in your search warrant. Am I correct?

A. The officers don't take the pictures. The crime lab would have taken the pictures, and I'm not going to testify --

Q. Well, yes, you are absolutely right. You're absolutely right. I'm going to give you the precise name of the crime lab pictures since you want to dance around in circles. But for the record, they would have been took by a McDougal. Am

I pronouncing your officer right that you applied for your affidavit with to help you with your search of the vehicle?
A. Officer Tracy McDougal would have processed the vehicle, that's correct.
Q. So Officer Tracy McDougal was the officer who took them pictures, am I correct?
A. I believe so.
Q. And those pictures are of what?
A. A Chevy Tahoe.
Q. What year? Could you just go to the last page of Document 4, the inventory receipt and return?
A. You didn't give me that.
Q. Yeah, I did. It's attached to your search warrant.
A. Oh, the search warrant.
Q. The last page. All the way to the very last page.
A. Okay, yes.
Q. In the middle there, it says a vehicle that ya'll searched within, could you please tell me the make and model of that vehicle?
A. A Chevy Tahoe.
Q. What year?
A. 2001.
Q. I thought you just stated to me and the Courts that you did an investigation of this vehicle and found out the name of this vehicle, and you knew the name of this vehicle, and

you applied for a search warrant for this vehicle, am I correct?
A. That's correct.
Q. What year make and model did you apply for your search warrant?
A. I didn't apply for a search warrant under any year, make and model.
Q. Oh, you didn't?
A. I applied for it --
THE COURT: Hold on, let him finish.
A. I applied for it under a presumed VIN number.
Q. So you didn't -- a?
A. And description.
Q. You didn't apply for it for -- you learned that the owner was Shanita E. Shaw, a 2002 blue Chevy Tahoe with a 21-day sticker in the window.
A. Sir, my answer is that there is a difference between the affidavit and the application.
Q. And what's that difference? The owner of the vehicle?
A. They are two different documents.
Q. They are different?
A. When I applied for the search warrant, I was very careful to indicate that it's a presumed blue Chevy Tahoe displaying no plates with a specific VIN number.
Q. So the one that you applied for in your application

because in your application, there's no VIN number. There's only a make and model of a vehicle.

A. That's not true. My application has a VIN number.

Q. Could you for the courts, can you please tell us where it's at?

A. It's the first page.

Q. I stand corrected. I stand corrected. There is a VIN number. And this VIN number is on two different vehicles. Is this VIN number on two different vehicles?

A. I don't know.

Q. In your application, you have two different vehicles. You have one that you applied for in the description, and you have one that got searched. You have one under the name of Linda Bell. You have one under the name of Shanita E. Shaw. Which vehicle did you have searched?

A. I've produced the vehicle that I had searched.

Q. Please, please, would you tell the Courts --

THE COURT: Hold on, hold on. You got to let him finish his answer. Go ahead.

THE WITNESS: It's indicated in page 5 of the inventory and receipt.

BY THE DEFENDANT:

Q. So on page 3 when you made reference to this vehicle, in the name of the owner of Shanita E. Shaw, a 2002 blue Chevy Tahoe with the 21-temporary day sticker in the window, that

you got approved by whatever judge to get searched, was that the 2001 by Linda Bell or was it the 2002 by Shanita E. Shaw? The owner Shanita E. Shaw, because there's clearly two vehicles here.
A. I don't see it that way.
Q. Oh, you don't? Well, the evidence clearly shows that because the two --
MR. PAULSEN: We're arguing at this point.
THE COURT: Sustained. Mr. Andrews, you can't make comments or speeches on what the evidence shows. You can ask questions, "doesn't the evidence show this?" And you can make arguments certainly after the witness has testified when it's time for argument.
THE DEFENDANT: Okay, well, well just for the record, I see two vehicles here, but okay. Moving on. Moving along. That record stands I mean it shows what it shows. I have no more questions of this witness. I think the record will reflect enough of how thorough of an investigator he was and.
THE COURT: Very well. Thank you, Mr. Andrews. Mr. Paulsen, do you have any brief redirect?
MR. PAULSEN: Very brief.

**REDIRECT EXAMINATION**

BY MR. PAULSEN:
Q. Let's get to the issue of this ping. Exhibit 3 is your

exigent request. You requested both current location and call detail records. When Mr. Andrews was asking you about the documents received on May 16th, which were those?
A. The call detail records.
Q. And what you were talking about on your direct exam for the real time pings, that's something different from those call detail records?
A. That's correct.
Q. And which did you rely on when you advised other officers to go to a particular location where you thought Mr. Andrews and the phone would be?
A. The real time pings.
Q. And you said that you were getting those on a regular basis during the evening of May 15th?
A. Correct.
Q. And I think we established at the previous hearing it's every 5, 10, 15 minutes?
A. I believe it's 15 minutes.
Q. Okay. Then you were asked about a discrepancy in that Exhibit 3. Oh, there were two shootings that day in your Exhibit 3 you referenced the first one occurred at like 23rd and Fremont in North Minneapolis at 1518 hours and Mr. Andrews, I think, showed you a supplement 13 by a different officer, Kermington I think it was, which had a slightly different address, 25th and Girard. First of all,

how far apart were those two locations be?
A. Just a few blocks.
Q. And I think you said in answer to his question that you didn't rely on that supplement 13 when you drafted your exigent ping request, is that what you said?
A. That's correct.
Q. And it looks like that document or supplement wasn't created until 2050 that night, which would be?
A. 8:50 p.m.
Q. Is that after you applied for the exigent warrant?
A. I'm pretty sure. It would have been real close.
Q. Okay. What did you rely on?
A. I relied on a totality of the circumstances along with the eye witness accounts that provided me names and phone numbers.
Q. Yeah, but I'm talking about for the address for the earlier shooting. I think you said you relied on something other than that?
A. Oh, reports of shot fired brought them to that area.
Q. Okay. And with respect to the blue Tahoe, do you know anything about whether or not it had an altered VIN number on it?
A. I don't know that first hand.
Q. Okay. I'm not going to test your knowledge on that. We'll take it up another time.

MR. PAULSEN: That's all I have, Your Honor.

THE COURT: Mr. Andrews, you have the right to recross limited to the issues he just brought up.

THE DEFENDANT: Yes, I would like to.

**RECROSS EXAMINATION**

BY THE DEFENDANT:

Q. Mr. Paulsen just brought up a point about the shots spotter. You said you relied on the shots spotter to give you your information that you put in your exigent ping about the first shooting on May 15th?

A. I believe that's correct, yes.

Q. In that case, was there not shell casings, spent shell casings recovered from the scene of that shooting also?

A. Yes, there was.

Q. And that also would have been in that report from when those shots was fired then recovered that you would have relied on for your exigent ping, right?

A. I didn't know, that wouldn't have been the thing that I was -- the thing that I relied on is simply the shots spotter activates the 911 call.

Q. So how did you tie the shots spotter then with the suspect shooting down on 1711 Plymouth? How did you make that connection after the shots spotter then?

A. After I arrested you, I continued to investigate the case, and the crime lab actually linked the casings from

that scene to your --
Q. I'd like to stop you. That's not the question.
THE COURT: Sorry, he gets to answer.
A. The crime lab actually linked the casings from that shooting that I referenced in my exigent ping order to the shooting that you were observed on camera at 1711 Plymouth.
Q. Thank you for that insightful information, but I'd like to bring you back to the question that I asked you which was how did you use the shots spotter information that you wrote in your exigent ping to tie that in with the shooting that happened earlier, that happened later on in the day to make that connection to put it into your exigent ping for T-Mobile?
A. Because in the same call there was a suspect description of a vehicle, which was very similar.
Q. So in that regard you used the report because the shots spotter can't tell you that. You made reference to a report then, am I correct?
A. There are added comments that go into a 911 call.
Q. So you're using an added comments from a 91 call which is from a person, am I correct?
A. Correct.
Q. So this person that would have added them calls into that would have been the said person who would have been at the scene of this crime, am I correct, or this shooting to

make these statements, these comments to add that to the call?
A. I couldn't answer that with the information in front of me.
Q. Oh, but you're going to stand on a story that the shot spotter connected these two shootings?
A. The crime lab actually connected the two shootings.
Q. You're under oath?
A. The crime lab connected the two shootings.
Q. But how did you make the connection when you wrote this exigent ping on May 15th to T-Mobile? How did you make the connection between the two shootings?
A. Similarities.
Q. Similarities?
A. Correct.
Q. So the shot spotter told you that it was a male with dreads and a blue Tahoe, is that what the shot spotter told you?
A. No.
Q. Because that's what you put in the exigent ping that you said was a true and accurate statement, am I correct?
MR. PAULSEN: That's a mischaracterization of the document. The document will speak for itself.
THE COURT: Go ahead.
THE WITNESS: The shots spotter directs you to an

area of shots. Callers with presumed knowledge get comments or cops that arrive at a scene add comments to the 911 call.
Q. Okay. So when you did this exigent ping, you had the case number that was involved in this shooting, am I not correct?
A. That's correct.
Q. And what's the number to that, what's the case number on that?
A. 18156610.
Q. Did the shots spotter enter that?
A. The shot spotter is the reason for the entry, yes.
Q. Okay, so you used that in reference when you did that, applied for that exigent ping meaning that you referenced that case, right?
A. That's correct.
Q. Which means you read that report, right? Before you entered that exigent ping, right? Because you referenced that case in that shooting when you were applying for your exigent ping, correct?
A. I'm going to hopefully clarify what you're asking for.
Q. Just yes or no? Just yes or no?
A. That's not a yes-or-no question.
Q. Yes or no, did you read that statement? Did you read that report to that case number that you just asked before you entered the exigent ping?

A. Which report are you talking about? You're talking about two different reports.

Q. The first shooting, the one that you say happened on 23rd and Fremont?

A. I read the spotter the 911 call, yes.

Q. No, I'm asking did you read the case number that you referenced in your exigent ping supplement?

A. I can't answer the question. I don't understand it.

THE DEFENDANT: Your Honor, he's --

THE COURT: The question is a little unclear.

THE DEFENDANT: Okay. I'm asking him he made reference in his exigent ping supplement that the reason that he needed these extreme circumstances to get this in because this male was out here just recklessly shooting people. He shot someone an hour before, then he went and shot these people that were on to him now.

He made a reference to that first case where he listed the person he listed the shots and all this other stuff and there was spent shell casings recovered at that scene, but he just testified to Mr. Paulsen's rebuttal that he used other information. When I required what information that was, he told me it was a shot spotter. He did not put in his supplement it was a shot spotter. He put a reference to the case. And the reference to that case would have told him that that shooting happened on 25th and Girard, not 23rd

and Fremont, which is way closer to his shooting down there, which means he's lying to get this exigent ping that he needed for this case, which more is going to come out about more lies revolving around this later.

But the thing that I'm getting to now about is that he knew that it was shell casings recovered from 25th and Girard, and he still chose to wrote that exigent ping and make the circumstances fit to say that there was immediate danger and the circumstances was extreme, and he connected them shootings to him shooting down there on 1711 Plymouth with the suspect.

THE COURT: So your question is, hold on, let me rephrase it, and maybe I can make this quicker. Your question is when he filed his application for the exigent circumstances ping, and he referenced another shooting, where did he get the information about the other shooting? Is that the question?

THE DEFENDANT: Correct.

THE WITNESS: From the 911 call.

Q. And you read that case that you referenced, did you not?

THE COURT: What do you mean by "read that case?"

Q. You read that information. You read what the officers wrote down as far as the details to that shooting, that case that you referenced, that 1566 case, the first shooting that you put in your supplement, you read that case, did you not?

A. At that time, they did not have supplements in their case.
Q. Oh, so you just referenced the case with false information lying under perjury to T-Mobile then, correct?
A. No, that's not correct.
Q. Well, the evidence is is it's correct?
THE COURT: Well, let's not argue.
Q. I'm going to ask you this again. Sergeant O'Rourke, did you or did you not reference a shooting that happened hours earlier than your shooting on 1711 Plymouth?
A. Yes, I did.
Q. And you referenced that shooting in your supplement exigent ping to T-Mobile; is that correct?
A. That's correct.
Q. And you even were so thorough with your detail, you listed that case number; is that correct?
A. That's correct.
Q. And you listed facts to T-Mobile that you said came from that case; is that correct?
A. That's correct.
Q. Now, the facts that was listed in that case that you listed to T-Mobile, are those in fact the documented facts that went into that case that you read? Or was them facts that you used to tie it in to make the connection so you can get your exigent ping?

THE COURT: Do you understand the question?
Q. Does the facts match? Does the facts from your supplement match the facts to that case number that you referenced when you wrote your exigent ping?
A. I believe the facts match well.
Q. So officers recovered spent shell casings on 23rd and Fremont?
A. I don't know exactly where they recovered them. It's in the reports.
Q. You have it up there. It's the other officer Scott Kermington's. I believe number two or was it one, maybe two? But, anyway, the record will reflect that, yes, it was what it was. It is what it is. So we'll move on from that. The T-Mobile thing, the final thing I wanted to make reference to, Paulsen also stated that you said you used the real time alerts, am I correct?
A. That's correct.
Q. When did you first turn over the real time alerts to anybody in law enforcement government that's assigned to prosecute this case state wise or federal?
A. When they request it.
Q. When did they request it?
A. I presume it was the day we had the hearing here.
Q. So September 10th? That's the first time you mentioned this real time location?

A. That's not correct.

Q. Well, can you please tell me or show me point me in the right direction where there's a shred or a comment or anybody that can bag up what you about to tell me another time when you had made this comment about this real time alert?

A. Made the real time alert in all the police reports and submitted the application for the real time alerts.

Q. Well, I would like to take you back to your statement, supplement 33, did you mention it in there? This is your first statement that you wrote after you was assigned to this case, am I correct?

A. What would you like to know about 33?

Q. Did you mention your real time alert in there? Did you mention your real time alert in this report?

A. Yes.

Q. Could you please point it out where it says anything, any sentences about any T-Mobile, any cell phone location, information, anything, a shred of that?

A. It said at approximately 2336 hours I received information that Andrews was in the area of 2810 Girard Avenue North.

Q. Does that say anything about a T-Mobile real time location?

A. No.

Q. So, again, I ask you does it say anything about your e-mail and what your real time location in this statement?
A. No.
Q. Could you please point me in the right direction on where it will show anyone or you writing it down on a piece of paper, anything in this case state-wise or federal government-wise where this real time location was mentioned?
A. Defendant's Exhibit 2.
Q. And when was that received?
A. You gave this to me today.
Q. When did you submit that? When did you give that to someone?
A. I gave it upon request.
Q. And when was you requested to give it?
A. I don't recall.
Q. You don't recall the date that someone requested you to give them your real time alert?
A. No.
Q. Could it have been June 6th when Sergeant O'Rourke, I mean Special Agent David Volk called you or talked to you roughly on that day? Could it have been then?
A. It could have been, yes.
Q. And could you please tell the courts why you didn't give it to them then?
A. Because I'm not required to.

Q. Because it didn't exist, am I correct?
A. No.
Q. Well, could you please give us a reason why?
A. I'm not required to.
Q. You are the investigator on this case, am I correct?
A. Yes, you're correct.
Q. So you would be submitting all of the evidence that you would need to thoroughly wrap up your case as far as location-wise, defendant-wise, your probable cause-wise to half the stuff you did, am I correct?
A. I submit everything upon request.
Q. Correct. And did not Sergeant Volk request the information on June 6th on how you got the location to the suspect?
A. He did request information on June 6th, yes.
Q. And you turned over information to that said sergeant on June 8th; right?
A. Yes, I turned information over to him.
Q. Was this document in that?
A. I don't know.
Q. You don't know?
A. Uh-huh (negative).
Q. Was it in July someone requested this? What made -- okay, a better question. What made you finally turn over this document? What brought this document to light again to

the forefront of your mind where you gave it to the government?
A. A request.
Q. By whom?
A. The government.
Q. By whom?
A. The government.
Q. Whom? Who in the government? Can you please tell me who?
A. I don't know. It would have been probably Agent Volk or Jeff Paulsen.
Q. So it was probably Agent Volk or Jeff Paulsen, so you don't know who asked for this document? Did they specifically ask for this or did they just ask for the information regarding how you located the suspect? What made this document unique to the point where you sent your information on how you located the suspect and then on a different occasion submitted this document?
What made these separate because this one would have been a real easy read instead of giving out T-Mobile phone numbers and cell sites, am I not correct? This is the precise location that you gave the officers, right?
You said it was 2810 Girard Avenue North. That is a house address; that's a residence, am I correct?
A. That's correct.

Q. So that's a real time address, am I correct? So wouldn't that have been easier to give this real time location other than the T-Mobile phone number in a cell site that puts it blocks away to officer s?

MR. PAULSEN: I'm going to object to the premise of the call, but with that understanding, you can try to answer it.

THE COURT: Go ahead.

THE DEFENDANT: I'm not sure what he asked.

BY THE DEFENDANT:

Q. Would it not have been easier when Sergeant Volk asked you for the information on how you located the suspect, would it not have been an easier process just to simply state, well, I have a real time location e-mail and faxed them over this real time location.

A. I had a bunch of them. No, it wouldn't have been easier.

Q. You had a bunch of them?

A. Yes, I got them every 15 minutes that night.

Q. Did you send even one? Did you send even one of them locations? Any one of them throughout the night on June 8th, June 6th, did you send any of them?

A. I don't know.

Q. Once again, I want to draw you back to the future, like present. Could you give me roughly a month or so that you

gave this to the government, this document here?

THE COURT: So the record should reflect what document you are showing the witness. That has previously been marked, I believe, as Government Exhibit 9; is that correct, Mr. Paulsen?

THE DEFENDANT: Yes, Government Exhibit 9, the e-mail for the real time location that the government Jeff Paulsen sent to my defense attorney Reggie Aligada on September 10th.

BY THE DEFENDANT:

Q. Can you please tell us what brought this document about after all of these months? Because the shooting happened May 15th, am I correct?

A. It was requested.

Q. It was requested when?

A. September 10th.

Q. Why?

MR. PAULSEN: That's a question he can't answer, but I can, and I'll be happy to answer it.

THE DEFENDANT: Do you want to get on the stand?

THE COURT: No, we're not doing that. The objection is foundation. It's sustained. Go ahead.

THE DEFENDANT: What, with the question?

THE COURT: No, move on to the next question. He can't answer that question why it was requested.

THE DEFENDANT: Well, can you? Oh, well, I guess it was put in on the 10th, months later so.

With that being in mind, I really, I really have nothing else of this witness, man, you know. I have nothing else for him.

THE COURT: Okay, very well. Sergeant, you may step down. Mr. Paulsen, you are finished with the witness, correct?

MR. PAULSEN: Yes, Your Honor.

THE COURT: All right. You may step down, thank you. All right. We're adjourned for today, so.

THE DEFENDANT: Your Honor?

THE COURT: Yes, what is it you would like?

THE DEFENDANT: I would like to submit this motion to you.

THE COURT: You may do so through your standby counsel.

MR. ALIGADA: Is that the only copy you got?

THE DEFENDANT: Yeah, they ran out of ink.

THE COURT: Do you need us to make a copy?

MR. ALIGADA: Yes.

THE DEFENDANT: And I would like to ask the Court, if it's okay with you, I would like to reserve the right to enter more motions on suppression of evidence that was turned over after the required time by the government.

I mean Friday, September -- Thursday, I'll start with September 6th, I was just now turned over said fingerprint that did not exist. I was turned over finally photos of the weapon in question. I was turned over state and government doctored up lab report that was dated back in June, June 6th. I have the same document that was dated in June 29th, and they're clearly different, but the one that they are trying to enter now, I would like to suppress because they're adding evidence about a gun matching the scene of the shooting that it currently didn't match and that was entered on the 7th of this month.

THE COURT: Let me --

THE DEFENDANT: 200 pictures and other evidence that was entered now, and I would like to have all of that suppressed as far as like ambush. He didn't give them in time under the discovery Rules of Evidence and under Rule 16, 26.

THE COURT: Here's what we'll do. Let me first inquire of Mr. Aligada. When was your motion filing date in this case?

THE DEFENDANT: They had to be in by June 23rd, I believe. And they had to turn their evidence, discovery over June 3rd. We had to turn ours over June 7th. The motion had to begin by June 31st. And June 31st, they responded -- I mean July, all July. July is what I meant to

say.

MR. ALIGADA: Your Honor, I believe our pretrial motions were due on July 24th.

THE DEFENDANT: Yes. And the government, Jeffrey Paulsen, he responded to the motions on July 31st.

THE COURT: Yep. So here's what we're going to do. I understand you to be making a general motion to exclude or suppress any evidence, any discovery that was turned over subsequent to the time Mr. Aligada filed the motion. So I will allow you to make that motion as a general motion to anything that was turned over after Mr. Aligada filed the motions. Okay?

Obviously, I'll have to look at the motion, but the mere fact that it may or may not have been turned over after discovery was ordered or the like does not make it automatically excludable or suppressible.

THE DEFENDANT: Your Honor, I would just like to point out one critical fact of that. In his response, he responded that all laboratory reports was in that was available minus one. He entered a fingerprint that was in in June.

THE COURT: Well, we'll deal with that whenever we reconvene, but I need to get these gentlemen along the path. So, marshals, so we're adjourned for today. I understand your point, and your issues are reserved. Okay?

THE DEFENDANT: So when is we back on the record?

THE COURT: I'll have to look at my calendar, and I need to confer with the government as well as Mr. Aligada. Okay? Okay. We're in recess.

(Court adjourned at 5:35 p.m.)

(5:43 p.m.)

(In open court without defendant present.)

THE COURT: I will just say on the record that we have conferred to get a schedule for continuing this matter. Admittedly, that has occurred outside the presence of Mr. Andrews, but the lawyers are available on Friday, October 5th, and so the Court is going to reserve that time. Presumably, that will work for Mr. Andrews as well, but I will expect that somebody will let me know if that is objectionable to Mr. Andrews.

MR. ALIGADA: Your Honor, I will send him a letter tomorrow indicating that October 5th is the date that the Court has chosen.

THE COURT: Okay. Very well. That's the end of the record. We can go off the record. We're in recess again.

(Court adjourned at 5:43 p.m.)

**INDEX**

**Government's Witness** **Page**

**KELLY O'ROURKE**

| | |
|---|---|
| Direct Examination by Mr. Paulsen | 11 |
| Cross Examination by Mr. Aligada | 21 |
| Redirect Examination by Mr. Paulsen | 71 |
| Recross Examination by Mr. Aligada | 73 |

**EXHIBITS**

| Government's Exhibits | Page |
|---|---|
| 5 | 15 |
| 6 | 17 |
| 7 | 14 |
| 8 | 20 |
| 9 | 12 |

| Defendant's Exhibits | Page |
|---|---|
| 1 | 33 |
| 2 | 36 |
| 3 | 51 |
| 4 | 66 |

* * *

I, Maria V. Weinbeck, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: *s/ Maria V. Weinbeck*

Maria V. Weinbeck, RMR-FCRR