UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

--------------------------------------------------------------
                              )  COURT FILE
UNITED STATES of AMERICA      )  NO. 18-CR-149 (SRN/DTS)
                              )
         vs.                  )  Courtroom 9 West
                              )  Friday, October 5, 2018
NORRIS DESHON ANDREWS         )  Minneapolis, Minnesota
                              )  9:00 A.M.
--------------------------------------------------------------


**<u>MOTIONS HEARING</u>**

**[ DAY 2 ]**


BEFORE THE HONORABLE DAVID T. SCHULTZ
UNITED STATES MAGISTRATE JUDGE


**A P P E A R A N C E S:**


For the Government:    **OFFICE OF THE U.S. ATTORNEY**
                       By:  JEFFREY S. PAULSEN
                            Assistant U.S. Attorney
                       600 United States Courthouse
                       300 South Fourth Street
                       Minneapolis, Minnesota  55415


For the Defendant:     ***Pro Se***

                       **OFFICE OF THE FEDERAL PUBLIC DEFENDER**
  **(Standby counsel)**  By:  REYNALDO A. ALIGADA, JR.
                            Assistant Federal Defender
                       107 United States Courthouse
                       300 South Fourth Street
                       Minneapolis, Minnesota  55415


Court Reporter:        **TIMOTHY J. WILLETTE, RDR, CRR, CRC**
                       Official Court Reporter - U.S.D.C.
                       Warren E. Burger Federal Courthouse
                       316 North Robert Street - Suite 146
                       St. Paul, Minnesota  55101
                       651.848.1224

```
 1         (9:00 a.m.)

 2                    P R O C E E D I N G S

 3                      IN OPEN COURT

 4         THE COURT:  All right.  Good morning, everyone.

 5  We are on the record in the matter of the United States vs.

 6  Norris -- I don't have the caption in front of me.

 7         Do you have it?

 8     (Document handed to the Court)

 9         THE COURT:  Norris Deshon Andrews.  Thank you.

10  Case Number 18-CR-149.

11         Will counsel for the Government state your

12  appearance for the record, please.

13         MR. PAULSEN:  Good morning.  Jeff Paulsen for the

14  United States.  Case Agent Dave Voth of ATF is with me.

15         THE COURT:  Good morning.

16         And for the defendant?

17         MR. ALIGADA:  For the record, Your Honor, Reggie

18  Aligada from the Federal Defender's Office.  I continue, I

19  believe at Mr. Andrews' request, to serve as standby counsel

20  and him representing himself pro se, Your Honor.

21         THE COURT:  Very well.  Good morning, Mr. Aligada

22  and Mr. Andrews.

23         Mr. Andrews, I think it would be prudent for me to

24  make a record just so that we're clear here, so -- and you

25  can be seated.
```

1              You understand that you have the right to be

2      represented by a lawyer from the Federal Public Defender's

3      Office in this case, do you not?

4              THE DEFENDANT:  Yes.

5              THE COURT:  All right.  And you understand that

6      for today, at least, that person would be Mr. Aligada, who

7      is an experienced counsel; you understand that, correct?

8              THE DEFENDANT:  Yup.

9              THE COURT:  Okay.  And you understand the

10     seriousness of this proceeding and the consequences or the

11     potential outcomes that are riding on this hearing?

12             THE DEFENDANT:  Yes, I do.

13             THE COURT:  Okay.  And is it your desire knowing

14     all of those facts to go ahead and represent yourself with

15     Mr. Aligada serving as standby counsel?

16             THE DEFENDANT:  Yes, I do.

17             THE COURT:  Okay.  And you're doing that

18     voluntarily, you're waiving your right to counsel in the

19     form of Mr. Aligada today?  In terms of him actually

20     representing you, you're knowingly and voluntarily waiving

21     that right in favor of representing yourself, correct?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Okay.  Very well.  Thank you.

24             We may proceed, counsel.

25             THE DEFENDANT:  Excuse me.  Excuse me, Your Honor.

1    May I speak?

2            THE COURT:  Oh.  Yes, sir.

3            THE DEFENDANT:  Prior to us leaving the last

4    continuance -- I think it was the second continuance of this

5    motion hearing, I had asked can I put other motions in,

6    because they dumped, like, when you say so much exculpatory

7    evidence on us two days, two days prior to the hearing that

8    I wasn't able to challenge because it was submitted in an

9    untimely fashion, and some of the documents are forged, so I

10   will want to put my motions in.

11           Not everything that I'm putting in in these

12   motions the Government, Jeffrey Paulsen, has.  These are

13   evidence and stuff that's from him, so I would like to put

14   these on the docket and actually litigate these today as far

15   as like dealing with them, because they can be dealt with

16   readily available evidence today that doesn't need no

17   continuances or nothing.  And he has everything that I'm

18   going to bring forth to support these allegations in these

19   motions.

20           THE COURT:  What is the nature of the motions?

21   How many motions and what are they asking the Court to do?

22           THE DEFENDANT:  Oh.  Okay.  Well, you want the

23   full headings of them?

24           THE COURT:  No, just tell me how many motions you

25   have and basically what they are.  Are they motions to

1   suppress certain evidence?  What are they?

2           THE DEFENDANT:  One is a motion to suppress all

3   untimely evidence that he gave us between the 6th of

4   September and the 12th of September.

5           THE COURT:  Okay.

6           THE DEFENDANT:  Another one is to dismiss this

7   indictment for loss of exculpatory evidence and also a

8   notice of my alibi.

9           THE COURT:  Okay.

10          THE DEFENDANT:  Another one is to compel the

11  Government to disclose the identification witness that made

12  the identification of me, the defendant, on May 15th, and to

13  suppress the identification of this said witness for lack of

14  grounds of actual seeing the shooting herself.

15          THE COURT:  Okay.

16          THE DEFENDANT:  I'm going to bring forth evidence

17  to show that she wasn't out there and she never seen

18  nothing, and secondly, he don't have this witness this

19  evidence was manufactured to.

20          There's another motion to suppress the search

21  warrant because it was false information in an affidavit and

22  the officers actually searched the wrong vehicle.  I mean,

23  if you -- the transcript, you heard the officer on the

24  stand, O'Rourke, is documented evidence of that.

25          And then there's another one to dismiss the

```
1    indictment for prosecutorial misconduct, and also I'm going

2    to be putting in -- this motion is going to have an

3    outrageous Government conduct to it for loss of exculpatory

4    evidence, withholding exculpatory evidence and presenting

5    false information to the grand jury.

6                THE COURT:  Okay.  Any other motions?

7                THE DEFENDANT:  No, I believe that five or six

8    about do it, yeah.

9                THE COURT:  Okay.

10               THE DEFENDANT:  One of them is a notice.  One of

11   them is just a notice to (indicating) him --

12               THE COURT:  Okay.

13               THE DEFENDANT:  And then the other one is all

14   motions.

15               THE COURT:  Right, notice of an alibi defense.

16               THE DEFENDANT:  Yeah.  But one of them -- one of

17   these is a motion to put my alibi down, but also to dismiss

18   the case for loss of exculpatory evidence while I'm doing my

19   alibi, and then this one is just strictly to notify them

20   that I'm putting in a Rule 12.1.

21               THE COURT:  Okay.  One last question for you,

22   Mr. Andrews.

23               At least as I heard your recitation, there is one

24   motion on which you would like to present testimony of a

25   witness.  Do I have that correct?
```

1          THE DEFENDANT:  Yeah.  In the reports -- it's

2     actually a report document in here that this witness has

3     made a statement, but this witness, they didn't get a name,

4     date of birth or nothing of this person.  And this is the

5     alleged positive identification, so it's going to go to

6     grounds of the probable cause that we're doing the search

7     and seizure for the -- what we're actually in the middle of

8     a hearing for now, which is the grounds that they had to

9     pull the vehicle over and everything that followed before

10    that.

11         THE COURT:  Okay.  All right.  Let me hear from

12    Mr. Paulsen on this issue, on these motions.

13         Mr. Paulsen?

14         MR. PAULSEN:  For the record, I haven't received

15    these motions.  I'm hearing about them for the first time

16    today.

17         But as far as disclosure of the witness, it's

18    going to be the Government's position that it was a mere

19    tipster, and this is someone who is just providing

20    information that leads to the arrest of Mr. Andrews and is

21    not somebody we'd be calling as a witness at trial, so I'm

22    going to oppose disclosure of that witness.

23         He said something about false information in the

24    search warrant affidavit.  I don't know what he's referring

25    to, but just like a lawyer would have to do, he's got to

1    make a substantial preliminary showing in order to get a

2    *Franks* hearing.  I don't think he's done that.  I don't even

3    know what he's claiming the false evidence is.  I think it

4    maybe has something to do with whether it's a 2002 Chevy or

5    a 2001, which is not material.

6         Prosecutorial misconduct.  He's alleging I

7    withheld exculpatory evidence.  I don't know what that

8    evidence is.  He's probably referring to these -- the cell

9    site records which we gave in advance of the hearing,

10   certainly well in advance of trial.

11        And something about false information to the grand

12   jury.  I can't respond to that.  I don't know what he's

13   claiming.

14        The other one about dismissing the indictment,

15   wasn't clear what the grounds were, but it sounds like it's

16   a legal matter that maybe we could brief post hearing.

17        THE COURT:  All right.  Here's what we'll do.

18        First of all, Mr. Andrews, you may file the

19   motions today.  I'll accept the filing of them regardless of

20   whether they are within the time frame allowed for, okay?

21        THE DEFENDANT:  That's the grounds for most of the

22   motions, is that all the evidence that I'm using is because

23   he didn't turn over Rule 16 discovery evidence and he

24   actually lied in some of his -- his consolidated response to

25   our motions and the judge at the arraignment hearing where

1    they was ordered to give it to us before the motions.  He

2    said that he gave us all this evidence and he didn't, and he

3    came up with laboratory reports and all the other things.

4    So I don't think he should get a break to call another

5    continuance or nothing.  I think that he should have to deal

6    with it today, because he turned it in in an untimely

7    manner.

8          And it wasn't like I didn't put it on the record

9    at the last hearing that I wanted to bring these motions

10   forth, because like I said, he turned this stuff over

11   literally on the 6th and the 7th of September.  I'm talking

12   about a fingerprint.  I'm talking about -- like, this is --

13         THE COURT:  Right.  I can't make that

14   determination today.  I haven't seen the motions.  What we

15   have to do is, I'm going to permit you to file the motions

16   that will then trigger service.

17         Mr. Aligada, will you make sure that the U.S.

18   Attorney's Office is served with the motions?  And then I

19   can review that and determine from there what the next steps

20   are, but I can't do it any other way today, okay?

21         I'm sorry, Mr. Aligada.  I asked you for a

22   response and then I didn't let you respond.

23         MR. ALIGADA:  The only idea, Your Honor, is, if

24   you accept the motions and you have the Clerk's Office file

25   them, they would be served on Mr. Paulsen.

1          THE COURT:  All right.  So I'll accept the

2    motions.  I'll deal with them when I've had a chance to look

3    at them.  I'm certainly going to preserve any rights that

4    you have.

5          And if -- and I understand your concern that some

6    of this relates to the proceedings today and that they have

7    turned over information prejudicially late.  If that is the

8    case, then that will, of course, have an impact on what the

9    Court considers from the evidence and what it does with the

10   evidence.

11         THE DEFENDANT:  But what about me wanting to

12   challenge -- because he tried to brush over that witness

13   person that he said gave a tip.  Well, that tip that he's

14   claiming to have is the actual identification of the

15   defendant.  This person reportedly gave not only a full

16   government name, but a readily available picture, and they

17   don't have a shred of evidence to support this, so I would

18   be challenging that.

19         And then even in that statement that was made by

20   the officer that this witness has made, this witness told

21   the officer that she only heard the shooting.  She never

22   actually saw it.  So all of their evidence that they're

23   bringing before the courts and the grand jury was false.

24   They never had a positive identification.  And I have the

25   evidence that I'm going to present today and prove that you

1    didn't have.

2              So with that issue, I still would like to bring

3    that up today.

4              THE COURT:  Well, and that's -- at least as I'm

5    hearing it, first of all, okay, you'll file your motions.

6    That's fine.  Those issues will be preserved and the Court

7    will -- your rights to challenge all that evidence and the

8    eyewitness identification will be preserved.

9              Second, to the extent that what you want to

10   present, you're suggesting you want to cross-examine some of

11   their witnesses about, you're going to be free to do that

12   today, but if there is a need for additional evidence or

13   additional argument on either side, we'll deal with that

14   down the road.

15             THE DEFENDANT:  I just need Sgt. O'Rourke brought

16   back.

17             THE COURT:  I see.  Well, that's not something I

18   can order today, probably effectively, but let's do this:

19             Let's start with the hearing.  We'll deal with

20   that at the break, perhaps.  And I understand you want to

21   cross-examine Sgt. O'Rourke further.  I'll have to hear a

22   little bit more about that, but let's go on with the other

23   witnesses while we have them here, okay?

24             THE DEFENDANT:  Okay.  Thank you.

25             THE COURT:  Thank you.

```
 1              Go ahead.
 2              MR. PAULSEN:  The next witness is one of the
 3      arresting officers, Sgt. Joel Pucely.
 4              THE COURT:  Would you say that last name again?
 5              MR. PAULSEN:  Pucely, P-U-C-E-L-Y.
 6              THE COURT:  Okay.
 7
 8        JOEL E. PUCELY, GOVERNMENT'S WITNESS, SWORN
 9              THE COURT:  All right.  Be seated, state your full
10      name for the record and spell your last name, please.
11              THE WITNESS:  Joel Edward Pucely, P-U-C-E-L-Y.
12                        DIRECT EXAMINATION
13      BY MR. PAULSEN:
14      Q.  By whom are you employed?
15      A.  The City of Minneapolis.
16      Q.  As a police officer?
17      A.  Yes, sir.
18      Q.  And how long have you been with the Minneapolis Police
19      Department?
20      A.  Since January of 2007.
21      Q.  And you're a sergeant?
22      A.  I am.
23      Q.  I want to take you back to May 15th of 2018.  Were you
24      involved in helping investigate a shooting incident and
25      making an arrest?
```

1    A.  Yes, sir, I was.

2    Q.  What was your first involvement?

3    A.  My first involvement was later in the evening.  I was

4    aware of the shooting that occurred.  I had just come on

5    duty when the shooting happened.  Later in the evening, like

6    10:30, 11 o'clock at night, I received a call from

7    Sgt. O'Rourke of the Assault Unit.  He informed me that he

8    had developed information that led him to believe that the

9    suspect vehicle in that shooting was in or around the 2900

10   block of Girard Avenue North and asked me to go and check

11   for it.

12   Q.  Okay.  And did you know the same of the suspect at this

13   point?

14   A.  I did.

15   Q.  And what was the name?

16   A.  Norris Andrews.

17   Q.  Had you done anything to familiarize yourself with that

18   person, Norris Andrews?

19   A.  Yes.  I had looked at prior booking photos.

20   Q.  And were these recent booking photos?

21   A.  Yes.

22   Q.  Okay.  So around 11 p.m. or so, O'Rourke tells you go to

23   the area of -- what was it again?

24   A.  29th Avenue North and Girard Avenue North.

25   Q.  All right.  And we have a document in evidence,

1    Government Exhibit 9, which was his -- the text message

2    alert he got from pinging the cell phone in question.

3           MR. PAULSEN:  And just to refresh everybody's

4    recollection, this is Pacific Daylight Time, so this alert

5    came in at 11:41 p.m. Minnesota time, and it had attached to

6    it --

7           THE DEFENDANT:  Objection.  Is he asking a

8    question or is he just leading the witness?  What is he --

9    is he testifying?

10          THE COURT:  Sustained.  Go ahead.

11   BY MR. PAULSEN:

12   Q.  Page 2 of the document was a map that accompanied that

13   alert, and if we can focus in on it, I want to ask you based

14   on this map, where did you go to do your surveillance?

15   A.  So initially I drove kind of -- a very small grid search

16   around the area because I wasn't sure of the confidence

17   rating of the ping, so I kind of drove through the alleys,

18   maybe a block north, block south, block east, block west,

19   just kind of in that area of 27th to 29th and Girard looking

20   for the vehicle.

21          After I didn't find the suspect vehicle, I called

22   Sgt. O'Rourke back, told him that I didn't locate the

23   vehicle, but I wasn't doing anything else at the time, so I

24   just told him that I would sit in the area and do

25   surveillance for a bit.  And I was sitting just north of

1    29th Avenue North facing southbound on Girard Avenue North.

2    Q.  So this (indicating) is Fremont?

3    A.  Correct.

4    Q.  It's not marked, but the next one over is Humboldt, so

5    would this be Girard here?

6    A.  Yes, sir.

7    Q.  Okay.  And you were up (indicating) here?

8    A.  Yup.

9    Q.  29th and Girard.

10           And so the suspect vehicle at that time that you'd

11   been directed to look for was what kind of a car?

12   A.  A blue Chevy Tahoe.

13   Q.  And you couldn't find the blue Chevy Tahoe?

14   A.  No, sir.

15   Q.  All right.  So then you did stationary surveillance from

16   that location?

17   A.  Yes, sir.

18   Q.  And at a certain point did you see a different -- did a

19   different vehicle attract your attention?

20   A.  Yes, sir.

21   Q.  Tell us about that.

22   A.  As I was sitting there -- I can't remember the exact

23   amount of time that I was sitting there, but a white GMC

24   Yukon with Minnesota dealer plates on it came into my view.

25   It was traveling westbound on 29th Avenue North, turned

1    southbound on Girard Avenue North, kind of drove south on

2    the block slowly and then turned eastbound on 27th Avenue

3    North.

4            Initially, I just, you know, didn't think a whole

5    lot of it, it was a car passing down the block, but then a

6    couple of minutes later the same vehicle came back from the

7    opposite direction.  So it came westbound on 27th, went

8    northbound on Girard and then parked on the east side of

9    Girard Avenue North facing northbound.

10   Q.  Like in (indicating) here somewhere?

11   A.  Yeah.  It was where the red indicator was.  It was a bit

12   south of there, but it was that same side of the road.  So

13   yeah, it was in the first -- I would say between like a

14   third of the way north to halfway north of 27th on the east

15   side.  It's tough, because it's a double block, so it's hard

16   to kind of describe.

17   Q.  And was there anything about the movements of the white

18   Yukon that was suspicious to you?

19   A.  Yeah, it was -- you know, the first time it -- I

20   remember noticing that it was driving south slowly, you

21   know, which to me kind of didn't indicate a ton at the time,

22   but then once it came back, I was kind of thinking back and

23   I'm like, well, maybe they're looking for somebody.  Maybe

24   they're looking to pick somebody up.  You know, the car

25   drives one direction and then within minutes it comes back

1     the opposite direction.  And then all of a sudden -- as soon

2     as I saw it, I remembered it because it had that dealer

3     plate on it.  And it parked and I was like, well, maybe this

4     is going to be somebody that's coming to pick somebody up on

5     the block.

6     Q.  So did you focus your attention on the car?

7     A.  Yes, sir.

8     Q.  Let's talk about what the lighting was like here in this

9     area.

10    A.  Uh-huh.

11    Q.  This was late at night.  I think according to your

12    report it's about 11:42 p.m.?

13    A.  Yes.

14    Q.  All right.  What was the lighting like?

15    A.  I mean, it was obviously dark, but there were

16    streetlights that illuminated the block pretty well.

17    Q.  Okay.  And did you have anything to enhance your vision?

18    A.  Yes.  I was using binoculars.

19    Q.  About how far away were you from your position to the

20    white Yukon?

21    A.  Oh, gosh.  I mean, I was -- I'm not the best at

22    estimating, like, actual distance, but I mean, it was a

23    ways.  It was far enough -- if I can just describe it, it

24    was far enough that with the binoculars I could clearly see

25    what was going on, but it wasn't close enough that I would

1   have been able to see faces in the lighting.

2   Q.  So as you're using your binoculars, did you see any

3   people?

4   A.  Yes, I did.

5   Q.  Tell us about that.

6   A.  I saw two individuals come out of a house that was

7   actually out of my view on the east side of the road.  It

8   was set back a little bit further.  They appeared to have

9   come out of that yard and they were kind of running,

10  jogging-running, and they went towards the white Yukon and

11  got inside.

12  Q.  Could you make out their faces?

13  A.  I couldn't make out their faces, no.

14  Q.  How about general description, height, weight?

15  A.  General description, the one that I had keyed in on due

16  to the fact that he -- this person that I saw matched the

17  general description of Mr. Andrews -- was a larger built

18  male with what looked to be long braids or dreadlocks.

19  Q.  And did that match the description of the person that

20  O'Rourke was looking for that night?

21  A.  Yes, sir.

22  Q.  So after you saw these two people jog to this white

23  Yukon and get in, what did you do?

24  A.  I just sat there and waited.  Within, you know, a few

25  moments it pulled away from the curb without signaling, came

1   up to the -- came northbound to the stop sign that controls

2   north/south traffic at 29th and Girard, and then made an

3   eastbound turn onto 29th Avenue North without coming to a

4   complete stop for the stop sign.

5   Q.  Are those both moving traffic violations?

6   A.  Yes, sir, they are.

7   Q.  When -- well, there's a video in evidence, your squad

8   video.  Was your squad video operating at the time you

9   observed these moving violations?

10  A.  No, it wouldn't have been.  The way that our squad video

11  works is, it's a digital system, so it's constantly

12  recording on like a 30-second loop.  So when you turn your

13  lights on the actual recording starts and it kicks back that

14  30 seconds.  So it would -- my lights weren't on, my

15  emergency lights weren't on, so it wasn't recording at that

16  time, no.

17  Q.  But you observed these moving violations yourself.

18  A.  Yes, sir.

19  Q.  So what did you do with respect to following this white

20  Yukon?

21  A.  I followed it from a short distance, kept it in sight

22  while I used my cell phone to call another officer to help

23  me stop it.  I kind of briefed him on where I was at and

24  what I was doing and just asked for help stopping it.

25  Q.  Is that Officer Schroeder?

1    A.  Yes, sir.

2    Q.  And at a certain point did you make a decision to stop

3    this white Yukon?

4    A.  Yes, I did.

5    Q.  About how far away from the original location were you?

6    A.  Well, the traffic stop was at Lowry and Fremont, so it

7    would have been --

8    Q.  It might be off our map, but would it be down

9    (indicating) here somewhere?

10   A.  It would be north of where this is.  So about three

11   blocks north of Fremont, but we went -- Fremont's a one-way

12   going southbound, so we went 29th to Emerson, north on

13   Emerson to 33rd, west on 33rd and then south on Fremont and

14   stopped it within that block.  So, I mean, roughly six

15   blocks away, or six blocks of travel.

16   Q.  And by then was Officer Schroeder in a position to help

17   you make the stop safely?

18   A.  Yes, sir.

19   Q.  That's when you turned on your lights?

20   A.  Yes.

21   Q.  And did the vehicle pull over right away?

22   A.  Yes, it did.

23   Q.  What happened then?

24   A.  I got out of my squad.  I approached the vehicle from

25   the driver's side with the intention of making contact with

1    the driver.  As soon as I got to the rear driver's side

2    window, so the person seated directly behind the driver, I

3    looked inside and I could clearly see that the person that

4    was sitting there was Mr. Andrews.

5    Q.  So let's set the stage for who was in the vehicle.  Who

6    was the driver?

7    A.  It was a female.  There was a female that was driving.

8    Q.  And was there a front-seat passenger?

9    A.  Yes, sir.

10   Q.  Who did that turn out to be?

11   A.  I can't remember the gentleman's name.

12   Q.  Okay.  And then the only other person was Mr. Andrews

13   seated in back?

14   A.  Yes, sir.

15   Q.  Once you recognized Mr. Andrews as the person O'Rourke

16   wanted you to take into custody, what did you do?

17   A.  At that point, that became my priority.  I asked

18   Mr. Andrews to step out of the vehicle, which he did.  He

19   was handcuffed without incident and taken back to my squad

20   and secured in the back seat of my squad.

21   Q.  Did he have a cell phone with him?

22   A.  Yes, he did.

23   Q.  And after he was secured, are you aware of whether any

24   weapon was found in the car?

25   A.  Yeah.  One of the officers I was assisting at scene

```
 1     informed me that a handgun was found somewhere in the

 2     vicinity of where Mr. Andrews was seated.

 3               MR. PAULSEN:  No further questions.

 4               THE COURT:  Thank you, Mr. Paulsen.

 5               Mr. Andrews?

 6               THE DEFENDANT:  Yes.

 7               THE COURT:  Do you care to cross-examine the

 8     witness?

 9               THE DEFENDANT:  Oh, yes, yes, sir.

10               THE COURT:  Okay.

11                         CROSS-EXAMINATION

12     BY THE DEFENDANT:

13     Q.  So, Joel -- can I call you Joel?

14     A.  Absolutely.

15     Q.  You ready to tell the truth now?

16     A.  I have told the truth the entire time so far.

17     Q.  Oh.  Well, we're going to get to the bottom of that.

18               Well -- okay.  Now, how did you say that you

19     received your information from Sgt. O'Rourke about this

20     situation?

21     A.  I think it was a phone call.

22     Q.  You think it was a phone call.

23     A.  Yes.

24     Q.  That was the first contact that was made.

25     A.  Between Sgt. O'Rourke and I?
```

```
1    Q.  Yeah.

2    A.  Yeah, as far as I know, a phone call or a text message.

3    Q.  And then what other -- what other type of contact did

4    y'all have?

5    A.  I believe that he sent me e-mails with pings that

6    Mr. Paulsen showed.  I think he was -- if I remember right,

7    he was forwarding me those e-mails so that I could see the

8    same thing that Sgt. O'Rourke was seeing.

9    Q.  He sent you a ping.

10   A.  The cell phone pings.

11   Q.  So he sent you that location.

12   A.  Yes.

13   Q.  So he sent you the precise three-foot location that he

14   just showed you on that paper.

15   A.  I didn't know it was a three-foot location, but --

16   Q.  Oh, yeah.  That was a direct location about -- and let

17   Sgt. O'Rourke tell it -- it's within a three-foot radius.

18   A.  Okay.

19   Q.  So if he sent you that location --

20        MR. PAULSEN:  Your Honor, I'm go to object to

21   mischaracterizing --

22   Q.  Why was you --

23        THE COURT:  Hold on, hold on.  As soon as he

24   starts to raise an objection, you have to be quiet so that

25   the court reporter can hear what the objection is and I can
```

 1   hear it.

 2              THE DEFENDANT:  Okay.

 3              THE COURT:  I'll sustain --

 4         MR. PAULSEN:  I just want to --

 5              THE COURT:  -- the objection.

 6         MR. PAULSEN:  -- preserve my objection.

 7              THE COURT:  Right.

 8         MR. PAULSEN:  He can ask his questions, but I

 9   don't want my silence to be taken as agreement.

10              THE COURT:  Understood.

11         Okay.  Go ahead, Mr. Andrews.

12   BY THE DEFENDANT:

13   Q.  You said that you were circling around this area.

14   A.  I did drive through the area, yes.

15   Q.  You did a six-block radius around, did you not?

16   A.  No, it was not that far.  It was -- I went like a block

17   north and a block south and then checked the alleys on

18   either side.

19   Q.  You went a block north and a block south.

20   A.  Yes.

21   Q.  Could you tell me why you did that?

22   A.  Because the ping wasn't for the vehicle.  It was for a

23   cell phone.  So, you know, if I have my cell phone in my

24   pocket and I park outside of this building and I walk, you

25   know, a block away, the ping is going to show a block away,

1    but my vehicle is still going to be parked in front of this

2    building.  So I had an idea of where the ping was, but I

3    didn't know if maybe the vehicle was parked a block or so

4    away, so I drove around looking for it.

5    Q.  Is that common practice, that people park their car a

6    block away from where they're at?

7    A.  I mean, it definitely could be.  I've seen it before.

8    Q.  Was this block congested, like packed with cars to the

9    point where no car can park on this block?

10   A.  No, it wasn't.

11   Q.  Was there like a concert or something going on this

12   night?

13   A.  No, it was a residential area.

14   Q.  So there was lots of parking spaces available, I would

15   suggest -- I would assume, right?

16   A.  Yes.

17   Q.  Now, with that in mind and you had this precise

18   location, I want to ask you again -- you're under oath, I

19   remind you -- why would you be searching anywhere other than

20   where that ping is at?

21   A.  Well, I knew that the incident in question was a

22   shooting, and in my experience people that are involved in

23   shootings are often paranoid that they're going to get

24   caught by the police.  So if they maybe have an idea that

25   their vehicle was seen at the scene of a shooting or leaving

1    the scene of a shooting and they want to go to one location,

2    they might park their vehicle a couple of blocks away so

3    that if the police see that vehicle, they won't associate it

4    with the house that the person is in.

5    Q.  Was there any indication to any of the suspects in your

6    alleged shooting that they had warrants out for them?

7    A.  No.

8    Q.  Was there any location put on TV that the vehicle that

9    you guys was looking for was wanted?

10   A.  No.

11   Q.  So how would the suspects have known that their vehicle

12   was seen or wanted at a location for a shooting to park it a

13   block away?

14   A.  Well, I think it's just human nature that if, you know,

15   a criminal act is committed, people assume that someone saw

16   it happen.  You know, this shooting occurred in broad

17   daylight.  I would think that the suspects would assume that

18   someone saw it happen and might have told the police that,

19   you know, for -- in this case that someone saw the person

20   who did the shooting get into a blue Chevy Tahoe and drive

21   out of the area.  I mean, that's how I would think of it.

22   Q.  You know you're reaching, right?

23              MR. PAULSEN:  I'm going to object, Your Honor.

24   It's argumentative.

25              THE COURT:  Sustained.

1    Q.  Okay.  Secondly -- okay.  So let's just say that this

2    truck -- since this is the story that you're going to stick

3    to, let's just say that this truck was two blocks away on a

4    side block and you found it.  What would you have done then?

5    A.  I would have talked to Sgt. O'Rourke.  I assume that he

6    would have wanted me to tow the vehicle.

7    Q.  So you would have just let the suspect go.

8    A.  At that point I don't think it's really letting the

9    suspect go.  I would have deferred to the investigator on

10   it.

11   Q.  I mean, because obviously he's going to notice you just

12   took his vehicle.  So if you took his vehicle a block away

13   because that's where you were searching for that, then the

14   suspect would have got away at this time, wouldn't he?

15   A.  Well, like I said, I would defer to the investigator on

16   that.

17   Q.  Oh, you would have deferred to the investigator.  Okay.

18   I'll move along from that.  I just wanted to develop the

19   record on that about the lies, but anyway.

20          Where did you say you was parked at?

21   A.  I was parked on the -- on Girard Avenue North just north

22   of 29th Avenue North facing southbound.

23   Q.  And you said that you seen the suspects how?

24   A.  What do you mean by that?

25   A.  How did you see the suspects?

1    Q.   With my eyes.

2    A.   With your eyes.

3    A.   Yes.

4    Q.   And this was at night.  This was at what time of night?

5    A.   It was -- I got in my report.  It was 11:40 something at

6    night, I think.

7    Q.   11:40 --

8    A.   Or actually a little later than that.  I'm sorry.

9    Q.   So it was dark.

10   A.   Yes, sir.

11   Q.   Could you tell me the -- can you describe the clothing

12   that the suspects had on?

13   A.   I don't recall that at this point, no.  I was using

14   binoculars.  I could see -- as I explained, from the

15   distance that I was with the binoculars that I had, I was

16   able to see people, general descriptions, you know, general

17   height and weight and hair style.

18   Q.   Was you ever to see a face?

19   A.   No.

20   Q.   Okay.  I want to slide you a picture up there.  If you

21   seen the picture of the suspect or the person that you took

22   into custody, you would be able to recognize it, would you

23   not?

24   A.   If I saw their face, yeah.

25            MR. ALIGADA:  May I approach, Your Honor?

```
 1              THE COURT:  You may.

 2     BY THE DEFENDANT:

 3     Q.  Do you recognize that photo?

 4     A.  That appears to be a photo of your back.

 5     Q.  So is that the clothing -- it appears to be a photo of

 6     whose back.

 7     A.  I would assume that this is your back.

 8     Q.  You just said "your back."  Who was "your back"?

 9     A.  I misspoke.  This is a photo of someone's back.  He

10     appears to be a male wearing a jacket with a hood with fur

11     on it and light blue or black pants.

12     Q.  Okay.  Do you recognize that photo?

13     A.  I mean, I don't know exactly -- I don't think I took

14     this photo.

15     Q.  Do you recognize anything in that photo?  Think back.

16     Think to May 15th at 11:40 at night.

17     A.  I guess I'm not -- I'm not really sure what you're

18     asking me.

19     Q.  I'm asking you to -- do you recognize that photo?  Have

20     you ever seen that set of clothes, that coat, that person

21     there?  Can you recognize and identify who that is?

22     A.  Yeah.  This was the clothing that you were wearing the

23     night that --

24     Q.  Who are "you"?

25     A.  Mr. Andrews.
```

1    Q.  So, can you tell me what color that coat is?

2    A.  It appears to be black.

3    Q.  Appears to be black.

4              THE DEFENDANT:  One moment, please.

5              THE COURT:  Is this marked?  This copy is not.  Is

6    it in evidence?

7              MR. ALIGADA:  No, it's not, Your Honor.

8              THE COURT:  Do you want it?

9              THE DEFENDANT:  I'm going to be introducing it.

10   Yeah.

11        (Pause)

12             Huh.  I seem to have misplaced my other photos I

13   was going to use.  The Government has offered these as

14   Exhibit Number 5, but I would like to also offer these.

15   Could you send them up there?

16             MR. ALIGADA:  Sure.  Does the Court know what

17   exhibit number we're up to for the defense?

18             THE COURT:  I do not.

19             MR. PAULSEN:  I think it's Number 5.

20             MR. ALIGADA:  I think Mr. Paulsen is right.

21             THE COURT:  I think that's right.  Let me look.

22             I think 5 would be a safe number to use.

23             THE DEFENDANT:  Enter both of those pictures.

24             MR. ALIGADA:  (Indicating).

25             THE DEFENDANT:  Yeah.

1      BY THE DEFENDANT:

2      Q.  Now, those photos that you have there, do you recognize

3      those, anybody in those photos?

4      A.  Do I recognize anyone in the photos?

5      Q.  Mm-hm.

6      A.  These are photos of Mr. Andrews.

7      Q.  When do you recognize those photos as being taken?

8      A.  I don't -- I don't know.  I don't know if I was present

9      when these photos were taken.

10     Q.  When did you see Mr. -- did you ever see Mr. Andrews

11     with those clothes on?

12     A.  Yeah, the day that this incident occurred.

13     Q.  So that's what he was wearing the night that you seen

14     him at night --

15     A.  Yeah.

16     Q.  -- that you arrested him?

17     A.  As best I can recall, yes.

18     Q.  As best as you can recall.  Can you describe the shirt

19     that he has on?

20     A.  Black shirt.

21     Q.  Can you describe the coat that he has on?

22     A.  In this picture it appears to be a black leather jacket.

23     It might be discolored, it might be brown.  In this picture

24     I can only see the inside of it, it appears to be brown, and

25     then there's light-colored jeans and black-and-red shoes.

1     Q.  Okay.  Thank you.

2               Now, once again --

3               THE COURT:  Let me interrupt you for one second.

4     I assume you want this in evidence --

5               THE DEFENDANT:  Yeah.

6               THE COURT:  So you're offering 5.

7               Do you have any objection, Mr. Paulsen?

8               MR. PAULSEN:  No, Your Honor.

9               THE COURT:  All right.  Five is received.

10              Sorry.  We just have to keep the record clear.

11    BY THE DEFENDANT:

12    Q.  I'd like to draw your attention to the TV screen there.

13              The photo that I'm about to show you is a

14    nighttime photo of roughly where you would have been parked

15    at on the exact same street that you just described to

16    Sgt. O'Rourke facing the exact same way that you would have

17    been facing.

18              That's the street you was parked on, right?

19    A.  I have no idea.  That is a street.  I have no idea if

20    that was the street I was parked on.

21    Q.  Okay.  Well, I will inform you that is 29th and Girard

22    facing south.  The stop sign that you see in the distance is

23    28th, roughly a quarter -- well, down the block you would

24    have said is where you would have seen --

25              THE COURT:  We have a problem with our screens up

1    here, so either we have to fix it or the officer has to move

2    to a different screen.

3              THE WITNESS:  Your Honor, I can look at that one

4    quickly.

5              THE COURT:  Why don't you go ahead and look at

6    this screen.

7              There's a bar right across his screens, his and

8    mine.

9         (Pause)

10             THE COURT:  All right.  Go ahead, Mr. Andrews.

11   BY THE DEFENDANT:

12   Q.  I'm going to be printing this photo and I'm going to

13   want to enter it into evidence.

14             THE COURT:  Okay.

15   Q.  Now, is that roughly where you was parked at?

16   A.  No.

17   Q.  So where were you parked at?

18   A.  I was parked right by the stop sign.  I was parked just

19   north of the stop sign at 29th and Girard.

20   Q.  You was parked just north, but you just told us earlier

21   that you was less than a quarter way down the block.

22   A.  No, I didn't.

23   Q.  Yes -- I'm not going to debate that.

24             Anyway, either way, that's the block right there.

25   Could you please tell me how if the suspect was wearing all

1    black and you wasn't able to see his face did you see that

2    he had long dreads with a hoodie on.

3    A.   The hood wasn't up.

4    Q.   Oh, it wasn't.  So what was the hood for then?

5    A.   I don't know.

6    Q.   When you arrested both of the suspects, were they not

7    both wearing hoodies?

8    A.   This is a jacket that you're showing --

9    Q.   Did both of their coats have hoods on them?

10   A.   I don't remember what the other person was wearing.

11   Q.   Would you like the inventory sheet?

12   A.   No, thank you.  I mean, I don't know what the other

13   person was wearing.  I didn't have any contact with that

14   person.

15   Q.   You didn't?

16   A.   No.

17   Q.   So Montreal Tyson wasn't took of his vehicle right while

18   you was there?  You didn't go to the passenger side and

19   escort him with officers out of the truck?

20   A.   I don't remember doing that.  If I did, I apologize.

21   Q.   Here we go with the -- I'm asking you again.  You know

22   that you're under oath, right?

23   A.   Yes.

24   Q.   Now, I'm going to ask you again, how did you recognize

25   the suspect in all black at nighttime with a hoodie, on or a

1    coat with a hood on?

2    A.  I saw a larger-build black male with long dreads or

3    braids who came out of a yard on the east side of the

4    street, got into the vehicle.  That general description, a

5    larger-build black male with dreads or braids matched the

6    description of Mr. Andrews.

7    Q.  So anybody -- you would have just stopped any vehicle

8    with anybody that night; is that safe to say?

9    A.  No.

10   Q.  So what made this person stand out to you?  Because

11   obviously you're not describing a suspect.  You're not

12   describing someone that you could positively identify that

13   you should have been pulling a before, because I'm pretty

14   sure north Minneapolis has lots of larger black guys with

15   possibly long dreads, you know, that you can't see the face,

16   wearing dark clothes.  Because from the description that you

17   was given, was the person wearing a black coat?

18   A.  I didn't have a description of the person.  That wasn't

19   relevant to what was going on.  Clothing description at that

20   point wasn't relative to what I was doing in that area --

21   Q.  So could you see his face?

22           THE COURT:  Make sure you let him finish his

23   answer.

24           Go ahead.

25   A.  As I said, no, I could not see the person's face.

1     Q.  So how did you make an identification?

2     A.  I did not make a positive identification of the person

3     at that time.

4     Q.  Oh.

5     A.  I saw a similar build and hair style to the person that

6     I was looking for.

7     Q.  Okay.  And could you please tell me, could you please

8     state for the Court how much was this person supposed to

9     weight that you was supposed to pull over, the suspect?

10    A.  Over 200 pounds.  Like I said, a larger build.

11    Q.  A larger-build man.

12    A.  Yes.

13    Q.  And you seen this at night with that heavy coat that

14    this guy had on that he was a larger-build man.

15    A.  You could still tell height and general size while

16    someone's wearing a jacket.

17    Q.  So you didn't know where this person was, what house,

18    you didn't -- this was not the suspect's vehicle, because

19    you was in fact looking for a blue Chevrolet Tahoe, am I

20    correct?

21    A.  That is correct.

22    Q.  And the vehicle that you was miraculously watching this

23    large black male get into, what kind of car was that?

24    A.  That was a white GMC Yukon.

25    Q.  A white GMC Yukon.  So that in fact was not the

1    suspect's vehicle.

2    A.  No.

3    Q.  In fact, you could not see this person's face that got

4    in this vehicle.

5    A.  I could not, no.

6    Q.  So you did not know who this person was other than it

7    was just a large black male that you stereotyped that got in

8    that vehicle, am I correct?

9    A.  It was a large-build black male that got into the

10   vehicle.

11   Q.  How long have you been working for Minneapolis Police

12   Department?

13   A.  Since 2007.

14   Q.  Since 2007.  In your capacity, or your mindset, how many

15   large black males is there over north?

16   A.  I could not make that -- I couldn't even make an

17   estimate.

18   Q.  Is it more than five?

19   A.  I can't -- yes.

20   Q.  Is it more than ten?

21   A.  I can't make an estimate.

22   Q.  Is it more than a hundred?

23   A.  I can't make an estimate.

24   Q.  So it's safe to say you would have just pulled over any

25   vehicle because you couldn't make an identification, am I

1    right?

2    A.  No.

3    Q.  You did not know who was in that vehicle, did you?

4    A.  I had reasonable suspicion that the person that had

5    gotten into that vehicle --

6    Q.  You had reasonable --

7    A.  -- was the person that I was looking for.

8    Q.  And what was the reasonable suspicion?

9    A.  My reasonable suspicion was that I had received the cell

10   phone pings from Sgt. O'Rourke that told me that that cell

11   phone that was the suspect's cell phone was in the area of

12   the 27 to 2900 block of Girard, the 27 -- 27th to 29th on

13   Girard on the east side of the street.  I saw a person who

14   matched the general description of the person who was

15   responsible for the shooting come from the east side of

16   Girard Avenue North and get into a vehicle and drive away.

17   Q.  And you was on 29th and Girard.

18   A.  Yes, sir.

19   Q.  So you said the window of the blocks that you had was a

20   two-block radius, right?

21   A.  It's a double block.  I don't think it's a full distance

22   of two blocks, no.

23   Q.  Well, if it's a double block, that just means it's one

24   extremely long block, am I correct?

25   A.  No, it's not a full two blocks.  It goes from 27th to

1    29th.  There is no 28th there, but it's not --

2    Q.  It's not?

3    A.  No, there's no 28th.  There's no 28th there.

4         THE DEFENDANT:  One moment, please.

5      (Pause)

6    BY THE DEFENDANT:

7    Q.  Well, you're on 29th, obviously, and you got a 28th and

8    a 27th block radius that you're looking for someone, right?

9    A.  I was looking for someone --

10   Q.  Am I correct?  Just yes or no.

11   A.  Yes.

12   Q.  And that two-block radius, you couldn't see no faces

13   why?

14   A.  I wasn't close enough to see faces.

15   Q.  So if someone was to come out, a larger black male was

16   to come out at the corner of 27th and Girard, would you have

17   been able to make identification of that person?

18   A.  No, that would have been farther away than where I saw

19   the two people come out and get into the car.

20   Q.  But you would have still been able to tell it was a

21   larger black male, would you not?

22   A.  I don't know.  I -- I would assume so, but that's not

23   what happened here and I wasn't forced to make that

24   identification from that full distance away.

25   Q.  Okay.  I'm going to move along, because I just wanted to

1    develop the record on what you were saying right there

2    anyway.

3          So you're telling me -- and this is your story --

4    that Sgt. O'Rourke sent you out here to locate and do what?

5    A.  To look for the suspect vehicle.

6    Q.  The vehicle, or the suspect itself?

7    A.  The suspect vehicle.

8    Q.  And what was you to do when you found the vehicle?

9    A.  I was going to call Sgt. O'Rourke back.

10   Q.  So he gave you a ping to go get a vehicle.

11   A.  He gave me the general area that the vehicle was in and

12   he forwarded me the e-mails he was receiving from the cell

13   phone --

14   Q.  So what was being pinged?  Was it a vehicle being pinged

15   or the suspect's phone, cell phone?

16   A.  The cell phone.

17   Q.  So you were looking for the suspect.

18   A.  I was looking -- I was looking for the vehicle.

19   Q.  So which one was more important to the case?  If you had

20   seen the suspect and you would have seen the vehicle and the

21   vehicle drove away, but the suspect went a different way,

22   which one would you have apprehended?

23   A.  I would have gone after the suspect.

24   Q.  So that tells me you was looking for the suspect then.

25   A.  No, not necessarily.

1    Q.  Not necessarily.  So when you drove around this area and

2    you went through these alleys and you didn't see the

3    vehicle, then why did you stay there if you're looking for

4    the vehicle?  Because the ping still stays there and you're

5    only looking for the vehicle, am I correct?

6    A.  Well, once I didn't find the vehicle --

7    Q.  Yes or no.  Was you just looking for the vehicle?

8    A.  When Sgt. O'Rourke --

9    Q.  Yes or no, were you looking for the vehicle, the SUV?

10   A.  At what point?

11   Q.  When you were sent to this location, because

12   Sgt. O'Rourke told you to go look for the vehicle, so you

13   were looking for the vehicle, correct?

14   A.  When I initially got into the area I was looking for the

15   vehicle, yes.

16   Q.  And when you drove around this location, you could not

17   find that vehicle, am I correct?

18   A.  You are correct.

19   Q.  And you decided to stay at this location, am I correct?

20   A.  Yes.

21   Q.  And you decided to do surveillance at this location, am

22   I correct?

23   A.  Yes.

24   Q.  So at this point you're not looking for the vehicle

25   anymore because you still have the cell site location saying

1    there's something here that you want, am I correct?

2    A.  Yes.

3    Q.  And what was that something that you wanted that was

4    still there?

5    A.  The cell phone.

6    Q.  The cell phone.  And who was the last to have the cell

7    phone?

8    A.  The suspect.

9    Q.  So you was there to get the suspect.

10   A.  Yes, at that point, yeah.  Once I didn't find the

11   vehicle, I figured there was -- I didn't have any other

12   tasks or duties that I needed to do at that time, so I

13   thought I'm going to sit here and wait to see if maybe I see

14   the suspect.

15   Q.  So why you would steady mislead the Court and say that

16   you was just here for a vehicle.

17   A.  I never said that.

18   Q.  I'm just developing a record to show that you're lying

19   under oath about what you was doing out there that night.

20         MR. PAULSEN:  I'm going to object to the

21   argumentative nature of the questions.

22         THE COURT:  Sustained.  That is argument.  You can

23   ask your questions, get your answers, and then you can argue

24   to me if you think this is establishing that the officer is

25   not telling the truth.

1          THE DEFENDANT:  Okay.

2     BY THE DEFENDANT:

3     Q.  I'll get down to the exact reason why.

4          What was the description, or should I say --

5     better question:  Was this suspect armed and dangerous?

6     A.  I would assume so, yes.

7     Q.  You would assume so.  What were you looking for the

8     suspect for?

9     A.  A shooting.

10    Q.  A shooting.

11    A.  Yes.

12    Q.  So this suspect was considered armed and dangerous.

13    A.  Yes.

14    Q.  And how many suspects was you looking for from this

15    shooting?

16    A.  I was looking for one.

17    Q.  How many suspects were you looking for from the

18    shooting?  How many suspects was at the shooting,

19    reportedly?

20    A.  I can't remember that for sure.  I was never at the

21    shooting.

22    Q.  Okay.  So what's the procedure when you're going to get

23    an armed suspect?  Do you take them down solo?

24    A.  No.

25    Q.  So what were you doing out here by yourself if you had a

1    ping for the cell phone?  If the suspect would have came

2    walking up to you or walking down the block, what would you

3    have done?

4    A.  Gotten on my police radio and aired what I was seeing

5    and asked for another squad to assist.

6    Q.  So why wasn't other squads there at the time if you had

7    the suspect's location?

8    A.  There was no reason for another squad to be there at the

9    time.

10   Q.  Why not?  You said you had the suspect vehicle or phone

11   pinged to this location, am I correct?

12   A.  That's correct.

13   Q.  So you knew that the suspect was here, right?

14   A.  I knew the cell phone was there.  I had no idea if the

15   suspect was there for sure.

16   Q.  So wouldn't it be more cautious to have more officers

17   involved so if you did see the suspect and he did still have

18   this firearm that you have some backup?  Because it is

19   midnight, am I right?

20   A.  Yes.

21   Q.  And this suspect is a larger black male, right?

22   A.  Yeah, but that doesn't have anything to do with it.

23   Q.  So you're telling me if this suspect would have came

24   out, you would have attempted to take this suspect by

25   yourself?

1    A.  No.

2    Q.  So why were you out there by yourself?

3    A.  Because I was working by myself that night.

4    Q.  Is it procedure to try to take into the custody or do a

5    sting operation of a suspect that's armed and dangerous?

6    A.  It wasn't a sting operation.  It was surveillance on a

7    block.

8    Q.  That's what I was getting to.  You were surveilling this

9    block, you were already out there, am I correct?

10   A.  No.

11   Q.  You wasn't out there for the suspect, am I correct?

12   A.  I explained why I was there multiple --

13   Q.  Do you know the name Anthony Kanz (ph)?

14   A.  No.

15   Q.  You don't?

16   A.  No.

17   Q.  You don't know Giacomo (ph)?

18   A.  Who?

19   Q.  Giac Pau (ph), Giacomo?

20   A.  No.

21   Q.  You don't?

22   A.  No.

23   Q.  Huh.  Interesting.

24           (Discussion off the record between the

25   defendant and Mr. Aligada)

```
1    BY THE DEFENDANT:
2    Q.  While I'm looking for this and telling him to pull up
3    something, do you remember talking to Officer Schroeder
4    after the suspect was taken into custody?
5    A.  I'm sure I talked to him.  I don't know what you're
6    referring to.
7    Q.  You did talk to Officer Schroeder, right?
8    A.  At some point after the suspect was taken into custody,
9    I'm sure that I talked to Officer Schroeder.
10   Q.  And when Officer Schroeder asked you how did you locate
11   the suspect, what did you tell him?
12   A.  I don't know.
13   Q.  You don't know?
14   A.  No.
15   Q.  I'm going to ask you again.  Do you know Anthony Kanz?
16   A.  No.
17   Q.  Do you know Giacomo Pau?
18   A.  No.
19            (Discussion off the record between the defendant
20   and Mr. Aligada)
21            THE COURT:  While you're doing that, Mr. Aligada,
22   I want to -- go ahead and do that.  I just want to make a
23   record that what was displayed as a picture taken on Girard
24   Avenue North facing south will be marked, and you said you
25   were going to print it out.  It'll be marked as Exhibit 6.
```

1    It has not been moved for admission yet.  I just want the

2    record clear.

3              MR. ALIGADA:  I'll make sure that that's printed,

4    Your Honor.

5              THE COURT:  Thank you.

6    BY THE DEFENDANT:

7    Q.  The phone call that you're about to hear is going to be

8    between you and Officer Schroeder, and it's going to be very

9    clear that Officer Schroeder is going to be talking to you,

10   because he's going to ask you how did you locate the suspect

11   and who were you watching, and you just testified to what,

12   that you was -- that you was sent there by Officer O'Rourke,

13   am I correct?

14   A.  Yes.

15   Q.  And that you was doing some surveillance work as a rogue

16   officer with no backup to apprehend an armed and dangerous

17   suspect, am I correct?

18   A.  I was doing surveillance on that block.

19   Q.  And you don't have no video of this surveillance.

20   A.  No.

21   Q.  So if the suspect would have came out and killed someone

22   because you were looking for this armed and dangerous

23   suspect, you would have had no surveillance of this, am I

24   correct?

25   A.  No, sir.

1    Q.  If this person would have came out and strangled someone

2    or stabbed them, you would have had no surveillance of this,

3    am I correct?

4    A.  No, sir.

5    Q.  So if he'd have came up to your car and just firing

6    reckless shots into your car, you would have had no

7    surveillance of that, am I correct?

8    A.  That's correct.

9    Q.  And why is that?

10   A.  Because it's not police procedure to videotape a

11   surveillance incident such as this.

12   Q.  Okay.

13            THE COURT:  Before you play it, Mr. Aligada, for

14   the record, this will be marked as Exhibit 7.  Somehow we'll

15   have to get a copy of it actually for the record.

16            THE DEFENDANT:  You ain't going to need to see it.

17   It's just a SUV being towed now.

18            THE COURT:  I understand.  We just have to keep

19   the record clear as to what's being shown the witness.

20            THE DEFENDANT:  This is Officer Schroeder and his

21   partner.  I don't know which car they was in, but it's

22   Officer Schroeder and his partner.  And the person you

23   couldn't hear talking is Officer Schroeder, and after you

24   hear it I guess the record will explain itself.

25        (Videotape played)

1          THE DEFENDANT:  Could you wind it back now?

2        (Videotape rewound and replayed)

3          THE DEFENDANT:  Do you want to stop it there?

4     BY THE DEFENDANT:

5     Q.  Do you remember that phone call now?

6     A.  Vaguely.

7     Q.  In that phone call, was you not saying that you was out

8     there just watching?

9     A.  You can't hear my voice on that phone call.  That's

10    Officer Schroeder's voice.  I don't know what I was saying.

11    Q.  You don't know what you were saying?

12    A.  No.

13    Q.  But in relation to what he was saying, what would you

14    take from that conversation what was being -- what was that

15    conversation about?  Was that not about the suspect being

16    taken into custody and how?

17    A.  That was -- yeah, sounds like Schroeder is asking about

18    where the people came from.

19    Q.  And who's the fat boy Giacomo?

20    A.  I didn't hear anybody say Giacomo.  I believe the fat

21    boy that he's referring to is a gentleman by the name of

22    Anthony Shannon.

23    Q.  He said Giac (ph).

24    A.  I didn't hear that.

25    Q.  Do we need to replay it again?

1    A.  He's referring to Anthony Shannon.  I can hear him --

2    Q.  He didn't say Anthony Shannon.

3    A.  Yes, he did.

4    Q.  No, he didn't.  He said Anthony Kanz.

5    A.  He said Anthony Shannon.

6            THE DEFENDANT:  Could you please replay it.

7    Q.  And he's going to call the fat guy Check.

8        (Videotape replayed)

9    Q.  Anthony Kanz.

10   A.  That's Anthony Shannon he said.

11   Q.  So you refer to Anthony Shannon.  Now, that means you

12   were familiar with this area and this block, am I correct?

13   A.  No.  I'm familiar with Anthony Shannon.

14   Q.  But if you know his name, then you obviously know where

15   he stayed at if you can clearly put his name to him like

16   that.

17   A.  I don't know where Anthony Shannon stays.  Officer

18   Schroeder was indicating that he believed --

19   Q.  So how did you know Anthony Kanz -- or Anthony Shannon?

20   Was he a suspect in this?

21   A.  No.

22           MR. PAULSEN:  Your Honor, I'm going to object.  I

23   don't see the relevance of this --

24           THE DEFENDANT:  You will in one second.

25           MR. PAULSEN:  -- post-arrest, talking about things

1      that happened after the arrest.  It doesn't go to probable

2      cause at all.

3                  THE DEFENDANT:  It will.  It's going to go to show

4      probable cause that he was out there conducting some rogue

5      surveillance on Anthony Kanz somehow, and he was going to

6      pull anyone over that left that area in a vehicle.  He was

7      going to pull any vehicle over because he was on this gang

8      task force conducting surveillance on a high-crime infested

9      block.

10                 THE COURT:  Well, I'll tell you what.  I'll give

11     you a couple more questions in this area.  I understand your

12     point and you're free to argue that, okay?

13                 THE DEFENDANT:  Okay.

14     BY THE DEFENDANT:

15     Q.  I'll move along anyway, because the record already shows

16     that you didn't see the suspect, and just being a larger

17     black male with -- I don't know you were able to tell --

18     actually, I want to ask you that for the record too.

19                 How were you able to tell with it being that dark

20     and this person wearing dark clothing that he had long

21     dreads, with or without the hood being up?

22     A.  You can see someone's general hair style with the aid of

23     binoculars.

24     Q.  Was these some night vision goggles?

25     A.  They were not.

1    Q.  So how did you -- how was it lighted enough for you to

2    see this?

3    A.  Streetlights.

4    Q.  Streetlight.

5    A.  Yes.

6    Q.  Hmm.

7              THE DEFENDANT:  Could you pull that picture up for

8    that block again?

9    Q.  These photos that's going to be showed is of the block

10   at night in reference to the light that you would have been

11   working with to see what you seen.

12             THE DEFENDANT:  After this I will move along.

13             THE COURT:  Okay.

14        (Pause - photos displayed)

15             THE DEFENDANT:  All right.  We'll get those

16   printed.  I want to move along.

17             THE COURT:  Okay.

18   BY THE DEFENDANT:

19   Q.  Now, at the stop, you said this vehicle had pulled

20   over -- it did some traffic violations, am I correct?

21   A.  Yes, sir.

22   Q.  Can you tell me what those traffic violations were?

23   A.  When the vehicle initially pulled away from the curb to

24   turn northbound on Girard Avenue North after the two males

25   got in, it did not signal that change of course.  It also --

1    Q.  How long did the vehicle sit at the curb before it

2    pulled off?

3    A.  A matter of minutes.

4    Q.  A matter of minutes.  Now, this is after you seen the

5    suspect get into this vehicle that you couldn't see and

6    identify, this unknown black male get into this vehicle that

7    you wasn't looking for, am I correct?

8    A.  This was after I saw the two people get into the car.

9    Q.  You saw the two people get in the car.  The car sat

10   there for two minutes.

11           Now, at this time you had already in your

12   capacity, in your mind, made up that, hmm, this is the

13   suspect, am I correct?

14   A.  It was around that time.

15   Q.  That's roughly when you would have had to make your

16   decision about was that the suspect, was it not?

17   A.  Yes.

18   Q.  Because that would have been the last time you seen the

19   suspect until he was taken out of the vehicle, am I correct?

20   A.  Yes.

21   Q.  So, you made your decision that that was the suspect.

22   So, at this time you should have been able to start

23   videotaping, because you knew for sure that you had to stop

24   this vehicle, that's your suspect, am I correct?

25   A.  I didn't have a video camera.

1   Q.  Don't -- ain't your squad cam equipped with video camera

2   footage?

3   A.  Oh, yes, yes, it is.

4   Q.  So if you know that you're going to make a traffic stop,

5   it's procedure to cut your squad cam on, am I correct?

6   A.  No.

7   Q.  It's not?

8   A.  Our squad cameras automatically come on when we turn our

9   emergency lights on.  That's what policy says we're required

10  to do.

11  Q.  Okay.  Pause.

12          This is going to show that your squad cam starts

13  recording well before you cut your squad -- your cam on.

14  A.  Yes, that's correct.  That is correct sir.

15  Q.  I know.  I just want to --

16          THE DEFENDANT:  The fourth one.

17      (Videotape played)

18  Q.  That car comes to a complete stop and he has his lights

19  on.

20  A.  Yes.

21  Q.  Following all traffic laws.

22  A.  Yes.

23  Q.  Your squad lights is not on.

24  A.  No.

25  Q.  And you're trailing this vehicle.

1    A.  Yes.

2    Q.  Now, this is the block that you're going to pull the

3    vehicle over on, am I correct?

4    A.  As soon as it makes a left-hand turn --

5              THE DEFENDANT:  Stop the video.

6    Q.  Now, that was roughly the last block and a half or so

7    before you pulled the vehicle over, am I correct?

8    A.  Yes.

9    Q.  So, you came from 28th and Girard.

10   A.  There is no 28th and Girard.

11   Q.  29th and Girard.

12   A.  Yes.

13   Q.  And the vehicle made a right, am I correct?

14   A.  Yes.

15   Q.  Now, the next block that it would travel to would be

16   Fremont, am I correct?

17   A.  Yes.

18   Q.  Fremont is a one-way heading south, am I correct?

19   A.  Yes.

20   Q.  So the vehicle had to travel another block, which is to

21   Emerson, am I correct?

22   A.  Yes.

23   Q.  Now, that's two blocks.

24   A.  Yes.  Yes.

25   Q.  Now, the vehicle travels -- the vehicle is going to make

```
1     a left here, right?

2     A.  Where?

3     Q.  On 29th and Emerson.

4     A.  Yes.

5     Q.  And it's going to travel to 33rd and Emerson, am I

6     correct?

7     A.  Yes.

8     Q.  And at 33rd and Emerson it's going to make another left,

9     am I correct?

10    A.  Yes.

11    Q.  So we're looking at how many blocks now?

12    A.  Well, it would be one, two, three, four, five, six,

13    seven.

14    Q.  Just to 33rd.

15    A.  Six blocks.

16    Q.  Six blocks, seven blocks.  Okay.  Let's just say six.

17    A.  Okay.

18    Q.  It made a left on there, then it goes to the corner

19    there.  That's seven blocks, am I correct?

20    A.  Yes.

21    Q.  Now, how long do you think it took that vehicle to

22    travel them blocks?  There was stop signs in here, am I

23    correct?

24    A.  Yes, and a stop light.

25    Q.  And a stop light.
```

1    A.  Yes.

2    Q.  How long did it take that vehicle to get to that last

3    turn turning off of Emerson onto 33rd?

4    A.  I don't know, maybe a couple minutes.

5    Q.  Couple minutes.  So, you got a couple minutes of this

6    vehicle sitting there before you pulled it over, right?

7    A.  Yes.

8    Q.  Then you got a couple minutes of you trailing this

9    vehicle, am I correct?

10   A.  Yes.

11   Q.  And all this time you haven't called for backup and you

12   know that this is the suspect.

13   A.  I was on the phone with Officer Schroeder getting him in

14   a position to assist me.

15   Q.  Wasn't Officer Schroeder already on this call?

16   A.  No.

17   Q.  Oh, he wasn't.

18   A.  No.

19   Q.  Okay.

20            THE DEFENDANT:  I would like to introduce this

21   next piece into evidence.  This is going to be -- well, it's

22   going to be two pieces of evidence.  One is going to be

23   Officer Schroeder's statement, supplement, and then the

24   other one is going to be Sgt. O'Rourke's.  This one here is

25   Officer Schroeder.

1          THE COURT:  That will be 8.  Number 7 is the video

2    that has just been displayed to the witness.

3          MR. PAULSEN:  Actually, Your Honor, I thought

4    Number 7 was the phone call between --

5          THE COURT:  You're right.  Number 8 is the video

6    that was just shown to the witness.

7          MR. PAULSEN:  Well, Number 8 is actually a

8    Government exhibit.

9          THE COURT:  Yes.  These are defendant's exhibits.

10          MR. PAULSEN:  Oh, okay.  I didn't know that he --

11          THE COURT:  Defendant Exhibit Number 8 will be the

12    video, Defendant's 9 will be Officer Schroeder's statement,

13    and Defendant's 10 will be Officer who?

14          THE DEFENDANT:  Kelly O'Rourke.

15          THE COURT:  Kelly O'Rourke's statement.

16    BY THE DEFENDANT:

17    Q.  Now, I remind you again, you know that you're under

18    oath, am I correct?

19    A.  Yes.

20    Q.  Now, once again, you was out here -- let's bring the

21    record up to date.  You're out here trying to locate a

22    suspect that's armed and dangerous by yourself, am I

23    correct?

24    A.  Yes.

25    Q.  And you located the suspect that was armed and dangerous

1    by yourself.  You seen someone that was heavyset with dreads

2    get into this vehicle, but you don't know this is the

3    suspect, correct?

4    A.  Correct.

5    Q.  But you're going to pull this vehicle over because you

6    have an assumption --

7    A.  Reasonable --

8    Q.  -- because it's a heavyset black male with some dreads

9    that this is the suspect, am I correct?

10   A.  I had reasonable suspicion to believe that it was the

11   suspect and I had probable clause to stop the vehicle based

12   on the two moving violations that I observed.

13   Q.  I didn't ask you about probable cause to stop the

14   vehicle.

15   A.  Okay.

16   Q.  So once again I'm going to ask you, you was out there by

17   yourself to stop an armed and dangerous suspect.

18   A.  Yes.

19   Q.  You had located him.  You had a ping from Sgt. O'Rourke

20   that told you that this guy was out there.

21   A.  The phone was out there.

22   Q.  The phone was out there.

23   A.  Yes.

24   Q.  Now, I'm going to ask you again, as an officer of the --

25   that you was the sergeant of the Gang Interactive Task

1    Force, Gang Task Force, or whatever, am I correct?

2    A.   Yes.

3    Q.   So you know law and procedure, am I correct?

4    A.   I do.

5    Q.   Would you ever tell one of your fellow officers to go

6    take down an armed and dangerous suspect that shot multiple

7    people in one day, multiple different shootings in one day,

8    because that's surely what the suspect was being accused of,

9    am I correct?

10   A.   I know of one shooting.

11   Q.   You only knew of one?  How many people were shot in that

12   one shooting?

13   A.   I can't remember.  I think there was at least two.

14   Q.   You said you familiarized yourself with this case, did

15   you not?

16   A.   I did.  I know where it happened.  I knew there was a

17   shooting.  I knew there was a blue Tahoe that was involved.

18   Q.   So you don't know how many people were shot?  Do you

19   even know if someone was shot?

20   A.   I do know that someone was shot, yes.

21   Q.   So how many people were shot?

22   A.   I don't know.

23   Q.   So you know the suspect's name.  You familiarized

24   yourself with that.  You're familiarized yourself with a

25   vehicle that was just leaving the scene.  Like, did this

1    vehicle hit someone?

2    A.  No.

3    Q.  So what made this vehicle stand out more than the human?

4    Who's more important here, the human or the vehicle, a human

5    life or a vehicle?

6    A.  I don't -- I don't know what you're asking me.

7    Q.  I'm asking you which one is more important.  Which

8    one -- which one, if you had to think about something, that

9    you would value more to think about, the human life or a

10   vehicle?

11   A.  What do I personally -- my feelings?  What do I

12   personally value more, a vehicle or a human?

13   Q.  Yeah.

14   A.  A human.

15   Q.  So you would care about more what happened to a human

16   life than a vehicle, am I correct?

17   A.  Yes.

18   Q.  So you should have known that -- let's just move it

19   along, move it along.

20           Anyway -- and I'll take you to -- let's start with

21   Sgt. O'Rourke.  Do you have his report up there?

22   A.  I do, yes.

23   Q.  Could you please read the sixth paragraph down where it

24   says:  "Approximately at 23:36 hours."  Could you please

25   read that full paragraph.

1          THE COURT:  Any objection, Mr. Paulsen?

2          MR. PAULSEN:  No, Your Honor.  He's already

3    testified to this, O'Rourke, I mean.

4          THE COURT:  Yes, understood.  I just want the

5    record clear that you're reading from Exhibit 10, correct?

6          THE WITNESS:  Yes.

7          THE COURT:  Go ahead.

8    Q.  "At approximately 2336 hours, I received information

9    that Andrews was in the area of 2810 Girard Avenue North.  I

10   contacted Sgts. Pucely and Peltz along with Officer

11   Schroeder and advised them of Andrews' location.  All three

12   were aware of the suspect description."

13   Q.  Could you please read the last officer that he said he

14   made aware?

15   A.  Officer Schroeder.

16   Q.  So this officer would have already known and he was sent

17   to this location, am I correct?

18   A.  I don't know if he was sent to that location.

19   Q.  Oh, you don't.  Well, could you please go to Officer

20   Schroeder's statement.  Can you please tell me what

21   supplement you're looking at?

22   A.  Supplement number 25.

23   Q.  Supplement 25.  And who was that supplement by?

24   A.  Officer Schroeder.

25   Q.  Officer Schroeder.  Okay.  I would like to point you to

1    the second paragraph.  Could you please read the paragraph

2    "At around 2350 hours."

3              THE COURT:  Any objection, Mr. Paulsen?

4              MR. PAULSEN:  No, Your Honor, Mr. Schroeder will

5    testify.

6              THE COURT:  Exhibit 9 for the record.

7              THE DEFENDANT:  This is Officer Schroeder's

8    statement.

9              THE COURT:  Correct.

10   A.  "Around 23:50 hours, I was directed to the area of 28th

11   Avenue North and Girard Avenue North, as I received

12   information from Sgt. O'Rourke that the possible suspects of

13   the shooting were in the area.  The suspect was ID'd from a

14   witness on the shooting A1/Norris Andrews."

15   Q.  Okay.  Now, you said that -- now, you just said right

16   here in Schroeder's statement that he was already made aware

17   of the situation, am I correct?

18   A.  Yes.

19   Q.  So he would already been at this location, am I correct?

20   He should've already -- you wouldn't have had to fill him

21   in.  He should have known what was going on, because as you

22   said, Sgt. O'Rourke told you he told Schroeder and he told

23   another officer that didn't write a report somehow in this

24   whole thing, but you two guys is going to testify y'all was

25   made aware, am I correct?

1    A.  What's the question?

2    Q.  Was you guys made aware of this situation?  Did the

3    Officer Schroeder statement just say that he was told to go

4    to 28th and Girard?

5    A.  His statement says that, yes.  The statement said he was

6    directed to the area.  It doesn't say that he went there.

7    Q.  So if you had to read that statement, what would you

8    take from that?  Do you think he just ignored it?

9            MR. PAULSEN:  Your Honor, Officer Schroeder is

10   going to testify next.  This question should be put to him,

11   not to somebody --

12           THE COURT:  Sustained as to foundation.

13   A.  I'm sorry.  Did you ask a question?

14   Q.  Yes.

15   A.  Okay.

16   Q.  With this paragraph being listed, could you please tell

17   us -- because I assume you've worked with Sgt. -- this

18   Schroeder, right?

19   A.  He's never worked for me, no.  I've worked with him.

20   Q.  But he's from the Minneapolis Police Department, am I

21   correct?

22   A.  Yes.

23   Q.  And this officer knows the law and procedures that goes

24   with this type of thing, does he not?  He's an officer, am I

25   correct?

1   A.  I can't speak to anything he that he knows or doesn't

2   know.

3   Q.  If an officer is given this type of location -- if you

4   was given this type of location -- let's take Officer

5   Schroeder out of here.

6        Let's just say you was told that.  What would you

7   have done if you was called and given this information that

8   the suspect from the shooting was on 28th and Girard and

9   that was the possible suspect that was over there in that

10  location?

11  A.  We talked about it.  I did receive this information --

12  Q.  No, if you were Officer Schroeder, this exact statement,

13  would you have went to this location?

14  A.  I'm sorry.  I can't speak to anything that Officer

15  Schroeder would have done.  I can only tell you what I do.

16  Q.  Okay.  So when you talk to Officer Schroeder -- because

17  obviously you're going to talk in circles -- when you were

18  talking to Officer Schroeder and you had to fill him in and

19  make him so much aware of this situation, that it took you

20  what, you said a few minutes with the car sitting there and

21  a couple more, so we're talking about five to ten minutes to

22  get him to back you up on a situation that he already knew

23  about, am I correct?

24  A.  It wasn't -- it was less than five minutes total.

25  Q.  You did just testify that the car sat there for a few

1    minutes, am I correct?

2    A.  I said a matter of minutes.

3    Q.  A matter of minutes.

4    A.  I don't know if that's -- I don't remember -- this was

5    five months ago.  I don't remember specifically if the

6    car -- I wasn't being looking at my watch.  I don't know if

7    the car sat there for a minute, few minutes --

8    Q.  Oh.  But you do know how long it took that car to drive

9    there, because you labeled stop signs and you went as far as

10   saying a stop light.

11   A.  You asked me --

12   Q.  So how long did it take the car to get up there to 33rd?

13   A.  I said a couple of minutes.

14   Q.  A couple of minutes.

15   A.  Yes.

16   Q.  So we're talking at least five minutes.

17   A.  No, to me a couple means two.

18   Q.  A couple means two.  So we're talking a couple minutes

19   at the curb, a couple minutes to drive seven, eight blocks,

20   and then make some more turns and drive some more, and you

21   still don't have no backup from a sergeant that was directed

22   to the same neighborhood, the same block that you was

23   already on after you, because you got your information at

24   what time?

25   A.  I would have to reference my report.  I have it in front

1    of me if you want me to reference my report.  I have the

2    exact time in there.

3    Q.  Yeah, I would like you to.  Here, I'm going to give it

4    to you.

5    A.  I have it right here in front of me.

6    Q.  Could you reference your report if it would help your

7    recollection.

8    A.  Yes.  At 23:42 hours, I received information from

9    Sgt. O'Rourke, so 23:42 hours was the exact time.

10   Q.  Okay.  Could you tell me what time you stopped the

11   vehicle.

12   A.  00:07 hours, seven minutes after midnight.

13   Q.  Seven minutes hours after midnight.  Hmm.  So at 12:07,

14   I mean, at 12 o'clock midnight, you would have still been on

15   28th and Girard, am I correct?

16   A.  Yes.  29th and Girard.

17   Q.  29th and Girard.  Could you please tell me again what

18   time Sgt. O'Rourke said that he was told to go to that

19   location.

20   A.  Sgt. O'Rourke was the one that was telling people about

21   the incident.

22   Q.  I'm saying what time did he start filling you guys in to

23   go to that location.

24   A.  I received information from him at 23 --

25   Q.  I said on his paper.  What time did he state on his?

1    A.  Whose paper are you referring to?

2    Q.  Sgt. O'Rourke.  The paragraph that you read.

3    A.  23:36 hours.

4    Q.  23:36.  That's approximately what time, Officer?

5    A.  11:36.

6    Q.  11:36.  Could you please tell me what time Officer

7    Schroeder said that he was sent over there.

8    A.  Around 23:50 hours.

9    Q.  Around 23:50 hours.  So that means you would have still

10   been over there, wouldn't you?

11   A.  Yes, I was probably there at --

12   Q.  Did you see Officer Schroeder's car come through there?

13   A.  I can't remember if I did or not.  I think I might have,

14   actually, now that you say that.  I think that I might have

15   seen his car come through the area.

16            THE COURT:  Everybody's got to slow down, okay?

17            THE DEFENDANT:  Okay.

18            THE WITNESS:  I'm sorry.

19            THE COURT:  This poor gentleman has to take it all

20   down.

21            You ask your question slowly, wait till he's

22   done --

23            THE WITNESS:  I'm sorry, Your Honor.

24            THE COURT:  -- give your answer slowly.

25            Let me stop for one second.  Mr. Aligada, I know

1    you have a court appearance upstairs.  I understand that you

2    need to leave here at 10:45, is that correct?

3              MR. ALIGADA:  That's correct, Your Honor.

4              THE COURT:  Okay.  Just so you know, we have to

5    take a break at 10:45 for Mr. Aligada to be up in front of

6    Judge Ericksen.

7              Go ahead.

8    BY THE DEFENDANT:

9    Q.  Okay.  So now the record is fully developed that there's

10   multiple people that should have been in this area and that

11   knew about this situation, because as Officer Kelly O'Rourke

12   put in his report, he was making multiple people aware

13   because this suspect was armed and dangerous, am I correct?

14   A.  He made multiple people aware.

15   Q.  He made multiple people aware.  And you testified to the

16   fact that you would never tell no one, or you wouldn't try

17   to take an armed and dangerous suspect down by yourself, did

18   you not?

19   A.  I would not.

20   Q.  Okay.  Moving along, that being said.

21             At what point would you say that Officer Schroeder

22   made it to your location?

23   A.  I believe Officer Schroeder, as I was making the

24   northbound turn -- or I'm sorry -- the southbound turn onto

25   Fremont from 33rd, I think that's when he pulled in behind

1    me.

2    Q.  He pulled in behind you.

3    A.  Mm-hm.

4    Q.  So was he on 28th and Girard with you?

5    A.  No.

6    Q.  How long before he was with you would you say -- after

7    you talked to him?

8    A.  I called Officer Schroeder as soon as I pulled away from

9    29th and Girard.

10   Q.  As soon as you pulled away from 29th and Girard.  So at

11   this point in time, you already knew that you wanted to stop

12   this suspect, am I correct?

13   A.  Yes.

14   Q.  And you can cut your cameras on for your car, am I

15   correct?

16   A.  I can, yeah.

17   Q.  So if you knew that the suspect was in that car that sat

18   there for multiple minutes, wouldn't that have been police

19   procedure to cut it on to start recording?

20   A.  It's not procedure, no.

21   Q.  So if the suspects would've just seen your car and got

22   to shooting again -- because you seen them, so obviously

23   they could have seen you, right?

24   A.  I have no idea what they would have seen.

25   Q.  I said they could have seen you.  By you seeing them

1    with your eyeballs, they could have seen you, am I correct?

2    A.  I was sitting in a dark vehicle, you know, a distance

3    away from them and they didn't have binoculars that I could

4    see, so I'm guessing that they probably couldn't see me --

5    Q.  I didn't ask you could they see.  I said they could

6    have.  You was out there.  You wasn't invisible, am I

7    correct?  Your vehicle wasn't invisible, am I correct?

8    A.  No, but it's unmarked.

9    Q.  It's unmarked, but it's still a vehicle, am I correct?

10   A.  That's correct.

11   Q.  You have a laptop in there, don't you?

12   A.  I had a squad computer, yeah.

13   Q.  And you have a dome light on your truck.  You have

14   lights and sirens on this truck, don't you?

15   A.  Not on the exterior of the vehicle.  They're all

16   interior.

17   Q.  But these is known undercover police cars in

18   Minneapolis.

19   A.  I don't know if they knew my vehicle.  It was dark.

20   Q.  Okay.  Moving along anyway, while you were out here, you

21   pulled the car over and you said that -- how did you

22   approach this vehicle?

23   A.  I walked up to the vehicle on the driver's side.

24   Q.  And at that point you said you immediately recognized

25   the suspect?

1   A.  Yes.

2   Q.  So you seen through the window.

3   A.  Yes.

4   Q.  And you seen the suspect.

5   A.  Yes.

6           (Discussion off the record between the defendant

7   and Mr. Aligada)

8       (Videotape played)

9   BY THE DEFENDANT:

10   Q.  That's Officer Schroeder, by the way.  That's when his

11   car came on.  He was going down Lowry.

12           Now, at this point that officer who's bending over

13   giving you his rear, that's Officer Schroeder.  You're the

14   officer who body cam'd this, am I correct?

15   A.  I don't know if that's my body camera or not.  I haven't

16   heard my voice.

17   Q.  Oh, you eventually will.

18           In the next clip you're going to hear -- Officer

19   Schroeder's going to try to get you to say that you seen

20   this person moving around, and you're going to state -- and

21   I quote -- "No, I couldn't see anything inside.  The tint

22   was too dark."

23           THE DEFENDANT:  Could you please play it.

24       (Videotape played)

25   BY THE DEFENDANT:

1    Q.  That's Officer Schroeder, right?

2    A.  Yes, sir.

3    Q.  Now, I ask you again, you just testified that you

4    clearly seen through the window again and recognized the

5    suspect.

6    A.  Yes.

7    Q.  So why did you just say it was too tinted, you couldn't

8    see nothing inside?

9    A.  Officer Schroeder was referring to as the vehicle was

10   coming to a stop when I would have been looking through the

11   back window of the vehicle --

12   Q.  He asked you when you walked up to the vehicle.

13   A.  Can I -- no, he didn't.  He said, "Did you see him

14   moving around inside?" and I said, "No."

15               THE DEFENDANT:  Well, could you please replay it.

16   Q.  If the window was too tinted --

17               THE COURT:  Hold on, hold on.

18               Did you finish your answer?

19               THE WITNESS:  No, Your Honor.

20               THE COURT:  Finish your answer.

21   A.  The reference that I was making when I said no, I

22   couldn't see was as the vehicle was coming to a stop.  I

23   would have been looking through the back window of the

24   Yukon, which is tinted very dark, almost black.

25               I could see in the rear driver's side window when

1    I walked up because I'm much closer to it.  There were

2    lights on.  I wasn't referring -- if Officer Schroeder -- I

3    don't know -- I'm just telling you what my thought process

4    was from the question that he directed towards me.  And if

5    it wasn't specific, I was referring to as the vehicle was

6    coming to a stop.  I could not see any movement inside of

7    the vehicle due to the tint level of the window, which my

8    reference was to the back window because that's the only

9    thing I could see when the vehicle was coming to a stop.

10   BY THE DEFENDANT:

11   Q.  That was a nice recovery, but I'm going to ask you this

12   now:

13            Before we go back to the video, this is a large

14   SUV, am I correct?

15   A.  Yes.

16   Q.  All of the windows in the back is privacy tinted the

17   same tint, am I correct?

18   A.  I have no idea.

19   Q.  So if you couldn't see through the back far window and

20   the back window is the same tint as the back window on the

21   back door, then how did you see in that window?  If you

22   couldn't see in the back windows, how did you see in the

23   other back window?

24   A.  I was further away.  My reference was being made to when

25   I was still inside of my squad car --

1      THE DEFENDANT:  Could you please replay the thing

2  again.

3      THE COURT:  Hang on.  Finish your answer.

4  A.  My reference was made to as I was looking at the vehicle

5  when I was still inside of my vehicle.  If I got out of my

6  vehicle and walked up to the exact same window, that back

7  window, and looked through it, I would be able to see

8  through it from that distance away.  It's the same idea as

9  the side windows, the ones that you're referencing.

10      THE DEFENDANT:  Could you please replay it again,

11  starting at five?

12      THE COURT:  And then ask your next question and

13  then we'll take a break.

14      (Videotape played)

15      THE DEFENDANT:  Stop it.

16  BY THE DEFENDANT:

17  Q.  Now, the comment that, "I could not see anything, it's

18  too tinted," could you please tell me the definition of that

19  in your mind, in your words?  That -- just the part of you

20  stating, just this one statement:  "I could not see

21  anything, it was too tinted."

22      Could you please tell me without -- in your car,

23  out your car, trying to make justifications, could you

24  please tell me the definition of "It's too tinted."  If I

25  was to tell you that something was too tinted and I couldn't

1    see anything, what would I be saying to you?

2    A.  I can't answer that question without giving context to

3    the question.  The windows weren't too tinted for me to see

4    through if I was close to them and using a light.  They were

5    too tinted to see through if I was a distance behind them in

6    my squad car looking through the windshield at the window.

7    Q.  But the officer was asking you -- was he not asking you,

8    "Did you see this person move?" and you said, "No," because

9    what?

10   A.  Because the windows were too tinted.

11   Q.  So if the windows was too tinted for you to walk up and

12   see this person move, then the windows would have been too

13   tinted for you to see this person's description, am I

14   correct?

15   A.  No.

16           THE COURT:  All right.  It's 10:44.  We have to

17   break so that Mr. Aligada can be up in Judge Ericksen's

18   chambers.

19           For planning purposes, how long will it take you?

20           MR. ALIGADA:  This is an uncontested final

21   revocation hearing, Your Honor.  I expect it to be completed

22   within 30 minutes.

23           THE COURT:  Okay.  So shall we reconvene here at

24   11:15 and then go on till noon?

25           MR. ALIGADA:  The hearing starts at 11:00, so I

1    anticipate we'd be done by 11:30.

2              THE COURT:  11:30.  What does everybody prefer to

3    do?  Do you want to come back here at 11:30 and go for a

4    little bit before we break for lunch.

5              MR. PAULSEN:  Yes, Your Honor.

6              MR. ALIGADA:  Yes, Your Honor.

7              THE COURT:  Mr. Andrews, good with you?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Okay.  We're in recess.  We'll

10   reconvene at 11:30.

11        (Recess taken at 10:45 a.m.)

12                        *     *     *     *

13        (11:44 a.m.)

14                        IN OPEN COURT

15        (Defendant present)

16              THE COURT:  I apologize, everyone.  I do not like

17   to make people wait.  I'm sorry.

18              Come on back, Officer.

19              THE COURT:  For planning purposes, Mr. Andrews,

20   how long do you think you will go with this witness?

21              THE DEFENDANT:  If I can get straight answers,

22   pretty quickly.

23              THE COURT:  Okay.  Please be seated, Officer.  You

24   understand you're still under oath.

25              THE WITNESS:  I do, Your Honor.

1          THE COURT:  All right.  Proceed, Mr. Andrews.

2     BY THE DEFENDANT:

3     Q.  Before we went on break, we was discussing the matter of

4     the tinted windows and the definition of:  "I can't see

5     through the tint, it was too dark."

6          Could you please tell us what that meant?

7     A.  That meant from my position seated in my squad car

8     looking through the back window, I could not see inside of

9     the car.

10    Q.  So when Officer Schroeder said, "Did you see him moving

11    around," he would have been referencing to you a car and a

12    half back inside of your vehicle with a passenger that's in

13    the full-size, or should I say extra large, edition of a

14    Yukon Denali with tinted windows.  Am I hearing you

15    correctly, that's what he was asking you?

16    A.  Yes.

17    Q.  So he wasn't asking you what a logical person would ask

18    Did you see this person moving at all"?

19    A.  What I took his statement to mean was that as the car

20    was coming to a stop, did I see any movement inside, and I

21    was unable to see inside of the vehicle from my position as

22    the vehicle was coming to a stop.

23    Q.  Did he ask you that?  Did he say, "when the vehicle

24    stopped"?

25    A.  No, he didn't say that.  I'm saying that that was what

1    my inference was by his question.

2    Q.  Do you remember what his question was?

3    A.  His questions was, "Did you see" -- I can't remember

4    what it was verbatim.

5    Q.  Do you want to hear it?

6    A.  I think I have the gist of it.

7    Q.  You have the gist of it or would you like to hear it?

8    Because there's a very big difference than what you're

9    trying to reference to and get around to and what's the

10   issue at stake here, which is that you couldn't see in the

11   window, is that correct?

12   A.  I could not see in the back window.

13   Q.  Could you see in the side window?

14   A.  From my position inside of my squad car, I could not --

15   Q.  So when you -- sorry about that.  When you walked up to

16   the vehicle, at that point you can see in the vehicle.

17   A.  Yes, I could.

18   Q.  And what did you see?

19   A.  I saw the suspect seated behind the driver.

20   Q.  You saw the suspect.  Was he moving?

21   A.  He was sitting there.

22   Q.  Was he bending down?

23   A.  No.

24   Q.  Was he kicking things?

25   A.  No.

1    Q.  Did you see a firearm in his hand?

2    A.  I did not.

3    Q.  But you seen his face clearly.

4    A.  I did.

5    Q.  I'm going to ask you under oath again, that's your final

6    statement about that, you seen through that tinted window?

7    A.  I could see through the back driver's side window.  I

8    could see that the suspect was seated in the seat directly

9    behind the driver, yes.

10   Q.  And at that time what did you do?

11   A.  I asked the male to step out of the car and I handcuffed

12   him.

13   Q.  Okay.

14            THE DEFENDANT:  Could you please play that.

15   Q.  This is your body camera, number one.

16       (Videotape played)

17   Q.  Could you please tell the Court why did you tell him to

18   roll down his window?

19   A.  Force of habit.

20   Q.  Force of habit or because you couldn't see through the

21   window?

22   A.  No, I could clearly see through the window there.

23   Q.  So why did you tell him, "Roll the window down"?

24   A.  It's a force of habit.

25   Q.  Force of habit.  But you just told the Court that you

1    seen through the window and just told him, "Get out the car"

2    and arrested him.

3    A.  Well, I left out one statement.

4    Q.  You left out a lot of statements.

5    A.  I -- okay.

6              THE COURT:  You've got to ask a question.

7    Q.  So at this point you told him, "Roll the window down,"

8    and as we can see, he's being taken out of the vehicle, am I

9    correct?

10   A.  Yes.

11   Q.  Okay.  Now we're going to move a little bit further, as

12   to how and why -- who okayed it for this car to be searched?

13   A.  At that point no one needs to okay the car to be

14   searched.

15   Q.  Why?

16   A.  Because the car is going to be impounded.

17   Q.  Why?

18   A.  Because we're arresting someone --

19   Q.  Who was under arrest?

20   A.  The male that's about to be -- Mr. Andrews is.

21   Q.  He wasn't under arrest.

22   A.  Yes, he is.

23   Q.  He was being taken down for questioning.

24   A.  No, he was under arrest at this point.  I had probable

25   cause to arrest him for second degree assault.

```
 1    Q.  You had probable cause to arrest him for second degree

 2    assault.

 3    A.  Yes.

 4    Q.  So that's your story you're going to stick to again.

 5    A.  Yes.

 6              THE DEFENDANT:  Could you please roll the footage

 7    again.  You know what?  Let's just start with that one.

 8    Just play it from where it's at right now.

 9       (Videotape played)

10              THE DEFENDANT:  Could you stop it.

11    BY THE DEFENDANT:

12    Q.  You said you was going to be making some phone calls.

13    Could you tell me what that was.

14    A.  Yeah.  I was going to call Sgt. O'Rourke.

15    Q.  So at this point the suspect is under arrest.

16    A.  Yes.

17    Q.  You read him his rights.

18    A.  No.

19    Q.  That's what you do when you put someone under arrest,

20    don't you?

21    A.  No.

22    Q.  You don't?

23    A.  No.

24    Q.  So is this suspect just being detained for questioning

25    or is he under arrest?
```

1    A.  This suspect is under arrest.

2    Q.  Okay.

3         (Discussion between the defendant and Mr. Aligada)

4         (Videotape played)

5              THE DEFENDANT:  Okay.  Go forward.  Right here.

6         (Videotape continues)

7              THE DEFENDANT:  Go back when he first opens that

8    up.

9         (Videotape continues)

10             THE DEFENDANT:  Just go back to where he gets in

11   the car.  Right there.

12        (Videotape continues)

13   BY THE DEFENDANT:

14   Q.  The suspect just asked you, "Am I under arrest?" and

15   what did you state?  "No, you're not.  You're just being

16   detained"?

17   A.  I said, "You're being taken down to talk to an

18   investigator."

19   Q.  So he wasn't under arrest, am I correct?

20   A.  By the letter of the law, at this point you are

21   technically under arrest.

22   Q.  By the letter of the law, when you arrest someone,

23   they're supposed to be read their rights, am I right?

24   A.  In a sense, yes, but in this situation, no.

25   Q.  So what makes one situation different from the other is

1    because it's going to make all of this illegal if I'm under

2    arrest and I'm not read my rights.

3              MR. PAULSEN:  Objection.  Legal conclusion.

4              THE DEFENDANT:  It is.

5              MR. PAULSEN:  Well beyond the probable cause for

6    the arrest.  Now he's talking about things that happened

7    after the arrest and there's been no motion in that regard.

8              THE COURT:  Well, it doesn't relate to probable

9    cause.

10             THE DEFENDANT:  It does, because I asked him this

11   is on the lines of what grounds did he have to search the

12   vehicle.  We're going for suppression of everything in the

13   vehicle.

14             THE COURT:  Okay.  I'm going to overrule the

15   objection, allow the officer to answer the question, but I

16   understand your objection, Mr. Paulsen.

17             Go ahead.

18             THE WITNESS:  What was your question, exactly?

19   BY THE DEFENDANT:

20   Q.  Simply, don't when you arrest someone, you read him his

21   rights, do you not?

22   A.  No, not under this circumstance.

23   Q.  And what is this circumstance?

24   A.  This circumstance is that I make the arrest as an

25   officer on the street, but I'm not questioning you.  At no

1    point did I question you regarding the incident that you

2    were under arrest for.  You have to be read your rights per

3    the **Miranda** decision prior to being questioned regarding the

4    incident that you're under arrest for, and that would be

5    something that Sgt. O'Rourke would do once we got down to

6    108 and he got you into an interview room.

7    Q.  So no one was under arrest.

8    A.  You were under arrest.  You had not yet been read your

9    rights.

10   Q.  So I wasn't under arrest.

11        MR. PAULSEN:  Your Honor, we seem to be going and

12   forth on this.

13        THE COURT:  Yes.  Sustained.  Asked and answered.

14   BY THE DEFENDANT:

15   Q.  Okay.  Well, how about the female passenger?

16   A.  The driver?

17   Q.  I mean the driver, yes, the female driver.

18   A.  About what?

19   Q.  Well, surely she was the driver of the vehicle, am I

20   correct?

21   A.  Yes.

22   Q.  Was she wanted from your shooting?

23   A.  No, not that I knew of.

24   Q.  So what probable cause, I ask you again, did you have to

25   search this vehicle?

1    A.  Well, we arrested Mr. Andrews for second degree assault,

2    the shooting.  We searched the area immediately around him

3    for any weapons due to the fact that the shooting had

4    happened, you know, roughly eight hours prior.

5              THE DEFENDANT:  Objection, Your Honor.  He's --

6              THE COURT:  No, no.

7              THE DEFENDANT:  That's not what I asked him.

8              THE COURT:  You asked the question.  He is

9    responding to it.

10             You go ahead and finish the answer.

11   A.  So the gun used in the shooting had not yet been

12   recovered.  We knew that going in.  You were taken into

13   custody in this vehicle less than eight -- approximately

14   eight hours prior -- after the shooting had happened.  I'm

15   sorry.

16             We searched the area immediately around where you

17   were taken into custody, which is where the handgun was

18   located.  Once the handgun was located, then a full search

19   of the vehicle ensued from there and then the vehicle was

20   towed.

21   Q.  So when we just watched you -- since you wanted to put

22   all that on the record, we're going to deal with that now.

23             What were you searching -- wasn't that the

24   immediate area that you were searching when you looked in

25   the back of the car that we just watched was not where

1        Mr. Andrews, the defendant, was sitting?

2        A.  In the back of what car?

3        Q.  In the back of that SUV.

4        Q.  Are you talking about with the backpack?

5        A.  Yes, the backpack.  Looking under the seat, looking all

6        around, feeling that whole area is not the area that the

7        suspect was sitting.

8        A.  Yes, it was.

9        Q.  You searched it, right?

10       A.  I started to search it and then there was

11       enough officers on scene --

12       Q.  Did you search the area?

13                THE COURT:  You got to quit cutting him off, okay?

14       He was mid-sentence when you cut him off.

15                THE DEFENDANT:  Well, tell him to stop lying.

16                THE COURT:  Pardon me?

17                THE DEFENDANT:  Tell him to stop lying.  This is

18       perjury.

19                THE COURT:  No, no.  Mr. Andrews, you asked a

20       question.  He gets to answer it.  I understand that you

21       believe him to be lying, not telling the truth.  That's an

22       argument, okay?  You can make that argument to me.  You

23       asked the question, he answers it, you think he's lying,

24       then you tell me that later in whatever form we're going to

25       do.

1           But finish your answer.

2   A.  I began searching the area around where Mr. Andrews was

3   seated in the car.  I then deferred to allow the other

4   officers that were on scene to finish that search.

5   Q.  So answering yes or no, you searched the backpack that

6   was seated where the suspect was seated, am I correct?

7   A.  I began to search that backpack, yes.

8   Q.  You searched under the seat, am I correct?

9   A.  Right.  I looked underneath the seat, yes.

10  Q.  And you moved things in the immediate vicinity where the

11  suspect was sitting, am I correct?

12  A.  Yes.

13  Q.  So it's safe to say that you searched the area that the

14  suspect was in, am I correct?

15  A.  I never completed the search.

16  Q.  You completed the search where the suspect was sitting,

17  am I correct?

18  A.  No.

19  Q.  Did Officer Schroeder tell you that the suspect kicked

20  the backpack?

21  A.  I don't remember.  I don't know.

22  Q.  You don't remember, you don't know.

23  A.  I don't know.  I --

24          THE DEFENDANT:  Could you please go back to the

25  beginning of his, same video, skip straight to the front.

1    Play it from the beginning.

2         (Videotape played)

3              THE DEFENDANT:  Pause it for one second.

4              I want the record to reflect that this is directly

5    after Joel, the witness on the stand, is getting off the

6    phone with Sgt. O'Rourke after he cut his body cam off for

7    whatever reason, to make this call.  He made this call and

8    he's coming back to the vehicle where he's now giving them

9    the okay to just ram -- just to search the vehicle,

10   whatever, and everything else you'll be able to tell.  I

11   just want the record to show that this is --

12             THE COURT:  I can't make that determination.  The

13   record can't reflect anything other than --

14             THE DEFENDANT:  All the video.

15             THE COURT:  -- what the testimony is or what the

16   video is.  The video is what it is.

17             THE DEFENDANT:  Well, could you start the video?

18   Thank you.

19        (Videotape played)

20             THE DEFENDANT:  Could you stop it.

21   BY THE DEFENDANT:

22   Q.  Now, at that point you guys are discussing what?

23   A.  The impound lot.

24   Q.  That the vehicle is going to be impound.  Under what

25   grounds?

1    A.  I can't remember the phone conversation I had with

2    Sgt. O'Rourke, but I would assume that Sgt. O'Rourke told me

3    to have the vehicle towed.

4    Q.  This is before the gun was found, am I correct?

5    A.  Yes.

6    Q.  And you're talking about that this vehicle from what he

7    just said is going down for Assault, Safe Streets, or a

8    weapon, am I correct?

9    A.  That's not exactly what we were talking about, but --

10   Q.  Could you please --

11   A.  -- we're talking --

12              THE WITNESS:  I'm sorry, Your Honor.

13   A.  We're discussing a procedural matter of where vehicles

14   get towed to when they're being held for one of the units in

15   the City.  This vehicle was being held for the Assault Unit

16   for Sgt. O'Rourke.  That's what that discussion is about.

17   Q.  Okay.  Is that the vehicle from the assault?

18   A.  No.

19   Q.  So you were going to tow this vehicle and seize it,

20   saying that this was the vehicle from the assault.  Could

21   you please tell the courts what was the description of the

22   vehicle that you was looking for for the assault?

23   A.  This wasn't the same vehicle.  It was a blue Tahoe.

24   Q.  Okay.  So this is not that vehicle, so why would this

25   vehicle be being towed down to the impound lot and seized

1      under assault --

2              THE DEFENDANT:  Well, could you please replay it

3      so I can hear all the things he named this vehicle was going

4      in under?

5          (Videotape played)

6      BY THE DEFENDANT:

7      Q.  All of those things he named sound like this vehicle's

8      going down for the crime itself, that it was involved in the

9      crime, am I correct?

10     A.  No.

11     Q.  So it's not?

12     A.  No.

13     Q.  Could you please tell us what he just made reference to

14     this vehicle going in for?

15     A.  Vehicles that are towed off of the street that are

16     involved in investigations are often held for units, such as

17     Safe Streets, the Weapons Unit or Assault.  He was just

18     making reference to individual units in the Minneapolis

19     Police Department.

20             This vehicle was being towed for the Assault Unit.

21     The Weapons and Safe Streets portion of that had nothing to

22     do with this vehicle.  He was making a reference, telling me

23     that -- he was telling me that the vehicle would be put into

24     the fenced-in part of the impound lot if it was being held

25     for the Assault Unit or if it would have been held for any

1    other unit.  This unit -- this car was being held for the

2    Assault Unit.

3    Q.  Could you please tell the courts why would this vehicle

4    if it wasn't in an assault be held for the Assault Unit?

5    A.  Because Sgt. O'Rourke works -- he is a member of the

6    Assault Unit.

7    Q.  And could you please tell the courts why would

8    Sgt. O'Rourke think or have -- because you work with Gang

9    Task Force stuff.  Why would this vehicle that didn't have

10   nothing to do with the assault be going in for the Assault

11   Unit?

12   A.  Because Sgt. O'Rourke works for the Assault Unit.  He

13   requested, I can only assume based on how this is

14   transpiring -- like I said, I don't remember -- that he

15   wanted the car towed and held for him.  I don't know if he

16   was going to execute a search warrant on it.  I don't know

17   what his plan was.

18   Q.  Okay.  So this vehicle right now from what you said is

19   that this vehicle didn't have nothing to do with nothing and

20   Sgt. O'Rourke was just randomly taking this vehicle --

21   holding it for Assault, right?

22   A.  No.

23   Q.  For the Assault Unit, right?  He wanted it for

24   investigation, am I correct?

25   A.  Yes, he wanted it as part of his investigation.

1    Q.  He wanted it as part of his investigation.

2         Now, the gun wasn't found yet, was it?

3    A.  No.

4    Q.  Was anything to indicate that this vehicle was in any

5    shape, form, size and way tied to the crime itself at this

6    point in time?

7    A.  Yes.

8    Q.  What?

9    A.  Mr. Andrews was the person who was implicated in the

10   assault as the suspect.  Mr. Andrews was arrested while

11   seated in that car after the car had transported him from

12   one location to another.  Therefore, that vehicle is now

13   tied to that assault.

14   Q.  So any vehicle that a suspect is in whether the person

15   who's driving has a license, insurance, or anything, if you

16   arrest someone -- let's just say Grandma's driving and

17   her -- you pulled it over and do a warrant check and her

18   grandson is wanted for murder.

19   A.  Different circumstance.

20   Q.  What makes that circum -- every circumstance seems to be

21   different in this situation.  What makes the average

22   circumstance different, because what I see -- what this is

23   sizing up to be -- and correct me if I'm wrong -- is illegal

24   search and seizure.  You had no reason to search or seize

25   this vehicle and you guys did.

1    A.  You're wrong.

2    Q.  Oh, I am?

3    A.  Yes.

4    Q.  So at this point is when you got your okay to search

5    this vehicle.

6    A.  As I explained earlier --

7              THE DEFENDANT:  Your Honor, could you please ask

8    him to answer the questions?  I didn't ask him what he said

9    earlier.  I asked him in reference to what I just asked him.

10   Q.  Is this the point in time where you got your probable

11   cause or you got your okay to search this vehicle?

12             THE COURT:   Go ahead.

13   A.  Prior to any vehicle being impounded we will do an

14   inventory search of the vehicle.  Now, additionally, as I

15   said earlier, in this circumstance Mr. Andrews is being

16   arrested for a second degree assault in which the gun hadn't

17   been recovered.  That gives us a secondary reason to search

18   the immediate area around him.

19             Now, procedurally, prior to impounding any vehicle

20   unless there's a forensic reason not to do so, we do a

21   search of that vehicle to make sure that there isn't

22   anything of outstanding value or whatever so that we can

23   document it.

24   Q.  Okay.  So until this point right here, the vehicle was

25   not supposed to be searched, so at this time you're going

1    to -- you got your okay that you're going to tow the

2    vehicle, so now you guys can begin to inventory this

3    vehicle, right?

4    A.   The vehicle still -- the vehicle still would have been

5    searched, the area around where Mr. Andrews was seated,

6    regardless if the car was going to be towed or not.  Once I

7    talked to Sgt. O'Rourke and he said he wanted the vehicle

8    towed and held for him --

9    Q.   Mm-hm.

10   A.   -- then a full inventory search of the vehicle was

11   completed.

12   Q.   Okay.  And Mr. Andrews is in the back seat, right?

13   A.   Yes.

14   Q.   And he was under arrest, right?

15   A.   Yes.

16   Q.   That's the story you're sticking to.

17   A.   Yes.

18            THE DEFENDANT:  Could you please go to his dash

19   cam, number 4.  Leave that open.  Just open the other one,

20   actually the car cams this time.

21            It's dark again.  You got to make it lighten

22   itself up.

23        (Discussion off the record between the defendant and

24   Mr. Aligada)

25            THE DEFENDANT:  I think you got to minus them

1    other screens.

2         (Videotape played)

3              THE DEFENDANT:  Now, Your Honor, if the courts

4    will allow, can I describe what we're seeing?

5              THE COURT:  This video is part of the court

6    record, so it speaks for itself.  You can ask him if --

7    BY THE DEFENDANT:

8    Q.  Okay.  What are we witnessing now?

9    A.  This is me searching you, Mr. Andrews.

10   Q.  Okay.

11             THE DEFENDANT:  Your Honor, can you all see that

12   good?

13             THE COURT:  I can see it.

14        (Videotape continues)

15   BY THE DEFENDANT:

16   Q.  Could you tell the Court what's happening now?

17   A.  The female driver is being removed from the vehicle.

18   Q.  Okay.

19             THE DEFENDANT:  Pause.  Just go back a split

20   couple seconds.  Right there.  Play.

21        (Videotape continues)

22             THE DEFENDANT:  Pause.

23   BY THE DEFENDANT:

24   Q.  Now, at this time, do you have the okay to search that

25   vehicle?  Have you talked to O'Rourke yet?

1    A.  No.

2    Q.  So no one should be going in and out of that vehicle

3    searching, am I correct?

4    A.  I mean, we still had to -- we still needed to search the

5    area where Mr. Andrews was seated.

6    Q.  And that's the back, correct?

7    A.  Yes.

8              THE DEFENDANT:  I would like to draw the Court's

9    attention to the officer that's standing by the driver's

10   side door.  Notice how he's reaching into his vest.

11             Could you please play the footage now.  Pay close

12   attention to this officer --

13       (Videotape continues)

14             THE DEFENDANT:  -- as he plants evidence in the

15   door.  There.  He's going to go in the car and move some

16   evidence around too.

17             Then he's going to go in the door and plant some

18   more, move some more stuff around while this officer tries

19   to cover for him, all before you had the okay to search this

20   vehicle.

21             Now he's going to try to play it off and act like

22   he's looking in the vehicle and not touching things.  He has

23   no gloves on.  He wasn't searching this vehicle.

24             Could you stop this for one moment.  Now, could

25   you please pull up the second video of him again.

```
1            MR. PAULSEN:  For the record, I object to the
2     narration.  Mr. Andrews is not under oath and he's just
3     characterizing a video.
4            THE COURT:  The objection is sustained.  The Court
5     will treat Mr. Andrews' narrative as argument.
6            THE DEFENDANT:  Could you go back.  Well, as a
7     matter of fact, right here, right here.  That's good.
8            Go back a little bit.  Go back a little further.
9     Keep going.  Keep going.
10           That's the officer right there.  At this point in
11    time, you're going to notice after you give him the okay
12    he's going to start putting on his gloves now after you talk
13    to O'Rourke, and now he's going to start his legal search of
14    this vehicle.
15           Could you please play the footage.
16       (Videotape played)
17           THE DEFENDANT:  As you see, he's putting on gloves
18    which he never had on when he was tampering and putting
19    evidence in the door.
20    BY THE DEFENDANT:
21    Q.  You care to explain to the courts the sequence of things
22    that we just witnessed?  Because if I'm not correct, that's
23    the illegal search right there.  That was illegal planting
24    of evidence which by the law I would think taints the
25    evidence.
```

1          But could you just please tell us what grounds did

2     he have to plant stuff in that door?

3          THE COURT:  Hold on.  I'm not going to allow that

4     question.  You can rephrase it to ask him the justification

5     for what's on the video, but you can't ask him a question

6     that assumes facts -- assumes an argument and treats them as

7     facts.

8     Q.  Okay.  Well, can you please justify the officers seen

9     putting things into the door and moving things inside the

10    vehicle with no gloves on before you gave the okay to search

11    this vehicle?

12         THE COURT:   Go ahead and answer the question.

13    A.  There's no evidence that I've seen that anyone put

14    anything in the door.  There's also no evidence that

15    anything was moved around inside of the car.  We saw a video

16    that was taken from a squad car that was parked to the rear

17    of the suspect vehicle.  We --

18    Q.  And what did you see that that officer was doing from

19    that squad cam in that video?

20    A.  I saw on officer standing near the open driver's side

21    door --

22    Q.  Doing what?

23         THE WITNESS:  Can I finish, Your Honor?

24         THE COURT:  Go ahead.

25    A.  I don't know what he was doing.  He was standing near

1    the open driver's side door.  At one point he leans into

2    vehicle.  I have no idea what he was doing.  I wasn't

3    standing there.  You can't tell from the video what he's

4    doing other than standing next to the door, looking into the

5    map pocket and leaning into the car.

6    Q.  So you don't see him tampering with things and moving

7    things around and pulling something out of his vest?

8    A.  No.

9    Q.  Do we need to watch it again?

10   A.  No.

11   Q.  I think we do.

12   A.  I didn't see it the first time --

13   Q.  Okay.

14          THE DEFENDANT:  Okay.  Well, could you please

15   replay it.  I think the officer needs to see it again.

16          THE COURT:  Hold on a second.

17          Okay.  Mr. Andrews, I'll let you play it again,

18   but here's the deal.  A lot of this is getting repetitive.

19   I understand your argument, I understand where you're going.

20   You've asked a question, he's answered it.

21          THE DEFENDANT:  But you're not --

22          THE COURT:  No, hold on.  You can have it

23   replayed, you can ask it again, but at a certain point he's

24   not going to change his answer, okay?

25          THE DEFENDANT:  Okay.  Well, Your Honor, at a

1    certain point, like -- ain't it like some type of contempt

2    to the Court that he's just blatantly lying?

3            THE COURT:  That a determination that the Court

4    makes when all the evidence is in and you've had an

5    opportunity to argue to me and convince me that you're

6    right, that he's lying, okay?

7            THE DEFENDANT:  But you see what you see, right?

8            THE COURT:  I am not going to comment on the

9    evidence at this point.  I see the video.  We'll deal with

10   what it shows and doesn't show at the appropriate time.

11   Right now all you're doing is putting this into the record.

12           THE DEFENDANT:  Could you -- okay.  Well, I would

13   like to have the video played again.

14           THE COURT:  Okay.

15   BY THE DEFENDANT:

16   Q.  Now, before -- as he's queueing this video, the search

17   that you say was authorized now because the suspect was

18   under arrest, am I correct?

19   A.  Yes.

20   Q.  So the driver of this vehicle, was she under arrest?

21   A.  At that point, no, I don't believe so.

22   Q.  And she was the licensed driver of this vehicle, she's

23   the one that was in control of this vehicle, am I correct?

24   A.  I don't know if she had a driver's license or not, but

25   yes, she was driving the vehicle.

1   Q.  Oh.  So you don't know if this person had a license and

2   insurance.  So whose vehicle is it?

3   A.  I have no idea.

4   Q.  You have no idea.  So you was just going to take

5   someone's random property without forfeit paperwork or

6   nothing.  You was just --

7   A.  There would have been a tow sheet completed.

8   Q.  There would have been a tow sheet completed.  And what

9   would that tow sheet have told, entailed?

10   A.  The facts of the vehicle tow.

11   Q.  Which is what?

12   A.  The identifying information from the vehicle.

13   Q.  Whose vehicle it was?

14   A.  That may or may not have been on the tow sheet.  That

15   didn't have anything to do with any of this, whose vehicle

16   it was.

17   Q.  When you run a vehicle VIN number or license plate, it

18   tells you whose vehicle it is, does it not?

19   A.  Yes.  I think -- if I remember correctly, this vehicle

20   had a dealer plate on it, so it wouldn't have had a person

21   associated with it regardless if it was run or not.

22   Q.  Okay.  We'll address that in a minute, because that's

23   going to bring me to another topic.

24          But anyway, this female driver is not under

25   arrest.  I just want to make sure that I got the sequence of

1     what's going on here.

2             This car was pulled over and this sketchy

3     situation about did you know it was the suspect or didn't

4     you.  For just argument's sake, you got your man out of the

5     truck, he's secured, he's in handcuffs, am I correct?

6     A.  Yes.

7     Q.  The passenger is in handcuffs, am I correct?

8     A.  Yes.

9     Q.  And the driver's secured inside of another officer's

10    squad car, am I correct?

11    A.  Yes.

12    Q.  So at this time all the suspects or occupants of this

13    vehicle is secured, am I correct?

14    A.  Yes.

15    Q.  So at this time you could have legally got a search

16    warrant or something to search this car if needed, right?

17    A.  Yeah, I think that was the plan.

18    Q.  That was the plan, to get a search warrant.

19    A.  Yes.

20    Q.  So could you tell me what went wrong and why this

21    vehicle was searched before the search warrant?

22    A.  We have to do an inventory search prior to the vehicle

23    being towed.  Also, as I said, the area immediately

24    surrounding where the suspect was seated in the car --

25    Q.  Mm-hm.

1    A.  -- can be searched for any evidence of the crime.

2    Q.  Only if the suspect is what, able to still reach into

3    the immediate area --

4    A.  No.

5    Q.  -- am I correct?

6    A.  No.

7    Q.  He's not?

8    A.  No.

9    Q.  Okay.  Well, that's on the record.

10            Well, anyway, you say that at this point in time

11   right here you haven't talked to Sgt. O'Rourke, right?

12   A.  I don't think so, no.

13   Q.  So the vehicle was not authorized to be towed or

14   searched at this point, am I correct?

15   A.  Not by Sgt. O'Rourke.

16   Q.  By anyone.  Is anyone on the scene gave the okay or

17   found probable cause to tow and search this vehicle yet?

18   A.  The area where the suspect was seated could have been

19   searched under a different exception.

20   Q.  And could you please tell us what that exception is,

21   because I thought you just told the courts that it was for

22   the car being towed, the inventory search.

23   A.  Additionally, as I stated, the area immediately

24   surrounding where you were, or where Mr. Andrews was seated,

25   could have been searched for evidence of the crime.

1    Q.  Only after it was said it was going to be towed, am I

2    correct?

3    A.  No, that's not necessarily true.

4    Q.  Could you please tell the Court the necessities of it,

5    because I'm law illiterate, so I need the record to fully

6    state what your reasoning was so we can understand this.

7    A.  If that area would have been searched and nothing would

8    have been found and Sgt. O'Rourke didn't want to have a

9    search warrant done on the vehicle or requested that I tow

10   the vehicle or that I have the vehicle towed, then we could

11   have let the vehicle go, but both of those things -- there

12   was a handgun located and Sgt. O'Rourke wanted the vehicle

13   towed for investigatory purposes.

14   Q.  Was the gun located before or after Sgt. O'Rourke wanted

15   the vehicle towed?

16   A.  After.

17   Q.  So he didn't know that there was a gun in that vehicle.

18   A.  No, he didn't.

19   Q.  So he didn't know there was a gun in that vehicle.  I

20   just want -- just yes or no.

21   A.  Not at that time, no.

22   Q.  Okay.  Now, at this point in time you say that -- the

23   immediate area of the suspect.  Was the suspect in the

24   driver's seat?

25   A.  No.

```
1     Q.  Was he in the driver's side door?

2     A.  No.

3     Q.  Okay.

4             THE DEFENDANT:  Okay.  Could you please play this

5     video.

6             THE COURT:  And before you press "Play," for the

7     record, has this video been marked and introduced?

8             THE DEFENDANT:  We got it from Jeffrey Paulsen.

9             THE COURT:  No, I understand that.  I'm just

10    trying to make sure that when somebody has to read the

11    transcript of this we know what we're talking about that you

12    are cross-examining the witness on.  If it hasn't been

13    marked, I believe we are on Defendant's 12.

14            MR. PAULSEN:  This would be a part of Government

15    4, I think it is, because all the squad videos are on

16    Government 4.

17            THE COURT:  Okay.  Fair enough.  Go ahead.

18        (Videotape played)

19            THE DEFENDANT:  Could you stop it.

20    BY THE DEFENDANT:

21    Q.  At that point in time, you kind of pointed at the

22    officer.  Could you tell me why you pointed at him.

23    A.  I have no idea.

24    Q.  You don't know why you pointed at him?

25    A.  I have no idea.
```

1    Q.  And this is the officer that's going to go inside this

2    driver's side door.

3    A.  I didn't even see myself point at anyone, but I don't

4    know why I would have pointed at somebody.

5             THE DEFENDANT:  Could you take it back like two

6    seconds, please.  Now just go frame by frame.  Right here.

7    There you go.  Press "Play."

8        (Videotape continues)

9             THE DEFENDANT:  Stop it.  Now, the button in front

10   of the "Stop."  Over.  The other way.  Over, over.  Right

11   there.  Go.  Click, click.  Keep going frame by frame.  I'm

12   going to tell you when to stop.  Keep going.  Right there.

13   Back one.  Go back one frame.  No.  Right there.  That one.

14   BY THE DEFENDANT:

15   Q.  Could you tell us what you're doing there.

16   A.  Moving my arms.

17   Q.  You're not pointing at that officer?

18   A.  No.

19   Q.  You're moving your arms.  Could you tell us why would

20   you just be randomly picking your arm up?

21   A.  No, I can't tell you why I'd randomly pick my arm up.

22   Q.  So we don't see you pointing there.

23   A.  No.

24   Q.  Okay.

25   A.  One hundred percent, unequivocally, no, I am not

1    pointing at anyone right there.

2              THE DEFENDANT:  Could you go another frame back.

3    Down, a little bit more.

4    Q.  Your arm's not up there.

5    A.  You're correct.

6    Q.  Now, the female is being escorted away from the car, am

7    I correct?

8    A.  Yes.

9    Q.  And you're just going to turn around to walk away from

10   the situation?

11             THE COURT:  Before you go on, answer that

12   question, but I just want the record to reflect that on the

13   video, the current time is marked at 00:09:52.  Again, I'm

14   just trying to keep your record clear.

15             Go ahead and answer the question, please.

16   A.  I'm sorry, sir.  What was your question again?

17             THE COURT:  Read it back.

18   Q.  Are your -- is your arm up as the female is walking

19   away?

20   A.  No.

21   Q.  So as you go to turn away --

22             THE DEFENDANT:  Could you go one split second

23   ahead again.  One more.

24   Q.  Your arm's still not up as you're turning away, correct?

25   A.  That's correct.

1    Q.  You're still looking back, though, right?

2    A.  Yes.

3              THE DEFENDANT:  One more.  One more.

4    Q.  Could you tell us what you're doing there?

5    A.  I don't know.  If the sequence continued, maybe I could

6    see what the follow-through of that motion is and I would --

7              THE DEFENDANT:  Take it a couple more times.

8    A.  -- have a better idea of what I was doing.

9              THE DEFENDANT:  Keep going.  Keep going.

10   A.  I can tell you what I'm doing now.

11   Q.  Please do.

12   A.  I'm keying my (indicating) microphone.  In that uniform

13   I wear right here, I'm keying that microphone to radio to

14   dispatch to say that the scene is under control, or code

15   four.

16   Q.  Okay.  So you need to stick your arm out from your body

17   to do that, or would you lift your arm straight up and key

18   your microphone?

19   A.  I don't think I got my arm away from my body.  I was

20   turning and my arm came up and keyed the mike and that's how

21   it happened.

22             THE DEFENDANT:  Could you please go back to the

23   second the judge had told us, 09 or whatever.  Right there.

24   Go back one.  Go more.  Go forward, forward, forward.  Right

25   there.  No, back, back one more.  Right there.

1    Q.  You're reaching to key your mike there?

2    A.  Yes.

3    Q.  So putting your arm out to the left of your body in the

4    direction that this girl is away from your body, is your

5    microphone outside of your body to that side?

6    A.  My arm is not extended out like that.  My arm is bent at

7    the elbow back towards the middle of my body at that point

8    right there.

9    Q.  That's not what this video is showing.

10   A.  Yes, it is.  That's absolutely 100 percent what that

11   video is showing.  My harm is bent --

12   Q.  Okay.  Well --

13   A.  Can I finish, please?

14   Q.  Yes.

15   A.  My arm is extended out and my elbow is bent, and my --

16   that would be my left hand, just like I sit here today, is

17   reaching towards the middle of my chest.

18   Q.  It is?

19   A.  Yes.

20          THE DEFENDANT:  Could you please go another split

21   second forward.

22   Q.  It looks like your arm's coming back -- now it looks

23   like it's bent forward.  It looks like it's coming forward.

24          THE DEFENDANT:  A little bit more.

25   Q.  It looks like it's still coming forward.

1          THE DEFENDANT:  A little bit more.

2     Q.  Looks like it's still coming forward and now has reached

3     your body.  Now you're reaching into your body close to

4     where your microphone's at.  So when your arm was extended

5     before, you was pointing.  Your arm was extended.  It was

6     not facing your body.

7          MR. PAULSEN:  Objection.  Argument.  This can all

8     be briefed later.

9          THE COURT:  It is argument.  Objection sustained.

10          THE DEFENDANT:  Well, could you please go ahead

11     and finish playing it.  I'll tell you when to stop again.

12     Stop.

13     BY THE DEFENDANT:

14     Q.  The officer by the driver's side door, is he not

15     reaching towards his vest?

16     A.  I can only see one officer right now.  I can see the

17     officer who's standing directly by the door.  I can se what

18     I believe to be his right arm.  There's an officer who's in

19     full uniform that's completely blocking his view with the

20     exception of his right arm.

21          THE DEFENDANT:  Could you back a split second.

22     A.  Oh, I'm sorry.  I apologize.  There's another officer

23     who is standing to the left --

24          THE DEFENDANT:  A little bit more.  A little bit

25     more.  A little bit more.  A little bit more.  A little bit

1    more.  A little bit more.  A little bit more.

2            I want his arm to be down.  Keep going to that

3    officer with the flashlight right there where the arm is

4    down.  Right when the girl gets past him.  A little bit

5    more.  There.

6    Q.  Do you see his arm is on his gun, am I correct?

7    A.  I don't know what his arm is on.  His arm is near his

8    gun.

9    Q.  His arm is near his gun.  So he's holding his flashlight

10   in his left hand.

11   A.  I don't know what he's holding in his left hand.

12   Q.  But he doesn't have nothing in his right hand, am I

13   correct?

14   A.  It doesn't look like it, no.

15   Q.  Okay.  And his right arm is where?

16   A.  His right arm is near his gun.

17   Q.  Is near his gun.

18            THE DEFENDANT:  Could you go a few split seconds

19   ahead.  Stop.

20   Q.  Could you tell me what his right arm is doing now?

21   A.  No, I can't.

22   Q.  Is it still by his gun?

23   A.  It's near his gun.

24   Q.  Did it move?

25   A.  Yes.

1    Q.  Did it move up or down?

2    A.  It moved up.

3              THE DEFENDANT:  Could you go a couple more split

4    seconds.

5    Q.  Did it move again?

6    A.  Yes.

7    Q.  Where did it go?

8    A.  It went up farther.

9    Q.  Okay.  And there was nothing in that hand, right?

10   A.  I didn't -- this is far away and it's green.  I don't

11   know if there's anything in his hand.  It does not look like

12   there's anything in his hand from this point of view, but I

13   cannot say that with 100 percent certainty.

14             THE DEFENDANT:  Could you please give a few more

15   seconds.  Stop.

16   Q.  Could you please tell us what it looks like his hand is

17   doing right now?

18   A.  I don't know.  I can't tell.

19   Q.  Is his arm crossed over his body?

20   A.  It looks like it, yes.

21   Q.  Like it's reaching towards his vest, inside of his vest?

22   A.  It could be.

23             THE DEFENDANT:  A couple more seconds ahead.

24   Q.  The officer is now looking at the door, is he not?

25   A.  It looks like he's looking into the car.

1    Q.  Okay.

2            THE DEFENDANT:  Keep going.

3    Q.  And he's still reaching into his vest, am I correct?

4    A.  I have no idea what he's doing right now.

5    Q.  Is his elbow still bent at the shoulder going towards

6    his vest?

7    A.  Yes.  Yes.

8    Q.  Okay.

9            THE DEFENDANT:  Keep going.

10   Q.  Now, at this point, where is all the other officers?

11   A.  Not near the car.

12   Q.  They've miraculously -- they just disappeared all at

13   once, am I right?  They're all just starting to leave.  Even

14   this officer is turning around, the last one, is he not?

15   A.  I don't know what he's doing.

16           THE DEFENDANT:  Go a couple more seconds.

17   Q.  Is he turning away?

18   A.  Yes.

19   Q.  So he's leaving too.

20   A.  Yes.

21   Q.  Can you explain why everyone at this split second has

22   decided to leave this area of this vehicle?

23   A.  Maybe because they had other things that they needed to

24   do.

25   Q.  So the vehicle where the gun is possibly still in there

1   needs to be searched because you say you need to search this

2   area, and everyone just dispersed from this car like

3   spontaneous combustion.

4          THE COURT:  You got to ask a question,

5   Mr. Andrews.

6   Q.  Did everybody leave that vehicle at one time?

7   A.  I mean, generally the same time, yeah.

8   Q.  Okay.

9          THE DEFENDANT:  Could you go a little bit further

10  now.  Just play it.  I'll just tell you when to stop it.

11  Stop it.

12  Q.  That officer that was seen reaching into his vest, could

13  you tell me what it looks like he's doing now?

14  A.  I can't tell what he's doing, and I also want to make it

15  clear that I don't know if he was reaching into his vest.

16  He was reaching towards his vest.  I don't know if he was

17  adjusting the strap on his vest.  I don't know what he was

18  doing.

19  Q.  Is he still in the same spot in the video?

20  A.  He took a step forward.

21  Q.  And which way is he facing now?

22  A.  It looks like he is kind of parallel to the door.

23  Q.  Like he's turning in to the door?

24          THE DEFENDANT:  Go frame by frame.  Right there.

25  A little bit more.  Stop.

1     Q.  His arm is still bent, isn't it?

2     A.  His right arm is bent, yes.

3     Q.  And it looks like he's looking into this door, isn't he,

4     facing the door, looking down into the door?

5     A.  Yeah.

6              THE DEFENDANT:  Go a couple more frames.

7     Q.  Is his arm coming down now?

8     A.  His head is coming down.  I don't know if his arm is

9     coming down.

10             THE DEFENDANT:  A little bit more.

11    Q.  Do you see his hand now?

12    A.  Yes.

13    Q.  Is it coming down to the door?

14    A.  Yes.

15             THE DEFENDANT:  Keep going.

16    Q.  Now, what he is placing in the door?

17    A.  I don't know if he is placing anything in the door.

18    Q.  Is he touching something in the door?

19    A.  I can't tell.  I can only see his back.

20    Q.  From the looks -- as an intelligent officer of the

21    court, does it look like this officer is touching this door?

22    A.  I don't want to make any inferences.  I can't see

23    anything but his elbow and his upper arm.

24             THE DEFENDANT:  Okay.  Go a little bit further.

25    Q.  What is he doing now?  Is he bending into this door?

1    A.  I have no idea what he's doing.  He appears to be

2    looking down at something that may or may not be in the map

3    pocket of the door.  I don't know what his arms are doing.

4    Q.  Okay.

5              THE DEFENDANT:  Go a little bit further.  Just

6    play it.  I'll tell you when to stop.  Because we all can

7    clearly see what's going on here.  Stop.

8    Q.  From your recollection, was that not meth said to be

9    found in that door?

10   A.  I have no idea what was found in that door.

11   Q.  You don't?

12   A.  No.

13   Q.  So the officer didn't come to you and tell you that they

14   found some Ecstasy and methamphetamines?

15   A.  I knew that there was Ecstasy located.  I don't even

16   know where it was found inside of the car.

17   Q.  So you never heard them say nothing about no meth.

18   A.  No, I don't -- I don't recall anything about any meth.

19   I remember Ecstasy.

20   Q.  You remember Ecstasy.

21   A.  Yes.

22   Q.  And that's your -- you're going to testify to that.

23   A.  Yes.

24             THE DEFENDANT:  All right.  Just play this part.

25   Just finish this off so we can see what the rest is he's

1    doing to this door.  Beside the door, moving something into

2    the car, back in the door again.  Now he's going to play it

3    off.  Nothing's going on.

4           All right.  You can stop that footage.  Now, go

5    back to his body cam too.  Back it up.  Not too far.  Right

6    there.  Play it.

7       (Videotape played)

8           Stop.  Go back a split second.

9    Q.  And I want you to listen to the background.  This

10   officer is going to tell you guys that it's suspected

11   methamphetamine in this door, the officer in the background.

12           THE DEFENDANT:  Stop.

13   Q.  Did you hear it?

14   A.  I think I heard something about meth.

15   Q.  So you're the control -- you what we would call the OIC,

16   like the officer in charge, am I correct, of the scene?

17   A.  Yes.  Yes.

18   Q.  So when something of that magnitude is found in the

19   door, wouldn't you be made aware of that?

20   A.  I mean, in this situation, a small amount of

21   methamphetamine, if that's in fact what was located,

22   wouldn't really have a whole lot of consequence on the

23   entire thing.

24   Q.  What makes you say it was a small amount of meth?

25   A.  I don't know.  I don't remember -- I don't even remember

1  meth being recovered.  I said I remember Ecstasy being

2  recovered.

3  Q.  So why did you just make reference to a small amount of

4  meth if you don't remember any meth being found?

5  A.  Because if it was, for example, a pound of meth, I

6  probably would have remembered.

7  Q.  So if an officer finds one gram of meth, it's the same

8  as finding a pound of meth?  He wouldn't inform you?

9  Wouldn't it still be the same thing to inform the officer in

10  charge that he's found a gram or a pound of meth?

11  A.  Well, someone mentioned something about meth on the

12  video.

13  Q.  But you just mentioned a small amount of meth and I

14  asked you earlier did you know the meth was there.

15  A.  You just directed me to the video that you can hear

16  someone saying something about meth, so I was acknowledging

17  the fact that someone said that there was meth in the car.

18  I don't have an independent recollection of that minus my

19  body camera footage that we just watched.

20  Q.  Well, I'm going to help enlighten you, because the

21  officer in fact said the same thing you just said, that it

22  was a small amount of meth, and just miraculously you chose

23  those exact words, a small amount of meth.  That's Officer

24  Joel -- what's his name?  One second, please.

25           THE DEFENDANT:  And I won't -- I'll tell the Court

1     relevance is still on the illegalness of this whole search.

2                    THE COURT:  Understood.

3                    THE DEFENDANT:  That's what this is going towards

4     so the courts understand.

5                    What exhibit is the defense on?

6                    THE COURT:  I believe you have entered through 11.

7                    Is that correct, Officer?

8                    THE WITNESS:  Oh, I'm sorry.

9                    THE COURT:  Through 11, correct, or 10?

10                   THE WITNESS:  The highest number I have is 10,

11    Your Honor.

12                   THE COURT:  Okay.  The next exhibit number is 11.

13    BY THE DEFENDANT:

14    Q.  His name is John Owen.  Does that sound about right?

15    A.  Yes.

16    Q.  Was that the officer that you just seen that that video

17    that we was just looking at and making reference, another

18    member of your gang intervention unit or team, your Gang

19    Unit?

20    A.  Yes, Officer Owen is a member of the Gang Unit.

21    Q.  So the other officers in blue, the ones that's not seen

22    planting evidence in a door, are regular Minneapolis police

23    officers, am I correct?

24    A.  They are patrol officers, yes.

25    Q.  And the Gang Task Force guy that you was pointing at or

1    you wasn't pointing at at the time he went to put this in

2    the door, he's with the Gang Task Force, am I correct?

3    A.   He is a Gang Unit officer, yes.

4    Q.   So that means he's under your control, am I correct?

5    A.   Yes.

6    Q.   Thank you.  Now, did you get a chance to read his

7    inventory report?

8    A.   No.

9    Q.   Would you like to read it, or would you like me to just

10   read it to you?

11               THE COURT:  No, you have to have a reason to

12   question the witness about the inventory.

13               THE DEFENDANT:  Oh.  I'll --

14               THE COURT:  Hold on.  Ask him if he's aware that

15   something, whatever it is you want to establish, was found

16   in the car.

17               THE DEFENDANT:  I already did that.

18   BY THE DEFENDANT:

19   Q.   But I will ask it again for the record because the judge

20   said.

21               Now, I want to ask you again, you said that you

22   was unaware that anything was found in this car.

23   A.   I said I didn't have an independent recollection prior

24   to reviewing my body camera footage just now.

25   Q.   So you didn't know about this meth, because that's what

1    I asked you under oath and you said you're testifying that

2    no one never mentioned or said nothing about any meth, am I

3    correct?

4    A.  I had no recollection of any methamphetamine being

5    recovered from that vehicle prior to watching my body camera

6    here today.

7    Q.  Okay.  Now, when you just referenced that it was a small

8    amount of Ecs -- I mean, of meth, where did you come up with

9    that?  Where did you get that from?

10   A.  I was making an example that if a small amount of

11   narcotics are recovered on a stop, any stop, it probably

12   isn't going to be burned into my memory and something that I

13   would remember, because over the course of my career I've

14   had a lot of stops that have resulted in the recovery of a

15   small amount of narcotics.

16   Q.  Okay.  I want --

17   A.  When a larger amount of narcotics is recovered, I

18   usually have a memory of it because it's a more memorable

19   instance.  That's why I said that if a small amount of

20   methamphetamine was recovered, I probably wouldn't have

21   remembered.  I do remember that there were somewhere in the

22   neighborhood of 90-some pills of Ecstasy that were

23   recovered.  That would be a larger amount.

24   Q.  So in a stop like this where you're trying to find you

25   some probable cause and you've got guns and everything, one

1   drug doesn't stick out to your memory more than another?

2   A.  Yeah, the Ecstasy sticks out more because there was

3   more -- it was a larger amount.  I didn't remember any

4   methamphetamine.

5   Q.  Which one is a seriouser (sic) drug, methamphetamine or

6   Ecstasy?

7   A.  In the eyes of the law they're roughly the same.

8   Q.  No, they're -- well, I pass on that.

9           I want to read you an answer of Joel Owen and I'm

10  going to ask you a question.

11          This is the third paragraph of Supplement 30, John

12  Owen Supplement, with the case that's in question:

13          "Once all parties were removed from the vehicle,

14  Sgt. Pucely advised that an inventory search should be

15  conducted.  I started to search at the driver's side door

16  and observed a clear containment container in the side

17  door" -- "in the side panel of the door.  Inside the clear

18  containment container was a small crystal-like substance

19  that I believed to be crystal meth."

20          That sounds like the same thing you said, it was a

21  small amount of meth, doesn't it?

22  A.  Yes, it does.

23  Q.  Is that just a coincidence?

24  A.  No, I explained this already.  When I referenced a small

25  amount of methamphetamine, it wasn't because I had an

1    independent recollection that there was a small amount of

2    methamphetamine recovered from that vehicle.  Why I said a

3    small amount of methamphetamine is -- was using it as an

4    example, that if a small amount of narcotics is recovered on

5    a stop, I probably won't remember that stop, or I won't

6    remember that portion of the stop, because there were a lot

7    of other things going on here.

8    Q.  But you remembered the Ecstasy because it was a large

9    amount, right?

10   A.  It was a larger amount, yeah.

11   Q.  Because you would charge somebody with a larger amount,

12   right?

13   A.  Well, someone could -- technically, someone could be

14   charged with a small amount of methamphetamine as well.

15   Q.  But the larger amount sticks out because you can charge

16   someone more with it, right?

17   A.  I don't know -- I honestly don't know what the charging

18   limits are for Ecstasy.  I don't know -- I would assume that

19   a small amount of methamphetamine is a lesser charge than

20   90-some pills of Ecstasy, but I don't have the charts in

21   front of me.  I don't have those numbers memorized.

22   Q.  No, I'm asking that to ask about why it stuck out to

23   you, because I want to get to the fact that why wasn't no

24   one charged with these drugs.  I want to understand --

25          MR. PAULSEN:  Objection on relevance grounds.

```
 1              THE COURT:  Sustained.  What's the relevance?

 2              THE DEFENDANT:  Huh?

 3              THE COURT:  What's the relevance of your question

 4     why no one was charged with a drug offense?  Assume that to

 5     be true.

 6              THE DEFENDANT:  Oh, it's true.  It's fact.

 7              THE COURT:  Okay.  Why is it relevant here?

 8              THE DEFENDANT:  Because I'm still trying to

 9     impeach this officer about his lies and that he just told

10     this officer -- he pointed to him.  I'm trying to develop

11     the record to show that he was -- that he knew about this.

12              THE COURT:  That's argument and you can argue

13     that.  All you can do today is establish the facts, meaning

14     whether you believe them or not, whether they're true or

15     not, you can get this officer's answers to questions that

16     you ask.

17              THE DEFENDANT:  Okay.  Well, listen.  I want to

18     introduce this into evidence under the grounds that -- with

19     the video in that it shows that this officer clearly got the

20     tampering and putting evidence in there, because this goes

21     to show, like, who knows how that gun got in there.  I think

22     they put it in there now.

23              THE COURT:  I understand that is your argument and

24     we will entertain your argument and rule on it, but that's

25     not what you're doing here.
```

```
1              Mr. Aligada, what's the exhibit number?

2              MR. ALIGADA:  11, Your Honor.

3              THE COURT:  Defendant's Exhibit 11.  Any

4    objection, Mr. Paulsen?

5              MR. PAULSEN:  No, Your Honor.  That would be John

6    Owen's statement.

7              THE COURT:  It's received.

8    BY THE DEFENDANT:

9    Q.  And before we leave this subject, I want to make it

10   clear that the area that that officer was searching inside

11   the door and inside that driver's seat, that's not where the

12   suspect was located, am I correct, the defendant?

13   A.  No.  Yeah.  Mr. Andrews was located behind the driver's

14   seat.

15   Q.  So when that officer went to search through that door,

16   he wasn't in fact searching the immediate area of the

17   defendant, am I correct?

18   A.  He was not.

19   Q.  Thank you.

20             Moving along from that.  Now, let me see here.

21             I want to ask you as far as procedure.  When

22   pulling over a vehicle for a traffic stop, as you said, in

23   this situation, am I correct? --

24   A.  Yes.

25   Q.  -- what's the procedure of approaching the car when
```

1    you're making a traffic stop for a traffic violation?

2    A.  Getting out of the squad car and walking up to the

3    driver's side of the car.

4    Q.  And who do you approach first?

5    A.  I approach whoever I come into contact with first.  I

6    look in all portions of the car as I'm approaching.  I don't

7    pass by windows.  If there's someone seated in a spot --

8    like in this example there was someone seated behind the

9    driver.  I wouldn't have walked past that person regardless

10   of who it was.  I would have had that person roll their

11   window down and talk to the driver beyond them.

12   Q.  So if it was four old ladies in the back seat of a car

13   with no tint and you're pulling this car over because it had

14   a busted taillight, you're telling me that you're going to

15   stop at the back door and get the -- question the passengers

16   in the back, because they surely would be who you pass

17   first, the little old ladies in the back seat.

18   A.  In that circumstance, no, I would walk up to the driver.

19   Q.  So what makes that circumstance different from this one

20   if you're conducting a traffic stop?

21   A.  Because I had reasonable suspicion to believe that a

22   person who had committed a shooting less than eight hours

23   prior to this stop was inside of that vehicle.

24   Q.  So when you try to throw the little facts about this

25   being a traffic stop, that wasn't in fact what it really

1    was.  You were going to stop this car regardless of what

2    happened, regardless if this car had low lights on, or

3    regardless if this car and did every traffic stop to the T,

4    you were still going to stop this vehicle anyway, were you

5    not?

6    A.  I don't think that's relevant, because there were two

7    moving violations that were committed within the first 30

8    seconds of the car moving.  I had a legal reason -- two

9    legal reasons to stop this car.  Yes, I had other ideas

10   about what I might find once the vehicle gets stopped, but I

11   had two legal reasons, two citable offenses, that I could

12   have written to the driver prior to making this stop.

13   Q.  So why didn't you go stop -- why you didn't step to the

14   driver about the traffic violations then?

15   A.  Because when I walked up to the rear passenger side

16   window, I observed Mr. Andrews, who I knew to have been the

17   suspect in a shooting that happened less than eight hours

18   prior, sitting behind the driver.  It would have been

19   incredibly unsafe to walk past Mr. Andrews and talk to the

20   driver when I knew that the firearm in the shooting had not

21   yet been recovered and I did not know if he was armed.  In

22   my experience, in my training in 12 years as a cop, I would

23   never ever walk past someone who I knew to be a suspect in a

24   shooting without taking them out of the car, handcuffing

25   them, pat frisking them for weapons, and moving them away

1    from the vehicle.

2    Q.  You're just contradicting yourself here.  You state

3    that, one, it's a traffic stop, or two, it's a takedown.

4    Which one is it?  Are you trying to just arrest someone, or

5    you're looking for a traffic stop here?

6    A.  I had a -- two legal reasons to stop that car.  I had --

7    Q.  Okay.  Could you stop right there?  Could you stop right

8    there, please.  I asked the question.  I received my answer.

9         THE COURT:  Hold on.  That's fine.  This record is

10   established on that point.  Here's what I need you to do,

11   Mr. Andrews.  I'm giving you a lot of latitude, you're

12   representing yourself, but here's the deal.

13        A lot of this you've asked and he's answered and

14   you've asked again and he's answered.  You need to get to

15   whatever other points you want to make with this officer,

16   okay?

17        THE DEFENDANT:  I'm trying to --

18        THE COURT:  No, I understand you're trying and I'm

19   giving you a lot of latitude, but --

20        THE DEFENDANT:  But you're not -- Your Honor,

21   listen.  This is your court.  Like I said, I don't know no

22   legal -- I don't have no law degrees or stuff, right?  So I

23   can only the questions how they need to be asked, but you're

24   letting him give me the runaround and he's not answering the

25   question correctly.  He's talking around the questioning.

1    He's taking two, three, to five minutes with each answer

2    that I'm not asking him and you're not stopping him and

3    you're not having him answer the question how I'm telling

4    him to answer, because clearly he's not telling the truth in

5    what he's saying.

6            THE COURT:  I will acknowledge that the witness

7    has given several narrative answers.  If you don't want a

8    narrative answer, the best way to accomplish that is to ask

9    a question that doesn't call for a narrative answer.

10           So, for example:  "Officer, did you or did you not

11   do X?  Officer, what was -- where was the passenger seated,"

12   et cetera, things that don't call for a narrative.  But if

13   you ask a question:  "Why did you stop?" or:  "What was your

14   justification?" he's entitled to give a narrative answer,

15   okay?

16   BY THE DEFENDANT:

17   Q.  Officer Joel, these next questions I want you to answer

18   all yes or no; do you understand that?

19   A.  Yes.

20   Q.  When the suspect -- well, the suspects came out of this

21   house, you seen them get into a vehicle, am I correct?

22   A.  Yes.

23   Q.  At that point the vehicle sat there for at least two

24   minutes, am I correct?

25   A.  Roughly, yes.

1    Q.  At that two minutes, you knew already that you thought

2    this was your suspect, am I correct?

3    A.  I had reasonable suspicion to believe --

4    Q.  Yes or no.

5    A.  I don't know.

6    Q.  You didn't know if that was the suspect or not?

7    A.  Not with 100 percent certainty, no.

8    Q.  Okay.  Now we're getting somewhere.

9            Second, with the thought in mind that maybe this

10   was the suspect, at that point you could have cut on your

11   recorder to your car, am I correct?

12   A.  Yes.

13   Q.  And if you'd have cut your recorder on to the car, it

14   would record these, quote-unquote, traffic violations, am I

15   correct?

16   A.  Yes.

17   Q.  So when the car pulled off, you have no proof whatsoever

18   that there was a traffic violation, am I correct?

19   A.  I had my observations.

20   Q.  I ask you again, yes or no, other than your statement or

21   your observation or your story line, do you have a shred of

22   proof that there was a traffic violation committed?

23   A.  No.

24   Q.  Once the car pulled off and then made it to the next

25   block, you at that point could have still cut your camera on

1    to this vehicle, could you not?

2    A.  Yes.

3    Q.  And you would have still in fact caught the vehicle if

4    it committed another traffic violation, am I correct?

5    A.  After the first --

6    Q.  Excuse me.  Am I correct?

7    A.  I can't answer that question as a yes or no.

8    Q.  Before the vehicle made the turn that you said it made

9    without coming to a complete stop, you could have cut your

10   camera on to caught that traffic violation, am I correct?

11   A.  I can't answer that question with a yes or no.  It needs

12   explanation.

13   Q.  It doesn't.  It's a yes or no.  Could you physically

14   took your finger and pressed the record button?

15   A.  Yes, I could have.

16   Q.  And you chose not to lift your finger and press the

17   record button, am I correct?

18   A.  I did not.  I did not turn the recorder on.

19   Q.  So when you didn't cut the recorder on, you don't have a

20   shred of proof that this car committed a traffic violation,

21   am I correct?

22   A.  My answer is the same.  No, I don't.

23   Q.  And also, when you say you had binoculars out, did you

24   cut your camcorder on inside your car or your body cam to

25   record that?

1    A.  No.

2    Q.  So you don't have a shred of evidence that you had a

3    camcorder or the binoculars out surveilling these suspects,

4    yes or no?

5    A.  No.

6    Q.  So once these suspects got in the vehicle and the car

7    got on its way and it traveled a mile, roughly, you still

8    did not choose to cut on your body cam, yes or no?

9    A.  No.

10   Q.  Is it not in your police procedure, yes or no, when

11   you're going out to a scene or going to possibly make an

12   arrest of something of this magnitude where it's a suspect

13   from a shooting that's armed and dangerous and you have

14   information from a T-Mobile ping that places this suspect

15   stationary on a specific block at a specific time that you

16   know where this suspect is at that's armed and dangerous, is

17   it not in your procedure to have your body cam on?

18   A.  No.

19   Q.  Thank you.  Second, is it not in your procedure when you

20   know you're going to pull a vehicle over for a traffic

21   violation to start recording?

22   A.  No.

23   Q.  Thank you.  I'll move on from that.  That's what I have

24   for that.

25              And you say that you wasn't out there for other

1   purposes, am I correct?

2   A.  What do you mean by "other purposes"?

3   Q.  Exactly what the question asked.  Were you out there for

4   other purposes?

5   A.  I don't know what "other purposes" you're referring to.

6   I don't know what the main purpose that you're referring to

7   is, so I wouldn't know what "other purposes" are.

8   Q.  Did you have any other agendas out there?  You were out

9   there to locate the suspect or the suspect vehicle.  That

10  was your purpose, am I correct?

11  A.  Yes.

12  Q.  So that's the only purpose you was out there, is that

13  correct?

14  A.  Yes.

15  Q.  So that would be the only purpose in this situation that

16  I'm talking about, am I correct?

17  A.  Yes.

18  Q.  Okay.  Thank you.

19          So you wasn't out there surveilling Anthony Kanz.

20  A.  There is no one that I know of named Anthony Kanz.

21  Q.  So the conversation that you and Sgt. -- I mean, Officer

22  Schroeder --

23          MR. PAULSEN:  I object to going over the same

24  thing again.

25          THE COURT:  Asked and answered.

1    Q.  Okay.  Well, it's on the record.  I just -- you know.

2             Oh, that's what I wanted to ask you.

3             Okay.  Now, back before all of this, you said that

4    Sgt. O'Rourke contacted you by phone?

5    A.  Yes.

6    Q.  And he sent you to this location by phone.

7    A.  Yes.

8    Q.  And that was your first and only communication with

9    Sgt. O'Rourke?

10   A.  To the best of my recollection, yeah, that was the first

11   time I had talked to him that day.

12   Q.  What would make something significant stand out?  Would

13   it have to be sent somewhere else?

14   A.  What?

15   Q.  If Sgt. O'Rourke sent you somewhere else, you would

16   remember that, would you not?

17   A.  I might.

18   Q.  Did Sgt. O'Rourke send you to St. Paul to check on 646

19   Thomas Avenue West for the suspect in his vehicle?

20   A.  I did not go to St. Paul that night.

21   Q.  Did you get told to go to St. Paul that night?

22   A.  No.

23   Q.  You didn't?

24   A.  No.

25             THE DEFENDANT:  I would like to enter into

1    evidence -- for the record, Your Honor, I want to make

2    somewhat of an objection, even though I'm going to use it.

3    I want to make an objection to the grounds that the

4    Government -- and this is going for the outrageous

5    Government conduct.  He's (indicating) clearly going to

6    introduce evidence that he wouldn't have been able to had we

7    not took a two-week pause.  He went and manufactured some

8    e-mails and stuff that he's going to bring other officers

9    back to try to clean up impeachment that I did on

10   Sgt. O'Rourke on the stand about some of his statements, and

11   had we not had to take a two-week pause, this wouldn't have

12   been available.  It's forged anyway, but --

13             THE COURT:  You want to enter that exhibit, is

14   that correct, for the purposes of impeaching this witness?

15             THE DEFENDANT:  Yes.

16             THE COURT:  For that limited purpose?

17             THE DEFENDANT:  Yes.  Just the email part, just to

18   show the relevance that this document is not real.  This is

19   a phony document.

20             THE COURT:  Okay.  Offered for that limited

21   purpose, Mr. Paulsen, do you have an objection to that

22   exhibit which has not yet been marked?

23             MR. PAULSEN:  No.  I provided that to the defense.

24             THE COURT:  All right.  Let's mark it.  It will be

25   received for the limited purpose you've offered it.

1          MR. PAULSEN:  That's Number 12, I believe.

2          THE COURT:  I believe that's right.

3     BY THE DEFENDANT:

4     Q.  This document that I hold in front of me is an email

5     correspondence going back and forth between you and

6     Sgt. O'Rourke.  And in this email, you're the one who

7     contacted O'Rourke and told him that my kid's mother was the

8     owner of a 2002 Chevrolet Tahoe with a 21-day sticker, is

9     that correct?

10    A.  I don't know what document you're referring to.  I would

11    need to see that.

12    Q.  But you would remember something that significant, am I

13    right, because you said that the first contact you had with

14    O'Rourke was when he told you to go to 28th and Girard, am I

15    correct?

16    A.  I don't have a recollection of what you're referring to.

17    Q.  Well, this email from you was at 11 p.m. on that night

18    in this 40 STS for tonight's shooting.

19    A.  Okay.

20          THE COURT:  He can't say anything about the email

21    if you don't show it to him.

22          THE DEFENDANT:  This is my only copy.  I need

23    copies of it, because if I give this to him, I won't be able

24    to make reference to it.

25          MR. PAULSEN:  I have an extra.

1          THE COURT:  Do you have an extra?  Thank you,

2     Mr. Paulsen.

3          (Document handed to the witness by Mr. Paulsen)

4     BY THE DEFENDANT:

5     Q.  Could you please read the time and date of that email,

6     the top one, and who it's from?

7     A.  It was sent from me to Sgt. O'Rourke at 11:03 p.m. on

8     Tuesday, May 15th.

9     Q.  11:03.  In your statement that you wrote in the

10    supplement, and in your report -- I mean, and in your

11    testimony on the stand, and to every other statement or

12    document that I see thus far, did not you say that

13    Sgt. O'Rourke called you at 11:42 and sent you to the area

14    over there on 28th and Girard -- 29th and Girard, should I

15    say?

16    A.  Yes.

17    Q.  And I just asked you under oath, yes-or-no -- answer

18    this question yes or no -- was that the first contact that

19    you and Sgt. O'Rourke had?

20    A.  It was the first contact --

21    Q.  Excuse me.  I said yes or no.

22    A.  I can't answer that question yes or no.

23    Q.  Is this document -- yes or no, is this document stamped

24    and dated before the time that's in your report saying that

25    Sgt. O'Rourke sent you to 29th and Girard?

1    A.  Yes.

2    Q.  Did you not just testify when I asked you how did

3    Sgt. O'Rourke get in touch with you, you said by phone, am I

4    correct?

5    A.  Yes.

6    Q.  You said that that was the first time he talked to you

7    and y'all made contact is when you told him to go over

8    there -- I mean, when he told you to go to 29th and Girard,

9    is that correct?

10   A.  I can't answer that yes or no.

11   Q.  Did you not just testify to that when I asked you the

12   same question less than five minutes ago, did you or did you

13   not -- was it not the first time he talked to you he told

14   you to go over there on 29th and Girard?

15   A.  That was my testimony, yes.

16   Q.  So this document that I have here, yes or no, is this

17   not a contradiction, or should I say impeachment, of that

18   statement?

19   A.  It's a contradiction.

20   Q.  So which one is the truth?  Is your statement the truth

21   that you wrote in your supplement, or is this the truth?

22   A.  Now that I've been provided with this email, I still

23   don't really have an independent recollection of it, but

24   this email clearly shows that I did have contact with

25   Sgt. O'Rourke prior to the phone call that I received from

1    him.

2    Q.  So it's safe to say that you're just willing to just

3    testify and say anything that you need to say to develop the

4    record or get your point across, is that not correct, yes or

5    no?

6    A.  No.

7              THE COURT:  Hold on.  It's not a proper question.

8              THE DEFENDANT:  It's not?

9              THE COURT:  No.  It's argumentative.

10   BY THE DEFENDANT:

11   Q.  Okay.  Well, let's just say, yes or no, you have your

12   own way of determining things of importance to remember, is

13   that not correct?

14   A.  No.

15   Q.  You don't determine what's important and what's not to

16   you?

17   A.  I don't make a conscious determination to forget

18   something.

19   Q.  So if Sgt. O'Rourke told you to go on 29th and Girard

20   and apprehend the suspect from a shooting and you decided to

21   go over there by yourself, no backup, no squad cams, no

22   nothing, you just went over there -- I mean, like you said,

23   this is an armed and dangerous person that you would never

24   approach without securing and putting in handcuffs because

25   he's so dangerous.  You just testified to that, am I

1    correct?

2    A.  Yes.

3    Q.  And this is the person that you went over here on 29th

4    and Girard to get with Sgt. O'Rourke telling you, you

5    remember that, right?

6    A.  Yes.

7    Q.  But you don't remember that you and Sgt. O'Rourke had a

8    conversation back and forth and he told you to go and check

9    646 Thomas in St. Paul for Mr. Andrews and his vehicle?  And

10   this was at 8:30 p.m.  This was well before 11:30 at night.

11   A.  I don't remember this.  I did not remember this exchange

12   until it was provided to me today.

13   Q.  Hmm.

14   A.  I'm not denying that it happened.

15   Q.  So when this thing makes reference for "tonight's

16   shooting," what shooting was it tonight?  Could you

17   please tell us what shooting it's talking about that's in

18   the nighttime, not the one from 4:00 o'clock in the

19   afternoon?

20   A.  I think -- I didn't write that.

21   Q.  Oh, you did.  It's at the bottom of yours.

22   A.  I did not write that subject line.

23   Q.  But you left it on there as a forwarded subject line.

24   It's what y'all was talking about.  You're both making

25   references back and forth, telling each other that this is

1    the subject, this "tonight's shooting."

2              So was there another shooting that you was out on

3    29th and Girard to investigate and you was going to pull

4    that white Tahoe over no matter what and who answered it?

5    A.  No.

6    Q.  Is it more believable to the Court -- if it's more

7    believable to you to tell the courts that you was out there

8    to get an armed and dangerous suspect, or you was doing some

9    surveillance on some gang activity because you're the Gang

10   Task Force and you thought you seen some gang activity get

11   into this vehicle, which one is more believable?  Let's

12   just -- now, you sit back, you think, and I want you to give

13   me a narration of this.  This is one where I'm going to

14   allow you to use your own judgment because I just want your

15   answer for the record, and I'm going to ask this question:

16             Is it more believable to you that an officer in

17   your capacity of magnitude would be out at 12:00 o'clock

18   midnight going to pick an armed and dangerous suspect up

19   that was involved in reportedly two shootings today that you

20   had the exact location for by yourself, or is it more

21   believable that you would have been out there surveillancing

22   some gang activity, watching the house of Anthony Kanz or

23   the fat guy, because it was another fat guy out there in

24   this area, and you seen this vehicle because this vehicle

25   was a white Tahoe -- I mean, a white Yukon Denali, am I

1    correct?

2    A.  Yes.

3    Q.  And you was looking for a blue Tahoe, am I correct?

4    A.  Yes.

5    Q.  So these was not the same vehicles, am I correct?

6    A.  You are correct.

7    Q.  But this vehicle stood out.  This vehicle made you --

8    even though you couldn't identify the suspect getting into

9    this vehicle, something stood out, am I correct?

10   A.  Yes.

11   Q.  And that something made you want to investigate and stop

12   that vehicle, am I correct?

13   A.  Yes.

14   Q.  So please tell the Court which one makes sense out of

15   those two scenarios.

16   A.  I have recounted the truth from the beginning to end of

17   this entire scenario multiple occasions.

18           I was in that area initially looking for the

19   suspect vehicle in the shooting at the direction of

20   Sgt. O'Rourke.  Once I did not find that vehicle, I didn't

21   have any other tasks or duty that I needed to do at that

22   moment and I knew that cell phone was in that block.

23           I made the decision on my own to sit on that block

24   and do surveillance and see if I could catch a glimpse of

25   the suspect or something that possibly led me to know that

1    the suspect was in a vehicle nearby, and that's what

2    happened and everything progressed along from there and

3    we've talked about it.

4    Q.  Okay.  Now, thank you, because that's what I was going

5    to get to.

6              You mentioned that you had that cell phone.  That

7    cell phone, was that a ping?

8    A.  Yes.

9    Q.  How does Sgt. O'Rourke tell you that location?

10   A.  He called me initially over the phone where the location

11   was and I think forwarded a couple updated pings to your

12   cell phone.

13   Q.  He forwarded a couple updated pings?

14   A.  Yes. I --

15   Q.  That was a yes or no.  You answered.

16             THE COURT:  He answered it, "Yes."

17             THE DEFENDANT:  Yes.

18   Q.  Now, with those e-mails being sent to your cell phone,

19   right --

20   A.  Yes.

21   Q.  -- you knew that the suspect was at this location,

22   right, because you had T-Mobile pings, yes or no?

23   A.  I knew the cell --

24   Q.  Excuse me?

25   A.  I can't answer that.

1    Q.  Okay.  Well, listen, why is that in none of your

2    reports?  You never mentioned that T-Mobile pings being sent

3    to your cell phone.

4    A.  Because it wasn't relevant to this case.

5    Q.  It wasn't?

6    A.  No.

7    Q.  Could you please read your statement about how you came

8    across the evidence that you found out that the suspect was

9    at this location?

10   A.  Yes.  In my supplement it says that at approximately

11   23:42 hours I received information from Sgt. O'Rourke that

12   he had determined that the suspect may be in the area of

13   29th Avenue North and Girard Avenue North.

14   Q.  Okay.  Now, you said that he had determined.  Now, if he

15   has sent you a realtime location to your email, it wouldn't

16   have been him determining, it wouldn't been his information.

17   You would have had direct knowledge that this email was sent

18   to your location, because this email seems to have

19   miraculously came up after some T-Mobile phone call records

20   that we put in that we got came up on September 7th.

21            THE COURT:  I'm sorry, Mr. Andrews.  I don't

22   understand the question.  You're going to have to rephrase

23   it.

24            THE DEFENDANT:  I'm going to the relevance to show

25   that -- once again, this is the same objection I had about

1  him having time to talk and reach these officers and tell

2  them what to say about a T-Mobile ping every -- it's in no

3  one's report.  Their whole narration used the 11:00 o'clock

4  hour which I'm going to introduce into evidence.  It's

5  already in evidence from Sgt. Voth and that Jeffrey Paulsen

6  gave it to us as to how they developed the suspect's

7  location.  And then this information that -- how they

8  developed they used between the 11:00 o'clock hour to get a

9  cell site, and that site recommended to 29th and Fremont

10  Avenue.

11          Now, from that cell site information, all they can

12  determine is what direction this cell phone was pinging

13  from, and it could be a mile in that direction, two.  Them

14  coming up with this new T-Mobile emergency ping is the

15  direct contradiction.

16          And another reason why I put in to have this thing

17  dismissed is because they're changing (indicating) their

18  evidence, because if we use the same T-Mobile record that he

19  used to say that they got the suspect's location at 11:00,

20  it gives the defendant an airtight alibi and that we'll show

21  the Court right now with the same phone records.

22          THE COURT:  So what's the question that you're

23  asking this witness?

24

25  BY THE DEFENDANT:

1    Q.  Why is this the first time you are now bringing up this

2    emergency ping that everyone keeps referencing to?

3    A.  I never referenced an emergency ping.  It's not the

4    first time I brought this up.  I believe we talked about it

5    on direct.

6              Sgt. O'Rourke called me and told me that he had

7    the ping in the area of 29th and Girard.  That's what led me

8    to that area.  Subsequently, after I was already there, he

9    sent me at least one updated ping showing me that it was

10   still in the same area.  I had nothing to do with the ping

11   itself.  I did not write a ping order, did not do any of

12   that.  The only thing that I had was that he forwarded at

13   least one email that I can remember --

14   Q.  Same one he showed you, am I correct?

15   A.  I believe so, yeah.

16   Q.  Okay.  Now, impeaching evidence, in that same ping he

17   showed you did show that phone registered on 28th and

18   Girard?

19   A.  This is -- there is no 28th and Girard.

20   Q.  Oh, it didn't?  Could you please read Sgt. O'Rourke's

21   statement about what was the address that that phone was

22   pinged in, because he testified to it on the stand too.

23   A.  I don't see an address in Sgt. O'Rourke's report that

24   you gave me.

25              THE COURT:  Okay.  What's the supplement number?

1         THE WITNESS:  I have Supplement Number 33 from

2    Sgt. O'Rourke, and I don't see an address other than 1711

3    Plymouth.

4    BY THE DEFENDANT:

5    Q.  It's the sixth paragraph.

6    A.  2810 Girard.

7    Q.  I thought you said you didn't see the reference.  How

8    can you reference that that's the --

9    A.  You told me which paragraph to go to.

10   Q.  But you already knew it.

11   A.  And the paragraph is only three lines long.

12   Q.  But it was the first --

13        THE COURT:  All right.  Read the first line of the

14   paragraph.

15   A.  "At approximately 23:36 hours, I received information

16   that Andrews was in the area of 2810 Girard Avenue North."

17   Q.  Thank you.  That's the first lines in that paragraph.

18   As soon as I said the sixth paragraph, you told me 2810

19   Girard, but you were just telling the courts and me that you

20   didn't see it in there.  You're willing to just say anything

21   on the stand, is that correct?

22   A.  No.

23        THE COURT:  You don't have to answer that.

24        That's not a proper question and I told you that.

25        THE DEFENDANT:  That's the thing about it.  I

```
1    don't know this court shit.
2            THE COURT:  I understand.  I'm trying to help you
3    with that.
4            Here's the deal.  It seems to me that we've -- you
5    established the facts you want to establish.  Now we're just
6    arguing with the witness.  Is there anything else to ask
7    this officer that isn't already in the record?
8            And what I mean by that is, for example, you
9    wanted to establish that he said he was directed to the
10   location because he received that phone call from Officer
11   O'Rourke, who also sent him a ping, but that that reference
12   to a ping was nowhere in his report.  You wanted to
13   establish that.
14           THE DEFENDANT:  I wanted to establish that --
15           THE COURT:  That's been established.
16           THE DEFENDANT:  I wanted to establish it again.
17   BY THE DEFENDANT:
18   Q.  Yes or no, you were on the block of 29th of Girard?
19   A.  I was at 29th and Girard.
20   Q.  And you was -- that ping was referenced in the block
21   between 27th and 28th and Girard, am I correct?
22   A.  27th to 29th, yes.
23   Q.  Long narration.  In your report, that directed you to
24   29th and Girard, the area of 29th and Girard?
25   A.  Yes.
```

1    Q.  So that means that he never sent you a ping, because

2    that ping would have given you the 2810 address, am I

3    correct?

4    A.  No.

5    Q.  It wouldn't?  Could you please look at the email again?

6    A.  The ping would have given me 2810 Girard.  When he

7    initially called me, he did not tell me a specific address.

8    He told me the area of 29th of Girard, which is very nearby

9    to 2810 Girard.  So what the line in my report that you're

10   referencing, that is based on the phone call that I had with

11   Sgt. O'Rourke, who directed me to 29th and Girard.  It was

12   after that that I received the pings and the exact address.

13   Q.  You wrote your report after all this, am I correct?

14   A.  I did.

15   Q.  So in your report you could have easily put in there

16   that he gave you the direct ping and you went over to 28th

17   and Girard, am I correct, because that would have been

18   easier for the court -- would have been the correct answer

19   in this situation, that I got an email from Sgt. O'Rourke

20   and he sent me to 2810 Girard.  I sat out there, seen the

21   suspects get in the vehicle, I watched the vehicle pull off,

22   knew it was him and I stopped him.

23          Would that not have been way easier, would that

24   not, simple truth, if this was the truth that you want the

25   courts to believe about this ping?

1    A.  No.

2    Q.  It wouldn't?

3    A.  No.

4    Q.  It's not easy to see that I had a direct ping on 28th

5    and Girard?

6    A.  No.

7    Q.  So it's easier that you were sent to the area of 29th

8    and Girard and I rode around looking for the vehicle and I

9    couldn't find it, so I just decided to stay and conduct

10   surveillance?  So it's more convincing that I had a realtime

11   location on the address and I saw this address and waited

12   till the suspect came out, realtime address of this suspect,

13   did you not?

14   A.  At some point I did.

15   Q.  So in that ping that you say that you had at some point,

16   it shows that the suspect was a quarter way of the block

17   into the 28, 27 block, am I correct?

18   A.  The ping was centered around 2810.

19   Q.  So why did you look around the area of 29th and Girard?

20   A.  Because we're talking about a distance of 200 feet here.

21   I didn't think that I needed to be that specific to a

22   certain address that I didn't even know where the ping was

23   centered around.  I was told to go to the area of 29th and

24   Girard.  That's what I did.  That's what I wrote in my

25   report.  Everything was sequential.

1    Q.  If that's what happened, that's what you wrote.  So that

2    ping that you're talking about that was sent to you that you

3    knew about, that's fictitious, is it not?

4    A.  No.

5    Q.  Well, could you please show us somewhere where you told

6    someone or you wrote it down about this ping?

7    A.  No.

8    Q.  You can't, can you?

9    A.  No.

10   Q.  Because it doesn't exist, right?

11   A.  It exists.

12   Q.  I'm sure the paper exists now.  We have it in evidence.

13   It doesn't exist you telling someone or writing it down.

14   Who can you reference to the courts --

15          THE COURT:  Finish your question.

16   Q.  In the courts paperwork, can you point to the courts

17   that would support that you had this realtime location?

18   Because everything else just does not make sense.

19          THE COURT:  Objection?

20          MR. PAULSEN:  No, I'll just let him answer the

21   question.

22   A.  I'm operating under my recollection of this incident.  I

23   do not have a physical copy of the ping.  That wouldn't have

24   been my place.  In this call -- Sgt. O'Rourke was the case

25   agent on this case.  If he was relaying his information to

1   me, it would have been his responsibility to provide that

2   information for the case file, not mine.

3   Q.  Could you please read his report and tell us, does it

4   say it in any his report that you have up there, his

5   supplement?

6   A.  What do you want me to read?

7   Q.  Just scan through and tell me if you see anything,

8   T-Mobile, anything, realtime location, anything from

9   Sgt. O'Rourke.

10              MR. PAULSEN:  I think we went through that with

11  Mr. O'Rourke.  I think he conceded he didn't put that in

12  there.

13              THE COURT:  That is my recollection as well.  In

14  addition, the document will speak for itself.

15              We've been going for an hour and 45 minutes.

16  Mr. Willette, if not the rest of us, needs a break and so

17  we're going to take a brief recess.  But here's the deal.

18  Here's what I want you to do, Mr. Andrews:

19              I appreciate what you're doing.  I think you're

20  doing a good job, okay, particularly for somebody who's not

21  schooled in the law, but we're repeating things, okay?

22              THE DEFENDANT:  I want to make sure --

23              THE COURT:  You want to make sure that the Court

24  understands where you're going, make sure you have the

25  evidence in the record to make the arguments that you want

1    to make.  I am telling you that I do understand where you're

2    going.  I do believe you have the evidence firmly in the

3    record from which to make an argument.

4         Now, if there's something not already dealt with,

5    by all means you have the right to question him, but it's --

6    your cross-examination has gone probably three times longer

7    than the direct, which is fine, but we're repeating things.

8         THE DEFENDANT:  One or two more just quick

9    questions.

10        THE COURT:  If you're going two questions and then

11   he's done, I'll give them to you, but two questions turns

12   into --

13        THE DEFENDANT:  After two questions, if he doesn't

14   give me the right answers, I reserve after the break --

15        THE COURT:  Well, you ask your two questions and

16   we'll see where you are.  You got two.

17        THE DEFENDANT:  Okay.

18   BY THE DEFENDANT:

19   Q.  In this case, you was made aware of the situation and

20   how the evidence was developed.  I want to know was you

21   informed of how the suspect's identity was determined?

22        Wait.  Better question.  With that question, did

23   you get or see or know -- did you physically see that

24   somebody forwarded it to you, made aware in any form and

25   size how the suspect's name was brought up and given?

```
 1    A.   No.

 2              THE DEFENDANT:  No further questions.

 3              MR. PAULSEN:  No redirect, Your Honor.

 4              THE COURT:  Okay.  Officer, you are excused.

 5              THE WITNESS:  Thank you, Your Honor.

 6              THE COURT:  Leave the exhibits there.

 7              We're in recess until quarter to 2:00.  Thank you.

 8                        *     *     *     *

 9         (1:50 p.m.)

10                        IN OPEN COURT

11         (Defendant present)

12              THE COURT:  All right. We're back on the record in

13    the matter of the United States vs. Norris Deshon Andrews,

14    Criminal Number 18-149.

15              Mr. Andrews, before the Government calls its next

16    witness, I just want to let you know the Court has a hard

17    stop today that cannot be avoided at 3:30, okay?  It's my

18    hope that you'll be able to finish your questioning of the

19    next witness by then.  I think you should be able to do it.

20              Let me also extend a compliment to you.  With the

21    last witness when you were using the yes-no format, those

22    were some pretty good questions, but it also moves the

23    hearing along, so it's my hope you'll finish with this

24    witness.  We will find out.

25              All right.  Mr. Paulsen, if the Government wants
```

1    to call its next witness.

2            MR. PAULSEN:  Officer Andrew Schroeder.

3

4        **ANDREW W. SCHROEDER, GOVERNMENT'S WITNESS, SWORN**

5            THE COURT:  Please be seated.

6            State your full name for the record and spell your

7    last name.

8            THE WITNESS:  My name is Andrew William Schroeder.

9    My last name is S-C-H-R-O-E-D-E-R.

10                       **DIRECT EXAMINATION**

11   BY MR. PAULSEN:

12   Q.  And you work for the Minneapolis Police Department?

13   A.  I do, sir.

14   Q.  How long have you been an officer there?

15   A.  Roughly four years.

16   Q.  I want to take you back to May 15th of 2018.  Were you

17   on duty that day?

18   A.  I was, sir.

19   Q.  Uniform and everything?

20   A.  Yes, sir.

21   Q.  Did you get some information about a shooting that

22   occurred late afternoon?

23   A.  Yes, sir.

24   Q.  And were you eventually provided with the name of a

25   suspect?

1   A.  Yes, sir.

2   Q.  Which was what?

3   A.  Norris Andrews.

4   Q.  And did you do anything to familiarize yourself with the

5   appearance of Mr. Andrews?

6   A.  I looked at his photos.

7   Q.  Which photos now?

8   A.  I believe it was a booking photo, might have been a

9   driver's license photo, and I had also seen surveillance

10  photos of the shooting scene.

11  Q.  Okay.  So you'd seen some still images from the actual

12  shooting scene itself?

13  A.  Correct.

14  Q.  So now I want to jump ahead to late that night.  Did you

15  get a call from a fellow officer about going to a particular

16  location?

17  A.  Sergeant, yes, sir.

18  Q.  Sergeant who?

19  A.  O'Rourke.

20  Q.  Okay.  And what time did you get that call?

21  A.  Close to midnight.

22  Q.  And where did Sgt. O'Rourke tell you to go?

23  A.  To the area surrounding 28th and Girard Avenue North.

24  Q.  Just so we're clear on the times, your report says

25  23:50, or 11:50 p.m., does that sound right?

1    A.  Yes, sir.

2    Q.  And did you then go to 28th and Girard North?

3    A.  Yes, sir.

4    Q.  What happened when you got there?

5    A.  I drove around the area.  I looked for a suspect

6    vehicle.

7    Q.  Which at that time was what?

8    A.  A blue Tahoe, or something similar.

9    Q.  Did you find the blue Tahoe?

10   A.  No, sir.

11   Q.  Okay.  Then what did you do?

12   A.  I drove around the area, I bumped into Sgt. Pucely, who

13   was sitting in the area, and I told him my primary

14   responsibility is to take 911 calls, so I had to go take a

15   911 call and he said he was going to stay in the area, so I

16   said, you know, "Call me if you need anything."

17   Q.  All right.  Did you get a call from Sgt. Pucely a short

18   time later?

19   A.  I did.

20   Q.  And what was the call about?

21   A.  He said he wanted to stop a vehicle he believed was

22   related and potentially had the suspect inside.

23   Q.  What did you do in response to that request?

24   A.  Drove to the area he directed me to and eventually we

25   stopped a vehicle.

1    Q.  And did this turn out to be a white Yukon or something

2    like that?

3    A.  Yeah, Yukon or Suburban.  I'm not sure of the exact.

4    Q.  It would be reflected on the squad videos, though.

5    A.  Correct.

6    Q.  And what was your role during the stop?

7    A.  I was a backup cover officer to Sgt. Pucely.  I

8    positioned my squad next to his.

9    Q.  As the stop was being made, where was your attention

10   trained?

11   A.  To the driver's side of the vehicle.

12   Q.  And did you see anything that caught your attention as

13   the stop was being made?

14   A.  I did.

15   Q.  What did you see?

16   A.  I saw a person sitting in the back seat behind the

17   driver lean over out of my view.  The person would have been

18   leaning towards the I guess passenger side of the vehicle,

19   if that makes sense.

20   Q.  All right.  And how were you able to see this?  What was

21   your vantage point?

22   A.  Well, I was parked next to Sgt. Pucely kind of at an

23   angle.  I believe my tires might have even been up on the

24   curb, so I was looking kind of directly in the

25   (indicating) I guess it would be driver's side of the

1   vehicle.  I was looking in the rear two windows.

2   Q.  So if we were to envision the driver's side, we've got

3   the front door window and the backseat door window.

4   A.  Yes, sir.  So I was looking in the backseat passenger

5   window and then the window behind that, which would be the

6   window to like -- I guess you call it the trunk or the cargo

7   area.

8   Q.  And after you observed these movements, what did you do?

9   A.  Sgt. Pucely and I went up to the car.

10  Q.  What happened then?

11  A.  I believe it was Sgt. Pucely opened the door and I

12  immediately recognized Mr. Andrews.

13  Q.  And was there anybody else in the vehicle?

14  A.  Yes, sir.

15  Q.  How many people?

16  A.  Two.

17  Q.  Who was the driver?

18  A.  A female that I never learned her name.

19  Q.  What was her condition during the stop?

20  A.  Nervous, shaking, crying.

21  Q.  Any other person?

22  A.  The person in the front passenger seat was Montrel

23  Tyson.

24  Q.  Did you run him for any felony warrants?

25  A.  I had previously in the evening and I was aware that he

```
 1    had several.
 2    Q.  So Montrel Tyson, the front-seat passenger, had felony
 3    warrants?
 4    A.  Yes, sir.
 5    Q.  Are you aware that a gun was found, a handgun was found
 6    in the vehicle?
 7    A.  I was.
 8    Q.  And did you learn where it was found?
 9    A.  I did.
10    Q.  Where was that?
11    A.  Underneath the back seat on the passenger side of the
12    vehicle.
13    Q.  And where is that in location to where you saw this
14    person who was moving?  Where was that in relation to the
15    movement?
16    A.  Right where he -- right where I saw him lean to.
17    Q.  And this person that you saw moving turned out to be
18    whom?
19    A.  Mr. Andrews.
20    Q.  One last thing.  No, never mind.  That's all I have.
21    A.  Yes, sir.
22            THE COURT:  Thank you, Mr. Paulsen.
23            Mr. Andrews, your witness.
24
25                         CROSS-EXAMINATION
```

1    BY THE DEFENDANT:

2    Q.  I want to draw your attention to the beginning of your

3    story.  You said you made -- somehow had contact with

4    Sgt. O'Rourke, right?

5    A.  Correct.

6    Q.  Could you tell me in that conversation what was said or

7    how you was related some information?

8    A.  On the phone.

9    Q.  Over the phone?

10   A.  Yes, sir.

11   Q.  Did you get any realtime location, e-mails, texts,

12   anything?

13   A.  No, sir.

14   Q.  So you were just sent to the general area of what?

15   A.  28th and Girard.

16   Q.  You were sent to the general area of 28th and Girard to

17   do what?

18   A.  To look for a potential suspect.

19   Q.  So you were sent there to look for a suspect.

20   A.  Yes.

21   Q.  What did he tell you?  How did he get this information?

22   A.  I believe it was through a phone.

23   Q.  You believe it was through a phone, or was it?

24   A.  You would have to ask Sgt. O'Rourke.  That's what I

25   believe.

1    Q.  You believe it was through a phone.  And when did you

2    just believably get this new information that it was through

3    a phone?

4    A.  I'm sorry.  I don't understand your question.

5    Q.  When did you get the information that you believed that

6    it was through a phone?

7    A.  Around midnight.

8    Q.  Around midnight?  What did he say?

9    A.  I don't recall the specifics.

10   Q.  But you can recall specifically who was moving and where

11   the car was and specific suspects' names and stuff, but you

12   can't remember some specifics about how Sgt. O'Rourke would

13   tell you he got a suspect's location, because you are

14   obviously -- was an investigative officer that he trusted to

15   go to this situation, am I correct?

16   A.  You're going to have to repeat the question.

17   Q.  Did Sgt. O'Rourke put his faith and trust in you to go

18   handle this situation, to go look for this suspect?

19   A.  Yes.

20   Q.  So he sent you into this situation.  Did he equip you

21   with the correct knowledge and what information he developed

22   and how he got that information?

23   A.  Yes.

24   Q.  And could you please tell the courts what it was.

25   A.  It was he was tracking a phone he believed to be the

1   suspect's in the area of 28th and Girard.

2   Q.  So he didn't send you no email.

3   A.  Correct.

4   Q.  No text messages.

5   A.  I don't recall that.

6   Q.  Did he give you an address?

7   A.  No.

8   Q.  So he just said, "Just ride around and look for him."

9   A.  Basically.

10  Q.  But if there was a realtime location, that would give

11  you a direct location, would it not?

12  A.  I'm not familiar with how phone pings work, so I can't

13  answer that question.

14  Q.  But I'm saying with your knowledge, the knowledge that

15  you do have as an officer -- how long have you been on the

16  force?

17  A.  With Minneapolis, four years.

18  Q.  How?

19  A.  Four.

20  Q.  How long have you been on the force, period?

21  A.  Twelve, roughly.

22  Q.  And in your 12 years cell phones has evolved, huh?

23  A.  Yes, they have.

24  Q.  And you've been able to keep track of how the location

25  magnitude of this has been going on, like the developments

1    of new technology on how to get cell phone locations and

2    stuff, have you not, over time you've learned more and more

3    and more, right?

4    A.  Yes, I have.

5    Q.  And how far has our technology come?  What's the

6    furthest and closest you've heard in your 12 years that cell

7    phones have developed you tracking a location?

8    A.  So from my basic understanding of cell phone pings, if

9    that's what you're asking, depends on several different

10   things which I don't know.  Cell phone pings, I have seen

11   5,000 meters.  I have seen cell phone pings within two

12   meters.  I don't know the specifics of what Sgt. O'Rourke

13   got, but he sent me to the general area of 28th and Girard.

14   Q.  To do what?  What was his specific thing that you was to

15   go there for?

16   A.  To look for a suspect.

17   Q.  You was looking for a person or was you looking for a

18   vehicle?

19   A.  Both.

20   Q.  You were looking for both now.  So since you know it was

21   both, can you tell us what he said you was looking for?

22   A.  Well, I knew what he was looking for.

23   Q.  What was he looking for?

24   A.  Norris Andrews in a blue SUV, Tahoe or something

25   similar.

1    Q.  So you remember Norris Andrews, but you don't remember

2    the girl's name that was crying, like the girl that you said

3    was visibly shaken, traumatized?

4    A.  I never identified her.

5    Q.  And why is that?

6    A.  Wasn't my job at that situation.

7    Q.  Oh, it wasn't.  But you identified everybody else.

8    A.  No, I knew who everyone else was.

9    Q.  So if you knew who the other two suspects was and an

10   officer of your years and experience, wouldn't it have been

11   in your best interests to find out who this other person

12   was?

13   A.  No.

14   Q.  No?  So this person didn't matter.

15   A.  No, sir.  It just wasn't my job at the time.

16   Q.  So why was this person arrested?

17   A.  I don't know that they were.

18   Q.  Didn't you take the person out?  You said she was

19   visibly crying, right?

20   A.  Yes.

21   Q.  Didn't you pat this person down?

22   A.  Yes.

23   Q.  You didn't ask this person their name as you patted them

24   down?

25   A.  I don't believe I did.

1    Q.  You asked the sus -- you asked Norris Andrews his name,

2    though, didn't you?

3    A.  I did.

4    Q.  But you already knew his name, though, didn't you?

5    A.  True.

6    Q.  So why wouldn't you ask the person that you physically

7    took out of a police car their government name and figure

8    out who they are and what they have to do with this crime?

9    A.  It was another officer-on-scene's job, not mine.

10   Q.  Did you take this person out of the car?

11   A.  And placed them in another officer's car.

12   Q.  Was you at the driver's side door with your gun drawn?

13   A.  Likely.

14   Q.  So you was leaning on this driver, right, in the doorway

15   of this driver -- this car?

16   A.  I guess I'm not sure what "leaning on" means.

17   Q.  You was in the doorway.  If this person was to try to

18   step out of the car, you would have to move.

19   A.  The driver?

20   Q.  Yes.

21   A.  Correct.

22   Q.  So when you was in that doorway, you didn't think to get

23   this person -- because this was a traffic stop, was it not?

24   A.  Yes, sir, it was.

25   Q.  And you didn't think to ask this driver for a license

1  and registration?

2  A.  We don't ask people for registration and I'm sure that

3  someone did ask her her name and eventually she did get

4  identified.  Again --

5  Q.  Before you pulled this person out of a vehicle, is it

6  not police procedure to identify this person by license and

7  registration of the vehicle?

8  A.  No.

9  Q.  You don't ask the person for their license or ID?

10  A.  Sometimes.

11  Q.  And what would make these times different?  Because this

12  was a traffic stop you just said, correct?

13           MR. PAULSEN:  Your Honor, I think this is getting

14  irrelevant at this point, whether or not he ID'd the driver.

15           THE COURT:  Go ahead and answer that question.

16  A.  I'm sorry.  You're going to have to repeat the question,

17  sir.

18  Q.  When you stop a vehicle for a traffic violation, which

19  is what you was on, right?

20  A.  In this situation it's a little bit different, because

21  on a normal traffic stop the person does not come out of the

22  vehicle.  We ask them for all the information we need to

23  conduct our police procedures.  We return to our vehicle and

24  come back and the car leaves.

25           This situation was a little bit different, as

1    everyone in the car was coming out of the vehicle, so at

2    some point that everyone's out of the vehicle, everyone in

3    the vehicle would get ID'd.

4    Q.  And this person wasn't relevant enough for you to know

5    their name?

6    A.  Correct.

7    Q.  Okay.  Moving along.  I just wanted to ask you just to

8    see if we can get some honest, truthful answers out of you.

9    You seem pretty honest.

10   A.  Thank you.

11   Q.  You're welcome.

12              Like I said, on the 28th, you mentioned that --

13   you just testified that you stopped and spoke to Sgt. -- I

14   mean, Joel Pucely.

15   A.  Sgt. Pucely.  Yes, sir.

16   Q.  Yes.  Where was he parked when you spoke to him?

17   A.  29th and Girard.

18   Q.  29th and Girard.  You stopped and got out of the

19   vehicle.  Was you driving?

20   A.  I did not stop and get out of the vehicle.

21   Q.  So how did you speak to him when you got over there?

22   A.  I pulled up window to window.

23   Q.  And you was driving?

24   A.  Yes, sir.

25   Q.  So you was driving.  You pulled up to him and you spoke

1    to him.

2    A.  Yes, sir.

3    Q.  Why is that not in your report?

4    A.  It's not relevant.

5    Q.  How isn't it?  This was supposed to be a coordinated

6    takedown between you, him -- you -- I mean, it's

7    Sgt. Pucely.  Sgt. O'Rourke gave you all the information to

8    go over there and apprehend this suspect.  Wasn't

9    Sgt. Pucely by his hisself?

10   A.  Sgt. Pucely was by himself, that's correct.

11   Q.  So you left, or you decided to leave an officer --

12   A.  Sergeant.

13   Q.  -- with two known armed suspects from a shooting earlier

14   on location by hisself; is that what you're telling the

15   courts?

16   A.  Yes.

17   Q.  Wow.  In your 12 years, that's the training you got, to

18   leave an officer to take down two armed suspects by hisself?

19   A.  I don't know how to answer that.  I mean --

20   Q.  Yes or no, yes or no.  Is that the training you have?

21   If you're a trained officer, your supervisor was in here

22   right now and you had to answer a survey question, would the

23   correct answer be that if you were sent on a stakeout

24   takedown to get two suspects that's armed and dangerous from

25   this location, to leave one officer by hisself to take down

1    these suspects or try to apprehend them while you go off on

2    another call?

3    A.  So the problem is, I was sent to the area to check.  I

4    wasn't sent on a stakeout.  I wasn't sent -- I was sent to

5    look.  Once I saw Sgt. Pucely, he was looking, so I left the

6    area.

7    Q.  I thought you said that Sgt. O'Rourke told you that it

8    was information from a phone tracking that the suspect was

9    there.

10   A.  So like I explained to you earlier, my knowledge of

11   phone pings, some can say that the phone is within one or

12   two meters of an address.  In this situation I was sent to

13   an area.  For me, an area means just that, several blocks.

14   So while Sgt. Pucely took "area" to mean he was sitting

15   stationary at 29th and Girard, my area was much greater than

16   that.

17   Q.  But this suspect was on -- in the general area right

18   there because you had Sgt. O'Rourke tell you from phone

19   tracking location that the suspect was there, right?

20   A.  Incorrect.

21   Q.  He didn't tell you that the suspect was at that

22   location?

23   A.  He told me that a cell phone was there.

24   Q.  And who had the cell phone?

25   A.  Believed to be the suspect, but not proven, hence the

1    reason why I would leave an able sergeant by himself,

2    because we didn't know who was there.

3    Q.  So you would leave a sergeant with a phone that your

4    superior officer, a sergeant that's an investigator that

5    does the investigation for these type of things, that looked

6    up and somehow figured out that a suspect was at this

7    location.  Are you telling me that you left one officer with

8    two armed and dangerous suspects -- I'm going to ask you

9    this one time, then I'm going to move along.

10   A.  Yes, I left him there alone.

11   Q.  Okay.  Moving further, when you went to arrest the

12   suspect, when you got the suspect out of the vehicle, you

13   made a call for backup, did you not?

14   A.  Likely.

15   Q.  Likely or did you?  Did you call for extra cars?

16   A.  I believe we did.

17   Q.  No, I said did you.  Not we, you.

18   A.  I don't recall.

19   Q.  So you don't recall when y'all was taking a suspect out

20   of the vehicle if you needed extra assistance here?

21   A.  I don't recall.

22   Q.  You don't recall?

23   A.  It would be on somebody's camera.

24   Q.  Would you like it played for your recollection or would

25   you just like to take that we've heard and seen it in this

1    courtroom?

2    A.  I would take your word for it.  If I called for backup

3    and you saw it on video, I believe that.

4    Q.  Okay.  You called for backup.  That's firmly stated.

5    It's on the record.

6    A.  Okay.

7    Q.  Now, what would make you call for additional cars if

8    it's same the officer, the one officer you left behind and

9    the suspects here on location now?  Now that you're here to

10   help him, you and your partner, what would make you call for

11   backup?

12   A.  So the situation changed a little bit from having just a

13   cell phone pinging in the area to now we have two -- your

14   words -- potentially armed and dangerous suspects, so now

15   the situation has changed from more of surveillance to an

16   arrest.

17   Q.  So when Joe Pucely called you, what did he state?

18   A.  Something to the effect of:  "I just saw two guys get in

19   a vehicle on the block.  I'd like to stop this car."

20   Q.  You saw two guys get into a vehicle on what block?

21   A.  Girard.

22   Q.  Why would he just say "the block"?  Was this a known

23   drug block, a gang-infested block?  Is there something about

24   this block?

25   A.  I don't remember his exact words, but I remember that he

1    said he saw two people get into a vehicle, that he wanted to

2    stop the vehicle.

3    Q.  Are you familiar with the block of 28th and Girard?

4    A.  It's a double block.  Yes, I am.

5    Q.  Do you know people who live on that block?

6    A.  I can't say for sure.

7    Q.  You can't say for sure?

8    A.  Correct.

9    Q.  So you don't know no one's government name or alias or

10   things like that that live on that block.

11   A.  I know several people who frequent the block, but I

12   don't know for certain if they live there.

13   Q.  Okay.  So if you know that them people frequent that

14   block, why would you know this?  How would you know this if

15   you don't know if they live there, but you know that they

16   frequent that block?  What is that type of activity called?

17   A.  Whose activity?

18   Q.  The activity that you would have been monitoring to know

19   that these people that could live there or don't live there

20   that would be on that block?

21   A.  Oh.  It's called community policing.  It's when you --

22   police drive through the area, they speak to members of the

23   community on a professional level, say hello, that type of

24   thing, give stickers to kids.  So I get to know people on a

25   lot of blocks.  I don't know if they live there or if

1    they're hanging out or if they're visiting friends, but

2    that's my job.

3        (Discussion off the record between the defendant and

4    Mr. Aligada)

5        (Videotape played)

6        MR. PAULSEN:  Not to interrupt, but I don't think

7    we've seen this one before.

8        THE DEFENDANT:  Oh, this is one where he's going

9    to get the name of the people on the block.  He's going to

10   get the given government names and aliases of the people on

11   the block.

12       THE COURT:  Is this video admitted, anybody know?

13       MR. ALIGADA:  Yes.  This is Government's Exhibit

14   4, I believe.

15       MR. PAULSEN:  Oh, okay.  It's on the Government

16   exhibit.  All right, fine.

17       THE COURT:  This is part of Government's Exhibit

18   4.  I'll note for the record --

19       THE DEFENDANT:  Oh, no.  This ain't a Government

20   exhibit.  I introduced this.  The first time that this was

21   played in court was by me.

22       THE COURT:  Well, be that as it may, then it has

23   two exhibit numbers, because I do remember the Government

24   Exhibit 4.

25       THE DEFENDANT:  He put the one in from the

1    shooting.  This ain't the shooting.  This is the squad cam

2    video.

3              THE COURT:  Do you know, Mr. Aligada, the defense

4    exhibit number on this one?  Is this 10?

5              MR. ALIGADA:  Your Honor, I don't believe that we

6    have put into evidence the entire video.  Mr. Paulsen

7    referenced this.  This is a single disc or file that has

8    multiple squad car videos on it and I wasn't clear on

9    whether the Government introduced it or not, but we

10   certainly can produce a copy of it and introduce it.

11             THE COURT:  That's fine.  For the record, this is

12   a squad video showing.  It is following a -- the Denali.

13   It's a white Denali.

14             THE DEFENDANT:  This is Officer Andrew Schroeder's

15   squad video, part two.  He has two parts to his.  For some

16   reason he stopped his cameras and restarted them.

17             THE COURT:  Go ahead.  I'm just trying to keep the

18   record clear.

19        (Videotape played)

20             THE DEFENDANT:  Go a little bit further to the

21   end.  A little bit more.  Right here.  Stop.

22   BY THE DEFENDANT:

23   Q.  Now, I want to ask you again under oath on the stand,

24   did you know people, government names and who lived on that

25   block that y'all was out there surveillancing?

1    A.   Again, I know several people on that block.

2    Q.   That live there.

3    A.   That frequent there.  I don't know if they spend the

4    night there.

5    Q.   Okay.

6              THE DEFENDANT:  Start the video.

7    BY THE DEFENDANT:

8    Q.   This is Officer Schroeder talking in his squad car to

9    Joel Pucely on the phone.

10   A.   Schroeder.

11   Q.   Schroeder.

12   A.   Thank you.

13      (Videotape continues)

14              THE DEFENDANT:  Stop.

15   BY THE DEFENDANT:

16   Q.   That's one guy, the fat boy.  Who's the fat boy, the fat

17   boy's house?  He obviously lives there.  That's his house.

18   A.   There's several obese people that live on that block, if

19   that's what you're asking.

20   Q.   Does this fat boy have dreads?

21   A.   Negative.

22   Q.   Do any of these fat people have dreads?

23   A.   One person that I know frequents that block has very

24   short dreads.

25   Q.   So you know -- by you saying that that fat person

1    doesn't have dreads, you know who that fat person is you're

2    talking about, right?

3    A.  I do.

4    Q.  Who is it?

5    A.  His real name?

6    Q.  Yes.

7    A.  Dari Evans.

8    Q.  Dari Evans.  That's one person that you know that lives

9    on that block.

10   A.  Well, I know he frequents there.

11   Q.  You just said that's fat boy's house.

12   A.  It's a house he frequents.

13   Q.  You just said it's his house.  If it's his house, he

14   either lives there or doesn't he?  When you say it's someone

15   house, is it their residence or is it just a place they

16   frequent, because I need to -- the courts need to know this

17   for the record.

18   A.  Sure.  For the record, the north side community is very

19   unique in the fact that several times people will say that

20   it's their house when they don't actually reside there.

21   Several times people will say, "No, I don't live here,"

22   although they have clothes there, they spend the night

23   there.  So I don't know if it's actually his house.  It's

24   definitely not the address on Dari Evans' ID.

25   Q.  So why would you say it's fat boy's house?  "I bet that

1    was fat boy's house," as in like he owns it or it's a

2    possession of his.  You state it as it is a possession, like

3    nine-tenths of the law, like it was his, his house.  Why did

4    you say that?

5    A.  Those would be your interpretations of my words.  Like I

6    already answered, because he frequents the house.

7    Q.  Well, just a minute ago you said you didn't know no one

8    that lived there, they just frequent that area, but that

9    showed you knew someone and you knew his name.  So now we

10   notice that this officer was out there doing something else

11   and you knew about it.

12             THE DEFENDANT:  Could you please start the video

13   again.

14             MR. ALIGADA:  From the same spot?

15             THE DEFENDANT:  Yes, from the same spot.

16        (Videotape continues)

17             THE DEFENDANT:  Stop.

18   BY THE DEFENDANT:

19   Q.  That don't sound like "Gary."  That sounds like "Anthony

20   Kanz."  That's somebody else who lived there on that block.

21   How many people do you know whose houses are there, man?

22   You just said you didn't know nobody.

23   A.  I'm sorry.  I couldn't hear that and I have no clue what

24   you're talking about.

25   Q.  Oh, you want to hear it again?

1          THE DEFENDANT:  Take it back a couple seconds.

2     Thank you.  That's enough.

3          (Videotape played)

4          THE DEFENDANT:  Stop.

5     BY THE DEFENDANT:

6     Q.  You bet it's Anthony Kanz' house.

7     A.  Same house.

8     Q.  You just said -- in the video you said it was different.

9     You said it was fat boy's house, he described another house,

10    and then you said you bet it was Anthony Kanz' house.

11    You're giving out government names to people whose houses

12    that you know on this block.

13          So as I asked you before, is this a block that you

14    guys watched, the Gang Task Force would be watching because

15    you know people by their aliases and you call them fat boys,

16    because I'm pretty sure that's not his government name.  His

17    name is not Fat Boy, is it?  Is it?

18    A.  His government name is not Fat Boy.

19    Q.  Okay.  And Gary -- because I know who this is.  He's an

20    African-American, is he not?

21    A.  His name is not Gary.

22    Q.  What is it?

23    A.  Dari.  It starts with a "D."

24    Q.  I know he's a Pau.  He's goes by Giacomo.  But he's an

25    African-American, is he not?

1    A.  He is.

2    Q.  Isn't calling an African-American "boy" a racist slang

3    or term?

4         MR. PAULSEN:  Your Honor, I think we're getting a

5    little far afield here.  This has nothing to do with

6    probable cause for the arrest.

7         THE DEFENDANT:  No.  I'll move along.

8         THE COURT:  Sustained.  The objection is

9    sustained.  The question is not relevant to the issues here.

10   BY THE DEFENDANT:

11   Q.  Okay.  Well, the relevance of the matter is that you

12   knew that people was out there and you knew that this

13   sergeant was out there for a different purpose, and I think

14   that this video both ways shows that and your testimony and

15   the other officer's testimony shows that.

16        So would you like to please tell the Court the

17   truth now of what was going on that night and how you guys

18   came to be out there on that block or how that officer got

19   out there on that block?

20        THE COURT:  You can answer it again.

21   A.  We were directed to the area of 28th and Girard by

22   Sgt. O'Rourke to look for a possible suspect or suspects and

23   a vehicle that was involved in a shooting earlier in the

24   evening.  That is the only reason we were there.

25   Q.  Were you still in the area when Sgt. Pucely called you

1    to tell you to come help him make this traffic stop?

2    A.  Yes, sir.

3    Q.  Where were you at?

4    A.  I believe I had just cleared a call near 34th and Girard

5    or 35th and Girard maybe.

6    Q.  So when he gave you that call, that's when your video

7    camera started?

8    A.  I don't know when my video camera started.

9    Q.  You said you cleared a call.  After he called you and

10   told you that he seen some suspects or somebody he wanted

11   make to make a traffic stop on, at that point you would cut

12   your squad cam on because you guys is going to make a stop,

13   am I correct?

14   A.  You're incorrect.

15   Q.  So when would you cut your camera on?

16   A.  My camera turns on when my lights turned on, and I

17   assume that's when it turned on in this case.

18   Q.  Okay.

19             THE DEFENDANT:  Could you go to video two and just

20   start it from the beginning, but I'm going to need you to

21   stop it very, very quickly, because I want to catch the

22   street he's on as he makes this U-turn.  It's going to be

23   Lowry Avenue going east.

24      (Videotape played)

25             THE DEFENDANT:  Stop.

1    BY THE DEFENDANT:

2    Q.  That vehicle just made a U-turn.  You're on Lowry and

3    Emerson right now.

4    A.  Correct.

5    Q.  You said you was on 34th and Girard.  Girard would be

6    another three blocks ahead of where you're at and another

7    three blocks to the right.  Why were you heading in the

8    other direction?

9    A.  So if I could just explain the start of this video.

10   Q.  Please.  Please do.

11   A.  So when a squad video activates, I'm assuming it

12   activated 30 seconds prior from the start, which means when

13   I turn my lights on, the squad camera backs up 30 seconds.

14          So, when I got the call from Sgt. Pucely, I was

15   near 34th and Girard, several blocks away from this screen

16   photo, you're correct.  I got in the area, was on the phone

17   with Sgt. Pucely.  He was directing me on where he was.

18          At this point you see me make a U-turn and then

19   I'm assuming I go down and around the block and activate my

20   lights, which activates my audio, which backs up the video

21   30 seconds of what you're seeing now.

22   Q.  So that's the story you want the courts to believe after

23   you just said you was on 34th and Girard.

24   A.  I guess you could GPS my car if you really need to find

25   out --

1    Q.  We see where you're at.  Is not this Lowry and Emerson?

2    Yes or no.

3    A.  This is Lowry and Emerson, yes, sir.

4    Q.  And the way you was facing is east, is that not correct?

5    A.  Yes.  So if I was coming --

6    Q.  Is that not away from Girard, yes or no, the way you was

7    facing before you made this U-turn?  Is Girard the opposite

8    direction?

9    A.  Correct.

10   Q.  No, it's not.  It's straight ahead of you.

11              THE COURT:  Your question actually asked what he

12   was facing before he turned around.

13   Q.  Which way is you facing now?

14   A.  Right now I'm facing west.  Girard would be two blocks

15   in front of me.

16   Q.  So the way you was facing when this video started was

17   the opposite direction, am I correct?

18   A.  Correct.

19   Q.  And Lowry is what number block?

20   A.  32.

21   Q.  32nd.  So you're four blocks away from where you said

22   you would have been when you got this call, right?

23   A.  Correct.

24   Q.  How far is this location from 28th or 29th and Girard,

25   four blocks, correct?  Wouldn't it be a straight shot if you

1    turned around and came straight down the blocks.  You would

2    go straight from 34th to 29th and Girard?

3    A.  If you want me to answer the questions, you got to ask

4    one at a time, because I just can't keep it straight.  I'm

5    sorry.

6    Q.  Okay.  Sgt. Pucely was on 29th and Girard, correct?

7    A.  Correct.

8    Q.  So when you got the call that he determined it was some

9    suspects in this vehicle, because he testified that the

10   vehicle sat there for awhile while he called you, he would

11   have still been on 29th and Girard, is that correct?

12   A.  That's Sgt. Pucely.  That's not --

13   Q.  Okay.  Well, where did he start at?  Where did you know

14   him to last be at?

15   A.  I believe he followed the vehicle.  When he first talked

16   to me he was on Emerson approaching Lowry.

17   Q.  Where was he at when you said you seen him?

18   A.  Which time?

19   Q.  When you seen him on Girard.  You said you stopped and

20   talked to him, did you not?

21   A.  Yes, I did.  I think I've answered that a couple times,

22   29th and Girard.

23   Q.  So he was an 29th and Girard, and when he was on 29th

24   and Girard, he told you that he just seen some suspects

25   enter this vehicle, am I correct?

1    A.  Incorrect.

2    Q.  Oh, he didn't?  So you know precisely where he was at?

3    A.  No, I don't.  That's why I said you'd have to ask him

4    that.  I know where I was when he called me.

5    Q.  And where were you?

6    A.  For the third time, I think I said 34th and Girard,

7    roughly.

8    Q.  Okay, roughly, 34th and Girard.  But the two directions,

9    they would cross each other, they would come into each

10   other, would they not?

11   A.  I'm not sure what you're asking.

12   Q.  If you took Girard and went straight backwards, what

13   would be the numbers that you would be going to?  Would you

14   go down in numbers?

15   A.  You're going to have to clarify what "backwards" means.

16   Q.  Either way you was facing on Girard.  If you was going

17   up or whether you was going down Girard.  If you was going

18   up, you would be going towards 35th and Girard, correct?

19   A.  So northbound.

20   Q.  Northbound.  That would be that (indicating) way,

21   correct?

22   A.  Northbound the numbers get higher.  If you go

23   southbound, the numbers get smaller.

24   Q.  Correct.  So you need to go southbound, which is where

25   he would have been at with the suspects if he was trailing

1    them, right?

2    A.  No.

3    Q.  You wouldn't?  So he's higher in the numbers?

4    A.  When Sgt. Pucely called me, the car was no longer on

5    Girard.

6    Q.  So what did he tell you?  Where did he tell you he was

7    at?

8    A.  Again, he told me he was following the vehicle on 29th,

9    I believe, and the vehicle was turning onto Emerson Avenue

10   North, turning northbound.

11   Q.  Okay.  So if it was turning northbound on 29th and

12   Emerson and you're on 34th and Girard, that means you'd have

13   came down to Lowry or even just took Girard over and started

14   coming down Emerson, because where you're at Emerson is

15   still a two-way, am I correct?

16   A.  So if you're asking me about how I got there --

17   Q.  Yeah.  How did you get facing east past Emerson going

18   towards the Lowry Bridge?

19   A.  So from my recollection, from roughly 34, 3500 Girard, I

20   drove over one block east to Fremont.  I drove south on

21   Fremont to Lowry.  On Lowry I turned east.  I proceeded east

22   on Lowry till I realized I had passed Sgt. Pucely, thus

23   making a U-turn which is captured on my squad video.

24           Does that clarify everything for you?

25   Q.  When he first called you, it told you where he was at

1    and the suspect.  You just said he said the suspect turned

2    north on Emerson, did you not?

3    A.  Yes.

4    Q.  So why would you pass Emerson if you know that the

5    suspects are coming your way on Emerson, because surely you

6    just said Lowry is 32nd, so if 32nd is before 29th, why

7    would you cross Lowry going that way?

8    A.  I don't know.

9    Q.  Because you wasn't on that call.  You didn't know

10   nothing about it.  Let's just be real.  Let's just keep it

11   real for the courts.  Because you went past it.  You was not

12   there.

13              THE COURT:  You do need to ask one question.

14              THE DEFENDANT:  I just wish I would make them tell

15   the truth.

16              THE COURT:  Well, if your question is:  Isn't it

17   true you were never on the call --

18   BY THE DEFENDANT:

19   Q.  Yeah.  Isn't it true you was never on the call?

20   A.  What call?

21   Q.  This call to this location.  You cut your cameras on the

22   moment you got the call to this location.

23   A.  My cameras were on before we made a traffic stop.  I

24   wasn't on an assigned call.

25   Q.  Okay.

1          THE DEFENDANT:  Could you play this so we could

2     see how far his damn car goes with the cameras off.

3     Q.  Because the current time that it has on your dash cam

4     that your car has been recording is six minutes.  This video

5     started at six minutes.  Where is the other six minutes?

6     A.  So I think you're confused.  That's zero, zero -- that

7     would be like six minutes after midnight.

8     Q.  Oh, is it?

9     A.  I think so.

10    Q.  You think so.

11         THE DEFENDANT:  Okay.  Play it.

12        (Videotape played)

13    A.  Yes, that's six minutes after midnight.

14    Q.  That's Sgt. Pucely and the suspect that just turned that

15    corner, is that not?

16    A.  Yes.

17        (Videotape continues)

18         THE DEFENDANT:  Stop.

19    BY THE DEFENDANT:

20    Q.  Now, you want the courts to believe that that's where

21    you was going, he told you to meet him there?  Because you

22    surely would have seen them if you was on that call.  You

23    surely -- because you just passed each other.  Because as

24    you would have been making that U-turn and going past Lowry

25    and going past Emerson, that car would have been right there

1    to your right.  It would have passed you, surely.  You

2    wasn't on the call.  He called you on the fly once he

3    decided he wanted to just stop the vehicle and you cut your

4    cameras on and you helped him stop it.

5              THE COURT:  Do you understand the question?

6              THE WITNESS:  Not at all.  I'm sorry.

7    Q.  I'm going to move along, man.  The record shows -- the

8    camera footage shows you was not -- you was going down Lowry

9    the opposite direction when the footage started.  I'm going

10   to move along for time's sake, because I got other things we

11   need to get to.

12             Okay.  When you guys stopped the vehicle, right,

13   you stated that you seen what?

14   A.  Saw the vehicle stop.  I saw a person later identified

15   as Mr. Andrews sitting behind the driver lean over out of my

16   view, leaning towards the passenger side of the vehicle.

17   Q.  You seen him lean over.  When did you convey this to

18   other officers?

19   A.  I believe as we were walking up.

20   Q.  As you was walking up?

21   A.  I think so.

22   Q.  You think so.  So could you see the suspect's legs?

23   A.  No, sir.

24   Q.  You couldn't see them?

25   A.  No.

1           THE DEFENDANT:  Could you please go start the body

2     cam, part two, from the beginning in this video.

3         (Videotape played)

4           THE DEFENDANT:  That was it.  That was perfect.

5     Just stop it right there, right here.  Stop.

6     BY THE DEFENDANT:

7     Q.  In this video that's going to start, that's you standing

8     there, am I correct?

9     A.  I believe so, yes.

10    Q.  You said you can't see the suspect's legs.  Why are you

11    going to tell Sgt. O'Rourke -- I mean, Sgt. Pucely -- that

12    you seen the suspect kick a backpack?

13    A.  So you asked me --

14    Q.  Why are you going to say that?  You just testified that

15    you couldn't see the suspect's legs, right?

16    A.  You asked me when we stopped the vehicle.

17    Q.  I asked could you see the suspect's legs, period, and

18    you said no.

19    A.  Once the door was open on the vehicle.

20    Q.  So you want us to go back and look at the door being

21    open on the vehicle so you can see if you see his legs,

22    because we see his legs, or would you like to just tell the

23    Court the truth?

24          THE COURT:  That's argumentative.

25    Q.  Okay.

1              THE DEFENDANT:  Play the footage.

2          (Videotape continues)

3              THE DEFENDANT:  Stop.

4     BY THE DEFENDANT:

5     Q.  You said there's a backup he was trying to kick.  Why

6     didn't you tell officers that you seen him leaning over and

7     bending over?  Why would you say he was trying to kick a

8     backpack?

9     A.  I didn't say that.

10    Q.  You did just say that.

11    A.  I believe if you listen to it closely, like he was

12    trying to kick.

13    Q.  How would he like be trying to kick a backpack?  Can you

14    tell me like how you seen that through that door with that

15    tinted window?

16    A.  I believe I was referring to, once the door was open, I

17    could see Mr. Andrews' full body.  The backpack was right

18    next to Mr. Andrews' right foot, like --

19    Q.  So why is that not in your report?

20    A.  I didn't think it was relevant.

21    Q.  You didn't think it was relevant.  So if they'd have

22    found that gun in that backpack, it would have been relevant

23    then, huh?

24    A.  Correct.

25    Q.  Because that's what you seen, right?

1   A.  Correct.

2   Q.  So now you seen him just doing the Holy Ghost in there.

3   He kicked the backpack, then he bent over.  Which one did he

4   do?

5   A.  So like my report says, I saw Mr. Andrews lean over.  I

6   did not see him kick a backpack.

7           THE DEFENDANT:  Could you please start it over.

8   No, don't start it over, just a second before.  I want to

9   make sure I heard it correct.

10          (Videotape played)

11  BY THE DEFENDANT:

12  Q.  Now, you didn't say that backpack next to where he was

13  sitting he tried to kick?

14  A.  I believe I said like he was trying to kick.  Like, I

15  didn't see you do it, but that's what I thought was

16  happening.

17  Q.  So you're willing to just about say anything to get the

18  record developed that where that gun was at, it was the

19  suspect's, is that not correct?  Is that not safe to say?

20          THE COURT:  Go ahead and answer.

21  A.  That would be very incorrect.

22          THE DEFENDANT:  Okay.  Could you please skip ahead

23  to five minutes.  As a matter of fact, that's it.  Perfect.

24          (Videotape played)

25          THE DEFENDANT:  Stop.

1    BY THE DEFENDANT:

2    Q.  Who's "He's in trouble" that you just made reference to?

3    Who's "He's in trouble"?

4    A.  Are you asking about the person?

5    Q.  Yeah.  Who's "He's in trouble"?

6    A.  Mr. Andrews.

7    Q.  Why would Mr. Andrews be in trouble?

8    A.  Because Mr. Andrews had been identified in the back seat

9    as a suspect in a double shooting, where now we pulled him

10   over and Mr. Andrews was seen leaning into the area where a

11   gun was recovered.

12   Q.  But just four or five minutes ago on this video, you say

13   he kicked the backpack, so I'm confused.  Did he lean over

14   and kick the backpack or did kick the backpack and then lean

15   over and put the gun over there?  Which one?  Was he trying

16   to stash the gun in the backpack, or was he stashing it

17   under the seat, because it seems like you're saying two

18   different things here.  It's not matching.  Was he stashing

19   it in the backpack, because it's just obvious you were

20   trying to lead the officers to believe that it was in the

21   backpack.  That's what you -- that was going to be your

22   probable cause if the gun was found in the backpack, that

23   you see him leaning the backpack -- he was kicking a

24   backpack, right?

25            THE COURT:  What question do you want him to

1    answer?

2    Q.  I want you to answer yes or no.  If the gun was found in

3    the backpack, would you have said that that was your

4    probable cause for what you seem like you said, he leaned

5    over in the back seat which you put in your report?  That

6    wouldn't have been in the report.  It would have just been

7    he kicked the backpack, would it not?

8    A.  You're going to have to --

9    Q.  Okay.  Listen, had the gun been found in the backpack,

10   what would your report have said?  Would it have said that:

11   When I pressed the stop light, he leaned over -- would it

12   still have said that? -- and then left the backpack being

13   kicked out?

14   A.  My report would speak to the truth of what happened and

15   what I observed.

16   Q.  So you would have still not said he kicked the backpack.

17   You wouldn't have said he was kicking the backpack next to

18   him, he was trying to kick that backpack.  You would have

19   just said -- you still would have said that, right?  If the

20   gun was found in the backpack, you still would have said he

21   was seen bending over where the gun was at.

22   A.  Sir, you're just speaking way too fast for me to

23   understand multiple questions at a time.

24   Q.  Yes or no.  Your report -- had the gun been found in the

25   backpack, right?  Are you following me?

1    A.  Yes, sir.

2    Q.  Yes or no.  If the gun was found in that backpack, would

3    your report still only have stated what it states now?

4    A.  Yes, sir.

5    Q.  So you would have left out that he was trying to kick

6    the backpack.

7    A.  Yes, because I did not see Mr. Andrews kick a backpack.

8    Q.  So you didn't lead the officer to that car and insist

9    that he look in that backpack because he was trying to kick

10   it?

11   A.  I suggested he look in it based on the fact that it was,

12   again, at the right foot of Mr. Andrews when he was removed

13   from the car.  And if you watch my video, it was like he was

14   trying to kick it.  So maybe that meant to me at that time

15   that Mr. Andrews' foot was touching the backpack.

16   Q.  We're going to play the video for that part too, but can

17   you tell me how you seen him lean over?  You seen that

18   through the tinted windows?

19   A.  Yes, sir.

20            THE DEFENDANT:  Could you take it two seconds back

21   and then play it again.

22            You're going to ask Sgt. Pucely a question.

23     (Videotape played)

24            THE DEFENDANT:  Stop.

25   BY THE DEFENDANT:

1    Q.  Now, when you asked Sgt. Pucely did he see him moving

2    around, what did he state?

3    A.  No.

4    Q.  Why did he state no?

5    A.  I'm guessing because he didn't see anyone moving around.

6    Q.  Was he in front of him or back of him when you

7    approached the vehicle?

8    A.  I don't recall.  His car --

9    Q.  Was he in front of you or back of you when you

10   approached that door?

11   A.  I believe he was in front of me.

12   Q.  So he would have had a better view into this car than

13   you, because, one, he was behind the vehicle, and, two,

14   surely he approached the vehicle before you, so he would

15   have seen into this vehicle before you, would he not?

16   A.  Walking, yes.  But when I saw the movement from

17   Mr. Andrews, it was before I had exited the vehicle when I

18   was parked parallel to the -- not parallel, but at an angle

19   to the vehicle.  So where Sgt. Pucely was looking in the

20   rear window, the jet black tinted window, I was looking in

21   the side windows where there's less tint and could see the

22   shadow of a very large-build Mr. Andrews duck out of view.

23   Q.  So when a vehicle is made -- you own newer model

24   vehicles, don't you?

25   A.  (No response).

1    Q.  You own vehicles, don't you?  Do you own an SUV or

2    something?  Have you ever seen an SUV or owned one?

3    A.  I've seen an SUV.

4    Q.  Standard.  When they put the privacy tint on the back

5    windows, do they standardly make the tint different?

6    A.  I have no idea.

7    Q.  You have no idea.  So they just pick certain windows to

8    make darker than other ones when they make their standard

9    vehicles with the tint?

10   A.  I have no idea.

11   Q.  So you're telling me the side back window on this

12   vehicle, which is also a rear compartment to this vehicle

13   because it's the trunk space, would be darker than the rear

14   window itself?

15   A.  That's what I believe.

16   Q.  That's what you believe.  So you believe that you

17   looking from an angle and Sgt. O'Rourke looking straight

18   through this vehicle --

19   A.  Sgt. O'Rourke was not --

20   Q.  Not O'Rourke.  I meant to say Pucely, Sgt. Pucely of the

21   Gang Unit.  He wouldn't have seen into this vehicle better

22   than you or before you?

23   A.  Obviously not, because I asked him and he said he didn't

24   see it.

25   Q.  So why was you so shocked?  You expected him to say,

1    "Yeah" and go along with you, did you not?

2    A.  No, I didn't.

3            THE DEFENDANT:  Could you please just play it

4    again, because it sounded shocked to me.  If I asked

5    somebody a question and I don't get the right answer, and I

6    say, "What?  What?"

7        (Videotape played)

8    Q.  What did you say, "What" for?

9    A.  I'm not sure.

10   Q.  You were shocked, huh?

11   A.  I don't think so.

12   Q.  It's pretty clear what's going on here, man.  I just

13   have one question, man:  Why?  Why did you choose to tell

14   these stories to make up your probable cause?

15           MR. PAULSEN:  I'm going to object as

16   argumentative, Your Honor, assumes facts not in evidence.

17           THE COURT:  Sustained.

18   Q.  Well, how else can I ask it?  Why did you choose to make

19   Mr. Andrews the target of your accusation about where this

20   gun was found?

21   A.  I guess I'm not clear what the accusation is.

22   Q.  Was Mr. Andrews sitting where that gun was found?

23   A.  Yes.

24   Q.  He was sitting where that gun was at.

25   A.  Yes.

1    Q.  So he wasn't pulled out the driver's side behind the

2    driver's seat.

3    A.  He was.

4    Q.  And that gun was pulled out from under the seat on the

5    passenger side, is that correct?

6    A.  Within reach of Mr. Andrews.

7    Q.  I didn't ask you within reach.  I asked you was he

8    sitting there.

9    A.  And my answer to that will be yes.

10   Q.  Yes, he was sitting in the seat where the gun was at.

11   A.  The back seat, yes.

12   Q.  So you're under oath and you're just going to continue

13   to sit here and lie to the courts.

14             MR. PAULSEN:  Argumentative.

15             THE COURT:  Sustained.  You can't ask that

16   question.

17             THE DEFENDANT:  Well, I'd like the record to

18   reflect that the officer has once again impeached himself.

19   The defendant got out the back seat behind the driver.

20             Could you please run that footage?  Play the first

21   one, the first body cam.

22      (Videotape played)

23             THE DEFENDANT:  Could you stop it.

24

25   BY THE DEFENDANT:

1    Q.  Officer Schroeder, could you please tell the courts what

2    you see on the video now.

3    A.  The suspect vehicle.

4    Q.  The suspect's vehicle?

5    A.  The vehicle the suspect was in.

6    Q.  Okay.  Which is what?

7    A.  A white Suburban Denali, whatever it is.  I don't know.

8    Q.  And what is this scene picturing?

9    A.  The suspect's vehicle.

10   Q.  What's going on in this scene?

11   A.  Well, this is Sgt. Pucely's body cam, so it would be

12   Sgt. Pucely walking up to the car.

13   Q.  And where are you at in relation to Sgt. Pucely?

14   A.  I would be from this screen to the left.

15   Q.  And they're going to approach this vehicle, am I

16   correct?  You and Sgt. Pucely and the officer that's off to

17   the right in this screen is going to approach this vehicle,

18   am I correct?

19   A.  Correct.

20            THE DEFENDANT:  Could you please play it.

21        (Videotape played)

22            THE DEFENDANT:  All right.

23   BY THE DEFENDANT:

24   Q.  Could you please tell us, what's the video showing now?

25   A.  Well, just prior to the video stopping you could see

1    kind of the silhouette of the headrest and Mr. Andrews'

2    large build.  It's the same view that I had from the side

3    window and this back window of Mr. Andrews leaning down out

4    of my view, looking at it from that same angle.

5            What this still picture is showing right now is

6    the back door prior to Sgt. Pucely opening the door and

7    arresting Mr. Andrews.

8    Q.  Can you see something through that window?

9    A.  Right now?

10   Q.  Yeah.

11   A.  I believe so.

12   Q.  What do you see?

13   A.  I believe this is a silhouette.  My screen's a little

14   blurry.

15   Q.  You see a silhouette of what?

16   A.  A body.

17   Q.  A body.  Is that body moving?

18   A.  The video is stopped, so no, it's not.

19           THE DEFENDANT:  Could you take it back a couple

20   seconds, approximately.

21      (Videotape played)

22           THE DEFENDANT:  Stop.

23   Q.  Can you see that silhouette still?

24   A.  I can't see it on the video.

25   Q.  Can you see a white thing on that door?  Can you see

1      something touching that door?

2      A.  Yes.

3      Q.  Is it moving?  When this video starts to play, can you

4      tell me if that thing moves from that door.

5              THE DEFENDANT:  Play it.

6          (Videotape continues)

7              THE DEFENDANT:  Stop.

8      Q.  Did that thing move?

9      A.  Not in the two seconds from the last time you stopped

10     the video.

11     Q.  So can you please tell us why did you tell the sergeant

12     that, oh, he was doing so much movement that -- what was all

13     this movement?  Because we just watched multiple seconds of

14     that silhouette stuck to that door, and now that the door's

15     open, can you please tell us what that white thing was that

16     was touching the door?

17     A.  The white thing I believe would be the hood, or the

18     collar.

19     Q.  The collar to the hood.  So that means this person was

20     up against the door, right?

21     A.  At the time that we walked up to the vehicle, the hood

22     was up against the door.

23     Q.  So if this person was doing all this movement and leaned

24     out of view, that hood would have left that door, is it

25     correct?

1    A.  You're absolutely correct and it did leave the door

2    prior to us walking up to the vehicle.

3    Q.  Okay.  Anyway.  Now, this is the picture of the door

4    being opened, am I correct?

5    A.  Correct.

6    Q.  You can visibly see the suspect's legs, can't you?

7    A.  Yes.

8    Q.  Could you please tell us where the suspect is seen

9    trying to kick a backpack.

10   A.  I never saw the suspect kick a backpack.

11   Q.  Well, could you please show us the suspect trying to

12   kick the backpack.  This is a perfect picture of the

13   suspect's legs and his body.  Could you show the suspect

14   leaning and trying to kick a backpack, please.

15   A.  In this still photo from Sgt. Pucely's body camera?

16   Q.  Yes.

17   A.  I don't know that you could see it.  This also isn't my

18   body camera, and I don't --

19   Q.  Was your body camera activated, by the way?

20   A.  At this point, it was not.

21   Q.  It wasn't.  That's illegal, is it not, to not have your

22   body cam on when you're arresting or taking into custody an

23   armed and dangerous suspect?  Ain't it illegal to have your

24   body cam off?

25   A.  I think that is incorrect.

1    Q.  So why did you make reference to that's Sgt. Pucely's

2    body cam as if your body cam's going to see something

3    different?

4    A.  It could had my body camera been on.

5    Q.  So why is Sgt. Pucely's body cam on and yours not?

6    A.  I -- so a body camera is manually activated.

7    Q.  Right.

8    A.  I believe I manually activated it.  Clearly I did not.

9    Once I realized that, I activated it.

10   Q.  So your body cam was supposed to be on.  When you go out

11   to a call, the body-worn cams that's now standard issue for

12   all Minneapolis police officers that's actively out in the

13   field, do not they supposed to be activated?

14   A.  Per our police department policy, they are supposed to

15   be activated.

16   Q.  So you are in direct violation of your police policy

17   right now by having your body cam off that you just made

18   reference to, am I correct?

19   A.  You are not correct.

20   Q.  How not?  You just said it's policy that it's supposed

21   to be on.

22   A.  It is, and our MPD policy, if you look at it, equates

23   for human error.

24   Q.  It equates for human error, but it's supposed to be on

25   minus the human error, so you just decided not to cut it on.

1     A.   Incorrect.

2     Q.   So why is it not on?  Was it broken?

3     A.   Like I explained to you --

4     Q.   Was it broken?

5     A.   No.

6     Q.   So it was functioning.

7     A.   Correct.

8     Q.   It could have been cut on.

9     A.   It could have been turned on had I done it correctly.

10    Q.   Okay.  Now, why did you just make reference that on

11    Sgt. Pucely's body cam it's not seen?

12    A.   I have no idea.  I've never watched this video before.

13    Q.   No, you just said on his body cam it's not seen like on

14    your body cam it would have been seen.  Once again, you're

15    just willing to say anything, are you not?

16              THE COURT:  You don't have to answer it.

17              You can't ask that question.  It's an

18    argumentative question.

19              THE DEFENDANT:  Well, anyway, could you please

20    finish playing the footage so we can see if we can see it on

21    anybody's cam this suspect trying to kick a backpack.

22         (Videotape played)

23              THE DEFENDANT:  Stop.

24

25    BY THE DEFENDANT:

1    Q.  Could you please show us any movement that would have

2    gave an indication that that individual that you could have

3    seen in that tight little space right there -- because you

4    see into the car, right?  Could you please look at the

5    camera.  Can you see into the car?

6    A.  This camera, you can see into the car, yes, you can.

7    Q.  And how far is the space, you would say, from the front

8    seat to the seat that the passenger was sitting in in the

9    back?

10   A.  A foot?

11   Q.  A foot.  Not a lot of room for you to see into if

12   someone's sitting, there, huh, a larger male, huh?

13   A.  Well, as you can see from where Sgt. Pucely's body

14   camera was, I was standing -- you can't see me in the video.

15   Q.  You're behind him.

16   A.  Or on the side of him.

17   Q.  You want to get the video?  You want to put up the dash

18   cam, or would you like to take our word that you're behind

19   him?

20   A.  Okay.

21   Q.  So how did you see it from behind him, or would you like

22   us --

23   A.  See what?

24   Q.  -- to play the video?  How did you see through

25   Sgt. Pucely if he's in front of you when this door opened

1    the suspect kicking the backpack?

2    A.  I never saw a suspect kick a backpack --

3    Q.  Well, you saw --

4            THE COURT:  Hold on, hold on.  Finish your answer.

5    A.  I never saw a suspect kick a backpack.  That's why it's

6    not in my report, because I didn't see that.

7    Q.  So why did you tell the sergeant that the suspect was

8    trying to kick the backpack?

9    A.  I believe, again, I said it was like he was trying to

10   kick it, which I think what that means in my mind is it was

11   right next to his foot.

12   Q.  So if I'm sitting stationary and the backpack is just

13   sitting stationary next to me and I don't make no movement

14   towards this backpack, I'm just sitting here, that means I'm

15   trying to kick that backpack?

16   A.  If you make no movement, I would say no.

17   Q.  So by you saying that this suspect was trying to kick

18   that backpack, it had to be movement, correct?

19   A.  Correct.

20   Q.  And what movement was it that led you to tell this

21   officer that he tried to kick that backpack?

22   A.  Like I explained, when we first pulled up I saw

23   Mr. Andrews lean completely over.  I saw a lot of movement.

24   I couldn't see legs at that time.  Once the door was open I

25   could see a backpack with Mr. Andrews' legs right next to

1   it.

2   Q.  So the way that he leaned over, that you said he bent

3   over his body, which you said his whole upper body leaned to

4   the right, am I correct?

5   A.  Correct.

6   Q.  So he leaned into the -- how did he kick the backpack

7   leaning over?  That's his arms, wouldn't it be?  Wouldn't

8   that be his arms where the backpack's at now?

9   A.  So again, I never saw anyone kick a backpack.  I'll just

10  say it again so we don't have to -- I never saw anyone kick

11  a backpack.

12  Q.  So please tell the courts why did you tell that officer

13  that?

14          MR. PAULSEN:  Your Honor, I think we've beaten

15  this to death.  We've been on it for about --

16          THE DEFENDANT:  He's not answering the question.

17          THE COURT:  No, he answered it.  It's asked and

18  answered.

19          THE DEFENDANT:  I still ain't satisfied with the

20  answer.

21          THE COURT:  I understand that.

22          THE DEFENDANT:  I'm not satisfied with the answer

23  and the Court shouldn't be.  That's not a good enough

24  answer.  He said -- he's clearly on the video saying he

25  kicked the backpack.

1              THE COURT:  Here's the deal, okay?  I'll let you

2      ask it one more time.  You've asked it about five.  He's

3      answered it however many times you've asked it.  I

4      understand you're not satisfied with the answer.  I

5      understand what your question is and his answer is.

6              Reask the question and answer it one more time.

7              THE WITNESS:  Yes, Your Honor.

8      BY THE DEFENDANT:

9      Q.  Okay.  The question is:  When you put your spot cam on,

10     what movement did you see?

11     A.  I saw Mr. Andrews disappear out of my view, appeared to

12     be leaning towards the right of the vehicle passenger side.

13     Q.  Would that gave you a notion that he kicked the

14     backpack?  Would that movement, him leaning to the side, as

15     you would say, roughly where this gun was at, would that

16     gave you the notion that someone kicked the backpack?

17     A.  No.

18     Q.  Okay.  When this door was open, could you please tell

19     the courts what would give you the notion there that he

20     kicked the backpack.

21     A.  I did not see anyone kick a backpack.  The notion like

22     he was trying to kick a backpack I said because the backpack

23     was very close to Mr. Andrews' right foot.

24     Q.  Okay.  Since the backpack was very close to Mr. Andrews'

25     right foot, that's what you said.  Now, if the gun would

1     have been found in his backpack that had what in it?  What

2     was in the backpack?

3                 MR. PAULSEN:  Your Honor, I think we're -- you

4     gave him a little leeway.  I think we exhausted the leeway.

5                 THE DEFENDANT:  I asked him what was in the

6     backpack.

7                 THE COURT:  That's a different question.  I don't

8     know that it's relevant, but answer it.

9     A.  I have no idea.

10                THE DEFENDANT:  All right.  Play the second one,

11    the second video, please -- yeah, the body cam, so he can go

12    in the backpack.  I want to show the -- this is going to

13    show the relevance of where the backpack was and what's in

14    the backpack, what was found in there.

15                Skip forward.

16      (Videotape played)

17                THE DEFENDANT:  Stop.

18    BY THE DEFENDANT:

19    Q.  Could you tell us what you see and the sergeant's going

20    to touch in his backpack?

21    A.  I have no idea and I'm not going to testify to anything

22    the sergeant did.

23    Q.  So what do you see him doing -- what's in the backpack?

24    A.  I have no idea.

25                THE DEFENDANT:  Play it.

1          (Videotape played)

2               THE DEFENDANT:  Stop.

3     BY THE DEFENDANT:

4     Q.  Could you tell us what the sergeant just pulled out the

5     backpack and threw in?

6     A.  It looked like a purse or something.

7     Q.  A female's purse, huh?

8     A.  Purses are not gender-specific.

9     Q.  Could you tell us what color the purse was.

10    A.  Pink.

11    Q.  Did it have any identifiable marks on it?  What did it

12    look like?

13    A.  A pink glittery purse.

14    Q.  Is that something like a male purse or a female purse?

15    A.  Again, in today's age, I will not gender-specify an item

16    of color.

17    Q.  But you was willing to call somebody a fat boy, wasn't

18    you?

19    A.  Yes, I was.

20    Q.  But you don't want to gender name a purse to an

21    individuals sex, but you will call somebody a fat boy?

22               THE COURT:  Go ahead.

23    A.  Again, yes, I said that clearly.  It's on the video.

24    Q.  And you don't think nothing's wrong with that.

25    A.  Well, it's actually -- his nickname, he goes by it, you

1    can check out his Facebook page.  He goes by Fat Boy.

2    Q.  So you've been on his Facebook page more to show that

3    you knew he lived on that block and more about him.  You've

4    been on his Facebook page, you know his alias, and he goes

5    by Fat Boy.  I thought he went by Check.  Ain't that his

6    nickname, Check, Giacomo?  He's a Pau?

7    A.  He's not a Pau.  His last name is Evans.

8    Q.  You know he's a Pau.  But it's okay.

9    A.  Okay.

10   Q.  That's here nor there.

11          THE DEFENDANT:  Could you please finish playing

12   the video.

13     (Videotape continues)

14          THE DEFENDANT:  Stop.

15   BY THE DEFENDANT:

16   Q.  What are you seeing now in the bag?

17   A.  I don't know what that is.  Hair product or some type of

18   bottle.

19   Q.  More feminine shit, right?

20   A.  Again --

21   Q.  Is this something that would be in a backpack that you

22   would have as a male?  Would it be some hair products and a

23   pink purse?

24   A.  I can't answer that.

25   Q.  You can't answer that.  Hmm.  Look on the passenger seat

1    across from there, right?  What do you see there?

2    A.  Looks like an open bag with something pink.

3    Q.  Something pink again, another feminine type of item,

4    correct?

5    A.  Your words, not mine.

6    Q.  But it's pink.  Do you wear pink?

7    A.  Yes.

8    Q.  Oh, okay.  Feminine male.  Good to know.

9              THE DEFENDANT:  You can finish playing it.  Finish

10   playing it.

11      (Videotape continues)

12              THE DEFENDANT:  Stop.

13   Q.  Did the sergeant just not reach across that seat and

14   actually flash a light by that seat and under that seat too?

15   A.  I'm sorry.  You're asking me a bunch of questions to

16   testify what a sergeant did.

17   Q.  Do you need us to replay it?

18   A.  No, because I'm not testifying to what a sergeant --

19   Q.  I'm going to ask you what did you see.  Did you see the

20   sergeant reach across to that other seat?  Did you see a

21   light flash under that seat?

22              MR. PAULSEN:  Your Honor, the video speaks for

23   itself.  I think the officer doesn't need to characterize

24   somebody else's video.

25              THE COURT:  Sustained.

1    Q.  Okay.  Well, where was the gun located?

2    A.  I later learned the gun was located under the back seat.

3    Q.  Which seat?

4    A.  Well, it's a bench seat, but on what side would be

5    roughly behind the front passenger seat.

6    Q.  Man, you just can't tell the truth for nothing, can you?

7              Could you please point in this video where a bench

8    seat's at?  Please.  Please show us in this video a bench

9    seat.

10             THE DEFENDANT:  Take it back a little bit.

11   Q.  Please show us the bench --

12   A.  So let me just clarify here.

13   Q.  Please.

14             THE COURT:  Hold on.  Go ahead.

15   A.  I never searched the vehicle.  I never went into the

16   vehicle.  I assisted in removing Mr. Andrews from the

17   vehicle.  I assisted in removing the driver from the

18   vehicle.  I later learned a gun was located in the vehicle.

19   And as you already saw in the video, from outside the

20   vehicle I looked underneath to what I thought was a bench

21   seat.  Maybe it's not, but the gun was underneath the seat

22   behind the front passenger seat.

23             THE DEFENDANT:  Take it back a little bit.  Play

24   it.

25        (Videotape played)

1              THE DEFENDANT:  Stop.

2      BY THE DEFENDANT:

3      Q.  What type of seat does that look like?

4      A.  It looks like a bucket seat.

5      Q.  So there's a space in between, am I correct?

6      A.  Correct.

7      Q.  Did the sergeant not just look under the bucket seat

8      that his hand's on now?

9      A.  I believe he did.

10     Q.  Is that not the same seat that you just took the

11     defendant out of?

12     A.  Yes.

13     Q.  So why would you testify to the courts that the gun was

14     under his seat?

15     A.  I didn't.

16     Q.  You did.

17     A.  I said it was under his seat because I believed it to be

18     a bucket -- or a bench seat.

19     Q.  But you put in your report the same thing.  You just --

20              THE DEFENDANT:  Anyway, man, I'm done with this

21     witness, man.  This shit's just getting ridiculous, man.

22              THE COURT:  Any further questions, Mr. Andrews, or

23     are you done?

24              THE DEFENDANT:  Man, I'm --

25              THE COURT:  I understand your points.

```
1              THE DEFENDANT:  I'm done with him.  I'm done with

2     him, man.  He's --

3              THE COURT:  All right.  Very well.

4              Mr. Paulsen?

5              MR. PAULSEN:  No redirect, Your Honor.

6              THE COURT:  Officer, you may step down.  Thank

7     you.

8              THE WITNESS:  Thank you very much, sir.

9              THE COURT:  All right.  Mr. Paulsen.

10             MR. PAULSEN:  Yes.  I'd like to offer a couple of

11    documents in rebuttal to some --

12             THE DEFENDANT:  Is this allowed?

13             THE COURT:  We'll find out.

14             What are you going to offer?

15             THE DEFENDANT:  I thought he had to offer people

16    for rebuttal.

17             MR. PAULSEN:  So there was an issue raised by

18    Mr. Andrews with Sgt. O'Rourke about whether the original

19    shooting happened at 23rd and Fremont, or I think it maybe

20    was 25th and Girard, and he tried to impeach him with

21    someone else's statement.

22             This is the incident detail report from that

23    night, the computer-generated summary of the call, and I'd

24    offer it because it shows that the location of the shooting,

25    according to this, is 23rd and Fremont Avenue North.  That
```

1    would be Government Exhibit 10.  Offer 10.

2              THE COURT:  Any objection?

3              THE DEFENDANT:  Hell, yeah.  I got a rebuttal to

4    that.  I got the public document record of that.  Hell,

5    yeah.  And this one says 25th and Girard.

6              THE COURT:  Okay, but is there an objection to

7    this document?

8              THE DEFENDANT:  I object to his, yes, because his

9    is false.  I object on the grounds that, one, it's an

10   officer who was actually on the scene.  He put it in his

11   report and it's up there, and then I'm going to give you the

12   public record of it that we got from public records, the

13   real documents.

14             THE COURT:  Government Exhibit Number 10 will be

15   received.  You can put into evidence whatever document

16   you're referring to.

17             MR. PAULSEN:  Okay.  And I will note that this

18   document also references 25th and Girard.  That's where some

19   casings were recovered.

20             THE DEFENDANT:  If I may ask, could you please

21   just have him read that document into the record, please.

22             THE COURT:  I'll read the document.  Trust me on

23   that, okay?

24             THE DEFENDANT:  Because this is just -- this is

25   outrageous, man.

1          THE COURT:  No, he's merely establishing the

2    relevance for the admission of the document.

3          MR. PAULSEN:  And then the other issue that was

4    raised with Sgt. O'Rourke was kind of two issues.  One was

5    this blue Tahoe.  What was your basis for --

6          THE DEFENDANT:  I object to this on the grounds

7    that he got -- he got to start making this -- he got the

8    chance to start making this stuff up like he informed all

9    them officers to say that about that ping.  He went and

10   picked up this little made-up information again that he's

11   going to try to enter.  Because if we'd have finished our

12   hearing that day like we were supposed to, he wouldn't have

13   had a chance to offer this into evidence.

14          So I object on the grounds that it's just unfair

15   to the defendant, period, all around.  Their testimony was

16   unfair, even though they was still impeaching, call them

17   lies, and the documents he's using now, I feel like they're

18   unfair, because, one, he didn't offer them in a timely

19   manner and this would have been exculpatory evidence,

20   because I could challenge it and get it suppressed, and now

21   the Court's going to have to waste time on a whole nother

22   hearing and matter with these simple issues when he could

23   have simply followed the law, and he knows the law.  Under

24   Discovery Rule 16, he was supposed to give me all of that.

25          THE COURT:  Your objection is noted.

1          Mr. Paulsen, please finish your --

2          MR. PAULSEN:  So in the search warrant application

3     for that blue Tahoe, Officer O'Rourke wrote that:

4          "I learned that Andrews' child's mother, Shenita

5     Esaw, is the owner of a 2002 blue Tahoe with a 21-day

6     temporary sticker according to" --

7          THE DEFENDANT:  Objection.

8          THE COURT:  Hold on.  Let him finish, please.

9          THE DEFENDANT:  I thought you wasn't going to let

10    this be read in.

11         THE COURT:  Just let him finish.  I have to hear

12    the context for this.

13         MR. PAULSEN:  -- "according to Minneapolis Police

14    Report No. 18-045880."

15         The accuracy of that statement was challenged by

16    Mr. Andrews even though he hadn't followed the rules for a

17    *Franks* hearing.  And so to rebut his arguments that that's

18    an incorrect statement, we went and got that police

19    report --

20         THE DEFENDANT:  The only reason --

21         MR. PAULSEN:  -- the same one that is referenced

22    in the search warrant, 18-045880, and I offer that as

23    Exhibit 11 to rebut his --

24         THE DEFENDANT:  Objection.

25         MR. PAULSEN:  -- accusation that there was a false

1       statement in the search warrant application.

2               THE COURT:  Okay.  What is your objection,

3       Mr. Andrews?

4               THE DEFENDANT:  Once again, he didn't have this

5       stuff, it wasn't offered in the beginning.  Once again, this

6       is -- on the discovery, the only reason we wasn't able to

7       make a **Franks** motion about it is because he never turned

8       over the search warrant itself.  They never told us -- they

9       never gave us the pictures to the truck till September 7th.

10      The hearing was on the 10th.  That's the first time we heard

11      about the search warrant.  We had to take a break, a

12      continuance so we can file motions, and I believe we did get

13      in a motion until we heard the search warrant itself.  Then

14      it was another motion that I'm putting in today to challenge

15      the motion itself under the grounds that they searched the

16      wrong damn vehicle.  It's the wrong car, it wasn't in the

17      correct name, he lied in the search warrant, and it was all

18      bogus.  So that shouldn't be entered into evidence, period.

19      He shouldn't be allowed to put it in.  It was in an untimely

20      manner.  He didn't have it, it wasn't readily available, and

21      it's breaking all type of rules of the Court.

22              THE COURT:  All right.  The objection is noted,

23      the issue is preserved, the objection is overruled, and the

24      document will be received.  That's Government Exhibit 11.

25              MR. PAULSEN:  And I should not that it's attached

1      to the email chain that Mr. Andrews put in earlier to show

2      that the officer had this report available to him on the

3      night in question.

4              And with that, that's all I have, Your Honor.

5              THE COURT:  Okay.  Mr. Andrews and Mr. Aligada as

6      appropriate, are there any witnesses that you wish to call

7      now?  Obviously they're not here.

8              THE DEFENDANT:  Could I get some rebuttal to what

9      he's doing?

10             THE COURT:  Do you have documents you wish to

11     enter into evidence?

12             THE DEFENDANT:  I damn sure do.

13             THE COURT:  Okay.  Have them marked and offer them

14     into evidence.

15             THE DEFENDANT:  Well, here's -- this is coming

16     from the Minneapolis Police Department, General Offense

17     Public Information Report.  And in this report it says:

18             "Officers were dispatched to the above area on

19     shots fired.  There were no shot spotters activation.  I

20     located approximately 13 DCCs at the above location, the

21     area one" -- "in the area of one neighborhood, believed a

22     blue 2000 Chevrolet Tahoe fired rounds at a clear" -- "a

23     purple Chevy Impala.  There was a gray van also roaming the

24     area.  Cleared the scene and found several" -- "I mean,

25     found a vehicle with the matching license plate of AGV 69 in

1        the area."

2                    THE COURT:  I need you to identify what the

3        document is.

4                    THE DEFENDANT:  Oh.  This is the Minneapolis

5        Police -- this is the document that he's referencing.

6                    THE COURT:  The police report.

7                    THE DEFENDANT:  The police report.

8                    THE COURT:  Is it in evidence?

9                    THE DEFENDANT:  No, not this one.  And I want to

10       enter this and I want to enter an officer's supplement.

11                   THE COURT:  Okay.  Let's mark the first one first.

12                   THE DEFENDANT:  Oh.  Also I want to -- it's two

13       pieces in here that need to be entered, because it's another

14       rebuttal to the same thing.

15                   THE COURT:  Is it all stapled together?

16                   THE DEFENDANT:  Yeah.

17                   THE COURT:  It's all one document.  Mark it, offer

18       it into evidence.

19                   THE DEFENDANT:  Okay.  Well, I want to tell you

20       what the evidence is first.

21                   This is going to be rebuttal to both of his

22       claims, one, that report out of St. Paul.  It's

23       case-referenced in here and it states a 60-year-old lady was

24       assaulted by her boyfriend of however many years and she was

25       too blind to make a report.

1         And the other one in here, that's the one he's

2    going to try to make reference saying that the car was in my

3    kid's mother's -- Shenita Esaw -- name.

4         The other one here is going to contradict

5    Sgt. O'Rourke saying that the shot spotter told him that the

6    shots was fired at 23rd and Fremont when it was 25th and

7    Girard and there was no mention of a suspect, and then the

8    description of the suspect itself was a large, dark-skinned

9    male with braids in his hair.  Clearly the suspect's

10   light-skinned or more lighter-skinned with long dreads, very

11   long dreads on his head.

12        So this will contradict both of them.  That's

13   going to be 13.

14        THE COURT:  Let me stop you for a second.

15        Mr. Paulsen, any objection to Defendant's Exhibit

16   13?

17        THE DEFENDANT:  Also in there is every case

18   reference that they made in this case, like the other

19   shooting that they're trying to say the gun was registered

20   to which happened in the Boston Terrace that has nothing to

21   do with the suspect.  That's also in there.  Nothing to do

22   with the suspect, not a shred of evidence.

23        MR. PAULSEN:  I'm looking at Number 11.  Relevance

24   is not apparent to me, doesn't have anything to do with the

25   ones I introduced, but if he wants it in for whatever value

1    it has, I won't object.

2              THE COURT:  All right.  Defendant's -- is it

3    13? --

4              MR. PAULSEN:  13.

5              THE COURT:  -- will be received.

6              What is the next document you wish to enter?

7              THE DEFENDANT:  Also, Scott Creighton.  I'm going

8    to enter his supplement in.  It referenced in here:

9              "I was on an earlier call in regards to shots

10   fired at 25th and Girard.  At approximately 15:20 hours the

11   caller-witness later told us that the description of the

12   shooting vehicle was a dark Chevrolet Tahoe without any

13   plates.  The caller-witness told us that the driver/shooter

14   was a large black male, dark-skinned, with braided hair.  He

15   stated that the passenger was a shorter male with a goatee

16   and shorter dreads.  Officer aired the information and

17   recovered several shell casings at this location."

18             And that case is 15-6610, which is the one he's

19   going to offer and answer in saying that the thing was on

20   23rd and Fremont.

21             THE COURT:  Marked Exhibit 14?

22             MR. ALIGADA:  14.

23             THE COURT:  Mr. Paulsen, any objection to 14?

24             MR. PAULSEN:  No objection.  It's the report of

25   Officer Scott Creighton, C-R-E-I-G-H-T-O-N for the record.

1             THE COURT:  Defendant's Exhibit 14 is received.

2             Any other documents, Mr. Andrews?

3             THE DEFENDANT:  Did we get this in, the impeaching

4     document of Joel Pucely to show that -- this made up email

5     that they sent?  I want this entered to show that -- this

6     says the shooting on the night and that he was in contact

7     with Sgt. O'Rourke reportedly from this from 7:51:04, so

8     obviously this is a forged document again.  I want to enter

9     that as evidence.

10            THE COURT:  Mark it as Exhibit 15.

11            MR. PAULSEN:  That's already in.

12            THE DEFENDANT:  Huh?

13            THE COURT:  Is it in?

14            MR. PAULSEN:  That's part of our Number 11 I just

15    put in.

16            THE COURT:  Okay.

17            THE DEFENDANT:  Where?  Oh, yeah, you did put it

18    in.

19            MR. PAULSEN:  Are you good with that?

20            THE DEFENDANT:  If the record is going to reflect

21    that -- yeah.

22            THE COURT:  It's in evidence as part of Government

23    Exhibit 11.

24            THE DEFENDANT:  Now, is this all the evidence that

25    I'm going to enter in to show for the topic of the

1    suppression?

2              THE COURT:  That's a decision for you.

3              THE DEFENDANT:  I'm asking you, can I just -- I

4    don't have to just do rebuttal.  I can just enter evidence

5    myself now, right?

6              THE COURT:  If you have evidence that goes to the

7    suppression motions that is --

8              THE DEFENDANT:  Oh, yeah.  Yeah.  Hell, yeah.

9              THE COURT:  Mr. Andrews, why don't you go through

10   that, what you have --

11             THE DEFENDANT:  I got it ready now.

12             THE COURT:  -- figure out what you want to put in.

13   The court reporter needs a break.  He's been going for,

14   again, another hour and 45 minutes or so.  So we'll take a

15   recess.

16             Marshals, can he remain in the courtroom and

17   review his documents?

18             DEPUTY MARSHAL:  Yes, Your Honor.

19             THE COURT:  Okay.  We'll come back on the record

20   at 20 minutes to 4:00, okay?  Thank you.

21        (Recess taken at 3:22 p.m.)

22                       *     *     *     *

23

24

25

1          (3:40 p.m.)

2                              IN OPEN COURT

3          (Defendant present)

4                  THE COURT:  All right.  We're back on the record

5     in the United States vs. Norris Deshon Andrews, Criminal

6     Number 18-149.

7                  Mr. Andrews, have you had an opportunity to go

8     through the documents you have and identify what you'd like

9     to admit?

10                 THE DEFENDANT:  Yes.

11                 THE COURT:  Okay.  Mr. Aligada, have you had a

12    chance to mark those yet?

13                 MR. ALIGADA:  Yes, Your Honor.

14                 THE DEFENDANT:  Are you -- what exhibit are you

15    up -- the Court's up to?

16                 THE COURT:  I think we're on Defendant -- you've

17    admitted 14, so the next number is 15.

18                 THE DEFENDANT:  Okay.  Well, the next one would go

19    as to probable cause, the identification of his suspect

20    shooter, on the grounds that, one, the officer illegally cut

21    his body cam off and took a statement.

22                 Two, this female is not identified because of

23    this, so the defendant doesn't get to challenge her in

24    court.

25                 And three is the main important one and I want to

1      put this into the record.

2              She stated:

3              "The female said" -- "The female told me he was

4      driving a blue SUV today.  She stated that she heard the

5      shots, ran inside, so she did not see which way the SUV

6      drove.  The female told me the defendant's name was N.O.

7      His real name was Norris Andrews.  She then showed me a

8      photo of Norris Andrews.  I went back to my car, looked up

9      Norris Andrews' NCIC and found Andrews' full name is

10     Andrews, Deshon Norris, 12-8-84.  This information was

11     passed along to Sgt." -- I don't even know his name.

12             But this is their way that they say they got my

13     government name and their eyewitness to the shooting.  And

14     as you can see from this officer's statement, she stated

15     that she merely heard the shots, so this is not

16     identification, so this goes to another kick at their

17     probable cause *per se*.

18             THE COURT:  Okay.  Just so I know, what is the

19     exhibit?

20             THE DEFENDANT:  Oh.  It's a supplement from the

21     case itself, a female who says she was at the scene.  It's

22     Supplement Number 9 by Officer Benjamin Brewer (sic).  I had

23     asked to have him here, but he's not, but I feel like his

24     name is certified, so I don't even need him to come.  I'm

25     just going to put his supplement in.  It tells the story.

1            And once again, this goes -- also I want this to

2       go to show the Government misconduct and the outrageous

3       Government conduct, because surely Jeffrey Paulsen knew this

4       and he still chose to take this to the grand jury.  Him and

5       David Voth over there promised that this right here was a

6       positive identification from an eyewitness to the shooting.

7            THE COURT:  Any objection, Mr. Paulsen, to

8       Exhibit --

9            MR. PAULSEN:  There's no objection, but it's

10      actually Officer Benjamin Bauer, B-A-U-E-R, not Brewer.

11           THE DEFENDANT:  It's Supplement 15 -- I mean, it's

12      Defendant Exhibit 15, Supplement Number 9, off of the

13      State's case.

14           THE COURT:  It's received, Defendant's Exhibit 15.

15           THE DEFENDANT:  Also I want to enter Exhibit 16.

16      This is Supplement Number 8 and it's by John Bunnell,

17      Supplement Number 8 in the same case.

18           This goes to show the credibility, one -- because

19      I had an objection to this too -- the Government offered a

20      photo lineup.  One, I object on the grounds that it was

21      given to us on the 7th of September, which is well past the

22      timeline.  We put a motion in asking for all identification

23      of the suspect well before this in July.  The courts told

24      them to give it to us in June.  In an order from the

25      arraignment hearing, they was ordered to turn it over under

1    the discovery rules 12, 16 and 26.2.

2             But in this statement here -- well, first issue is

3    the thing itself, the exhibit, is clearly suggestive.  The

4    suspect's picture is whited out.  It's -- everybody else is

5    dark.  Number 6, it looks like a computer spoof, like it's

6    just completely darkened out.  And the suspect, he's way

7    taller in the picture, his head's enlarged, and he's

8    brighted (sic) up.  Everybody else, like, you can clearly

9    see was darkened out.

10            Sixteen goes to show -- Defendant Exhibit 16 goes

11   to show the witness' that actually circled that picture

12   credibility, because he needed to be able to identify this

13   suspect.  And his statement here, he said that the suspect,

14   a black male, got out of a 2004-2005 Chevrolet Blazer,

15   started walking towards him and began shooting at him.

16            I'm going to also enter in an exhibit of a video

17   of the shooting itself which contradicts this and that this

18   victim it looks like was with the other victims, and he

19   was -- he got another statement in here where he's going to

20   say that he was just out here with his aunty and was

21   randomly shot or whatever.  So Number 8 is going towards the

22   credibility of their witness.  This witness did not know who

23   the shooter was, did not see the shooter, and the pictures

24   would clearly show that Sgt. O'Rourke made it very easy for

25   him to identify the suspect by making an overly suggestive

1    picture.

2              Also, Number 17 --

3              THE COURT:  Hang on.

4              Any objection to 16, Mr. Paulsen?

5              MR. PAULSEN:  No.  Sixteen is the report of

6    Officer John Bunnell, B-U-N-N-E-L-L, and I have no

7    objection.

8              THE COURT:  It's received.

9              THE DEFENDANT:  Next would be 17.  This is a

10   Supplement 46 by Kelly O'Rourke.  It's a question-answer

11   supplement by the same victim, Blanton, and in this one it

12   goes to tell a whole nother story of how he was shot and the

13   manner he was shot and what he was doing there.

14             THE COURT:  Okay.

15             THE DEFENDANT:  Which is just all off.  He's going

16   to state in here it was two shooters and he was talking to

17   his aunty and was shot.  The video of the shooting itself

18   will clearly show that him and the other victim approached

19   these suspects and engaged them into an argument, and he

20   actually was going towards this argument to engage and join

21   in on this fight once the shots was fired.  And it's not the

22   same as what Supplement 16 says, so it goes to show again

23   his credibility of identifying the suspect with that

24   picture, because I'm challenging that picture identification

25   also.

1              THE COURT:  Understood.

2              Any objection to Exhibit 17, Mr. Paulsen?

3              MR. PAULSEN:  No objection.  I just want to point

4    out, though, that this is a statement that was given on

5    May 30th, 2018, so long after the arrest, and the

6    Government's position will be that something that occurs and

7    is known only after the arrest cannot factor into probable

8    cause for the arrest.

9              THE DEFENDANT:  That's not when this statement was

10   given.  This statement was given May 18th.  He entered it

11   May 30th.

12             MR. PAULSEN:  Okay.

13             THE DEFENDANT:  This statement was tooken at

14   Hennepin County Hospital May 18th at 12:30.

15             MR. PAULSEN:  It still is after the arrest.

16             THE COURT:  Okay.  Well, I'll sort that out.  It's

17   admitted.

18             THE DEFENDANT:  Yes.  Like I say, I would like to

19   note that it is the 18th, two days after.

20             THE COURT:  Okay.

21             THE DEFENDANT:  The next exhibit that I want to

22   enter as 18, we got to burn a copy of it, but it's the

23   footage of the shooting itself, the unreindacted (sic)

24   version with all of the cameras.  Because he put in a

25   cropped-out version of it where you couldn't see this

1    witness -- I mean, this victim.  This 18 is going to go to

2    show multiple different things.  One, the two females.  One,

3    which is the one that gave the Government name.  It shows

4    her apartment in and out.  No female any shape, form or size

5    was in or out of that apartment at the time of shooting,

6    which goes to show once again that she didn't see the

7    shooting and it was secondhand knowledge.

8            The other female's apartment, which is right next

9    door to her, that gave another statement is going to show

10   that she wasn't out there and she gave a statement saying

11   and no one gave a name, which means she's using third-hand

12   knowledge.

13           And also it's going to go to show that this same

14   victim, victim Blayton, or Blanton, also -- he lied.  Once

15   again, this video is going to show him approach with the

16   other victim and approach the suspects in a hostile manner

17   and engage in a fight, where in his second statement he's

18   going to say that he was just merely out there talking to

19   his poor old aunty and he turned around and he was shot, and

20   then the person got out of the car and tried to shoot him

21   again.  And then when the suspect got in the car, he hung

22   out the passenger window and tried to finish him off while

23   someone else drove.  The video will go to show that the

24   shooter shot him, got into a vehicle and drove off.  No more

25   shots was fired.  He didn't get in or out this vehicle,

1   which makes both of these victim statements that circled

2   this picture false.

3            Which goes to show once again that the Government

4   knew this, because these are the videos that we was telling

5   them to give us, and once again, we couldn't put no motions

6   in to suppress these because he kept them till September 7th

7   also, which was the Friday before the Monday that we went

8   into the hearing.

9            So the videos themselves I would have put in for

10  suppression just on the grounds that this is exculpatory

11  evidence, because it goes to show that, one, like I just

12  said, the victims is lying.  The witnesses that they're

13  alleging to have don't exist.  These officers are just

14  putting stuff in their reports.  You just seen impeachments.

15  The Minneapolis police officers write anything.

16            And this Officer -- what is it -- Supplement

17  Number 15 -- Supplement 9, Exhibit 15, is no better.  He

18  just made up this story.  There's not a shred of proof that

19  this female exists.  She didn't see the shooting.  Nothing's

20  there that supports that she gave him a government name and

21  a readily available picture on her phone.

22            THE COURT:  Okay.  Let me stop you then.  I

23  believe we're on 18.  Eighteen is a --

24            THE DEFENDANT:  Is going to be the unreindacted --

25            THE COURT:  -- unedited version of the shooting

 1    video.  First of all --

 2              MR. PAULSEN:  I assume it's the copy I gave them,

 3    and if so, I have no objection.

 4              THE DEFENDANT:  It's multiple videos on there,

 5    different angles.

 6              THE COURT:  Okay.  It's received.  Eighteen is

 7    received.

 8              THE DEFENDANT:  For that purpose, another video is

 9    going to go to show for probable cause.  As a matter of

10    fact, can't I just call myself as a witness?

11              THE COURT:  You can.

12              THE DEFENDANT:  I would like to do that.

13              THE COURT:  I'll tell you what.

14              THE DEFENDANT:  Just swear me in.  It's not going

15    to take long.  It's not going to take long.  What I need to

16    testify to will take roughly about five, maybe ten minutes,

17    depending camera time, for him to play the little video or

18    whatever.  Other than that --

19              THE COURT:  Okay.  Before we get to that, any

20    other documents or tangible exhibits you want to put in?

21              THE DEFENDANT:  Yeah.  Once I get on the stand,

22    I'm going to be putting another video in.

23              THE COURT:  Okay.  Anything else?

24              THE DEFENDANT:  Yeah.  That video's going to be

25    18 -- 19.

1          THE COURT:  19.  All right.  Well, we'll cross

2     that bridge when we get to it.  Other than 19 and whether

3     you testify, anything else?

4          THE DEFENDANT:  Yes.  Another video which is going

5     to be a post-arrest interview which the Government also has,

6     I'm going to be entering that as Exhibit 20.

7          THE COURT:  And what is it, a post-arrest

8     interview of you?

9          THE DEFENDANT:  Of me, yes, giving a statement.

10         THE COURT:  Okay.  Any objection to 20 at this

11    point, Mr. Paulsen?

12         MR. PAULSEN:  It obviously doesn't go to probable

13    cause for the arrest because it's after the fact, but I

14    won't object and deal with it in the briefing.

15         THE COURT:  Okay.  20 is received then.  It'll be

16    marked and received, whatever the post-arrest statement

17    video is.

18         THE DEFENDANT:  This is already in.  Stuff that I

19    got that's in as early exhibits, can they still be used for

20    different purposes?

21         THE COURT:  Meaning what?  You want to use it for

22    a different motion?

23         THE DEFENDANT:  No, a different meaning in the

24    same motion.

25         THE COURT:  You can argue whatever you like to

1    about whatever is in evidence.

2              THE DEFENDANT:  Yeah.  I want to ask you so you

3    understand what I'm saying just so there won't be any

4    misunderstanding.

5              The Officer David Voth -- I think I answered this

6    already.  I think I impeached Sgt. O'Rourke with this

7    earlier in the thing.

8              MR. PAULSEN:  I can tell you.  Is it the June 6th

9    report?

10             THE DEFENDANT:  It's his narration, his first

11   report.

12             MR. PAULSEN:  I'm not sure that one's in.

13             THE DEFENDANT:  Yeah, it's this one along with the

14   attachments.  It's this one.  Is it in?

15             THE COURT:  If we don't know, mark it, offer it.

16             Mr. Paulsen, objection to what will be marked as

17   21?

18             MR. PAULSEN:  No objection.

19             THE DEFENDANT:  Aside from that was another one

20   that was going to be used for multiple purposes.  I believe

21   it's also by David Voth.  I think it's his Report Number 5

22   where he called Sgt. O'Rourke and the attachments about how

23   they located the suspect.

24             THE COURT:  Okay.  Here's what we'll do.

25             THE DEFENDANT:  Those is in, right?

1          THE COURT:  I believe so, but I can't swear to it.

2     Here's what we'll do.

3          Anything that you discover after today that you

4     wish to be entered that's a document, have Mr. Aligada talk

5     to Mr. Paulsen, I suspect there won't be any objection, and

6     it'll be received, okay?

7          Let's turn to the issue of your testifying.

8          Mr. Aligada, do you need a little time to consult

9     with Mr. Andrews on that question?

10         MR. ALIGADA:  Your Honor, I certainly can take a

11    couple minutes to talk with him about it.  But I mean, what

12    I anticipate it would be is him testifying in the narrative

13    without my involvement, but I'm happy to talk with him about

14    legal issues that could arise.

15         THE COURT:  I think that would be prudent.  Can

16    you do it here?

17         MR. ALIGADA:  Yeah.

18         THE COURT:  Okay.  Do you need us to exit the

19    courtroom?

20         MR. ALIGADA:  That would probably be the best

21    practice.

22         THE COURT:  Okay.  One last recess then.  We'll

23    recess for about five minutes.

24         And then if you testify, Mr. Andrews, it's --

25    you're telling it's not too long, correct?

```
 1                 THE DEFENDANT:  No.

 2                 THE COURT:  Not correct or not too long?

 3                 THE DEFENDANT:  It's not going to be too long.

 4                 THE COURT:  Okay.  All right.  We're in recess for

 5       five minutes.

 6            (Recess taken at 3:57 p.m.)

 7                           *      *      *      *

 8            (4:02 p.m.)

 9                            IN OPEN COURT

10            (Defendant present)

11                 THE COURT:  All right.  Back on the record in

12       United States vs. Norris Deshon Andrews, Criminal Number

13       18-149.

14                 Mr. Andrews, during the break you've had an

15       opportunity to speak with standby counsel, correct?

16                 THE DEFENDANT:  Yes.

17                 THE COURT:  All right.  And, Mr. Aligada, I'm

18       going to direct these questions to you.

19                 Have you had an opportunity to apprise Mr. Andrews

20       of any legal issues and ramifications of testifying here

21       today?

22                 MR. ALIGADA:  I have, Your Honor.

23                 THE COURT:  All right.  And are you satisfied that

24       he has understood whatever advice and counsel you may have

25       given him?
```

1          MR. ALIGADA:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Mr. Andrews, is it still your intention to

4    testify?

5          THE DEFENDANT:  Yes, but we figured out a couple

6    more exhibits that need to be entered real quick.

7          THE COURT:  Okay.  Let's do that.

8          THE DEFENDANT:  Okay.  We got one of -- Exhibit 22

9    is going to be a T-Mobile record that the Government had

10   that once again they didn't give to us till September 6th,

11   but he has it.  That's that one from May 16th.  This is the

12   response to Sgt. O'Rourke's extinguishing ping that he did.

13   That's that one.

14         THE COURT:  That's Number 22, correct?

15         THE DEFENDANT:  Correct.

16         THE COURT:  Number 23 is going to be the one

17   that -- is going to be the first and last page, because I'm

18   not going to enter all that, the first and last page of the

19   one we subpoenaed just to show a time frame --

20         THE COURT:  Understood.

21         THE DEFENDANT:  -- of the one we got.  But the

22   whole one that they got I'm going to enter, but it's pretty

23   much a duplicate of the one we got, plus something.

24         THE COURT:  Okay.

25         THE DEFENDANT:  So that's going to be 23.

1           Also, I want to ask the Court, that motion that I

2     gave you when we left last time, was it docketed?

3           THE COURT:  You know what?  As I'm sitting here, I

4     simply don't know.

5           THE DEFENDANT:  Well, he had it and he had time to

6     read it.

7           THE COURT:  It will be docketed.  It will be

8     addressed.

9           THE DEFENDANT:  Yes, because I can -- we can very

10    well -- it can be argued after this in my motion if he's

11    willing to let it go on the record.

12          THE COURT:  It'll be docketed and you can submit

13    further briefing and other material on it.

14          THE DEFENDANT:  One, I would like to enter

15    e-mails.  The next one would be e-mails back and forth from

16    Reggie Aligada to my state attorney, Laura Prahl.  This is

17    going to be Exhibit 24.

18          THE COURT:  What is the purpose of Exhibit 24?

19          THE DEFENDANT:  Huh?

20          THE COURT:  What's the purpose?

21          THE DEFENDANT:  Oh.  It's going to be about his

22    (indicating) conduct.

23          THE COURT:  Okay.

24          THE DEFENDANT:  Exhibit 25 is going to be e-mails

25    back and forth from the Government to my counsel which shows

1    the times and dates that we get these exhibits.  It's going

2    to go more towards his conduct and outrageousness that he's

3    displaying.

4              And the last one is going to be -- hold on.

5              (Discussion off the record between the defendant

6    and Mr. Aligada)

7              THE DEFENDANT:  Also, I would like to enter two

8    sets of forged documents, laboratory reports that the

9    Government turned in.  One is from June 4th.  This is a

10   forgery.  I will enter with it Supplement 44, which is the

11   original document to this supplement -- I mean, this piece

12   of evidence that I'm going to enter.

13             The Government has both of these.  Supplement 44

14   was received in mid-January from the Government.

15   Supplement -- I mean, the attachment is going to be just

16   given to us on the 7th of September, and this is a forgery

17   of this (indicating) one.

18             THE COURT:  So they need to be marked.

19             THE DEFENDANT:  And the reasoning for that is

20   because it goes to show that once again the Government took

21   false information to the grand jury when it said that the

22   gun recovered from the vehicle matched the shell casings

23   that was recovered from the shooting scene, because they're

24   making their case by way of constructive possession.  So

25   this goes to show that they didn't have a match, Supplement

1     44, which was done May 29th, verified May 30th, and was

2     given to us in July, well before our motions went in asking

3     for all other evidence.

4            And the other one that I'm attaching with it is

5     the false one.  It's an approved medical examiner report.

6     They have an extra line on here where it's going to show

7     that the gun matched the shooting now, because I was making

8     an issue about it, so he brought it up and that's going to

9     show more of his conduct when I get around to that.

10           THE COURT:  Number, Mr. Aligada?

11           MR. ALIGADA:  26, Your Honor.

12           THE DEFENDANT:  26, those two documents.

13           THE COURT:  Thank you.

14           THE DEFENDANT:  And mind you, I'm pushing for

15     suppression of that other one.

16           THE COURT:  Understood.

17           THE DEFENDANT:  27 is going to be a fingerprint

18     ridge detail that was also just turned over to the defendant

19     on September 7th.  And in this supplement it's saying that a

20     right thumbprint was found on the gun and this was verified

21     May 18th.  Two days after the shooting they had this

22     fingerprint.  So if they surely had this fingerprint, they

23     wouldn't be trying to prove constructive possession, because

24     this is direct possession of the gun that would have been

25     alleged to be in that vehicle that we're going for

1     suppression, as you can see, tampering with evidence.  But

2     that's this exhibit.

3              THE COURT:  That's 27?

4              MR. ALIGADA:  27.

5              THE DEFENDANT:  Also, I'm going to enter in under

6     more loss of exculpatory evidence.  We can telling this fine

7     officer here to give us all of the car video footage of not

8     only the shooting situation, but of when the defendant was

9     arrested.  He stated it was only them two cars footage.

10    Well, I have a document to show that it was five different

11    cars footage.  It was five cars seen on video on Joel

12    Pucely's body cam, which we're also going to be entering

13    into evidence somewhere within these exhibits.  But yeah,

14    this shows there's way more body cam footage and car cam

15    footage.

16             And I also would to suppress this footage if they

17    try to get it in later on the grounds that it's loss of

18    exculpatory evidence and it's untimely, we can't make a

19    motion to get it out of there, so I would just have it

20    excluded.

21             THE COURT:  Mark it, Mr. Aligada?

22             MR. ALIGADA:  28, Your Honor.

23             THE COURT:  Thank you.

24             THE DEFENDANT:  Also, I would like to enter as

25    showing -- this is from the investigator on my state case,

1      Darcy -- what's her last name -- Darcy Goolich (ph).

2              This is her handwritten note from June before I

3      was indicted on this case.  It's going to show that I told

4      them to go get alibi camera footage.  This is going to go to

5      show loss of exculpatory evidence by the Government.  They

6      knew well in advance they didn't go get this footage that

7      I'm also going to be entering in evidence in one moment when

8      I testify.

9              MR. ALIGADA:  This is 29, Your Honor.

10             THE COURT:  Thank you.

11             THE DEFENDANT:  But that's the document from the

12     county before I was indicted, which is going to go to show

13     consistently that I've been telling the truth.  And I

14     believe -- I believe that -- I believe that just about does

15     it, and then we can get the rest on the road so we can wrap

16     this hearing up.

17             THE COURT:  Okay. So, Mr. Prahlsen, any objections

18     to Exhibits I believe it's 22 through 29?

19             THE DEFENDANT:  Also, I'm going to have him print

20     up over 200-and-something pictures -- I'll just name some of

21     them -- as far as exculpatory evidence:

22             The fingerprint, the gun itself.  We didn't have

23     that until -- all of these was turned over on May 6th and

24     May -- I mean, September 6th and September 7.  This is all

25     exculpatory evidence that we put in motions they was ordered

1    to give us in arraignment hearings.  They didn't.  They

2    dumped on us three days before the motions hearing.

3              Over 200 photos.  These photos consisted of the

4    search warrant that he just entered in on the 10th which we

5    had to take a break for, the filings of that search warrant,

6    the pictures of the truck conducted during that search

7    warrant, the fingerprint, the gun, the crime scene, the

8    shell casings, the identification of photo lineups.  Like,

9    we had none of this.  All of this was dumped on us three

10   days prior to the motions hearing, so we didn't have a

11   chance to get --

12             THE COURT:  Okay.

13             THE DEFENDANT:  So I'm going to have him enter all

14   of those pictures as Exhibit --

15             MR. ALIGADA:  30.

16             THE DEFENDANT:  -- 30, the pictures and stuff that

17   we got from September 7th -- 6th, 7th, and the 12th.

18             THE COURT:  Okay.  Anything that is not here today

19   that you need to do that on will be handled in the manner we

20   talked about.  Mr. Aligada will provide it to Mr. Paulsen

21   and the Court will hear from them as to whether there's an

22   objection, and if there is, I'll rule on it at that time,

23   okay?

24             THE DEFENDANT:  Yeah.  They need to be suppressed.

25             THE COURT:  I understand that's your purpose in

1    admitting them.

2              THE DEFENDANT:  Okay.

3              THE COURT:  Is that it?

4              THE DEFENDANT:  Yeah, that does it.

5              THE COURT:  Okay.  As to the exhibits you have,

6    Mr. Paulsen, 22 through 29, any objections?

7              THE DEFENDANT:  22 is going to be a full phone

8    documentation and 23 is just going to be our portion of the

9    same phone document, but two pages, just the beginning and

10   the end.

11             THE COURT:  Understood.

12             MR. PAULSEN:  No objection to 22 and 23.

13             I really haven't had a chance to review these

14   emails between Mr. Aligada and the state lawyer, but I'll do

15   it later.  I have no objection.

16             And then the emails between myself and

17   Mr. Aligada, no objection.

18             26, I believe, was reports regarding the

19   examination of the gun, two pages.  No objection.

20             27, I guess, is the fingerprint report.  No

21   objection.

22             28, I guess it's a chain-of-custody report on some

23   videos.  No objection.

24             29, handwritten notes by his state investigator.

25             THE DEFENDANT:  They attached this to the email.

```
 1    I just had them printed out, because the emails themselves,

 2    they can't let the attachment come out, but they was

 3    attached to the emails.

 4            MR. PAULSEN:  So it looks like the investigator is

 5    taking notes of things Mr. Andrews is telling him or her.

 6    It looks like it may be a summary of his alibi.  I question

 7    the relevance for probable cause, but we might as well put

 8    it in the record if he wants it, so no objection.  The last

 9    one, 30, I guess is going to be photos of the crime scene.

10            THE COURT:  Thirty we'll find out about.

11            MR. PAULSEN:  Presumably no objection to that.

12            THE COURT:  Okay.  So Exhibits 22 through 29 are

13    received.

14            Mr. Andrews, do you wish to testify?

15            THE DEFENDANT:  Yeah.

16            THE COURT:  All right.  I assume he goes up here,

17    correct?

18            DEPUTY MARSHAL:  Wherever you'd like him, Your

19    Honor.

20            THE COURT:  Come on up, Mr. Andrews.  Yeah,

21    Mr. Aligada will take care of that.  You need to stop and

22    raise your right hand, please.

23          NORRIS DESHON ANDREWS, DEFENDANT, SWORN

24            THE COURT:  State your full name for the record

25    and spell your last name, please.
```

```
1              THE DEFENDANT:  Norris Deshon Andrews,
2    A-N-D-R-E-W-S.
3              THE COURT:  Now, Mr. Andrews, you are going to
4    testify about whatever it is you wish to testify about.  Go
5    ahead.  You don't have to go through this questioning
6    yourself and then answer it.  Go ahead and testify in a
7    narrative fashion, whatever it is you need the Court to
8    know.
9                       DIRECT EXAMINATION
10             THE DEFENDANT:  Okay.  Well, first off, I would
11   like to play -- play my post-interview.  This is a statement
12   that was given to Sgt. Kelly O'Rourke on June 6th, roughly
13   an hour after I was taken into custody.
14             Go to the third before the last one.  That one.  I
15   can't see it.  All right.  Scroll over.  Keep going until
16   you see him come in the room.
17        (Videotape played)
18             Start the next one.
19        (Videotape played)
20             Stop.  I would like the record to reflect and show
21   impeachment of Officer Joel Pucely's testimony again.  It
22   goes to show that I was not under arrest, that I was merely
23   being detained again and I'm going to be read my rights now,
24   which is the officer right here, the investigator that told
25   them bring me down that's testifying, his statement right in
```

1    my post-interview that I was not under arrest.  This is

2    going to show probable cause -- that they didn't have

3    probable cause to search that vehicle that night, because

4    you said you searched it incident to arrest.

5              You can continue.

6         (Videotape continues)

7              In that statement he just asked me where was I at

8    at 4:30, which is before the time of the shooting, which was

9    first called in and logged in at 4:42, and I told him I was

10   in Loring Tower.

11             Could you please finish playing it.

12        (Videotape continues)

13             Stop it again.  He just asked me where I was at

14   at 5:00 o'clock, which is after the shooting, and I told him

15   I would have still been down there picking Dearra up, which

16   is the girl I deal with, but I was late to get her at 4:30

17   to get her son.  So me and my brother was down there riding

18   around the building waiting on her because she told them

19   that -- I mean, she told us that she was going to push the

20   time back to 5:00, so we left, went to the gas station a

21   block away and came back, and that's why I was telling him

22   we're going to be down there on camera.

23             Continue to play it.

24        (Videotape continues)

25             Stop it.  That's the end of the value of that

1    footage.  I just wanted that down to show that this is the

2    night of May 16th at roughly 2:00 in the morning.  I was

3    arrested at 12:07 on the 16th, so this is like an hour and

4    some change later.  I just gave an alibi statement to the

5    lead investigator in this case, Sgt. Kelly O'Rourke.

6              Could you go to the -- you can take this down.  Go

7    to the Loring Tower videos.

8              MR. PAULSEN:  Well, if we're going to play

9    something that's not in evidence, I think I need to look at

10   it first.

11             THE DEFENDANT:  No.  I told you this was getting

12   put in evidence.  I already marked it as an exhibit.

13             MR. PAULSEN:  What number is this?

14             MR. ALIGADA:  I don't think we have it.

15             THE DEFENDANT:  No, we said we were going to burn

16   it.  Remember I told him I was going to put this in?

17             MR. ALIGADA:  Exhibit 19.

18             THE DEFENDANT:  Y'all had a chance to go get it.

19   I told your sergeant, which is the Government.  You had this

20   video too, because you turned this video of my

21   post-statement over to us.  We didn't have this, y'all had

22   it.  Y'all gave it to us late again.  And as you can see,

23   the statement was on there, so y'all had the chance to go

24   get this footage just like we did.

25             MR. PAULSEN:  Your Honor, if I may, unless I'm

1    mistaken, this is not something we've turned over.  It's

2    something that purportedly --

3                THE DEFENDANT:  I'm talking about the statement.

4                THE COURT:  Hold on.  You got to let him finish.

5                I'm sorry, Mr. Paulsen.  Go on.

6                MR. PAULSEN:  So my problem with this proposed

7    video, it's not something I've ever seen, and without having

8    seen it, I have no idea where it come from, whether it's

9    authentic, whether it's from the day in question, so without

10   a foundation -- and I haven't heard any -- I'm going to

11   object to this one.

12               THE DEFENDANT:  The time, date and everything is

13   stamped on there.  If you need more further ground, the

14   investigator for the Federal Defender's Office is who went

15   and got this footage, but the video itself has got the time

16   and date stamped on it, so there's going to be no ifs, ands,

17   or whats about it being authentic and what time it's from,

18   the date it's from.

19               And once again, like I said, y'all -- the state

20   government and all the officers involved have my

21   post-interview to my arrest and they had it all this time,

22   so you had the chance to go get it.

23               MR. PAULSEN:  That's fine.  I've consulted with

24   Mr. Aligada.  I'm not going to object.

25               THE COURT:  Go ahead, Mr. Aligada.

1          THE DEFENDANT:  Play video two.  Stop video two.

2          Now, mind you, before this video starts, I want to

3     put on the record that this is loss of exculpatory evidence

4     that I'm just going to put down.  This video is still going

5     to show that I was where I said I was at, but I want to put

6     on the record before that that this is loss of exculpatory

7     evidence.

8          I, Norris Andrews, defendant in this case, was

9     arrested May 16th.

10          Before May 20th, I told my attorney down in the

11     state, Laura Prahl, to have her investigators go get footage

12     from this building, a gas station and two other stores

13     within a week or so after I was arrested, well within the

14     time frame to get my alibi footage.  No one did it.

15          A month and a half later I was indicted.

16     Mid-July, Mr. Aligada took over my case.  He had his

17     investigator go.  His investigator was able to go down

18     and -- all other footage was gone except for this building,

19     which was the criticalist footage.  Two months later, the

20     Loring Towers still had the whole day of May 15th.  I told

21     them to go get the whole day.

22          And the value of the whole day would be, at

23     4:00 in the morning on May 15th, I would arrive at the

24     Loring Tower.  There's cameras inside, there's cameras

25     outside.  The cameras inside will show what I was wearing

1        when I arrived at 4:00 in the morning.

2               The cameras inside also will show 2:00 p.m. when I

3        left the Loring Tower.  This stuff can be verified, because

4        I told my lawyer and them the same thing down in the state

5        to go get the footage.

6               So the afternoon hour between 2:00 when I left, it

7        would have showed what I had on, which was different than

8        what I had on last night, and 2:00 o'clock is roughly two

9        hours before the shooting happened, so that would go to show

10       relevance to what I had on.  Because if I arrived in one

11       outfit and I left at 2:00 o'clock in the afternoon and

12       there's then another outfit, the outfit I was wearing would

13       more than likely predict what I had on at your shooting,

14       which was different.  And I told them on this -- my

15       post-interview that I had on red too.  You're going to hear

16       that more.  But after that the video still would have showed

17       me come back into the building, go up, tell up Dearra I was

18       there or whatever.  She gets mad, she don't let me in, so I

19       get back in the car.  And my brother gets out the car.  He

20       goes in.

21              Now, mind you, I just said I was late.  She was

22       supposed to pick her son up at 4:30.  By me being late she

23       pushed it back to 5:00 o'clock, so now she's texting me

24       while I'm sitting in this vehicle here.

25              But the last time before you see my likeliness,

1    somehow, some way, two months later the video got -- after

2    my lawyer and the investigator got the subpoena for it --

3    I'm going to go more into that later, but it's a loss of

4    exculpatory evidence is what I'm going to tell you.  Two

5    months later they told me that the video was there.  We put

6    in a request for the full day's worth of the video.

7         What I was brought back as a defendant was only

8    the hours between 4:30 and 6:30 and none of the inside

9    cameras.  So throughout the whole May 15th day, I was only

10   given 4:30 to 6:30, and I was told by my attorney and his

11   investigator that the footage was just gone now.  Two months

12   after they said they had it, when we asked for it, we got a

13   subpoena, we went and got it, and when we went and got it --

14   I'm going to bring up that more of a issue later as far as

15   the loss of exculpatory evidence, but it's still enough here

16   that verifies everything that I said in that interview about

17   where I was going to be at, at what times I said I was going

18   to be there.

19        And I'm going to have the investigator over there,

20   he's going to testify that I told him to go down there and

21   get the other footage, the exhibit I entered by Darcy

22   Goolich.  Her written notes from June is going to also show

23   that I told them to go get this footage and why I told them

24   go get this footage so it can show my alibi, and once again

25   they ignored it and it's gone, and this is going to point

1      more to Government corruption as we go along.

2              But as you can see from this, it's May 15th,

3      4:30 p.m.  I'm already in the vehicle.  Like I said, somehow

4      miraculously the video only starts after I'm already in the

5      vehicle, but it's the same vehicle I told you in the

6      post-interview and that my attorney notes going to tell you,

7      the white Nissan Maxima right here.

8              And you're going to see my brother come out, he's

9      going to make a face at me, then this vehicle's going to

10     make a U-turn, and then I'm going to put it to the other

11     videos so you can see what the rest of it was, which is what

12     I stated in my post-interview where I was going to be at the

13     time of their shooting.

14             Start the video, please.

15         (Videotape played)

16             As you see, it's 4:30.  There's my brother.  He's

17     talking to his kid's mother.  He's telling her to come down

18     in the back.  We're going to go around the back and get

19     something out of his kid's mother's car.  She's going to

20     pass me some money through the passenger window and I'm

21     going to give it to my brother.  She's going to talk to us

22     for a few minutes, then we're going to come back around the

23     front and attempt to get my girlfriend, but she's still not

24     going to be ready, so we're going to leave and go to the gas

25     station and come right back.  You're going to see all that

1     on footage.  He made the face.  He got in now.

2              Now, once again, I tell you this, to say that

3     there's over 20 videos of inside this building footage and

4     somehow, some way, the defendant didn't get it when I asked

5     for it and they requested it, and then miraculously it got

6     deleted.  That's another reason why I'm going *pro se* right

7     now with standby counsel.

8              Stop that one.  Go to video one and go to 32,

9     4:32.  Go back, back, back.  Right there.  Just stop right

10    there.

11             You're going to see the vehicle come into the

12    picture.

13             You still got it going?

14             The SUV is going to enter this picture, go down to

15    the corner, make a left, and then it's going to turn into

16    the back of this building.  You see it?  There it is.  It

17    just made a U-turn, it's going to the corner, it's making a

18    left.

19             Stop it.  Go to video four.

20        (Videotape played)

21             Stop it.  As you can see in the crack of the

22    left-hand corner, there's the SUV.  It's going to turn into

23    the parking lot.

24             Start it.  And if you notice the time, it's still

25    lining up.  It's 4:32.

1          Stop it.  Go to video three.

2          These are only the outside cameras, as I said.

3          Go to 4:32.  The red car that you will notice on

4    the right side of your picture, we're going to come park on

5    the driver's side of this car.  That's my brother's kid's

6    mother.  You see her doing some stuff, her little friend or

7    whatever.  We're going to come in, then she's going to come

8    walking out.

9          Is it freezing?  No, it's still going.  As you

10   see, the time is 4:32 still.  Here's the SUV turning into

11   the lot.  We're parked right there.  In roughly another

12   minute or two -- well, go to 36, because it's going to be a

13   few minutes of just sitting there until she comes out.

14         37.  Go back.  She's there already.  Go forward.

15   Just let it play from there.

16         There she is entering the screen.  She's going to

17   go to the passenger side, get something out the car, put it

18   back, come around, come to the passenger side.  She's going

19   to pass me something through the window to give to my

20   brother.  Now she's just standing there just talking to us

21   smoking a cigarette.  Well, I'm smoking a cigarette and I

22   passed it to her.

23         As you can see, this is roughly when his shooting

24   starts.  It's 4:40, or just about.

25         We're going to pull off, because I don't want to

1    be late taking her to get her son from Franklin at 5:00.  So

2    we're going to go back around the front and we're going to

3    park in front of this building and attempt to wait on her to

4    come out.  I'm going to start texting her, tell her to come

5    down.  She's going to tell me she's not coming down till 55

6    after, so -- because its only roughly seven, eight blocks to

7    Franklin from here.  This is Nicollet, Nicollet Avenue.

8    Coming out of downtown going to Franklin, it's roughly about

9    seven, eight blocks there.  And she's saying she's only

10   going to come down -- my phone records will show the texts

11   and calls back and forth between me and her to, and it's

12   going to put me down here at this time.

13           So we're going to go out.  And if you trust us, we

14   can skip the camera on the side of the building that's only

15   going to show us -- go out here, make the turn and then come

16   around the front.  If y'all willing, the Court's willing, to

17   spare for time, we can just go up to video number one.

18           Go to 4:40.  There we are pulling up.  We just

19   came out the back --

20       (Videotape changed and played)

21           THE COURT:  Can you stop for a second?

22   Mr. Aligada, can you back it up a couple of frames?

23           THE DEFENDANT:  Oh.  You want to see it pull

24   around the corner?

25           THE COURT:  Go ahead now.

```
1                    MR. ALIGADA:  (Complies).

2                    THE COURT:  Okay.

3                    THE DEFENDANT:  As you see, I'm going to sit

4     there.  I'm going to text her.  She's going to tell me she's

5     not coming down right now.

6                    I'm going to get the text back.  We're going to

7     make a U-turn, go one block up, and then we're going to go

8     to the -- we're going to make a left into the SuperAmerica,

9     which is I believe on Grant, one block off of Nicollet.

10    It's the SA right here.  We're going to turn into there.

11                   And we lost that footage, because it's going to be

12    on my lawyer and them notes that I told them to go get this

13    footage from SA in June too, but they didn't go get it.

14    Time lapsed.  SA got rid of the footage.  All the May 15th

15    footage was there two months later, so how -- we only got

16    this little bit of footage there, though.

17                   We make a U-turn.  Now we're going back there,

18    whatever.

19                   Okay.  Now, you see this is after the shooting.

20    This is at 4:41 and this is in south Minneapolis still,

21    roughly on the other side of town from your shooting, which

22    is where I said I was going to be at.

23                   Could you stop it.  Go back to camera three and go

24    to 5:01.

25           (Video changed and played)
```

1          We're late, by the way, because we was trying to

2     get some pizza and some gas, so I was late to get her again.

3          Now, this is where she's going to get mad.

4          You see us -- hold on.  Go back, because I want

5     you to see the vehicle actually come in.  Right there. Stop.

6     Perfect.

7          We're going to come in, pull into the same spot,

8     come out, go back around the front, because I'm telling her

9     to come down.  She's been me like crazy:  You're late.

10    You're late.  I'm only five, six minutes late, I mean.  You

11    wanted to wait till 55 after.  We was up at the gas station.

12    There's a little pizzeria right there.

13         Here we go turning in.  There's the same vehicle.

14    We're going to pull in, we're going to back out.  We're

15    going to go around the front.

16         Could you go back to camera one.

17      (Videotape changed and played)

18         Go to 4:41.  I mean -- oh, no, no, no, no, no, no.

19    You're going to go to 5:02 and nine seconds.  We're going to

20    turn the corner.

21         Yeah, roughly.  Just leave it there.  That's good.

22         Now, in this picture, if you close, you're going

23    to see me roll the window up and show that I'm in the

24    vehicle, because like I said, these are some spotty cameras.

25    If they would have just got the inside footage, you would

1   have seen my likeliness and stuff if they'd got the rest of

2   the day.  But like I say, this is -- I believe this was a

3   move for the Government or in the Government's favor.  We're

4   going to stop early this time.

5           Now, you see the window's down?  It's going to

6   start to go up.  That's me rolling it up.  We're going to

7   sit here to 3:02, because she's talking shit now.  She's

8   telling me:  You bitch.  I don't need you no more.  She's

9   mad, calling out my name, so I tell her I'm going to go

10  ahead and leave.

11          Now I'm going to show you the girl come out just

12  so the courts know that I wasn't lying as we pull off.  Now,

13  remember the time we pull off, 3:02.

14          Go to camera three.

15      (Videotape changed and played)

16          We leave for good.  You're not going to see us no

17  more, but I want to put up my alibi for the girl.

18          Go to 5:01 and 50 seconds.

19          Right there.  You're going to notice her come walk

20  in the screen with her sister's baby dad.  They're going to

21  get in this black SUV right here.  Notice that she's not

22  going to have a baby.  She's only going to have a bag in her

23  hand.  Relevancy.

24          Now you see us leaving the parking lot.  That was

25  the truck just leaving out.  We're going back around the

1    front, which is the last footage we just watched.  She was

2    looking out the door.  So now she's going to come out.  This

3    camera's like it's an elevator inside the building a little

4    further back and she's coming out that way now.  You will

5    see her in probably about another roughly 15 seconds.

6              And there's her baby dad, her sister's baby dad

7    and her.  They're going to get in the SUV and go to the

8    left, which is towards Franklin, which is what I told you

9    the daycare's at.

10              And her name's Dearra Young.  The Government  can

11   look it up and see that she lived in the building at the

12   time.  I would have had her here to testify to this too, but

13   we don't deal with each other no more, so I got to work with

14   what I got.

15              THE COURT:  Just for the record, you can subpoena

16   her if you need her for future court hearings.

17              THE DEFENDANT:  She's a -- it's a long story with

18   her, man.

19              THE COURT:  Is that it?

20              THE DEFENDANT:  No.  You can go forward to -- the

21   truck's going to leave.  Go forward to 5:26 and 28 seconds.

22   There for the pull out, go to the left.  At 5:26 she's going

23   to come back.

24              Wait.  Go back.

25              There it is.  You see the truck coming back in,

1    parking in the same spot?  She's going to get out with the

2    baby, go into the building around the front which I'm going

3    to show you.  He's going to get out the truck and leave the

4    parking lot and go somewhere else.  He had to run another

5    errand at the Family Dollar over here for his baby mama, so

6    this is going to show that she wasn't with him, but she only

7    got the ride with him because I was late, which is what I

8    told the investigators from the beginning, that I wasn't at

9    their crime scene and didn't do the shooting.

10          I told them if they'd have went and got this

11    footage, they would have seen me with red on.  Then I'm

12    going to play some other footage where I actually tell the

13    officers while I'm being arrested that I had red on and the

14    outfit that they was arresting me in and alleging to be

15    my -- the clothes I had on at the shooting that I just put

16    on that night because it was chilly, and that's why I had

17    the coat on also.  Schroeder's going to make a reference to

18    it.  But all that's going to be just split-second stuff and

19    then he can get his cross on or whatever.

20          Do you see that?  She has the baby.  Closer up

21    picture of her.

22          Go to camera four.  Go to 5:28.

23       (Videotape changed and played)

24          Right there.  She's going to come walking through

25    the screen with the baby.  And if for a time for the courts,

1     if everyone would just let this be, she's going to turn,

2     walking up the front.  I can show you the camera right

3     there.  Then I can show you the ramp of her walking in too,

4     but for the argument of saving time, we're all going to be

5     able to see that she has the baby coming back by herself.

6            There she is.  She didn't leave with that baby,

7     which goes to show that once again I told these detectives

8     and stuff.

9            So I'm going to be entering this whole video.  All

10    this documented evidence that -- for the sake of Government

11    misconduct, like lying to the jury, like all type of

12    different stuff that they could have done and investigated

13    and knew that I didn't do this.  There was multiple stuff

14    along the way that told them I didn't do it.  The gun didn't

15    match, all type of stuff.

16           Okay.  You can stop this one.  Go to Joe Pucely,

17    his body cam one.  Stop.

18           Can you pull up -- put this down and pull up on

19    this screen -- pull up on this screen the supplement of, if

20    you remember it -- I believe it's -- go to 30, Supplement

21    30.

22           MR. ALIGADA:  Mr. Andrews, I don't have --

23           THE DEFENDANT:  Scroll down.  I'll tell you.  Skip

24    a lot of them.  Keep going.  Keep going.  Keep going.

25           What I'm going to show here is going to be -- no,

1    go down.  Wait.  Go up, up, slowly.  Go up.  Keep going to

2    the next one.  Each one I tell you to skip, skip.  Skip that

3    one.  Skip, skip, skip this whole one.  Skip.  Yeah, just

4    keep going.  I'll tell you when to stop.  No.  Keep going.

5    Stop.  No, go to the next one.  That's not it.  No, that's

6    not it.  No, that's not it.  Go to 30.  I thought it was 30.

7             MR. PAULSEN:  30 is Officer John Owen.  Is that

8    what you want?

9             THE DEFENDANT:  No, but it's right there with his.

10   It's the one with the officer who said he found the truck.

11   Keep going.  Keep going.  Slow down.

12            MR. PAULSEN:  31.

13            THE DEFENDANT:  Huh?

14            MR. PAULSEN:  Jacob Spees, 31, found the truck.

15            THE DEFENDANT:  Right here.

16            Now, in this officer's supplement he states that

17   he was sent to this location with information and O'Rourke

18   testified that he sent the officer to 26th and James, but in

19   fact this officer went to 24th and James.

20            I just said that as a tangent, but what I want you

21   to pay attention to is this officer said he located the

22   vehicle, which is a 2001 Chevrolet Tahoe, parked behind 2412

23   James.  While checking the vehicle for occupants, he

24   observed the ID in the center console in plain view.  From

25   his point of view he was able to read the ID number and that

1    matched the suspect from the shooting.  He took photos.  The

2    Government never turned those over.  He said he didn't enter

3    the vehicle and he notified whoever from the Assault Unit.

4           Okay.  Now, go back to -- now, you see he said my

5    ID was in there in the center console and he never went in

6    this vehicle.  He never searched it.

7           I'm going to enter this as evidence.  I forgot to

8    put it in, so that's going to be whatever the next one is.

9    I will get around to it.

10          But play that video, that body cam that I had you

11   tee up.  Skip.  Keep skipping till they take me out the

12   vehicle.  Right here is good.  Stop.

13          Now, when he takes me out the vehicle -- this is

14   already going to be an exhibit -- he's going to ask me what

15   is my government name.  At that time I'm going to tell him

16   my government name, but I'm also going to inform him that I

17   have my ID on me, I have my ID on my person.

18          Could you play it.

19      (Videotape played)

20          Stop one more time.  This is Officer Joel Pucely

21   body cam footage number one which was introduced by the --

22   was given to us by the Government.

23          Okay.  Play it.

24      (Videotape changed and played)

25          Also I want to make a record for saving time for

1    the courts.  The item that he just took out of my lap was a

2    cell phone.  He just set it on the hood of the truck -- I

3    mean, the top of the truck.  The Government made reference

4    to it because he knew I was going to make an issue out of

5    this too, but just take note that he just took that phone

6    and put it on the truck.  I'm going to show you something

7    else in this video footage as we go further along, but to

8    save time I'm just going to point you to each issue.

9              Okay.  Go ahead.

10         (Videotape continues)

11             But this is about the ID.  I just told him I have

12   my ID on me.  He's going to frisk me down, take my ID, do

13   whatever, throw it on the hood.  He's going to do what he

14   does with it.  I seen him with it.  He takes my ID.

15             Go to his second video.  Skip ahead.  Right here.

16   Perfect.  Stop.

17         (Videotape changed and played)

18             I just told him again and that was Sgt. Schroeder

19   asking me my name.  I told him my name and then I told him

20   that the officer that's searching me, which is Joe Pucely, I

21   told him he took my ID already.  This is the second time

22   they searched me after they took me back out of the squad

23   car, which is once again me telling them that, "You have my

24   ID."

25             Skip ahead.  More.  More.  More.  More.  Back just

1       a little bit.  A little bit more.  Right there.  Stop.

2               Before he gets in -- he's going to get in and he's

3       going to take my information.  He's going to ask my name and

4       all this, but I want you to take note of his screen and what

5       he said.

6               He's going to ask me for my government name, my

7       date of birth and all of that.  Then he's going to ask me my

8       address.  I'm going to give him my address.  He's going to

9       be flicking the screens and he's going to state:  "So your

10      ID's correct," which means that he has my ID in his

11      possession in this vehicle.

12              Could you please go forward and play it again.

13      Stop.

14          (Videotape played)

15              As you see, he's flicking through screens.  None

16      of that has my information up there, period.  He's just

17      doing some stuff.  He's obviously looking at something to

18      verify my ID and he's going to say it in one second.

19              Play the rest of it.

20          (Videotape continues)

21              You can see he's not looking at my info.

22              Now, once again I want the record to reflect that

23      he just said my ID is correct and I told him yes, which once

24      again shows that the State had my ID and it wasn't in fact

25      in that truck that they're going to go to in the next three

1    hours, because this is 12:07, 12:10-ish.  They're going to

2    go to that vehicle at 3:00 in the morning.

3           And also, when Ms. Darcy Goolich had the records

4    from my state attorney information that she sent in the

5    emails to him, which is why I'm going to state that I told

6    them that they had a phone call of the same morning I went

7    into custody, which is before I knew they found the truck.

8    He's going to tell me over the phone that she woke up, she

9    went outside, seen the officer two-stepping it back to his

10   truck.  At that point, the passenger window was jimmied

11   down, the 2001.  This officer never went in the truck and

12   that ID was in there.  This is going to show that it was

13   record documented that this officer broke into my truck.

14   She's going to send it to her investigator and go get the

15   actual form, because they already heard the phone call.

16   There's emails to him because she sent him the emails.  She

17   then sent him emails about other stuff that's pertaining to

18   the case too, because he's going to go back and forth with

19   her.

20          So skip forward.

21     (Videotape played)

22          We're almost out of here.  I just want to develop

23   the record.

24          Keep going.  Go all the way until we're getting

25   out the car at the station.  A little bit more.  We're

1   downtown now.  A little bit more.  A little bit more.  Right

2   there.

3        (Videotape continues)

4        Stop.  At this time I'm going to ask him about my

5   cell phone and my ID and stuff that I left, I mean, that was

6   left there.  He's going to -- clearly he's going to lie and

7   state that he didn't take no cell phone.  I had nothing in

8   my pockets, he didn't take my ID, he didn't take nothing,

9   but clearly the video footage and stuff is going to

10  contradict that.

11       Could you keep playing it.

12       (Videotape continues)

13       Stop.  Now, you heard him say he didn't take my

14  cell phone.  We all seen him put the cell phone on the roof

15  of the car.  And in his report he actually states that he

16  put the cell phone on the roof, but I want to point you to

17  some corruption by him.  He's going to think that he cut his

18  body cam off to make a phone call, but he's not.

19       Go forward.  Skip forward.  Go back just a little

20  bit.  Skip forward just a little bit more.  Right there.

21  Play it.

22       (Videotape continues)

23       Now, this is where he's covering his body cam

24  thinking he cut it off.

25       Stop.  This is Joe Pucely again, once again,

1    corruption at its best.  He just said he didn't have it, he

2    didn't do it, and once again you see him trying to cut his

3    body cam off and minimize the footage that he left my stuff

4    there.  So my ID being in that truck, that's tampering with

5    evidence also, so that tends to evidence not only in the

6    Tahoe that the Government had since May 16th and they didn't

7    search till June and gave the wrong truck numbers and stuff,

8    and he put my kid's mother in this report for whatever

9    reason, telling them it was a 2002.

10          But as you seen from the Supplement 31 that we're

11   going to enter into evidence, when the officer towed it, he

12   said it was a blue 2001 Chevrolet Tahoe and he actually

13   lists the serial number, all of which before Sgt. O'Rourke

14   wrote this report he could have checked to verify who was

15   the owner of that vehicle.  The owner of that vehicle was a

16   Tamika, and I'm going to enter that into evidence, her name,

17   the registration of the vehicle and everything, the 2001.

18   It was never in my kid's mother's name.  So them trying to

19   put this -- this is more government corruption with them

20   trying to put this bogus report in saying that it was a

21   domestic and it was wrote it in there, they would have had

22   that at the first hearing.  They made that shit up.  The

23   number that we had -- excuse my language.  But the number

24   that we had and that we looked up for this case registered

25   to, like I said, a 60-year-old woman and I entered that into

1    evidence.  It's going to be in that police thing.  And this

2    is a domestic with her husband.  The police didn't -- she

3    didn't file charges because she was too blind to sign the

4    papers.  That's what it's going to say in there, no

5    reference to a Chevrolet Tahoe, no reference to a Shenita

6    Esaw.

7         And then if you look in the forged documents that

8    they made, if you look in there, it says that that's from

9    June 4th, and it was a 2002 with a 21-day temporary sticker

10   in the window.  That's what he's going to allege that this

11   is, right?  Well, how is it May 16th that -- when you towed

12   this vehicle, this one had a 21-day sticker in the window?

13   Now, is it me, or is that the longest 21-day sticker in

14   history?

15        That goes to further proof that they knew that

16   this wasn't the truck.  They made up a truck.  Because if

17   the 2002 that you're alleging my kid's mother had in her

18   name with the 21-day sticker was from March 4th, which is

19   when the alleged domestic took place, then there's no way

20   possible that it would have been a valid 21-day sticker in

21   the window, which was valid because this sticker that's in

22   fact in the 2001 that you guys got that they entered into

23   evidence late that I'm putting in the suppression to get

24   marked out, they actually take a up-close picture of the

25   sticker the night before or the night when the vehicle's

275

 1    being taken.  That sticker was issued May 5th, ten days

 2    before the arrest of the suspect, which makes that a valid

 3    21-day sticker, and the one from March 4th would have been

 4    also unvalid.

 5              So when they go to make their argument about, oh,

 6    it was in his kid's mother's name and all that, bull.  They

 7    had a chance to look up the VIN number.  They didn't.  They

 8    searched the wrong car, they lied to the judge.

 9              Even the vehicle that they searched in their

10    inventory report, it said a blue 2001 Chevrolet Tahoe.  They

11    had the vehicle in their custody a month and a half before

12    they did the search.  They had the VIN numbers the same

13    night.  They had already went in the truck.  They had

14    already did stuff to the truck.  They clearly were saying

15    that it was a 2001.

16              They took pictures of the door with the VIN number

17    saying it was a 2001.  They took pictures of the VIN number

18    in the window.  Everything in this truck -- they went

19    through the owner manual and took pictures of it saying it's

20    a 2001.  They even took pictures of the ownership of the

21    truck itself in the impound lot and it said it was in a

22    Tamika -- a Tamika Barnes, when really it's supposed to be

23    in a Linda Bail.  It just never crossed over because the

24    truck has still got a lien on it from an Automobile Giants

25    and they didn't transfer it over.

1          So the vehicle that they did search, yeah, that

2     was my vehicle with my stuff in it.  I'm admitting that,

3     everything you found in there.  It's false, though.  The

4     insurance card, that's mine.  All the stuff that was in

5     there legally with my name on it, my tickets, my citations,

6     those are mine.  The stuff that you guys are showing is not.

7          Your witnesses at the scene said that the vehicle

8     that did the shooting had tape repair on it.  The vehicle

9     that you towed had tape repair on it.  It had a whole light

10    missing.

11         THE COURT:  Mr. Andrews, you got to slow down.

12         THE DEFENDANT:  Oh.  The vehicle that -- a witness

13    that was at the scene, another witness that gave the name NO

14    and a cell phone number that wasn't out there -- and the

15    video was showed that I'm going to enter into evidence that

16    she wasn't out there neither.  But she's going to say that

17    the vehicle that the suspect is known to drive has some tape

18    repair somewhere on it.  They enter into evidence so many

19    pictures of this light hanging out, taped up, and all this

20    stuff that's on this truck.

21         The vehicle that's in the video of the shooting,

22    there's no tape.  There's no light hanging off.  They towed

23    that vehicle, the 2001, less than 12 hours after the

24    shooting.  Once again, I told them I wasn't the right guy.

25    They had the wrong truck.  They had a chance to check that

1    truck.  It wasn't the right truck.  The evidence didn't fit.

2         This is Government corruption at its best.  Them

3    two (indicating) knew.  It started off with David Voth,

4    because he was the one taking the information from the

5    sergeant.  He checked it over.  He knew that it didn't

6    match.  He knew the gun didn't match the crime scene.

7    Supplement 44 said the gun didn't match the crime scene.

8    They knew this.  They turned over Supplement 44 in July,

9    which means that that's the evidence that they took to the

10   grand jury.  In Supplement 44, that gun was not a match.

11   The make-up copy that they made to Supplement 44, which is a

12   forgery that they turned over September 7th, says that the

13   gun was a match.  That's a forged document.

14        Also, another thing that we're going to put into

15   evidence.  They put the search warrant for the DNA in.  The

16   search warrant that they put in was a forgery of the

17   judge's.  I have the original copy with the judge's

18   signature on it.  It's down there at the table.  We're going

19   to enter it into evidence.  That one has the date, the judge

20   name and everything on the same page.  The one they entered,

21   the judge name is on the second page, no date.  It's not

22   even wrote the same.  But they stamped the judge's signature

23   onto it, another forged document by the Government.  He knew

24   that, they knew that, and I had objected to it, so I'm using

25   it as my argument.  I put my motion in for Government

1    corruption.  That's why I'm developing this stuff on the

2    record.

3              I'm entering my notice for my alibi.  My alibi is

4    in.  One is going to be a motion for an alibi.  The second

5    one is going to be a motion for my alibi, also to dismiss

6    this case for loss of exculpatory evidence by both the

7    Government and my attorney.  No one went and got that

8    footage.  I don't know what they was thinking, what they was

9    doing, but it's well-documented that I was telling people to

10   get the whole day.

11             Also, these (indicating) two is more corruption.

12   Once again, in David Voth's report he entered in the way

13   that they develop what you say.  You call Sgt. O'Rourke on

14   June 6th and asked him how did he get the location of the

15   suspect.

16             THE COURT:  Mr. Andrews, let me interrupt you for

17   a second, okay?

18             THE DEFENDANT:  I wrapping up.

19             THE COURT:  Okay.  You're wrapping up?  Because

20   you're well into argument, which is fine.  The only reason I

21   care about it is you can make all those arguments later.

22             The Marshals Service has to transport a lot of

23   people back to Sherburne County.  They've been waiting 45

24   minutes.  That's fine.  If you're wrapping up, that's fine

25   too, but just recognize that if there's factual information

1    you want in the record, put it in.  If it's argument, you

2    can wait.

3           THE DEFENDANT:  No, it's factual.  I want to talk

4    about the evil eye and double-edge sword and about the

5    evidence they entered as an exhibit, but it's David J. Voth,

6    ATF officer in this case.

7           June 16th he spoke to Sgt. O'Rourke, asked him how

8    he developed the supplement on May 10th.  Sgt. O'Rourke

9    on June 8th in response sent him his supplement and roughly

10   eight attachments that show the time reference, date and the

11   paperwork that they used to get the suspect.  And that time,

12   date and reference they only gave -- the Government -- the

13   defendant at the 11:00 o'clock hour.  Why did they only give

14   it at the 11:00 o'clock hour?  Because they wanted to show

15   that that was the hour and the cell site information they

16   used to get the suspect.  There's no way in a realtime

17   emergency ping, nowhere.  There's many, many perjuries on

18   this stand and impeachment that none of these officers had

19   this until it was turned over May 10th, which is what Kelly

20   O'Rourke testified to and we took a continuance that day.

21   So that's in the evidence.

22          Also -- I mean, the phone records.  This is why

23   they changed their records.  If you look at the records

24   which they refused to turn over till September 7th, it shows

25   the full time from the 13th to midnight May 15th.  In those

1    records it got cell site tower information.  Now, that's the

2    same cell site tower information they used at the 11 o'clock

3    hour to locate the suspect.

4          If you go to the 4:00 o'clock hour over south,

5    Loring Tower on Nicollet, which I said from the beginning

6    which gives me an airtight alibi, somehow, some way, the

7    Government was dealing with my attorney, because they

8    wouldn't return multiple emails to them and asking them back

9    and forth, they wouldn't give us the full document of the

10   realtime ping, because David Voth put in -- said they had 48

11   hours.  So September 7th they gave us theirs, but a week or

12   two earlier, maybe three weeks earlier, he was telling me if

13   they don't want to give it to us, put a subpoena in.  Well,

14   it was put in and we got our own.  We got ours

15   September 6th.  They gave it to us on September 6, 7,

16   brought it to me before the motions -- two days before the

17   motions hearings.

18         Now, in ours, ours went through May 16th.  Theirs

19   didn't.  The thing that was different from ours from theirs

20   is ours showed the 16th.  This goes into the corruption of

21   how all of this is twisted together with the Government's

22   outrageous conduct and what he's willing to do, Jeffrey

23   Paulsen, to get a conviction.  He changed his story.  In

24   came this realtime ping location, because he was made aware

25   from my attorney that I was going to use their phone records

1    that they gave us as an airtight alibi, but in doing that I

2    feel like my attorney exposed him and working with the

3    Government.  How do I prove that?  This is facts.

4         Their time frame stopped midnight May 15.  Ours

5    went through May 16th.  On May 16th, 5:00 o'clock, text

6    messages, so we knew that the time frame was off by five

7    hours.  The Government didn't know this.  Up until this

8    point they was only putting in the 11:00 o'clock hour from

9    T-Mobile.  If you go back to 4:40, which is the shooting, I

10   was over south, the other side of town from their shooting.

11        Now, for the Government to prove my time is, say,

12   this five hours, which they show with his time, they got to

13   put in another way the suspect's location on May 15th going

14   into May 16th.  In comes the realtime location.

15        But here's the fact that the Government had to be

16   working with my attorney.  The Government wouldn't have

17   known that it was the five-hour gap unless my attorney had

18   told them May 16th that my phone was still making phone

19   calls till roughly 5:00 o'clock in the morning, so that goes

20   to show there was a 5:00 o'clock gap.  Even with that

21   5:00 o'clock gap, it still put me downtown south closer to

22   -- the phone is bouncing around, but it's an airtight alibi

23   where I was from the cameras and the T-Mobile records.

24        But they changed their time frame now and they put

25   the realtime in because they need to push my time back,

1    which I knew, but that's why we get to the T-Mobile records,

2    which show the beginning of our time and the end of our time

3    to show where ours went.  They changed their story three

4    days after we got our records, which goes to show someone

5    gave them that information that the five hours was off.

6    Surely they had four or five months before September 10th to

7    put their realtime location in, which is why I impeached

8    Kelly O'Rourke and the other officer, pressed them so hard

9    about why that email didn't exist and why it was so

10   important.  It goes to show that they changed the story

11   line, they changed their evidence, because they received

12   evidence I believe from my attorney just like my attorney

13   and them got rid of the footage two months later.

14            And if we put a subpoena in, the investigator is

15   going to testify when we put him up here that they told him

16   that they saved the footage, but they just needed -- the

17   footage was there.  If the whole day was saved, why when you

18   went back to get it a week or so later only two hours was

19   saved after I was outside after?  This shows nothing of my

20   life from the morning time, to the afternoon, to when I came

21   back.

22            THE COURT:  Mr. Andrews, let me stop you.

23            THE DEFENDANT:  That's the loss of exculpatory

24   evidence.

25            THE COURT:  I understand your argument.

1          Let me ask Mr. Paulsen:  Is it your intention to
2     cross-examine Mr. Andrews?
3          MR. PAULSEN:  I have to on a couple points.
4          THE DEFENDANT:  I stopped there.
5          THE COURT:  I got to ask the marshals:  Are we
6     holding it up for an hour?
7          DEPUTY MARSHAL:  Yes, Your Honor.  It's been held
8     up.  They have other drops they have to do with other
9     agencies as well, but if we had a sense -- I was trying to
10     find that out earlier -- it doesn't seem like there's a
11     timeline here, so they're still waiting downstairs.
12          THE DEFENDANT:  I don't feel that I -- that this
13     should be another continuance if they got to leave and come
14     back and get me, because he said they'd be able to do that.
15     If there's going to be another continuance like that again
16     where I can't put my argument in, try to scramble and get
17     evidence and get it into the record and stuff like that,
18     then I object, because I feel like it was some type of
19     violation with this time.  I'm already putting in false
20     documents that I got to keep proving left and right that are
21     forged.
22          THE COURT:  Very short answers.  How long are you
23     going to go?
24          THE DEFENDANT:  Man, I'm done now.  He can cross
25     me.

```
1            THE COURT:  How long are you going to go?

2            MR. PAULSEN:  Hopefully just a few minutes.

3            THE COURT:  What does that mean?

4            MR. PAULSEN:  I have two areas I want to go into.

5            THE COURT:  So are we talking ten minutes or half

6    an hour?  I know you don't --

7            MR. PAULSEN:  Five minutes.

8            THE COURT:  Are you done?  I don't want to put you

9    off.  We've got other things we have to manage here, so I

10   don't want you to say you're done if you're not done, but

11   same thing I told you before.  Argument you don't have to

12   make today, and frankly, the more you argue, the more you're

13   letting him (indicating) know, okay?

14           THE DEFENDANT:  If this wraps up the motions

15   hearing today and we can get our transcript and put our

16   arguments in.  I don't want to do another continuance where

17   he's going to call other witnesses and all this other stuff.

18           THE COURT:  I don't want to either, I don't want

19   to either, but I can't and I will not keep everybody here

20   until 6:00, 6:30, 7:00 o'clock.  I've got to wrap this up

21   and I got to either put a time limit on you or talk to the

22   marshals about what they can do.

23           THE DEFENDANT:  He said they can come back and get

24   me.

25           DEPUTY MARSHAL:  That was at 4:00 o'clock, Your
```

1    Honor.

2              THE COURT:  All right.  Look, 15 minutes.  I don't

3    want to continue it either, Mr. Andrews, but at quarter to

4    6:00 we're done, okay?  Do you want to keep talking or do

5    you want Mr. Paulsen to cross-examine you?

6              THE DEFENDANT:  I guess he can cross.

7                        **CROSS-EXAMINATION**

8    BY MR. PAULSEN:

9    Q.  The cell phone, you're saying you did have a cell phone

10   with you when the police stopped you?

11   A.  Correct.

12   Q.  Is that the phone that has the number 651-502-5142?

13   A.  I had two cells.

14   Q.  The telephone number 651-502-5142, that's the one they

15   pinged.

16   A.  Yes.

17   Q.  Did you have that one with you when you were stopped?

18   A.  Yes.

19   Q.  Did you have it with you all day long?

20   A.  Yes.

21   Q.  Didn't loan it to anybody?

22   A.  No.

23   Q.  Is that the one you claim you were texting to a female

24   during the time of your alibi, which is the time I have the

25   shooting?

1    A.   No, that's not what I'm testifying to.

2    Q.   You showed some videos of a car, white car, with a time

3    stamp between 4:00 and 5:00 p.m.  You're saying you were in

4    that car?

5    A.   That's what I said in my post-statement.

6    Q.   Can you tell us who these people were that were

7    supposedly with you?

8    A.   No.  If -- y'all had a chance to go check in on that

9    stuff, so I'm not dragging no one else into this.

10        THE COURT:  I'm sorry.  If you know the answer to

11   his question, you're going to have to answer it.  The

12   question is:  Who was with you?  Do you know their identity?

13        THE DEFENDANT:  Yes, I know their identity.

14        THE COURT:  So what's the answer?

15   A.   Yes, I know their identity.

16   BY MR. PAULSEN:

17   Q.   Well, you said you were in that white vehicle.

18   A.   Yes.

19   Q.   Who else was?

20   A.   Brother.

21   Q.   What is his name?

22   A.   Mike Jones.

23   Q.   Mike Jones.  And you said there was a female that came

24   up to that white car?

25   A.   Mm-hm.

1    Q.  Who was she?

2    A.  That's my brother's baby mother.

3    Q.  What's her name?

4    A.  I don't have her government name.  She go by DeeDee.

5    Q.  And I thought you said -- wasn't there a Dearra Young?

6    A.  Yes.

7    Q.  She lived at that Loring Tower?

8    A.  Yes.

9    Q.  Somebody that you interacted with or claimed to during

10   the 4:00 o'clock to 5:00 o'clock hour time period?

11   A.  Yeah.

12   Q.  Anybody else?

13   A.  Yeah.  People at the SuperAmerica and the pizza shop.

14   Q.  Would they know you by name?

15   A.  Probably not.

16   Q.  One other thing I want to clear up.  You did use a blue

17   Tahoe that day?

18   A.  No.

19   Q.  Well, let me be clear, because I thought I heard you say

20   that the stuff in the blue Tahoe was yours.

21   A.  It is.

22   Q.  And is that a vehicle --

23   A.  Broke down.

24   Q.  Let me finish my question.  Is that a vehicle you've

25   driven in the past?

```
 1     A.   In the past?

 2     Q.   Yes.

 3     A.   In reference -- what do mean in the past?

 4     Q.   Is that a vehicle Shenita Esaw used?

 5     A.   No.

 6     Q.   All right.  So who used it?  Who had it?

 7     A.   Me until it broke down.

 8     Q.   When did it break down?

 9     A.   Sometime like April.

10     Q.   So are you saying it's been sitting in the location that

11     it was found since April?

12     A.   Roughly just about like beginning of May into April,

13     somewhere in there.

14     Q.   All right.

15     A.   Broke down for a few weeks prior.  That's why I was

16     getting a ride from my brother.  And if you looked at the

17     pictures and stuff, you would see that it was dusty and beat

18     up, and even your officer said that the vehicle wasn't

19     working.  That's why they didn't give our investigator the

20     keys when he went to go to try to check that you all broke

21     the window and jimmied the windows down.

22     Q.   The second cell phone, did you have that with you in the

23     car when you were stopped?

24     A.   Yes.

25     Q.   So there should be cell phones from you in evidence?
```

1    A.  Yeah, but y'all lost one and I told your officer.  If

2    you listened to my post-interview, I told him that I had a

3    phone, 502-4191.

4    Q.  502-4191?

5    A.  Correct.

6    Q.  What's the area code?

7    A.  651.

8    Q.  Would that be in your name?

9    A.  What?

10   Q.  The second cell phone?

11   A.  I doubt it.  It was a Wi-Fi phone that I just made Wi-Fi

12   calls and stuff on it and text messages.

13           MR. PAULSEN:  That's all I have, Your Honor.

14           THE COURT:  Thank you.

15           THE DEFENDANT:  I got a rebuttal.

16           THE COURT:  You have 11 minutes.

17                   **REDIRECT EXAMINATION**

18           THE DEFENDANT:  How should I put this?

19           I was asked about my cell phones and I told the

20   officers, and they said in their paperwork at the beginning

21   of y'all's supplement -- I'm going to enter that into

22   evidence too because of the fact of ownership of the

23   vehicles.  That's why I want the rebuttal.

24           You were asking whose vehicle was it.  That

25   vehicle in question is mine.  It's not in my government

1     name.  It's in someone else's that's got better credit than

2     me, but it's my vehicle, insurance and everything.  It was

3     mine.

4            But in your consolidated response to our motions,

5     you're going to state -- and this is another reason I put in

6     the beginning of that supplement, which is going to be like

7     the witnesses, the victims, the others, you know, the

8     portion of the State case, you have it.  It's the beginning

9     before the statement started with the evidence and all that,

10    videos and stuff that y'all refusing to give us that didn't

11    exist, body cams, the bullets, the gun, that type of stuff.

12    But in there your officers checked the ownership of another

13    vehicle.  That's the GMC Yukon.

14            Now, at the time that vehicle was in my name, so

15    when you go to try to say I had no standing when y'all

16    violated our constitutional rights and searched that vehicle

17    without proper grounds to even pull it over, let alone

18    search and seizure, you're false.  That's a false statement.

19    If you look at the beginning of that supplement -- could you

20    pull up the beginning of the state case -- it's going to

21    list the ownership in this whole case as mine.

22            Go all the way to the top.  And yes, I'm entering

23    this into evidence.  Go down.  Go down after the victims and

24    stuff until you get to the vehicles.  Keep going, keep

25    going, keep going.

```
1              In your supplement your ground is going to be that
2      I had no standing.  Well, I did.
3              Keep going.
4              And this is your evidence that you turned in.
5      This is your reindacted statement to the Government's case.
6              Keep going.  It's coming up very, very quickly.
7      Stop.  Go up.  Go up.  No, no, down, the same way you was
8      going.  It's page 10.
9              Stop right there.  Can you zoom in on the section
10     that has vehicle one.  Enlarging a little bit more.  A
11     little bit more.
12             Stop.  That's the vehicle that we was pulled over
13     in, which is a 2012 GMC Yukon with the dealership tag 17712
14     D, GMC Yukon.  Owner name, Norris Andrews.  This vehicle was
15     verified, it was checked into.  You want to know by whom?
16             Would you go to the thing again.  We're running
17     out of time.  Go to the squad cams.
18             This is another purpose that I'm going to be
19     entering this video into evidence.
20         (Pause)
21             Go to three -- or four, four, four.  I believe
22     it's four.  No, it's three.  We only need the very beginning
23     of this.  Is that the truck being towed?
24             MR. ALIGADA:  Yes.
25             THE COURT:  Play it.
```

MR. ALIGADA: It's playing.

(Videotape played)

THE DEFENDANT: What you're going to hear when his microphone is on is Officer Schroeder talking to his partner, and his partner is going to tell him that he ran the VIN number. He's the one putting the -- filling out the tow sheet, the registration and owner of this vehicle and -- but he's going to say and testify that he ran a VIN number and the VIN number to the dealership plates doesn't match, is that the plates that it does go on there which registers it to the owner is in fact another plate, and the plate that's on there is the dealership so the car can have a plate on it. But this is going to show that he looked into this and he verified whose vehicle it was.

Could you please start that footage.

(Videotape played)

Stop. Need I say more? So when you put your argument in -- yeah.

With that, how much more time we got?

THE COURT: You have three minutes.

THE DEFENDANT: Three minutes.

Last but not least, I would also like to put it on the record that the Government also gave my vehicle to an unknown male. They gave it to a Larry Smith that said he was Domonique's father. Domonique is a fictitious name.

1    The Government knew this.  They found meth and that dope on

2    that girl.  They promised her they would let her go if she

3    was going to come and testify that I was the one that put

4    that gun in that car.

5              Well, lo and behold to them, the one that they

6    thought was 16 years old, she's actually 21.  Her name is

7    Rachelle Hawkins.  Y'all released her to a man named Larry

8    Smith and you need Larry Smith's report.  That's in the last

9    one.  I'm going to enter that too.  He actually states in

10   there that the girl's his stepdaughter, and then when she

11   asked him what's her mother's name, he says Danielle, and

12   the investigator says, "Danielle who?" and he says,

13   "Danielle Hall."  So if this is his stepdaughter, how is it

14   Domonique Smith and how is it Larry Smith?  He didn't adopt

15   the daughter.  This is his stepdaughter.  You made some

16   terrible mistakes, a lot of Government misconduct,

17   outrageous Government conduct.

18             And with that I have nothing further for the

19   record, but I do reserve the right to enter those other

20   items.  I would ask to bring Sgt. O'Rourke back to impeach

21   him some more, but I think the record clearly shows that

22   these detectives, the Government, the lengths that they're

23   willing to go to to frame an innocent man and things that

24   they're willing to put in emails that it's not even remotely

25   right.

1       You got emails saying the shooting was at night,

2   but the detective just testified that he didn't talk to

3   Sgt. O'Rourke, emails or nothing.  If he sent Sgt. O'Rourke

4   all this information about the suspect, which is the forged

5   documents that you sent to my lawyer since the last meeting,

6   well, you just turned it over in the last 48 hours and he

7   had his investigator bring it to me.  Well, I read pretty

8   fast, real fast, and --

9       THE COURT:  Mr. Andrews, we are at 5:45, okay?

10   You have reserved your right to put in any further documents

11   per the procedure we've talked about.

12       THE DEFENDANT:  How do I --

13       THE COURT:  Mr. Aligada will take care of those

14   kinds of details.

15       MR. ALIGADA:  I'll order transcripts and I'll mail

16   them or deliver them as fast as possible.

17       THE COURT:  And all the exhibits, so we'll make

18   sure that that's all taken care of.

19       THE DEFENDANT:  So I just call him and tell him

20   the extra exhibits to add in?

21       THE COURT:  You do that, yes.

22       MR. ALIGADA:  One administrative thought.  Perhaps

23   we should introduce -- maybe I'll talk to Mr. Paulsen about

24   that.

25       THE COURT:  That's fine.

1            All right.  I'm going to stay out here.  You

2      gentlemen need to get on the road, okay?  So we're in

3      recess.

4            Go ahead.   Don't stand up on my account.  Can I

5      speak with the CSO when we're done?

6            THE DEFENDANT:  Do I need to give you the other

7      motions?

8            THE COURT:  Mr. Aligada will take care of that as

9      well.  All of that stuff will be filed, taken care of, it

10     will be heard and it will be ruled on.

11           THE DEFENDANT:  And we can argue on it?

12           THE COURT:  Yes.

13           THE DEFENDANT:  All right.

14           THE COURT:  You have to leave any exhibits that

15     have been marked up there.  You have to leave them there.

16     You will get copies of everything that's been marked.

17           THE DEFENDANT:  Just for the record, I want to

18     give this to the Government.  Y'all can introduce it.  This

19     is the 16-year-old Domonique Smith, a/k/a Rachelle Hawkins,

20     that my truck -- here.  I want to introduce --

21           THE COURT:  Leave it there.  We'll mark it.  We'll

22     get it introduced.

23           THE DEFENDANT:  That's her picture, photo, and her

24     Government information is behind it.

25           THE COURT:  Thank you.

1          THE DEFENDANT:  Are we going to be need to have

2     any more hearings?

3          THE COURT:  Not for a while.

4          THE DEFENDANT:  What would cause us to have

5     another hearing?

6          THE COURT:  Another motion perhaps, but that's for

7     a later date.  Rest assured, Mr. Andrews, we do not discuss

8     your case out of your presence.

9          THE DEFENDANT:  So if I decide not to put these

10    other motions in, we don't have to have another date?

11         THE COURT:  Correct.

12         THE DEFENDANT:  Because I want to wrap this up.  I

13    want to get the argument in.

14         THE COURT:  Even if you put these motions in, they

15    can go in without another hearing and without in-court

16    presence.

17          All right.

18          (Proceedings concluded at 5:50 p.m.)

19                    *     *     *     *

20

21

22

23

24

25

**I N D E X**

**W I T N E S S E S:**                                                **PAGE**

**JOEL E. PUCELY**
     Direct Examination by Mr. Paulsen                      12
     Cross-Examination by the Defendant                    22

**ANDREW W. SCHROEDER**
     Direct Examination by Mr. Paulsen                     156
     Cross-Examination by the Defendant                   162

**NORRIS DESHON ANDREWS**
     Direct Examination by the Defendant                  250
     Cross-Examination by Mr. Paulsen                     264
     Redirect Examination by the Defendant                269


\* \* \* \* \*


**E X H I B I T S**

| NUMBER | FOR ID | IN EVIDENCE |
|---|---|---|
| Defendant 5 (Government 5) | | 32 |
| Defendant 6 | 47 | |
| Defendant 7 | 48 | 58 |
| Defendant 8 | | 58 |
| Defendant 9, 10 | | 58 |
| Defendant 11 | | 126 |
| Defendant 12 | | 137 |
| Government 10 | | 218 |
| Government 11 | | 221 |
| Defendant 13 | | 225 |
| Defendant 14 | | 226 |

**E  X  H  I  B  I  T  S  (CONTINUED)**

**NUMBER**                    **FOR ID   IN EVIDENCE**

Defendant 15                              230

Defendant 16                              232

Defendant 17                              233

Defendant 18                              236

Defendant 19                (236)

Defendant 20                              237

Defendant 21                              238

Defendant 22 through 29                   249

*     *     *     *

**C E R T I F I C A T E**


I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.



*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224