## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

               Plaintiff,

v.

Norris Deshon Andrews,

               Defendant.

Criminal File No. 18-CR-149
(SRN/DTS)


ORDER

---

Norris Deshon Andrews, Sherburne County Jail, 13880 Business Center Dr., Ste. 200, Elk River, MN 55330, *pro se*

Daniel L. Gerdts, 331 Second Ave. S., Ste. 705, Minneapolis, MN, standby counsel for Defendant

Jeffrey Paulsen, United States Attorney's Office, 300 South Fourth Street, Ste. 600, Minneapolis, MN 55415, for the Government

---

SUSAN RICHARD NELSON, United States District Judge

      Before the Court are Defendant Norris Deshon Andrews' Objections ("Objections") [Doc. No. 145-3[1]] to the February 21, 2019 Order and Report and Recommendation ("Order & R&R") [Doc. No. 133] filed by Magistrate Judge David T. Schultz. The Order & R&R addressed several of Andrews' pretrial discovery motions, his motion challenging pretrial detention, and a number of motions to dismiss the Indictment and suppress evidence. The magistrate judge held four evidentiary hearings on these motions on September 10 and 19,

---

[1] A technical error occurred when the Clerk's Office initially scanned the Objections for filing [Doc. No. 145]. The rescanned Objections [Doc. No. 145-3] corrected the error by eliminating duplicate pages found in the initial filing.

2018, October 5, 2018, and December 17, 2018. Combined, the hearings were over 14 hours long. In the Order & R&R, the magistrate judge denied Andrews' motions that sought to suppress evidence or dismiss the Indictment. (*See* Order & R&R at 23–26.)

Pursuant to Andrews' request to appear before the district court judge on his Objections and other matters, (*see* Def.'s Letter at 4 [Doc. No. 143]), this Court held status conferences on April 2 and 8, 2019. At the April 2 status conference, attorney Kevin O'Brien represented Andrews. (*See* Apr. 2, 2019 Minutes [Doc. No. 154].) On April 8, Andrews appeared pro se and Mr. O'Brien served as standby counsel. (*See* Apr. 8, 2019 Minutes [Doc. No. 157].) At both status conferences, the Court heard oral argument on Defendant's Objections to the Order & R&R and took the Objections under advisement.[2] For the reasons set forth below, Andrews' Objections are overruled.

## I.     BACKGROUND

### A.  Shooting, Identification of Suspect, and Surveillance

Andrews is charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). (*See* Indictment [Doc. No. 1].) The charge stems from a shooting that occurred at approximately 4:45p.m. on May 15, 2018, near an apartment complex in the 1700 block of Plymouth Avenue North in Minneapolis. (Def. Ex. 14 (MPD Case Rpt., Creighton Supp. 13); Sept. 10 Hr'g Tr. at 9–10 [Doc. No. 51].) Security camera footage of the incident shows a group of people congregating on a sidewalk adjacent to an outdoor parking area. (*See* Gov't Ex. 1 ("Cropped Video"); Def. Ex. 18 ("Uncropped

---

[2]  Additionally, at the April 8, 2019 status conference, the Court granted Mr. O'Brien's motion to withdraw as counsel [Doc. No. 156].

Video").) Two people arrive in a blue SUV with no front license plate and approach the group of people. (*Id.*) The driver of the SUV—a black man with a larger frame, long dreadlocks, glasses, a dark colored t-shirt, distressed jeans, and athletic shoes—appears to engage in conversation with members of the assembled group. (*Id.*) Eventually, he brandishes a gun and fires several shots before driving away by himself in the SUV. (*Id.*) His former passenger runs away from the scene on foot. (*Id.*)

Shortly thereafter, officers arrived at the scene of the shooting, (*see* Def. Ex. 14 (MPD Case Rpt., Creighton Supp. 13)), including Minneapolis Police Sgt. Kelly O'Rourke. (Sept. 10, 2018 Hr'g Tr. at 10.) Investigating officers spoke with percipient witnesses. (*Id.* at 12– 13.) Although the parties dispute whether these persons were eyewitnesses to the shooting itself, O'Rourke learned the following information from officers' discussions with numerous witnesses: the shooter was described as a large, heavy-set black male, wearing glasses, with his hair in long dreadlocks, driving a blue Chevy Tahoe SUV, the shooter was called "N.O.", his full name was Norris Andrews, he was seen arguing with the victims before the shooting took place, the person accompanying him was named Montrel Tyson, and a witness provided Andrews' cell phone number and a photo of him. (*Id.* at 13, 17; Def. Ex. 15 (MPD Case Rpt., Bauer Supp. 9); Def. Ex. 58 (MPD Full Case Rpt., Pearson Supp. 3, Hanneman Supp. 6, Spee Supp. 11)).) Sgt. O'Rourke accessed a law enforcement database, found jail photos of Norris Andrews, and compared them to the images of the shooter from the security camera video. (Sept. 10, 2018 Hr'g Tr. at 13.) He believed that they depicted the same person. (*Id.* at 14.) He also conducted a Google search of the suspect's cell phone number, which indicated that the subscriber's last name was Andrews. (*Id.*; Sept. 19, 2018 Hr'g Tr. at 59 [Doc. No. 62].)

From other investigating officers, Sgt. O'Rourke learned that about an hour earlier, a "shots-fired" call had been placed in the same general area, at 25th and Girard Avenue North, and similar shell casings were found at the scene. (Sept. 10, 2018 Hr'g Tr. at 14.) Sgt. O'Rourke testified that in that earlier incident, "a blue Chevy Tahoe with no plates was described as a potential suspect vehicle." (*Id.* at 14; Gov't Ex. 10 (Incident Rpt.) at 2 (call log noting, "ACCORDING TO WITNESSES BLU TAHOE WAS SHOOTING AT PLE IMPALA LOW RIDER."; "DARK BLU TAHOE WITH NO PLATES"; "SHOTS FIRED . . CLR SAW BLU TK LEFT ON GIRARD IN UNK DIRECTION . . CLR HEARD PPL ARGUING." ) (emphasis in original); Def. Ex. 58 (MPD Full Case Rpt., Creighton Supp. 13) (stating that 911 caller/witness identified the shooting vehicle as a dark blue Chevy Tahoe without any plates and the driver was a large black male with dark skin and long braided hair)).

Based on the similarities between the two incidents, the information from witnesses at the later shooting, and the shooting captured on the security camera footage, Sgt. O'Rourke submitted an exigent circumstances order to T-Mobile, the service carrier of the cell phone number in question, to "ping" the phone in order obtain real-time locations and call detail records for the suspect's cell phone. (*Id.* at 15; Gov't Ex. 3 (T-Mobile Exigent Request).) Sgt. O'Rourke provided the following facts in support of the exigent situation: "[L]ife threatening shooting of two victims, one was shot in the chest. Eye witnesses know the suspect to currently be using [phone number]. Zetx shows a last name of a subscriber to be the same as the suspect." (Gov't Ex. 3 (T-Mobile Exigent Request) at 1.) Sgt. O'Rourke provided further detail on a supplement to the form:

The suspect has been identified as using XXX-XXX-XXXX by an eye witnesses [sic] to the crime. I am a police investigator with the Minneapolis Police Department and have been so for 20 years. On this day there was a shots fired call at 23rd and Fre[]mont Avenue in north Minneapolis (18-156610) at 1518 hours. The shooting being investigated occurred at 1642 hours at 1711 Fre[]mont Avenue north in Minneapolis. The same suspect vehicle was described at both scenes. The second scene produced a video that showed the individual that is known to use the target number getting into the described suspect vehicle. The identified suspect also has an extensive criminal history involving weapons and narcotics. On this day during the second shooting he was said to be settling up with a debtor. The egregious part is that after shooting one of the victims multiple times the suspect got back out of his vehicle and made another attempt to finish him off, shooting at him a few more times. I believe at this point it has only been a few hours and the suspect is armed and danger[ous] and is a threat to public safety after showing he can shoot multiple people and commit multiple shootings in a short period of time.

(*Id.* at 2.) Sgt. O'Rourke testified that the above-quoted section of the application contained a typographical error with respect to the shooting address—the shooting occurred at 1711 Plymouth Avenue North, not 1711 Fremont Avenue. (Oct. 5, 2018 Hr'g Tr. [Doc. No. 69] at 22–23.) After he submitted the exigent order, Sgt. O'Rourke received emails approximately every 15 minutes with information on the location of the phone. (Sept. 10, 2018 Hr'g Tr. at 20.)

At approximately 11:00 p.m., the phone appeared to be stationery in the vicinity of 2810 Girard Avenue North.[3] (*Id.* at 20–21.) At approximately 11:30 p.m., Sgt. O'Rourke dispatched two police officers, Officer Andrew Schroeder and Sgt. Joel Pucely, to the area in order to locate Andrews. (*Id.* at 21.) To familiarize himself with Andrews' appearance, Sgt. Pucely looked at a prior booking photo or driver's license image of Andrews, as well as still

---

[3] T-Mobile provided a record of the incoming/outgoing call numbers and times obtained from the location request. (Def. Ex. 2 (T-Mobile Exigent Request & Resp. at 00000085–90).)

images from the surveillance video. (Oct. 5, 2018 Hr'g Tr. at 13, 157.) After the officers looked for Andrews without successfully finding him, Sgt. Pucely continued his surveillance of the area alone, parked at 29th and Girard Avenue in an unmarked squad car. (*Id.* at 14–15, 71.)

From his position, Pucely observed a white GMC Yukon with Minnesota dealer license plates drive by twice. (*Id.* at 15–16.) He found the vehicle's movements suspicious, suggesting that the driver was looking for someone. (*Id.* at 16.) The Yukon eventually parked. (*Id.* at 17.) Using a pair of binoculars and the illumination of streetlights, Sgt. Pucely saw two people leave a house, jog towards the Yukon, and get inside the SUV. (*Id.* at 16–18, 51–52.) Although Sgt. Pucely could not see their faces, he believed that one of them matched the description of the shooting suspect, based on similarities in build and hairstyle. (*Id.* at 18, 36.) Sgt. Pucely watched as the Yukon pulled away from the curb, but failed to signal, and turned onto 29th Avenue North without coming to a full stop at a stop sign. (*Id.* at 18–19.) Sgt. Pucely followed the Yukon and called Officer Schroeder to assist in a vehicle stop. (*Id.*)

### B. Stop and Search of the Yukon

Sgt. Pucely turned on his lights to initiate a stop for the two moving violations, and the Yukon promptly pulled over. (*Id.* at 20.) Several other officers also arrived. (*See* Def. Ex. 7 (Dashcam Video).) The driver was a woman, Montrel Tyson was the front seat passenger, and Norris Andrews, who Sgt. Pucely recognized from the booking photos, was the backseat passenger. (Oct. 5, 2018 Hr'g Tr. at 20–21.) Sgt. Pucely testified that as he approached the car from the rear, he could not see into the back window because it was tinted. (*Id.* at 73–74.) Officer Schroeder testified that from his vantage point alongside the Yukon, however, he

could see into it and observed the backseat passenger move around, "leaning towards the I guess passenger side of the vehicle[.]" (*Id.* at 159–60.) Pucely asked Andrews to step out of the vehicle, at which time Andrews was handcuffed and moved to the back seat of Pucely's squad car. (*Id.* at 21.)

Sgt. Pucely's police bodycam video shows that prior to transporting Andrews, Pucely asked Andrews to exit the squad car and submit to a search of his person. (Def. Ex. 32 (Pucely Bodycam) at 3:19–3:40.) While Pucely performed the search of Andrews' pockets, another officer asked Andrews for his name, (*id.* at 3:39), which Andrews provided, adding, "You got my I.D." (*Id.* at 3:40–3:44.) Sgt. Pucely responded, "I didn't get an I.D. from you, that's what I'm looking for," and repeated, "I didn't find an I.D. anywhere." (*Id.* at 3:45–48.)

In the squad car, Sgt. Pucely entered Andrews' name in a Minnesota driver's license database. (*Id.* at 7:54–8:12.) The I.D. results screen, visible from Pucely's bodycam footage, included Andrews' name, date of birth, and address. (*Id.* at 8:12.) Sgt. Pucely verbally verified with Andrews his middle name and date of birth. (*Id.* at 8:13–8:19.) Sgt. Pucely then asked Andrews for his current address. (*Id.* at 8:31–32.) After Andrews responded, Pucely stated, "Okay, so your I.D. is correct." (*Id.* at 8:34–8:35.)

Upon arrival at the police station, Sgt. Pucely guided Andrews to the door and through the lobby, indicating directions with a manila envelope that apparently contained any items removed from Andrews' pockets. (*Id.* at 19:08–19:21.) When Andrews inquired about the whereabouts of his cell phone, Sgt. Pucely initially stated that Andrews did not have a cell phone on his person. (*Id.* 19:09–19:11) Andrews protested, stating, "Y'all took my stuff outta my pockets, my I.D. and stuff should be in there." (*Id.* at 19:21.) Sgt. Pucely responded,

"All I took out of your pockets were keys," gesturing with the manila envelope. (*Id.* at 19:33.) While escorting Andrews to the interview room, Sgt. Pucely phoned officers at the scene of the stop. (*Id.* at 20:09–20:22.) He explained that when he first approached the Yukon and asked Andrews to exit it, he had removed the phone from Andrews' lap, and likely placed it on the roof of the Yukon. (*Id.* at 20:09; *see also* Def. Ex. 7 (Dashcam Video) (showing officer place object on roof of vehicle).) It appears that officers located the phone. (Def. Ex. 32 (Pucely Bodycam) at 20:30–20:40.) (Sgt. Pucely states, "Just make sure it's powered off.")

Booking photos taken of Andrews show a black man with long dreadlocks and glasses, wearing a dark colored t-shirt, a jacket, distressed jeans, and black athletic shoes with red and white trim. (Def's Ex. 5 (May 15, 2018 Photos); Gov't Ex. 5 (May 15, 2018 Photos).)

Prior to towing the Yukon, officers conducted a search of the vehicle at the scene of the stop. (Oct. 5, 2018 Hr'g Tr. at 90, 94–95.) They found a 9mm handgun under the back seat in the vicinity of where Andrews had been seated. (*Id.* at 21–22; 105.)

**C.  Search of Tahoe, Forensics, and Photo Array Identification**

Sgt. O'Rourke interviewed the driver of the Yukon, identified at that time as Dominque or Domonique Smith. (Sept. 10 Hr'g Tr. at 24–25; Gov't Ex. 7 (Search Warrant & App.) at 3.) Andrews disputes that that is her true name and states that her name is actually Rachelle Hawkins. (Oct. 5, 2018 Hr'g Tr. at 292–93, 295; Def. Ex. 30 (Photograph).) Sgt. O'Rourke testified that through his investigation, he believed that Smith's father was the owner of the Yukon and had consented to her use of it. (Sept. 10, 2018 Hr'g Tr. at 23.) Smith stated that earlier that evening, she had received a call from Tyson or Andrews, asking for a

ride from the approximate area of 26th Street and James Avenue North. (*Id.*) Because she was late to arrive, she received a subsequent call, directing her to 2810 Girard. (*Id.*)

Sgt. O'Rourke then sent officers to the vicinity of 26th Street and James Avenue North, where they found a blue Tahoe, which was taken into police custody. (*Id.* at 13.) In July 2018, Sgt. O'Rourke applied for a search warrant to search the Tahoe,[4] which he obtained. (*See* Gov't Ex. 7 (Search Warrant & App.).) Inside the vehicle, officers found identification bearing Andrews' name, including a Minnesota driver's license, a Visa debit card, a temporary proof of insurance card, and a Robbinsdale Police Department citation. (*Id.*; Sept. 19, 2018 Hr'g Tr. at 14.) Andrews contends that his driver's license was planted by the searching officers, asserting that Sgt. Pucely had obtained his identification card earlier, when he was taken into custody. (*See* Def. Ex. 32 (Pucely Bodycam).)

Sgt. O'Rourke obtained a court order for a DNA sample and fingerprint sample from Andrews, as well as a photo line-up. (Sept. 19, 2018 Hr'g Tr. at 19–20; Gov't Ex. 8 (Hennepin Cty. Order).) As to fingerprint evidence, specifically "friction ridge impression evidence," the Minneapolis Crime Lab analyzed the gun for evidence, comparing it to samples obtained from Andrews and Tyson. (Def. Ex. 27 (Crime Lab Rpt.) at 1.) The Crime Lab Report indicates a match between a friction ridge impression found on the gun and Andrews' right thumb fingerprint. (*Id.*) In addition, investigators test-fired a discharged cartridge casing from the gun, finding that they matched the casings left at the Plymouth Avenue shooting. (Def. Ex. 58 (MPD Full Case Rpt., Carlson Supp. 44).)

---

[4] The search warrant application is discussed in greater detail below at 35–36.

Approximately three days after the shooting, Sgt. O'Rourke interviewed one of the shooting victims in the hospital. (Sept. 19, 2018 Hr'g Tr. at 15.) The victim stated that he could not identify the shooter by name, but described him as having "long dreads or braids, just long hair, glasses." (*Id.* at 16.) Among other things, the victim stated that he had been talking to his "auntie" when Defendant fired shots at him. (*See* Dec. 17, 2018 Hr'g Tr. [Doc. No. 115] at 80–81.) After the shots were fired, the victim contended that the shooter got into a blue truck, with someone else at the wheel, and fired additional shots at the victims from the window of the moving vehicle. (*Id.*)

Later, Sgt. O'Rourke returned to the hospital with a photo array. (Sept. 19, 2018 Hr'g Tr. at 16.) The photo array included a composite page with six photographs, followed by six sheets of paper containing the individual photographs from the composite page, one picture per page. (Gov't Ex. 6 (Photo Array).) All of the photograph subjects are black men with dreadlocks. (*Id.*) The background on the picture of Andrews is a lighter shade of grey than the grey background on the other pictures. (*Id.*) Andrews' head also appears to be slightly larger in the frame than in the other photographs. (*Id.*) Sgt. O'Rourke told the victim that the perpetrator might or might not be in the photos, but to take his time looking at each individual photograph, one at a time, without Sgt. O'Rourke being able to see them. (Sept. 19, 2018 Hr'g Tr. at 18.) With certainty, the victim identified Andrews as the shooter, and signed and dated the photograph of Andrews to signify the positive identification. (*Id.*; Govt. Ex. 6 (Photo Array).)

### D. Procedural Background

As noted in the Order & R&R, Mr. Reynaldo Aligada of the Federal Defenders Office previously represented Andrews and filed a number of pretrial motions on his behalf [Doc. Nos. 24–31; 40–42]. The magistrate judge held a hearing on September 10, 2018 to address these motions. However, Mr. Aligada requested a continuance of the evidentiary portion of the hearing when the Government moved the admission of an exhibit that was not previously disclosed. (Sept. 10, 2018 Hr'g Tr. at 26–28.)

On September 19, 2018, the hearing resumed before Magistrate Judge Schultz. Andrews stated that he wished to represent himself for purposes of the hearing and wanted to file additional motions himself. (Sept. 19, 2018 Hr'g Tr. at 3–8.) After an inquiry, the magistrate judge found that Andrews knowingly and voluntarily waived his right to counsel. (*Id.* at 9–10.) Thus, he granted Andrews' request to represent himself at the hearing and appointed Mr. Aligada as standby counsel. (*Id.*) Sgt. O'Rourke testified at the hearing and Andrews also cross examined him at length. (*Id.* at 21–70, 73–87.) Because the hearing was running past the close of business hours, it was continued to October 5, 2018. (Oct. 5, 2018 Hr'g Tr. at 2.)

At the nearly seven-hour long October 5 hearing, Andrews continued to represent himself, and Mr. Aligada continued to serve as standby counsel. (*Id.* at 2–3.) Sgt. Pucely, Officer Schroeder, and Andrews testified. (Oct. 5, 2018 Minutes [Doc. No. 48].) Andrews filed several pro se motions at the hearing [Doc. Nos. 53–59, 65–66].

Shortly thereafter, in light of a conflict of interest that had arisen between Andrews and Mr. Aligada, the magistrate judge granted Mr. Aligada's request to withdraw as standby

counsel. (Oct. 18, 2018 Order [Doc. No. 64].) The Court then appointed Kevin O'Brien as substitute defense counsel. (Oct. 24, 2018 Order [Doc. No. 67].) Following a November 9, 2018 *Feretta* hearing at which Andrews appeared to give contradictory answers about his desire to represent himself, the magistrate judge gave Andrews additional time to consider his self-representation decision. (Nov. 13, 2018 Order at 2 [Doc. No. 74].) If Mr. O'Brien were to continue to represent Andrews, the magistrate judge directed Mr. O'Brien to withdraw any pro se motions that Andrews had filed when he was also represented by counsel. (*Id.*) The magistrate judge also gave defense counsel additional time in which to file additional pretrial motions and to reopen the evidentiary hearing in order to present additional witnesses or to recall witnesses who had previously testified. (*Id.*)

Subsequently, Andrews informed the Court that he was unhappy with Mr. O'Brien's representation. (Nov. 14, 2018 Letter [Doc. No. 92].) The magistrate judge held a hearing on December 17, 2018, at which Andrews waived his right to counsel, and the magistrate judge appointed Mr. O'Brien as standby counsel. (Dec. 17, 2018 Hr'g Tr. at 4.) At the hearing, Andrews presented arguments, testified, entered exhibits, and was cross examined. (*See id.* at 2–156.) The magistrate judge allowed Andrews to re-file any of the pro se motions that Mr. O'Brien had recently withdrawn. (*Id.* at 146–47.) Likewise, the magistrate judge gave the Government time to respond to any of the re-filed motions. (*Id.* at 147.)

### E. Magistrate Judge's Findings and Recommendations

As relevant to Andrews' objections, in the Order & R&R, the magistrate judge ruled on the following procedural issues: (1) as to evidence in the Government's possession, but not yet produced to Defendant, (*see* Def.'s Pro Se Mot. for Discovery [Doc. No. 75]), because

the Government agreed to produce the material, the magistrate judge denied Defendant's discovery motion as moot; (2) regarding Andrews' request to reopen the evidentiary hearing to call additional witnesses, and to present oral argument on his motions, (*see* Def.'s Pro Se Mot. for Oral Arg. [Doc. No. 110]; Def.'s Pro Se Mot. to Reopen Pretrial Mot. Hr'g [Doc. No. 111]), the magistrate judge found that Andrews had not sufficiently demonstrated a need to reopen the hearing, noting the well-developed record, which included several days of testimony and numerous memoranda; (3) as to Andrews' motion for a new detention hearing, (*see* Def.'s Pro Se Mot. for Detention Bond Hr'g [Doc. No. 96]; Def.'s Pro Se Mot. for Revocation of Order [Doc. No. 109]), the magistrate judge denied it, finding that none of the grounds that Andrews asserted would assure his further appearance in court or the safety of the community. (Order & R&R at 6–8.)

With respect to the substantive rulings at issue here, the magistrate judge denied Andrews' motions to dismiss the Indictment[5] for allegedly outrageous government conduct based on the following grounds: (1) fabricated evidence; (2) destruction of exculpatory evidence; (3) withheld evidence; (4) witness tampering; (5) eye witness identification; and (6) vindictive prosecution. (Order & R&R at 9–13.) The magistrate judge also denied

---

[5] (*See* Def.'s Pro Se Mot. to Dismiss on Due Process Grounds [Doc. No. 80]; Def.'s Pro Se Mot. to Dismiss Indictment for Lack of Probable Cause [Doc. No. 98]; Def.'s Pro Se Mot. to Dismiss Indictment for Loss of Exculpatory Ev. [Doc. No. 100]; Def.'s Pro Se Mot. to Dismiss Indictment & Suppress Ev. from Search & Seizure [Doc. No. 101]; Def.'s Pro Se Mot. to Dismiss Indictment for T[a]mpering with Ev. & Loss of Exculpatory Ev.-Witness [Doc. No. 116]; Def.'s Pro Se Mot. to Dismiss Indictment for T[a]mpering with Witness & Ev. [Doc. No. 117]; Def.'s Pro Se Mot. to Dismiss Indictment for Discovery Violations [Doc. No. 118]; Def.'s Pro Se Mot. to Dismiss Indictment for T[a]mpering with Witness & Ev. [Doc. No. 119].)

Andrews' Fourth Amendment motions to suppress evidence related to: (1) the exigent cell phone location information (*see* Def.'s Am. Mot. to Suppress Cell-Site Location Information [Doc. No. 85]; Def.'s Pro Se Mot. to Suppress Ev. [Doc. No. 104]); (2) the arrest and search of the white Yukon (*see* Def.'s Am. Mot. to Suppress Ev. From Unlawful Arrest & Stop & Search of GMC Yukon [Doc. No. 86]); (3) identification through the photographic array (*see* Def.'s Am. Mot. to Suppress Eyewitness Identifications [Doc. No. 87]); (4) the search of the blue Tahoe (*see* Def.'s Mot. to Suppress Ev. from Search of Chevrolet Tahoe & Request for *Franks* Hr'g [Doc. No. 88]; Def.'s Pro Se Mot. to Suppress Search Warrant [Doc. No. 97]); (5) percipient witness identification (*see* Def.'s Pro Se Mot. to Compel Disclosure of Identification Witness [Doc. Nos. 102]; Def.'s Pro Se Mot. to Suppress Identification of Defendant [Doc. No. 103]); and (6) untimely disclosures (*see* Def.'s Pro Se Mot. to Suppress All Late & Untimely Ev. [Doc. No. 99]; Def.'s Pro Se Mot. to Add On/Amended Mot. to Doc. No. 55 [Doc. No. 112]).

Andrews has filed lengthy Objections to the Order & R&R, in which he advances several arguments.[6] First, he contends that Magistrate Judge Schultz was biased in the following ways: (1) making the Government's case for it and generally favoring the Government, (Objs. at 2, 7, 19, 22, 38–39, 51); (2) taking longer to respond to Defendant's

---

[6] Andrews repeats many of these arguments throughout his Objections. The Court addresses them collectively to avoid repetition. The Court also notes that Defendant presents several overlapping arguments in support of his claims of both judicial bias and violations of due process. (*See, e.g.*, Objs. at 3–4 (denying request for oral argument, taking too long to rule); 6 (relying on exhibits that were not admitted in evidence); 29–30 (denying his request for defense witness testimony)). The Court considers all of the bases of Defendant's arguments.

motions and generally causing delay, (*id*. at 3–4, 11–12, 16–17, 54, 56); (3) not reading Defendant's motions, (*id*. at 12–13); and (4) characterizing the facts of the case in contradiction of the evidence and relying on false statements and testimony, (*id*. at 5, 7, 20, 24, 40–48, 50).

In addition, Andrews appears to argue that the magistrate judge denied him due process with respect to his pretrial motions, which he argues is also indicative of bias, citing the following examples: (1) ruling on motions without holding hearings or considering evidence, (*id.* at 3); (2) denying him access to a law library or computer while in pretrial detention at the Sherburne County Jail, (*id*. at 4, 9, 17); (3) relying on exhibits that were not introduced at the evidentiary hearings, (*id*. at 6); (4) denying requests for defense witnesses and supporting evidence, and cutting hearings short, (*id*. at 8–9, 20, 35); (5) forcing him to accept Mr. O'Brien as his counsel, even though Defendant had "fired" him, (*id*. at 9–11); (6) taking too long to rule, (*id*. at 17); (7) failing to rule in point-by-point detail by addressing each motion individually, (*id*. at 20); (8) permitting the Government's untimely disclosure of evidence, (*id*. at 33–35, 55); and (9) permitting the Government to ask leading questions. (*Id*. at 22.)

Further, Andrews argues that the magistrate judge improperly relied on falsified, tampered, and planted evidence. (*Id*. at 21, 23–30, 32, 35, 36–37, 40–43, 45, 48, 50.) He also contends that the Government has withheld exculpatory evidence. (*Id*. at 31–34, 46–47, 55.) In addition, he contends that his motions were tampered with, citing the removal of pages. (*Id*. at 23.)

He reasserts his arguments to suppress the exigent cell phone location information, arguing that the Government was required to obtain a search warrant and failed to do so, (*id.* at 38–42), and the Government lied about the exigent circumstances in order to obtain the information. (*Id.* at 42–45.) Similarly, he argues that there were no grounds to stop or search the white Yukon, (*id.* at 48), the photo array was unduly suggestive, (*id.* at 49), and the search of the Tahoe should be suppressed because the warrant was improperly obtained, evidence was planted, and the vehicle was held for too long. (*Id.* at 52.)

Andrews also moves for the disclosure of the identity of the percipient witness, arguing that the video evidence demonstrates that this witness was not an eye witness to the shooting, and the Sixth Amendment grants him the right to confront the witness's accusations. (*Id.* at 53–54.) Further, Andrews challenges the magistrate judge's denial of reconsideration of his pretrial detention.[7] (*Id.* at 15–16.)

Finally, the Court notes that in separate objections, ([Doc. No. 150]), Andrews challenges the magistrate judge's separate Report and Recommendation ([Doc. No. 144]) on Andrews' Motion to Dismiss for Speedy Trial Violations. The Court addresses the speedy trial objections in a separate order.

---

[7] At the April 8, 2019 status conference, the Court ruled from the bench on the portion of Andrews' Objections challenging his continued detention, finding that no conditions or combination of conditions will ensure Andrews' appearance in Court and the safety of the public. (*See* Apr. 8, 2019 Minutes at 1.) Accordingly, because the Court has already ruled on this issue, the Court does not address it further here.

## II.    DISCUSSION

The district court must undertake an independent, de novo review of those portions of the R&R to which a party objects and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* D. Minn. L.R. 72.2(b)(3).

At the outset, the Court notes that Andrews often confuses issues more properly reserved for trial, including, for example, witness credibility, and the ultimate issue of his guilt or innocence, with the legal standards and facts relevant to his suppression motions. Some of his arguments may potentially be raised at trial, subject to the requirements and standards of the Federal Rules of Evidence and Rules of Criminal Procedure, but are not germane to the suppression and dismissal motions, as noted below.

### A.    Bias and Due Process

Andrews appears to argue throughout his Objections that because bias infected the magistrate judge's analysis and recommendations, this Court should sustain his Objections and grant his motions. As noted, he contends that Magistrate Judge Schultz favored the Government, (Objs. at 2, 7, 19, 22, 38–39, 51, 56), took longer to respond to Defendant's motions and generally caused delay, (*id*. at 3–4, 11–12, 16–17, 54, 56), failed to read Defendant's motions, (*id*. at 12–13), and characterized the facts contrary to the evidence and relied on false statements and testimony. (*id*. at 5, 7, 20, 24, 40–48, 50). A number of Andrews' arguments concern alleged due process violations, which he claims are indicative of the magistrate judge's bias.

Generally, accusations of judicial bias are asserted in order to seek a judge's recusal under 28 U.S.C. § 455 and § 144, not to appeal evidentiary and suppression rulings. Thus, Andrews' allegations of "bias" do not lead to the result that he seeks here—a favorable ruling on his underlying motions. Rather, under § 455, a judge or magistrate judge must disqualify himself from any proceeding in which "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455.

To the extent that Andrews seeks the recusal of the magistrate judge, it is denied. There is no showing of personal bias, let alone a showing that personal bias influenced the magistrate judge's Order & R&R.[8] The fact that Andrews disagrees with Magistrate Judge Schultz's findings and recommendations does not support a claim of bias. The Supreme Court has stated that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Instead, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*

The Court's review of the exhaustive record here shows no such "deep-seated favoritism or antagonism." To the contrary, the magistrate judge presided over multiple

---

[8] Nor does Andrews meet the strict statutory requirements necessary to move for recusal. *See* 28 U.S.C. § 144 (describing affidavit that must be filed); *see also In re Medlock*, 406 F.3d 1066, 1073 (8th Cir. 2005) ("The affidavit must be filed within certain time limits.").

lengthy hearings to afford Andrews a full opportunity to be heard. Among other things, Magistrate Judge Schultz explained the proceedings and, as necessary, the law, admitted Defendant's evidence, allowed him to fully cross-examine the Government's witnesses, present arguments, testify, and gave him additional time in which to raise pro se arguments. And the magistrate judge also issued evidentiary rulings in Andrews' favor. For example, he sustained an objection lodged by Andrews, (Oct. 5, 2018 Hr'g Tr. at 14), and overruled an objection to one of Andrews' questions. (*Id.* at 84.)

### 1. Favoring the Government

Through his Objections, Andrews accuses the magistrate judge of "making objections for the Government" and generally favoring the Government's presentations. (Objs. at 2, 22, 56.) He cites numerous portions of the hearing transcripts that, he argues, demonstrate this alleged favoritism and bias. (*Id.* at 22) (citing Sept. 19, 2018 Hr'g Tr. at 31–32, 35–40, 42–49, 53–56, 64, 70, 75, 85–86; Oct. 5, 2018 Hr'g Tr. at 61–64, 99–101, 140, 148, 152–54, 214.) As "the most noticeable" example, Andrews points to a portion of the September 19, 2018 hearing transcript, (*id.*), during which Andrews asked Sgt. O'Rourke about the timing of the Government's production of an exhibit. (Sept. 19, 2018 Hr'g Tr. at 86.) Magistrate Judge Schultz properly identified the Government's objection as an objection to foundation, which he also properly sustained, as the witness lacked sufficient knowledge to answer the question:

> Defendant: Can you please tell us what brought this document about after all of these months? Because the shooting happened May 15th, am I correct?
>
> Sgt. O'Rourke: It was requested.

Defendant:  It was requested when?

Sgt. O'Rourke:  September 10th.

Defendant:  Why?

Gov't:  That's a question he can't answer, but I can, and I'll be happy to answer it.

Defendant:  Do you want to get on the stand?

Court:  No, we're not doing that.  The objection is foundation.  It's sustained.  Go ahead.

Defendant:  What, with the question?

Court:  No, move on to the next question.  He can't answer the question why it was requested.

(*Id.*)

After having carefully reviewed Defendant's examples of alleged favoritism toward the Government or of the magistrate judge "doing the Government's work for them," the Court rejects any notion of favoritism.   None of Andrews' examples support such a finding.  (*See, e.g., id.* at 35–36 (discussion about whether a document should be a separate exhibit, or a single exhibit); 36–37 (magistrate judge asking the witness if he understood Defendant's question about the timing of document production and informing Defendant, "I don't believe the witness has the foundation to answer that."); 39–40 (discussing timing of document production).)   Contrary to Defendant's assertion of favoritism, the record shows that the magistrate judge afforded Andrews considerable latitude and provided assistance, frequently explaining the proceedings and legal rulings to him.  He did not favor the Government.

Andrews also notes as another example of "bias," the fact that the magistrate judge referenced legal authority and exhibits that the Government had not cited. (*See* Objs. at 7, 19.) In analyzing a legal issue, courts are not limited only to the case law on which the parties rely. The fact that the Court cites cases that support the Government's position is not evidence of bias. It demonstrates that the Government's position is supported by the law. And the Court may certainly rely on evidence in the record, regardless of whether a party expressly brings it to the Court's attention.

Furthermore, the record belies Andrews' assertions that the Government failed to raise certain arguments. For example, Andrews argues that the Government failed to present an argument concerning Andrew's standing to challenge the search of the Yukon. (Apr. 2, 2019 Hr'g Tr. at 20 [Doc. No. 164].) But the Government expressly raised this issue at least twice in opposition to Andrews' suppression motions. (*See* Gov't's Consol. Resp. at 3 [Doc. No. 34]; Gov't's Consol Resp. to Sept. 12, 2018 Mots. at 3 [Doc. No. 44].) On yet another occasion, in response to pro se motions duplicative of defense-counsel filed motions, it also incorporated its earlier standing arguments by reference. (Gov't's Consol. Resp. to Nov. 26, 2018 Mots. at 2 [Doc. No. 84].)

## 2. Concerns Raised in Defendant's Letters

Andrews also contends that bias accounts for why the magistrate judge failed to respond to his letters concerning his displeasure with Mr. O'Brien, whom he contends he had already "fired," (Objs. at 9–11), and his complaints about access to legal resources. (*Id.* at 8–10.) But without a motion before the Court, and while Andrews was, in fact, represented by counsel, the magistrate judge acted properly.

### 3. Delay of Proceedings

Andrews' claim that Magistrate Judge Schultz somehow deliberately "delayed the trial with multiple continuances" likewise fails. (*Id.* at 8–9.) As explained in more detail in the Court's ruling on Andrews' speedy trial objections, the speedy trial clock is stopped by various events, including when motions are filed and taken under advisement. The magistrate judge did not deliberately slow the pace of these proceedings.

Similarly, the Court rejects Andrews' claim that Magistrate Judge Schultz took longer to respond to pro se motions than other motions on the docket. (*Id.* at 2–3, 17.) There is nothing here that shows a deliberate effort to slow the pace of rulings on the pro se motions. Moreover, the Court notes that pro se pleadings often require more of the Court's time and attention to ensure that self-represented litigants' arguments are fully understood and addressed.

Similarly, the Court rejects Andrews' suggestion that the magistrate judge purposely delayed proceedings by directing Mr. O'Brien to withdraw certain pro se motions, only to later direct that he re-file them. (*See id.* at 9–11.) As the magistrate judge explained at the December 17 hearing,

> I am trying to give you your full and fair opportunity. I am the one who said withdraw the motions; and the reason for that, right or wrong, is we had a situation where you were represented, then not represented, filed a bunch of motions, then represented again and now not represented again. And what you don't get to do is be represented, but file motions on your own.

(Dec. 17, 2018 Hr'g Tr. at 33.) To the extent that "delays" occurred during this period, Andrews himself affected the timing by filing pro se motions when he was represented by counsel.

### 4. Due Process in Proceedings

Andrews presents numerous arguments that the magistrate judge denied him an opportunity to present his arguments, all of which are without merit. While Defendant contends that the magistrate judge cut hearings short, (Objs. at 8–9), the four transcripts from Andrews' motions hearings, reflecting over 14 hours of time, refute any such notion. Granted, the constraints of securely transporting Andrews and other pretrial detainees back to the pretrial detention facility at the close of court affected hearing schedules. However, the magistrate judge promptly continued hearings to afford Andrews the opportunity to be heard, just as this Court did on April 2, when Andrews required additional time to present oral argument on these Objections.

In addition, Andrews asserts that the magistrate judge failed to address his motions in the proper order. (*Id.* at 20.) He argues that the magistrate judge demonstrated bias and outrageous conduct by addressing Andrews' grounds of argument collectively, as opposed to each argument individually. (*Id.*) This objection is frivolous. The Court is not required to address a party's motions in a particular order. Just as the Court is doing here, in order to avoid repetition—and many of Andrews' motions are repetitious—the magistrate judge addressed the common bases of Defendant's motions. Moreover, in the magistrate judge's discussion of those common bases, he referenced the filed motions by docket number.[9] (*See, e.g.*, Order & R&R at 8, 14, 16,17–18, 21–22.)

---

[9] The magistrate judge also addressed Andrews' pro se oral motions.

Andrews also claims that the magistrate judge exhibited bias and denied him due process by cutting hearings short and ruling on motions without holding hearings, considering evidence, or permitting defense testimony. (Objs. at 3, 8–12, 20.) Again, the magistrate judge held numerous hearings to ensure that Andrews had the opportunity to present his arguments and evidence. As to the presentation of defense witnesses, at the October 5 hearing, Andrews stated that he had wanted to cross examine Officer Benjamin Bauer, but conceded that his testimony was unnecessary, stating, "I feel like his name is certified, so I don't even need him to come. I'm just going to put his supplement in. It tells the story." (Oct. 5, 2018 Hr'g Tr. at 229–30.) He also noted that he would have called an alibi witness, Dearra Young, to testify, "but we don't deal with each other no more, so I got to work with what I got." (*Id.* at 264.) When Magistrate Judge Schultz reminded Andrews that he could subpoena her if he needed her testimony for future court hearings, Andrews replied, "[I]t's a long story with her, man." (*Id.*)

Similarly, at the December 17, 2018 hearing, Andrews expressed his desire to proceed and disavowed the need for any witnesses, stating, "Now, if the court is willing and ready, like I said, I got readily-available evidence where I really don't need none of them to testify." (Dec. 17, 2018 Hr'g Tr. at 27.) He reiterated his point, stating, "[I]f we go through with this hearing today, I don't even need no witnesses. I can get it poppin' without 'em, because the evidence gonna show I just want to impeach 'em, so we could get it poppin' without 'em right now today and then we can go to the memorandas or whatever." (*Id.* at 35.) Moreover, Andrews stated that his brother, whom he apparently contends is an alibi witness, was then in custody and could not testify. (*Id.* at 93.) All of the above demonstrates that Andrews had

sufficient opportunity to subpoena witnesses, but chose not to do so and the only witness that he called was himself.

At the conclusion of the December 17 hearing, Andrews expressed concern that all of his evidence had not been admitted, citing his exhibits as an example. (*Id.* at 149.) Magistrate Judge Schultz clarified, "When you reference the exhibits and you're showing me the lime green jump drive, flash drive, are you talking about paper, essentially documents that you want entered into the record?" (*Id.*) Andrews confirmed that that was his concern, and the magistrate judge gave him additional time in which to file any memoranda or more exhibits. (*Id.* at 150, 151.) Magistrate Judge Schultz ultimately concluded that Andrews had not sufficiently demonstrated the need to reopen the hearing, as his testimony and argument addressed all of his motions, and he filed additional written motions. (Order & R&R at 7.)

The Court has copies of all of Andrews' exhibits, including his supplemental exhibits, and has reviewed all of the transcripts of the motion hearings. The Court rejects any argument that Magistrate Judge Schultz failed to consider the evidence, read Defendant's filings, or provide him sufficient opportunity to present evidence and argument. The Order & R&R is replete with citations to the record, including Defendant's testimony, exhibits, and memoranda, and the hearing transcripts demonstrate the magistrate judge's commitment to accommodate Andrews' requests and needs as a self-represented litigant. The Court finds no basis for Andrews' claim of bias or a lack of due process.

### 5. Characterization of Facts

Andrews also objects to the magistrate judge's characterization that "Andrews seeks to suppress, in effect, any evidence that the Government may possibly use at trial." (Objs. at

5) (quoting Order & R&R at 1.)  Andrews claims, "that's a false statement," arguing that he only seeks to suppress evidence that was illegally obtained.  (*Id.*)  The way in which the magistrate judge summarized Andrews' position—in the opening paragraph of the Order & R&R—has little bearing on the substantive questions of whether certain evidence is subject to suppression or the dismissal of the Indictment.  Moreover, even if the purported distinction between *all* of the Government's evidence versus *only* allegedly illegally obtained evidence were critical, Andrews contradicts himself, arguing that *all* of the evidence that the Government has withheld is exculpatory and he will not "know for sure til he gets it."  (*Id.* at 55.)  In any event, the magistrate judge's characterization of Andrews' evidentiary arguments in no way demonstrates bias.

In sum, the Court rejects Defendant's contention that the magistrate judge exhibited bias and denied him due process, for all of the reasons discussed above.

### B.  Remaining Discovery from the Government

Andrews also takes issue with the magistrate judge's ruling that denied as moot his motion for discovery of various evidence in the Government's possession.  (*Id.* at 13.)  Because the Government has agreed to provide the evidence, this objection is overruled.

The Court addressed this subject at the April 2019 hearings and asked the Government to update the Court on the status of its production of the requested material.  Counsel for the Government has since advised the Court in an April 12, 2019 letter that it produced the requested police reports to the Federal Defender's Office, which was committed to promptly hand-delivering them to Andrews.  (Gov't Apr. 12, 2019 Letter at 1 [Doc. No. 161].)   In addition, counsel for the Government completed its review of additional bodycam recordings

that Andrews had requested and was prepared to disclose them either directly to Andrews or through substitute counsel. (*Id.*) The Court requests that the Government promptly confirm that arrangements have been made for Mr. Andrews to review the bodycam recordings.

### C. Exigent Cell Phone Location Information

Andrews argues that the information from the exigent circumstances cell phone location request—which the magistrate judge refers to as "exigent pings"—should be suppressed, along with all subsequently obtained evidence. (Objs. at 38–42.) First, he argues that the Government "lied" about what happened during the shooting, stating that in Sgt. O'Rourke's request for the exigent location information, the sergeant referred to both a "life-threatening" shooting, yet also noted "non-life-threatening injuries." (*Id.* at 42–43.) Andrews contends that there was no reason to believe that anyone else was in danger, nor was there any proof of future plans. (*Id.* at 44.)

> Pursuant to the Stored Electronic Communications Act,
>
> a [service] provider . . . may divulge a record or other information pertaining to a subscriber . . . or customer . . . (not including the contents of the communications) . . . to a governmental entity, if the provider, in good faith, believes that an emergency involving danger or death or serious physical injury to any person requires disclosure without delay of information relating to the emergency.

18 U.S.C. § 2702(c)(4).

There was no Fourth Amendment violation here. First, no evidence shows that in a fluid, developing investigation, Sgt. O'Rourke deliberately "lied" in order to obtain the exigent cell phone location information. As for the supposed "lies," Andrews appears to refer to information attributed to a percipient witness, and Sgt. O'Rourke's statement—gleaned

from information provided by one of the shooting victims—that the suspect shot at the victims a second time before leaving the scene of the shooting. The Government asserts, however, that a second volley of shots is corroborated on one of the security videos, in which a bystander in a green shirt is seen reacting to possible shots fired from inside the Tahoe. (Gov't's Resp. to Def.'s Dec. 18, 2018 Mots. [Doc. No. 108] at 4 n.1) (citing Def. Ex. 18 (Uncropped Video) at 4:42:03, 4:42:12).

However, the salient facts on which Sgt. O'Rourke based his request are clearly borne out by the evidence. A shooting occurred and witnesses, whether eyewitnesses to the shooting itself or eyewitnesses to events immediately preceding the shooting, placed Andrews at the scene, identifying him as the gunman. (Sept. 10, 2018 Hr'g Tr. at 10–13, 17.) Moreover, there was reason to believe that Andrews had participated in a shooting approximately an hour and a half earlier, in the same general area, based on similarities in shell casings found at both sites and information suggesting that a blue Chevy Tahoe with no plates was a potential suspect vehicle. (*Id.* at 14.) Finally, investigating officers determined that the suspect, Andrews, had "an extensive criminal history involving weapons and narcotics." (Gov't Ex. 3 (T-Mobile Exigent Request) at 2.)

Based on these facts, the Court agrees with the magistrate judge that when Sgt. O'Rourke applied for the cell phone information, he reasonably believed that Norris Andrews was the suspect, and that he was still armed and dangerous. As Magistrate Judge Schultz properly found, whether the victims' injuries were labeled "life-threatening" or whether the shooter fired again at victims before leaving the scene is not material. Importantly, the shooter had recklessly used deadly force. He thus caused "an emergency involving danger or death

or serious physical injury" sufficient to meet the statutory requirements of 18 U.S.C. § 2702(c)(4), and Sgt. O'Rourke reasonably relied on information that he had learned in the course of the developing investigation.

Andrews also argues that because the Government did not obtain a warrant for the cell phone location information, it must be suppressed under the Fourth Amendment. (Objs. at 40–41.) He contends that the Government's access to the location information constituted an "interception of communication," because the officers received precise, real-time updates, outside of normal cell service. (*Id.* at 41–42.) Andrews asserts that Sgt. O'Rourke only requested the information under 18 U.S.C. § 2702 for stored communications, but illegally received interceptions under 18 U.S.C. § 2518 instead.[10] (*Id.*)

The information obtained here, however, simply involved location, not the content of communications. As the magistrate judge correctly recognized, § 2518 authorizes the interception of the contents of electronic communications, and is not at issue here. (*See* Order & R&R at 14, n.6.) Rather, under § 2702, Sgt. O'Rourke received the voluntary disclosure

---

[10] Somewhat relatedly, as indicative of purported bias, Andrews claims that the magistrate judge improperly faulted Defendant for failing to develop an argument based on *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018), a Fourth Amendment case regarding the collection of cell phone historical location data. (Order & R&R at 15.) In contrast, Andrews argues, the magistrate judge made the "'full argument' for the Gov[ernment] on every issue[.]" (Objs. at 39.) The Court disagrees. In the Order & R&R, Magistrate Judge Schultz observed that Defendant's prior counsel, in a motion that was initially withdrawn, and later in a motion that was never fully briefed or argued, suggested that exigent location information must be suppressed pursuant to *Carpenter*, in which the Supreme Court held that the collection of historical cell phone location information required a search warrant. (Order & R&R at 14–15.) Not only did Andrews fail to elaborate on this argument, but the Supreme Court in *Carpenter* expressly noted that its ruling did not address the collection of real-time location information. (*See id.*)

of Andrews' cell phone location information from Andrew's provider, T-Mobile, for a limited period, due to exigent circumstances. Under such circumstances, a warrant is not required. The Court overrules Andrews' objections on this issue.

### D. Stop & Search of the White GMC Yukon

Andrews objects to the magistrate judge's recommendation to deny the suppression of evidence obtained from the search of the Yukon. (Objs. at 27, 45–48.) He further argues that officers can be seen on their bodycam video "planting" evidence in the Yukon. (*Id.* at 27) (citing Def. Ex. 7 (Dashcam Video) at 9:52.) He argues that this is somehow related to the magistrate judge's purported bias, stating, "This is another reason why the judge ruled not to let me reopen hearing or call witnesses for these pro-se motions." (*Id.*)

As to the initial stop of the vehicle, even minor traffic violations provide sufficient probable cause to support a stop. *United States v. Miller*, 915 F.3d 1207, 1209 (8th Cir. 2019). Here, officers had probable cause to stop the Yukon, having observed it commit violations for failing to signal and failing to come to a complete stop at a stop sign. (Sept. 19, 2018 Hr'g Tr. at 18–19.) Defendant argues that the vehicle was following all traffic laws and had no reason to stop, (Objs. at 48), but even if that were the case, based on Officer Pucely's observation of a person entering the Yukon who matched the shooting suspect's description and Andrews' jail photo, officers had reason to believe that Andrews was a passenger in the Yukon. They also had reason to believe that Andrews was involved in the shooting, based on information provided by witnesses to the shooting, corroborating information obtained during the investigation involving review of the shooting video, Andrews' cell phone number, his jail photo, and cell phone tracking data that led officers to the location in question.

The officers also had probable cause to arrest Andrews. As the magistrate judge noted, a warrantless arrest does not violate the Fourth Amendment if it is supported by probable cause. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008–09 (8th Cir. 2017). Probable cause "exists when the totality of the facts known at the time of the arrest would justify a reasonable person in believing that the individual has committed or is committing an offense." *Id.* Moreover, "probable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication." *United States v. Edwards*, 891 F.3d 708, 711–12 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 349 (2018) (citing *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)). Given all of the facts noted above, officers had probable cause to arrest Andrews at the time of the stop.[11]

As for the search of the Yukon, Fourth Amendment rights "are personal rights that may not be asserted vicariously." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004). A defendant must demonstrate a "requisite connection" to the property being searched. *Carpenter v. United States*, 138 S. Ct. 2206, 2227 (2018) (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). The magistrate judge agreed with the Government, (*see* Gov't's Consol. Resp. to Def.'s Pretrial Mots. at 3 [Doc. No. 34]), finding that Andrews lacked standing to challenge the search of the Yukon, as he was not the owner of the vehicle. (Order & R&R at 16.) Magistrate Judge Schultz acknowledged that Andrews claims to be

---

[11] The Court notes that there is some ambiguity in the record as to whether Andrews was officially placed under arrest at this time, (*compare* Oct. 5, 2018 Hr'g Tr. at 69, 250–51 *with* Oct. 5, 2018 Hr'g Tr. at 81), but regardless of the terminology, he appears to have been under arrest at the time of the stop, and sufficient probable cause supported his arrest.

the owner of the vehicle, and notes that the police report's description of non-inventoried property lists him as the owner. (*Id.* at 16 n.7) (citing Def. Ex. 33 (MPD Case Rpt. with Supps.,) at 00000010). However, the magistrate judge also found that the report is contradicted by title records, which lists a "Sunny Day Welch" as the owner. (*Id.*) (citing Def. Ex. 62 (Minn. Dep't Pub. Safety Title Record for Yukon) at 2.) Finding that Andrews did not demonstrate the necessary standing to challenge the search, the magistrate judge found that Andrews could not suppress any evidence obtained from its search. (*Id.*)

The evidence in front of the magistrate judge supported his finding that Andrews was not the owner of the Yukon. In his Objections, Andrews offers an explanation for the contradictory facts. (Objs. at 46–47.) He contends that the prior owner, Sunny Day Welch, traded or sold the Yukon to a car dealership, and the dealership received a title for the Yukon, which Defendant had recently purchased. (*Id.*) Further, Andrews contends that a Bill of Sale, indicating his ownership of the Yukon, was found in the vehicle. (*Id.*) This Court's review is limited to the facts and evidence that were before the magistrate judge, and in that regard, it is unclear whether Andrews is the owner of the Yukon.

But even assuming that Andrews is the owner, and has standing, the search of the vehicle was proper. As the Government has argued, (*see* Gov't's Consol. Resp. to Def.'s Pretrial Mots. at 3–4) (citing *United States v. Ross*, 456 U.S. 798, 808–09 (1982); *United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011)), the officers had probable cause to believe that a gun was in the car before they conducted a search. Pursuant to the automobile exception to the warrant requirement, "officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the car contains contraband or other evidence." *Edwards*,

891 F.3d at 712 (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). The Supreme Court has explained that the reason for this exception lies in the lower expectation of privacy in vehicles and their unique mobility. *California v. Carney*, 471 U.S. 386, 390–91 (1985). Prior to the search here, as discussed above, the officers had probable cause to believe that the car contained a gun based on their reasonable belief that Andrews had been involved in two shootings only hours earlier, combined with Andrews' furtive movements at the time of the stop. (Oct. 5, 2018 Hr'g Tr. at 159–60.) Accordingly, the Court overrules Andrews' objections concerning standing and adopts the Order & R&R, as modified by the analysis above.

Finally, the Court has reviewed the videos that allegedly show officers planting evidence in the Yukon, (*see* Def. Ex. 7 (Police Dashcam) & Def. Ex. 8 (Police Dashcam)), but finds that the evidence fails to bear out Andrews' speculative accusations. For the most part, officers' backs face the camera, obscuring the view. Sgt. Pucely also viewed the videos during his cross examination and testified that he did not see officers planting evidence. (Oct. 5, 2018 Hr'g Tr. at 99.) Moreover, Andrews appears to allege that officers planted drugs in the car, particularly in the car door. (*Id.* at 97–101.) For purposes of the felon-in-possession charge here, however, the relevant evidence is the gun. None of the video evidence shows officers planting a gun in the vehicle.

For all of these reasons, the Court overrules Andrews' objections concerning the legality of the search and seizure of the Yukon.

### E.   Search of the Blue Chevy Tahoe

One of Andrews' primary contentions before the magistrate judge and in his Objections is that the charge against him is based on planted evidence and false testimony. The Court addresses these arguments in the various contexts in which they arise.

Andrews contends that evidence concerning the blue Chevy Tahoe should be suppressed and the Indictment should be dismissed.  He argues that his identification card, which he contends officers took from him when he was placed in custody, was subsequently planted in the blue Tahoe in order to "get [probable cause] to tow it" and conduct a search. (Objs. at 28, 50.)  He further argues that the search warrant application was improper and that the vehicle was held for too long prior to the search.  (*Id.* at 51–52.)  The Court disagrees.

As to the allegedly "planted" evidence, there is utterly no evidence to support Andrews' bald assertion that officers engaged in any misconduct.  Andrews focuses on the fact that officers found his driver's license in the Tahoe, but in addition to the license, they found numerous pieces of evidence linking the vehicle to Andrews by name, including a Visa debit card, a temporary proof of insurance card, and a Robbinsdale Police Department citation.  (Gov't Ex. 7 (Search Warrant & App.).)   The Court rejects the notion of evidence "planted" in the Tahoe.

Officers conducted the search of the Tahoe pursuant to a search warrant.  As the magistrate judge noted, when considering a challenge to a search warrant, a court may only consider information found within the four corners of the warrant to determine the existence of probable cause.  *United States v. Farlee*, 757 F.3d 810, 819 *8 Cir. 2014) (citing *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999)).  A search warrant affidavit establishes

probable cause "if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." *United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010). Courts examine the sufficiency of a search warrant affidavit not in a "hypertechnical" fashion, but using "common sense." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007).

As noted, the search warrant affidavit for the search of the Tahoe stated that security camera footage at the scene of the Plymouth Avenue shooting showed the shooter driving an older model blue Tahoe, which was missing a front license plate. (Gov't Ex. 7 (Search Warrant & App.) at 3.) In his affidavit, Sgt. O'Rourke also noted the shooter's distinctive clothing, glasses, height, weight, and long dreadlocks, which the officer observed from the video. (*Id.*) Sgt. O'Rourke further stated that from "eyewitness accounts of the incident," he learned that Norris Andrews was the shooter. (*Id.*) He noted that incoming police reports included a T-Mobile cell phone number that Andrews was using. (*Id.*) O'Rourke learned corroborating information that the cell phone number was listed to a user with the last name Andrews. (*Id.*)

In his affidavit, Sgt. O'Rourke also stated that he compared prior booking photos of Andrews to the crime scene images "and determined he was a person of interest as the shooter in this case."

The affidavit also noted an association between Andrews and a blue Tahoe, information from a March 2018 police incident report involving Andrews and the mother of his child, which stated that "Andrews' child's mother Shenita Esaw is the owner of a 2002 blue Tahoe with a 21-day temporary sticker per Minneapolis CCN 18-045880." (*Id.*) In

addition, the affidavit stated that after Andrews and the occupants of the Yukon were in custody, one of the occupants provided a location for the blue Tahoe, in the vicinity of 24th and James Avenue North.[12] (*Id.*) Sgt. O'Rourke further stated that after he dispatched officers to look for the vehicle in that general area, they found a vehicle matching the description and towed it to the impound lot for processing. (*Id.*)

Based on the information within the four corners of the warrant application, there was a fair probability that officers might find evidence from the shooting in the vehicle. As set forth above, the affidavit lays out numerous corroborating facts, coming from witnesses, video surveillance, prior booking photos, criminal incident reports, and witness interviews. These facts show a connection between the shooter, the blue Chevy Tahoe, and Andrews. The Court agrees with the magistrate judge that officers had probable cause to search the Tahoe.[13]

Andrews challenges the magistrate judge's denial of a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks*, a defendant may challenge the finding of probable cause if he makes a substantial preliminary showing that the affiant recklessly disregarded the truth through a false statement or omission that was necessary to the finding of probable cause. *Id.* Andrews challenges the veracity of the witness who identified him by name and phone number at the scene of the shooting, (*see* Objs. at 36), the affiant's statement

---

[12] It appears that location might have been 26th and James. (*See* Sept. 10, 2018 Hr'g at 24.) This discrepancy is immaterial.

[13] Andrews' claim that the magistrate judge "made up" facts about the search in support of the Government (Objs. at 51) is meritless. The magistrate judge considered the information in the search warrant affidavit.

that the mother of his child was the Tahoe's owner, (*see* Dec. 17, 2018 Hr'g Tr. at 68), and

the affiant's statement that the Tahoe was a 2002 model. (*See* Oct. 5, 2018 Hr'g Tr. at 274.)

As to a female witness's identification of Andrews as the shooter, he claims this is

based on false evidence, pointing to the security camera footage, which, he contends, does

not show female witnesses. (Objs. at 36.) He also appears to argue that the police report

merely states that a witness "heard" gunshots before running inside, and therefore, the witness

is not a true eyewitness. (Oct. 5, 2018 Hr'g Tr. at 229.) This fails to meet the substantial

preliminary showing necessary for a *Franks* hearing. First, given that security camera footage

was taken from a fixed location, it is quite possible that witnesses were outside of the frame

or viewing events from an inside or concealed location. Second, regardless of whether the

witness was an eyewitness to the shooting itself, she observed two people argue prior to the

shooting, then heard gunshots. (Def. Ex. 15 (Bauer Supp. 9).) She identified the person

arguing with the victim as Andrews, and was familiar enough with him to have a photograph

of him on her cell phone. (*Id.*) It also appears that the same witness provided Andrews' cell

phone number. (Def. Ex. 58 (MPD Full Case Rpt., Mattsson Supp. 7).) Even if she did not

directly see Andrews shoot the victim, this was a reasonable tip for officers to investigate and

include in the search warrant application. It is not "false evidence," nor was the inclusion of

Andrews' name in the search warrant application reckless. Thus, this does not rise to a

substantial preliminary showing for a *Franks* hearing, nor does it independently require the

suppression of evidence or the dismissal of the Indictment.

The Court likewise finds that information in the search warrant affidavit concerning

Andrews' association with the blue Tahoe does not demonstrate a reckless disregard for the

truth.  Sgt. O'Rourke stated that from the surveillance video, he observed that the shooter was driving an "older model blue Chevrolet Tahoe with no front license plates."  (Gov't Ex. 7 (Search Warrant & App. at 3).)  It appears that the person whom Sgt. O'Rourke identified in the affidavit as the owner of the Tahoe—the mother of Andrews' child—may not have been the owner of the vehicle.  (*See* Def. Ex. 63 (Minn. Dep't Public Safety Title Record for Tahoe) (listing "Rockstar Automotive" as the owner).)  But Sgt. O'Rourke reasonably based the statement on information that he had obtained from a March 2018 domestic assault incident report involving Andrews and the complainant, a woman who was apparently the mother of his child.  (Gov't Ex. 11 (Incident Rpt.) at 6.)  In fact, the incident report stated that the woman owned a blue 2002 Chevy Tahoe.  (*Id.*)  It was reasonable for Sgt. O'Rourke to rely on this information showing an association between Andrews and the blue Tahoe.

Andrews argues that this information, which references a Minneapolis incident report, is "false" because the Minneapolis report does not relate to him.  (Dec. 17, 2018 Hr'g Tr. at 68.)  The Government has explained, however, that Sgt. O'Rourke inadvertently referenced a *Minneapolis* Police Department domestic assault incident report, when the domestic assault incident report, bearing the same number, actually came from the *St. Paul* Police Department.  (*See* Gov't's Resp. to Dec. 18, 2018 Mots. at 5; Gov't Ex. 11 (Incident Rpt.).)  This typographical error utterly fails to show a reckless disregard for the truth, nor was it unreasonable for Sgt. O'Rourke to include this information in the search warrant affidavit.  As the Eighth Circuit has observed with respect to search warrant affidavits, "A mere typographical error does not establish a 'deliberate falsehood,' or a 'reckless disregard for the truth,' nor does it cast doubt on the affidavit's showing of probable cause[.]" to search

the residence.  *United States v. Butler*, 594 F.3d 955, 961–62 (8th Cir. 2010) (citations omitted) (incorrect date of controlled drug buy did not cast doubt on probable cause); *see also United States v. Arenal*, 768 F.2d 263 (8th Cir. 1985) (typographical error in search warrant application of address to be searched did not render warrant invalid).

As an example of another allegedly false statement in the search warrant affidavit, Andrews notes that O'Rourke referred to a 2002 model Tahoe, (Gov't Ex. 7 (Search Warrant & App.) at 3), although the vehicle in question was actually a 2001 Tahoe.  Like the Minneapolis versus St. Paul incident report, this discrepancy in the model year does not affect probable cause, nor is there any evidence to suggest that Sgt. O'Rourke recklessly disregarded the truth.  *Butler*, 594 F.3d at 961–62.  He relied on information in the St. Paul incident report that did, in fact, refer to a 2002 Tahoe.  (Gov't Ex. 11 (Incident Rpt.) at 6.)  The Court thus rejects Andrews' argument that the Government "made up a truck" to search.  (*See* Oct. 5, 2018 Hr'g Tr. at 274.)

### 1. False Evidence Ballistics Reports, "Forged" Search Warrant, and Conspiracy

Andrews also asserts that the magistrate judge improperly relied on false evidence, including false ballistics reports, a forged search warrant, and a tampered or falsified DNA swab, in reaching his findings and recommendations.  (Objs. at 23–26.)  The Court disagrees with Andrews.  Other than his rank speculation, there is no basis for his accusations.

In a related argument, he appears to contend that his former defense counsel, Mr. Aligada, conspired with the Government to set him up, that defense counsel failed to obtain certain alibi evidence, (*see* Def. Ex. 36 (June 8, 2018 Email)), that the Clerk of Court

"tampered" with his motions, and that the magistrate judge demonstrated "fishiness" by ascertaining that one of Andrews' pleadings was filed with the aid of standby counsel. (Objs. at 18, 23, 25.) The Court rejects these arguments, as no evidence supports Andrews' claims of deliberate efforts to hinder or interfere with his defense.

### 2. Witness Testimony at Motions Hearings

Andrews also contends that at the motions hearings, Sgt. O'Rourke made false or inaccurate statements and Officers Pucely and Schroeder are not credible witnesses. (*Id.* at 21–22.) There is no evidence that Sgt. O'Rourke made false statements, as discussed earlier. Defendant or his counsel will have an opportunity to cross examine witnesses at trial, subject to the requirements of the Federal Rules of Evidence and the Federal Rules of Criminal Procedure. The jury will make determinations of credibility. At this point, nothing in the record demonstrates false statements or evidence.

### 3. Witness Tampering

Andrews argues that the magistrate judge denied him the opportunity to offer evidence in support of his claim of witness tampering. (*Id.* at 35.) Magistrate Judge Schultz observed that after the conclusion of the motions hearings, Andrews filed a motion [Doc. No. 119] alleging that officers had "tampered" with a potential witness, his girlfriend Tamika Barnes. (Order & R&R at 12.) The magistrate judge noted that Andrews offered no evidence in support of his accusation, and found it not credible. (*Id.*)

In a single sentence of his Objections, Andrews incorporates his earlier argument, offering no new evidence or argument. (Objs. at 35.) In the underlying motion, Andrews stated that during the weeks of December 18, 2018 through January 4, 2019, representatives

of the Government spoke with Ms. Barnes, "and tried to tell her not to help the victim" when she inquired about getting the blue Chevy Tahoe (that was still registered in her name until January 3, 2019.)"[14] (Def.'s Witness Tampering Mot. at 1 [Doc. No. 119].) Andrews accuses Sgt. O'Rourke of "[going] as far as to ask her about her relationship and personal things that had nothing [whatsoever to do] with the case or the SUV in question to the point where this witness is nervous and don't want to testify for fear that the government may now come at her and try to pin bogus charges against [her] as they are doing [to] the defendant[.]" (*Id.*)

Although "government conduct designed to intimidate potential defense witnesses is improper," *United States v. Horton*, 756 F.3d 569, 576–77 (8th Cir. 2014) (citing *United States v. Habhab*, 132 F.3d 410, 415 (8th Cir. 1997)), the Court agrees with the magistrate judge that the facts alleged here do not support a claim of intimidation. Nothing suggests that questions about Barnes' relationship with Andrews were designed to intimidate. Furthermore, Barnes was apparently free to refuse to answer such questions. This objection is overruled.

### F. Disclosure of Witness

Andrews seeks to compel the disclosure of the identity of the shooting scene witness who identified him by name, [Doc. Nos. 102, 103], arguing that she is "the key to the probable cause," (Objs. at 53), and that the Sixth Amendment affords him the right to confront the Government's witnesses. In response, the Government claims that the witness is a confidential informant who functioned as a "mere tipster," whose identity need not be

---

[14] By "victim," the Court assumes that Andrews is referring to himself, since he makes no reference to the shooting victims in his motion.

disclosed unless the Government seeks her testimony at trial.  (*See* Gov't's Resp. to Def.'s Dec. 18, 2018 Mots. at 9.)  The magistrate judge found that Andrews' Sixth Amendment rights were not yet implicated at this time, as it was not clear whether the Government would ultimately attempt to use the witness's statement or obtain her testimony at trial.  (Order & R&R at 12–13.)

"The Constitution does not require that prosecutors disclose the identity of confidential informants in every case." *United States v. Hollis*, 245 F.3d 671, 674 (8th Cir. 2001).  The Supreme Court has "consistently declined to hold that an informer's identity need always be disclosed in a federal criminal trial, let alone in a preliminary hearing to determine probable cause for an arrest or search." *Colorado v. Nunez*, 465 U.S. 324, 326 (1984) (citation omitted). The Government contends that the confidential informant's identity is privileged, noting that the witness asked for anonymity out of concern for personal safety.  (Gov't's Resp. to Def.'s Dec. 18, 2018 Mots. at 9.)

In general, the confidential informant privilege permits the government to withhold the identity of persons who confidentially provide information to law enforcement officers. *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1052–53 (8th Cir. 2007).  "In order to override the government's privilege of nondisclosure, defendants must establish beyond mere speculation that the informant's testimony will be material to the determination of the case." *Hollis*, 245 F.3d at 674 (citing *United States v. Harrington,* 951 F.2d 876, 877 (8th Cir. 1991)).  It is the defendant's burden to prove materiality. *United States v. Faulkner*, 826 F.3d 1139, 1147 (8th Cir. 2016).

Here, Officer Bauer's report shows that the witness in question requested that their conversation not be recorded and expressed concern about providing her name, for fear of retaliation. (Def. Ex. 15 (Bauer Supp. 9).) Likewise, another officer responding to the shooting, Officer David Mattsson, stated in his report, "One person, [WHO WISHES TO REMAIN ANONYMOUS AND FEARS FOR THEIR SAFETY . . . ] and listed in this report as "W6" gave me information but was fearful of being seen talking to police. I was able to get their name and phone number, and to then leave and call them via my work cell phone." (Def. Ex. 58 (MPD Full Case Rpt., Mattsson Supp. 7)) (emphasis in original). Elsewhere in the full case report, the name and address of "W6" is redacted. (*Id.* at 00000007.) This sufficiently demonstrates the Government's intention to protect the witness's identity, as it notes the witness's concerns, and officers' efforts to ensure safety by speaking privately with the witness on the telephone. This supports the assertion of the confidential informant's privilege. *See Elnashar*, 484 F.3d at 1053 (finding that agent's notes and redacted documentation demonstrated intent to protect the informant's identity.)

As to whether this witness's disclosure would be material to Andrews' case, in *Faulkner*, the Eighth Circuit held that disclosure of an informant's identity was not required where the informant provided "valuable initial information for the officers to obtain warrants from which evidence was gathered," but subsequently did not provide evidence "related to the charges in the instant case," did not testify at trial, and did not witness or participate in the charged offenses. 826 F.3d at 1139. The Eighth Circuit considered the informant to be a "mere tipster." The same is true here. The confidential informant, "W6," did not participate in or witness the charged offense of being a felon in possession. And while the witness

43

provided valuable information, numerous other facts—not merely the witness's identification of Andrews—formed the basis for a search warrant, and corroborated her identification.

Andrews' Sixth Amendment right to confront the witness has not been violated and the disclosure of the witness's identity is not required at this time. Andrews also moves to suppress the witness's identification of him [Doc. Nos. 102, 103], arguing that she could not have seen the shooting. If the witness testifies at trial, this goes to the weight of the testimony, not its admissibility. And if the confidential informant is a trial witness, Andrews will have the opportunity to cross-examine the witness, consistent with his Sixth Amendment rights.

### G. Photographic Array

Andrews argues that the photographic array that Sgt. O'Rourke presented to one of the shooting victims, Derrick Blanton, in the hospital, violated Andrews' Fifth and Sixth Amendment rights. Therefore, he objects to the magistrate judge's findings to the contrary. (Objs. at 49.)

The Court agrees with the magistrate judge that because Andrews was not present during the pretrial photographic identifications, the presence of counsel was not necessary and there was no Sixth Amendment violation. *United States v. Davis,* 785 F.2d 610, 616 (8th Cir. 1986) (citing *United States v. Ash*, 413 U.S. 300, 317–19 (1973)).

Further, the Court finds no Fifth Amendment violation. It is true that where the procedure for pretrial photographic identifications is so "impermissibly suggestive" that it creates "a very substantial likelihood of irreparable misidentification," courts have found violations of the Fifth Amendment. *United States v. Mshihiri*, 816 F.3d 997, 1008 (8th Cir. 2016) (citing *Simmons v. United States*, 390 U.S. 377, 384 (1968)). Courts first determine

whether the procedure was impermissibly suggestive and then, based on a totality of the circumstances, determine whether the suggestive presentation violated due process by creating a substantial risk or likelihood of irreparable misidentification. *United States v. Martin*, 391 F.3d 949, 952 (8th Cir. 2004).

Here, the victim viewed each of six photographs of persons of a similar age, build, and race as Andrews, and with a similar hairstyle. (Gov't Ex. 6 (Photo Array).) Andrews finds it impermissibly suggestive that the background of his photograph was lighter than the other five photographs and that his face occupied more of the frame than the other subjects. (Objs. at 49.) Sgt. O'Rourke told the victim that he might not find the suspect among the photographs and that he should look at each of them, one at a time. (Sept. 19, 2018 Hr'g Tr. at 18.) The Court agrees with the magistrate judge that as no other physical differences isolated Andrews' photo, the procedures that Sgt. O'Rourke used mitigated any differences in the photographs themselves. *Schawitsch v. Burt*, 491 F.3d 798, 802 (8th Cir. 2007) (finding photo array not impermissibly suggestive where defendant's photo was the only one with detailed height markings in the background and reasonable differences in hair length and facial hair were not impermissibly suggestive).

Even if the array were impermissibly suggestive, Andrews has not demonstrated a substantial likelihood of misidentification under the totality of the circumstances. In analyzing this factor, courts consider: "1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the confrontation;

and 5) the time between the crime and the confrontation.  *Id.* (citing *United States v. Williams*, 340 F.3d 563, 567 (8th Cir. 2003)).

In a hospital interview with Sgt. O'Rourke three days after the shooting, Blanton, the shooting victim, stated that he was able to see the shooter at close range: "I looked at him shooting."  (*See* Def. Ex. 58 (MPD Full Case Rpt., O'Rourke Supp. 46); *see also* Gov't Ex. 1 (Cropped Video); Def. Ex. 18 (Uncropped Video).)  Blanton answered affirmatively when Sgt. O'Rourke asked, "You looked right at him when he shot you?" (*See* Def. Ex. 58 (MPD Full Case Rpt., O'Rourke Supp. 46).)  Furthermore, Blanton appeared to be attentive during the shooting, describing the shooting itself and the suspect's departure from the scene.  (*Id.*) He described the suspect as a light-skinned black man with eyeglasses, long dreadlocks, about "6 foot [tall]," and "kind of stocky."  (*Id.*)  Blanton stated that he would "definitely" recognize the shooter if he saw him again.  (*Id.*)  In fact, when he was shown the photo array later that day, or shortly thereafter, he was certain that Andrews was the shooter.  (Sept. 19, 2018 Hr'g Tr. at 18; Govt. Ex. 6 (Photo Array).)  This is similar to *Schawitsch*, in which the Eighth Circuit found no due process violation where the witnesses saw the perpetrator at close range, paid close attention during the crime, and were certain that the defendant was the robber.  491 F.3d at 803.

In addition, Sgt. O'Rourke told Blanton that the shooting suspect might or might not be included in the photographic array, and he was careful not to influence Blanton's review and selection.  (Sept. 19, 2018 Hr'g Tr. at 18.)  Therefore, there was little pressure on Blanton to make a specific identification. *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560 (2018) (finding that under the totality of the circumstances, the defendant failed to prove that the

witness's identification was unreliable; even with the witness's initially vague description of the shooter and a 17-month delay between the shooting and identification, the victim had a good opportunity to view the shooter, paid attention during the crime and remembered the shooter's distinctive walk, demonstrated a high level of certainty in his identification, and was under little pressure to make a particular identification).  Under the totality of the circumstances, even if the photo array had been impermissibly suggestive—which it was not—there was no substantial risk or likelihood of irreparable misidentification and no due process violation.  Andrews' objections with respect to the use of the photographic array are therefore overruled.

### H. Exculpatory Evidence

Andrews objects to the magistrate judge's finding that he has failed to show that the Government destroyed exculpatory evidence.  (Objs. at 46–47, 55.)  In support of Andrews' argument of outrageous Government conduct, he also contends that the Government has deliberately withheld exculpatory evidence, warranting the dismissal of the Indictment.

As Magistrate Judge Schultz notes, the Government "may not in good or bad faith suppress evidence favorable to the accused." *United States v. Bugh,* 701 F.3d 888, 894 (8th Cir. 2012).   Andrews has evidence from some security cameras that he contends provides an alibi, placing him at a distance from the Plymouth Avenue shooting, at approximately the same general time on May 15.   (*See, e.g.,* Def. Ex. 38 (Towercam 1).)  He argues that other video footage, which has since been destroyed, would further support his alibi defense.  (Objs. at 33–34.)  Whether Andrews is seen in the existing videos is unclear.  While Andrews makes much of the missing Loring Tower Apartments security footage that would allegedly provide

an alibi, if it existed, he does not allege that the Government ever possessed that footage. Rather, he contends that defense counsel, in conjunction with the Government, ensured that the video was destroyed.

No such evidence supports his contention. Moreover, the Court has reviewed the existing Loring Towers video and other surveillance videos, and it is not clear if Andrews is in them. (*See* Def. Ex. 19 (Loring Tower Videos); Def. Ex. 38 (Towercam 1); Def. Ex. 39 (Towercam 2); Def. Ex. 40 (Towercam 3); Def. Ex. 41 (Towercam 4).) Issues concerning Andrews' alleged alibi, if deemed admissible, may be relevant at trial, but these issues fail to warrant the dismissal of the Indictment due to allegations of outrageous government conduct.

Similarly, Andrews refers to missing video evidence that a girlfriend or former girlfriend recorded on her cell phone, allegedly depicting officers rummaging through the blue Tahoe, prior to towing it. (Objs. at 28.) Again, other than Andrews' speculation, there is no evidence that the Government ever possessed this deleted cell phone video. The Court agrees with the magistrate judge that such bare assertions fail to meet the burden for establishing outrageous conduct. *See Gleason*, 980 F.2d at 1187.

Likewise, the Court overrules Defendant's Objections related to his claims that the Government has deliberately withheld evidence and disclosed it in an untimely fashion. As a general matter, the Government noted early on that it viewed some of the requested evidence, such as bodycam evidence that did not picture Andrews, as Jencks Act material and therefore not subject to disclosure until shortly before trial. (*See* Oct. 5, 2018 Hr'g Tr. at 3–4.) There is no evidence that the Government deliberately withheld evidence to slow the pace of proceedings or in violation of its *Brady* obligations.

In particular, Andrews moves to suppress as untimely disclosed the photographs of the Plymouth Avenue shooting, photographs of the blue SUV, and other miscellaneous photos. The Government represents that it disclosed the photos to Mr. Aligada, Andrews' former counsel, on September 7, 2018, after Mr. Aligada requested them on August 13. (Gov't's Resp. to Def.'s Dec. 18, 2018 Mots. at 9.) The Court agrees with the Government that it was not required to provide copies of the photographs, as Rule 16(a)(1)(E) merely allows for the defendant to inspect or copy them. Nor has Andrews shown prejudice resulting from the timing of disclosure. Similarly, the Court rejects Andrews' argument with respect to the production of the photographic array that the Government provided on August 13, 2018, (*see id.* at 9–10), certainly in advance of the motions hearing.

As to lab reports regarding the fingerprint on the gun and a test-fired casing from the gun that matches the casings left at the Plymouth Avenue shooting, Andrews acknowledges that the Government disclosed the lab reports on September 6, 2018, four days prior to the first motions hearing. (Def.'s Mot. to Suppress Untimely Ev. [Doc. No. 99] at 3.) Moreover, in the Government's response to Defendant's pretrial motions, it indicated that one or more of the lab reports might be delayed. (*Id.*) Andrews has identified no prejudice resulting from the timing of these disclosures. Further, as the Government points out, these reports are not relevant to issues in Andrews' pretrial motions, but are instead evidence to be used at trial. (*See* Gov't's Resp. to Def.'s Dec. 18, 2018 Mots. at 10.)

In addition, the Government has disclosed certain phone records that Andrews contends were exculpatory, but they appear to place Andrews' phone near the scene of the Plymouth Avenue shooting, at the approximate time of the shooting, allowing for conversion

from Coordinated Universal Time to local time. (*See* Def. Ex. 22 (Call Records Spreadsheet).)

The Court finds no basis for the suppression of evidence or dismissal of the Indictment based on the timing of the disclosure of evidence here. Andrews' objections in this regard are overruled.

## I. Vindictive Prosecution

In response to Andrews' motion to dismiss the Indictment for selective prosecution, the magistrate judge found no such evidence to support his assertion and recommended the denial of the motion. To the extent that Andrews challenges that recommendation, his objection is overruled.

As the magistrate judge observed, a defendant bears a heavy evidentiary burden to show prosecutorial vindictiveness. *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004). There is no objective evidence here, nor any presumptive evidence, on which to base a claim of prosecutorial vindictiveness. Andrews relies on the same evidence on which he bases his claims of outrageous government conduct and bias, namely, claims that evidence was fabricated, destroyed or tampered with. As no evidence supports his assertion, any objections to the magistrate judge's recommendation are overruled.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant's Objections to the February 21, 2019 Order & Report and Recommendation [Doc. No. 133] are **OVERRULED**;

2. The February 21, 2019 Order & Report & Recommendation is **AFFIRMED** and **ADOPTED**;

3. Defendant's Motion to Retain Rough Notes and Evidence [Doc. No. 29] is **GRANTED**;

4. Defendant's Motion for Discovery [Doc. No. 75] is **DENIED AS MOOT**;

5. Defendant's Motion for a Detention Bond Hearing [Doc. No. 96] is **DENIED**;

6. Defendant's Motion to Admit Exhibits [Doc. No. 105] is **GRANTED**;

7. Defendant's Motion for Revocation or Order and for Detention Hearing [Doc. No. 109] is **DENIED**;

8. Defendant's Motion for Oral Argument of Pretrial Motions [Doc. No. 110] is **DENIED**;

9. Defendant's Motion to Reopen Pretrial Motions Hearing and Call Additional Witnesses for Evidence and [to] Testify [Doc. No. 111] is **DENIED**;

10. Defendant's Motion to Dismiss on the Grounds of Violations of the Due Process Rights of the Defendant Arising Out of Outrageous Government Conduct [Docket No. 80] is **DENIED**.

11. Defendant's Motion to Suppress Cell-Site Location Information [Docket No. 85] is **DENIED**.

12. Defendant's Motion to Suppress Evidence from Unlawful Arrest and Stop and Search of a GMC Yukon [Docket No. 86] is **DENIED**.

13. Defendant's Motion to Suppress Eyewitness Identifications [Docket No. 87] is **DENIED**.

14. Defendant's Motion to Suppress Evidence from Search of Chevrolet Tahoe and Request for *Franks* Hearing [Docket No. 88] is **DENIED**.

15. Defendant's Pro Se Motion to Suppress Search Warrant for False Information in Affidavit [Docket No. 97] is **DENIED**.

16. Defendant's Pro Se Motion to Dismiss Indictment for Lack of Probable Cause on Grounds of False Facts in Information/Evidence [Docket No. 98] is **DENIED**.

17. Defendant's Pro Se Motion to Suppress All Late and Untimely Evidence [Docket Nos. 99 and 112] is **DENIED**.

18. Defendant's Pro Se Motion to Dismiss Indictment for Lost of Exculpatory Evidence [Docket No. 100] is **DENIED**.

19. Defendant's Pro Se Motion to Dismiss Indictment and Suppress All Evidence from Search and Seizure on May 16th [Docket No. 101] is **DENIED**.

20. Defendant's Pro Se Motion to Compel Government to Disclose Identification Witness [Docket No. 102] is **DENIED**.

21. Defendant's Pro Se Motion to Compel Government to Disclose Identification Witness [Docket No. 103] is **DENIED**.

22. Defendant's Pro Se Motion to Suppress Evidence (T-Mobile/Metro PCS Exigent 'Ping') [Docket No. 104] is **DENIED**.

23. Defendant's Pro Se Motion to Dismiss Indictment for Tampering with Evidence [Docket No. 116] is **DENIED**.

24. Defendant's Pro Se Motion to Dismiss Indictment for Tampering with Witnesses and Evidence [Docket No. 117] is **DENIED**.

25. Defendant's Pro Se Motion to Dismiss Indictment for Violation of Discovery and Inspection Order [Docket No. 118] is **DENIED**.

26. Defendant's Pro Se Motion to Dismiss Indictment for Tampering with Witnesses and Evidence [Docket No. 119] is **DENIED**.

Dated: May 8,  2019                          s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge