UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | | |
|---|---|---|
| United States of America, | ) | File No. 18CR149 (SRN/DTS) |
| Plaintiff, | ) | |
| vs. | ) | Minneapolis, Minnesota |
| | ) | July 18, 2019 |
| Norris Deshon Andrews, | ) | 9:10 A.M. |
| Defendant. | ) | |

---

BEFORE THE HONORABLE MAGISTRATE JUDGE DAVID T. SCHULTZ
UNITED STATES DISTRICT COURT
**(MOTIONS HEARING)**

APPEARANCES

For the Plaintiff: United States Attorney's Office
JEFFREY PAULSEN, AUSA
SAMANTHA H. BATES, AUSA
300 South Fourth Street
Suite 600
Minneapolis, MN 55415

For the Defendant: Norris Deshon Andrews, Pro Se

DANIEL L. GERDTS, ESQ.
(Stand-by Counsel)
331 Second Avenue South
Suite 705
Minneapolis, MN 55401

Court Reporter: KRISTINE MOUSSEAU, CRR-RPR
300 South Fourth Street
Suite 1005
Minneapolis, MN 55415

Proceedings recorded by mechanical stenography; transcript produced by computer.

**9:16 A.M.**

**(In open court.)**

THE COURT: Good morning, everyone. Please be seated.

All right. Good morning. We are on the record in the matter of the United States versus Norris Deshon Andrews, Criminal Number 18-149. Counsel for the government, if you would note your appearance for the record, please.

MR. PAULSEN: Good morning, Your Honor. Jeff Paulsen for the United States. With me is AUSA Samantha Bates, who is co-counsel on the case now.

MS. BATES: Good morning.

THE COURT: Good morning, Mr. Paulsen and Ms. Bates.

And for the defendant?

DEFENDANT ANDREWS: Norris Andrews for the defendant pro se.

MR. GERDTS: Daniel Gerdts, I am stand-by counsel for Mr. Andrews.

THE COURT: Good morning, Mr. Andrews and Mr. Gerdts.

All right. Before we turn to the limited subject of this hearing, let me ask. First of all, there was a

request made for an inspection of the keys of the vehicle.

Have you brought those keys, Mr. Paulsen?

MR. PAULSEN: We didn't bring them, but we -- the government can go get them if need be. I think Mr. Gerdts has seen the keys, and if Mr. Andrews still wants to see them, we can go get them.

THE COURT: All right. My understanding is, and the record reflects, that Mr. Gerdts examined the vehicle and the keys.

Mr. Andrews, do you wish to see the keys this morning?

DEFENDANT ANDREWS: That's a false statement. Gerdts didn't see them keys, and neither did I, and that's not what I had asked for in my motion. My motion asks to have the keys and the vehicle examined together to check the windows and stuff because what they -- the accusations about what happened with the vehicle.

THE COURT: Okay. Hold on.

Mr. Gerdts, did you examine the vehicle?

MR. GERDTS: I do go out and examine the vehicle, Your Honor.

THE COURT: Were the keys accessible to you at that time?

MR. GERDTS: I don't know if they were or not. I didn't ask for them. I didn't know it was an issue at the

time.

THE COURT: Okay. Mr. Andrews, is the request that you want to have the vehicle inspected with the keys present at the time of inspection?

DEFENDANT ANDREWS: Yes. That's what my motion said, and it specifically being that I'm my own counsel, I had asked the courts months ago how would that be done where I get to inspect it because obviously I need to see certain things and test certain things with it, and he's only stand-by counsel, so he can only do so much, and I don't have no investigator on my case, so we have a problem there.

But my motion clearly stated what I wanted to happen, and that was the vehicle tested, the windows, with the keys and stuff, so --

THE COURT: All right. Well, we'll deal with that after today's hearing. I'm not sure what the relevance of testing the vehicle windows with the keys are, but, Mr. Paulsen --

Hang on Mr. Andrews.

MR. PAULSEN: The agent did do that, and the keys did operate the Tahoe, and the report was prepared, and it was disclosed weeks ago, so it's been done. By the way, we said repeatedly we're not using any evidence from the blue Tahoe in our case in chief unless he opens the door, so it

is of marginal significance at this point.

THE COURT: All right. Understood. So today's hearing, we have a --

DEFENDANT ANDREWS: Your Honor --

THE COURT: -- reopened hearing.

Yes, Mr. Andrews.

DEFENDANT ANDREWS: Can I comment to that before we --

THE COURT: I don't think it's necessary at this point. I understand your position, okay, and I'll rule on that motion after today's hearing.

Today's hearing is a reopened hearing on four issues per Judge Nelson's order, and they relate to newly discovered evidence, and I want everybody to be on the same page. Number one, whether the body cam videos that were produced demonstrate that there was an absence of probable cause for the stop of the Yukon.

Number two, whether any of the newly produced evidence reflects anything as to the ownership of the Yukon, but Judge Nelson also cautioned that whether or not that affects the standing to object to evidence relating to the Yukon, it won't change the results of the suppression hearing absent something that undermines the probable cause for the stop of the Yukon.

Issue number three, whether the body cams show

that a firearm was planted in the Yukon; and number four, does the body cam footage relate to in some way the information that the officers provided to T-Mobile for the purpose of obtaining the exigency ping.

Those are the issues we're dealing with. Okay?

DEFENDANT ANDREWS: I have an issue with that, and I wrote a motion and a letter to the judge weeks ago dealing with that. The judge misconstrued that letter. That letter was not my motion to reopen, and I made that very clear in that letter that she somehow misconstrued, and she says she construed it to be that, and I wrote her again.

I wrote the courts because clearly that's not, that was not the evidence, and it was prematurely ruled on, and since then, I wrote a reconsideration motion also today that has not been said nothing about, and if the magistrate will look at the motion that the judge granted to reopen of the hearing, you will see yourself that that was nothing more than a letter asking for an oral request to come to court to present the evidence that I wanted to use to reopen the hearing.

And the judge misconstrued that as my motion to reopen, and I just gave a couple of examples of the things that I would, at that hearing to reopen the hearing, be talking about with other things that I was going to also

bring up, and since then I have put my actual motion in. I have put my memoranda in behind it, and I put all of the evidence that's been late that I have been planning to disclose today at this hearing as evidence for my motions and stuff to reopen.

THE COURT: As to that, Mr. Andrews, that will, that lies with Judge Nelson as to whether your most recent motion will be considered or granted. I am bound by Judge Nelson's order regarding this hearing, and those are the four issues that Judge Nelson reopened the motion hearing for this Court to deal with. So that's what we're doing today.

DEFENDANT ANDREWS: She ruled on something that wasn't a motion.

THE COURT: You'll have to take that, you'll have to take that up with her.

DEFENDANT ANDREWS: She's not, she's not answering. No one is doing that. How can I take that up with her if she's not responding?

THE COURT: You have to take that up with Judge Nelson. She has ruled on the motion.

DEFENDANT ANDREWS: Okay.

THE COURT: She has ruled on your current motion. Today's hearing deals with those four issues. So, Mr. Andrews, do you, first of all, do you intend to call

any witnesses today on those, on any one of those issues?

DEFENDANT ANDREWS: How can I call witnesses when I can't get my subpoena responded to, and I wrote your courts. I've called your clerk. I have left messages with your office. How am I supposed to get my subpoena served?

THE COURT: To my knowledge, Mr. Andrews, every subpoena that you have requested has been either expressly denied or has been issued.

DEFENDANT ANDREWS: Subpoena has been denied? I said none of my subpoenas has been denied, and a lot of them has gone unanswered.

THE COURT: Okay. Mr. Andrews, any subpoenas that have not been either granted or expressly denied do not relate to the subject of this hearing, and I am referring only to the subpoenas that were requested on July 12th, and I understand those to be ex parte, so I'm not discussing the contents of those in front of counsel.

DEFENDANT ANDREWS: I have subpoenas in that pertain to these hearings like this that's before that, and I have been asking you how do I get them served with the U. S. Marshal's Office, the same ones that you didn't grant for four months and then took another two months to get them to me, and then there is still other motions -- I mean subpoenas in that I done had in for another two or three months that you still haven't sent to me or nothing like

that.

THE COURT: Okay. Mr. Andrews, I'm not going to sit here and debate with you what I have and haven't done.

DEFENDANT ANDREWS: I was --

THE COURT: I'm not going to sit with you and debate with you what has been granted and not granted. Do you have any witnesses to call today?

DEFENDANT ANDREWS: Yeah. I guess just the federal people because I can't -- my witnesses is not available again by error of the Court.

THE COURT: What witness would you call?

DEFENDANT ANDREWS: Hmm?

THE COURT: Are you going to call a witness today?

DEFENDANT ANDREWS: Yeah.

THE COURT: Who?

DEFENDANT ANDREWS: I'm going to be calling some federal witness. I'm going to call Agent Voth. I'm going to probably put myself up there.

THE COURT: Okay. Call your first witness, please.

DEFENDANT ANDREWS: For what?

THE COURT: For today's hearing. Are you calling witnesses for the hearing?

DEFENDANT ANDREWS: Can we slow down a little bit

because I need to know how this hearing is going to be conducted. It seems like I'm not being told what's up. My issues have not been presented. This hearing is on the fly. I feel like I'm being undermined with my topics.

I feel like my evidence is going to be undermined. I have new evidence that the judge is not even talking about or seeing because the prosecution keeps on giving it, like this new flash drive I just received with a terabyte, 900 some gigs worth of data, of new videos and evidence that's been being requested for over a year now that he has just turned over that you keep saying that you -- in all essence last August, and that didn't get put into this, going towards this hearing, either, because the judge prematurely ruled on a letter.

So I want the courts to understand that I need you to slow down and tell me how is this hearing going to go because I don't understand how this evidence is going to be put on, how it's supposed to be presented. You know what I'm saying? I'm going to be ready, and I need to put my evidence on, but I need to know the rules and the technicalities on how we're going to do this.

THE COURT: Okay. Let me know if you don't understand anything I'm about to say. This hearing is governed by Judge Nelson's order granting a reopening of the motions hearing. That order was docket number, I

believe -- no. I don't have the docket number in front of me.

MR. PAULSEN: 224.

THE COURT: Thank you. 224. That was issued June 19th, so one month ago. The order states that there are four issues to which this hearing has been or which this hearing will be directed. One is whether any of the evidence produced in response or evidence which you claim was produced late, the body cam footage, specifically, relates to the probable cause for the stop of the Yukon.

Number two, second issue is whether any of the what I will for shorthand purposes call the late produced evidence, whether any of that evidence relates to the ownership of the Yukon such that it would give you standing to challenge the seizure of evidence from the Yukon.

Number three, whether the body cams depict, any of the body cam videos, depict that one of the officers planted a firearm in the Yukon as you have alleged; and number four, does the body cam footage in any way depict something relating to the information that was then provided to T-Mobile which was the basis on which T-Mobile provided the exigency ping.

Those are the four issues that Judge Nelson has ordered be reopened in today's hearing. So you are entitled to call witnesses related to any one of those

issues, including yourself, and you are entitled to present argument and evidence on those four issues. So my question to you was, do you have witnesses that you wish to put on the stand now that address any of those four issues?

DEFENDANT ANDREWS: Are you talking about just to put the evidence on through? Let's start off with Agent Voth.

THE COURT: Okay. Are you calling Agent Voth?

DEFENDANT ANDREWS: Yeah.

THE COURT: All right. Agent Voth, if you would come forward, please.

MR. PAULSEN: I would like to make a little statement, too, since Mr. Andrews is claiming he is not prepared for the hearing that he asked for over a month ago and has been granted. I asked over a week ago through stand-by counsel for notice of who the witnesses were going to be, what documents are going to be entered, what body cams because, as I said in my memo to you yesterday, all I've got is a list of generic stuff that is not descriptive at all.

And that hasn't been complied with, so if anyone is going into this blind it's the government. We have given up a lot of stuff, and he says it proves something, and he won't tell us what he is going to use. And I said in my memo, I'm going to object to anything that wasn't

disclosed with particularity, and we'll see how it goes here.

I've anticipated a couple of things, and if those are what they are, I probably won't object, but if we get into some new stuff, somebody's body cam that he wants to play in order to make an argument it shows something, he has done that once before with the John Owens incident, and the judge ruled that it doesn't. There is no evidence on that video of anybody planting evidence, and I have a feeling he's going to do it again.

And when he doesn't tell me ahead of time what videos he's going to use or what officers he is accusing, and I just show up and he's allowed to put in anything? We will be here all day, Your Honor, and I'm going to be very, I --

THE COURT: I can assure you we will not be here all day. Your objection is noted. It is well received. I agree with you that the defendant has not provided required notice. Not withstanding that, we are going to proceed. We will deal with it as those issues arise.

Mr. Andrews, I want to make it clear that the issues that are before you or that are before this Court are the four that I have mentioned. Evidence and argument that go to those issues and those issues alone are permitted.

If you go afield from that, I will sustain any objection that Mr. Paulsen makes.

DEFENDANT ANDREWS: Man, you going to sustain anything he do anyway. This is a shit show biased ass courtroom, man, and as far as him saying that I didn't give you all notice, if you read my memoranda to my motion that I put in to reopen after I put in a letter and a motion telling the judge that she misconstrued the letter that she is putting down to give me these restrictions on what I can do on my reopening of the hearing, to all this bogus assed evidence they just gave me, it is what it is.

You know what I'm saying? We might as well get this little bullshit on the road, you know what I'm saying, because ain't no "I didn't tell him." He can read the motion. The motion is in. It's what, 133, 134. 138 is the motion to reopen. You know what I'm saying?

So I don't understand how you saying you don't have the evidence. You don't know? You know what's coming. That's why you're all blocking me and trying to stop my evidence and the rest of my motions from getting argued. There is no way that I should have a restriction on what I can argue with this new evidence that they didn't give me, period.

This new evidence pertains to each and every last one of my prior entered motions, every last one of them.

So ain't no way that I shouldn't be able to argue because this evidence I was supposed to have at these motion hearing that could have proved my prior motions, that was biasedly ruled upon errors by the Court.

As far as him talking about what isn't shown on the video, come on, man. We all know what them videos show, and they damn sure didn't show what them reports here said. So all of that? Miss me with that, man. They all just, they ain't going to use this or use that. Let's go ahead and get this thing on the road so I can go about my business and get my appeals.

There ain't no misunderstanding. I understand what he said. I understand he going to object I understand any time he don't agree with it, but I'm still going to, I'm still going to present my case.

THE COURT: All right. Mr. Andrews, three things, and then I will swear in the witness and we will go forward.

Number one, I understand that you are expressing frustration with the result of your motion for reconsideration, but that has been ruled upon by Judge Nelson.

DEFENDANT ANDREWS: My motion to reconsideration, that --

THE COURT: Hold on. Hold on. Mr. Andrews, I'm

speaking.

DEFENDANT ANDREWS: You keep falsely speaking, though. Speak the truth.

THE COURT: Mr. Andrews, the second thing I'm going to say is that I have a lot of patience, but I have a couple of rules. Number one, when anyone else in the courtroom is talking, please do not interrupt them.

Number two, I would appreciate it -- I understand your frustration. I don't agree with your assessment of bias.

DEFENDANT ANDREWS: This is shit, man.

THE COURT: Mr. Andrews, I do not agree with your assessment that this Court or anyone connected with it has been biased or unfair to you.

DEFENDANT ANDREWS: With the --

THE COURT: You are entitled to your opinion. However --

DEFENDANT ANDREWS: Can we get on with it?

THE COURT: We will get on in a second.

DEFENDANT ANDREWS: I don't need your lecture, man. You are not lecturing the government. I do not need your lecture. Can we just go on about our business?

THE COURT: Mr. Andrews, no further expletives. Understood? Is that understood?

DEFENDANT ANDREWS: Yes, Your Honor.

THE COURT: Thank you.

Agent Voth.

**(Witness sworn.)**

THE COURT: State your full name and spell your last name for the record.

THE WITNESS: David Voth, V, as in Victor, o-t-h.

THE COURT: Go ahead, Mr. Andrews.

DEFENDANT ANDREWS: Give me a minute to get my evidence together under the restrictions that has been placed on me.

**(Pause.)**

**(Defendant confers with counsel.)**

**DAVID VOTH,**

after having been first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY DEFENDANT ANDREWS:

Q. Agent Voth, good afternoon. Good morning, man.

A. Good morning.

Q. Are you aware of the facts of this case?

A. I believe so.

Q. And you are the case agent in this case; am I correct?

A. Correct.

Q. So you would be one of the officers who testified at

the grand jury hearing?
A. Yes.
Q. Okay. Are you aware of an incident that took place on May 15th, 2018, in the city of Minneapolis?
A. Yes.
Q. How familiar, how familiar are you with the facts of that case and the way the evidence was developed?
A. Well, the evidence was primarily developed by the Minneapolis Police Department. I reviewed those reports. I've spoken to officers from that police department. I've coordinated with the U. S. Attorney's Office.
Q. And are you confident enough that you know the facts of this case and you can recite them?
MR. PAULSEN: Your Honor, I'm going to object to this as just a general question about the case. It's not focused on any one of the core issues.
DEFENDANT ANDREWS: It's going to the probable cause.
THE COURT: The prior questions were prefatory. That last question is either redundant or improper, so it's sustained.
Go ahead, Mr. Andrews.
BY DEFENDANT ANDREWS:
Q. Let's just get straight to it. A shooting occurred on May 15th, correct?

A. Yes.
Q. And a suspect was developed; am I correct?
A. Yes.
Q. Can you tell me the identification process that was developed on that suspect?
MR. PAULSEN: Your Honor, this identification process is not one of the four issues, and this is not based on any newly discovered evidence. We have litigated the eyewitness identification months ago. This is just trying to try the case and not focusing on the core issues.
THE COURT: Agreed. Sustained.
Mr. Andrews, you really need to direct your questions to, if you're dealing, for example, with the issue of the probable cause for the stop of the Yukon.
DEFENDANT ANDREWS: This is.
THE COURT: Well, then get to the new evidence.
DEFENDANT ANDREWS: This is.
THE COURT: The body cam.
DEFENDANT ANDREWS: This is.
THE COURT: Hold on. The body cam and how it affects the probable cause for the stop of the Yukon. General questions about the process of identifying the suspect have in fact been dealt with, and while you may be leading up to something, I need you to get straight to it.
DEFENDANT ANDREWS: Huh-uh. No, I'm not going to

do that, Your Honor, because my arguments always seem to be misconstrued or cut short or you seem to don't get the facts right. So I'm going to make sure that I thoroughly get it into the record this time so there can be no misunderstanding. The new evidence is definitely going to be put forward.

I'll try to move it along a little faster to help the courts along, you know, since everybody seems to be in a rush today.

BY DEFENDANT ANDREWS:

Q. As I was saying, the suspect was identified in the process of how you all had the probable cause to do the T-Mobile thing and stop the vehicle on that night?

A. I don't understand your question 100 percent, but I will say yes.

Q. Was the suspect identified by a new witness?

MR. PAULSEN: We're not dealing with any new evidence.

DEFENDANT ANDREWS: It is.

MR. PAULSEN: It was the subject of prior hearings, and we're just rehashing everything we did in the past.

DEFENDANT ANDREWS: No, we're not. I'm going to play a video.

MR. PAULSEN: Let's see what the video is, Your

Honor, is my suggestion.

DEFENDANT ANDREWS: Okay.

MR. PAULSEN: And we need to know which individual this is before he starts playing, which officer it is.

DEFENDANT ANDREWS: You're going to see it. It's your evidence, but I will identify the officer on the video.

MR. PAULSEN: We need an exhibit number on this item if it's going to be offered for the Court, Your Honor.

DEFENDANT ANDREWS: Somebody need to figure out what exhibit we're up to. I think we're up to like 63 or 64. I've been trying to get all my exhibits since --

THE COURT: We will mark it in just a second.

All right. Mr. Andrews, while we're waiting for the correct exhibit number to identify it with, can you identify the body cam video you are about to display?

DEFENDANT ANDREWS: Yes. One moment. I'm opening it up right now to look at it. It's got to be Officer Bauer.

THE COURT: Officer Bauer?

DEFENDANT ANDREWS: Yeah, Officer Bauer. It's going to go to number 9.

BY DEFENDANT ANDREWS:

Q. Do you agree with that?

A. No, sir, I don't agree with that.
Q. This is all for the probable cause for the stop, and this is the probable cause for the T-Mobile, so it's going to be two in one.
THE COURT: Okay.
Are you ready to proceed, Mr. Andrews?
DEFENDANT ANDREWS: No.
THE COURT: That's fine.
DEFENDANT ANDREWS: I'm having some technical difficulties getting this drive open. All right. We got action now.
BY DEFENDANT ANDREWS:
Q. Okay. Now while we're waiting on this, we can continue on with the process we got going.
Are you familiar with that report?
A. I've reviewed the report.
Q. Could you --
THE COURT: Will you identify the report for the record, please, Agent Voth?
THE WITNESS: Yes, Your Honor. It is Minneapolis case 18-156712. It is supplement number 9 by Officer Benjamin Bauer.
THE COURT: Okay. Thank you. Go ahead, Mr. Andrews.

BY DEFENDANT ANDREWS:

Q. Is that not the report that the government is alleging that they got the identification of the suspect, the suspect's name, the defendant's name, my name?

A. I don't know where the government got its information. Your name is included in this supplement, yes.

Q. Is that the supplement that my name is mentioned in? Is that not the only supplement where the witness gave my government name and showed a picture of it?

A. I don't know.

Q. You don't know?

A. I know this is one, but there is 175 pages to that report. I know this is one, but there is others, and I don't know if your name is mentioned in the other ones.

Q. So you need your reports? Do you want me to get your reports?

A. No, I wasn't there. I didn't take any statements from the witnesses.

Q. You say you're the case agent on the case. I'm just trying to put the facts together. You know what I'm saying?

A. Okay.

Q. So can you read that statement?

A. For sure. The entire thing or just the part where your name is mentioned?

MR. PAULSEN: This statement is not new evidence.

DEFENDANT ANDREWS: The video.

MR. PAULSEN: I believe the statement is already in the record. Let's get to the new evidence. The point of the hearing is some new evidence that contradicts past evidence. We rehashed old evidence.

THE COURT: Understood, and I agree with you, Mr. Paulsen, but I think Mr. Andrews is just asking the witness to refresh his own recollection about what's in the report as a preface to what he is about to ask him regarding the video.

Am I correct, Mr. Andrews?

DEFENDANT ANDREWS: Yeah. I want everyone in the courtroom to be aware of what the reports say so when we watch this video, we won't have to keep going back and forth to the video for me to point this stuff out.

THE COURT: Okay. So the report -- go ahead, Agent Voth, but understand that this is for context for the video which is the new evidence.

DEFENDANT ANDREWS: Mm-hmm.

THE WITNESS: For clarity, sir, would you like me to read the entire report or the part where your name is mentioned?

BY DEFENDANT ANDREWS:

Q. The whole report.

A. Supplement of Officer B. Bauer, Badge Number 340, on 5/15/2018, 20:01. On 05/15/2018I responded to a call of a shooting at 1705 Plymouth Avenue North, along with my partner Officer Lessard. While en route I heard over the air that there was two victims that were shot in the rear parking lot of the address. My BWC was activated.

We arrived, and I noticed that there was enough officers with the victims in the back parking lot on the grass just west of the parking stalls. I then noticed that there was a female standing on the steps in the rear of 1707 Plymouth Avenue North. I asked the female if she had seen or heard anything.

The female told me that she does not live at the address and that she was just visiting from Texas with her child. The female said that she was inside of the address when she heard several shots in the parking lot. The female stated that she made sure that her child was okay, and she laid down on the ground until the shots were over. The female refused to give me her name or date of birth.

The paramedics arrived shortly after and transported the victims to the hospital. I deactivated my BWC to speak with another officer about the incident. While speaking to the officer, a different female came out of the rear of 1707 Plymouth Avenue North. The female waved for me to come over to her.

I began to walk toward her, and before I turned my BWC on, she asked me if I could not record her. I told her sure and asked her what she needed. The female told me that she lives at 1707 Plymouth Avenue North in the apartment and she would rather not give me her name because she was scared for retaliation.

The female then told me that she knew who the shooter was. I asked her how she knew. She told me that she saw the suspect in an argument with the victims before the shooting took place and she knows that the suspect has beef with them, and beef is in quotations. I asked her what she meant by that, and she told me that she just knew that they did not get along.

I'm just reading verbatim.

She stated, described the shooter as a heavy set black male, approximately six feet, with long dreadlocks and goes by NO. The female told me he was driving a blue SUV today. The female stated that she heard the shots and ran inside, and she did not see which way the SUV drove. The female then told me that NO's real name is Norris Andrews. She then showed me a picture on her phone of Andrews.

I then went back to the squad car and looked up Norris Andrews in NCIC and found Andrews' full name to be Andrews, Norris Deshon, date of birth 12/8/1984. This

information was passed along to Sergeant Angerhofer. I stayed on scene until I was instructed by Lieutenant Zimmerman to ID a male who was standing in the rear of 1705 Plymouth Avenue North.

I activated my BWC and approached the male. The male claimed to be the owner of Minnesota 524WLG, which was parked in the rear parking lot of the address a few stalls to the east of where the shooting had occurred with its driver's side door open. The male gave me the name Steve Wallace, 7/2/1988, 612 715-8792.

I went back to the squad car to confirm that Wallace was telling the truth. However, I was unable to ID him. I found that the vehicle registers to a John Bobby Walker, 7/2/1988. However, there is no DL photo on file. The male was released from the scene by Lieutenant Zimmerman.

I then cleared the scene. End of supplement 9.

DEFENDANT ANDREWS: Okay. Now --

THE COURT: For the record you're about to display body worn camera of Officer --

DEFENDANT ANDREWS: Officer Bauer.

THE COURT: We will mark that with an exhibit sticker as soon as I have the number. Go ahead, Mr. Andrews.

Hang on. The Bauer BWC video is Exhibit Number

62.

Go ahead, Mr. Andrews.

THE COURT: That's what we have.

DEFENDANT ANDREWS: There is some pictures in that document from the trucks and stuff.

MR. PAULSEN: I have 65.

THE COURT: All right. Here's what we're going to do. Fine. We will be discontinuous with the sequencing. We are going to start with 100. The Bauer video will be 100. We will go from there forward. Okay?

Go ahead, Mr. Andrews.

DEFENDANT ANDREWS: If I may, can I make a few key notes of, should I say what we're going to watch and what to look for?

THE COURT: You go right ahead. Yeah.

BY DEFENDANT ANDREWS:

Q. In that report, Agent Voth, this officer says he approached this shooting scene and a female was on the stairs, and she refused to give her name and stuff, right? She said she was from out of town, and she laid down on the floor and refused to give her name; is that correct?

A. There are two females. One of them described that, correct.

Q. No. No. No. When he first walked up, there was one female, right, and then he cut his body cam off, and

another female came out, right?
A. Yes.
Q. Now the second female came out, stated all these things about Mr. Andrews; am I correct?
A. That's how the report reads, sir.
Q. Now we're going to watch the video, and I may do a little commentating in between to stop the actual questioning so we can move the hearing on a little faster.
But this is the officer's body cam.

**(Video recording played, no sound.)**

BY DEFENDANT ANDREWS:
Q. The volume doesn't start like 30 seconds so --
Can everybody see it?

**(Pause.)**

THE COURT: Okay. We now have the volume. We now have the audio, correct?
MS. BATES: It's on my computer. I'm fine letting Mr. Andrews use mine, but it's going to be a couple of minutes. Okay?
THE COURT: Okay.

**(Pause.)**

**(Video recording played.)**

DEFENDANT ANDREWS: I'm going to stop this for a second because this don't seem to be playing the right one.

BY DEFENDANT ANDREWS:

Q. All right. Now I want to stop the video for a second.

This apartment that he is walking up to, as you can see the top of it is 1707, which was what was in the report. It's going to get closer so you can see it. I just stopped it here. That's the lone female standing there. She is going to say she's from Texas, so you're going to know that this was the female that he was reporting about in the beginning of that that says she is from Texas.

You're going to notice that she didn't refuse. She is not going to refuse to give her name and stuff like that, and this other female is going to come out there, and we will go from there once we get further into it, but this is the apartment. That's the female, and we will see.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. I want to stop it again. Now, this is where the video is going to take a detour from what the officer said in his report. The owner of this apartment is now coming out on the porch, and she is going to engage in this conversation, too, where as his report said that this officer came in contact with a, how should I -- an uncooperative female that was from Texas that wouldn't give her name and stuff, and then he cut his body cam off, right?

Is that not what the report said, Agent Voth?
A. At the end of the second paragraph, he said I deactivated my BWC to speak with another officer.
Q. No. Read that other paragraph.
A. We arrived, and I noticed that there enough officers with the victims in the back parking lot on the grass just west of the parking stalls. I then noticed that there was a female standing on the steps of 1707 Plymouth Avenue North.

I asked the female if she had seen or heard anything. The female told me that she does not live at the address, and she was just visiting from Texas with her child.
Q. Mm-hmm.
A. Excuse me. The female said that she was inside of the address when she heard several shots in the parking lot. The female stated that she made sure that her child was okay, and she laid down on the ground until the shots were over. The female refused to give her name or date of birth.

The paramedics arrived shortly after and transported the victims to the hospital. I deactivated my BWC to speak with another officer about the incident.
Q. And then just the first sentence into that second paragraph?

A. While speaking to the officer, a different female came out of the rear of 1707 Plymouth Avenue. The female waved for me to come over to her.

Q. Stop. Now at that point in that story, there is only one female in this equation, right? The first female when he cut his body cam off, so it shouldn't be another female there, right?

MR. PAULSEN: Your Honor, this is why I made this objection and now that motion yesterday. He is asking -- he doesn't bring the Officer Bauer to court, doesn't give us any notice ahead of time which officer we should have here, and he's trying to ask a totally different officer about somebody else's report and somebody else's body cam.

It's ridiculous. It's unfair and no reason to do it this way. At this point I'm going to renew my objection. I said I was going to object to any undisclosed witnesses. He did not say he was going to call David Voth. I now object because he didn't comply with the local rule and give us notice of which witnesses he was going to call.

I think Agent Voth should be excused. He has no personal knowledge of this. He can play these videos, but at some point if he is trying to make some points with him, we're going to have to get the real officer in here and explain this. This officer can't explain Officer Bauer.

DEFENDANT ANDREWS: That's something, I strongly

object to that, and I'm going to show you in one second. This witness, he was informed that this witness, I wanted him to testify, and I'm going to show an e-mail to you where you was actually talking about this witness and Officer Bauer and why I wanted him to testify, and this is, what, almost a year ago.

THE COURT: Hang on, Mr. Andrews.

DEFENDANT ANDREWS: It's been a long time since.

THE COURT: Hang on. Here is the problem. Okay? You're asking this agent to comment on what appears to be a discrepancy between Officer Bauer's report -- hold on -- Officer Bauer's report and Officer Bauer's body cam video. This agent can't answer that. The video and the report do speak for themselves, so you don't --

My point, Mr. Andrews, is, you don't need to cross-examine this witness about that discrepancy.

DEFENDANT ANDREWS: But I do.

THE COURT: Well, what are you going to ask this witness that is within his personal knowledge?

DEFENDANT ANDREWS: He is the case agent on this case, so he has been writing reports. He took this probable cause to the grand jury, which is what I brought up in the beginning when you all was trying to push me along. This all goes to my probable cause that they didn't have probable cause to do none of this, none of this in the

beginning.

You didn't have probable cause to arrest me. You didn't have probable cause to go get my phone records. You didn't have probable cause to stop that car that night. You didn't have probable cause to do illegal search and seizure after this. This is limiting to these four issues. By her giving me a right to challenge the stop of that vehicle, that challenges the probable cause to everything that happened before because everything that happened before led up to them stopping that vehicle.

THE COURT: Well, I understand your argument. You're free to make that argument.

DEFENDANT ANDREWS: And --

THE COURT: But you have to ask this witness questions that are within his personal knowledge.

DEFENDANT ANDREWS: Oh, he got facts in front of him. I'm not asking him, I'm not asking him nothing that is not factual in front of him. I'm asking him to verify because he is the case agent and he knows what is going on. This is the government's case, so all of them are in this together.

If I'm asking him does this report say this, does the video show this, he knew I wanted these other officers. I can pull up the e-mail from him where he knew I wanted Bauer here months and months, almost a year ago, and I can

show you more documentation where I told him I wanted him up on the stand and Bauer, and I didn't get them.

And you all kept denying all my motions and stuff like that, and now we're here, and I told you I was unprepared, and so now I have to put this evidence on the best way I can. I can present it through him. I can present it through him because this is a government issue, and I also have a motion in for something like that, too, but we're not dealing with that today. What we're dealing with is the probable cause of it.

THE COURT: Probable cause to stop the Yukon?

DEFENDANT ANDREWS: To stop the Yukon, and so we need why did you allegedly have probable cause for the ping for the T-Mobile records? This goes to the documentation she gave me.

THE COURT: Agent Voth, were you involved in stopping the Yukon?

THE WITNESS: No, Your Honor.

THE COURT: Were you involved in securing the exigency ping from T-Mobile?

THE WITNESS: No, Your Honor.

THE COURT: Was your involvement after those things occurred?

THE WITNESS: Yes, Your Honor.

THE COURT: So really what you're doing,

Mr. Andrews, is arguing --

DEFENDANT ANDREWS: No.

THE COURT: -- which is fine. You can present your argument, but this agent doesn't have personal knowledge that would be --

DEFENDANT ANDREWS: Your Honor --

THE COURT: -- factual.

DEFENDANT ANDREWS: You're limiting my case. Can you please stop making excuses for the prosecution to stop me from presenting my case?

THE COURT: I am not.

DEFENDANT ANDREWS: You just found and the government sees how this is going. He knows I'm going to crash their evidence. Your whole probable cause is going out the window. I don't give a damn. I can get up there myself. I can commentate on it. I can stop. I can play the tape. I can talk about their report. I can be up there until next week.

THE COURT: Okay.

DEFENDANT ANDREWS: We need to move it along quicker, and he can talk about the facts, or I can put me up there, and we can drag it out.

THE COURT: Okay. Mr. Andrews, I need to address a number of the things that you said. Number one, no one is limiting your case -- hold on, Mr. Andrews. I did not

interrupt you. Do not interrupt me.

No one is limiting your case. The purpose of this hearing has been limited by or is limited to certain issues. You have had the opportunity to call witnesses with factual personal knowledge regarding those issues. No notice, at least in this Court's record, has been given.

I am giving you what leeway you need with Agent Voth, but I am going to sustain the objection as to the question that was asked because the Court -- Agent Voth has no knowledge of what Officer Bauer saw, heard, felt, understood.

And to the extent that your argument is based upon what you would say is a discrepancy between the body worn camera video and the report, that is as readily apparent to the Court as it is to Agent Voth, and so Agent Voth doesn't provide any information or testimony that will assist the Court.

If you have questions for Agent Voth that deal with his personal knowledge relevant to the four issues that are involved in this hearing, by all means ask them. If you wish to simply make argument on those issues based on this evidence, I will absolutely permit you to do that, but asking him does the video show that is, is not a proper question, and it doesn't help the Court.

DEFENDANT ANDREWS: Yes, it does. It's in the

testimony -- the record cannot reflect what we're watching. Someone has to put it into the record, just like all you when, when, when, when that Joel Pucely was on the stand, and I asked him about that officer planting that stuff in that car and was that officer touching stuff in that door.

And he chose to say no, he wasn't, but we all could see that the officer was touching stuff in that door, and then the courts chose to use his testimony instead of using the video which shows what it shows, which is the dude touching that stuff in that door which is illegal search and seizure.

Someone needs to put it into the record. She can't type what that video is showing. She is not watching it.

THE COURT: Again, I'm not going to debate the rules of evidence, but the video is in the record. It is now part of this hearing. It is part of the evidence before the Court on the motion regarding the probable cause for the stop of the Yukon.

DEFENDANT ANDREWS: You all can seem to misconstrue the record. I understood what you said or whatever. We can move on.

BY DEFENDANT ANDREWS:

Q. You see what's on the screen, Agent Voth? This goes towards what Paulsen said about people not, not requesting

them. Can you see what's on the screen?

A. Yes.

THE COURT: Go ahead, Mr. Andrews.

DEFENDANT ANDREWS: Should I read it because this ain't got nothing to do with him?

THE COURT: Go ahead.

DEFENDANT ANDREWS: This is an e-mail from Jeffrey Paulsen to my prior counsel, Reggie Aligada. This is from Paulsen. A couple days ago you told me that Mr. Andrews would like to call Special Agent Voth. That's the agent that's on the stand right now; Sergeant O'Rourke, who has already testified at length; Officer Benjamin Bauer.

I would like to pause. That's the officer who I have this officer on the stand testifying about his body camera report that was just released a year later that I have been trying to get this whole time, as witnesses in his motion of the motion hearing. Special Agent Voth will be at the hearing Friday and will probably testify as a government witness to rebut some of Mr. Andrews' allegations at the previous hearing.

I have arranged for Sergeant O'Rourke to be on stand-by. He works across the street from here. I also requested the presence of Officer Bauer but have not heard definitely whether he is available.

Now, how is this government continuously just blatantly just lying to the courts saying that I didn't ask for these officers and he didn't know. This is a specific e-mail.

THE COURT: Again, Mr. Andrews, I'm not going to debate it with you, but the point he is making and about which he is correct is that today's hearing, July 19 of 2019, you did not provide notice that you wanted Officer Bauer here for today's hearing, and the fact that there was a discussion between Mr. Paulsen and Mr. Aligada ten months ago is not notice for today's hearing. That's his point.

DEFENDANT ANDREWS: First and foremost, he never asked me who did I want. Secondly, I told you all that the judge took a letter that wasn't even a motion to open this hearing without taking on my evidence. If you had waited on the motion then, yeah, he would have known what witnesses I wanted, and he could have sent a proper letter to me because I am my own attorney.

So if he wanted to know who I wanted to testify and what I was going to be evidence, he could have sent me a letter. I didn't get no notice of that. Where is the e-mail? Where is any documentation that he asked me these things? I'm not required to tell him anything. Like I said, this hearing was put on on the fly. So we are just flying by here.

THE COURT: All right. We're not going to go on the fly here. Hold on. You're going to get and have gotten your due process. Here's what we're going to do. Okay?

Are there witnesses on these four topics that have personal knowledge relevant to those topics that you wish to call at this hearing?

DEFENDANT ANDREWS: Yes. Special Agent Voth.

THE COURT: Special Agent Voth does not have personal knowledge --

DEFENDANT ANDREWS: Yes, he does.

THE COURT: -- of these topics.

DEFENDANT ANDREWS: He testified to them at the grand jury, didn't he?

THE COURT: That's a different issue. Okay? If you want to ask him questions that are within the scope of his knowledge, certainly I will permit them, assuming they're relevant to the limited scope of this hearing, but where I was going with this, Mr. Andrews, is if you want other witnesses at this hearing, I want to know that.

We will discuss then where we go with this because I'll tell you one thing that is not changing is the trial date for your trial, and so we have a window of time in which to get this hearing conducted, and if you need witnesses for it, Mr. Paulsen is entitled to notice of

those witnesses.

So are there witnesses that you want to testify on the four topics that we have identified this morning in addition to Special Agent Voth?

DEFENDANT ANDREWS: If, if, if this was such an issue and he has such a right, why wasn't this presented before this hearing today because I'm pretty sure you all have been in this predicament before.

THE COURT: Let's do this. We're going to take a short break.

Mr. Gerdts, I want you to explain the notice requirements and explain to Mr. Andrews why we are where we are.

DEFENDANT ANDREWS: I don't need it. I don't need no continuance.

THE COURT: We're taking a five-minute break.

DEFENDANT ANDREWS: Man, you just -- you just can't get it right. The witnesses keep getting off the stand. When I cross examined, he being stopped. This happened at three or four different motion hearings. You keep stopping, sir, all because of what he say. This man is not right.

It's because of him we're here because of him and his lack of giving this discovery. Had this discovery been given when it was supposed to and motion ruled on when it

was supposed to, we wouldn't be here because this stuff would have been ruled upon at the motions hearing. We would have dealt with it. It would have already been in evidence.

We would have ruled on it, and he wouldn't be running scared right now because he would have had his witnesses on the stand and everybody prepared, and we would have been ready. Don't put this on me. I am stuck in jail. I write about limited access. I write about not being able to subpoena my witnesses and no computer access.

The stuff I'm working with is what I'm getting from the government, and what I am getting is being shoved up my ass. Sorry for the language.

THE COURT: That's strike number two on your language. Okay? Listen. Hold on. Everybody needs to calm down. We're going to take a five-minute recess. I do want you to consult with your counsel. I'm trying to help you, Mr. Andrews, and it's true.

Court is in recess.

THE CLERK: All rise.

**(Recess taken.)**

**(In open court.)**

THE COURT: You may be seated.

All right. Are you ready to proceed,

Mr. Andrews?

MR. PAULSEN: Your Honor, for what it's worth, I think his suggestion that he just play these things and comment on them himself rather than having Voth to comment on it would probably expedite things.

THE COURT: I agree.

DEFENDANT ANDREWS: I'm not letting him off the stand because I need him for other topics and stuff.

THE COURT: Okay.

DEFENDANT ANDREWS: So I'm not agreeing to that.

THE COURT: Fine. Proceed, Mr. Andrews, but please answer my question. Are there other witnesses for this hearing that are related to the four topics that are the subject of this hearing that you need to call?

DEFENDANT ANDREWS: Yeah. Just me.

THE COURT: Okay.

DEFENDANT ANDREWS: You let me put Paulsen up there?

THE COURT: Of course not. That would be highly improper.

DEFENDANT ANDREWS: No, it wouldn't. It happens.

THE COURT: Let's proceed with your questions for Agent Voth.

BY DEFENDANT ANDREWS:

Q. Should we got to re-boot some stuff?

MS. BATES: It's ready to go, Mr. Andrews.

DEFENDANT ANDREWS: Now, I don't even remember.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. What was the last question I asked you?

A. I don't remember.

Q. I guess we can just get back to the video, you know, about what the video is showing, and I know we talked about that. I asked you a question or two about that before because this is the video.

You've read it. So you personally have knowledge about that report, and you're personally going to watch this video.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Did you hear what they just said?

A. No, sir. The only part that I clearly heard was she said she had Texas plates on her car. Other than that, I can't make out what they're actually saying.

Q. Well, just for the record the other girl that just came out here, she has been identified as living there, and she says she needs to move. That is the second female, quote unquote. Once he cut his body cam off, she says she fears for her life and don't want to identify herself and give her name and picture. This is her.

I am going to go back with the volume so you can maybe hear it this time.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Did you hear it that time?

A. No, sir.

Q. Where she asked, you need to move, and she said I am going to move?

A. No. I hear a lot of talking. I can't make out what they're actually saying. I apologize.

Q. Okay. Don't worry about it.

**(Video recording played.)**

THE WITNESS: I'm just going to say if there is any questions about what is being said, I believe the audio is where Mr. Andrews is standing. The volume is not coming out of where I am, so I can't hear what is being said. Just to clarify, I can't hear what is being said.

BY DEFENDANT ANDREWS:

Q. That's impossible. Everything is coming out of here. We all hear.

A. My speaker was not on, Mr. Andrews. I apologize for my hearing, but I did not have a speaker.

Q. Let me play the video. Can you hear now?

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. Did you hear her that time?
A. I did. Yes, sir. Thank you. She said she needs to move. Fixing to move, something about moving, correct.
Q. So just quick question: What you read in that report, is there a difference about what that report is saying to what we're watching on this video?
A. I don't believe so. The video is not over. There is -- there is I'm assuming more to come.
Q. In that report, correct me if I'm wrong, did not that report say he talked to a lone female on this porch that identified herself as being from Texas and refused to give her name and stuff and says she just laid on the ground with her child.
He cut his body cam off. Another female came saying I live here and I don't want to be recorded so please don't turn your body cam back on in so many words and don't get my name and picture, right?
A. You asked a couple of questions. One, I would like to clarify. The video is not over. I don't know what is going to play on the rest of the video. There is a recording where the body cam is turned off, correct.
Q. His report right now?
A. Mm-hmm (Yes).
Q. His report says there is only going to be one female

out there before the body cam is turned off?

MR. PAULSEN: Same objection. The report has been read in the record. He is trying to ask a witness who is not the author of the report to interpret the report. If he wanted the interpretation, he should have asked for Officer Bauer to be here for this hearing, not the one back in October.

THE COURT: Sustained. Go ahead, Mr. Andrews.

DEFENDANT ANDREWS: Am I going to get anything to play about how we going to bring this evidence in? I'm just asking you a question now. It's about what his personal knowledge is, right, this officer on the stand. So once he reads that report, he can interpret, and that's his personal knowledge now. He knows the facts of that report; am I correct?

He knows the facts. I'm not asking him to give his permanent opinion. I'm asking him a yes or no question.

BY DEFENDANT ANDREWS:

Q. Did that report, yes or no, did that report say that it was one lone female out there that he had talked to before he deactivated his body camera?

A. No.

Q. How many females did he talk to before he deactivated his body cam in that report?

MR. PAULSEN: Same objection, Your Honor. This is Officer Bauer's report, not this witness's.

THE COURT: Overruled.

THE WITNESS: He doesn't say how many. He says that he noticed a female standing on the steps. He doesn't say by herself. You said the word "lone." The word "lone" is not in this report. I don't know how many people were present. I know he says he saw a female.

BY DEFENDANT ANDREWS:

Q. Okay.

A. Standing on the steps.

Q. If he saw a female, I'm not going to go there because that is asking you to speculate, but he said he seen a female, right, and then he said after he talked to a female he cut his body cam off, and another female came. Am I right --

A. A different female.

Q. A different female came out?

A. That would be different from the first one.

Q. Different from the first one, so at this point there is already a second female and his body cam is still on; am I correct?

A. I don't think so, no. He deactivated his BWC to speak with another officer. While speaking to the officer, a different female came out.

Q. His body cam is still going at this point; am I correct?
A. Correct.
Q. And there is another female in this video; am I correct?
A. Correct.
Q. And she is standing next to the female, and they're talking, and she just identified herself as the person who lived in that apartment; am I correct?
A. She said she has to move. I don't know if she's the one who lives in that apartment next door. I don't know.
Q. I'm going to carry on. The record shows -- it's going to get better. The questions will get deeper in a minute. We want to continue on with the video.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. Agent Voth, could you please state the address above the door of these young ladies' head?
A. I believe it's 1707.
Q. 1707?
A. I believe so.
Q. Is that not the same address that was in that report from Officer Bauer?
A. Yes.
Q. Just clarifying for the record we're at the right

house. These are the right females, you know.

MR. PAULSEN: Your Honor, I object to that statement because Bauer is not here to verify it.

THE COURT: Sustained.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Agent Voth, did you hear the question that the officer finally just asked them?

A. Yes.

Q. And what was it?

A. I believe he said, you didn't see anything or did you see anything.

Q. And did you hear their responses?

A. I know there is two people talking, and I can't tell which one is talking. I know the second, the one in the dark pants and shirt as opposed to the one in the white dress, I would say, she is currently talking and saying something about getting ready to walk out the door.

Q. Meaning they was inside the residence?

A. I assume so. That's speculation. I don't know where they were.

Q. A prudent person of your thoughts, if you was getting ready to walk out the door --

A. Can I see the rest of what she said about walking out the door?

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Did you hear what he just asked her after that?

A. About a vehicle driving off.

Q. What did she say?

A. I believe she said no.

Q. All she heard was shots, right?

A. Can you replay it?

Q. Yes. I can.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. As this officer is going to walk up, I would like you to pay attention to the girl in white and listen to what she is going to say.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Did you hear what she said?

A. The one in white?

Q. Yeah.

A. No. I thought the other one was talking.

Q. No. She is going to say her name is Tiara.

A. The officer walking up or the first officer?

Q. The officer walking up. I'm going to replay it for you so you can catch it this time. All right?

A. Okay.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. And that's where Officer Bauer's video ends. Now I want to ask you from your personal knowledge of what you read in that report there, did that first female ever refuse to give her name? Did she ever say anything about not giving her date of birth?

MR. PAULSEN: Your Honor, I'm going to object. The documents speak for themselves. There is no reason to ask a witness who wasn't part of it to give an opinion.

DEFENDANT ANDREWS: It's personal knowledge now. He has it.

THE COURT: I'll overrule the objection. It's not personal knowledge, but you, I'm letting you ask him what he heard.

Go ahead, Agent Voth.

THE WITNESS: I did not hear the word "refuse" to give.

BY DEFENDANT ANDREWS:

Q. Did you hear the officer at any given time ask her her name and date of birth and she said no?

A. I did not hear her give her date of birth. There was some mention of a friend. I'm not sure if that was asking.

Q. Her name is Ryan and her name is Tiara. Did you ever hear her refuse, which is what the report says? The female

that was from out of town, Texas, refused to give her name and date of birth.

A. Okay.

Q. And heard the shots and laid on the ground with her child. Did you hear any of that during that sequence?

A. I heard something about her children, but if it goes to your point about the refuse, I did not hear her refuse.

Q. Okay. And the other female that came out there, did either one of them say that they was outside during that video?

A. No. I believe the one said she was at the door, going out the door, getting ready to go out the door. I am not sure. There was something about the door and her status related to the door.

Q. And she said she did not see nothing; am I correct?

A. I'm not sure which one responded. I heard the officer ask the question. I heard a negative response. I'm not sure from whose mouth that was spoken.

Q. And they both was right there. The question was asked. We've seen it was from the same girl. Another question: When they asked that same female about the truck, did she see any vehicle, what did she say?

A. My recollection she said no.

Q. Now, could you please tell us what the report of Bauer said, to your recollection?

A. Yeah, if you go to the third --

MR. PAULSEN: Same objection, Your Honor. We covered this last time.

THE COURT: Overruled.

THE WITNESS: If you go to the third paragraph, apparently there is a subsequent conversation that is not on that BWC, and in that paragraph, the person speaking stated that it was the blue, hold on, blue SUV.

BY DEFENDANT ANDREWS:

Q. Now, in the sequence of that video, does it match the sequence of what you have in that report up there, to your recollection?

A. I believe so. He speaks with the other officer. He turns his video off, and then there is more to follow that's not on the video.

Q. I'm going to ask you, you're under oath.

A. Yep.

Q. You know what that mean, right?

A. I do.

Q. To testify truthfully?

A. Correct.

Q. So when he stated in that report that he see a female on that porch and he approached that female and that female said that she was from out of town Texas and said she refused to give her name and date of birth and she didn't

see nothing and when the shots went off she laid on the ground with her child until the shots was over, this officer said he then cut his body cam off and left.

Is that what the video showed?

A. You made about eight statements.

Q. The whole thing of what I just said, did this video show the officer talk to one uncooperative female that only heard the shots and she laid on the floor and he cut his body cam off?

Is that what the video showed?

A. The video showed him speak to --

Q. Yes or no, please. Yes or no. Yes or no answers. Did the video show him talk to one lone female that identified herself from Texas and stated that her child was in the house, she was in the house, laid on the floor?

MR. PAULSEN: Same objection.

THE COURT: Hold on.

MR. PAULSEN: It's the same objection. The documents speak for themselves. The document can be compared if necessary.

THE COURT: Understood. Your objection is well taken. I will let Agent Voth answer or Voth answer as to his impression of whether the video is consistent with the report.

Go ahead, Agent.

BY DEFENDANT ANDREWS:
Q. Yes or no.
A. If it's consistent with the report?
Q. Well, no. No. No. That ain't what I asked.
A. That's what the judge just said.
Q. That's what he referenced. I asked you a specific question. Yes or no. Yes or no. Was there only one female out there who identified herself as being from Texas, and was the same one only female out there who refused to give her name, and this officer then cut his body cam off?
Is that what the video shows?
A. The video shows two females.
Q. Is that what it shows?
A. I can't answer --
Q. Yes or no.
THE COURT: Hold on. Everyone, don't talk over each other. Second of all, you can't ask a compound question that had -- hold on -- has three parts to it and say yes or no. He can't answer a question like that yes or no. So break it into parts and make him answer it yes or no.
DEFENDANT ANDREWS: Okay.
BY DEFENDANT ANDREWS:
Q. Okay. Yes or no. This officer stated that he seen a

lone female on this porch or he seen a female on this porch; am I correct?
A. Yes.
Q. The video showed a female on that porch, did it not?
A. Yes.
Q. The video only showed one female on that porch; am I correct?
A. Initially, it showed one.
Q. Yes or no.
A. She was --
Q. Yes or no. Without commentation, without --
A. I can't answer your question as asked.
Q. It's yes or no. I said yes or no. Did the video show one female when he initially walked up to that balcony? Did it show one female?
A. Yes.
Q. He questioned this one female initially, did he not?
A. Yes.
Q. And his question of this initial female, he asked her a sequence of questions that she answered; am I correct?
A. Yes.
Q. At any given time, was she uncooperative?
A. I guess that depends on your definition of "uncooperative."
Q. Did she refuse to give her government name?

A. I don't know that I heard him ask her her government name.
Q. Does not his report say he asked her her name and she refused to give it?
A. It doesn't say he asked. It just says the female refused to give her name and date of birth.
Q. And that would state that she refused to give her name and date of birth. We'll move along from that. Yes or no. Did this female state that she was from Texas?
A. I heard her reference her plates were from Texas. I don't know that I specifically heard her being from Texas.
Q. I'm going to replay the video. We all heard her say it multiple times that she was from Texas. She said it five or ten times. Let's just tell the truth so I can move along. Ain't no use dancing around the questions. Please.
A. You asked me a question. I answered.
THE COURT: Hold on. We're not going to have argument. Ask a question.
BY DEFENDANT ANDREWS:
Q. Now, from the officer's report after he talked to this female, did he mention another female being on this porch in the report you have? Yes or no.
A. Can you be more specific?
Q. Did the Officer Bauer, or however you say his name, in the report you have, supplement 9, did he mention another

female on the porch before he deactivated his body camera?
A. No.
Q. In the video before he deactivated his body camera, was there not another female on that porch? Did not another female come out on that porch? Yes or no.
A. Yes.
Q. And this female made reference to herself staying in this apartment, did she not, and stated that I'm going to move after the girl from Texas stated, and I quote, "Bitch, you need to move," and she says, "Girl, I am. I'm fit to move."
A. There was general discussion about moving, yes.
Q. By a second female, right?
A. Yes.
Q. Now, in the officer's report and your recollection, does those match? Did he put that in his report that this female came out, and he spoke to her and asked her all these questions, and she stated that she lived there before he cut his body cam off?
Is that in his report? Yes or no.
A. Not before, no. After, yes.
Q. Yes.
A. I want to make that distinction.
Q. After. Now let's get to the "after." So in his report he says that another female came out while he was talking

to another officer and flagged him down; am I correct?
A. Yes.
Q. And what did he say that female stated?
MR. PAULSEN: Asked and answered. We've read the report in the record before, Your Honor.
DEFENDANT ANDREWS: Okay. Well, you know, it is what it is.
BY DEFENDANT ANDREWS:
Q. Just one simple question to you and your recollection: Is that a true and accurate report, or does that report contradict itself and show that this officer is being dishonest, someone is being dishonest?
MR. PAULSEN: I'm going to object, Your Honor. Asks for a credibility determination about someone who is not even here to defend himself because we had no notice that Officer Bauer would be used this way.
THE COURT: Sustained and lacks foundation as well.
DEFENDANT ANDREWS: I asked him his personal opinion about the report and the video. That's personal knowledge. He keep saying he has to have knowledge about it. He has watched the video. He has read the report.
Now I'm asking him in his personal knowledge because now I'm asking about his credibility. That's why he is on the stand, and I'm going to ask him some more

questions down the line about things that have to do with him and reports from him. So his credibility is going to be under attack, too, on the video.

BY DEFENDANT ANDREWS:

Q. With that being said, I want to ask you under oath, does this video contradict themselves?

MR. PAULSEN: Same objection.

BY DEFENDANT ANDREWS:

Q. The video and that report, do they contradict they self?

MR. PAULSEN: Same objection.

THE COURT: Overruled.

THE WITNESS: No.

DEFENDANT ANDREWS: I'll move along from that. The record, the courts, everyone in here can clearly see what that is and what that was.

Your Honor, quick question. As far as how we're doing this thing on the fly, this still ties into my motions, right, because this, this argument went into motion practice, and there is a motion in on this.

THE COURT: I'm not sure what you're asking, but, yes, you can make argument and present evidence on the topics which are the subject of today's hearing.

DEFENDANT ANDREWS: Yeah, but them subjects of today's hearing is not specific to the heading of my

pretrial motions, but they're within these motions.

THE COURT: Well, we're here on a defined scope of issues, so --

DEFENDANT ANDREWS: But to, but to get to the constitutional violation of the matters, you're going to have to re-approve or take your, give an opinion on some of my motions. These have to be ruled on. You can't rule upon the four topics because the four topics is not motions.

Them four topics were within motions, so how are we going to --

THE COURT: Understood.

DEFENDANT ANDREWS: -- deal with that because I mean I know the motions that they retained when I was going to slide off to -- I made mention of them as to this record as to why I just went through this sequence with him because the courts need to know about how this is going to deal with the lack of proper cause to stop that vehicle.

THE COURT: And that is something that I do want to hear. You can do it now, or you can do it when you're done with this witness, either one.

DEFENDANT ANDREWS: Okay. Well, the reason why I brought this up is because this is their only identification of me, and I had stated in many different motions and many different hearings and transcripts. To

save the Court time, do you need me to bring them up? You should remember.

I brought it up saying this is a false statement, that this witness did not exist, that this did not happen, and I continuously asked for this video to prove it. The government suppressed this. I kept demanding for it. I kept asking for it. I have documentations where I continuously asked for this footage so I could put in my motion 58, which went into docket 102, and in my motion 54, which was deleted and later reentered as docket 98.

Both pertain to this and pertain to this witness and the credibility of the identification process. I was never identified in this situation. They was told, I was told the government evidence was that this witness said my name. Officers ran with it. No one went back to get with this witness and identify, verify or show her a picture to clarify.

No official identification process was done, and the evidence was quite contradicting just of the story that he told, so I challenged it, and my motion was denied because it was unavailing, and I didn't have the proper backing of this video to show that this is not the sequence of what happened.

And I knew this is not what happened because I'm in contact with these people that live here. I know

everybody on this goddamned block.

THE COURT: Hang on a second. I understand your argument is that this body cam video contradicts the evidence that has been put forth that identified you which then led to the stop of the Yukon. That's in essence your argument, correct?

DEFENDANT ANDREWS: It is, but it's going to go into the other topic of this, which is the false information inside the T-Mobile report that was given to T-Mobile to allegedly get my phone records.

THE COURT: Understood. Go ahead.

DEFENDANT ANDREWS: But as I was saying that, yeah, this was suppressed, and this was supposed to be in, you know. Like I say, I want to raise, maintaining that objection again that this should have been the topic of -- that should have been able to be addressed, too, had the judge not misconstrued and limited my access on what I'm reopening this hearing about because I have motions on this, about this government's conduct and the officers' conduct and a suppression motion of all the evidence and also a suppression motion of the indictment itself for this government's conduct, which I'm going to continue to show so --

In essence, like I say, that's why I was so emotional earlier about why my stuff is being limited and I

put in another motion about it, but moving on to the rest of the motions, no other documentation from the government was my name ever given, and the video footage of this situation --

MR. PAULSEN: That's not a correct statement, Your Honor. There were multiple witnesses at the scene. He has only covered one of them here.

DEFENDANT ANDREWS: Your Honor, can you please --

THE COURT: Hold on. I understand. As I understand, Mr. Andrews is now making argument. Certainly the government will be given the opportunity to make any argument they see fit, and I'm not going to cut off his argument even if the government asserts that it's inconsistent with the evidence.

You can point that out when it's the government's turn to argue. Okay.

DEFENDANT ANDREWS: Yeah. My, my, my arguments to that so when he do, he can have his swing, and I rebut him is that I'm going to clear it up. No identification of me was given other than this of my government name. My government name is Norris Deshon Andrews, date of birth 12/8/84. I was never identified by name other than this alleged report that we see as false.

Now, also this same witness that we just, this Bauer thing, we seen that in the reports they say that she

also gave a phone number. Well, that's false, you know. Now, there is another video of another officer, and I believe his name -- I know it's supplement number -- supplement 9, I believe it is.

THE COURT: Supplement 9 is Bauer's report, I believe.

DEFENDANT ANDREWS: 7. It's going to be -- give me one second. I'm going to put it up on the screen so you all can see it.

THE COURT: Just a housekeeping question for you, Mr. Andrews. Will you have additional questions for this witness?

DEFENDANT ANDREWS: Oh, yeah.

THE COURT: Okay.

DEFENDANT ANDREWS: And by the way, this next one I'm going to bring up is, I haven't been given this. The government was supposed to turn this one over, too, and they refused to do it. This was a debate also. It's number 7 by David Mattsson. His body cam and his audio footage have not been turned over, and it's been repeatedly and repeatedly asked, and the government gave me this hard drive with over 900 gigs of data in the last week or two.

It's still not in there of supplement number 7. This is where the alleged witness number six says the name of NO and gives a phone number that no one ever verified or

can tie to me. Who the hell knows? My government name is not NO. I'm not from Chicago. I'm from New Orleans.

She also states I got out of jail in March of '18 doing four or five years. That's obviously not me. No one went to this same lone female, as you can see from this report, and I'll read them into the record. No one went and verified with her that I was essentially the person they was talking about in this report, either, and I beg the government to dispute that.

On 5/15/18, I was in a uniform patrol as marked NDP squad 447, and they just tell the number at approximately --

THE COURT: Hold on one second. Couple of things. First of all, is this supplement in the record, Mr. Paulsen?

DEFENDANT ANDREWS: Yes.

THE COURT: Do you know?

MR. PAULSEN: I believe it is.

THE COURT: Okay. Mr. Andrews, you don't have to read the entire report into the record. It's part of the record.

DEFENDANT ANDREWS: I --

THE COURT: If there is something you want to point to in this --

DEFENDANT ANDREWS: Yes. I'm pointing out the

couple identifications allegedly that the government have of me. It was only, it was only two or three on the scene. That was one, which is supplement number 9. Here is supplement 7 where a female states the name NO, gives the wrong description of me, and like I said, once again, none of this is on audio or body cams. It's all at -- the officers allegedly cut off these body cams and made these reports.

This female says the name NO and he's going to have pounds of weed in his truck. Something about some guy named Little Moe. None of these is government names, and not one point during this segment of the document does anybody go verify with this girl who this NO character is, and this is what the government took to the grand jury, along with that other supplement they just had, and said that I was the person that did this and they had eyewitnesses to this, and that's coming from -- and that's why I want to bring this up.

BY DEFENDANT ANDREWS:

Q. Can you see your computer monitor?

A. Yes.

Q. This is a report that you wrote; am I correct?

A. Yes.

THE COURT: Do we have an exhibit number on this?

DEFENDANT ANDREWS: It's the same one. It's all

the same.

THE COURT: It's all the same exhibit?

DEFENDANT ANDREWS: Mm-hmm.

THE COURT: Do we have an exhibit number on that?

DEFENDANT ANDREWS: This exhibit is in the record in like two or three exhibits, but the whole case file is one exhibit itself, and I believe it's 33.

THE COURT: Okay.

DEFENDANT ANDREWS: So all of this falls under 33 or 32 case file.

THE COURT: Go ahead.

BY DEFENDANT ANDREWS:

Q. This is the report that you wrote, right?

A. Yes.

Q. And you stand by this report; am I correct? Do you need to read it to refresh your recollection?

A. Sure.

Q. Tell me when to scroll.

A. Go ahead. You can scroll.

Q. Okay.

A. Okay.

Q. You stand by that, correct?

A. Correct.

Q. That's essentially what you went and took to the grand jury; am I correct?

A. Generally, yes.
Q. Generally, yes?
A. We had to talk about prior felony convictions, interstate nexus. There is other elements.
Q. That's the narration of events, right?
A. Generally, yes.
Q. And, and, and narrative part 1, that paragraph there, you talk about the shooting scene and how you're going to -- the gun is being placed in the defendant's hand, and that's on May 15th; am I correct? At the shooting; am I correct?
A. I don't think I understand your question, sir.
Q. When did you all allege that the defendant possessed this firearm?
A. I guess I would have to see the indictment.
Q. Can you read the top of your, right there?
A. The top of my report says May 15th.
Q. Can you read that sentence?
A. The very top one?
Q. Right there it says, "On May" --
A. Two sentences start with, "On May."
Q. Can you start with the top one?
A. On May 15th, 2018, Norris Andrews, a multi convicted felon, was in possession of a Taurus 9 millimeter handgun used during a shooting at 1711 Plymouth Avenue North,

Minneapolis, Minnesota.

Q. So that's saying that you're charging me with this firearm from the shooting on May 15; am I correct?

MR. PAULSEN: Your Honor, this has nothing to do with the four motions. This is not new evidence. This is a report that has been offered and disclosed months ago. We're not dealing with new evidence here.

DEFENDANT ANDREWS: It's going to lead straight into it.

THE COURT: Tell me how. Where are you going with it?

DEFENDANT ANDREWS: I want to question him because this is his personal recollection. He obviously wrote this report here for the indictment. So we're going to talk about his identification process because now he is personally involved in this and how I was identified, and it goes to the second part, which is down here, about them having the phone records in part 2 because this whole report right here has to do with each of the four elements of what this hearing is about.

THE COURT: Well, here's -- here's the issue in a sense. We did go through the prior identification. What we're trying to get to is whether any of the new evidence, whether -- and those are really the body cam videos.

DEFENDANT ANDREWS: You're right.

THE COURT: Somehow bear on the question of the information that was given to T-Mobile or the probable cause for the stop of the Yukon.

DEFENDANT ANDREWS: Correct.

THE COURT: So I already have in mind the content, which is the prior identification or the identification as we discussed it. The question really that we're trying to focus on is, how does the newly produced evidence bear on those questions.

DEFENDANT ANDREWS: Because we still -- one more identification. There is no confusion, if I close the documents?

**(Defendant confers with counsel.)**

THE COURT: Okay. What are we watching now, Mr. Andrews?

**(Video recording played.)**

DEFENDANT ANDREWS: This is going to be from supplement number 6, and this is going to be towards evidence from Mark Hanneman and testimony from O'Rourke.

THE COURT: Okay.

DEFENDANT ANDREWS: About the identification process and --

THE COURT: Okay. So this will be marked as Exhibit 101. It's the body cam video of which officer? O'Rourke?

DEFENDANT ANDREWS: No. Mark Hanneman, supplement number 6.

THE COURT: So the record is clear Exhibit 101 is the body cam video of Officer Mark Hanneman.

DEFENDANT ANDREWS: Mm-hmm. And the reason to show this is that O'Rourke' testimony and this officer's report said that this lone female that we're going to watch gave my government name and said that Norris Andrews did these actions.

O'Rourke actually said right there where you're sitting now, and he testified to that. Do you remember that?

THE WITNESS: I remember we had a previous motions hearing that Sergeant O'Rourke has testified at, and I don't know what we're talking about here, no.

BY DEFENDANT ANDREWS:

Q. Do you remember that O'Rourke testified to, testified to the fact of that video? I mean, what that video showed?

A. I haven't seen the video, so no would be my answer.

Q. At the hearing. Did you remember O'Rourke's testimony stating that the female identified me that was with Montrel Tyson? She identified me as the shooter, Norris Andrews as the shooter?

A. No, I don't remember that.

Q. Okay. This is going to be September 9th, 2010,

testimony from Sergeant O'Rourke, do you understand? I want to refresh your recollection, if I may.

THE COURT: Go ahead.

BY DEFENDANT ANDREWS:

Q. This is, like I say, September 10th, 2018, testimony, and actually, I believe that Paulsen's questioning the witness here, if I'm not mistaken, and this is going to start at page 18, line 24. Paulsen asked the question of:

Was there one other piece of information relayed to you about, having to do with where Andrews and Tyson went after the shooting, like some girlfriend's house?

The answer O'Rourke: Tyson went to a girlfriend's house and told her exactly what happened.

How do you know that?

Because there was a police, there was a police report written by officers on-scene, and they relayed this information to me.

All right. Is this something you knew before Mr. Andrews gets arrested later on that night?

That's correct.

Paulsen: I misspoke. It was only Tyson that ran to the girlfriend's house?

Yes.

And some officers went over there and interviewed this girlfriend?

Yes.

Question: And what did you learn as a result of that interview?

Answer: The girl stated that Tyson called Andrews from her cell phone, and it's one of the people who provided us with the cell phone number.

Question: Okay. Did the girlfriend provide any information about the shooting itself?

Yes -- I mean answer: She said there was a disagreement. Whether it was about money or drugs, I don't remember for sure, but that they were -- Andrews was agitated and committed to shooting the people that owed him that.

Question: This is something the girlfriend knew from talking to her boyfriend, Montrel Tyson?

Answer: That's correct.

Question: And this -- and then she said that Tyson called Andrews while at her place?

Answer: Correct.

And did the officers who went out to check the story look at her phone to confirm that?

Yes.

And that same number was in the phone, the (651) 502-5142?

That's correct.

And then he goes and says he's going to jump ahead.

Now, from your recollection and reading and hearing that, that witness just identified the shooter from who Montrel Tyson as being the person that shot. This is another formal identification that was put into this evidence and stated that I was identified; am I correct?

A. I don't know that I understand that question.

Q. To your recollection, was I just identified? Was my name given as a person that did this shooting?

A. I don't know. I know that this is September, and Officer O'Rourke is talking about something that happened. I don't know if your name was used by the young lady.

Q. Is my name Andrews?

A. Yes.

Q. So when this witness just said that her boyfriend, Montrel Tyson -- you know who Montrel Tyson is, don't you?

A. He was the front seat passenger.

Q. He was the alleged front seat passenger in the vehicle, correct?

A. He was the front seat passenger.

Q. He was the alleged front seat passenger, correct?

A. That's your word not my word.

Q. Okay. Well, has this case been convicted and proven?

MR. PAULSEN: Argument here, Your Honor.

THE COURT: Okay.

BY DEFENDANT ANDREWS:

Q. Okay. Well, anyway, for argument sake, he was the passenger, right, and this Montrel Tyson went to this girlfriend's house; am I correct?

A. That's my understanding, and that's what the report says.

Q. And this Montrel Tyson told this girlfriend that Andrews shot this person, and his girlfriend heard these things, right?

A. That's what the report says.

Q. And the name Andrews was stated multiple times in there as the person that did this shooting; am I correct?

A. That's what the report or I guess it's a transcript in front of me says that Officer O'Rourke said.

Q. And the officers also went and verified this, and it was on a body cam. They went and checked the story, and it was caught on body cam, correct?

A. I believe they interviewed the young lady, and they had their body cams on, yes.

Q. Now we're going to watch that body cam, this sequence, to see if the name Andrews is mentioned or anything of the sort of me being involved in this shooting.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. For the record, this is Mark Hanneman's video of a domestic dispute, and it's case number 18-158632, and it's May 15th, and the body camera says 23 to 28 minutes.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Did you hear me just asked about on the video?

A. No. I heard a dog barking.

Q. You didn't hear them ask did the shooter have a blue shirt, green pants?

A. Can we replay it, please?

Q. Yeah. I can replay it.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Did you hear him that time?

A. What I heard him say was the guy who fled on foot to the east.

Q. What did he have on?

A. A blue shirt and green pants.

Q. And what was the response?

A. Can you replay it? I was listening to the question and the dog.

**(Video recording played.)**

THE WITNESS: No. That was the answer over the radio.

BY DEFENDANT ANDREWS:

Q. He did not?
A. I'm just saying what I heard.
Q. The person the asked watched the video, and they just said, no, he did not, right?
A. I don't know. I'm telling you what I heard. I heard the word no. I'm not sure what he said.
Q. You heard him ask over the radio, right?
A. Yes.
Q. His police dispatch radio, right?
A. I believe so.

**(Video recording played.)**

MR. PAULSEN: Your Honor, I object.

THE COURT: Pause the video, please?

DEFENDANT ANDREWS: Huh?

THE COURT: Pause the video.

MR. PAULSEN: There was after the word "no" there was further explanation by the dispatcher. He just conveniently skipped that, and he skipped another part about the blue shirt.

DEFENDANT ANDREWS: Do you want me to go back? The video looked like it was skipped. It wasn't playing.

**(Video recording played.)**

MR. PAULSEN: If he wants to correct the record and make it complete, he has to go back a little farther than he just did.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Just for the record, you heard what the dispatch said when he asked about the sleeve, that they couldn't get the good match on the color. It was too far, right? Do you want to verify and clear up the record, so I'm making sure we still have it clean.

You heard that, too, right?

A. No. I'm sorry. It's very hard to hear. You're trying to put me under oath on the record what is being said. I can hear sound. I can hear words, but I don't want to say under oath what exactly is being said. There is a dog barking --

Q. Don't worry about it. That's not a factor of what is going on. The record shows itself. They tell them that it's not that, so we can move along. So Paulsen will have no objection, I'm going to skip it.

Now, I want you to pay attention to what he is going to ask her, the young lady filling out the report, and what her response is going to be because this is critical.

A. Okay.

Q. And I don't want to have to go back to it.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Did you hear that?
A. I believe so.
Q. What did she say?
A. That the guy owed somebody money and they started shooting.
Q. Yeah. The guy he knew was with someone, right, and they owe someone some money. I'm going to replay it for you again so everyone can hear it.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. Whoever this guy was with, you heard that, right?
A. Yes.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. Now at any time during this sequence, did you hear her say anything about Norris Andrews, Andrews period?
A. No.
Q. Did you -- anything in that sequence that would proofly tell you that I did that?
A. In that sequence that I just listened to, it was the guy he was with.
Q. The guy who was with?
A. I assume Montrel Tyson was with. I don't know.
Q. Let's clean the record up.
A. I might not be the person for the record.

Q. You're doing great.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Pay attention to the guy and the guy he was with. Not the guy Montrel was with, the guy, because the officer is going to try to put a couple words in her mouth that she is going to blow off and go with because she want to get Montrel locked up, but listen to what she initially said about what Montrel told her.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Whoever the guy was with, correct?

A. Possibly.

Q. I'm going to do it one more time, and then we can just move on.

**(Video recording played.)**

THE WITNESS: Something about his guy was with.

BY DEFENDANT ANDREWS:

Q. Something about the guy he was with?

A. No. You said whoever. I'm asking you --

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. You didn't hear whoever that time?

A. I did that time, something about whoever this guy was with.

Q. Yeah. He owed some money and they shot someone, right?
A. Can you keep playing it? I don't know if she said shot someone.

**(Video recording played.)**

THE WITNESS: The guy owed someone some money.

**(Video recording played.)**

THE WITNESS: The guy that he was with shot him.

BY DEFENDANT ANDREWS:

Q. This guy and the guy that he was with?

MR. PAULSEN: Your Honor, this is ridiculous argument.

DEFENDANT ANDREWS: It's not.

MR. PAULSEN: It speaks for itself. It has nothing to do with probable cause.

DEFENDANT ANDREWS: It is. It is. This is the information that O'Rourke is going to watch and listen to when he makes his distinction of what he is going to tell T-Mobile.

THE COURT: I understood your argument. Okay? I get it. This witness --

DEFENDANT ANDREWS: I can move on now.

THE COURT: Yeah. I mean, he can't tell what the officer said or what she said. All he can say is what he is hearing and the video.

DEFENDANT ANDREWS: He is doing perfectly what I

wanted him to do, which is put into the record of what is being said because this evidence keeps getting misconstrued. This part of the evidence was suppressed by him.

I said give me this evidence because this evidence could have been proved a long time ago what this thing was all about. There was no probable cause, and these officers are lying in their reports.

THE COURT: Keep going.

DEFENDANT ANDREWS: But, yeah, I'm -- that's all their identifications, you know. At this point, I suppose that that's the two down there at the alleged shooting. That's the one where the alleged phone numbers and alleged the girl said that Montrel told her that Norris Andrews, I mean --

Let me see something here. She said that Tyson called Andrews while at her place. Let me see another time. She said that there was a disagreement. Whether it was about money or drugs, she don't know for sure but that Andrews was agitated and committed to shooting the person that owed him.

BY DEFENDANT ANDREWS:

Q. Did you hear any of that?

A. I heard --

Q. Yes or no. Did you hear any of that? Did you hear

that there was a disagreement?
A. Yes.
Q. And something about some drugs and money, and she don't remember for sure, but that Andrews was agitated and committed to shooting the person that owed him? Did you hear any -- did you hear that?
A. Yes. I heard her say that somebody owed somebody money and there was a shooting. I don't know -- I didn't hear the word "agitated," but that could just be Mr. O'Rourke explaining something.
Q. That's not the question.
A. I don't understand the question.
Q. Yes or no. Yes or no. Simply this: In your personal recollection, your opinion, is she saying that there was a disagreement, whether it was about money or drugs, she's not for sure, but there was, and Mr. -- and Andrews, the name Andrews, was agitated, which is a defendant, was agitated and committed to shoot the person that owed him?
A. I see where you're going. She did not say the word "Andrews." She said the person whoever was with.
Q. Whoever was with Montrel's friend, right?
A. I don't know that I agree with that totally. She didn't use the word "Andrews" if that's what you're asking me.
Q. Did she say that the person who was with Montrel's

friend?
A. No.
Q. The guy?
A. She said whoever was with. We went through this.
Q. Whoever he was with. There was two other people?
A. That's not how I interpret it. That's not my opinion.
Q. The record show what it shows. You know where this is going. You can duck and dodge the questions all you want, but moving along, it's clear to me here, and this is Jeffrey Paulsen's question, examination of Sergeant O'Rourke on September 9th, 2018, pages 8 -- I mean 19 through 20, and that was the video that was played in connection with that was from Officer Mark Hanneman.
And the report was supplement number 6, and also while we're on supplement number 6 -- I just move along because we'll deal with that as it comes down to it. Argument, however we're going to do that.
But just for the record, in the supplement my name is not mentioned, either, and she specifically states that no, she does not know who the shooter is. Can you see the little thing right here?
Do you see the highlighted area?
A. Yes.
THE COURT: Just for the record, which exhibit or which --

DEFENDANT ANDREWS: This is --

THE COURT: This is supplement 6.

DEFENDANT ANDREWS: Supplement 6, Mark Hanneman's report.

THE COURT: Okay.

DEFENDANT ANDREWS: This is the same sequence this girl or the domestic case or whatever, before we move on.

BY DEFENDANT ANDREWS:

Q. Could you please read what the highlighted part say?

A. Yes. She did not know the identity of the friend of OT1/Tyson who was owed the money and had committed the shooting.

Q. Yes. Yes. Once again I'm going to ask this in any formal way for you. Did that transcript from O'Rourke, does not that say that she said it was Andrews that was agitated?

A. Can you show me the report -- it's not a report. The transcript. I'm sorry.

Q. I might have closed that.

THE COURT: It's okay. The record will reflect what the transcript said.

DEFENDANT ANDREWS: Okay.

THE COURT: Okay?

BY DEFENDANT ANDREWS:

Q. Now, once again, that went to my argument about the whole probable cause thing and no probable cause to stop, search, arrest or invade my privacy, and that leads into two problems with the next argument, which is going to go into the T-Mobile phone records, too.

But before I jump into that, there is one more kind of big/small identification little thing we need to address.

This is the shooting. In this case, there was two shootings that was tied to Mr. Andrews; is that correct?

A. There was two shootings tied to the same firearm.

Q. Was there two shootings prior to the one investigated on Plymouth Avenue North?

A. Yes.

Q. Yes? Yes?

A. You're talking about matching to the gun?

Q. Yes.

A. Yes. The gun matched another shooting, correct.

Q. And was that shooting given an exigent situation to T-Mobile to make the exigent situation for your probable cause to give the phone ping?

A. It wasn't my probable cause. Are you asking if it was included in --

Q. Yes.

A. -- Sergeant O'Rourke's write-up to T-Mobile?
Q. Yes.
A. I would have to see it.
Q. I will show it to you right now.
THE COURT: While you're looking for that, Mr. Andrews, let me just talk to the court reporter for a second. Okay?

**(Off-the-record discussion with the court reporter.)**

THE COURT: Go ahead, Mr. Andrews.
BY DEFENDANT ANDREWS:
Q. Could you please read what's on the screen? This is also a supplement, I mean an exhibit. This is going to be a part of actually Agent Voth's report, but it's the same Exhibit 33 part of the actual ping document. This is your report number 5, and this is going to be an attachment to it that came from Sergeant Kelly O'Rourke with the Minneapolis Police Department as to how the information was developed on May 15th and getting a suspect.
And the enclosures in that, you also provided, he provided the T-Mobile exigent form in the supplement used for his exigent situation, correct? Is that not what we're looking at?
A. Sure.
Q. Now the supplement to the exigent, could you read that into the record?

A. The suspect has been identified as using 651 502-5142 by an eyewitness to the crime. I am a police investigator with the Minneapolis Police Department and have been so for 20 years. On this day, there was a shots fired call at 23rd and Fremont Avenue in North Minneapolis, (18-156610) at 1518 hours.

The shooting being investigated occurred at 1642 hours at 1711 Fremont Avenue North in Minneapolis. The same suspect vehicle was described at both scenes.

Q. You can stop there. Now, it said the suspect's vehicle was described at both scenes; am I correct?

A. That is what it says.

Q. And it also said the suspect has been identified by eyewitnesses to the crime as having this particular cell phone number; am I correct?

A. That's what the document I just read says.

Q. We need not go into -- that's false because eyewitnesses, there was none, and they didn't get that number because there was no eyewitnesses. We just went through that.

But the thing about it the part --

MR. PAULSEN: I object to "the record," Your Honor. The record is everything going back to September, and there is plenty of evidence in the record about that.

THE COURT: I will -- your objection is noted.

Rest assured that to the extent that Mr. Andrews' cross-examination of this witness also blends in argument about the state of the record, I will understand that to be argument and that the record will speak for itself, but I am going to allow him to make argument, even if it is interwoven in the questioning of the witness.

Go ahead, Mr. Andrews.

BY DEFENDANT ANDREWS:

Q. Okay. Now, with this first shooting that is mentioned in here, it's a case report number, am I correct, a Minneapolis case number of 18156610; am I correct?

A. That is what is listed on this document.

Q. And it essentially says that your suspect vehicle was described at this scene, right?

A. It says the same suspect vehicle was described at both scenes.

Q. Mm-hmm. And there is also a report by an officer who was at this scene who said that the suspect was tied to this scene and described and identified by a witness at this same case; am I correct?

A. I don't know.

Q. You don't know?

A. I don't know.

Q. Do you need your recollection refreshed?

A. Sure.

Q. Okay. Hold on. I believe it's supplement 13. Yes. It's 13, and for the record, this is supplement 13, the same exhibit as the rest. It's the full case. It's Scott Creighton. I don't know how to spell his name.
A. Creighton.
Q. Creighton, spelled C-r-e-i-g-h-t-o-n, and he is the officer that responded to this call. He watched some video footage, and he talked to some officers, but in doing that, he remembered his recollection of an earlier call, and to save the courts some time and stuff, we're just going to get to the part where he remembered about that earlier call.
Can you please read into the record what's at the top that says, "I was on an earlier call"?
A. Yes. I was on an earlier call in regards to "shots fired" at 25th and Girard Avenue North at approximately 1520 hours. The caller/witness later told us that the description of the shooting vehicle was a dark blue Chevy Tahoe without any plates.
The caller/witness told us that the driver/shooter was a large black male, dark skin, and long braided hair. He stated the passenger was a black male with shorter dreads and a goatee. Officers aired the information and recovered several spent casings from that location, (CCN 156610).

Q. Okay. That's enough of that. Now, that's the same case that the one that was mentioned in that first shooting in the supplement, am I right?
A. I believe so.
Q. And this shooter/driver was identified this time as the person that was in this blue Tahoe, the large black man, dark skin, and that's what the witnesses said; am I correct? That's what this paragraph is saying? That's what the officer was told, right?
A. You said the shooter was identified, and I don't agree to that, no.
Q. The shooter was described?
A. Yes.
Q. The shooter, he was told a description of the shooter?
A. The shooter was described, correct.
Q. This is the same case number, right?
A. Which case number? There is two cases --
Q. The first shooting, the shooting that happened on 25th and Girard, that's case number 156610. This shooting right here describes the driver of this blue Tahoe or whatever as the shooter at this scene; am I correct?
A. I believe so.
Q. And this is the same information that was relayed to T-Mobile because this is the same case number; am I correct?

A. I would generally think so.

Q. Okay. Now I'm moving on. There is a video to this, and there is some phone calls. We're going to watch the witness and see what the witness actually said about this case, this suspect, this vehicle and everything that has to go with, and we're going to see if they describe the shooter, the driver/shooter as a dark skin man, long braided hair and a passenger short with a goatee and some dreads. We're going to watch the video.

MR. PAULSEN: Which video is it?

DEFENDANT ANDREWS: This is going to be Paul Gillies and three other officers. Whichever one I play, I'm not sure. You didn't list his names on there.

MR. PAULSEN: If we're going to compare someone's report, we have to compare it to the person's body cam video. We can't compare it to somebody else's body cam video.

DEFENDANT ANDREWS: He won't give me Creighton, but Creighton is going to identify himself in the video. The person whose video it is, you can't see him, but I'm going to identify the officer, and he's going to stand directly with Creighton. Creighton's full mic is going to be displayed on the video.

It's not his video because the government wouldn't give me Creighton's body cam that makes this

statement. The same witness that he is going to be questioned that he is talking about, these officers are going to be together throughout the whole interview from the beginning of the scene and the ending of the scene, and the 911 call is also here to play to see if these witnesses or anyone said any of the stuff that's in these reports.

THE COURT: How do you identify the officer depicted in the video as Officer Creighton? How do you know that that's Officer Creighton?

DEFENDANT ANDREWS: He's going to say his name, and he's going to talk on the dispatch. He's going to identify himself.

THE COURT: Okay. Overruled.

DEFENDANT ANDREWS: He wants to know the officer's name, and I'm going to tell him -- this Paul, and I know that's his name. I'm pretty sure it's Paul Gillies, and I have his supplement to this whole case, and I displayed it.

THE COURT: In any event, Mr. Andrews, so the record is clear, you are representing that the body cam video you're about to display depicts the same events that are described in the report of Officer Creighton?

DEFENDANT ANDREWS: Correct. And I was going to read into the record the officer's report who actually, body cam we're going to watch.

Could you all furnish me with the report? Thank you.

THE COURT: Has that report been received in evidence?

DEFENDANT ANDREWS: No.

THE COURT: Okay.

DEFENDANT ANDREWS: This was just, this was just disclosed. That's what I was saying about the judge prematurely opening this hearing and not letting me list all my evidence.

THE COURT: We'll need to mark that report as Exhibit 102.

DEFENDANT ANDREWS: This is a whole, this is a whole police supplement, a case, and it's the case under MP -- it's 18156610, and it's a full supplement. It's only like three or four supplements in it, but it's this officer, another officer, and then there is some lab reports and stuff, and it's on the flash drive thingy but --

THE COURT: Mr. Andrews, just so you also know for planning purposes, we will take a lunch recess at some point relatively soon. So when you get to a convenient breaking point, let me know, please.

DEFENDANT ANDREWS: Can you tell me what Bates number it is so I can pull it up on here? I notice the

Bates number is in here. I guess it's that next supplement. Since we ain't putting them in the record, we can always just enter them later, just the whole supplement of this case, and then we will --

THE COURT: We will need to mark that and include it in the exhibits. Do you have a copy of the entire supplement?

DEFENDANT ANDREWS: They do. It's on this computer. It can get printed.

THE COURT: I understand, but you don't have a paper copy of it?

DEFENDANT ANDREWS: Yes, I do.

THE COURT: You can't find it?

DEFENDANT ANDREWS: It's in the supplement. I'm trying to --

THE COURT: Why don't we do this: Unless there is a really critical reason why we shouldn't break now, why don't we break now so that either that can be printed and we can mark it or you can find it and we can mark it, give everybody time to grab some quick lunch, including yourself. I assume they feed you, and then continue after that.

Is there any reason why that would be unacceptable, Mr. Andrews?

DEFENDANT ANDREWS: No.

THE COURT: Okay. So let's do that. Let's take a break. Let's make sure that Mr. Andrews gets a hard copy of the supplement so that we can mark it and include it in the exhibits, and then that will be Exhibit 102. 103 will be the body cam video of, I believe, Mr. Andrews said that it was Officer Gillies, but whoever it is, we will identify it and mark it.

DEFENDANT ANDREWS: Paul.

MS. BATES: G-i-l-l-i-e-s.

THE COURT: Okay. All right. We will mark that as part of the record when we resume. Okay.

We're in recess now until 1:15.

THE CLERK: All rise.

THE COURT: Excuse me one minute. Mr. Andrews, just so I am putting this all in context, what I am understanding your point to be is that the identification for you or the information in the various police reports that identify you as the shooter --

DEFENDANT ANDREWS: Mm-hmm.

THE COURT: -- reference various other materials such as discussions with witnesses who, which discussions are captured on videos, and your point is that these newly produced body cam videos show that in fact you weren't identified and therefore that the police reports are inaccurate? That's in general the argument.

DEFENDANT ANDREWS: Yes. That's the evidence. It's tied in also is going to show that the good faith, I'm going to show that these officers can't rely on good faith because O'Rourke watched these same videos and witnessed the same stuff, and he had the same information available to him as he made these reports, these documents, and when he testified.

THE COURT: Okay. Very well. I just want to make sure I understand your point, and I think I do. Thank you.

We're in recess until 1:15.

MR. PAULSEN: Your Honor, one scheduling thing?

THE COURT: Yes.

MR. PAULSEN: I know the witness has a commitment that is longstanding, and he needs to get out of here about three o'clock.

THE COURT: Okay. I see no reason why the agent can't be excused by three o'clock. To the extent that you're asking him questions about what does the video show, rest assured the video shows what it shows, and that's a matter of record, but --

DEFENDANT ANDREWS: I mean, obviously I can get up there and put it into the record myself.

THE COURT: Right.

DEFENDANT ANDREWS: Do you want me to testify

from here?

THE COURT: You can testify from there, one of the two, but we will get it done logistically so the agent can meet his prior commitment and he can put his evidence in.

DEFENDANT ANDREWS: I want him to come back because there is certain stuff I want him to touch on that got to do with his reports, so this is a matter of his reports now. There is going to be stuff about the other officers and stuff to do with his reports, but they're his reports and stuff that he wrote that he is supposed to verify that he watched, and he still wrote false reports.

THE COURT: My suggestion is that if you have things that are his that you want to question him about, I would do that first.

DEFENDANT ANDREWS: Yeah. I'll try keep him off the stand by three, but I'm not going to maintaining no guarantees.

THE COURT: I understand your predicament, but we also have a predicament.

DEFENDANT ANDREWS: He's under oath, though.

THE COURT: I will determine when he is free to go, and I'm asking you to make the effort.

DEFENDANT ANDREWS: I'm going to try.

THE COURT: So he does.

DEFENDANT ANDREWS: I'm going to try.

THE COURT: All right. We're in recess. Thank you.

THE CLERK: All rise.

**(Lunch recess taken.)**

**(In open court.)**

THE COURT: Be seated. Agent Voth, let me remind you you're still under oath.

THE WITNESS: Yes, Your Honor.

THE COURT: Mr. Andrews, are you ready to proceed?

DEFENDANT ANDREWS: Yeah, I got that exhibit that we were trying to get.

THE COURT: Yep.

DEFENDANT ANDREWS: They so graciously printed a copy.

THE COURT: Okay.

DEFENDANT ANDREWS: It's seven pages long. It's the whole supplement.

THE COURT: Okay. We'll mark it as Exhibit 102.

Any objection to Exhibit 102, Mr. Paulsen?

MR. PAULSEN: No, Your Honor.

THE COURT: Thank you.

Go ahead, Mr. Andrews.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. It was two videos to this. This one is going to be Paul Gillies, and Officer Creighton, he is going to come into the video and be in the video, too.

I would like to ask the government could they just give me his body cam because he is in this sequence, too.

MR. PAULSEN: I don't know that Officer Creighton had one. We will have to check on that. We gave all the body cams from this particular CNN that we had. I don't know if Creighton was one of them.

THE COURT: And whether or not he was wearing one, you don't know whether it was active.

MR. PAULSEN: Yeah.

DEFENDANT ANDREWS: If he wasn't, he is in violation of that, again, because once again, they miraculously keep cutting these body cams off.

THE COURT: So Officer Gillies, or whoever it is, his body cam video is marked Exhibit 103.

DEFENDANT ANDREWS: For the sake of time, the car is going to drive two or three minutes to the scene. Can we skip to when they get there?

THE COURT: By all means.

**(Videotape played.)**

BY DEFENDANT ANDREWS:
Q. He's going to the scene on 25th and Girard.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. You see the street sign?

**(Video recording played.)**

DEFENDANT ANDREWS: Can Your Honor turn the volume down?

THE COURT: I was adjusting my speaker.

DEFENDANT ANDREWS: I thought you were doing it because of the speaker. That's the school in the background.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. The officer that you just seen to the right of the scene is going to be Officer Creighton, and he's going to identify his self, but if you need further confirmation, he said his little ID and card number as he got out of the dispatch, and we can replay that later if need be, but once again, it's in the record if he want to identify his self.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. Now, before this sequence played, this is going to be the witness is going to give the description, and he just said that he seen what happened, but he didn't want his

neighbors to know, watching him drop the dime, and they asked him, well, did you see what vehicle was involved, and he said, and this is what he's going to have to say.

I'm going to go back a little bit. This is that call from the witness, and this is what we really need to pay attention to.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Now, you heard what the witnesses said. Now this report here from Officer Creighton, did we not just hear the witness say a purple low rider and the Astro van were shooting at each other?

A. That's not what I heard.

Q. Oh, you didn't?

A. I heard three vehicles described.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Three vehicles and two vehicles were shooting at each other and the police suggested --

A. That's not what I heard.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Could you pay attention to when he asks him the cars involved?

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. What kind of car was the first one?
A. Purple Caprice in the nineties and a low rider.
Q. Okay.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. What he say was the second car?
A. Gray Chevy Astro van.
Q. Okay. Pay attention to what he is going to say about them two cars.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. What did he say about the two cars?
A. I believe they were shooting at each other.
Q. The gray Astro van and the Impala were shooting at each other?
A. That's what he said.
Q. Now, can you please tell us what this report says right here from Officer Creighton?
A. Do you want me to read it?
Q. That one paragraph, the top one.
A. I was on an earlier call in regards to "shots fired" at 25th and Girard Avenue North at approximately 1520 hours. The caller/witness later told us that the description of the shooting vehicle was a dark blue Chevy Tahoe without

any plates. The caller/witness told us that the driver/shooter was a large black male, dark skin and long braided hair.

He stated the passenger was a black male with shorter dreads and a goatee. Officers aired the information and recovered spent casings from the location, (CCN 156610).

Q. Now, did this witness ever say that the driver of this blue Tahoe was a shooter? Did you hear him say that?
A. Can you play it without stopping it so I can re-hear everything he said?
Q. For sure, and can you pay attention to when he describes or he mentions a passenger and describes the driver?

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. Now, when he mentioned the Tahoe, what did he mention it to reference?
A. It had no plates on the back.
Q. Did he mention anything about that Tahoe being involved in that shooting?
A. He said it was at the corner and to which Officer Creighton said that's where the shell casings were at.
Q. He hasn't said that. That's not what he stated so far. What did he say so far?

A. It had no plates and was parked at the corner.
Q. And before that he said the gray Astro van and the Caprice were shooting at each other?
A. Right.
Q. And he said the blue Tahoe was sitting at the corner, and it had no plates on it?
A. Generally, yes.
Q. Generally?
A. He talked about other things.
Q. Did he say he seen this truck doing a drug deal, or did he say drug deals go down on that corner?
A. Drug deals go down at that corner because there is no house.
Q. At no reference did he say that the shooter, the driver of this truck, was the shooter, correct?
A. Not to this point, no.
Q. At any point. Now, if you will listen, I want you to be aware. Is the officer going to insinuate that the shooting happened at that truck, and that's maybe who did the shooting? Would you please pay attention?

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. What year did he say that truck was in?
A. In the 2000s.
Q. That report said that the truck was a 2000, didn't he?

He specifically said a 2000 model, did he not?
A. I don't know. I don't have the report in front of me.
Q. That's another one. They put it in a -- it's in the, it's in the other one. I will bring the other one up in a minute because there is definitely another report on it.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. Did you see what he said about the driver?
A. Big guy with dreads, I think.
Q. What did he say about the passenger?
A. Replay it, please.
Q. And this Officer Creighton who we are watching right there, that is his body cam on his chest. That's him looking straight on the camera listening to the whole thing, by the way.

**(Video recording played.)**

THE WITNESS: The other guy I didn't see. That's what I heard.
BY DEFENDANT ANDREWS:
Q. The other guy I didn't see?
A. That's what I heard.
Q. So now, once again, I'm going to take you back to this report. Did this witness or anybody here state that, in that video that we just watched, that Creighton watched, did the caller witness say the shooter was a large black

man, dark skin, braided hair and his passenger was a shorter guy with dreads and a goatee?
A. Can we finish playing the video? He might have, but you stopped it, so I don't know.
Q. Okay.

**(Video recording played.)**

THE WITNESS: Yeah, short hair and a goatee.

BY DEFENDANT ANDREWS:
Q. Astro van.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. Did you hear what he said that time?
A. That time he said short hair and goatee was driving the gray Astro van.
Q. Which is what you repeated the first time?
A. It is what it is. There is multiple people talking. I can only tell you what I hear.
Q. The short guy with the goatee and stuff is in the Astro van?
A. Maybe there is two guys with goatees. I don't know.
Q. What was the passenger in the blue van?
A. We have to go back. I thought he described the passenger the same way, short with a goatee.
Q. He just said he didn't see the passenger.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. Did you hear that time about the passenger?
A. The other guy I didn't see is what I heard.
Q. Correct. So in your opinion from this and that report, that's not what that witness said, is it? That witness didn't say that, did he?
A. That witness described several people. I can let the officers describe it. I can only tell you what I hear.
Q. Did you hear what this report says right here, the shooter was the driver? The shooter/driver was a larger black man, dark skin, braided hair, and the passenger was a shorter guy with a goatee?
A. The dark Tahoe SUV was at the corner and that he heard the shots and he looked out, and all the cars were driving different directions.
Q. Did he not say which cars were shooting at each other?
A. Initially he provided a statement that said the Astro and the Caprice, and later he said he heard the shots and just heard cars leaving, so I don't know.
Q. But he said they were shooting at each other?
A. That's what he initially said, and later he appeared to somewhat contradict himself. He heard the shots and saw the cars leaving.
Q. Win, lose or draw, does that accurately depict what Creighton put in his identification for this CCN number?

MR. PAULSEN: Same objection as before, Your Honor. It's not for this witness to make credibility determinations.

DEFENDANT ANDREWS: I mean he is --

THE COURT: Sustained.

DEFENDANT ANDREWS: Personal knowledge. I mean, I guess, the judge -- Your Honor, it's in the record. Everybody can see it. They're saying what he said. So I guess we can move on from that. You know what I'm saying? That's another false manifest evidence to tie into this situation, and I also want to point out that this Officer Scott Creighton, he made this statement after he was at the scene of this shooting and watched the video and watched the alleged shooting people involved and had his own little personal opinions about stuff.

And obviously he wrote that false statement to tie it in, and he wrote it later that night after conversing with officers, whatever, you know. This report was wrote at eight o'clock at night, 8:50 at night, and this shooting happened at two or three o'clock in the afternoon, 2:30 in the afternoon. The other one happened at 4:45.

So you know what I mean? It's clear what is going on here again, but I'll go back to the issue which was the T-Mobile report.

MR. PAULSEN: Before we move on, he hasn't played the entire video. I don't know if there was clarification later on. He didn't give us notice he was going to use this video. I am going to go back and use the full video and see if there is more information on it.

DEFENDANT ANDREWS: Do that. Sure. All right. So I'll go back to the T-Mobile report, and now we have, I'm going to start pointing out the false things in this T-Mobile report.

One, the eyewitness identification with that phone number, one, that's false. Two, the scene of the crime when them shots was fired was not 2030 Fremont. It was 25th and Girard.

Number three, false in this report, the shooting that happened on Plymouth was not 1711 Fremont also. It was 1711 Plymouth Avenue North. The reason that these two shootings was said to be on 2030 Fremont was to make the exigent situation more serious because that's a four block radius.

Whereas, if you put on 25th and Girard and move it all the way down to 1711 Plymouth, you're in a totally different area of the city, totally different, whereas these two was only a couple blocks apart.

Secondly, let me see here because I know there is another part of this I've got to play. When obviously the

part about them, the shooter getting back out of the car and making another attempt to finish him off, obviously --

MR. PAULSEN: Your Honor, this is not within the scope of the hearing.

DEFENDANT ANDREWS: It is. It is false information to T-Mobile.

MR. PAULSEN: Can I finish, Mr. Andrews?

THE COURT: You have to let him finish.

Go ahead Mr. Paulsen.

MR. PAULSEN: This is not new evidence. We covered this at the first motion hearing, maybe the continuation of it. Officer O'Rourke said he made a mistake between Fremont and Plymouth. This is things that have already been ruled upon, and I object.

THE COURT: Yes.

DEFENDANT ANDREWS: This is the September 9th hearing. Jeffrey Paulsen is going to be questioning Sergeant O'Rourke, September 9th of 2018.

Okay. Now in light of that comment he made about just O'Rourke and put in O'Rourke like he made a mistake, I would like to point out that he actually testified to this, too, and when I say him, Jeffrey Paulsen, and you understand about the next part of this testimony I'm going to read here. This is, like I say, that hearing from September 9th, page 10. Question 22.

You personally viewed it, and I would like to describe its quality. He's talking about the video of --

THE COURT: The surveillance video at 1711 Plymouth. Hang on. That isn't new evidence, so --

DEFENDANT ANDREWS: But --

THE COURT: How does that relate to the new evidence? What's is your tie-in?

DEFENDANT ANDREWS: It's probable cause. She said I can use probable cause. This all goes in the backing of the motion for this to get it dismissed. I just want to put it on the record. I mean --

THE COURT: The record here, let me help you. The record as to probable cause --

DEFENDANT ANDREWS: Uh-huh.

THE COURT: -- has all been, it all exists. You don't have to go over what was said before or what was testified to. What we're now doing is, we're now adding in the new evidence, the body cam videos, and the issue is, do those undermine what was --

DEFENDANT ANDREWS: The prior error.

THE COURT: -- previously thought of as probable cause.

DEFENDANT ANDREWS: Correct.

THE COURT: No. I understand your point. You just don't have to put back into the record all the stuff

that is already there about the prior evidence.

DEFENDANT ANDREWS: But we never, it never got documented and talked about in the record because my motions was blown off. Like none of this part of my motions was ever dealt with. No one ever talked about it because my motion was tooken off the record, and you ruled on it when it was put back on the record without me having a hearing or nothing to actually present the evidence for it.

Like I'm just, this is a quick reading thing into the record, like you would just humor for this part of the record. Like I say, a lot of my evidence was misconstrued and overlooked and stuff, man. I just want it clear this time, and I don't want no miscommunication and what you say the word is ambiguity. I don't want no ambiguity about the evidence and what it's going to decide and what it's going to show and what I'm going to prove.

THE COURT: Okay. Go ahead, Mr. Andrews, but I'm just telling you. You don't have to go through all the evidence, and I can't let you -- I can't have you go through all the evidence and rehash the last two evidentiary hearings.

DEFENDANT ANDREWS: I'm not.

THE COURT: Okay.

DEFENDANT ANDREWS: I'm going to keep it simple.

THE COURT: Go ahead.

DEFENDANT ANDREWS: The basic evidence.

THE COURT: Yeah.

DEFENDANT ANDREWS: Like I said this is in light of what he said. They're talking about the video. They're talking quality of the video, and before I go into this, this is going to show that the government, Jeffrey Paulsen, did this on purpose and suppressed this evidence to thwart my chance to prove my motions to the Court, so pretty much he was doing prosecutorial misconduct.

He asks him, and you have had a chance to personally view it. How would you describe the quality?

Answer by Sergeant O'Rourke: It was good quality.

Paulsen: Your Honor, I'm going to offer Exhibit Number 1 at this time. It says it's a cropped video of the shooting.

By Paulsen, question: Could you explain what cropped means?

Answer: I'm not entirely sure. The crime lab would have handled that. So I'm not sure exactly what cropped means. I'm assume it captured the time frame and shooting.

Question: All right.

Answer: And the fleeing.

Okay. If I represent to you that it looks like it's been condensed so that it focuses on the shooters as opposed to the whole panorama, would you accept that?

MR. ALIGADA: Objection. Leading and foundation.

The Court: Overruled.

The Witness: Yes.

Paulsen: Okay. I'm going to offer Exhibit 1 with the understanding that it looks to me like it has been shrunk down or blown up, I guess, from the original.

The Court: Mr. Aligada, any objection?

Aligada: I object. Lack of foundation.

Overruled. It will be received.

Question: And I showed you Exhibit 2, a couple of still frame photos from that video. Are you familiar with those?

And then the witness, obviously he goes on to identify the videos. Now, this next part of this Paulsen is going to say, well, that's why I wanted to explain about the video being chopped down or condensed because had it not been condensed, you would have seen the vehicle leave the shooting, and I'm going to read it word for word.

Okay. Here it is.

Question: And this is page 17.

Question by Paulsen: It also goes on to say, and this is why I brought up the cropped part about the video.

The egregious part is that after shooting one of the victims multiple times, the suspect got back out of his vehicle and made another attempt to finish him off, shooting at him a few more times.

On the uncropped video, do you see that happen?

The witness: Yes.

Okay. If it's not on the cropped video, that may be because somebody blew it up just to cover the initial shooting?

Correct.

I bring that up because they was refusing to give us this video to cross-examine this witness when he was on the stand.

THE COURT: O'Rourke, right?

DEFENDANT ANDREWS: Sergeant O'Rourke when he was at the hearing. By not giving us this video, it was -- we couldn't.

THE COURT: Which video?

DEFENDANT ANDREWS: The cropped version that he put in when he was giving this testimony when he said the person got back out of the car and did all this shooting that the government was also testifying to saying obviously he witnessed it also because he's saying that the only reason you can't see the person get back out of this car and make an attempt to finish him off is because we shrunk

it down or blew it up.

But if you look at the whole video, you see the person get out of the car. Once you get the video of the whole shooting, it shows the defendant or whoever was in this truck never got back out of the car to shoot anyone. So that goes to show that the part of this T-Mobile document, the last part down here, absolutely false about the egregious part got back out and finished them off.

THE COURT: Let me stop you for one second. Is the uncropped video, the uncropped surveillance video, is that part of the new evidence?

MR. PAULSEN: No. That was part of my objection. None of this is new. We had the uncropped video at one of the later motion hearings.

THE COURT: That's my recollection.

DEFENDANT ANDREWS: Saying that the witnesses need to be brought back and put back on the stand, and I was refused that after the evidence was given, just like now all this late evidence is being given, and obviously you're witnessing this critical evidence.

This is exculpatory and very impeaching to the testimony that these officers' reports and stuff has been given, and you see how damaging it is.

MR. PAULSEN: Your Honor, before I interrupt --

DEFENDANT ANDREWS: This evidence should have

been given back then because had it been given back then -- you're a pretty fair judge. You see what is going on. Your opinions and rulings would have been a lot different because I would have had a lot more backing behind my motions had I been given this same footage that I have been asking for since at least January -- I mean July or August of last year.

And I also have new e-mails from Reggie Aligada to Jeffrey Paulsen that I just received from my stand-by counsel Daniel Gerdts that he just received from a prior attorney that was on this case that was relayed down to me, and he can verify that we just got them, and these videos, I mean these e-mails showed that he was specifically asked for my phone for me to go through the contents of it.

And he was specifically asked again and again for these same videos, and it was actually described why we wanted these videos and other things that we're going to talk about as we continue to go down this list for this motion hearing because this other stuff that obviously we're going to argue about, which is the truck and the stop and all that other stuff.

The sake of time, you get it. You see what is going on, so I can move along from that part of it.

THE COURT: Okay. I understand your point.

MR. PAULSEN: My only point was, Your Honor, this

is not new evidence. We covered this. We briefed it. The shooter did not get out of the vehicle a second time. He shot out the window a second time as he was driving away, and that has been briefed and ruled on, and so this is not new territory. I object.

DEFENDANT ANDREWS: Why did you lead the witness and you and him testify that he did get out of the vehicle and in a cropped video that you turned over that, you know what I'm saying, you leaving the door open for this?

THE COURT: Well, that's argument, and it isn't the new evidence that we're dealing with here. Certainly Mr. Paulsen is not subject to cross-examination, so I understand your point.

DEFENDANT ANDREWS: But that's, that's the reason why them other motions I was trying to say about needed to be live in this motion hearing, so we could discuss what we're discussing now, and it would legitimately be ruled upon like you say. You know, this motion is about their late discovery given and holding *Brady* and *Giglio* material.

THE COURT: Understood. I understand your point. Okay.

DEFENDANT ANDREWS: Okay. So moving on from the T-Mobile thing. So he filed, he allegedly said he filed this with T-Mobile, and that's another thing, Your Honor, I want you to understand. Just because I'm taking the

credibility away from the probable cause for this T-Mobile stuff, that's not me saying that I agree because I intend to put on evidence to show you that all of this was manifest by the government and that these T-Mobile records, even this right here, was never sent to T-Mobile on this night or by Sergeant O'Rourke.

It wasn't had by the Minneapolis Police. It was manufactured by Jeffrey Paulsen and his little crew and staff. I'm going to show you that in one minute. Just because I'm taking the probable cause away from this doesn't mean that I'm saying that this is legit because you know a part of this hearing I'm going to be saying that they didn't have the T-Mobile records period that night, and I'm going to prove that.

THE COURT: Understood.

DEFENDANT ANDREWS: Okay. Yeah. I think I can move on from the probable cause for the false information gave to T-Mobile.

THE COURT: Okay.

DEFENDANT ANDREWS: I mean, I'm pretty sure that was clear enough. I wasn't identified as a witness, and obviously it can be seen that they was lying in all these reports, these officers. I am attacking these officers that are not here. I asked to have them come back, if you remember that motion to reopen, plus the little e-mail that

I sent to him before that trying to have these officers here.

So I wanted to impeach them and attack their credibility while they was on the stand about this stuff, but obviously they couldn't be here. So I'm asking you when you go to make your ruling, can you take that into account about the lies and stuff that is being told or --

THE COURT: Understood.

DEFENDANT ANDREWS: -- whatever? Okay. I guess I will deal with the little issue of standing real quick because it will be quicker to go back with him.

THE COURT: He has limited time.

DEFENDANT ANDREWS: I know. Three.

THE COURT: Okay. All right.

DEFENDANT ANDREWS: As far as the standing issue. Okay. This is a document, an affidavit, from Rachel Hawkins who I have been explaining throughout this whole case is not Dominique Smith. Quick background of it I guess is, this is the girl who was driving the vehicle.

THE COURT: The Yukon.

DEFENDANT ANDREWS: The GMC Yukon when I was arrested on May 16th and the firearm was found and a search ensued after that. I can say I have been telling officers and people and everybody that this girl in fact name was Rachel Hawkins, and I had kept -- she was actually at court

once or twice, and I was trying to get her to testify, but it just wasn't to happen with the delays and the continuances and stuff like that.

And then and we ran out of time and, you know, all the other bullshit that happened -- excuse my language. She just didn't testify. When I had put my standing on, I had the government records to show that my standing was in their records and, and -- which one is this again?

Okay. Yeah. Exhibit 30 is a document that I entered on October 5th of Rachel Hawkins, and it's a picture of her, Sherburne County system printout, because she obviously was on probation there, and there is her date of birth, social security number, all that good stuff, when she was in there, when she was released. The government denied this.

They told me she was a lay person, and they went on and kept their story that this Dominique Smith person told them what this truck was, and there was some dispute about that I want to bring up and raise because I can't because of the limited issues that we're dealing with here.

But anyway, that's proof that who she is, and this document here is going to prove standing because --

MR. PAULSEN: Before he displays that, Your Honor, I wrote in my motion I object to this document. He has had ample opportunity to bring Ms. Hawkins here. This

is the fifth time we've had a motion hearing, and his excuses for her never testifying before don't add up.

He could have had her here. She was in the courtroom a couple of times apparently.

DEFENDANT ANDREWS: Yeah.

MR. PAULSEN: This is hearsay. I'm objecting to it. This is a significant issue. We have interviewed her. We have every reason to believe this affidavit is false and manufactured by the defendant and possibly she was coerced or somehow induced to give it, but unless she is here live to be cross-examined, this should not come in. This is untrustworthy evidence.

DEFENDANT ANDREWS: These are the big facts, Your Honor. The big facts are in their case. This girl is Dominique Smith, and she is a 17-year-old girl and L. C. Smith is her father, and they released my vehicle to this L. C. Smith. The facts of this case is that in their reports from the police officer, they ran the VIN number on this vehicle, and it came back to me Norris Deshon Andrews, and it says right here in their government document at page 13 at the top of this thing.

Now subsequent to dealing with my prior counsel, which was ineffective, he added some stuff into one of my memoranda motions, and the thing that he added was quite, should I say, contradicting. That's the word the courts

use so I'll go with that, but it shouldn't have been added in the contents it was added, and I'll address that also.

Even with it being added, it still, it still showed that I was the rightful owner because the documents the courts went off of said it was contradicting, actually showed that the vehicle was sold, and it was no longer in Sunny Day Welch's name, and the new evidence on the plates show that this vehicle when pulled over, it had dealership plates on it, and it had a yellow sticker in the window.

The registration from the DVM that this unsolicited help by my prior counsel was a motion that he wasn't supposed to when he submitted it that led to me losing my standing because this right here on the screen clearly shows who has standing. This came from the Minneapolis Police Department after they ran the VIN number and everything. See the VIN number and the name and stuff. Like I said, that was that.

The government has her down as Dominique Smith, a 17-year-old. They took this man down there and physically took my car out of the impound lot and gave it to him. This man I vaguely know. He knows more Rachel than me. At first I didn't know who he was. I didn't know him by Larry Charles Smith. I know him as L. C. He is a drug addict. Me and Rachel know him.

Like I say, this document here, it's not

rehearsed. I got the phone records. They got them, too. They gave me some of the documents of it, but, yeah, I mean, I'm going to put this in, this affidavit, and explain it about what happened, which is what I was saying from the beginning.

THE COURT: I reserve rulings on your objections.

MR. PAULSEN: This is not newly produced evidence by the government. Judge Nelson's order indicated it would be based on things disclosed by the government. This is something he has obtained from somebody that is --

DEFENDANT ANDREWS: No. No. No. She said newly discovered evidence. I didn't say no newly discovered evidence was going to pertain, body cam was going to pertain to this topic. Like I say, she misconstrued the whole letter, period.

If we read my letter that she took as a motion, it's going to say all I was asking for was a reopening to ask to have an evidentiary portion to have this hearing to show what I wanted to put on at this hearing.

THE COURT: Understood. I understand the objection. I'm going to reserve the ruling on it.

Go ahead and proceed, Mr. Andrews.

DEFENDANT ANDREWS: Okay. This document is from Rachel Faith Hawkins. I'm going to read it into the record.

THE COURT: You don't need to read it into the record. It is in the record. Mark it as Exhibit 104. If there is parts you want to draw my attention to --

DEFENDANT ANDREWS: Yes, it is. Yes, it is. Just the part I should say when I made the turn onto Fremont to turn down Broadway, we were pulled over. Everyone was taken out of the truck. It was towed after I was taken downtown. It should be noted I was never told why I was pulled over, nor was I asked for my license and insurance card.

Now that I think about it, my name wasn't even asked before I was taken out of the truck with officers holding a gun to me. I was told, Sergeant O'Rourke told me to say what was that. I was told because I had a warrant, and they had a gun inside the truck. The name Dominique Smith is a fake, and Larry Smith isn't my father. He said that to help get me out of the detention center.

Larry also stated to, the truck -- she left out the word. He allowed me to use it for sale and work. He sells cars. So he had a lot of cars and trucks for sale. After the truck was released, Norris had me sell it for him because he needed the money. I don't know the information about the title being changed because he did that part himself.

That's the part you need to see. There is the

notary of it. This is well after the hearing. I have multiple motions in and multiple hearings. I tried to have this girl Rachel Hawkins subpoenaed to court. It was actually a full motion. I believe it's 101 where her name is listed in there, and she wanted -- I wanted her to testify about standing.

And I believe it's at the September 19th hearing, and the October 5th hearing when you asked me, did I have witnesses, I mentioned, yes, and that they was in the courtroom, but obviously, you know, we ran out of time, and we didn't get around to them.

Here is a picture of her and her ID. They printed it funny at the -- this claim from the clerk's office, it was part of another document. They sealed it, and it's kind of dark. That is her and her ID. This, I wanted to show you this is hers, and this is Rachel Hawkins.

THE COURT: Okay. Let's mark that exhibit, please.

DEFENDANT ANDREWS: Hmm?

THE COURT: We need to put an exhibit sticker on it so we have a clear record.

DEFENDANT ANDREWS: What's on the back of that? Like I said, this was all an attachment to another motion that I put in, and the clerk's office detached it at the

order of my judge and sealed it so --

THE COURT: And I understand why they did that, but this can be marked. This exhibit will be sealed.

DEFENDANT ANDREWS: Yeah, but --

THE COURT: But part of the record and the reason it's being sealed is that it has personally identifying information with respect to the young lady who is the subject of the exhibit, and we can't have that posted publicly because somebody could steal her identity.

DEFENDANT ANDREWS: Yeah, but the e-mail is from O'Rourke, and Reggie Aligada was sealed in that, too, and then on the back -- because I had Daniel Gerdts print this up for me. So this is like the only copy I have, but he printed it front to back so the affidavit from Dominique I'm going to use for another portion of this, but we're not going to get to talk about it because of the limited access on this hearing. It's on the back of this, too.

THE COURT: That's fine, too.

DEFENDANT ANDREWS: The last page --

THE COURT: So it's on the docket. We will print the copy limited to those three pages and mark that.

DEFENDANT ANDREWS: Yeah.

THE COURT: So the record is clear.

DEFENDANT ANDREWS: It's attachment, it's attachment 4, page 1 through 3.

THE COURT: Okay.

DEFENDANT ANDREWS: But it's under the sealed portion of it.

THE COURT: Okay.

DEFENDANT ANDREWS: That's for the standing. Now that I put my standing on, I'm definitely going to be arguing the cause of stopping that truck, but I want to deal with another little issue while he's up there on the stand.

Paragraph 2 here in your narration, this is again Exhibit 33, but it's Special Agent David Voth report number 1. We have already been discussing it, and in a portion of this, you get to mentioning in your narration things that -- and I want to know.

BY DEFENDANT ANDREWS:

Q. Did you witness these yourself, the things in number 2?

A. No.

Q. Did you watch these videos?

A. No.

Q. So how did you become aware that this narration had taken place?

A. I put it right in there. See supplement 26, see supplement 25, see supplement 29. It's from reading the police reports, specifically those supplements, as well as others.

Q. So I'm going to point out to you because this is going to be a main issue about my standing to challenge the search grounds is that you say Officer Schroeder learned that the -- no. No. No. No.

Officer Schroeder stated in his report that he could see the backseat passenger later identified as Norris Andrews. Officer Schroeder stated that he recovered a 9 millimeter pistol under the backseat. Officer Schroeder stated in his report that the gun was located roughly where Andrews was seen leaning over when the vehicle was stopped.

Does that sound accurate?

A. Sounds accurate, yes.

Q. And have you had any way of verifying that or proving that or knowing that that's accurate?

MR. PAULSEN: Your Honor, I'm going to object to this. It's not part of the issue --

DEFENDANT ANDREWS: It is.

MR. PAULSEN: -- in Judge Nelson's order, and it's not newly discovered evidence.

DEFENDANT ANDREWS: It's part of the video.

MR. PAULSEN: It has been out there since the beginning. He has testified before. There is nothing new here.

DEFENDANT ANDREWS: I will play the video.

THE COURT: I think he is laying foundation for

what is about to follow, so to that extent it's overruled.

BY DEFENDANT ANDREWS:

Q. So my question is, Have you looked at any evidence or any documentation that give you any type of independent verification that this event actually happened and that this event that you quoted in your narration is actually true facts?

A. Again, it says where it came from.

Q. I'm saying, have you checked?

A. Checked the report? I read the report.

Q. And you know there is body cameras, right?

A. Yes, I know there is body cameras.

Q. So there is video?

A. I didn't say it was based on video. It is based on the supplement.

Q. Have you seen the videos?

A. I've seen them now.

Q. You've seen them now. From watching the video and your recollection, did that happen?

A. Let me clarify. This report was not after I watched the video, the video I watched in court most likely with you.

Q. All the videos, you all had them for years. I just got --

A. To be fair, I don't work for Minneapolis. Minneapolis

has them. I work for ATF. I did not have them.
Q. When you indicted this case and they gave you this case, you gave Jeffrey Paulsen all the information he was going to need to take to the grand jury; am I correct?
A. No, you're not correct.
Q. What did they give you?
MR. PAULSEN: Your Honor, this is again, that's off limits.
DEFENDANT ANDREWS: Okay. I won't even go there. I'm going to jump straight into it so we can get straight to the heart of this.
BY DEFENDANT ANDREWS:
Q. Do you believe that that was an accurate statement that I was seen leaning over in this truck?
A. I believe it is a -- I'm sorry. Did you say honest or accurate?
Q. Yeah.
A. I believe what is written in the officer's shorter supplement.
Q. And that's what you took to the grand jury --
A. That is part of what we took to the grand jury.
Q. -- saying that? The next video I'm going to be playing is from Officer Schroeder.
THE COURT: That will be marked as Exhibit 105, Officer Schroeder's body cam video.

DEFENDANT ANDREWS: If I can find this.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Now here is Officer Schroeder's body cam video that he cut all these or he chopped half of it out, however it happened, but everything that happened before this point, which is very relevant, is missing, you know, and I don't know how else to put it, but it's missing.

MR. PAULSEN: I'm going to object to that.

THE COURT: Hold on. Please stop the video.

DEFENDANT ANDREWS: I'm trying to.

THE COURT: Okay. Mr. Paulsen, what was your objection?

MR. PAULSEN: I object to the statement that the body cam was turned over later, whatever. If he had given us notice of whose body cam he wanted to use, we could have been prepared to meet this. There is more than one Schroeder body cam video. For him to say this particular one doesn't capture things that might be on others.

I reserve my right to dispute that and correct the record on that.

THE COURT: Have all of the body cam videos of Officer Schroeder of this night been produced?

MR. PAULSEN: Yes.

DEFENDANT ANDREWS: They have been produced late,

extremely late.

THE COURT: Understood. Understood.

DEFENDANT ANDREWS: Now to that comment he just made, Officer Schroeder even testified that he cut his body camera. I just wanted to see how honest he was going to be about it. He testified to it in the whole hearing. Would you like to read that?

THE COURT: Go ahead and proceed with this video, Mr. Andrews.

DEFENDANT ANDREWS: I'm saying we ain't going to address what he just said?

THE COURT: You can address it in argument, but he isn't here to testify to your questions.

DEFENDANT ANDREWS: Tell him to stop saying shit and lying about stuff. Just tell him to tell the truth.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Two things I'm going to try to witness here. One, did you just hear Officer Schroeder say there is a backpack right next to where he was at?

A. Yes.

Q. Two, did you hear Officer Pucely, he is going to be identified as Officer Pucely, talking to all of them at the scene telling them don't touch anything yet? Did you hear him yell?

A. I heard somebody say don't touch or don't touch anything or something.
Q. That is Pucely. We're going to find out that that's Pucely in one second.

**(Video recording played.)**

BY DEFENDANT ANDREWS:
Q. I'm going to pause. Do you know what 710 is?
A. I believe that is the car call sign to like the on-duty or the duty detective or detective sergeant. So generally, I don't think every detective works 24 hours, seven days a week.
So they take turns, and when they take turns, my understanding is that instead of saying Sergeant so and so or detective so and so, they just say 710 so they take a rotation being 710. That's my understanding.
Q. 710 in this situation would have been O'Rourke because O'Rourke would be the one investigating this case?
A. That would be my interpretation. You have to ask Sergeant O'Rourke that.
Q. Who tracked the phone, who wrote the exigent order?
A. Sergeant Kelly O'Rourke.
Q. Sergeant Kelly O'Rourke, so he should have been 710?
A. You would have to ask Sergeant O'Rourke, but that seems to make sense.
Q. That seems to make sense. Okay.

Now, Your Honor, this is also going to be a couple points I want to make all in one, but I'm going to try to have you follow along. This is going to go to show that what I was saying about they didn't have the T-Mobile records, which I was already going to prove but this is going to prove beyond a reasonable doubt, that they never had the damn phone records.

Could you please read the first paragraph and stop after he said --

THE COURT: For the record this is supplement 33.

DEFENDANT ANDREWS: Supplement 33.

THE COURT: From Exhibit 32.

DEFENDANT ANDREWS: Yes, and this is supplement from Sergeant Kelly O'Rourke.

BY DEFENDANT ANDREWS:

Q. Could you please read it?

A. Read it?

Q. Yeah.

A. On 5/15/2018 I was contacted by Lieutenant Moua and was assigned Minneapolis Case Number 18-156712. This case was a shooting that occurred at 1711 Plymouth Avenue North, Minneapolis, Minnesota, Hennepin County. Upon being assigned, I contacted dispatch and had them add me to this call as car 743.

Q. Stop. Who was tracking the phone that you heard him

say on that thing? Did you hear him say 710?
A. That was what I believe he said, yes.
Q. What is Sergeant O'Rourke on this call?
A. According to this report it says car 743.
Q. 743. That's not 710; am I correct? 710 would be dispatch?
A. I don't know if that's true.
Q. I'm going to tell you it's dispatch.
A. Okay.
Q. Now, Sergeant O'Rourke needs to be the one tracking this phone to have given it to these officers on this night, but just hold that in mind while I finish playing the rest of this video so it all can come together.
Be paying attention to what he says about the witness he had in the car and what Sergeant Pucely was doing and called and told him what he wanted to do and how he had a lack of any traffic violations or anything.
Like I say, this video says a whole lot about a lot of different things that happened that night that I was trying to prove and tell you the whole time. I'm going to go back a little bit more so we can --
**(Video recording played.)**
BY DEFENDANT ANDREWS:
Q. Now, that's Sergeant Pucely, the guy that, quote unquote, supposed to know this whole situation, that is

supposed to have all this information, that is supposed to be in tune with Sergeant O'Rourke the whole night, supposed to have all this stuff. He's supposed to know everything, but he has got to get information from Andrew Schroeder to tell what's his name on the phone, and it's going to be clear who he is on the phone.

I'm going to play his new body cams and the other officers' body cams, and you're going to hear everything about that, but I just wanted to finish playing that, but before I go along with that, I want to show this T-Mobile phone record while we're still on that subject to show that he didn't, he wasn't using it. I mean, he didn't, he's not that call.

Now, this is on, once again, from your supplement report, David Voth, this is supplement number 5.

MR. PAULSEN: Your Honor, I'm going to object to this. This has been litigated before. This is not newly discovered evidence. It has been in the evidence for months. There have been rulings on this. We're going over it again?

DEFENDANT ANDREWS: The new evidence --

THE COURT: Go ahead, Mr. Andrews.

DEFENDANT ANDREWS: The new evidence makes it arguable again because in light of the new evidence it is to be proven that they didn't have this information now

because my whole argument for my motion and stuff from the beginning, and she said I could argue that they didn't have the T-Mobile records on the night that I was stopped.

So this is going to go towards the stop of the vehicle again.

THE COURT: How is the new evidence going to show that?

DEFENDANT ANDREWS: It just showed that Sergeant O'Rourke didn't have it, that he didn't have track of that phone. I told you that from the beginning. Secondly, it showed that the pings didn't exist. I'm going to point out that the new pings shows that this stuff was false, also.

BY DEFENDANT ANDREWS:

Q. If you watch the T-Mobile phone records, which I have been stating from the beginning and you look at who did they provide it to, can you please read the information down at the bottom, the agency?

A. This document says, Agency 911. Request: Minneapolis Police 911 operator. Agency address: Minneapolis Police Department. Billing city and state: Minneapolis, Minnesota 55415. Provided on May 16th, 2018.

Q. That's enough. Thank you. Now had Sergeant O'Rourke asked for this exigency order, it would have went to him. Proof of that. I'm going to show you now. It is the same phone records. It just was subpoenaed by the defense.

Now, could you please read the agency on that one?
A. I can try. I think it says agency attorney/other. Requester: John Lageson. Agency office: Office of the Federal Defender, District of Minnesota. Billing city and state: Minneapolis, Minnesota 55415.
Q. Correct. Now, does not that specifically list who it is, what it is and the direct agency and billing that it came from?
A. This document, yes.
Q. And that other document, it did also, didn't it?
A. Yes.
Q. And the person that they say requested that stuff, was it Sergeant O'Rourke?
A. According to the document it's a 911 operator.
Q. A 911 operator, right?
A. That's what it says.
Q. And the 911 operator is not the detective that is supposed to have this information that gave it to the officers on this night, is he?
MR. PAULSEN: Your Honor, once again this is not newly discovered evidence. He could have asked Sergeant O'Rourke about this.
DEFENDANT ANDREWS: It is. He just gave it to me.

MR. PAULSEN: We're talking about records that were in evidence.

THE COURT: We're talking about records that were subpoenaed and the response to the subpoena.

DEFENDANT ANDREWS: He didn't have this, neither. He gave it late. Do you want me to go back to the transcripts so you can see it?

THE COURT: No. No. No. What you need to do is, if your assertion is that he did not have, that Sergeant O'Rourke did not have the exigent ping information on May 16th of 2018, you can establish -- if you can establish that, you need to establish that through the recently produced evidence and videos.

DEFENDANT ANDREWS: I just played. Did he say 710? 710 is dispatch.

THE COURT: Okay. Then you have made your point.

DEFENDANT ANDREWS: Huh?

THE COURT: Then you have made your point.

DEFENDANT ANDREWS: My point needs to be completely validated. It needs to be completely in the record, and by "completely in the record," I need all of my evidence in there. I need strong backing. So that means my prior evidence with my new evidence because it's all going towards my prior motions.

So when you make your ruling, you're going to be

ruling on a prior motion that I had. You're not just going to rule on this hearing because you can't because this hearing is not a motion of itself. It's a motion that's been ruled upon that we're reopen this hearing to present new evidence and hash out who was right and who was wrong.

THE COURT: I understand. All of your evidence that was previously submitted is still in the record and is available to me, and I understand your point. You don't need to go back over that evidence to have it in the record now.

DEFENDANT ANDREWS: If I make an argument now, so I'm going to get to write a motion after that?

THE COURT: We'll cross that bridge when we get to it, but I understand your point, but for purposes of the hearing, you don't have to go back and do that. Okay?

DEFENDANT ANDREWS: I just, I just, like I say, I asked you at the beginning how this all was going to go on the fly. I don't know if we're doing motions after this.

THE COURT: I understand.

DEFENDANT ANDREWS: Memorandas, I have to get it how I can.

THE COURT: Do me a favor. I have a witness with 20 minutes left in their time here. Anything that relates to the newly discovered evidence, the newly produced evidence that this witness has knowledge of, direct your

attention to that because for argument, if you want to argue the point you're making now, let's do that after the witness is done, but I understand your point.

Your point is 710, not 743, and when you asked for the records, it identifies the particular person who asked it, and your point is when it does that, that undermines the assertion that Sergeant O'Rourke asked for the record because it says 911 operator.

I get your point.

BY DEFENDANT ANDREWS:

Q. I told you I didn't have it from the beginning, and it went to show it right there. And secondly, the thing about that video is that I wanted to ask you is that when he says, when he said that Pucely called him, did he mention anything about a traffic violation?

A. If you're going to ask me about that video, that was a few minutes ago. Can you play what it is you want me to comment on?

Q. Your memory is only good for a few minutes?

A. Apparently so.

Q. No problem. I'll replay it.

**(Video recording played.)**

BY DEFENDANT ANDREWS:

Q. Can you tell me what it is Pucely told him?

A. It was two dudes in a car. He dumped his informant and

flew up there.
Q. Correct. Was there any mention of traffic violations?
A. Not in the video I just watched.
Q. In any video you have ever watched, was there any mention of a traffic violation?
A. I don't know that I can answer that.
Q. You watched all the video?
A. Like a year ago, literally like September. It's now July. Ten months ago.
Q. Would you take my word for it if I told you it was never mentioned?
MR. PAULSEN: I'm going to object to that, Your Honor. If he wants to put in newly discovered video --
DEFENDANT ANDREWS: I've got a million of them I can play.
THE COURT: Hold on. Hold on. Everybody hold on.
Kristine --
COURT REPORTER: I didn't get you, Mr. Paulsen.
THE COURT: Go ahead, Mr. Paulsen.
MR. PAULSEN: I just object to that question. He's asking him to comment on evidence he's not familiar with because no notice was given of what evidence would be used at this hearing.
DEFENDANT ANDREWS: Yes, it was. Even with her

limiting my evidence, she said all the newly disclosed body cam footage. Even all the stuff where she limited me where she prematurely opened this hearing, they still had the body cams. That's what we're using, the goddamned body cams. You can't dispute the body cams. They're factual of what happened.

As I said from the beginning, that's what the body cams were implemented, to protect the public and the evidence in situations like this. All our evidentiary and suppression hearings, when all of my prior counsel, and I have been telling Jeffrey Paulsen that could have come off the video and cleared up the disputes and stopped the Court from making false prosecutorial misconduct rulings. We could have saved time.

Like I say, all of this has been a violation of my speedy trial rights, my due process rights because the clock stopped. I keep filing a motion. I keep having these hearings. I have been sitting in jail a whole goddamned year with all this evidence that could easily have been dismissed because of constitutional violations. Now we're here.

THE COURT: I understand your argument. Here's where the record stands. You asked him if he remembered anything about -- I can't now remember.

DEFENDANT ANDREWS: Anybody talking about a

traffic stop on video.

THE COURT: And he said he couldn't remember whether he had seen that on any of the videos or not. Mr. Paulsen is making the point he didn't go back and review any of the videos or the newly produced videos for this hearing, so the state of his memory is, he doesn't know.

DEFENDANT ANDREWS: He said he witnessed them a year ago. None of these videos is new.

THE COURT: I understand.

DEFENDANT ANDREWS: He watched them a year ago. He had them all. I only had two videos and five police squad cams. Now I have damn near 100 that was given to me in the last month that I have been asking for.

THE COURT: I understand.

DEFENDANT ANDREWS: So he watched them. So there is no question about I haven't watched all these videos. I went and hurried up and watched the ones that I was going to likely need for this hearing. Like I say, I have been writing motions and stuff to tell you all that I'm not having access to this stuff at the jail. So I am definitely unequipped for these hearings.

It's just I went and studied what I needed to study like he should. He's like a case agent. He should know this evidence. He should know it like the back of his

damn hand. He is prosecuting a man for 15 years to life. You damn well better make sure that this shit is correct.

THE COURT: All of that is argument. His answer is, he doesn't recall.

BY DEFENDANT ANDREWS:

Q. You don't recall what, watching the videos, or you don't recall if any officer ever mentioned anything about traffic stop or traffic violation?

A. I know during previous hearings, Sergeant Pucely provided testimony under oath about traffic stops.

Q. In any report -- not a report, any body cam footage of anything, was it ever shown at any hearing from Paulsen, from me, anybody, him talking about a traffic stop?

A. Sergeant Pucely testified about a traffic stop.

Q. His testimony is incredible. I asked you about a video. All this stuff is on video. The dispatch is in the video. His body cams is in the video. His call logs and detail reports, I have the call logs here.

No where one time was it ever mentioned anywhere, even when he pulled this vehicle over, about a damn traffic stop, and this is newly given evidence.

Can you see what that says?

A. Kind of. Can you point me to -- okay.

Q. What does it say right there?

A. Right where?

Q. That I highlighted in red.
A. Incident detail report.
Q. What does it say there?
A. Date of source, date of data warehouse, incident status: Closed. Incident number: 18-157363. Incident date: 5/16 --
Q. Pause. The incident date, is that not the time this vehicle was stopped?
A. It could be.
Q. Okay. When was this last updated?
A. Last updated I think it says 6/18/2018, 11:54:33.
Q. Can you please read the address right here where it says this happened?
A. Lowry Avenue North/Fremont Avenue North.
Q. Is that not where the suspect was pulled over in the vehicle?
A. Sounds right.
Q. Sounds right. Is that not the officers that were involved here. Joel Pucely, is that not the sergeant?
A. Joel Pucely, yes.
Q. Andrew Schroeder, is he not the guy that there, too?
A. I believe so.
Q. This is all the officers that were there that night; is that right?
A. I don't know who some of these people are.

Q. Okay. Anyway --
A. I don't want to authenticate the document. I don't know. I didn't generate this report. It's not my report.
Q. Yeah. Okay. Do you see where it say, I mean, date, time, user, type, comment and all that right here (indicating)?
A. Yes.
Q. Do you see what the date is?
A. 5/16/2018. Time 00:07:11. Comment: Dealer plate facing southbound.
Q. What's the dealer plate?
A. Then it goes on to the next line. It says NCIC plate check. I believe this is 17712D as in David.
Q. Is that not, is that not the plate that is on the GMC Yukon?
A. I believe so.
Q. You believe so, so we go on from there. Now, anywhere during that first sequence from Sergeant Kelly, I mean Pucely or whatever, did he mention anything about a traffic stop or a traffic violation? Did he tell dispatch anything about a traffic violation?
A. I don't know.
Q. You're reading it?
A. You tell me. I'm reading dispatch? I have no way to know that.

Q. You're reading dispatch?
A. I don't know.
Q. This is dispatch. That's him calling dispatch to check that plate?
A. You're telling me. I'm sorry. I don't know.
Q. You know what an incident detail report is.
A. It's a report. I don't know that it's dispatch. You're putting words in my mouth.
Q. You guys turned this over to me.

Can we ask Paulsen to authenticate what it is?

THE COURT: No.

DEFENDANT ANDREWS: It came from the government.

MR. PAULSEN: Maybe it did.

DEFENDANT ANDREWS: It did.

MR. PAULSEN: No one told me it was going to come up at this hearing.

DEFENDANT ANDREWS: It's Bates stamped and everything.

THE COURT: Needs to be marked as well.

DEFENDANT ANDREWS: And this was just turned over by the government in the last month or two. We have been asking for this, and it could easily have proven these allegations as to whether this was a traffic stop or a fishing expedition.

MR. PAULSEN: I don't know that it came from our

office. It's got our Bates stamp on it. I question the relevance for this hearing.

THE COURT: I understand. We should mark it as Exhibit 106, and I understand your point, Mr. Andrews. One of the justifications for the stop was a traffic violation, but this document doesn't report a traffic violation.

DEFENDANT ANDREWS: At all.

THE COURT: Is your argument, and there is nothing on the body cam video of Officer Schroeder that shows or discusses a traffic violation?

DEFENDANT ANDREWS: Or Pucely or anyone else.

THE COURT: Understood.

DEFENDANT ANDREWS: And also there is no traffic ticket was wrote.

THE COURT: Understood.

DEFENDANT ANDREWS: We seen the affidavit from the girl. She said she was never asked about insurance or nothing, and in previous hearings, I played video footage of me and my codefendant Montrel Tyson asking this, asking the officers well why was we pulled over. No one could say why we was pulled over.

No traffic violation was mentioned. Everybody kept saying we don't know. We're just supposed to take you down for questioning. Am I under arrest? No, you're just going down for questioning. You're just going down for

questioning.

Like I say, it's multiple points here that need to be made, and there is only a certain amount of time, and how I needed the evidence in, like I say, I don't know. I'm kind of winging it here.

THE COURT: I understand.

DEFENDANT ANDREWS: And trying to tie it all together with the limited resources. I have the resources now but --

BY DEFENDANT ANDREWS:

Q. Anyway, in this right here, did you, did you see anything about a traffic stop?

A. No, sir.

Q. So is it safe to say that that probably wasn't there?

A. To say what?

Q. To say that probably wasn't there?

A. Wasn't what?

Q. The traffic stop?

A. Sergeant Pucely testified that there was a traffic stop.

MR. PAULSEN: Can we be clear about a traffic stop?

DEFENDANT ANDREWS: Traffic violation.

THE COURT: Okay. Traffic violation.

DEFENDANT ANDREWS: He's not objecting. That's

why I keep talking because I was told when he objects I've got to stop talking. He's just getting up testifying like he is me like he has got the floor. He is not even making legitimate objections. He's just talking.

THE COURT: His concern, which was a valid one, was that the record be clear. You're asking actually, I think, about there is no evidence of a traffic violation which caused the stop as opposed to, there is no question that the vehicle was stopped.

DEFENDANT ANDREWS: Yes.

THE COURT: And that's what he was trying to clarify.

BY DEFENDANT ANDREWS:

Q. Also I want to ask him was he a police officer.

A. I was a deputy U. S. Marshal. I was in the United States Marine Corps. I have been an FBI agent.

Q. That's enough. In doing that, you know how to conduct a traffic stop, do you not?

A. The only traffic stop I would have conducted was in the Marines, and as a deputy U. S. Marshal, we don't enforce traffic violations.

Q. Do you know roughly what a traffic violation, if I'm speeding or drunk driving or what have you not, is there a citation or something that is supposed to be given, some type of ticket or documentation supposed to be given?

MR. PAULSEN: We're getting far afield based on any new evidence.

DEFENDANT ANDREWS: It is.

MR. PAULSEN: This could have been covered at prior hearings when Pucely was on the stand. Why do it now?

DEFENDANT ANDREWS: Because we didn't have this evidence. My motion was prematurely tooken off the docket and was added late to the docket. You know, like I know --

THE COURT: Okay. Let's stop.

Agent Voth, the question was, Do you know what a traffic violation would be, and depending on your answer, the question is going to be, do you see anything that on this document you would interpret as being a recitation that a traffic violation occurred?

THE WITNESS: As a general matter, I know what a traffic violation is. On this document that was up and is no longer up, I did not see a recitation for a traffic violation.

THE COURT: And this document for the record is Exhibit 106.

BY DEFENDANT ANDREWS:

Q. And would you please read the alarm level and what it says across the side of there?

A. Alarm level I believe is blank, and it says problem:

Traffic law enforcement.
Q. Agency?
A. Police.
Q. Jurisdiction?
A. MPD/MFD/north.
Q. This is the same document we have been talking about, right?
A. I believe so.
Q. So this is a traffic law enforcement. It should have been a traffic violation or something with this, shouldn't it?
A. I don't know, Mr. Andrews. This is not my document. I didn't create it. I don't own it. I don't work for the department. You're asking me questions about a Minneapolis incident detail report. I don't know.
Q. Okay.
A. Sorry.
Q. This is your case. Can you tell me if there is -- can you tell me where is the traffic ticket in your case because I have been --
A. Traffic ticket? Not a traffic ticket that I have seen.
Q. The traffic ticket, have you seen a traffic ticket in this case?
A. No, sir, I have not seen a traffic ticket in this case.
Q. Have you seen a traffic violation in this case, like a

legitimate traffic violation, piece of paper, documentation, other than Pucely uncredible, unsupported testimony?
A. I believe his report reflected that --
Q. That's not his testimony --
A. You asked me a question. I'm trying to answer it.
Q. Okay. Other than anything that Officer Pucely without no backing is saying, have you seen anything that would lead you as a prudent officer to put some stop behind this traffic stop or traffic violation, something that is proven because this officer had a body cam. This officer had a squad cam. This officer had binoculars and portable handheld cameras, and when all of this technology was rolling, there was no traffic violation. You seen the video?
A. I saw one video of his squad.
Q. And in that video, in that squad, that car had his blinking lights and followed all the traffic lights, and it stopped at the corner and made correct signals and everything, did it not?
A. Sergeant Pucely testified it did not.
Q. I said you're seeing the video. I'm going off your personal knowledge. What you said you just seen, you seen that video, this squad car video. When that video started, did that car break any traffic laws?

A. Not to the best of my knowledge.
Q. So no? Yes or no. It didn't, no?
A. Not that I saw, no.
Q. Okay. I will move on from that, man. That's a pretty --
THE COURT: All right. Mr. Andrews, it's three o'clock.
DEFENDANT ANDREWS: He can go ahead, man.
THE COURT: This witness is in need of leaving. In the minute you have left, is there any other question for this witness?
DEFENDANT ANDREWS: Not in no minute.
THE COURT: All right. Agent, you may step down. Thank you.
THE WITNESS: Thank you.
DEFENDANT ANDREWS: Just for the record I wasn't done with that witness, so however we have to deal with that, we will deal with it.
THE COURT: We will make a record of that in a second.
DEFENDANT ANDREWS: No. That's mine.
**(Witness excused.)**
THE COURT: Go ahead. You're free to go.
DEFENDANT ANDREWS: Thank you for time. It's fine to see you again.

THE COURT: Let's take a moment. I want to make a record of a couple of things.

Number one, Mr. Andrews, you have indicated that you had additional questions for that witness.

DEFENDANT ANDREWS: Mm-hmm.

THE COURT: What are the areas of questioning that you had for that witness, if you can say?

DEFENDANT ANDREWS: This, this whole, this whole case thing because I have no way to question the evidence. I want the evidence -- I want a sound mind of the government speaking on the evidence and the facts. I don't want a biased mind.

Like he's, he was a person that didn't have nothing to do with the report writing. He didn't have nothing to do with the videos. So he can look at one or the other and be a fact finder in his own opinion in his own mind, and he can tell whether there was contradiction and if this video impeaches the actual evidence, which is the testimony in the reports of these officers.

So I was using him for impeachment purposes, but I say, all of this stuff had his hands tied because he wrote reports on it and took it to the grand jury and testified to it, and also I'm going to be asking the government, now that he has testified, I would like his grand jury testimony on the 26.2 because he has taken the

stand now, which makes his testimony accessible to me.

THE COURT: We'll deal with that later. Can you tell me specifically what areas of questioning you have left for this witness? In other words, I would --

DEFENDANT ANDREWS: All of it.

THE COURT: All of it doesn't help me. If you say, you know, I was going to question him about this body cam or that issue --

DEFENDANT ANDREWS: Where did I leave that?

THE COURT: -- then I can deal with it.

DEFENDANT ANDREWS: Well, obviously I was still going with the probable cause of stopping the Yukon that we had dealt with. The standing for the automobile, I was going to get back into that and actually bring up the DMV document and show that it showed that there was no contradiction that this vehicle was sold by the last current owner, and it just never transferred over.

Like I said from the beginning, and I don't know how the courts didn't see that in my memoranda and didn't see that in the reports and seeing it had dealership plates on it, and all the officers kept reporting that it had dealership plates on it.

Then as far as the firearm, too, this is videos missing, and it was also going to be documentation that I wanted him to verify that these officers looked under the

seats where this firearm was allegedly found, didn't see the gun, but later officers looked under the exact same seat and now the gun is miraculously there after the new video with the officers planting dope in the doors and stuff, because as you have seen from the testimony of Pucely and now they said that the officer had covered --

When he reached in his vest to grab the drugs, they are saying he used his hand to call code 4, his dispatch radio. I have his body cam. He never called code 4. You see his hand come down and put something in the door. Another officer's video, you see him actually tamper with the stuff in the door.

Like I said, I could see him talk about it why I could put the evidence on and we could get there.

THE COURT: No. I understand. The reason I asked you that is, the topics that you have described really don't call for this witness's knowledge. You can make argument and evidence exactly what you're talking about without this witness on the stand. That's why I was asking.

DEFENDANT ANDREWS: But I have to get on the stand, and he's going to cross me.

THE COURT: You can make argument based on the evidence. You can offer the body cam videos that you deem relevant to these questions. You can offer them into

evidence at this hearing. I doubt Mr. Paulsen is going to object to the admission of those body cams. We'll see, and if he does, we'll see what my ruling is.

One other housekeeping matter: Mr. Paulsen and Mr. Andrews, you both obviously want to argue probable cause, et cetera, based on how this new information affects that analysis. Do you want to do that in writing, or do you want to do it verbally here in court? How do you want to proceed?

Mr. Andrews, I will tell you that you're here in court. You're articulate. You can make those arguments. If you feel the need to submit something in writing, you also said that you have difficulty mechanically getting that accomplished because of limitations that you have at Sherburne County.

DEFENDANT ANDREWS: Yeah. Sorry about that, but I have been, with that being said, also, I've read a lot of case law where a lot of people got shunned or got their motion and their argument kicked down by the government because if you rule in my favor, he is going to object, and the appellate court is going to smack it down and overturn because you have nothing to back you up.

I don't have no case law. I have nothing in the record to back up what you're saying if you ruled in my favor. So I have seen a lot of cases get returned over

against the defendant, and it hurt them by going orally. But, yes, I would like to go oral, but also I would like to, if possible, enter something that at least hits on all the different valid points, not like go into detail like I'm going to orally about it and bring it all together, but something to just, point one, point two, point three, you know, under each one of these so the Court can have something to go off the record.

THE COURT: I understand.

DEFENDANT ANDREWS: And maybe some case law if I can get my hands on some.

THE COURT: Regardless of whose favor I would rule in, but let's take your implicit question. If I were to rule in your favor on something, it would be supported not only by facts and evidence in the record, but also by case law so that it would be, it could well be overturned by Judge Nelson and/or the Eighth Circuit, but it wouldn't be because I haven't supported anything in the record, but I understand you're concerned and what you're suggesting.

Mr. Paulsen, what does the government want relative to arguing these issues today?

MR. PAULSEN: I don't think I can argue it today. I have to watch the rest of the videos. As I said along the way, I have to check out squad 710 versus 743. I don't know if there is any merit to this. I'm hoping we can

finish the evidentiary portion today and maybe a brief due in a week or something like that.

THE COURT: Okay. All right. Poor Kristine has been typing her fingers off. Let's take a recess, 15 minutes it is, and then we will be back here.

Mr. Andrews, what I will ask for from you is, by all means put in any other documents or body cam videos you want, and I will give you however much time you need to tell me why they're relevant and wrap it all up orally, and I will give you the opportunity to also put something in writing.

Okay? We're in recess. We will be back at 3:25.

THE CLERK: All rise.

DEFENDANT ANDREWS: Hey, can I remain up here? I have to do some stuff.

THE COURT: Yep. Assuming it's okay with the marshals.

**(Recess taken.)**

**(In open court.)**

THE COURT: Please be seated. All right. We're back on the record. Here's how we're going to proceed for the rest of the hearing, and we need to be efficient. The first issue, Mr. Andrews, is, do you have any other exhibits that you want entered into the record on this

hearing, and if so, let's start there.

Identify them. We will assign them an exhibit number, and they will become part of the record, and just for the sake of the record, you probably better talk from the podium.

DEFENDANT ANDREWS: Ms. Bates?

MS. BATES: Yeah.

DEFENDANT ANDREWS: Would you do my --

MS. BATES: Yes. Sorry.

DEFENDANT ANDREWS: Is there a way that we can just enter them all for the limited purpose of argument in one fell swoop, like this whole passport of all this new information that they just given me because they have it in a -- it's actually a packet document that they gave me, and it actually lists the new stuff since the hearings versus all the old stuff that they gave and there is dates next to.

So if they was to give me that packet, I could give it to you. I mean, I have put it into the, one of my motions and the appellate court -- not the appellate court, but the clerk's office didn't add it by accident. So I called in like yesterday and had them add it. It was going to be 231, and it was an attachment that went with it.

So he brought me my stuff off the docket. I only had one copy, and I never got that copy back from, you

know, so --

THE COURT: Let me ask Mr. Paulsen or Ms. Bates. Is there a, so is there an electronic, is there a disk of everything that was produced subsequent that is within the scope of this hearing?

MS. BATES: Your Honor, we don't have a disk that I can hand you right now.

THE COURT: Right.

MS. BATES: We could create one. There was a drive given to Mr. Gerdts and Mr. Andrews. That is what Mr. Andrews speaks of.

THE COURT: Right.

MS. BATES: A lot of them had been previously disclosed. Some had not. We decided we were going to Bates stamp everything and give it again so we could stop having these arguments about what had and hadn't been disclosed and the dates.

The spread sheet he is talking about is something a paralegal in our office created that has all the information with the Bates numbers, and it has when it was previously disclosed, but I can't say those dates are 100 percent accurate.

DEFENDANT ANDREWS: They are.

MS. BATES: And all the information listed, that would be the entire record in this case as far as I'm

aware.

THE COURT: So why don't we do it this way, then: Do you have any objection to marking and submitting the spread sheet, number one, and number two, then create a disk and submit that that contains everything that was, I'll call it, late so we know what we're talking about, but everything that was produced after our prior hearings?

DEFENDANT ANDREWS: Just because I'm doing it like that doesn't mean that I'm still not going for suppression of this evidence and motions in limine because if you remember right, you had spoke at our first hearing about everything that they gave me after the motions was entered in July of 2018 was subject to suppression, and that was back in September of '18.

So this stuff that they're just giving me like a week ago, man, like I say, man, after you see the rest of these videos and hear the argument I'm going to put on, and they're the same arguments that we've already argued and you had falsely ruled against me, and had this evidence been given, you would have ruled totally different.

I think you're going to see that it's some sanction time, man. Like, they have been naughty prosecutors.

THE COURT: So to answer your question, first of all, anything that was produced that you feel was produced

in an untimely fashion is appropriately the subject of a motion in limine before Judge Nelson, and she knows that, and that's not a suppression issue. It's a motion in limine. It's an exclusion issue under a different theory.

Number two, I understand that your basis for suppression may have been previously articulated, and I have ruled against you on those. The new evidence will then be used -- you're not limited in terms of arguing, okay, they never had probable cause for the Yukon. The way the evidence will be received and used is, does the new evidence establish what you have been arguing all along.

So, no, you're not waiving anything by agreeing to let this come in in this fashion.

DEFENDANT ANDREWS: Because some of it I'm going to definitely not want in, but I can't say that -- it's going to take a while if I have to go through this video. I might want to pick which ones I want to use now, whereas I can just go to the ones I want to use. We can dance on them, talk about them, like identify them in the record and keep going and you all enter them how you all enter them and give me a copy of however they enter them, and then we can move on.

MR. PAULSEN: If what he is proposing is that everything we have just disclosed in this case be made part of the record I vigorously object to that. It's contrary

to Judge Nelson's order. She specifically said it's not a purpose of this reopened motion hearing to enter evidence on the record.

She said, look, you have said, Mr. Andrews, even before you got this recent bunch of discovery, she said, Mr. Andrews, you are saying based on some earlier discovery you could prove four issues. I'm going to give you one more chance. What she meant by that was any newly disclosed evidence as of the time you filed that motion, or if you get something afterwards, you can put that in if it relates to one of those issues.

But she never authorized, and in fact I read her order as specifically prohibiting what he is proposing, which is dumping everything into the record and hoping something sticks. That's no way to handle this motions hearing.

I mean, he has had plenty of time. He claimed in his motion filed in June, motion to reopen, that he had the evidence already to prove these four things, and so this is his day to try to do that. If he's unprepared to do that, it's probably because the things he claimed that he could prove don't exist, never happened, and he doesn't have any proof for them.

So I object to this proposal to just dump everything in the record and sort it out later. We will

never get this case tried by September 23 if we do that.

DEFENDANT ANDREWS: You know what I think at this point, Your Honor? It's proven that we actually look at this motion because he keep trying to make reference to it like his bible or like that's what the judge really meant like if she knew or took the time to sit back and actually think about what I was saying or think about my motion and looked at the motion itself, she would have easily -- I mean, a blind man could be able to see that this is not the hell what this was.

And it was, like I say, it was prematurely ruled on, and he is using that as a crutch. If he wants to bring up the motions, tell him to bring up the motions after that critiquing incorrectly. I mean here on the screen. Ta da.

THE COURT: Hold on. So Mr. Paulsen is correct as to Judge Nelson's ruling. I understand you object to the way she ruled and you think it's error, and you can preserve that and have that, pursue that if necessary in the Eighth Circuit Court of Appeals. We are limited to the four issues, and I'm trying to be efficient is what I'm trying to accomplish are --

DEFENDANT ANDREWS: Let's put the body cams in. She said the body cams can go in. Slide all the body cams in.

THE COURT: I'm fine with the body cams coming

in. I need to hear from Mr. Paulsen on that.

DEFENDANT ANDREWS: He don't got no say so. She said the body cams can come in.

THE COURT: He can object to that or not object to that.

MR. PAULSEN: Just one second.

DEFENDANT ANDREWS: I can, we can argue about that. Every last one of them I can say and devour you all with. I can do this shit for days.

MR. PAULSEN: Your Honor, here's the problem.

THE COURT: Yep.

MR. PAULSEN: The reason we're here is because he submitted a motion on June 13th requesting to reopen the hearing, and in that document he claimed that he already had this evidence to prove these four -- he had more than four, but she limited it to four.

DEFENDANT ANDREWS: Mm-hmm.

MR. PAULSEN: He already had this evidence to prove these things.

DEFENDANT ANDREWS: Mm-hmm.

MR. PAULSEN: We subsequently gave another large discovery disclosure with a lot more body cams, but he claimed he already had what he needed.

DEFENDANT ANDREWS: Mm-hmm.

MR. PAULSEN: It's a red herring to say this

recent disclosure affects his ability to prove these motions. She said I will give you one more chance. She did not say you can throw everything at me. What she said was, if you have some newly disclosed evidence that shows that there was no probable cause for the Yukon, that you have standing on the Yukon and the other two, you can put that in.

But this proposal to just dump everything in with no notice to us as to what he specifically is claiming it says is, I think, contrary to Judge Nelson's order.

THE COURT: I agree with you. I'm just trying to figure out how we do that.

DEFENDANT ANDREWS: Even with, like I say, even with him keep going back to this motion 220 that the first line, the opening of it all says that this is what this was, and even if we only use the evidence from back that I had up until this point, that is still not all the evidence that I had at this point.

It was still prematurely ruled on, and the video that I had up until this point I still shower you with. I still devour the prosecution with. She said all the body cams. They just, they know what the body cams I got now. They know I found the missing links. They should have gave this stuff.

You talk about this was *Jencks*. If this stuff

was *Jencks*, they have a *Jencks* violation because Schroeder testified, and you just gave me six different videos with Schroeder that you have been holding off for a year. Pucely testified, and you just gave me five of his that I didn't until recently have.

Those are *Jencks* violations, constitution violations, outside of Rules of Criminal Procedure of the courts by Rule 16 and withholding this stuff. They just keep making up stuff as they go along. They're caught in the wrong now, and the chicks is coming home to roost, should I say, because the evidence is mounting against them, and they're trying to stop it, Your Honor.

You should be able at this point to see I'm not putting in a frivolous argument. Everything I'm putting in is valid going towards these prior motions. You should allow this stuff to come in because if you don't, it's going to make a fifth or sixth constitutional violation which is blocking my defense which is not allowing me to present all my evidence.

Had this stuff been produced when it was supposed to, I would have been able to present it. I would have been able to cross-examine these witnesses. We wouldn't be here.

THE COURT: So here's what we're going to do: You may feel that Judge Nelson ruled on your motion

prematurely, but it is not my place, nor will I, determine that Judge Nelson did that. I don't frankly believe that she did, but it is not my call to make.

You can put in, you can offer evidence, specific body cams, specific documents, that --

DEFENDANT ANDREWS: That's what --

THE COURT: -- that you argue demonstrate one of the four things that are at issue, that it shows there was no probable cause for the stop of the Yukon. It demonstrates that you had standing through ownership of the Yukon to raise concerns regarding its search.

Number three, that the firearm was planted in the Yukon, and number four, that there was no probable cause to get the exigent ping from T-Mobile. That's the scope of what you're allowed to put in.

DEFENDANT ANDREWS: Mm-hmm.

THE COURT: He's objecting to just dumping everything in, and that's a fair objection. You have to offer exhibits that go to that that he can object to or not object to.

DEFENDANT ANDREWS: Mm-hmm.

THE COURT: So let's do it this way: Do you feel any additional exhibits --

DEFENDANT ANDREWS: We're going to have to just go through them and pull them out as I make my argument.

THE COURT: I'm trying to do it a little bit more efficiently than that.

DEFENDANT ANDREWS: Yeah. I do. I do. I have, I have certain videos that I'm going to be playing, you know. I have certain documentation that I'm going to tie in with these videos as far as pictures and stuff. You know what I'm saying? And things of that nature, still frame pictures off of body cams, pictures they turned over during all of this.

Even in this limited motion, 220 is speaking about it. I'm speaking on proof of my standing, which was that affidavit. That's in here, but for some reason that wasn't mentioned when she said that I could talk about my proof of standing.

Like I say, there is room for flexibility here. I feel like I'm getting the short end of the stick here. I'm going to catch the wrath here. I don't understand where it goes. I'm going to do it quicker. He is going to label them as we go. He's going to object. To what he don't, he don't. You have to sustain it and let it go as we go. That's the only way I can think to do it.

THE COURT: We can do one thing before we do that, which is that you tell us now what you plan to use. For example, you could and should just give us a list. I'm going to show this body cam, that body cam and this other

body cam, and I'm going to put in these three documents. I need you to identify which exhibits you are going to use to prove these points.

DEFENDANT ANDREWS: To do that he's going to object, and I have to explain them and argue them. We're going to run out of time because I'm stuck arguing and explaining my points, the videos to them breaking in that Tahoe.

Now, he's going to say it's not proper cause, but I'm going to say it is because I was not under arrest. It went under probable cause why I was booked to the county. My IDs was found in the suspect vehicle. That is probable cause. The videos can go in under that. I had those before he gave me this other stuff.

That's how we got around to having this hearing reopened in the first place because of those videos and busting out windows in the truck and planting my ID in it. That also triggers back on the standing on the search of the Yukon Denali because evidence was taken from the scene of that to the scene of when the Tahoe, I mean the Tahoe was towed.

So now you're moving evidence, which is again illegal search and seizure because you tamper them with evidence, which is a Fourth Amendment violation.

THE COURT: No other way for me to say this. You

and I are having an argument about an argument about an argument so we can have an argument. What I need you to do is identify the exhibits you're going to proffer, and he may not have an objection. We don't know that.

DEFENDANT ANDREWS: Officer Womble, Officer Spies. Officer Womble don't have a report, and I keep telling them to give it to me. Officer Spies and Officer Womble, both of their body cams.

THE COURT: Okay. What else?

DEFENDANT ANDREWS: Schroeder body cams. Officer Hanneman's body cams. Let me go into this damn thing. I can tell you better. Bunnell body cams, B-u-n-n-e-l-l. Chaput, C-h-a-p-u-t. Officer Owen's body cams. Officer Partyka, P-a-r-t-y-k-a. These is all from the arrest and the stop and search of the Yukon.

THE COURT: You said Chaput, Owens, Partyka.

DEFENDANT ANDREWS: Chaput, Moua, Owens and Partyka.

THE COURT: Moor was the one we were using?

MR. PAULSEN: Moua.

THE COURT: Oh, Moua, yeah. You seem to be using, you seem to have two particular files that you're toggling between in your computer.

DEFENDANT ANDREWS: Four of them, five of them.

THE COURT: Okay. Keep going.

DEFENDANT ANDREWS: See, a lot of the officers was at the morning scene and the night scene, and then they kept stopping and starting their videos. So a lot of these are the same officers. This one has Partyka in it, Owen, Moua. They are using their body cams. The ones that is in there now I don't need them. I know I'm going to be using Rasmussen. I'm going to be using this, this Therres, T-h-e-r-r-e-s; Spee, S-p-e-e and Tyler. I think I need -- let me see something.

Oh, yes. The 911 calls, the domestic dispute that we went through earlier, I'm going to need that. The shots fired call from the first shooting and then the shooting obviously at 1511 Plymouth, those are going to have to go in because I don't want him later to say that oh, well, the witnesses' testimony we was talking about came from the 911 calls.

They didn't, and they didn't come from dispatch because this is dispatch, the 911 calls.

THE COURT: For what it's worth --

DEFENDANT ANDREWS: I was going to go back and use them.

THE COURT: Mr. Andrews, if he relies on something or wants to make an argument, it's going to be in the record.

DEFENDANT ANDREWS: Yeah, but I'm still, my

argument is still that none of these witnesses said what the reports said, right? So these callers are witnesses because some of these callers are people that didn't get reported because they was, it was *Brady* material for me so the government didn't go and investigate it. Like you're going to hear a call in here where the caller is actually going to list something completely different, like a whole other shooter, and no one is going to go investigate it.

And they're going to list some other things, different things these witnesses is going to say, and I don't want that to be put into a report that this is what was said when it really wasn't.

THE COURT: The problem that I'm hearing is you're trying to try your case in this hearing.

DEFENDANT ANDREWS: No. No. No. I'm not. I'm putting that in the record. I'm putting this folder as a whole into the record because it's something out of each one of those I'm going to be playing. The whole first shooting as a 911 call, all the calls called in on a timeline, by it goes one after the other, like 1508, boom, and then that caller talk.

The next one 1702, boom, and then they talk. You see what I'm saying? So these are actually witnesses. But, no, I'm not trying to -- all of this is, I'm going to tie in and make relevant to each one of my cases.

Everybody I said I'm going to use. The people I don't, I'm just not. You don't have to label them.

You have it wrote down on paper now, so as I hurry up and run through them, you can assign them docket numbers as I use their information and he object to them and you let them or don't for whatever reason. Some of the stuff I'm going to use. All of it I probably don't because I'm going to get to my issues a little quicker, but those are videos that I remember off the back of my head that I went into a lot of times to get information from for my case.

But I know a few of them, a lot of them I'm not going to use because they're not what I think they are, and --

THE COURT: Right.

DEFENDANT ANDREWS: -- that's why I said put them all in, and the ones I don't use I just won't use.

THE COURT: Would it be more efficient or -- well, would it be more efficient, Mr. Andrews, if instead you put in a document like you suggested earlier, point one, reference this, and then we identify those exhibits as a part of the record?

In other words, you seem to be doing some of this by the seat of your pants and in that you may not actually use some of these. Would it be more efficient for you to

submit a record to the Court that says --

DEFENDANT ANDREWS: No.

THE COURT: -- that says here are my points? This, this, this and these are the documents that show it.

DEFENDANT ANDREWS: No, because I'm not getting the proper access I need. My mail is not going out like it's supposed to, and the Court has not responded to my motions and misconstruing what I am saying. I want to give it orally so there is no misunderstanding what it is.

Afterwards I will give you some documentation. Like I say, all of this is wasting everybody's time when I can be putting on my exhibits whatever. He object to what he object to and you allow it in or not.

THE COURT: How long will it take you to walk through this?

DEFENDANT ANDREWS: I don't know until we get going. Some of it has already been covered. By me talking about it doing it myself, we should breeze through it. I know where I'm going. I know what files are going in mostly, a couple misses here and there but --

THE COURT: Mr. Paulsen, how does that sound as a way of proceeding?

MR. PAULSEN: Well, I am going to object to the body cams that go to the search of the blue Tahoe for the reasons previously stated. Those were the first two he

listed. That's not part of what the judge ordered could be reopened and relitigated. The rest of them --

DEFENDANT ANDREWS: It's probable cause.

MR. PAULSEN: -- looks like eleven body cams, and I don't know how many 911 calls he was planning to play. At the rate we have been going, we have done three or four today in the last six hours. I'm not optimistic we will get very far today.

My suggestion, given the hour, is if we have to come back another day, come back with what I wanted to have before this hearing, namely a list of exhibits he's going to put in so we can look at them ahead of time and decide, one, whether we're going to object or not, and two, whether we might need the officer here to actually interpret whatever stray comment Mr. Andrews pulls out on somebody's body cam video, which he is prone to do.

If we want to be efficient about it, let's let him do a little work ahead of time and tell us what the exhibits are, what they show, give us a time stamp so we know on a body cam which 30 seconds is relevant, and we could move quickly if he would be required to do that.

It sounds like he is not quite sure of what he wants. Giving him a few days to think about it, coming back Monday or something.

DEFENDANT ANDREWS: I know exactly what I want.

MR. PAULSEN: He says he knows what he wants, but I hear him saying different things at different times. I just think if he really was sincere when he said six weeks ago I've got what I need to prove these four issues --

DEFENDANT ANDREWS: Six weeks?

MR. PAULSEN: Five weeks ago, I guess. By now he ought to be able to put it down on paper.

DEFENDANT ANDREWS: It ain't been a month, fam.

MR. PAULSEN: I think your motion was June 13th.

DEFENDANT ANDREWS: Yeah. That's barely a month.

THE COURT: All right.

DEFENDANT ANDREWS: But, Your Honor, that whole thing he just said, man, that was just a frivolous ass argument, and I hope you're not entertaining that.

THE COURT: I'm very much entertaining it.

DEFENDANT ANDREWS: I don't see how, Your Honor, when the fact of why we're here is because of them. I'm not late with my evidence. I'm not none of that. I got what I need my argument to be now. I'm ready to deal with my argument now.

If we take another continuance, it's only going to prejudice me more. I keep telling you all and I keep bringing up not having the adequate stuff to do in the jail. He keep talking about me giving him a list of all of these motions and stuff. I told you all I wasn't going to

be ready for this hearing.

You forced this hearing. I'm pretty sure that your chambers that message I left, you got it. Just like I called Judge Nelson, and they got it. I talked to your court clerks and calendar people about these issues, and I said that this was not going to be enough time, and I said that, but now that we're here, let's deal with it.

THE COURT: Hang on one second.

DEFENDANT ANDREWS: Right. We sat here for 30 minutes.

THE COURT: I know. You're absolutely right. We have been sitting here for 30 minutes, and I have been trying to bring order to this proceeding. Here is -- you have one hour and 15 minutes to present whatever additional information you have bearing on any of the four issues identified in Judge Nelson's order.

So use your time efficiently and wisely. Okay?

DEFENDANT ANDREWS: Yeah. Once again, you know, I'm going to object to being put on a time restraint again, same as last time.

THE COURT: Your option is this. You can choose either option. You can choose to do this in the next hour and 15 minutes --

DEFENDANT ANDREWS: Mm-hmm.

THE COURT: -- or you can do exactly what

Mr. Paulsen is suggesting, which is provide a list of evidence you wish to use, give them some indication of what it shows and where the information that is contained in the body cams' time stamp information, provide that to them, and then we can come back and do that efficiently, but we have to have some process here.

We have to have some order because we can't continue to have these sprawling hearings that go on for eight or nine hours because you have been given four narrow issues, and I'm trying my best to make sure that you get the time that you feel you need, but I also, the government also has a fair objection that they don't have notice of what this hearing is going to be about from the perspective of the evidence you want to put in.

DEFENDANT ANDREWS: The judges, did nobody tell her to prematurely rule on this? I have a motion and a memoranda, and I told you all that, had you not made that bogus ass motion and memoranda in. It was listed months in advance before that letter went in that I was telling you all that I couldn't finish my motion that I had in that I was writing about this hearing.

THE COURT: You have to take that issue up with Judge Nelson.

DEFENDANT ANDREWS: Right. Five years down the line, ten years down the line if I'm convicted with this

perjured evidence. Using time wisely, I would like to move along and get what I can get done if I can.

THE COURT: Go ahead, please.

DEFENDANT ANDREWS: Thank you. As I was saying, I guess we go with, the next video is going to be of Officer Owens.

THE COURT: Officer Owen's body cam will be marked as Exhibit 107.

DEFENDANT ANDREWS: Now which one it is going to pop up is a big question because they gave them to me scrambled. As you can see, these are his body cams, how many times he stopped his body cam.

Okay. This is the one, this is the first one of him going to the scene, and this is going to go against Pucely's credibility of them needing an authorization to search this vehicle.

THE COURT: For the record, this cam video is a 5/16/2018 time stamp 0507 and some seconds.

**(Video recording played.)**

DEFENDANT ANDREWS: The first thing I want to put on with this is that this video is going to show that everyone who was under arrest at this scene is going to be told they were under arrest. So we're going to clear up the Court's ambiguity about whether the defendant, me, was under arrest or not at this scene and whether or not that

led to the probable cause for the incident to arrest to search his car or was it an inventory search or was it just a fishing expedition.

We're going to get all that cleared up right now.

**(Video recording played.)**

DEFENDANT ANDREWS: That's Officer Andrew Schroeder talking. He just informed Montrel Tyson that he is under arrest.

**(Video recording played.)**

DEFENDANT ANDREWS: Also, I want the record to reflect that this is also the traffic stop as you noticed that he hasn't told her what she has been stopped, what she has been pulled out of this vehicle for. No gun has been found. No drugs has been found.

Everyone is being removed from this vehicle right now. The defendant has just been removed seconds earlier, and we seen that on Pucely's body cams and earlier videos, and I can display some other officers' new videos to show it in a minute.

But this is right after the defendant has been taken out of the car. Nothing has been found at this point. You're going to see that this is not a traffic violation. You see he's taking the girl out now.

**(Video recording played.)**

DEFENDANT ANDREWS: Now, you see this officer's

hands. It's the same officer that we was debating what he was doing. Look at this officer across from us in this truck. You see him on that seat back there in the passenger side, all way in the back? Let me see something. How you touch the screen, here, here, there. That's an officer. That officer, they still refuse to give me his body cam. That officer has not wrote a report.

That officer is over there tampering with where that gun is at. That officer is looking under them seats, and that gun is not there. I'm going to continue to play it. Watch Officer Owen, and his hand is up, and he's going to say he's going to call code 4. He's not.

He's going to take his hand down and put something in this door and act like he got some drugs and other shit that he put in the door.

**(Video recording played.)**

DEFENDANT ANDREWS: Now, he is going to reach in the door and grab the meth that he just put in the door back out the door.

**(Video recording played.)**

THE COURT: Stop the video, please. Mr. Andrews, this doesn't go to the probable cause for the stop of the Yukon, your ownership of the Yukon.

DEFENDANT ANDREWS: She --

THE COURT: You're going to the planting of the

firearm; is that right?

DEFENDANT ANDREWS: Yeah, and the drugs, yes. And she said, and the standing to challenge the search. It got to be some new evidence about the illegalness of the search.

THE COURT: Keep going.

DEFENDANT ANDREWS: This is the illegalness of the search. As you're listening to this, if you listen in the background, you're going to hear Officer Pucely yell over there, don't touch anything, stop touching stuff.

When I asked who gave the okay for them to touch anything in this vehicle it was, we don't need it because we're supposed to search the immediate area of the suspect. Was it in the area of driver's side door or the passenger door or back door? No, it wasn't. It was the passenger back -- I mean the driver's side back door.

They are planting stuff in the driver's door, in the passenger door, in the passenger back door where the gun was at, everywhere but where the suspect was at, and they are saying they didn't need probable cause and they didn't need permission.

Pucely come over here and give them permission to start an inventory search. No inventory is done. There is no inventory report. There is nothing whatsoever to show any of this was legit, and this vehicle is towed without

probable cause, before they find a gun, before they find anything to have this vehicle towed.

They're going to get the order from Officer O'Rourke to tow this vehicle. This new video is going to show all of that, which is what I said from the beginning.

**(Video recording played.)**

DEFENDANT ANDREWS: Now, the officer's hand is going to go up.

**(Video recording played.)**

DEFENDANT ANDREWS: You heard Officer Schroeder say there was a backpack he was trying to kick. Officer Pucely say, don't touch anything. This is Officer John Moua, don't touch nothing. They are going to have to wait on their probable cause to search this car.

They're going to wait for their authorization to search this car.

**(Video recording played.)**

DEFENDANT ANDREWS: He's going to stop his body cam. Restart his body cam.

THE COURT: For the record, this will be marked as Exhibit 108, time stamp 5:11:250 or thereabouts.

DEFENDANT ANDREWS: And also on this body cam right here you can see that officer from the other side, and we got, recently we sent the government a request to get this officer who was tampering with that gun under that

seat over there, his name and body cam.

He is right here. That's his body cam right here. You're going to see it on multiple other cameras way closer with other officers at the scene. He is some type of canine officer. What he did on that side of the car, they won't give it to us. He searched under the seat, and he searched over there, and this, this big ass gun is over there. Officer Pucely is going to be looking under that seat, and the gun is not going to be there.

And this Officer Moua is going to find the gun miraculously, but we're still with probable cause to search the car right now.

**(Video recording played.)**

DEFENDANT ANDREWS: As you heard right there, he told them just do an inventory search of the vehicle, just inventory search it. He just got that okay from Officer O'Rourke, and you're going to hear this. All of this tampering with evidence, it already happened by now, so this is an illegal search.

**(Video recording played.)**

DEFENDANT ANDREWS: You heard him say he was going for Sergeant O'Rourke, and also the gun is not found. None of this ecstasy and all this other stuff has been found, and no mention to this sergeant or Pucely or O'Rourke about this methamphetamine, and this truck is

being told that it's going to be towed. He has told no one, and it's already listed that this truck is going to be towed.

There is no probable cause for this. They was looking for it. This is not the truck the shooting happened out of. There is no probable cause or evidence that the evidence would be found for a shooting when you're looking for a blue 2001 Tahoe and you've got a white GMC Yukon.

**(Video recording played.)**

DEFENDANT ANDREWS: Now, did you just hear this Andrew Schroeder, the officer, that's why I wanted that Agent Voth on the stand because in Schroeder's reports and the government's argument is that they had probable cause to search the area where the defendant was at because he was seen making fugitive movements and leaning over where the gun was at.

Well, you just heard Andrew Schroeder say that the defendant was trying to kick that backpack. Now we had this whole dispute at the other hearing where Schroeder didn't have his body cam on and the other officer wasn't quite as close. This officer is quite damn close, and we have heard it on two different cameras.

Not only on the Schroeder camera where he told him before he was trying to kick the backpack and he was

going to tell the officers that he had a confidential informant in his car when his testimony on the stand was that he was on a domestic call when he got the call from Pucely to come down there and assist him in a traffic stop.

Now all of a sudden he had a confidential informant in a car that was pointing to an address that the suspects might have been in. So we've got a lot of lies going on here. We've got a lot of contradictions, and the only way we could put this evidence on that the government gave it, I put this on, and the Court chose to believe it was credible.

So like I say, I only have a limited amount of time so I have to get the evidence in as I can.

**(Video recording played.)**

DEFENDANT ANDREWS: But --

**(Video recording played.)**

DEFENDANT ANDREWS: Yeah, see the backpack.

**(Video recording played.)**

DEFENDANT ANDREWS: Now that's Officer Pucely going in the back door where the suspect was taken out of. He is going to search the whole area, look under the seat, and he's going to lean over and look under the seat where the firearm is at and flash his light under there and look. No firearm. That is two officers that is going to look under the seat, and I'm going to show you on a different

body cam, too, that he is going to lean over and look under that seat.

**(Video recording played.)**

DEFENDANT ANDREWS: The next video I'm going to play is from Officer Moua, but he has a lot of videos, too.

**(Video recording played.)**

DEFENDANT ANDREWS: Okay. Now, if you watch off of Officer Moua's camera, you're going to watch Pucely right here.

THE COURT: Before you start it, the record should reflect that Exhibit 109 is the body cam video of Officer Moua that begins with the time stamp 05:12:312.

DEFENDANT ANDREWS: This is going to show Officer Pucely putting his gloves on and searching the area where the suspect. Moua is looking under the seats where the gun is at, and he didn't see it, too, looking where the gun is at. There is Pucely looking under that seat.

**(Video recording played.)**

DEFENDANT ANDREWS: Also, I want the courts and the government to be aware that they gave me some footage of the squad cams, and I can't play them, all the squad cams, because they didn't give me the correct apps for them, and the public housing authority videos, they are unplayable.

Could you give me the correct apps for them? I

mean, that's all I can say about that. Do you all know how to make them play? Do you want to show me?

MS. BATES: I can show you after the hearing. I would be happy to go through it with you.

DEFENDANT ANDREWS: Then you're going to say that it was working and it wasn't.

MS. BATES: We didn't --

DEFENDANT ANDREWS: The next video is going to be -- okay. I want to play the one with the Tahoe.

MR. PAULSEN: I'm going to object to those for the reasons already stated, Your Honor. They don't go to anything in the reopened motion hearing.

THE COURT: That motion is sustained until you can tell me, Mr. Andrews.

DEFENDANT ANDREWS: They're probable cause for everything that happened. I wasn't under arrest yet. Excuse me. I'm talking.

THE COURT: Go ahead.

DEFENDANT ANDREWS: It seemed like you just sustaining the things he is saying without even getting my side to it. You know what I'm saying? That's not fair or right.

THE COURT: Go ahead.

DEFENDANT ANDREWS: This needs to go in simply because, one, just because I feel like just because they're

saying they're not going to use it, that still doesn't mean that it doesn't need to be in the record for the appellate court because I do have motions in for outrageous government conduct, whether you all like it or not, and the judge ruled that, okay, they're not going to use it so we don't have to talk about it, blah, blah, blah, blah, blah, and that's how that went.

But still for the record, it still needs to be in because it needs to be documented. It needs to be reported, and my issue needs to be preserved, but even for this issue, it still goes to probable cause. They put it in their reports as their probable cause as to why I was arrested, what I was taken down for.

The evidence was moved from one scene to the next. My ID was clearly in my pocket, and it's video now of them that shows my ID was on top of the police car, and Officer Pucely grabbed it and put it in with the car keys, and somehow it made it's way over to that Tahoe, and these officers busted the windows on the Tahoe. There is evidence of that.

And their reports are going to say that they didn't go into the Tahoe, they didn't search it or nothing. You're hear the alarm go off. One officer shut his body cam off. You're going to hear the doors open and slam.

THE COURT: What are they depicting, the search

of the Yukon or Tahoe?

DEFENDANT ANDREWS: The Tahoe.

THE COURT: Okay. You can identify them for the record. The proper way to proceed is to identify them. Mr. Paulsen is going to object. I've already heard his objection. I'm going to sustain the objection, but these will be part of the record to preserve the issue for appeal.

The issue about the Tahoe has been determined, and it's not among the limited topics on which Judge Nelson has reopened this hearing.

DEFENDANT ANDREWS: But you can't, you can't -- she said I can use the body cams. These is new body cams.

THE COURT: On the four issues.

DEFENDANT ANDREWS: Okay. Yes. And I'm using them on my probable cause for my arrest, which is the stop and everything that was to happen in sequence. It's all sequence. The illegal search and seizures, period.

THE COURT: Was the Tahoe searched prior to the stop of the Yukon?

MR. PAULSEN: Several hours after. Mr. Andrews was already down at the station being questioned by O'Rourke by the time they go do anything with the Tahoe.

DEFENDANT ANDREWS: The evidence in the Tahoe was still out in the open, and it was being taken from one

search to the next. It is the same search, which is a constitutional violation.

THE COURT: Identify the body cam videos you wish to display, if you would, which ones?

DEFENDANT ANDREWS: They're just listed as this. This is how the government gave them to me. Norris Andrews vehicle find.

THE COURT: You have to identify them for the record.

DEFENDANT ANDREWS: They're Officer Womble and Officer Speis.

THE COURT: Officer Womble's body cam video, is it one clip?

DEFENDANT ANDREWS: They both is one. One is going to be cut short, and the other one is going to be played entirely and incriminate the other one. There is only going to be one report written.

THE COURT: Okay. Officer Womble's video will be marked as Exhibit 110. Officer Speis' video is Exhibit 111.

MR. PAULSEN: It's Officer Speis.

THE COURT: S-p-e-i-s?

MR. PAULSEN: Yes.

THE COURT: Mr. Paulsen, do you object to these exhibits?

MR. PAULSEN: Yes, I do. Do you want me to restate the reasons?

THE COURT: No. The objections are sustained.

Keep going, Mr. Andrews.

DEFENDANT ANDREWS: I don't understand what that means.

THE COURT: It means that they have been marked and are part of the Court's record, but I'm not going to let you put them into evidence on the limited issues before the Court.

DEFENDANT ANDREWS: There ain't no use to go on, man. Let's go ahead and pack it up to go back to the unit. I request a continuance.

THE COURT: The request for a continuance is denied.

DEFENDANT ANDREWS: How you going to deny it? You ain't heard my grounds.

THE COURT: What's your grounds, Mr. Andrews?

DEFENDANT ANDREWS: It's pointless. You denied it.

THE COURT: What's pointless?

DEFENDANT ANDREWS: Me giving you my grounds for my continuance. You denied it.

THE COURT: I will reconsider my denial if you have some grounds for a continuance.

DEFENDANT ANDREWS: No, you're not. You're going to hear me talk so I can embarrass myself and deny my shit. Let's go ahead and move along. I'm not getting no fair shake. There is no way I can present my evidence. There is no way I can continue on like this. Nothing is being accomplished. You wasting my time.

You biasly letting him have his day forward. You should be allowed by saying by default because of what they did. You know like I do the trial judge is wrong in limiting my evidence like this. You know this evidence should be coming in.

None of this shit should be stopped like this. All of my stuff I put on in front of you, none of it has been frivolous, not one thing. All them officers lying in the reports, not one thing I lied about. This officer that is going to plant that, that is going to break in my fucking truck, I didn't lie about that.

These public pretenders not going to get my evidence, and I told them that they broke in my truck and my girl had that motherfucking video? I didn't lie about that. He kept saying I was lying. Now that I found the goddamned video, the police video shows I wasn't lying about them breaking in that car and putting my ID in there.

But you all you ruled against that. Now you trying to tell me I can't put it in the record and preserve

my rights?

THE COURT: It is in the record.

DEFENDANT ANDREWS: No, it is not in the record.

THE COURT: It is in the record.

DEFENDANT ANDREWS: What exhibit is it?

THE COURT: Exhibit 110.

DEFENDANT ANDREWS: Right. And I have to go to appellate court and do 10, 15 fucking years down the line because I'm not going to have my evidence, right? Right?

THE COURT: Mr. Andrews, this hearing is bounded by Judge Nelson's order.

DEFENDANT ANDREWS: It's not.

THE COURT: I'm restrained by that order.

DEFENDANT ANDREWS: It's not. It's not.

THE COURT: The exhibits do not bear on the four issues --

DEFENDANT ANDREWS: They do, man.

THE COURT: -- that are before this Court.

DEFENDANT ANDREWS: Listen. I'm asking for a continuance. I'm done talking, man. I'm done with this whole fucking shenanigan that you got going. It's just a sham. I'm done with it.

THE COURT: Do you have more evidence?

DEFENDANT ANDREWS: I'm done. It's over.

THE COURT: Hang on.

DEFENDANT ANDREWS: Fuck this hearing. Take me downstairs. I've got to get my shit together. This is over with.

THE COURT: Mr. Andrews, do you have any other evidence --

DEFENDANT ANDREWS: It's over with. Ain't nothing to talk to me about, fam. Could you please stop talking to me?

THE COURT: Mr. Andrews --

DEFENDANT ANDREWS: You pissing me off.

THE COURT: Just wait.

DEFENDANT ANDREWS: I'm not waiting on nothing no more. I'm going to eject my flash drive, and I don't give a fuck about your courtroom.

THE COURT: The record will reflect that we have been going since approximately 9:30 this morning. The Court has given the defendant wide latitude in the evidence that he has presented.

DEFENDANT ANDREWS: You ain't give me nothing.

THE COURT: I am willing to continue, giving you time to put this evidence in today, and I'm asking you, Mr. Andrews, if you have further evidence you want to put in in this hearing today.

DEFENDANT ANDREWS: Yeah. Fuck you, and fuck your courtroom.

THE COURT: Marshals, it's time.

Kristine, while we are on the record, Mr. Paulsen, Ms. Bates, the Court does not have in its possession any of the videos that were either offered or entered into evidence. I am going to ask that you put those into evidence or submit them to the Court so they can be part of it.

**(Defendant confers with counsel.)**

THE COURT: Mr. Gerdts, I will ask that you review the submissions that are provided by the United States Attorney's Office, and if any of them conflict with your recollection of what was offered, I ask that you provide that or call that to the Court's attention.

MR. GERDTS: Very good, Your Honor.

**(Defendant exits courtroom.)**

THE COURT: Okay. Anything further, Mr. Paulsen?

MR. PAULSEN: Well, I never got a chance to cross David Voth, and the only issue I really think I need to cross him on, he has done research on this registration and title for the Yukon. I can just submit his report that's been given to the other side.

It's got all the documents attached to it, but I think in fairness, since -- you haven't ruled on whether that --

THE COURT: I haven't ruled on whether that

affidavit or that declaration is admissible.

MR. PAULSEN: But I have to assume that it's going to come in, and I've got a whole bunch of reports and certified documents and bills of sale that show that Mr. Norris Andrews's name was never on that Yukon. It's either Larry Smith or Sunny Day Welch.

It's only Exhibit 62 he put in an earlier hearing to show that vehicle was registered to Sunny Day Welch, and I think I should be able to put those in, especially if there is consideration of that Rachel Hawkins' affidavit.

THE COURT: Here's, here's what I am inclined to do with respect to that issue. I agree with you that it is hearsay. I am inclined to exclude it, but even if the Court were to consider it and find that there is standing, I have not seen anything today, so obviously I have to await argument that demonstrates an absence of probable cause with respect to the stop and search of the Yukon. That's the way the evidence is looking to me.

If you wish to put those exhibits in, I have to let Mr. Gerdts or Mr. Andrews object to their admission, and I will do that, so you may submit them.

Mr. Gerdts, please do communicate to Mr. Andrews that he has the right to object to their admission, and I guess we will deal with that when that happens.

Anything else, Mr. Paulsen?

MR. PAULSEN: Just the question of whether you're going to want supplemental briefing or not. I mean, I'm happy to respond to some of these issues and arguments. I mean, I should -- I'll tip my hand here. We called O'Rourke during that break to say what does 710 mean. It's a generic term for the investigator on call. It's got nothing to do with car 743. Little things like that, but I understand there is an interest in moving this along so we're ready for the September 23 hearing.

I wouldn't ask for more than, certainly no more than a week. Probably get it done by next Wednesday or so if the evidence is all in now. If the evidence is all in and we can start writing our brief, I'll submit those documents regarding the Yukon that I talked about. If they object, so be it. You have to rule. That's what I propose.

THE COURT: If I allow you to do that, I have to I think allow Mr. Andrews whatever written submission he wants at the same time. I think the best and most efficient orderly process would be to give Mr. Andrews one week from today to submit anything relevant to the issues in this hearing, whether it's his description of the evidence or his argument under the case law and then give you -- so that's Thursday, the 25th.

Would you be able to make your submission --

well, how soon after the 25th could you make your submission?

MR. PAULSEN: How about the 31st?

THE COURT: That's fine, and we'll get our ruling out as soon as possible.

Mr. Gerdts, I don't mean to not hear from you, and I recognize you're stand-by counsel, but anything you want to call to the Court's attention on any of the issues we've just discussed or anything else relating to this hearing?

MR. GERDTS: No, except for regarding the time schedule, Mr. Andrews may require some assistance from me. I'm going to be out of town for sure beginning Wednesday of next week for a week, and I will be unavailable to Mr. Andrews during that time, but I can visit him before then, just to let the Court know that that's what my schedule is.

So I can communicate to him that if he wants to put something in writing, it should be within a week from today. Is that what I just heard the Court say?

THE COURT: Correct.

MR. GERDTS: I can communicate that to him, and that would be next, is it Thursday, today?

THE COURT: Yes.

MR. GERDTS: So I would be here for most of that

time, at least, but if the government is going to run some videos past me, I'm going to need to do it before Wednesday, otherwise I won't be able to do it unless I get to it after I get back, because I'll be back by the 1st for sure.

THE COURT: Right. Understood. I think on the videos, really I'm hoping the government understands what the exhibits are, and if they submit one that is the wrong one or you think is the wrong one as long as we clarify that before the Court rules, I think that will be sufficient.

MR. GERDTS: Very good.

THE COURT: Okay. Anything further?

MR. PAULSEN: Not for the government.

THE COURT: Mr. Gerdts, anything further for the defendant?

MR. GERDTS: No. Thank you.

THE COURT: Okay. We are off the record and in recess.

THE CLERK: All rise.

* * *

I, Kristine Mousseau, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: s/ Kristine Mousseau, CRR-RPR
Kristine Mousseau, CRR-RPR

**I N D E X**


| DAVID VOTH | PAGE |
| --- | --- |
| Direct Examination by Defendant Andrews | 17 |

| DEFENDANT'S EXHIBITS | REC'D |
| --- | --- |
| Exhibit 100 | 28 |
| Exhibit 101 | 73 |
| Exhibit 102 | 102 |
| Exhibit 103 | 103 |
| Exhibit 104 | 129 |
| Exhibit 105 | 135 |
| Exhibit 106 | 154 |
| Exhibit 107 | 188 |
| Exhibit 108 | 192 |
| Exhibit 109 | 196 |
| Exhibit 110 | 200 |
| Exhibit 111 | 200 |