UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. 18-CR-149 (SRN/DTS) |
| Plaintiff, | |
| v. | **ORDER AND**<br>**REPORT & RECOMMENDATION** |
| NORRIS DESHON ANDREWS, | |
| Defendant. | |

_____

## INTRODUCTION

Defendant Norris Deshon Andrews moved to reopen the suppression hearing in this matter to submit additional evidence, primarily police bodycam videos, that he contends were untimely disclosed by the Government and bear upon this Court's denial of several of his prior motions. The District Court granted Andrews's request, although it did so on a limited basis.[1] On July 18, 2019, the Court held the reopened hearing. Over more than six hours, Andrews questioned the case agent who lead the federal investigation and played portions of several bodycam videos from the investigation and his subsequent seizure. Having considered Andrews's submissions, this Court finds that the new evidence does not alter its prior conclusions.

The Court also addresses several motions Andrews has filed, each seeking either suppression or inspection of evidence, or dismissal of the indictment. For the reasons stated below, the Court recommends each of these motions be denied. **Finally, to maintain the current trial date, the parties shall have seven days from the date**

---

[1] Both in filings and during the hearing, Andrews has protested the limited scope of the District Court's order. *E.g.,* Def.'s Mot. for Recons., Docket No. 228. That issue is not before the undersigned.

**of this Order and R&R to file and serve any objections. D. Minn. LR 72.2(a)(1), (b)(1).**

## FINDINGS OF FACT

The Court incorporates by reference the full factual background from the May 8, 2019 Order (Dkt. No. 187). Any additional relevant facts drawn from the evidence submitted during the July 18, 2019 hearing are incorporated below when they bear upon this Court's prior recommendations.

## CONCLUSIONS OF LAW

### I.  Motions Within the Scope of the Reopened Suppression Hearing

The District Court granted Andrews a reopened suppression hearing to address four narrow issues previously addressed by the Court, but on which Andrews contended he had new, relevant evidence recently disclosed by the Government. Each is discussed below.[2]

#### A.  Exigent Cell Phone Location Information

Andrews previously challenged the Government's use of exigent cell phone location information, arguing that Sgt. Kelly O'Rourke, the officer who applied for the information, lied to obtain the information. Def.'s Pretrial Mot. to Suppress Evidence, Dkt. No. 104. The Court rejected this argument, finding no evidence that Sgt. O'Rourke made deliberately false statements in the application, and further finding that the salient facts Sgt. O'Rourke included in the application were borne out by the evidence. May 8, 2019 Order at 27-28. The Court agreed to reopen the hearing on this issue because

---

[2] Andrews did not file post-hearing briefing. He requested a two-week extension of time to file his briefing. The Court granted him a one-week extension. July 24, 2019 Order, Dkt. No. 247. He then requested another extension, which the Court denied. Aug. 2, 2019 Order, Dkt. No. 257. However, the thrust of Andrews's arguments is clear from the hearing, as he blended examination of his witness with argument.

Andrews stated that some of the newly disclosed bodycam footage provided "factual proof that false info was given to T-Mobile on [the] exigent application about Defendant from alleged witnesses." June 19, 2019 Order at 6, Dkt. No. 224. During the hearing, Andrews argued that the tainted cell phone location information supplied in whole or part the probable cause for the later stop of the Yukon, which should then also be suppressed. He introduced three bodycam videos he contended bore on this issue. After reviewing Andrews's new evidence, the renewed motions are denied.

### 1. Officer Bauer bodycam

Andrews first introduced bodycam footage from Officer Benjamin Bauer, who responded to the Plymouth Avenue shooting and subsequently wrote a report. Most of the video shows Officer Bauer standing behind the apartment at 1707 Plymouth Avenue North. Def. Ex. 100 at 0:5:00-0:19:00. When he approaches the apartment, one woman is standing on the stoop. *Id.* at 0:05:00. She tells Officer Bauer she does not live there, and is trying to leave with her daughter. *Id.* at 0:05:05. A second woman comes out of the unit. *Id.* at 0:05:20. When asked by Officer Bauer if they saw anything, the women say they were about to walk out the door when they heard shots, but neither woman claimed to see the shooting itself. *Id.* at 0:08:30. Eventually, another officer approached Officer Bauer to speak with him, and Officer Bauer turned his bodycam off. *Id.* at 0:18:55.

Andrews argued during the hearing that the bodycam footage shows several discrepancies from the report that Officer Bauer subsequently wrote, thus casting doubt on the report and, presumably, any reliance on it by Sgt. O'Rourke. The Court disagrees. In his report, Officer Bauer states that he spoke to a woman outside the unit at 1707 Plymouth Avenue North, and that the woman told him that she and her

daughter were visiting from Texas. Def. Ex. 15. He also accurately notes that the woman said she was inside the apartment when she heard gunshots. *Id.* Officer Bauer does say in his report that the woman "refused to give [him] her name or Date of Birth[,]" *id.*, but that is neither an important fact, nor is it entirely inaccurate. Officer Bauer never got the first woman's name or date of birth, though it does not appear that he asked for it.

Regardless, Officer Bauer's report states, consistent with the video, that he turned his bodycam off to talk to another officer. It is at this point that Officer Bauer says another woman came out of the unit and asked to speak with him off camera, at which point she told Officer Bauer the information included in his report. Whether that was the second woman seen in the video or someone else entirely is unclear. It is also irrelevant. The bodycam video does not refute any material fact in Officer Bauer's report. There were also other witnesses who supplied information to officers.[3] Def. Ex. 58 at 22. So, to the extent that Sgt. O'Rourke relied upon Officer Bauer's supplemental report, the Court finds that the bodycam video does not show Sgt. O'Rourke lied, or that any information in his request to T-Mobile is otherwise discredited.

### 2. Officer Hanneman bodycam

Andrews also introduced bodycam footage of Officer Mark Hanneman, captured when Officer Hanneman and his partner responded to a call involving Montrel Tyson's girlfriend. Def. Ex. 101. Although the focus of the visit was the alleged domestic assault

---

[3] During the hearing, Andrews also argued that a different witness who provided the phone number ultimately linked to Andrews never gave the police Andrews's "government name." July 18, 2019 Hr'g Tr. 67-68, Dkt. No. 252. The Court cannot see the import of this during a fluid, developing investigation where some witnesses may only know an individual by a nickname.

by Tyson, police asked the girlfriend and her family about the shooting. The girlfriend told the officers that Tyson came to her apartment and told her he was involved with a shooting. *Id.* at 0:03:20. She said the guy Tyson was with was owed money. *Id.* at 0:09:00. Officer Hanneman showed the girlfriend a still frame from the security camera, and she believed one of the people in the photograph was Tyson. *Id.* at 0:15:12. Toward the end of the encounter, Tyson's girlfriend told the officers that, although she did not know the shooter's name, she had his phone number because Tyson had called him. *Id.* at 0:21:50. The phone number she provided is the same number Sgt. O'Rourke identified in his exigent application to T-Mobile. *Id.* at 0:22:20; Def. Ex. 2.

During the reopened hearing, Andrews argued that Officer Hanneman's bodycam video showed that Sgt. O'Rourke lied during the September 10, 2018 hearing when he testified that Tyson's girlfriend identified Andrews as the shooter. Hr'g Tr. 74-77, 86-87. To the extent Andrews means this to impeach Sgt. O'Rourke's prior testimony, the Court rejects that suggestion. When Sgt. O'Rourke testified about what Tyson's girlfriend told the police, he was linking various strands of the investigation together; he clearly did not state in his application that Tyson's girlfriend had identified Andrews by name. To the contrary, Officer Hanneman's bodycam video shows officers independently linking the phone number to the suspected shooter. As such, Officer Hanneman's bodycam footage does not undermine the veracity of Sgt. O'Rourke's application to T-Mobile or the development of Andrews as a suspect in the investigation.

### 3.    Officer Gillies bodycam

Finally, Andrews introduced bodycam footage from Officer Paul Gillies responding with another officer to an earlier shooting mentioned in Sgt. O'Rourke's application to T-Mobile. Def. Ex. 103. After picking up numerous bullet casings, Officer

5

Gillies approached a man who said he had information about the shooting. *Id.* at 0:10:20. The man told the officers that he saw three vehicles possibly involved in the shooting: a grey van, a metallic purple Caprice, and an early 2000s blue Tahoe with no plates. *Id.* at 0:10:40. The Tahoe was sitting at the street corner. The man initially said he believed the van and Caprice were shooting at each other. *Id.* When an officer said they recovered the casings near the corner, the witness interjected "from the Tahoe." *Id.* at 0:11:08. He identified the driver of the Tahoe as "kind of a big guy with dreads," but didn't see the passenger well. *Id.* at 0:11:30. As Officer Gillies walked back to his squad car, a woman approached from the sidewalk to speak to him. *Id.* at 0:13:20. When Officer Gillies said he understood that the "blue Tahoe was the one doing the shooting," the woman nodded in agreement and added that she thought the purple car was the target of the shooting. *Id.* at 0:13:30.

   Andrews contended at the hearing that this bodycam footage contradicted the police reports of the officers upon which Sgt. O'Rourke subsequently relied. The Court disagrees. From the bodycam, it is clear that the officers responding to the scene had already received information from several 911 calls. Officer Gillies's report states that neighbors said the blue Tahoe was parked where the casings were found. Def. Ex. 102 at 4. His bodycam footage supports this. Officer Creighton's report, written after the shooting on Plymouth Avenue, referred back to the earlier call and identified the blue Tahoe as the "shooting vehicle." Def. Ex. 14. This is perhaps an imprecise description of what the witness said, but it is not directly contradicted by the bodycam video. Officer Creighton also states the witness described the Tahoe's passenger. In fact, the witness was describing the driver of the van immediately after discussing the occupants of the Tahoe. Although Officer Creighton is incorrect, it is not evidence that he lied; far more

6

likely, he misunderstood or misremembered who the witness was talking about when describing a man with shorter dreads and a goatee. This minor misconstruction, unrelated to identifying the driver of the Tahoe (which was Officer Creighton's focus), does not cause this Court to doubt the veracity of Sgt. O'Rourke's application to T-Mobile.

### B. Standing to Challenge Search of the Yukon

Andrews also previously challenged the stop and search of the Yukon he was riding in at the time of his arrest. The Court overruled this challenge, in part, because Andrews had not established standing to challenge the search. Fourth Amendment rights "are personal rights that may not be asserted vicariously," but require the defendant have a sufficient interest in the property being searched. *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004). As part of the reopened hearing, the Court provided that, "[t]o the extent that Andrews now has evidence bearing on the ownership of the GMC Yukon, he may present it at the reopened motion hearing." June 19, 2019 Order 5.

The Court remains skeptical of Andrews's standing to challenge the search of the Yukon. Despite claiming in his objections to the February 21, 2019 R&R that a Bill of Sale established he owned the vehicle, the only new evidence presented at the hearing was an affidavit by Rachelle Faith Hawkins. Def. Ex. 104.[4] Hawkins, purportedly the

---

[4] The Government objected to this affidavit at the hearing and the Court reserved ruling on the objection. For the purposes of the pretrial motions, the Government's objection is overruled. However, the Court will also accept into the record Special Agent Voth's report of his research on the ownership of the vehicle. The Government has marked this as Government Exhibit 15, but it has previously submitted an exhibit with that number—the application and warrant for the search of a cellphone. Gov't Ex. 15, Dkt. No. 200-1. So, the Court will refer to this as Government Exhibit 16.

7

driver of the Yukon when it was pulled over, states that Andrews owned the vehicle at the time and was allowing her to use it. *Id.* at 1. The official records regarding this vehicle are, in a word, messy. *See generally* Gov't Ex. 16. Even then, Andrews's name appears nowhere in any of these records. And Hawkins's affidavit does not explain why she thinks Andrews owns the Yukon, other than that he lets her use it. Thus, this Court does not alter its original conclusion regarding Andrews's lack of standing.

### C.  Probable Cause to Stop the Yukon

Had this Court altered its prior determination regarding standing, Andrews has not introduced new evidence altering the Court's conclusion that there was probable cause to stop the Yukon. The Court previously identified two bases providing probable cause: (1) the observed traffic violations and (2) Officer Pucely's observation of a person matching the shooting suspect's description entering the Yukon in an area the suspect was believed to be. May 8, 2019 Order 30.

During the hearing, Andrews played bodycam footage from Officer Schroeder, Def. Ex. 105, and provided other documents which he argued shows that Sgt. O'Rourke never actually received the exigent cell phone location information from T-Mobile. Andrews's argument would require the Court to follow him down a series of unfounded conjectures, which the Court will not do. Moreover, the cell phone tracking data leading officers to the general area where Andrews was found was only one of several facts the District Court cited in finding probable cause for the stop. May 8, 2019 Order at 30.

Andrews also contended that the traffic violations cited as a basis to stop the car never actually occurred. He noted that nowhere, either on bodycam videos or in any report, was a traffic violation mentioned and that, in her affidavit, Hawkins claims she was never asked about a traffic violation or issued a ticket. Hr'g Tr. 154; Def. Ex. 104.

8

None of this alters the Court's prior crediting of Officer Pucely's testimony that he observed the violations before stopping the Yukon. May 8, 2019 Order 30 (citing Sept. 19, 2018 Hr'g Tr. 18-19). Minor traffic violations provide sufficient probable cause to stop a vehicle. *United States v. Miller*, 915 F.3d 1207, 1209 (8th Cir. 2019). The Fourth Amendment does not require that a police officer issue a citation for the traffic violation, only that the officer have probable cause to do so. *United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005). It is not surprising that officers neglected the traffic violation after they found a suspect in two shootings in the vehicle.

Andrews's new evidence does not alter the Court's prior conclusion that officers had probable cause to stop the Yukon.

### D. Planting of the Firearm

The Court previously rejected Andrews's argument that officers planted the handgun in the Yukon. After giving Andrews an opportunity to present new evidence, it rejects the argument again. Andrews submitted bodycam footage from several officers who were part of the stop and search of the Yukon. Def. Exs. 107-09. Having reviewed each of these new videos in their entirety, the Court cannot say that any of them show an officer planting the handgun in the Yukon.

## II. Search of the Cellphone and *Franks* Hearing (Docket No. 177)

Andrews seeks to suppress any evidence the Government obtained by searching a cell phone taken from Andrews the night he was arrested.[5] *See* Order, May 8, 2019,

---

[5] Andrews also requests an evidentiary hearing on this motion. That request is denied. The cited basis for the hearing was the new bodycam footage relating to the exigent cell phone location information, which was already part of the reopened hearing. "It is within [this Court's] discretion not to hold an evidentiary hearing at all," *United States v. Hardison*, 859 F.3d 585, 589 (8th Cir. 2017) and the Court finds no need to hold an evidentiary hearing on the substance of this particular motion.

at 7-8. After failing to secure Andrews's consent to search the phone, the Government obtained a search warrant. Gov't Ex. 15, Docket No. 200-1. None of the reasons Andrews cites to suppress the search are availing, so his motion to suppress is denied.

First, Andrews argues that that the search of the cell phone must be suppressed because the warrant application, and thus the warrant, relied upon information obtained from the use of the real time cell phone location information (the "exigent pings") to form probable cause. *See United States v. Villa-Gonzalez*, 623 F.3d 526, 535 (8th Cir. 2010) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). The Court has already ruled that officers legally obtained the exigent cell phone location information from T-Mobile. Order, May 8, 2019, at 27-30. As noted above, none of the new evidence Andrews offered during the reopened hearing alters that conclusion.

Next, Andrews contends the supporting affidavit could not support the magistrate judge's finding of probable cause to search the cell phone. When considering such a "four corners" challenge to a warrant affidavit, this Court's duty "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (cleaned up). Probable cause exists when the information "warrant[s] a man of reasonable caution in the belief that an offense has been or is being committed, and that evidence bearing on that offense will be found in the place to be searched." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009) (internal quotations and citations omitted).

Here, the issuing magistrate had such a substantial basis formed by the following facts set forth in the affidavit. By interviewing witnesses and reviewing surveillance video, police identified Andrews as a potential suspect in the shooting at 1711 Plymouth Avenue North, as well as a cell phone number he used. Gov't Ex. 15 at 8-9 (Aff. Supp.

Appl. Warrant ¶¶ 6-7). Police officers then obtained the "exigent ping" order and tracked the phone number to a "particular area of North Minneapolis and began surveillance in the area . . . ." *Id.* at 9 (¶ 7). While conducting surveillance, officers "observed suspects getting into a vehicle" and subsequently stopped the car. *Id.* (¶ 8). Police removed Andrews, who was wearing clothing that matched that of the shooter in the surveillance video, from the backseat and took the cell phone in question from his lap. *Id.* (¶ 9). They also found a handgun under the backseat, and subsequent testing found Andrews's fingerprints on the gun. *Id.* (¶¶ 8, 10). Andrews has previous felony convictions and is prohibited from possessing a firearm. *Id.* (¶ 10). Historical cell site location information placed the cell phone with the phone number used to track Andrews in the area of 1711 Plymouth at the time of the shooting. *Id.* at 10 (¶ 11).

From these facts, the issuing magistrate judge had sufficient information to find probable cause that Andrews had committed a crime and that the cell phone might contain evidence of that crime. Officers found the cell phone with Andrews and in the same vehicle where they found the handgun, and historical cell-site location information placed the cell phone near the shooting at the time it occurred. Thus, the magistrate judge could find at least a fair probability that the cell phone contained evidence, such as communications with the shooting victims or information tending to indicate ownership of the handgun.

Finally, Andrews requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge allegedly false statements or omitted facts in the affidavit. Under *Franks*, a criminal defendant may challenge the validity of a search warrant by showing "(1) that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit; and (2) that the affidavit's remaining

11

content is insufficient to establish probable cause." *United States v. Reinholz*, 245 F.3d 765, 775 (8th Cir. 2001). "This same analysis applies to the omissions of fact." *Id.* Before this Court orders a *Franks* hearing, the defendant must make a "'strong initial showing' of deliberate falsehood or reckless disregard of the truth." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (quoting *United States v. Pennington*, 287 F.3d 739, 743 (8th Cir. 2002)).

Andrews has not satisfied his initial burden to warrant a *Franks* hearing. He has not identified any false statements or omissions in the affidavit, much less made an initial showing regarding their falsity. Rather, Andrews appears to re-raise his argument that the Government needed a warrant to obtain the exigent cell site location information from T-Mobile and seeks the *Franks* hearing as a means of introducing evidence on this issue. Again, the Court has already rejected Andrews's arguments regarding the exigent cell site location information and finds no reason to change its conclusions. Moreover, a *Franks* hearing is not the proper vehicle to consider such a challenge. Andrews's request is denied.

### III.   Inspection of the Blue Tahoe (Docket No. 183)

Andrews's request to inspect the blue 2001 Chevrolet Tahoe and a set of keys that includes a key for the Tahoe is moot. His standby counsel inspected the Tahoe on the same day this particular motion was filed. Gov't's Consolidated Resp. Def.'s Apr. and May 2019 Mots. 5-6, Docket No. 200; Letter to District Judge, May 9, 2019, Attach. 3, Docket No. 192. Given the complications posed by transporting Andrews to inspect the vehicle himself, standby counsel's inspection is sufficient. *Cf. McKaskle v. Wiggins*, 465 U.S. 168, 184 (1984) (holding that a "defendant's Sixth Amendment rights are not violated when a trial judge appoints standby counsel—even over the defendant's

objection—to . . . assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals"). Andrews also had an opportunity to inspect the keys himself. Accordingly, the inspection he sought through his motion has been conducted to the extent practicable and the motion is moot.

## IV.   Motions to Dismiss the Indictment (Docket Nos. 235, 237)

### A.   Speedy Trial (Docket No. 235)

In the first of two motions to dismiss the indictment, Andrews contends that the undersigned violated his rights by not promptly granting two ex parte applications for subpoenas he filed in February and by failing to provide an address for the U.S. Marshals to effectuate service. He contends that the Court's conduct violated both his right to due process and his rights under the Speedy Trial Act.

Andrews's claim that the delayed granting of his subpoena applications violated the Speedy Trial Act is without merit. For various reasons unrelated to the ex parte applications, Andrews's speedy trial clock was stopped for the entire time between February 14, 2019, when the first of the two ex parte applications was filed, and March 28, when the Court granted the two ex parte applications. Mem. Opinion and Order on R&R, App'x A, Dkt. No. 190. Andrews's assertion that the undersigned, despite granting the applications, did not order the Clerk of Court to supply the subpoenas until two months later is without merit. The March 28 order clearly instructs the Clerk of Court to issue the subpoenas. Similarly, Andrews does not support his contention that it is the Court's responsibility to inform him how to effectuate service of his subpoenas.

His claim that this delay violated his right to due process also fails. To show a due process violation, Andrews must establish that the alleged violation resulted in

13

"actual and substantial prejudice to the presentation of his defense." *United States v. Skinner*, 433 F.3d 613, 616 (8th Cir. 2006). Alleged prejudice that is "insubstantial, speculative or premature" does not establish a due process violation. *Id.* at 617. Here, Andrews alleges without any support that the delayed granting of his ex parte application resulted in the loss of phone records from the county jail was "a vitally important piece of the material evidence to support the defendants [sic] motions." Mot. to Dismiss 2, Dkt. No. 235. But, Andrews does not explain how the allegedly lost phone records were potentially exculpatory or otherwise necessary for his defense. Because he has not satisfied his burden of showing actual prejudice, Andrews's motion to dismiss must be denied.

### B. Outrageous Government Conduct (Docket No. 237)

Finally, Andrews argues the indictment against him should be dismissed or, alternatively, all evidence against him be suppressed, under a theory of outrageous government conduct. He contends that the Government has ordered officials at the Sherburne County Jail where he is being held to hold him in conditions that make it impossible for him to mount a defense.

Both the Supreme Court and Eighth Circuit recognize that a court may dismiss an indictment to avoid a Fifth Amendment due process violation if the court finds that the Government has engaged in conduct that "shocks the conscience." *See United States v. Boone*, 437 F.3d 829, 841 (8th Cir. 2006); *United States v. Russell*, 411 U.S. 423, 431-32 (1973). However, dismissal is only appropriate if the conduct at issue "falls within the narrow band of the most intolerable government conduct[,]" *Boone*, 437 F.3d at 841, specifically, "actions 'violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause.'" *United States v.*

14

*Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (quoting *Russell*, 411 U.S. at 432). A claim of outrageous government conduct is an affirmative defense, *id.*, and so Andrews bears the burden of proving such conduct. *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013).

Andrews has not demonstrated that the Government has acted so outrageously so as to require dismissal under the Due Process Clause.[6] The only evidence Andrews offers regarding the conditions of his confinement at Sherburne is his own statements. There is no other evidence that the alleged conditions, which are often vaguely stated, are even occurring. Moreover, Andrews merely "feels [and] believes" that Sherburne County is acting at the behest of the Government. Mot. for Dismissal 2, Docket No. 237. Without a substantiated claim regarding the alleged wrongful behavior and the Government's role in instigating it, the Court cannot dismiss the indictment.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT:

1. The ruling on all of Defendant's prior motions be AFFIRMED.

2. Defendant's Motion to Suppress Evidence from Search of Cellphone and Request for *Franks* Hearing [Dkt. No. 177] be DENIED.

3. Defendant's Pre-Trial Motion to Dismiss Indictment with Prejudice for Loss of Exculpatory Evidence and Violation of the Defendant's 5th and 6th Constitutional Amendments to Due Process and Speedy Trial Act Rights [Dkt. No. 235] be DENIED.

---

[6] Although Andrews argues for suppression of all evidence in the alternative, this Court could find no case where such a remedy was even considered in relation to a claim of outrageous government conduct. Perhaps that is because the effect would be the same as ordering dismissal. In any event, the above analysis applies with equal force to both forms of relief.

15

4. Defendant's Pretrial Motion for Dismissal of Indictment and Suppression of All Evidence for Violation of Due Process and Outrageous Gov Conduct [Dkt. No. 237] be DENIED.

## ORDER

The Court, being duly advised in the premises, upon all the files, records and proceedings herein, now makes and enters the following Order.

IT IS HEREBY ORDERED that Defendant's Motion for Discovery [Dkt. No. 183] is DENIED as moot.

Dated: August 9, 2019                s/David T. Schultz
                                     DAVID T. SCHULTZ
                                     United States Magistrate Judge