## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal File No. 18-CR-149 |
| | (SRN/DTS) |
| Plaintiff, | |
| | |
| v. | ORDER |
| | |
| Norris Deshon Andrews, | |
| | |
| Defendant. | |

---

Norris Deshon Andrews, Sherburne County Jail, 13880 Business Center Dr., Ste. 200, Elk River, MN 55330, *pro se*

Daniel L. Gerdts, 331 Second Ave. S., Ste. 705, Minneapolis, MN, standby counsel for Defendant

Jeffrey Paulsen and Samantha Bates, United States Attorney's Office, 300 South Fourth Street, Ste. 600, Minneapolis, MN 55415, for the Government

---

SUSAN RICHARD NELSON, United States District Judge

Before the Court is Defendant Norris Deshon Andrews' Post-Hearing Response Memorandum (Def.'s Post-Hr'g Mem. [Doc. No. 262].) Defendant, who is self-represented, signed the memorandum on August 7, 2019, and the Clerk of Court filed it on August 12, 2019. The memorandum thus crossed paths with the issuance of the August 9, 2019 Order and Report and Recommendation ("Order & R&R") [Doc. No. 261] filed by Magistrate Judge Schultz. In Defendant's motion for an extension to file objections to the Order & R&R, filed by stand-by counsel, he noted that the Post-Hearing Memorandum did not reach the magistrate judge prior to the issuance of the Order & R&R, and asked that it

be considered in connection with his objections to the Order & R&R. (*See* Def.'s Mot. for Extension [Doc. No. 263].)

Although the Court granted Defendant an extension to August 23, 2019 to file objections, (Aug. 20, 2019 Order [Doc. No. 264]), he did not do so by that date, nor has he filed any since that time. Accordingly, the Court construes his Post-Hearing Memorandum as his Objections to the Order & R&R.

The Order & R&R primarily addressed several of Andrews' prior suppression motions as they related to newly disclosed evidence presented at the reopened suppression hearing. (*See* Order & R&R at 1.) On July 18, 2019, the magistrate judge held the reopened suppression hearing, limited to certain issues. In the Order & R&R, the magistrate judge recommended that the rulings on Andrews' prior motions be affirmed. (*See id.* at 15–16.) Further, he ruled on additional motions that Andrews had filed, seeking either the suppression or inspection of evidence, and the dismissal of the Indictment. (*Id.*) Magistrate Judge Schultz recommended the denial of these motions.

Also before the Court are two motions that Andrews filed on July 31, 2019: (1) "Defendant's Pretrial Motion to Suppress All Evidence from the Stop & Seizure of the G.M.C. Yukon on May 16th 2018 for Lost, Destroyed, and/or Missing Exculpatory Evidence by the Government" [Doc. No. 254]; and (2) "Defendant's Pretrial Motion to Suppress Any and All Evidence from the Stop, Search & Seizure of the G.M.C. Yukon— for Lost and Destroyed Material, *Brady* Evidence" [Doc. No. 255].

For the reasons set forth below, Andrews' Objections are overruled and his additional motions are denied as moot.

## I.    BACKGROUND

The background of this case is presented in detail in the Court's May 8, 2019 Order [Doc. No. 187], and is incorporated by reference here.  Andrews, who is self-represented, is charged with being a felon in possession of a firearm.  (*See* Indictment [Doc. No. 1] at 1.) His trial is scheduled to begin on September 23, 2019. (Order & Trial Notice [Doc. No. 222].)  For purposes of Andrews' Objections, the most relevant facts concern evidence presented at the July 18, 2019 reopened suppression hearing, which is well summarized in the Order & R&R.  The Court addresses these facts in its discussion of Andrews' Objections below.

## II.    DISCUSSION

### A.  Standard of Review

As noted, before the Court are the magistrate judge's recommendations on dispositive motions to suppress evidence or dismiss the Indictment, and his ruling on a non-dispositive motion for discovery.  Different standards of review apply to dispositive and non-dispositive motions.  With respect to the dispositive motions, the district court must undertake an independent, de novo review of those portions of the R&R to which a party objects and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* D. Minn. L.R. 72.2(b)(3).

As to the district court's review of the magistrate judge's decision on non-dispositive motions, such as the motion for discovery here, it is "extremely deferential." *Coons v. BNSF Ry. Co.*, 268 F. Supp. 3d 983, 991 (D. Minn. 2017) (citing *Reko v. Creative*

*Promotions, Inc.*, 70 F. Supp. 2d 1005, 1007 (D. Minn. 1999)).  The Court will reverse

such a ruling only if it is "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A);

Fed. R. Civ. P. 72(a); L.R. 72.2(a).

### B.  Motions Related to the Reopened Suppression Hearing

#### 1.  Scope of the Reopened Suppression Hearing

As a preliminary matter, Andrews continues to object to the fact that the Court

construed his June 9, 2019 letter requesting oral argument on the question of reopening the

suppression hearing as a motion to reopen the suppression hearing.  (*See* Def.'s Post-Hr'g

Mem. at 1–2.)  Previously, he has argued that he merely sought permission to file the

motion and would have included additional grounds for relief in a subsequent filing.  (June

22, 2019 Letter [Doc. No. 227] at 1–4.)

At the May 28, 2019 status conference, the Court informed Andrews that in order to

demonstrate the need for reopening the suppression hearing, he must establish good cause,

based on evidence that was unavailable to him at the prior hearings.  (*See* July 24, 2019

Order at 8.)  In his June 9, 2019 letter, filed approximately two weeks after the May 28,

2019 status conference, he made several substantive arguments in support of his request to

reopen the hearing.  The Court addressed these arguments in the June 19 Order, permitting

the reopening of the suppression hearing on a limited basis.  (June 19, 2019 Order [Doc. No.

224] at 4–8.)  As noted, the reopened hearing was held on July 18, 2019, and lasted over six

hours.[1]  (*See* July 18, 2019 Hr'g Minutes [Doc. No. 242].)  The hearing has now occurred,

---

[1] Andrews claims that the six-hour hearing "ended short" when he "became overwhelmed
with the bias[ed] rulings and unfair limits placed on his evidence." (Def.'s Post-Hr'g

and Andrews' continued objections as to whether this Court properly construed his June 9 letter are moot.

### 2. Factual Information Provided to T-Mobile

Andrews reiterates his objections to minor discrepancies in certain evidence that has been previously entered in the record. This includes: (1) whether the shooting victims' injuries were sufficiently "life-threatening" to justify the exigent circumstances cell phone location information, (Def.'s Post-Hr'g Mem. at 3); (2) whether Sgt. O'Rourke linked Andrews' cell phone number to his name through a Google search or the Zetx system, (*id.*); (3) errors in the addresses provided to T-Mobile, (*id.*); (4) whether the shooter exited his vehicle and shot one of the victims again, (*id.*); and (5) whether the suspect vehicle lacked one license plate or two. (*Id.* at 3–5.) As the Court has previously found, none of this evidence shows that Sgt. O'Rourke deliberately "lied" in order to obtain the exigent cell phone location information from T-Mobile. (May 8, 2019 Order at 28.) To the contrary, the salient facts on which Sgt. O'Rourke relied were borne out by the evidence. (*Id.*)

---

Mem. at 2.) This assertion is utterly unfounded. The transcript reflects Andrews cross examined witnesses and entered several exhibits into evidence during the course of the hearing. (See July 18, 2019 Hr'g Tr. [Doc. No. 252].)

Andrews also faults the magistrate judge, counsel for the Government, and his standby counsel for selecting post-hearing filing deadlines outside of his presence. (Def.'s Post-Hr'g Mem. at 2.) Near the conclusion of the reopened suppression hearing, Andrews demonstrated increasing hostility and disrespect to the Court by directing a string of profanities to the magistrate judge and the legal process. (*See* July 18, 2019 Hr'g Tr. at 202–05.) At that point, and at the magistrate judge's direction, the U.S. Marshals escorted Andrews out of the courtroom. (*Id.*) Following his departure, Magistrate Judge Schultz briefly discussed briefing deadlines with counsel and stand-by counsel. (*Id.* at 205–09.) No substantive issues were discussed, the deadlines were communicated to Andrews, and his Objections are under consideration here. There is no evidence of bias or unfair rulings on the part of the magistrate judge.

Nonetheless, the Court permitted the reopening of the hearing to consider Andrews' position that some of the newly disclosed bodycam videos provided "factual proof that false info was given to T-Mobile on [the] exigent application about Defendant from alleged witnesses." (June 19, 2019 Order at 6.) The bodycam footage in question is from Officers Bauer, (Def. Ex. 100), Hanneman, (Def. Ex. 101), and Gillies (Def. Ex. 103). Despite Andrews' argument that this evidence impeaches or contradicts information provided to T-Mobile, (Post-Hr'g Mem. at 5–6), it does not refute any material facts contained in the officers' reports or provided to T-Mobile.

As the magistrate judge explained, while Officer Bauer states in his report that a witness refused to provide her name or date of birth, it appears that he did not actually ask for that information. (Order & R&R at 3–4.) That is an immaterial discrepancy. Consistent with the video, his report states that he spoke with another witness, who asked to speak off camera. (*Id.*) It is also irrelevant whether this witness is a person previously seen on the video or not. (*Id.* at 4.) Other witnesses provided information to the officers. (*Id.*) The Court thus agrees with the magistrate judge that to the extent Sgt. O'Rourke relied on Officer Bauer's report, the bodycam footage does not discredit that information, nor does it show that Sgt. O'Rourke lied. (*Id.*)

Officer Hanneman's bodycam footage shows his response to a domestic assault call involving Montrel Tyson's girlfriend. (Def. Ex. 101 (Hanneman Bodycam).) The magistrate judge rejected Defendant's argument that this bodycam video demonstrates that Sgt. O'Rourke lied during the September 10, 2018 suppression hearing when he said that Tyson's girlfriend had identified Andrews as the shooter. (Order & R&R at 4–5.) As

Magistrate Judge Schultz notes, when O'Rourke testified about what Tyson's girlfriend stated, he was linking together pieces of the investigation; his application to T-Mobile did not state that Tyson's girlfriend identified Andrews as the shooter. (*Id.* at 5.) Rather, Officer Hanneman's bodycam video demonstrates that officers were independently linking Andrews' cell phone number to the suspected shooter. It does not impugn Sgt. O'Rourke's application to T-Mobile or the development of Andrews as a suspect in the shooting investigation.

Officer Gillies' bodycam footage shows him responding with another officer to the earlier shooting mentioned in Sgt. O'Rourke's T-Mobile application. (Def. Ex. 103 (Gillies Bodycam).) Andrews argues that the video contradicts evidence in Gillies' report and Officer Creighton's report describing the blue Chevy Tahoe—specifically, whether it was missing front license plates or both license plates, whether it was the vehicle from which shots were fired in the earlier shooting, and whether a witness described the Tahoe's passenger or driver. (Def.'s Post-Hr'g Mem. at 6–7.)

The Court agrees with the magistrate judge that Officer Gillies' report, stating that neighbors said the blue Tahoe was parked where the shell casings were found, is supported by the bodycam footage. (Order & R&R at 6.) Although Officer Creighton said that a witness described the Tahoe's passenger, when, in fact, the witness apparently described the driver of a grey van immediately after discussing the occupants of the Tahoe, (*id.*), this discrepancy is not evidence that Officer Creighton lied. (*Id.*) Rather, as the magistrate judge observed, (*id.*), he likely misunderstood the information. The Court agrees that this

minor misconstruction does not discredit the veracity of Sgt. O'Rourke's T-Mobile application.

Andrews further argues that Officer Gillies' bodycam video refers to the blue Chevy Tahoe missing two license plates, whereas the blue Chevy Tahoe in the second shooting was described as missing only the front plate. (Def.'s Post-Hr'g Mem. at 6–7.) This distinction is insignificant. Witnesses may have only seen the vehicle from one vantage point. Importantly, witnesses consistently described the same type of vehicle and indicated that it lacked one or two license plates. Distinctions between the number of missing plates do not impugn the information that Sgt. O'Rourke submitted to T-Mobile to obtain the exigent cell phone location information.

In addition, Andrews states that the bodycam footage from Officer Mattson is apparently unavailable, but were it available, Andrews would have impeached his prior statement. (*Id.* at 6.) The Court rejects Andrews' rank speculation and finds that none of the bodycam footage of any of the officers discredits their reports or the T-Mobile application in any material way.

Relatedly, Andrews again argues that the Government and law enforcement officers have withheld, lost, or selectively disclosed critical evidence and committed prosecutorial misconduct. (*Id.* at 8–9, 16.) There is no basis for Andrews' unfounded claims, nor was this one of the limited subjects that the Court permitted Andrews to address in the reopened suppression hearing. (June 19, 2019 Order at 3) (rejecting governmental or prosecutorial misconduct as a basis for reopening the suppression hearing).

Accordingly, Andrews' grounds of objection concerning the information that officers provided to T-Mobile are overruled.

### 3. Stop of White GMC Yukon

Andrews argues that officers stopped the Yukon without probable cause. This Court previously found probable cause for the stop for two reasons: (1) Officer Pucely observed traffic violations; and (2) he also observed a person who matched the description of the shooting suspect enter the Yukon in the area in which the suspect was believed to be. (May 8, 2019 Order at 30.)

In *Brendlin v. California*, 551 U.S. 249, 255 (2007), the Supreme Court held that a vehicle passenger is "seized" during a traffic stop, and therefore, may challenge the stop itself. However, even minor traffic violations provide sufficient probable cause to support a stop. *United States v. Miller*, 915 F.3d 1207, 1209 (8th Cir. 2019).

Andrews argues that no traffic violations occurred, noting that officers failed to issue traffic citations and failed to identify violations on any bodycam footage. (Def.'s Post-Hr'g Mem. at 18) (citing Def. Ex. 31/50 (Pucely Bodycam); Def. Ex. 32/51 (Pucely Bodycam 2)). The Fourth Amendment does not require that an officer issue a citation for the violations in question, only that the officer has probable cause to believe that traffic violations have occurred. *United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005); *see also United States v. Parks*, 353 Fed. App'x 78, 79 (8th Cir. 2009) (finding stop was lawful where officer issued warning about driving without a rear license plate light, but did not issue a citation or testify about whether the plate was legible from at least 50 feet away); *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996) ("[S]o long as police have

probable cause to believe that a traffic violation has occurred, the stop is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot."). Although Andrews disputes that traffic violations occurred, the Court continues to rely on Officer's Pucely's testimony that he witnessed two traffic violations prior to stopping the Yukon. (May 8, 2019 Order at 30) (citing Sept. 19, 2018 Hr'g Tr. [Doc. No. 62] at 18–19.) There is no evidence suggesting that Sgt. Pucely made contradictory statements or that his testimony was untrustworthy. Further, the Court agrees with Magistrate Judge Schultz that it is unsurprising that officers dispensed with the traffic violations when they encountered suspects involved in two shootings inside the stopped vehicle. (Order & R&R at 9.)

As to the second basis for stopping the vehicle—that Officer Pucely observed a person matching the description of the shooting suspect in the vicinity of the area in which the suspect's phone was located—Andrews primarily attempts to discredit the underlying investigation, arguing that: (1) officers relied on false identifications; (2) the phone pings did not occur; and (3) another officer, not Sgt. O'Rourke, received the cell phone tracking information. (Def.'s Post-Hr'g Mem. at 14–18.) He also argues that probable cause is undermined because officers did not stop the vehicle involved in the shootings, but instead stopped the white Yukon, and no guns or drugs were found before officers ordered that the vehicle be seized and towed. (*Id*. at 20.)

As to the identification of Andrews as a suspect, he argues that none of the newly disclosed bodycam footage shows witnesses identifying Andrews. (*Id*. at 13–16.) The Court has previously addressed the witness identifications in the context of Sgt. O'Rourke's

application for the T-Mobile exigent cell phone location information. (*Supra* at 6–8; Order & R&R at 3–7.) The Court again rejects Defendant's assertion that witnesses gave false information, failed to identify Andrews, or that witness information in officers' reports is contradicted by the bodycam videos in any material way. Whether by cell phone number, nickname, name, or photograph, several witnesses identified Andrews as the shooting suspect mere hours before he was apprehended. (*See, e.g.*, Def. Exs. 2 (T-Mobile Exigent Request & Resp.); 14 (MPD Case Rpt., Creighton Supp. 13); 15 (MPD Case Rpt., Bauer Supp. 9); 100 (Bauer Bodycam); 58 (MPD Full Case Rpt.) at 22; (101 Hanneman Bodycam); 102 (MPD Case Rpt., Gillies Supp. 1); 103 (Gillies Bodycam).)

Andrews' argument that officers "never had the 'phone pings'" or somehow fabricated the location information is also contravened by the record. Sgt. O'Rourke applied to Andrews' cell phone carrier, T-Mobile, for the exigent location information, (Gov't Ex. 3 (T-Mobile Exigent Request)), and has attested to the application's authenticity. (Sept. 10, 2018 Hr'g Tr. [Doc. No. 51] at 15.) The Government also provided a sample of the location information that was generated in accordance with the application, (Gov't Ex. 9 (Email with Location Information)), and offered testimony about how officers used the location information to determine Andrews' location. (Sept. 10, 2018 Hr'g Tr. at 20–22.)

Andrews suggests that Sgt. Pucely was patrolling the area to look for general gang or drug-related activity—not to look for the shooting suspect—and thus had no reason, beyond a "hunch" or "fishing expedition," to stop the Yukon. (*See* Def.'s Post-Hr'g Mem. at 16–17.) "Any traffic stop is constitutional, no matter the officer's actual motive, so long as the officer had probable cause to believe that a traffic violation actually occurred." *United*

*States v. Long*, 320 F.3d 795, 798 (8th Cir. 2003) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Sgt. Pucely testified that he observed firsthand the driver of the Yukon fail to signal and fail to come to a complete stop at a stop sign. (Sept. 19, 2018 Hr'g Tr. at 18–19.) Sgt. Pucely had probable cause to believe that a traffic violation had actually occurred, and there is no evidence to the contrary.

In his Objections, Andrews also relies on certain comments made by Officer Schroeder, captured on his bodycam, to argue that the stop was made without probable cause. He first points to Officer Schroeder's comment to another officer that Sgt. Pucely saw two men running from a house into the SUV. (*Id.* at 17) Andrews asserts that "two dudes running from a house is not a traffic violation." (*Id.*) (citing Def. Ex. 105 (Schroeder Bodycam)). But the Government has never contended that such actions constituted a traffic violation. Again, Sgt. Pucely observed a failure to signal and a failure to come to a complete stop. (Sept. 19, 2018 Hr'g Tr. at 18–19.)

Moreover, the context of Officer Schroeder's full bodycam footage bolsters the Government's position on the legality of the stop and search. Officer Schroeder explains that he was in the area, working with an informant to try to locate the shooting suspects, when Sgt. Pucely informed him that he saw two suspects run from a house into a white vehicle. (Def. Ex. 105 (Schroeder Bodycam).) Upon receiving that information, Officer Schroeder abandoned the informant in an alley and immediately proceeded to the scene of the traffic stop to provide backup. (*Id.*) His comments support Sgt. Pucely's testimony. Within a short time of the shooting at the apartment parking lot, multiple witnesses identified Andrews by name, nickname, phone number, or photograph as the shooter.

Shortly thereafter, Sgt. O'Rourke successfully applied to obtain exigent cell phone location information for Andrews. Later that same day, multiple officers, including Sgt. Pucely and Officer Schroeder, were looking for Andrews in an area consistent with his cell phone tracking information. Sgt. Pucely observed the white Yukon suspiciously drive by twice, which suggested to Sgt. Pucely that the driver was looking for someone. (Oct. 5, 2018 Hr'g Tr. [Doc. No. 69] at 15–16.) After the Yukon parked, Sgt. Pucely observed two men run to the vehicle and get inside. (*Id.* at 16–18.) One of the men matched the general description of the shooting suspect, based on similarities in build and hairstyle. (*Id.* at 18, 36.) Independent of the traffic violations, Officer Pucely had probable cause to stop the Yukon based on these observations, his knowledge of the shooting investigation, and the collective knowledge of the investigating officers.

Andrews also points to another of Officer Schroeder's comments, in which he discusses the stop with another officer, stating that "710 was tracking the [suspect's] phone." (Def.'s Post-Hr'g Mem. at 17) (citing Def. Ex. 105 (Schroeder Bodycam)). Andrews contends that "710 is not Sgt. Kelly O'Rourke" because O'Rourke was purportedly assigned to "car 743" on the night in question. (*Id.*; *see also* Def. Ex. 32 (Pucely Bodycam 2).) Andrews appears to argue that Schroeder's comment contradicts Sgt. O'Rourke's previous testimony that he was personally tracking the suspect's location on May 15, 2018. (Def.'s Post-Hr'g Mem. at 17.) The Court rejects this argument. At the reopened suppression hearing, Sgt. Pucely testified to his understanding that "710" is a Minneapolis Police Department term used to denote the rotating on-duty detective or detective sergeant. (July 18, 2019 Hr'g Tr. at 138–39.) His understanding was that "710"

referred to Sgt. O'Rourke, who was the on-duty detective sergeant that night. (*Id.*) This comment does not impeach Sgt. O'Rourke's prior testimony.[2]

Finally, Andrews' arguments that officers stopped a different vehicle than the one involved in the shootings, and no guns or drugs were found before officers ordered that the vehicle be seized and towed, (Def.'s Post-Hr'g Mem. at 20), also fail. While officers were looking for a blue Chevy Tahoe, they were also tracking the suspect's cell phone location. Sgt. Pucely observed Defendant, who matched the shooting suspect's description and was in the vicinity of the cell phone tracking information, run to the Yukon and get inside. Officers had ample probable cause to stop the Yukon. Moreover, officers had reason to search and seize the Yukon once they found the shooting suspect as a passenger in the vehicle, as the Court discusses further below.

### 4. Standing to Challenge Search of the GMC Yukon

Andrews previously challenged the search of the white GMC Yukon from which he was removed and taken to the police station. The Court denied his motion challenging the

---

[2] Further, as the Government notes, even if "710" somehow denoted a different officer, it nonetheless establishes that someone in the Minneapolis Police Department was tracking Andrews' phone on May 15, 2018, refuting Andrews' argument that no tracking information existed. (*See* Gov't's Post-Hr'g Mem. [Doc. No. 259] at 6.) Andrews seizes upon this alternative argument, essentially characterizing it as an admission that Sgt. O'Rourke was not, in fact, the officer tracking Andrews' phone, noting the Government's use of the phrase "even if." (Def.'s Post-Hr'g Mem. at 18) (stating, "That comment in itself should be enough to show you the lengths the Gov't will do to frame the defendant!") Andrews argues that this demonstrates that the Government has framed him and its evidence is false. (*Id.* at 18–19.) Andrews' argument is without merit. First, the Court finds Sgt. Pucely's testimony credible that "710" refers to the investigating officer on duty. Second, the Government's hypothetical, alternative legal argument does not support Andrews' speculative claims of police misconduct or fabricated evidence. Rather, it lends greater support to the Government's position.

constitutionality of the search, finding that he lacked standing, and, even if he had standing, the stop and search of the vehicle were both proper. (May 8, 2019 Order at 32–33.)

With respect to Andrews' motion to reopen the suppression hearing, the Court held that to the extent Andrews possessed newly disclosed evidence bearing on the ownership of the Yukon, he could present it at the reopened hearing. (June 19, 2019 Order at 5.) However, the Court cautioned that unless other newly disclosed evidence supported his claim of an unlawful stop and seizure, his motion to suppress would fail because the Court had previously found that even if he had standing, the search was lawful. (*Id.*)

A person asserting a Fourth Amendment right must demonstrate that he had a reasonable expectation of privacy in the place searched, and that his expectation was reasonable. *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004). "The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search." *United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) (internal quotation marks omitted). In general, a passenger does not have standing to challenge a vehicle search where he has "'neither a property nor possessory interest in the automobile.'"[3] *Id.* (quoting *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015)). A "'defendant must present at least some evidence of consent or permission from the lawful owner/reenter [of the vehicle] to give rise to an objectively

---

[3] Andrews relies on *Brendlin v. California* to support his standing to challenge the stop. (*See* Def.'s Post-Hr'g Mem. at 19.) The Court simply notes that while *Brendlin* permits a passenger to challenge the stop itself and his individual seizure, 551 U.S. at 255, it does not pertain to the *search* of the vehicle. *United States v. Guzman*, 454 Fed. App'x 531, 534 (8th Cir. 2012) (discussing *Brendlin*).

reasonable expectation of privacy'" in the vehicle. *Russell*, 847 F.3d at 619 (quoting *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995)). In *Russell*, the Eighth Circuit ruled that because the defendant failed to provide evidence that his girlfriend, the renter of the vehicle in question, allowed him to drive the vehicle or exercise any possessory control over it, he lacked standing to challenge the search. *Id.*; *cf. United States v. Bettis*, No. 17-cr-48 (WMW/TNL), 2017 WL 3382312, at *2–3 (D. Minn. Aug. 7, 2017) (finding that defendant had standing to challenge rental car's search based on his wife's testimony that she gave him permission to use the car).

The Minnesota Department of Public Safety, Driver and Vehicle Services, lists "Sunny Day Welch" as the owner of the vehicle. (Gov't Ex. 16 (Rpt. of Investig.).)[4] In his Objections, Andrews provides a complicated account of the vehicle's ownership history, and claims that pending liens impacted the process of transferring title. (Def.'s Post-Hr'g Mem. at 10–13.) Andrews states that Welch was a longtime family friend from whom

---

[4] In the Order & R&R, the magistrate judge accepted into the record a report prepared by ATF Special Agent David Voth concerning his research on the ownership of the Yukon. (Order & R&R at 7 n.4) (discussing Gov't Ex. 16). The Government attached Agent Voth's report [Doc. No. 259-1] to its post-hearing memorandum. Andrews had called Voth as a witness at the reopened suppression hearing. (Gov't's Post-Hr'g Mem. at 5–6.) However, due to the witness's prior commitment, the hearing ended before the Government could cross-examine Special Agent Voth. (*Id.*) Also, because of Andrews' conduct near the conclusion of the hearing, the proceedings ended before the Government could offer the report in evidence. (*Id.*) Under these circumstances, the magistrate judge properly considered Special Agent Voth's report.

In the Government's post-hearing memorandum, it mistakenly referred to Agent Voth's report as "Government Exhibit 15." Because the Government had previously submitted an exhibit with that number, the magistrate judge referred to the report as Government Exhibit 16 (Order & R&R at 7 n.4), which the Court adopts here.

Andrews agreed to purchase the Yukon. (*Id.* at 12.) As an attachment to his Objections, Andrews provides vehicle-related documents, some of which appear to show that in the past, Andrews had obtained other cars from other members of the Welch family.[5] (*Id.*, Attach. 1 [Doc. No. 262-3] (Vehicle-Related Papers).) However, before Andrews could finalize arrangements with Sunny Day Welch to transfer title, Andrews asserts, he lost contact with Welch and was indicted on the instant charge. (Def.'s Post-Hr'g Mem. at 12.) Unbeknownst to Andrews, Welch died in March 2018. (Gov't Ex. 16 (Rpt. of Investig.) at 3.)

At some point after officers had seized and towed the Yukon, a man named Larry Charles Smith attempted to obtain its release from the towing company. (Id. at 1–2.) He was unsuccessful, as he could not provide the necessary title documents. (*Id.*) Ultimately, Rebecca Welch, a sister of Sunny Day Welch, presented the necessary paperwork to obtain the vehicle, and is, to the Court's knowledge, the last known person to legally possess it. (*Id.* at 2.)

At the reopened hearing, Andrews submitted an affidavit from Rachelle Faith Hawkins. (Def. Ex. 104 (Hawkins Aff.).) Hawkins, who was the driver of the Yukon at the time of the stop,[6] appears to suggest that Andrews was the Yukon's owner and had allowed

---

[5] The Court observes that among the documentation in Defendant's attachment purportedly showing that Andrews "buy[s] and sell[s] a lot of cars and ha[s] multiple vehicles," (Def.'s Post-Hr'g Mem. at 11), is a City of Minneapolis ticket for the towing of a 2001 blue Chevy Tahoe—the vehicle involved in the shootings. (*Id.*, Attach. 1 (Vehicle-Related Papers) at 9.)

[6] Hawkins admits that she falsely identified herself as Dominique Smith at that time. (Def. Ex. 104 (Hawkins Aff.) at 1.)

her to use the vehicle.  (*Id.* at 1)  In her affidavit, she omits the crucial verb regarding ownership, stating, "The truck to [sic] Norris at the time, He was allowing me to use if [sic] for school and work."  (*Id.*)  The Government objected to the Court's consideration of the Hawkins Affidavit, arguing that it was both inadmissible hearsay and not newly discovered evidence.  (Gov't's Post-Hr'g Mem. [Doc. No. 259] at 4.)  The Government recently interviewed Ms. Hawkins, (*see* Gov't Ex. 16 (Rpt. of Investig.) at 2), and asserts that Hawkins acknowledged that she did not write the affidavit, but met with one of Andrews' friends, who presented it to her and asked her to sign it.  (Gov't's Post-Hr'g Mem. at 4.)  Although the magistrate judge considered the Hawkins Affidavit, he gave greater weight to the vehicle records.[7]  (Order & R&R at 8.)  Those records do not identify Andrews or Hawkins as the Yukon's owner.

As he has previously argued, Andrews points to the police report's description of non-inventoried property, which lists him as the owner of the Yukon.  (Def. Ex. 33 (MPD Case Rpt. with Supps.) at 00000010.)  But the entry on the police form is not legal indicia of ownership, and the Court agrees with the magistrate judge that no title documents identify Andrews as the Yukon's owner.[8]  Nor is there any evidence from the legal owner of the

---

[7] The Court agrees with the magistrate judge's findings and notes that some of Ms. Hawkins' statements are contradicted by other evidence in the record.  For example, she states in her affidavit, "It should be noted that I was never even told why I was pulled over."  (Def. Ex. 104 (Hawkins Aff.) at 1.)  But in bodycam footage from Officer Schroeder, he removes her from the Yukon and informs her that the passengers in the Yukon were involved in a shooting earlier that day, "so that's why we're here."  (Def. Ex. 105 (Schroeder Bodycam) at 00:49–00:55.)

[8] Andrews contends that documents supporting his claim of ownership of the Yukon were located in the Yukon and in the blue Chevy Tahoe, and law enforcement officers lost or

Yukon as to Andrews' possessory interest in the vehicle. *Russell*, 847 F.3d at 618–19. While Andrews argues that the Court refused to permit Ms. Hawkins to testify at the reopened hearing, (Def.'s Post-Hr'g Mem. at 8), there is no dispute that Ms. Hawkins was not the owner of the vehicle. Because she was not the owner, she could not attest that Andrews held any possessory interest in the Yukon. In short, there is no evidence of consent or permission from the lawful owner of the Yukon to permit an objectively reasonable expectation of privacy in the vehicle on Andrews' part. *Russell*, 847 F.3d at 618–19.

### 5. Search of the Yukon

Moreover, as this Court highlighted when it permitted the reopening of the suppression hearing on a limited basis, even if Andrews had standing, in order to suppress evidence resulting from the search of the Yukon, he would have to identify newly disclosed evidence to alter the Court's prior conclusion that officers had probable cause to stop the Yukon. (June 19, 2019 Order at 5.) He has failed to do so. For the reasons noted earlier, (*supra* at 8–14), the stop was fully supported by probable cause, and, as this Court previously held, officers conducted the search pursuant to the automobile exception to the warrant requirement. (May 8, 2019 Order at 32–33.) Under the automobile exception,

---

destroyed them. (Def.'s Post-Hr'g Mem. at 11, 13.) He asserts that bodycam footage from Officer Owen's search of the Yukon shows the title and bill of sale in the vehicle. (*Id.* at 13) (citing Def. Ex. 108 (Owen Bodycam)). The Court has reviewed the video, including the portion showing the search of documents found in the vehicle's console. (*See* Def. Ex. 108 (Owen Bodycam) at 2:07–2:13.) Not only is it impossible to read the documents, they appear to be the approximate size and shape of traffic citations—far narrower than an 8 ½ x 11 document. Moreover, despite Andrews' frequent accusations that the Government has destroyed evidence, nothing credibly supports his claims, nor does this video show any such conduct.

"officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the car contains contraband or other evidence." *United States v. Edwards*, 891 F.3d 708, 712 (8th Cir. 2018) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)). The reason for this exception lies in the lower expectation of privacy in vehicles and their unique mobility. *California v. Carney*, 471 U.S. 386, 390–91 (1985). Prior to the search here, as discussed above, the officers had probable cause to believe that the car contained a gun based on their reasonable belief that Andrews had been involved in two shootings only hours earlier, combined with Andrews' furtive movements at the time of the stop. (*See* Oct. 5, 2018 Hr'g Tr. at 159–60.)

Andrews argues that the search cannot be characterized as a search incident to arrest, because officers failed to uniformly inform the occupants of the vehicle that they were under arrest, creating ambiguity. (Def.'s Post-Hr'g Mem. at 21–22) (*comparing* Def. Exs. 31/51 (Pucely Bodycam 1), 32/52 (Pucely Bodycam 2) *with* Def. Ex. 105 (Schroeder Bodycam).) The Court has never ruled on the lawfulness of the search on this basis; rather, the Court found it was lawful under the automobile exception. (May 8, 2019 Order at 32–33.) This ground of objection is moot.

Similarly, Andrews argues that this was not a lawful search for purposes of officer safety, as all of the occupants of the Yukon were outside the vehicle and/or in police cars, and unable to reach for a weapon or contraband. (Def.'s Post-Hr'g Mem. at 22.) Because the Court has never ruled that the search was lawful on grounds of officer safety, this ground of objection is moot.

Andrews also argues that the search of the vehicle was not a lawful inventory search. He notes that Officer Pucely told officers at the scene of the stop to "inventory search it and let me know if there's anything [Sgt. O'Rourke] needs to know about," but officers failed to follow proper procedure by completing an inventory sheet. (*Id.* at 20) (citing Def. Ex. 108 (Owen Bodycam).) While Sgt. Pucely used the phrase "inventory search," the Court has found the search was proper under the automobile exception to the warrant requirement.[9] (May 8, 2019 Order at 32–33.) Because the Court did not rule on the lawfulness of the search as an inventory search, this objection is moot.

### 6. Additional Objections

Defendant also asserts that his Fourth Amendment rights were violated because he was held for longer than warranted for a traffic violation.[10] (Def.'s Post-Hr'g Mem. at 19.) In *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015), the Supreme Court noted that where a police-observed traffic violation forms the *only* basis for the seizure, the seizure "becomes unlawful if it is prolonged beyond the time reasonably required to complete the

---

[9] The search of the Yukon was not an inventory search. Nor does Sgt. Pucely's use of the phrase "inventory search" transform it into one. An inventory search is the search of a lawfully impounded vehicle without a warrant or probable cause, and is done to protect the owner's property while the vehicle is in police custody, protect the police against property claims, and protect the police from possible danger. *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) (citations omitted). The Yukon, however, was lawfully searched on-site, based on probable cause that it contained the shooter's gun and contraband. (May 8, 2019 Order at 32–33.)

[10] Andrews also argues that there was no probable cause for officers to detain the female driver of the vehicle, as she was not tied to the shooting investigation, and she could have instead retained possession of the Yukon and driven away. (Def.'s Post-Hr'g Mem. at 21.) Andrews has no standing to challenge the detention of the other occupants of the Yukon. *See Barragan*, 379 F.3d at 529 ("Fourth Amendment rights are personal rights that may not be asserted vicariously.")

mission of issuing a ticket for the violation.") (citation omitted). Consistent with *Rodriguez*, in *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 1602 (2018), the Eighth Circuit found no Fourth Amendment violation where a state trooper pulled over the defendant's car due to overly tinted windows *and* also based on information from a confidential informant that the vehicle contained cocaine. The Eighth Circuit agreed with the district court that even though the trooper cited overly tinted windows as the basis for the stop, "the probable cause that already existed from the CI's information was enough in this case." *Id.* at 628–29.

Here, Defendant's seizure was supported by much more than just Sgt. Pucely's observed traffic violations. Like the defendant in *Rowe*, Andrews' preoccupation with the traffic stop is misplaced. As the Eighth Circuit explained,

> The error in Rowe's argument is his focus on the fact that [the trooper] effectuated an investigatory stop based only on the excessive window tint. The stop was not unconstitutionally expanded given that the entire basis for the stop was the drug interdiction, despite the trooper's alternate reasoning offered. Rowe's argument that the officers exceeded the scope of their authority and thus converted the seizure into a de facto arrest is inapposite.[11]

*Id.* at 629. For the reasons discussed earlier, there was probable cause here to believe that Andrews was the shooting suspect and likely possessed the gun involved in the two shootings earlier that day. Officers knew of his general whereabouts based on the exigent cell phone location information and Sgt. Pucely observed Defendant, who matched the

---

[11] Furthermore, the Eighth Circuit found there was probable cause to arrest the defendant that night, even though he was not arrested at that time, because he was the sole occupant in a vehicle that was likely transporting a large quantity of cocaine. *Rowe*, 878 F.3d at 629. The court thus found that "any arrest that might have occurred was not unlawful and was warranted on these facts." *Id.* (citing *United States v. Guevara*, 731 F.3d 824, 831–32 (8th Cir. 2013)).

description of the shooting suspect, run to the Yukon and enter it, in the cell phone tracking area. Even Andrews acknowledges that he and Tyson "may have been wanted for questioning in connection with the O'Rourke case investigation." (Def.'s Post-Hr'g Mem. at 21.) Probable cause supported the stop, search, and seizures here. *Rowe*, 878 F.3d at 628–29.

Andrews also challenges the level of Sgt. Pucely's knowledge of the investigation at the time of the stop, arguing that Pucely did not know the suspect's name or what charges he might face, and therefore, presumably lacked probable cause to effect the stop or detain him. (Def.'s Post-Hr'g Mem. at 22.) As "proof" that there were no grounds to detain him or arrest him at the scene, Andrews points to a conversation captured on Officer Schroeder's bodycam video in which Officer Schroeder purportedly "has to inform [Sgt.] Pucely of who the defendant and Tyson was." (*Id.* at 22–23) (citing Def. Ex. 105 (Schroeder Bodycam).) First, the Court is uncertain as to whether it is Sgt. Pucely with whom Officer Schroeder is speaking near the end of the video, in response to a question from the other officer. But furthermore, Officer Schroeder appears to refer to the *other* passenger in the Yukon, Tyson, stating, "That's the second guy that was involved today." (Def. Ex. 105 (Schroeder Bodycam) at 1:39–1:46.)

Similarly, Andrews notes officers' discussions, in which they ask each other for Andrews' name. (Def.'s Post-Hr'g Mem. at 23) (citing Def. Ex. 32/51 (Pucely Bodycam 2) at 2:55, 3:10, 22:25.) He also asserts that when he asked Officer Pucely why he was being questioned, Pucely responded, "I don't know." (*Id.*) (citing Def. Ex. 51 (Pucely Bodycam 2).) Andrews argues that this evidence undercuts the Government's evidence that Sgt.

Pucely was working closely with Sgt. O'Rourke, had viewed Andrews' booking photo, and had been looking for the shooting suspect for several hours. (*Id.* at 22–23.)

Probable cause for the stop and search of a vehicle "may be based on the collective knowledge of all law enforcement officers involved in the investigation and need not be based solely upon information within knowledge of the officer(s) on the scene if there is some degree of communication." *Rowe*, 878 F.3d at 628 (citing *United States v. Shackleford*, 830 F.3d 751, 753–54 (8th Cir. 2016)). As noted, investigating officers had evidence identifying Andrews as the shooting suspect and information that led them to an area where they believed Andrews was located. The officers, including Sgt. Pucely and Officer Schroeder, were in communication with each other and in contact with Sgt. O'Rourke, who was leading the investigation. (*See, e.g*., Def. Ex. 105 (Schroeder Bodycam) at 1:14–1:35; Oct. 5, 2018 Hr'g Tr. at 13, 19–20, 57, 70, 157.) Officer Schroeder assisted in the stop of the Yukon, and other officers appeared on the scene as well. (*See* Def. Ex. 105 (Schroeder Bodycam).) Given the rapidly unfolding events and the presence of multiple officers, it is hardly surprising that officers possessed varying individual levels of knowledge about the investigation, and informed each other about the underlying events and identities of the suspects. While Sgt. Pucely took part in the investigation, he followed Sgt. O'Rourke's directive to bring Andrews in for questioning, and may not have known all of the bases for which he would be questioned.

The evidence clearly shows that the officers were in communication with each other and their collective knowledge sufficiently provided probable cause for the stop, search, and seizure of the Yukon. *Rowe*, 878 F.3d at 628. Moreover, there was probable

cause to detain and arrest Andrews, regardless of whether he was officially arrested or not. Officers have probable cause to arrest "when, considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *Edwards*, 891 F.3d at 711 (citing *United States v. Velazquez–Rivera*, 366 F.3d 661, 664 (8th Cir. 2004)). This standard is "not a high bar," requiring just "a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (citing *District of Columbia v. Wesby*, __U.S. __, 138 S. Ct. 577, 586 (2018)). In light of the circumstances of the rapidly developing investigation here, unfolding within hours of the shootings—including witness identifications of Andrews as the shooter, Andrews' cell phone location information, the security camera video from the apartment parking lot shooting, Andrews' booking photos, and the resemblance between Andrews and the shooting suspect depicted in the security video—officers had trustworthy information sufficient to lead a prudent person to believe that Andrews had committed a crime.

### C. Cell Phone Evidence and *Franks* Hearing

In the Order & R&R, the magistrate judge also considered Andrews' motion to suppress any evidence that the Government obtained by searching his cellphone [Doc. No. 177]. (Order & R&R at 9.) Magistrate Judge Schultz noted the following: (1) the Court's prior finding that officers legally obtained the exigent cell phone location information; (2) the warrant for the search of the cell phone was issued based on sufficient indicia of probable cause in the application; and (3) officers did not knowingly and intentionally, or with reckless disregard for the truth, include any false statements or omitted facts in the

affidavit.  (*Id.* at 11) (citing Gov't Ex. 15 [Doc. No. 200-1 (Cell Phone Warrant & Application).)  Accordingly, he denied Defendant's motion.  (*Id.*)

It does not appear that Andrews objects to this portion of the Order & R&R.[12] Although the Court need not address portions of the ruling to which Andrews fails to object, even if he did object, the Court agrees with the magistrate judge's findings and recommendations that the issuing magistrate judge had a substantial basis for concluding that probable cause existed to search Andrews' cell phone.  *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983).  Accordingly, the Court likewise agrees with Magistrate Judge Schultz that Andrews is not entitled to a hearing to challenge allegedly false or omitted facts in the affidavit, pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  He failed to meet his burden to identify any such statements or omissions and the Court denies his motion.

### D.  Motions to Dismiss the Indictment

#### 1.  Speedy Trial

In response to Andrews' motion to dismiss the Indictment on speedy trial grounds [Doc. No. 235], Magistrate Judge Schultz found that the delay in granting Defendant's subpoena applications did not violate Andrews' rights under the Speedy Trial Act or under the Due Process Clause.  (Order & R&R at 13–14.)  Andrews does not appear to challenge this in his Objections; therefore, the Court is not obliged to address it.  However, even if he did, the Court agrees with the magistrate judge's findings and recommendation.  There was

---

[12] Nor does Andrews address his claim that officers "planted" the firearm in the Yukon— a subject that was within the limited scope of the reopened suppression hearing.  The Court has reviewed the bodycam footage and agrees with Magistrate Judge Schultz that no evidence supports Andrews' allegation.  (*See* Order & R&R at 9.)

no violation of the Speedy Trial Act, as the speedy trial clock stopped for the time between when the first of the two applications was filed, and when the magistrate judge granted the second one. (*Id.* at 13.) Andrews' suggestion that the magistrate judge failed to properly instruct the Clerk of Court to issue the subpoenas is without merit.

Further, Andrews has failed to establish that the alleged violation resulted in "actual and substantial prejudice to the presentation of his defense." *United States v. Skinner*, 433 F.3d 613, 616 (8th Cir. 2006). While Andrews referred to lost phone records from the county jail, he failed to "explain how the allegedly lost phone records were potentially exculpatory or otherwise necessary for his defense." (Order & R&R at 14.) This motion is denied.

### 2. Outrageous Government Conduct

With respect to Andrews' motion to dismiss the Indictment, or, in the alternative, suppress all evidence against him based on outrageous government conduct [Doc. No. 237], Magistrate Judge Schultz recommended that the motion be denied. (Order & R&R at 14–15.) Although Andrews refers to government misconduct at various points in his Objections, the basis for his motion involves conditions and treatment at the Sherburne County Fail, where he is currently serving pretrial detention. His Objections do not appear to address these allegations; therefore, the Court need not address them.

In any event, the Court finds no grounds to award Andrews relief. As the magistrate judge observed, under the Fifth Amendment, a court may dismiss an indictment if the government's conduct "shocks the conscience." *See United States v. Boone*, 437 F.3d 829, 841 (8th Cir. 2006). However, dismissal is proper only if the conduct "falls within the

'narrow band' of the 'most intolerable government conduct.'" *Id.* (quoting *United States v. Pardue*, 983 F.2d 843, 847 (8th Cir. 1993)). That "narrow band" of conduct is reserved for "actions 'violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause.'" *United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). In the 2016 *Combs* decision, the Eighth Circuit observed, at that time, that only two reported court of appeals decisions, both dating from the 1970s, have found government conduct so outrageous as to violate due process. *Id.* (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) (involving a defendant who was approached by a DEA informant about building a methamphetamine factory, for which the government supplied all of the materials and land, while the defendant incurred no cost in building the factory, was subordinate to the informant, and did not know how to manufacture methamphetamine); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971) (concerning defendants who were encouraged by an undercover agent to resume a discontinued bootlegging operation, were provided the necessary materials, and were threatened by agents to accelerate production, and the agents served as the defendants' only customer)). These cases involve government actors who actively encouraged defendants to engage in unlawful activity, well beyond constitutionally permissible investigative methods such as sting operations or the infiltration of a criminal enterprise. *Id.*

Andrews, who bears the burden of proving outrageous conduct, *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013), fails to identify any such conduct here. Rather, he cites conditions and treatment at the Sherburne County Jail, which he "feels [and]

believes" are directed by the counsel for the Government and the U.S. Marshals Service. (Order & R&R at 15) (citing Def.'s Mot. for Dismissal at 2). He asserts that officials at the Sherburne County Jail, with the involvement of counsel for the Government and the U.S. Marshals Service, are impeding his access to the courts by placing him in medical segregation after a leg injury healed and denying him access to the law library, among other things. (Def.'s Mot. to Dismiss at 1–2.) As to legal access, however, Andrews has rejected the services of appointed counsel, he has the assistance of standby counsel, and he has received several extensions to deadlines, including an extension of the trial date. *See Stanko v. Patton*, 568 F. Supp. 2d 1061, 1076 (D. Neb. 2008) (finding access to the courts claim failed where detainee refused appointed counsel and proceeded pro se, was provided with standby counsel, and was not actually injured)*, aff'd*, 357 Fed. App'x 738 (8th Cir. 2009), *cert. denied,* 560 U.S. 956 (2010). No evidence supports Defendant's allegation of the involvement of counsel for the Government or the U.S. Marshals concerning Andrews' access to legal resources, nor has he shown an actual injury. The docket in this case reflects Andrews' ability to access legal resources and represent himself, as he has filed numerous pro se motions and represented himself at motions hearings.

With respect to segregation, Andrews' broken leg and subsequent treatment appear to have prompted his placement in medical segregation. Not only is there no evidence of the involvement of counsel for the Government or the U.S. Marshals with respect to his cell placement at the Sherburne County Jail, placement in segregation for medical reasons is reasonably related to legitimate penological interests. *See Lewis v. Casey*, 518 U.S. 343, 361 (1996).

In sum, Andrews has failed to demonstrate that the Government has acted so outrageously as to require dismissal of the Indictment.

### D. July 31, 2019 Motions to Suppress Evidence Seized from the Yukon

Also before the Court are two additional motions in which Andrews seeks to suppress evidence from the Yukon on the grounds that the Government lost and destroyed *Brady* evidence [Doc. No. 254 & 255]. These motions, filed on July 31, 2019, are untimely and were filed without leave of Court. In any event, Andrews has previously asserted these arguments, on multiple occasions, and the Court has rejected them. (May 8, 2019 Order at 48.) Accordingly, the motions are denied as moot.

### E. Discovery Order

Andrews does not appear to challenge magistrate judge's ruling concerning the inspection of the blue Tahoe. Because his standby counsel has now inspected the blue Tahoe, the magistrate judge denied his motion [Doc. No. 183] as moot. Even if Andrews had objected to the magistrate judge's ruling, the Court finds no clear error in it.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1. Defendant's Objections, construed in his Post-Hearing Memorandum [Doc. No. 262] to the August 9, 2019 Order & R&R, are **OVERRULED**;

2. The August 9, 2019 Order & R&R [Doc. No. 261] is **AFFIRMED** and **ADOPTED**;

3. The rulings on Defendant's prior motions are **AFFIRMED**;

4. Defendant's Motion to Suppress Evidence from the Search of Cellphone and Request for *Franks* Hearing [Doc. No. 177] is **DENIED**;

5. Defendant's Pre-Trial Motion to Dismiss Indictment with Prejudice for Loss of Exculpatory Evidence and Violation of the Defendant's 5th and 6th Constitutional

Amendments to Due Process and Speedy Trial Act Rights [Doc. No. 235] is **DENIED**;

6.  Defendant's Pretrial Motion for Dismissal of Indictment and Suppression of All Evidence for Violation of Due Process and Outrageous Gov[ernment] Conduct [Doc. No. 237] is **DENIED**;

7.  Defendant's Pretrial Motion to Suppress All Evidence from the Stop & Seizure of the G.M.C. Yukon on May 16th 2018 for Lost, Destroyed, and/or Missing Exculpatory Evidence by the Government [Doc. No. 254] is **DENIED as MOOT**; and

8.  Defendant's Pretrial Motion to Suppress Any and All Evidence from the Stop, Search & Seizure of the G.M.C. Yukon—for Lost and Destroyed Material, *Brady* Evidence" [Doc. No. 255] is **DENIED as MOOT**.

Dated: September 3, 2019                    s/Susan Richard Nelson
                                            SUSAN RICHARD NELSON
                                            United States District Judge