# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal File No. 18-CR-149 (SRN/DTS) |
| Plaintiff, | |
| v. | SENTENCING OPINION |
| Norris Deshon Andrews, | |
| Defendant. | |

---

Jeffrey Paulsen and Samantha Bates, United States Attorney's Office, 300 South Fourth Street, Ste. 600, Minneapolis, MN 55415, for the Government

Daniel L. Gerdts, 331 Second Ave. S., Ste. 705, Minneapolis, MN, for Defendant Norris Deshon Andrews

---

SUSAN RICHARD NELSON, United States District Judge

On March 16, 2020, this Court sentenced Defendant Norris Deshon Andrews ("Andrews") based on his recent federal conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) and 924(e)(1). (*See* Oct. 4, 2019 Court Minutes [Doc. No. 289].) Andrews represented himself at the nine-day jury trial, accompanied by his standby counsel, Daniel Gerdts.[1] On October 4, 2019, the jury found Andrews guilty of being a felon in possession of a firearm, in violation of § 922(g).

---

[1] Following his conviction, Andrews requested that Mr. Gerdts be appointed to represent him. The Court granted that request. Mr. Gerdts currently represents Andrews, and represented him at sentencing.

## I.      BACKGROUND

Prior to Andrews' sentencing, U.S. Probation prepared the Presentence Investigation Report ("PSR") [Doc. No. 308].   Andrews' objections to the PSR included the following: (1) any statement or implication of his actual guilt for the offense of conviction or the underlying shootings; (2) the assertion that the firearm in question had been stolen from a Minnesota resident in March 2018; (3) assertions suggesting that he committed any impropriety by claiming to own the GMC Yukon involved in the case; (4) the conclusion that he willfully attempted to obstruct justice based on these facts; (5) that he committed the instant offense after sustaining at least two convictions of a crime of violence (consequently, contributing to a base offense level of 24 in the PSR, instead of 20, under Andrews' calculations); (6) certain offense-level increases related to obstruction of justice, possession of a stolen firearm, use/possession of a firearm in connection with another felony offense, and, relatedly, the overall offense level; (7) the application of an enhanced sentence under the Armed Career Criminal Act, ("ACCA"), 18 U.S.C. § 924(e), based, in part, on two Minnesota convictions in 2011 for second-degree assault, allegedly uncounseled, as well as the effect of those convictions on his criminal history score; (8) counting the two 2011 second-degree assault convictions as separate predicate offenses, instead of as a single predicate offense, if any; (9) factual assertions related to a 2006 Minnesota third-degree assault conviction, as well as whether the third-degree assault conviction qualifies as a predicate offense under the ACCA; (10) factual assertions regarding a 2011 Minnesota conviction for fourth-degree assault on a correctional employee, as well as whether this offense qualifies as an ACCA predicate offense; (11) factual assertions concerning a 2016 Minnesota conviction for second-

degree burglary, as well as whether this offense qualifies as an ACCA predicate offense; (12) the inclusion in Andrews' criminal history score of an allegedly uncounseled 2016 Minnesota conviction for disorderly conduct; and (13) the criminal history score, application of the ACCA, and applicable Guidelines sentencing range. (Def.'s Sentencing Mem. [Doc. No. 309] at 1–15.)

Before the Court imposed Andrews' sentence of 262 months, the Court addressed his objections and stated its rulings and reasoning, in detail, on the record. This written opinion memorializes one aspect of the Court's rulings—namely, whether Andrews qualifies as an Armed Career Criminal under the ACCA based on the inclusion of two 2011 convictions for second-degree assault as ACCA predicate offenses. Andrews argued that these two convictions were obtained in violation of his Sixth Amendment right to counsel, and therefore do not qualify as ACCA predicate offenses. (Def.'s Sentencing Mem. at 5–6; 8–15; Def.'s Reply [Doc. No. 315] at 1–4.) This opinion addresses that particular argument.

## II. DISCUSSION

As relevant here, under the ACCA, a person who violates 18 U.S.C. § 922(g) and has three previous convictions for a "violent felony" committed on different occasions, is subject to a mandatory minimum term of imprisonment of not less than 15 years, 18 U.S.C. § 924(e), and an enhanced adjusted offense level under the Guidelines. U.S.S.G. § 4B1.4(b). As a general matter, the Eighth Circuit has held that Minnesota second-degree assault qualifies as a "violent felony" under the ACCA. *United States v. Lindsey*, 827 F.3d 733, 740 (8th Cir. 2016).

Andrews argues, however, that the second-degree assault convictions were obtained in violation of his right to counsel, and therefore, are not valid ACCA predicate offenses. (Def.'s Sentencing Mem. at 5–6; 8—15; Def.'s Reply at 1–4.)  The convictions resulted from a 2011 jury trial in Minnesota state court before the Hon. Patricia Kerr Karasov.  Andrews represented himself at trial.  *See State v. Andrews*, Nos. A11-2200, A11-2201, 2012 WL 5834450 (Minn. Ct. App. Nov. 19, 2012), *review denied*, Aug. 19, 2014.  While Andrews was initially represented by appointed counsel, after the trial began, he asked to represent himself due to a "conflict of interest" with his attorney. *Id.* at \*3.  Judge Karasov granted his request to proceed pro se and designated his appointed counsel as standby counsel. *Id.*  Here, at sentencing, in support of his argument that these convictions cannot serve as qualifying ACCA convictions, Andrews argues that: (1) Judge Karasov provided an inadequate warning pursuant to *Faretta v. California*, 422 U.S. 806 (1975), failing to advise him of the risks of self-representation; and (2) she also failed to provide substitute appointed counsel when he asked for new counsel, thus "forcing him" to represent himself.  (*See* Def.'s Sentencing Mem. at 5, 8–15; Def.'s Reply at 1–5; Def.'s Supp'l Mem. [Doc. No. 318] at 1–4.)

In *Custis v. United States*, 511 U.S. 485 (1994), the Supreme Court held that a defendant in a federal sentencing proceeding has no constitutional right to collaterally attack the validity of a prior state court conviction used to enhance his sentence under the ACCA, unless, under a narrow exception, the conviction was obtained in violation of his right to counsel.  While the government bears the initial burden of establishing the fact of conviction, the defendant must demonstrate that the conviction was "constitutionally infirm." *United*

*States v. Levering*, 431 F.3d 289, 294 (8th Cir. 2005) (quoting *Moore v. United States*, 178 F.3d 994, 997 (8th Cir. 1999)).

The facts of *Custis* concerned the denial of the right to counsel altogether, which is not the case here. 511 U.S. at 496. In fact, in *Custis*, the Supreme Court declined to extend collateral review at sentencing to cases in which a defendant alleges mere ineffective assistance of counsel, noting that doing so "would require sentencing courts to rummage through frequently nonexistent or difficult to obtain state-court transcripts or records that may date from another era, and may come from any one of the 50 States." *Id.* However, the Eighth Circuit has entertained broader claims for collateral review at sentencing of an ACCA predicate conviction where the defendant asserted insufficient waiver of his right to counsel, as opposed to the denial of the right to counsel altogether. *See United States v. Armstrong*, 554 F.3d 1159 (8th Cir. 2009) (reviewing defendant's claim, but finding waiver was adequate, and remanding for resentencing under the ACCA).

In *Armstrong*, the Eighth Circuit observed that "[t]he Sixth Amendment provides a criminal defendant the right to counsel and the corresponding right to waive the right to counsel and proceed pro se. *Id.* at 1165 (citing *United States v. Patterson*, 140 F.3d 767, 774 (8th Cir.1998) (internal citation omitted). If the right to counsel is waived, the waiver must be knowing, intelligent, and voluntary. *Id.* (citing *United States v. Crawford*, 487 F.3d 1101, 1105 (8th Cir. 2007)); *see also State v. Rhoads*, 813 N.W.2d 880, 885–86 (Minn. 1995). That standard is met "if the trial court specifically informed the defendant of the dangers and disadvantages of self-representation, or if the entire record evidences the defendant knew and understood the disadvantages." *Armstrong*, 554 F.3d at 1165 (citing *Crawford*, 487 F.3d at

1105-06). Courts look to "'the background, experience, and conduct of the accused . . . [including] the defendant's past contacts with the criminal justice system and his performance at the proceeding at which he represented himself.'" *Id.* (quoting *Ferguson v. Bruton*, 217 F.3d 983, 985 (8th Cir. 2000) (per curiam) (quoted source and internal marks omitted)).

Applying this standard to the facts in *Armstrong*, the court found that while the trial court "did not engage in a specific colloquy with Armstrong regarding the dangers and disadvantages of proceeding unrepresented on the [criminal charge]," after reviewing the entire record, the court was convinced that Armstrong made a voluntary, intelligent, and knowing waiver of his right to counsel. *Id.*; *see also Rhoads*, 813 N.W.2d at 885–86 (finding that a district court's failure to conduct an on-the-record inquiry regarding waiver "does not require reversal when the particular facts and circumstances of the case demonstrate a valid waiver."); *State v. Krejci*, 458 N.W.2d 407, 412 (Minn. 1990) (noting that while the district court did not make a full, on-the-record *Faretta* inquiry at hearing at which defendant ultimately acted pro se, surrounding circumstances made clear that defendant was aware of the consequences of self-representation).

The Eighth Circuit noted in *Armstrong* that by the time of the defendant's waiver, he had had extensive prior contact with the criminal justice system, including prior self-representation. 554 F.3d at 1165. Moreover, the court considered Armstrong's conduct at the plea and sentencing hearing, finding that Armstrong responded to the court's questions, confirming that he had discharged his counsel, did not want counsel, believed he had no reason for counsel, and understood that counsel would not be advising him or representing his interests. *Id.* at 1166. The court further noted that Armstrong later affirmed that he

planned to proceed without counsel and indicated at various points that he understood the proceedings. *Id.* The court also observed that Armstrong's performance at the plea and sentencing hearing was "sophisticated and intelligent," noting that he advocated for a concurrent sentence and credit for time served, and had also successfully moved for discovery materials. *Id.* Accordingly, based on "Armstrong's criminal history, along with his conduct and performance at his plea and sentencing hearing," the court found that his waiver was constitutional, and therefore, the conviction could be counted under the ACCA. *Id.*

Here, although the record from Andrews' 2011 convictions, nearly nine years later, is incomplete, the Court is convinced that Andrews' waiver of the right to counsel was knowing, intelligent, and voluntary, for the reasons discussed below.

### A. Andrews' Direct Appeal to the Minnesota Court of Appeals

First, the Court notes that Andrews has never before asserted the denial of his right to counsel with respect to the 2011 second-degree assault convictions—not on direct appeal, when he was represented by counsel, nor by filing a motion for postconviction relief or a habeas petition. Rather, Andrews raised this issue for the very first time nearly nine years later, on the eve of sentencing in the instant federal case.

The Court looks preliminarily to the opinion of the Minnesota Court of Appeals in Andrews' direct appeal of the second-degree assault convictions. In 2012, the Minnesota Court of Appeals observed that Andrews had twice asked to represent himself during the 2011 proceedings. *Andrews*, 2012 WL 5834450, at \*2–3. As to Andrews' final request, the appellate court stated, "After the trial began, Andrews again asked to represent himself, asserting a "conflict of interest" with his appointed counsel. The district court granted the

request and designated appointed counsel as standby counsel." *Id.* at *3. The Minnesota Court of Appeals made this factual finding—that Andrews asked for, and was granted, the right of self-representation—with the advantage of the full district court record.

### B. Numerous On-the-Record Discussions Between Andrews and the Trial Court About Self-Representation

From the portions of the trial court record that remain available, it is apparent that Judge Karasov discussed self-representation with Andrews on several occasions during the 2011 proceedings. Andrews expressed a clear, informed understanding of his options and his choice to proceed pro se, as discussed below.

#### 1. March 2, 2011 Hearing

At a March 2, 2011 court appearance, Andrews voiced disagreement with his public defender, Michelle Hayes. He asked for new representation, claiming that Hayes had a "conflict of interest," and was conspiring with the prosecution and Judge Karasov. (Jt. Ex. 1[2] [Doc. No. 313] (Mar. 2, 2011 Hr'g Tr.) at 10–11; 15.) Judge Karasov advised Andrews that he could keep his public defender, hire his own attorney, seek an attorney from the Legal Rights Center, or possibly represent himself. (*Id.* at 10–20.) However, Judge Karasov declined to appoint a different public defender. (*Id.*) She gave Andrews a form to review and complete if he chose to petition to represent himself. (*Id.* at 15.)

#### 2. May 19, 2011 Hearing

At a subsequent hearing on May 19, 2011, prompted by a letter from Andrews to Judge Karasov that appears to now be unavailable, Andrews again accused Ms. Hayes of conspiring

---

[2] Joint Exhibits 1–4 are found at Doc. No. 313.

with the prosecution, and he requested new counsel. (Jt. Ex. 2 (May 19, 2011 Hr'g Tr.) at 1.)

He engaged in the following colloquy with the judge:

> ANDREWS: Your Honor, I typically don't want to go pro se, but if it came
> down to her or, you know what I'm saying, me going pro se—I mean, I want—
> but I want a different alternative.
>
> THE COURT: Well, you're not getting a different attorney.
>
> ANDREWS: I said alternative. Something—something got to—something
> got to give. We don't have no—
>
> THE COURT: You're not getting a different attorney, so that's a choice you
> need to make.

*Id.* at 17–18.

Although Andrews accused Hayes of "not filing [his] motions," (*id.* at 3), Ms. Hayes

explained on the record that as an officer of the court, she was prohibited from filing frivolous

motions. (*Id.* at 25.) Ms. Hayes remained as Andrews appointed counsel at the conclusion

of the hearing. (*See id.* at 23.)

Also at the hearing, Andrews actively participated in identifying witnesses that he

wanted to subpoena, and described certain video footage that he hoped to obtain in discovery,

showing a clear understanding of his case and the mechanics of putting on a defense. (*Id.* at

6–16.)

### 3. June 7, 2011 Hearing

At a hearing on June 7, 2011, Andrews again raised the issue of self-representation.

(*See* Jt. Ex. 3 (June 7, 2011 Hr'g Tr.) at 4.) By that time, in addition to Ms. Hayes, another

public defender, Julius Nolen, represented Andrews as well. (*Id.*) The Chief Public Defender,

Bill Ward, appeared at the hearing. (*Id.* at 4–5.) In response to Andrews' prior criticism of

counsel, Mr. Ward vouched for the work of Ms. Hayes and Mr. Nolen. (*Id.*) In particular, he described his review of the case, including the pretrial motions that counsel had filed, and stated that he was "more than satisfied with what's been done in this case." (*Id.* at 6.) Further, he stated, "And I'm not only supportive of, but I would handle the matter the . . . same way that Ms. Hayes and Mr. Nolen are." (*Id.* at 6–7.)

> The Court then addressed Andrews:
>
> THE COURT: All right. So Mr. Andrews, you're going to have to make a decision—well, first, we're going to have to get a different trial date, and you're going to have to make a decision whether you're going to represent yourself, whether you're going to let Mr. Nolen o[r] Ms. Hayes represent you, or how you want to proceed.
>
> ANDREWS: Your Honor, with all due respect, this is not—it's not even a fair option that I'm being given here. She's not—they're not—what you're not understanding is they're not even—we're not even discussing my case. No one—
>
> THE COURT: Mr. Andrews, how long have you been a lawyer? Sitting—standing right in front of you are three lawyers that probably have 60 years' worth of experience.
>
> ANDREWS: And they all on the same payroll as her. It's not no secret that they swap cases out. They're not going to swap me out.
>
> THE COURT: You can have your opinion about that, but I've been around 30 years, myself, and that isn't the case.

(*Id.* at 7.)

In response to Andrews' questions about how to obtain witness subpoenas and discovery, Judge Karasov advised him that Ms. Hayes and Mr. Nolen could assist him as standby counsel, although one of the risks of self-representation was the additional difficulty in contacting potential trial witnesses. (*Id.* at 12–13.)

### 4. July 27, 2011 Trial, Day 1

On July 27, 2011—the date set for trial—the issue of self-representation arose again. Although Andrews again expressed dissatisfaction with his counsel, and his inability to conduct voir dire himself, he agreed to their representation, stating:

> Okay. Look, I just want to put on the record that, like I said, I feel like ineffective counsel. There's a conflict of interest with them. I've been stating that from the beginning. I tried to get them removed. They can do their thing. We can continue on. I'm going to be appropriate here. I'm going to sit back and let them do their thing. But I want it on the record that, yes, we've already discussed this before, so I feel I don't got to go through it again.

(Jt. Ex. 4 (July 27–28, 2011 Trial Tr.) at 18.)

After jury selection, however, Andrews changed his mind and decided to represent himself. (*Id.* at 28) (stating, "I'd rather represent myself" than proceed "with this counsel.") Although Judge Karasov did not engage in a full colloquy with Andrews about the risks of self-representation at that time, she did advise Andrews that he would be held to the rules of evidence and criminal law. (*Id.* at 29.) She also directed Ms. Hayes and Mr. Nolen to remain at counsel table, rather than sit in the back of the courtroom, as was apparently customary. (*Id.* at 28.) The jury then entered the courtroom and proceedings got underway. (*Id.* at 31.) At the time for defense opening statements, Judge Karasov asked Andrews if he was prepared to give an opening statement or would prefer that standby counsel deliver it, giving Andrews another opportunity to change his mind and accept representation. (*Id.* at 44.) Andrews gave the opening statement himself. (*Id.* at 45.)

## 5. July 28, 2011 Trial, Day 2

On the second day of trial, Judge Karasov engaged in a lengthy colloquy with Andrews, which included the following:

> THE COURT: [Y]esterday, Mr. Andrews decided to represent himself in this matter, and Mr. Nolen and Ms. Hayes are his standby counsel. And I didn't go through a complete waiver because Mr. Norris already—I mean Mr. Andrews had already filled out a Petition to Proceed as Pro Se Counsel on March 2, 2011. And I just wanted to go over that with you, Mr. Andrews. Do you recall filling out that form?
>
> ANDREWS: Yes.
>
> THE COURT: Okay. And on this form, it indicates that you're able to read and write; that you're familiar with the criminal system—justice system; that you read the complaint; and that you understand the charges against you, two times Prohibited Person in Possession, and two times Second Degree Assault; that you discussed your desire to represent yourself with Ms. Michelle Hayes, and now, I assume, you have also discussed it with Mr. Nolen.
>
> ANDREWS: No.
>
> THE COURT: You haven't discussed it with Mr. Nolen?
>
> ANDREWS: I haven't discussed it with no one.
>
> THE COURT: Well, you talked to both of them, but you don't want them to represent you, right?
>
> ANDREWS: Yeah, I did that.
>
> ***
>
> THE COURT: And it says here that you understand you do have an absolute right to have an attorney representing you, right?
>
> ANDREWS: Yes.
>
> THE COURT: Okay.

ANDREWS:  Well, there's —yeah, I understand that I have a right to have this public defender represent me.  But like I said, there's a, you know, a conflict of them.

THE COURT:  Yes.  And like I've told you, you're not getting a new public [defender].

ANDREWS:  I don't want a new public defender.  I would like—if you can give me some type of other counsel, pro bono, however.

THE COURT:  I cannot give you any other pro bono attorney.

ANDREWS:  I got no legal, law stuff like that, so —

THE COURT:  And it's also my understanding that in the past you indicated you were going to get your own private attorney and you never did, which is why the public defenders have remained on your case.

ANDREWS:  Yes, because since then I have lost my fiancée in the process of dealing with this case.  I have lost my cars.  You know, a lot of things have happened with this case.

THE COURT:  Okay.  And you understand that by making your decision to represent yourself after the jury selection that you're bound by the same rules as an attorney?  Do you understand that?

ANDREWS:  I don't know no rules of no attorneys.

THE COURT:  All right.  Well, you gave a very good opening statement.  I'll tell you that.  You've been in court before, right?

ANDREWS:  Yes, but no trial.

THE COURT:  Okay.  And what you need to understand, that in making any decisions regarding this case, you have the right to consult with your advisory counsel at any time during the trial.  Do you understand that?

ANDREWS:  Yes.

***

THE COURT:  Okay.  Al[]right.  And you are under no obligation to accept the representation of the public defender's office, but I've determined that you

possibly might need some legal assistance and that's why they're going to be here. Okay. Do you understand the maximum penalty that you're facing on this matter, I believe, is 180 months? Do you understand that?

ANDREWS: Yes.

(*Id.* at 82–83; 86–87; 90.)

During this colloquy, Andrews also argued that Ms. Hayes and Mr. Nolen were not prepared to try the case because they failed to obtain certain witness testimony from a gas station employee and video surveillance footage from the station. (*Id.* at 90.) However, Ms. Hayes stated that within a week of being assigned the case, she asked an investigator to explore this evidence, but found nothing helpful to Andrews' case. (*Id.* at 92–93.) She further stated that she so advised Mr. Andrews, and declined to expend additional resources investigating what she considered a "dead end" as early as January 2011. (*Id.* at 93.)

After further discussion about the status of the evidence, Judge Karasov resumed her *Faretta* inquiry:

THE COURT: So you feel that this is the best decision for you to represent yourself?

ANDREWS: You know, at this point, I'm at the mercy of the courts. It's an unfair thing. You know, I'm not getting nothing, so let's just get it started. Let's go on with this railroad.

THE COURT: Al[]right. I just want to put on the record that even after you signed this petition to represent yourself, this has been an ongoing issue with you, and you've changed your mind several times. And I have a letter I received from you on May 17, 2011, again wanting to fire your public defender, Michelle Hayes, and wanting to go pro se. So you've made that request several times during these proceedings, and then you've changed your mind several times and—

ANDREWS: Because you didn't take her off.

THE COURT: I just want to make sure that you understand you have an absolute right to represent yourself, and you're being granted that right. And I have your indication of that desire from March in writing, and I just need to confirm that that is your decision again here today.

ANDREWS: I can't go on with them. Yes. Yes, that's my decision.

(*Id.* at 96–97.)

While Andrews argues that he never expressly asked to proceed pro se, but was forced to do so, in violation of the Sixth Amendment, the Court disagrees. In *United States v. Conklin*, 835 F.3d 800, 804–05 (8th Cir. 2016), the Eighth Circuit considered similar claims of a Sixth Amendment violation from a defendant who refused to expressly state whether he wished to be represented by counsel or to represent himself. Despite the trial court's warnings about the dangers of self-representation, the defendant in *Conklin* categorically refused appointed counsel, refused to retain an attorney, but represented that he was seeking one, and ignored the court's deadline for resolving the issue. *Id.* at 805. On appeal following his pro se conviction, the Eighth Circuit observed that "[i]t is clear that a defendant cannot manipulate this Sixth Amendment right in order to delay or disrupt his trial." *Id.* at 804 (citation & quotation omitted). Accordingly, the court noted, "it is well-established that an accused can waive his right to counsel by conduct." *Id.* Thus, "'where a defendant is warned that he must choose between continuing with court-appointed counsel or proceeding pro se, the defendant's choice to discharge the appointed counsel constitutes a knowing and intelligent waiver of the right to the assistance of counsel.'" *Id.* (quoting *United States v. Sanchez-Garcia*, 685 F.3d 745, 751 (8th Cir. 2012)).

As in *Conklin*, 835 F.3d at 805, the trial court here discussed the subject of self-representation with Andrews on multiple occasions, including the risks. Andrews knew that he could find retained counsel, use the services of appointed counsel, or represent himself. All of Andrews' on-the-record discussions with the trial court support a finding that he made a knowing, voluntary, and intelligent waiver of his right to counsel through his conduct. Although Judge Karasov did not conduct a full *Faretta* inquiry on the first day of trial, the context is important, as the jury had been selected and was waiting. She conducted a fulsome inquiry the following day. *See Armstrong*, 554 F.3d at 1165 (noting that waiver is knowing, intelligent, and voluntary where the trial court specifically informs the defendant of the dangers of self-representation, or the entire record shows that the defendant knew and understood the risks). There is ample evidence here to find that Andrews was adequately aware of the risks of self-representation. Moreover, as discussed below, there is also written evidence that Andrews provided to the trial court establishing his waiver of the right to counsel.

### C.  Written Evidence of Adequate Waiver

As reflected in the transcripts discussed above, Andrews prepared and signed a state court form entitled "Petition to Proceed as Pro Se Counsel." (Gov't's Sentencing Mem., Ex. 3 (Pro Se Pet. [Doc. No. 311-3]). On the petition, Andrews indicated that he had received and read the criminal complaint, fully understood the charges against him, had discussed self-representation with his appointed counsel, and was aware of the evidence that the prosecution would use against him. (*Id.* at 1–2.) Andrews indicated that he wished to waive his right to counsel, and understood the following:  (1) his pretrial rights; (2) the dangers of self-

incrimination or perjury, if he chose to testify; (3) his rights at trial, including the right to subpoena witnesses; (4) the penalties that he faced if found guilty; (5) his eligibility for a public defender; (6) the procedure for obtaining investigative services; (7) the expectation that he conduct his own legal research; (8) advisory counsel could be appointed and, if so appointed, would be present for all court appearances, but could not initiate motions, objections, arguments, or any other aspect of representation without his prior approval; (9) if he chose to relinquish the right of self-representation, the court would not automatically grant that request, but would consider the circumstances, including whether advisory counsel would be prepared to take over, and whether the jury had been sworn; and (10) if he relinquished the right of self-representation, the trial date might be continued, if requested by new counsel, or a mistrial be declared and the trial date reset. (*Id.* at 2–4.) Judge Karasov approved Andrews' signed Petition. (*Id.* at 4.)

Moreover, although the Court does not have the benefit of a May 17, 2011 letter from Andrews to Judge Karasov, the Court notes that Judge Karasov referenced that letter in her July 28, 2011 colloquy with Andrews, stating, "I have a letter I received from you on May 17, 2011, again wanting to fire your public defender, Michelle Hayes, and wanting to go pro se. So you've made that request several times during these proceedings, and then you've changed your mind several times[.]" (Jt. Ex. 4 (July 27–28, 2011 Trial Tr.) at 96–97.)

Andrews' Petition to Proceed as Pro Se Counsel, which he signed, and the Court's representation that he made another written request to proceed pro se, further supports the Court's finding here that his decision to represent himself in the 2011 second-degree assault proceedings was knowing, intelligent, and voluntary.

### D. Familiarity with Criminal Justice System & Ability to Represent Himself

As noted in *Armstrong*, among the things that courts consider when evaluating whether the waiver of representation complies with the Sixth Amendment's right to counsel, are the defendant's past contacts with the criminal justice system and his performance at the proceeding at which he represented himself. 554 F.3d at 1165 (citing *Crawford*, 487 F.3d at 1105).

At the time of the 2011 second-degree assault proceedings, Andrews was well acquainted with the criminal justice system. He acknowledged that familiarity in the Petition to Proceed as Pro Se Counsel (Gov't's Sentencing Mem., Ex. 3 (Pro Se Pet.) at 1) (stating, in response to an inquiry, "I am familiar with the criminal justice system and procedures in American [law] by way of: Prior appearances in criminal court[.]"). Indeed, at the time of the 2011 proceedings, Andrews already had eight juvenile adjudications and ten adult convictions. (*See* PSR at pp. 4–7; 9–14.) This familiarity with the criminal justice system lends support to a finding that Andrews' waiver to the right to counsel complied with the Sixth Amendment.

Moreover, the record reflects that although the jury convicted Andrews, he capably represented himself at trial. *See Armstrong*, 554 F.3d at 1165. Judge Karasov complimented him on his opening statement, (Jt. Ex. 4 (July 27–28, 2011 Trial Tr.) at 87), and also noted that he had properly impeached a witness. (Gov't's Supp'l Response [Doc. No. 321], Ex. 1 (July 28, 2011 Trial Tr.) at 152.) Moreover, in rejecting Andrews' pro se argument of judicial bias, the Minnesota Court of Appeals stated in its ruling on his direct appeal that Judge Karasov had overruled objections from the prosecution, prompted "proper questioning" from

Andrews, admitted certain evidence over the state's objections, allowed Andrews to "fully cross-examine" the state's witnesses, overruled each of the state's objections during his closing argument, and denied the state's motion to sentence Andrews as a career offender at that time. *Andrews*, 2012 WL 5834450, at *7. This lends further support to a finding that Andrews adequately represented himself at trial, and that he adequately waived his Sixth Amendment rights.

Accordingly, the Court finds that Andrews' background, experience, and conduct demonstrate that he knew and understood the disadvantages of self-representation. *Armstrong*, 554 F.3d at 1165; *Ferguson*, 217 F.3d at 985.

For all of the foregoing reasons, the Court is convinced that Andrews' waiver of his right to counsel with respect to the 2011 second-degree assault proceedings was knowing, intelligent, and voluntary. Over a period of nearly nine years, Andrews has never asserted this argument in any appeal or petition in state or federal court, including when he was represented by counsel on direct appeal. The Minnesota Court of Appeals noted in its ruling on Andrews' direct appeal that he had waived his right to counsel. *Andrews,* 2012 WL 5834450, at *2–3. Moreover, the district court transcripts here show many discussions between Andrews and the trial court about self-representation, including discussions about its perils. In addition, Andrews submitted a signed, written Petition to Proceed Pro Se to the trial court, evidencing his clear understanding of the charges against him, the prosecution's evidence, his right to counsel, his right to appointed counsel, his right to self-representation, the dangers of self-representation, and the expectations and standards to which he would be held. (Gov't's Sentencing Mem., Ex. 3 (Pro Se Pet.).) He also appears to have submitted a

letter to the trial court, asking to proceed pro se. (*See* Jt. Ex. 4 (July 27–28, 2011 Trial Tr.) at 96–97.) Andrews was no stranger to the criminal justice system at the time of his waiver, having accumulated eight juvenile adjudications and ten adult convictions, and he ably performed his defense. Although Judge Karasov did not conduct a full *Faretta* inquiry on the first day of trial, when, with the jury just selected and trial imminently underway, Andrews chose to proceed pro se, the entire record shows that Andrews knew and understood the disadvantages of self-representation. *Armstrong*, 554 F.3d at 1165. Judge Karasov provided a fulsome *Faretta* warning the following day, and all of the other evidence in the record demonstrates that at the time Andrews elected to represent himself, his waiver of the right to counsel was knowing, intelligent, and voluntary. Andrews has failed to meet his burden of showing that his conviction was constitutionally infirm. *See Levering*, 431 F.3d at 294.

### E. Substitution of Counsel

Finally, in his supplemental briefing, Andrews asserts a slightly different Sixth Amendment argument: that because his relationship with trial counsel had irretrievably deteriorated, the district court should have appointed substitute counsel. (Def.'s Supp'l Mem. at 2–7.) He argues that the court's failure to do so violated his Sixth Amendment right to counsel. (*Id.*) The Court disagrees.

"A criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991). The Eighth Circuit has noted that "[w]hen faced with a motion to appoint substitute counsel, the district court must

balance several factors, including 'the need to ensure effective legal representation, the need to thwart abusive delay tactics, and the reality that a person accused of crime is often genuinely unhappy with an appointed counsel who is nonetheless doing a good job.'" *United States v. Barrow*, 287 F.3d 733, 738 (8th Cir. 2002) (quoting *Hunter v. Delo*, 62 F.3d 271, 274 (8th Cir.1995)).

As with his other Sixth Amendment argument, Andrews raised this for the first time at sentencing—in his supplemental memorandum, at that. Notably, there was no judicial finding of a breakdown in the attorney-client relationship or of an irreconcilable conflict by the trial court. Certainly, portions of the record, quoted above, show Andrews' dissatisfaction with appointed counsel. But while he identified a "conflict of interest," the perceived conflict of interest consisted of baseless accusations that his attorneys were conspiring with the prosecution and the court. The record contains no evidence whatsoever of any such conspiracy, and Judge Karasov, through her actions, rejected any such argument.

To the extent that the "conflict of interest" was a "conflict" between Andrews and his counsel, the record fails to show that any such conflict became irreconcilable, or that his attorneys were inadequate and unprepared to represent him at all times. Andrews initially obtained appointed counsel, and after complaining about Ms. Hayes, a second public defender was assigned to his case. (Jt. Ex. 3 (June 7, 2011 Hr'g Tr.) at 4.) When he refused to continue with the two court-appointed attorneys and chose to represent himself, the appointed attorneys remained on the case as standby counsel. (Jt. Ex. 4 (July 27–28, 2011 Trial Tr.) at 28.) Had Andrews made credible assertions of an irreconcilable conflict or a complete breakdown in the attorney-client relationship, the trial judge would not, in all likelihood, have appointed

Ms. Hayes and Mr. Nolen as standby counsel. Instead, she was satisfied that Andrews was able to work with them. Moreover, the record shows that a *third* public defender, Jane Imholte, joined Ms. Hayes and Mr. Nolen at trial as standby counsel. (*See* (Gov't's Supp'l Response, Ex. 1 (July 28, 2011 Trial Tr.) at 81; 177.)

The record also reflects that *all three* attorneys were well prepared to represent Andrews, and, in fact, did so at various times before and during trial. Before trial, Chief Public Defender Bill Ward investigated Andrews' complaints against his attorneys and found them meritless. (*See* Jt. Ex. 3 (June 7, 2011 Hr'g Tr.) at 4–7.) Moreover, Mr. Ward reported to the court that he was "more than satisfied" with the performance of counsel and would conduct the defense in the same way, were he assigned to the case. (*Id.* at 6–7.)

As noted, Andrews invoked his right to self-representation only after voir dire. During trial, Ms. Imholte cross examined at least one witness, with Andrews' permission. (Gov't's Supp'l Response, Ex. 1 (July 28, 2011 Trial Tr.) at 177.) Were the attorney-client relationship irretrievably broken or conflicted, it is unlikely that Andrews would have allowed her assistance at trial. The record further reflects that Andrews sought the guidance of standby counsel throughout the trial. At trial on July 28, 2011, Judge Karasov observed that "the record should reflect that Mr. Andrews has been consulting with his advisory counsel throughout the morning." (*Id.* at 152.) Near the end of the jury trial, Judge Karasov further commented that "throughout the trial, Mr. Andrews has been consulting frequently and meaningfully, it appears, with his advisory counsel." (Gov't's Supp'l Response, Ex. 2 (Aug. 2–3, 2011 Trial Tr.) at 495.) Despite Andrews' accusations and arguments to the contrary,

there was not a complete breakdown in attorney client communications or in the attorney-client relationship, nor was there an irreconcilable conflict.

Moreover, while Andrews accused counsel of failing to meet with him, and, indeed, Ms. Hayes eventually stated that she would no longer meet him in detention, (Jt. Ex. 1 (Mar. 2, 2011 Hr'g Tr.) at 19–20), the record reflects that Mr. Nolen and Ms. Hayes both met with him on several occasions. (*See, e.g.*, Jt. Ex. 3 (June 7, 2011 Hr'g Tr.) at 13) (Mr. Andrews, agreeing to speak with counsel following the hearing); Jt. Ex. 4 (July 27–28 Trial Tr.) at 95 (Mr. Nolen, stating that counsel sat down and played recorded evidence with Andrews on more than one occasion).

The facts here strongly support "'the reality that a person accused of a crime is often genuinely unhappy with an appointed counsel who is nonetheless doing a good job.'" *Barrow*, 287 F.3d at 738 (quoting *Hunter*, 62 F.3d at 274). Indeed, Andrews' dissatisfaction appears to have stemmed, primarily, from counsel's refusal, at times, to follow his directives, based on their professional judgment and ethical obligations as officers of the court. (Jt. Ex. 2 (May 19, 2011 Hr'g Tr.) at 25) ("Part of the concerns, Your Honor, involved the—issues of what are the purview of the attorney and our obligations are regarding frivolous motions, candor to the court, certain things like that. And we have—I have informed Mr. Andrews that I would not file frivolous motions, and I, as his attorney, would direct the investigation of the case and make the legal decisions [about] how the case proceeds. That's my understanding of my role as an attorney. That's what the three levels of supervisors above me have all confirmed.); *see also* Jt. Ex. 3 (June 7, 2011 Hr'g Tr.) at 5) ("I mean, I guess what I'd say is that we feel we've investigated the case properly and we're prepared for trial. We

think we've got an adequate defense to present. We've investigated every—regarding the videos, we've looked into that. We're satisfied we've done what we can."). This does not demonstrate the type of irreconcilable conflict or breakdown in communications or breakdown in the attorney-client relationship that supports the substitution of counsel. Andrews has not met his burden of establishing that his Sixth Amendment rights were violated when the trial court refused to substitute counsel. *See Levering*, 431 F.3d at 294.

## III.  CONCLUSION

For all of the foregoing reasons, the Court holds that Andrews was not deprived of his right to counsel in connection with the two Minnesota 2011 convictions for second-degree assault. Accordingly, these convictions are qualifying ACCA predicate offenses. Andrews' objections on this basis are overruled.


Dated:  March 23, 2020                          s/Susan Richard Nelson
                                                SUSAN RICHARD NELSON
                                                United States District Judge